UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

IN RE: XEROX SECURITIES LITIGATION

Civil Action No. 3:99-CV-2374 (AWT)

May 29, 2008

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO EXCLUDE THE PROFFERED EXPERT TESTIMONY OF
ANTHONY SAUNDERS, LEE BUCHWALD AND CHARLES DROTT**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

EXPLANATION OF CITATION CONVENTIONS .......................................................v

Background ..................................................................................................................1

Summary of Argument ................................................................................................2

Argument .....................................................................................................................4

I.      APPLICABLE LEGAL STANDARDS. ...........................................................4

II.     PROF. SAUNDERS SHOULD BE PRECLUDED FROM TESTIFYING
        THAT PLAINTIFFS SUFFERED ECONOMIC LOSS FROM THE
        FRAUD ALLEGED IN THE COMPLAINT. .....................................................6

        A.      The Loss Causation Standard...................................................................6

        B.      Prof. Saunders's Methodology Is Unreliable to Prove Loss
                Causation.................................................................................................7

        C.      Prof. Saunders Cannot Show That the Alleged Corrective
                Disclosures Contained New Information................................................12

        D.      Prof. Saunders Did Not Disaggregate Reliably the Effect of
                Allegation-Related News From Other Factors. ......................................15

        E.      Prof. Saunders Cannot Prove that the Alleged Corrective
                Disclosures Revealed Some Aspect of the Alleged Fraud.....................17

        F.      Prof. Saunders Failed to Comply with Fed. R. Civ. P. 26. ...................19

III.    MR. BUCHWALD'S TESTIMONY SHOULD BE EXCLUDED IN ITS
        ENTIRETY.......................................................................................................21

        A.      Mr. Buchwald Failed to Conduct Any Analysis....................................21

        B.      Mr. Buchwald Is Not Qualified. ...........................................................24

        C.      Mr. Buchwald Attempts to State Ultimate Legal Conclusions..............26

IV.     MR. DROTT'S TESTIMONY SHOULD BE EXCLUDED IN ITS
        ENTIRETY.......................................................................................................27

        A.      Mr. Drott's Disclosure Opinions Are Not Based on Any Reliable
                Theory or Methodology. ........................................................................29

        B.      Mr. Drott's Accounting Analysis Is Based on Unsupported Factual
                Assumptions............................................................................................33

        C.      Mr. Drott Impermissibly Attempts To Opine on Scienter. ....................36

Conclusion .................................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Amorgianos v. Nat'l R.R. Passenger Corp.,
  303 F.3d 256 (2d Cir. 2002)...................................................................................5, 6

AstraZeneca LP v. Tap Pharm. Prods., Inc.,
  444 F. Supp. 2d 278 (D. Del. 2006)............................................................................25

Baker v. Urban Outfitters, Inc.,
  254 F. Supp. 2d 346 (S.D.N.Y. 2003)..............................................................5, 10, 26

Bell v. Ascendant Solutions, Inc.,
  422 F.3d 307 (5th Cir. 2005) ....................................................................................11

Berk v. St. Vincent's Hosp. & Med. Ctr.,
  380 F. Supp. 2d 334 (S.D.N.Y. 2005)........................................................................33

Carpe v. Aquila, Inc.,
  No. 02-0388-CV-W-FJG, 2005 WL 1138833 (W.D. Mo. Mar. 23, 2005)............11, 19

Daubert v. Merrell Dow Pharms., Inc.,
  509 U.S. 579 (1993)......................................................................................... passim

Dreyer v. Ryder Auto. Carrier Group, Inc.,
  367 F. Supp. 2d 413 (W.D.N.Y. 2005)............................................................5, 25, 26

Feinberg v. Katz,
  No. 01 Civ. 2739(CSH), 2007 WL 4562930 (S.D.N.Y. Dec. 21, 2007) ....................27

Fener v. Belo Corp.,
  Civil Action No. 3:04-CV-1836D, 2008 WL 876967 (N.D. Tex. Apr. 2, 2008) ........15

Freeland v. Iridium World Commc'ns, Ltd.,
  Civil Action No. 99-1002, 2008 WL 906388 (D.D.C. Apr. 3, 2008)..........................19

Fyfe v. Baker,
  No. 1:06-CV-28, 2007 WL 1866882 (D. Vt. June 28, 2007) .....................................20

Hill v. City of New York,
  No. 03-CV-1283 (ARR) (KAM), 2007 WL 1989261 (E.D.N.Y. July 5, 2007)..............
  ..........................................................................................................6, 24, 29, 30, 31

Hill v. Equitable Bank, Nat'l Ass'n,
  Civ. A. No. 82-220, 1987 WL 8953 (D. Del. Mar. 3, 1987) ......................................27

**Page(s)**

In re Omnicom Group, Inc. Sec. Litig.,
No. 02 Civ. 4483 (WHP), 2008 WL 243788 (S.D.N.Y. Jan. 29, 2008) .............. passim

In re PNC Fin. Servs. Group, Inc.,
440 F. Supp. 2d 421 (W.D. Pa. 2006).............................................................................8

In re Rezulin Prods. Liab. Litig.,
309 F. Supp. 2d 531 (S.D.N.Y. 2004)..................................................................25, 36

In re Williams Sec. Litig.,
496 F. Supp. 2d 1195 (N.D. Okla. 2007)...................................................................7, 18

In re Xcelera.com Sec. Litig.,
Civil Action No. 00-11649-RWZ (D. Mass. Apr. 25, 2008) .................7, 9, 10, 12, 13

In re Zonagen, Inc. Sec. Litig.,
322 F. Supp. 2d 764 (S.D. Tex. 2003) .............................................................. passim

Kuhmo Tire Co. v. Carmichael,
526 U.S. 137 (1999)......................................................................................................4, 6

LaBarge v. Joslyn Clark Controls, Inc.,
No. 03-CV-169S, 2006 WL 2795612 (W.D.N.Y. Sept. 26, 2006)..................24, 29, 31

Lentell v. Merrill Lynch & Co.,
396 F.3d 161 (2d Cir. 2005)........................................................................... passim

Macaluso v. Herman Miller, Inc.,
No. 01 Civ. 11496 (JGK), 2005 WL 563169 (S.D.N.Y. Mar. 10, 2005) .............34, 35

Major v. Astrazeneca, Inc., Nos. 5:01-CV-618 (Lead) (FJS/GJD), 5:00-CV-1736
(Member) (FJS/GJD), 2006 WL 2640622, (N.D.N.Y. Sept. 13, 2006)......................20

McKowan Lowe & Co. v. Jasmine, Ltd.,
No. Civ. 94-5522 RBK, Civ. 96-2318 RBK, 2005 WL 1541062
(D.N.J. June 30, 2005) ................................................................................................8

Nimely v. City of New York,
414 F.3d 381 (2d Cir. 2005)...........................................................................................5

Oscar Private Equity Invs. v. Allegiance Telecom, Inc.,
487 F.3d 261 (5th Cir. 2007) ......................................................................................15

Oxford Gene Tech. Ltd. v. Mergen Ltd.,
345 F. Supp. 2d 431 (D. Del. 2004)............................................................................25

**Page(s)**

Pugliano v. United States,
 315 F. Supp. 2d 197 (D. Conn. 2004) ................................................................. passim

Rieger v. Orlor, Inc.,
 427 F. Supp. 2d 99 (D. Conn. 2006) ................................................................. passim

RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,
 No. 94 Civ. 5587 PKL RLE, 2000 WL 310352 (S.D.N.Y. Mar. 24, 2000) .................8

Ryan v. Flowserve Corp.,
 245 F.R.D. 560 (N.D. Tex. 2007) ............................................................10, 11, 18, 19

San Leandro Emergency Med. Group Profit Sharing Plan v. Philip,
 75 F.3d 801 (2d Cir. 1996) ..............................................................................................26

Smith v. Herman Miller, Inc.,
 No. CV-03-5358 (CPS), 2005 WL 2076570 (E.D.N.Y. Aug. 26, 2005)........24, 30, 31

Teachers' Ret. Sys. of La. v. Hunter,
 477 F.3d 162 (4th Cir. 2007) .......................................................................12, 13, 14

United States v. Scop,
 846 F.2d 135 (2d Cir. 1988)..........................................................................................27


**STATUTES & RULES**

Fed. R. Civ. P. 26 .................................................................................................3, 19, 20

Fed. R. Civ. P. 37(c) .............................................................................................................20

Fed. R. Evid. 702 ........................................................................................................2, 4, 5, 33


**OTHER AUTHORITIES**

Mark P. Kritzman, What Practitioners Need To Know About Event Studies,
 Fin. Analysts J., Nov.-Dec. 1994 .................................................................................8

A. Craig MacKinlay, Event Studies in Economics and Finance,
 35 J. Econ. Literature 13 (1997) .................................................................................8

## EXPLANATION OF CITATION CONVENTIONS

The following citation conventions will be used throughout this Memorandum:

- "Complaint" for references to the Amended Consolidated Class Action Complaint for Violations of Federal Securities Laws, dated April 28, 2000.

- "Buchwald Report" for references to the Expert Report of Lee E. Buchwald, dated October 15, 2007.

- "Buchwald Tr." for references to the deposition testimony of Lee E. Buchwald, dated December 18, 2007.

- "Drott Report" for references to the Expert Report of Charles R. Drott, dated October 15, 2007.

- "Drott Tr." for references to the deposition testimony of Charles R. Drott, dated January 24, 2008.

- "Saunders Report" for references to the Expert Report of Professor Anthony Saunders, dated October 15, 2007.

- "Saunders Tr." for references to the deposition transcript of Professor Anthony Saunders, dated December 20, 2007.

- "Gompers Report" for references to the Expert Report of Professor Paul A. Gompers, dated February 8, 2008.

- "Gompers Tr." for references to the deposition transcript of Professor Paul Gompers, dated April 8, 2008.

- "Wyatt Report" for references to the Expert Report of Arthur R. Wyatt, dated March 17, 2008.

- "Kabureck Tr." for references to the deposition transcript of Gary Kabureck, dated April 28, 2004.

- "Fulford Tr." for references to the deposition transcript of Patrick Fulford, dated May 6, 2004.

- "Baugher Tr." for references to the deposition transcript of Kenny R. Baugher, dated January 13-14, 2004.

- "Croessmann Tr." for references to the deposition transcript of Diane Croessmann, dated March 2, 2004.

- "Topper Decl., Ex. [ ]" for references to exhibits to the Declaration of Prana A. Topper, dated May 29, 2008.

Defendants Xerox Corporation ("Xerox"), Paul A. Allaire, G. Richard Thoman and Barry D. Romeril (collectively, "Defendants") respectfully submit this memorandum in support of their motion to exclude the proffered expert testimony of Anthony Saunders, Lee Buchwald and Charles Drott.

## Background

Plaintiffs allege that Defendants violated Section 10(b) and Rule 10b-5 of the Securities Exchange Act by misrepresenting the success of a global restructuring program announced by Xerox in April 1998 (the "Worldwide Restructuring"). In particular, plaintiffs allege that Xerox misled investors by reporting that it had achieved "benefits" from the Worldwide Restructuring, while failing to report that it had experienced operational problems with one of the Worldwide Restructuring's 150 initiatives--namely, the reorganization of customer administrative support operations that were part of the Customer Business Operations in the United States (the "CBO Reorganization" or customer administration consolidation). In essence, plaintiffs claim that undisclosed problems with the CBO Reorganization made Xerox's statements about the "benefits" of the Worldwide Restructuring false and misleading.

However, the CBO Reorganization was much smaller in scope, purpose and implementation cost than the Worldwide Restructuring, and Xerox was able to achieve benefits from the Worldwide Restructuring even if it experienced some problems with the CBO Reorganization. Indeed, the Worldwide Restructuring had 150 separate initiatives that took place all over the world (including in Europe, Africa, Latin America, Asia and the United States) and involved all aspects of Xerox's business (including manufacturing, research and development, distribution, services, sales and administration). The CBO Reorganization was only one of those initiatives, and it was limited to Xerox's administrative operations in the

United States.  Moreover, it only involved the planned elimination of about 550 positions

(compared to 9,000 for the Worldwide Restructuring), was projected to cost less than $35 million

to implement (compared to $1.6 billion for the Worldwide Restructuring) and was projected to

create annual cost savings of around $60 million a year by 2001 (compared to $1 billion a year

for the Worldwide Restructuring by 2001).[1]

        Contrary to the undisputed facts, and Xerox's numerous public disclosures

throughout the Class Period[2] about the problems that existed in the CBO Reorganization,

plaintiffs allege that Xerox failed to disclose that the CBO Reorganization had caused:  (1) rising

accounts receivable and days sales outstanding ("DSO")[3] from order processing and billing

disruptions; (2) sales force productivity issues; and (3) declining customer satisfaction.  (See

Saunders Report (Topper Decl., Ex. A) ¶ 14.)  Plaintiffs claim that the class suffered economic

loss when those problems were "revealed" to the market on September 16 and October 8, 1999.

### Summary of Argument

        In support of their claims, plaintiffs intend to call three purported expert witnesses

to testify at trial.  The proffered testimony of each witness suffers from numerous incurable

defects that render each witness's testimony inadmissible under Federal Rule of Evidence 702

---

[1]   As part of a completely separate program, on January 6, 1999, Xerox announced that it
would realign its document processing business under four industry-based operations:  Industry
Solutions; General Markets; Developing Markets; and Business Group Operations.  Xerox
simultaneously announced a plan to realign its sales force territories from geography-based
selling to industry-based selling (the "Sales Force Realignment").  The Sales Force Realignment
was completely distinct from the Worldwide Restructuring and the CBO Reorganization.
Plaintiffs allege that Xerox concealed the CBO Reorganization's impact on its sales force by
blaming certain disruptions on the Sales Force Realignment.  Plaintiffs do not allege that Xerox
misrepresented any aspect of the Sales Force Realignment.

[2]   The Class Period runs from October 22, 1998 through October 7, 1999.

[3]   DSO is a metric used to measure aging of accounts receivable.

and controlling Supreme Court precedent:

First, plaintiffs intend to call Anthony Saunders, an economics and finance professor, to opine on loss causation.  Prof. Saunders seeks to testify that plaintiffs suffered economic loss when the market purportedly learned of alleged problems with the CBO Reorganization on September 16 and October 8, 1999.  However, Prof. Saunders did not employ any reliable methodology to determine whether there was any "new" information about Xerox discussed on either of those dates that could have caused the stock price to decline.  Moreover, Prof. Saunders failed to disentangle the effects of allegation-related information released on those dates from the effects of other, non-allegation-related information that was simultaneously released.  In fact, he did not even seek to determine whether the information discussed on the purported corrective disclosure dates corrected any aspect of the fraud alleged in the Complaint-- and it did not.  For those reasons and others, as explained below, Prof. Saunders cannot reliably testify that the disclosure of the alleged fraud caused plaintiffs to suffer economic loss.  That portion of Prof. Saunders's proffered testimony must be excluded.[4]  (See infra § II.)

Second, plaintiffs intend to call Lee Buchwald, an investment banker, to opine on (1) the materiality of the CBO Reorganization; (2) the knowledge of Xerox's management during the Class Period; and (3) the accuracy of Defendants' public statements during the Class Period.  Mr. Buchwald is no more qualified than a non-expert, lay juror to opine on those topics, and his opinions are unreliable.  Mr. Buchwald did not conduct any analyses or empirical studies, nor did he review any professional articles or academic publications.  Instead, Mr. Buchwald

---

[4]   Prof. Saunders also seeks to testify that Xerox's stock traded in an efficient market during the Class Period.  While he failed to prove that Xerox's stock traded in an efficient market, we do not challenge that aspect of Prof. Saunders's proffered testimony in this motion, except with respect to his failure to meet his disclosure obligations under Federal Rule of Civil Procedure 26. (See infra § II(F).)

openly conceded at his deposition that he merely proffers subjective opinions based on his

review of a portion of the discovery record in this case.  For those reasons and others,

Mr. Buchwald's testimony should be excluded in its entirety.  (See infra § III.)

Third, plaintiffs intend to call Charles Drott, an accountant, to testify that Xerox's

disclosures during the Class Period were false and misleading because Defendants reported on

the benefits of the Worldwide Restructuring, but used purported "improper accounting practices"

to conceal certain alleged "adverse restructuring effects" caused by the CBO Reorganization that

Xerox was required to disclose.  However, Mr. Drott did not apply any reliable methodology or

standards to reach his opinions on what Xerox should have disclosed.  Indeed, the only

"analysis" Mr. Drott purports to provide does not support his opinions and is based on

incomplete and unreliable data.  Mr. Drott also employs improper assumptions that render his

opinions unreliable.  Finally, Mr. Drott impermissibly attempts to offer an opinion regarding

what Xerox management "knew or recklessly disregarded" during the Class Period.  For those

reasons and others, Mr. Drott's proffered testimony should be excluded in its entirety.  (See infra

§ IV.)

## Argument

## I.       APPLICABLE LEGAL STANDARDS.

Under the framework set up by the Supreme Court's holding in Daubert v.

Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), and Federal Rule of Evidence 702, the district

court is charged to act as a "gate-keeper" and must exclude an expert's proffered testimony if:

(1) the expert is not qualified to opine on the specific matters in his or her report; (2) the expert's

testimony is not based on reliable principles and methods; or (3) the expert's testimony is not

relevant.  See Daubert, 509 U.S. at 597; Kuhmo Tire Co. v. Carmichael, 526 U.S. 137, 147-48

(1999); Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005).  The party offering the

expert testimony has the burden of proving admissibility.  See Rieger v. Orlor, Inc., 427 F. Supp.

2d 99, 102 n.3 (D. Conn. 2006); Baker v. Urban Outfitters, Inc., 254 F. Supp. 2d 346, 353

(S.D.N.Y. 2003).

        With respect to qualifications, an expert's background and credentials must be

analyzed against the specific subject of the expert's testimony.  It is not enough for the expert to

have general experience tangentially related to the matters in the expert's report.  See Baker, 254

F. Supp. 2d at 353-54.  Instead, the expert's training, knowledge and experience must qualify the

expert to answer the specific questions the expert seeks to address.  Dreyer v. Ryder Auto.

Carrier Group, Inc., 367 F. Supp. 2d 413, 416-17, 425 (W.D.N.Y. 2005).

        Even when an expert is qualified, the proffered testimony still must be excluded

unless it meets Rule 702's requirements for reliability, namely:

> "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the
> product of reliable principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case".

Fed. R. Evid. 702.  Courts in the Second Circuit consider a list of five "Daubert factors" in

determining whether an expert's methodology is reliable:  (1) whether the theory or technique on

which the expert relies has been or could be tested; (2) whether the theory or technique has been

subjected to peer review and publication; (3) the known or potential rate of error of the technique

or theory when applied; (4) the existence and maintenance of standards controlling the

technique's operation; and (5) whether the theory or technique has been generally accepted in the

scientific community.  Rieger, 427 F. Supp. 2d at 102.  If an expert's method is not reliable, the

expert's testimony must be excluded.  E.g., Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d

256, 267 (2d Cir. 2002).

Those Daubert requirements apply to all expert testimony (not just scientific testimony) and must be satisfied for every step in an expert's analysis.  Kuhmo Tire, 526 U.S. at 147-49; Amorgianos, 303 F.3d at 267 ("[I]t is critical that an expert's analysis be reliable at every step. . . . [A]ny step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible." (emphasis in original)).

Finally, expert testimony is relevant only if it will assist the jury.  See Hill v. City of New York, No. 03-CV-1283 (ARR) (KAM), 2007 WL 1989261, at *5 (E.D.N.Y. July 5, 2007).  Expert testimony is not relevant if it is directed towards lay matters that the jury can understand on its own.  See Rieger, 427 F. Supp. 2d at 103.

## II.   PROF. SAUNDERS SHOULD BE PRECLUDED FROM TESTIFYING THAT PLAINTIFFS SUFFERED ECONOMIC LOSS FROM THE FRAUD ALLEGED IN THE COMPLAINT.

Plaintiffs' counsel asked Prof. Saunders to determine whether plaintiffs suffered economic loss from the fraud alleged in the Complaint.  (Saunders Report (Topper Decl., Ex. A) ¶ 1.)  Prof. Saunders did not undertake the analysis necessary to determine whether the false and misleading statements alleged in the Complaint caused the alleged losses that he purports to quantify in his report.  As a result, he should not be permitted to testify on loss causation.  See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005) ("Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.").

### A.   The Loss Causation Standard.

To establish that plaintiffs suffered economic loss from the fraud alleged in the Complaint, Prof. Saunders must show that the market reacted negatively to one or more "corrective disclosures" that revealed the alleged fraud to the market.  See Lentell, 396 F.3d at 175; In re Omnicom Group, Inc. Sec. Litig., No. 02 Civ. 4483 (WHP), 2008 WL 243788, at *5

(S.D.N.Y. Jan. 29, 2008) (holding that failure properly to identify at least one corrective disclosure is "fatal under Second Circuit precedent"); In re Williams Sec. Litig., 496 F. Supp. 2d 1195, 1265 (N.D. Okla. 2007) ("It is the exposure of the falsity of the fraudulent representation that is the critical component of loss causation.").

   To properly identify a corrective disclosure, Prof. Saunders must show that "the disclosed fact [was] new to the market" and that it "reveal[ed] some aspect" of the alleged fraud. Omnicom, 2008 WL 243788, at *5.  He also must "distinguish the alleged fraud from the 'tangle of [other] factors' that affect a stock's price".  Id. at *7.  Indeed, "[b]ecause the law requires the disaggregation of confounding factors, disaggregating only some of them cannot suffice to establish that the alleged misrepresentation actually caused Plaintiffs' loss".  Id. at *8 (emphasis in original); see also In re Xcelera.com Sec. Litig., Civil Action No. 00-11649-RWZ, at 4-5 (D. Mass. Apr. 25, 2008) (order granting motion to preclude testimony of expert witness).

   Prof. Saunders identified only two alleged corrective disclosures that he attributed to damages during the Class Period:  September 16 and October 8, 1999.  Thus, Prof. Saunders must establish that allegation-related information was released on those dates, and that the allegation-related information:  (1) was new to the market; (2) caused the market's reaction; and (3) exposed the falsity of the alleged fraud.  See Omnicom, 2008 WL 243788, at *5, *7-8. Prof. Saunders's methodology is not reliable to prove any of those elements.

  **B.** **Prof. Saunders's Methodology Is Unreliable to Prove Loss Causation.**

   The generally accepted methodology used by experts and economists to prove loss causation through an event study analysis, as Prof. Saunders purports to do here, is to analyze all the dates during the Class Period on which the alleged fraud potentially could have

been disclosed to the market.[5]  See Mark P. Kritzman, What Practitioners Need To Know About Event Studies, Fin. Analysts J., Nov.-Dec. 1994, at 17; A. Craig MacKinlay, Event Studies in Economics and Finance, 35 J. Econ. Literature 13 (1997), at 14 ("The initial task of conducting an event study is to define the event[s] of interest . . . ."); see also Gompers Tr. (Topper Decl., Ex. B) at 196:3-200:7.  To complete that analysis, experts typically review (at a minimum) all the news related to the company discussed on dates alleged in the operative complaint, along with all the major press releases, analyst reports and public filings about the company during the Class Period.  See, e.g., In re PNC Fin. Servs. Group, Inc., 440 F. Supp. 2d 421, 428 (W.D. Pa. 2006) (relying on expert's review of "all press releases, . . . SEC filings, [company] annual reports [and company information] available on various electronic and news service databases" to identify corrective disclosures); McKowan Lowe & Co. v. Jasmine, Ltd., No. Civ. 94-5522 RBK, Civ. 96-2318 RBK, 2005 WL 1541062, at *4-5 (D.N.J. June 30, 2005) (relying on expert's review of company's "SEC filings, press releases and other disclosures, and news items relating to [the company]" to prove there were no corrective disclosures); RMED Int'l, Inc. v. Sloan's Supermarkets, Inc., No. 94 Civ. 5587 PKL RLE, 2000 WL 310352, at *4-8 (S.D.N.Y. Mar. 24, 2000) (finding reliable expert's analysis which "included every piece of public information [the expert] could locate about [the company] that was available during the Class Period, including . . . press releases and public filings, 13D filings of persons acquiring large interests in [the company], and reports in the business press", and noting that "[a] researcher performing an event study must identify which company-specific events to study, and in the process, categorize those

---

[5]  An event study is a technique used by economists to analyze the effect of particular events (e.g., alleged misstatements or omissions) on a company's stock price.  See MacKinlay at 13; Kritzman at 17, 19.

events as fraud or non-fraud related").

If, after analyzing all the relevant disclosures, the expert observes a statistically significant negative stock price reaction on the first date that the alleged fraud was disclosed to the market, and the expert is able to disentangle the stock price effect of that news from all the other news released on the same date, the expert can determine that the market reacted negatively to the revelation of the fraud, and, on that basis, can identify a corrective disclosure to prove loss causation.  See Omnicom, 2008 WL 24378, at *8.

Contrary to that generally accepted methodology, Prof. Saunders limited his search for potential corrective disclosure dates to the 13 dates during the Class Period on which Xerox's stock price allegedly exhibited statistically significant abnormal returns.  (See Saunders Tr. (Topper Decl., Ex. C) at 106:8-20, 116:17-117:17, 169:6-170:17; Saunders Report (Topper Decl., Ex. A) ¶¶ 28-29, 68-69, 72, 78.)  He did not comprehensively review other dates in the Class Period to find potential disclosures of the fraud alleged in the Complaint.[6]  (Id.)

---

[6]   While Prof. Saunders did briefly mention in his report two dates without statistically significant returns on which CBO Reorganization issues were discussed publicly (May 14 and June 28, 1999), it does not appear he reviewed those dates as part of his event study analysis to determine corrective disclosures.  (See Saunders Report (Topper Decl., Ex. A) ¶¶ 55, 65.)  Moreover, his brief discussion of some--though not all--of Xerox's relevant disclosures on just two of the remaining three hundred plus dates in the Class Period did not constitute the minimum analysis necessary to support his loss causation opinions.  See, e.g., Xcelera.com, Civil Action No. 00-11649-RWZ, at 2.  In addition to being incomplete, Prof. Saunders's approach is misleading.  For example, Prof. Saunders cites edits to a draft of Xerox's CEO's May 14, 1999, earnings teleconference presentation to suggest that Xerox did not disclose the CBO Reorganization's impact on Xerox's first quarter 1999 revenue growth.  (Saunders Report (Topper Decl., Ex. A) ¶ 64.)  However, the teleconference transcript demonstrates that Prof. Saunders is wrong:  Xerox's CEO did, in fact, state that the CBO Reorganization's impact on sales force productivity affected Xerox's first quarter results.  See Xerox Investor Conference (May 14, 1999) (Topper Decl., Ex. D), at 136-37 (discussing salesforce disruptions caused by CBO Reorganization's "G&A activities").

With respect to June 28, 1999, Prof. Saunders claims that Xerox's CFO "stated the 1998 customer administration restructuring was 'on-track'".  (Saunders Report (Topper Decl., Ex. A) ¶ 55).)  Again, Prof. Saunders is wrong.  Xerox's CFO stated that the Worldwide Restructuring as a whole--and not the specific CBO Reorganization initiative--was "'on track'".  B. Alex

However, Defendants could have disclosed (and did disclose) the alleged problems with the CBO Reorganization on other dates during the Class Period that did not exhibit statistically significant abnormal returns and that, therefore, were not pre-selected for review by Prof. Saunders.[7]  Prof. Saunders's failure to analyze all the relevant dates on which the alleged fraud might have been disclosed to the market is contrary to generally accepted procedure, and is a basis for exclusion.[8]  See Xcelera.com, Civil Action No. 00-11649-RWZ, at 2 (excluding expert for failing properly to analyze relevant, allegation-related dates in loss causation event study); Ryan v. Flowserve Corp., 245 F.R.D. 560, 573 (N.D. Tex. 2007) ("[T]he opinions of Plaintiffs' expert [are] flawed and underwhelming in several aspects.  The flawed thread interwoven throughout [the expert's] opinion is his results-oriented approach to the public data often discounting inconvenient but relevant facts.").

It is easy to understand why Prof. Saunders adopted that unconventional

---

Henderson & David M. Vogt, Prudential Securities, Xerox Delivers Upbeat Presentation At Prudential Securities' 2nd Annual Imaging Technology Conference (June 28, 1999) (Topper Decl., Ex. E), at 6 (Quoting Xerox's CFO as stating:  "We took a restructuring program which was announced a little over a year ago. It's on track; we expect $1 billion pre-tax savings by year 2001.").  Indeed, Prof. Saunders ignored the fact that when Xerox's CFO did specifically address the CBO Reorganization, he attributed Xerox's 1998 receivables "disappointment" to the fact that Xerox "cut back too fast and too many in the administrative side as we restructured in the United States".  Id.

[7]    It is possible that Xerox's numerous disclosures about the problems with the CBO Reorganization were not accompanied by statistically significant stock price movements because the market deemed those problems to be immaterial.  In any event, if Xerox previously disclosed the alleged fraud to the market during the Class Period (see infra § II(C)), and the market did not react negatively to those disclosures, there can be no loss causation.  See, e.g., Lentell, 396 F.3d at 172 (requiring causal link between disclosure of the alleged fraud and stock price drop causing plaintiffs' damages); Flowserve, 245 F.R.D. at 571 ("Without any price reaction, particularly a negative one, no investor could have suffered a loss.").  Prof. Saunders failed even to test whether the alleged fraud was disclosed on earlier dates where the stock price did not react significantly.

[8]    Plaintiffs have the burden of showing that Prof. Saunders's novel methodology is reliable, and they cannot meet that burden.  See, e.g., Baker, 254 F. Supp. 2d at 353-54.

approach.  To prove loss causation, Prof. Saunders had to demonstrate that Xerox's stock price dropped by a statistically significant amount when the alleged fraud was revealed to the market. Lentell, 396 F.3d at 172; Flowserve, 245 F.R.D. at 571.  By restricting his corrective disclosure analysis to those dates on which he pre-determined the stock price movement to be statistically significant, Prof. Saunders avoided reviewing the dozens of dates during the Class Period that would have disproved loss causation because the stock price did not exhibit a statistically significant return in response to news that discussed the alleged CBO Reorganization problems. Put simply, Prof. Saunders cheated by only reviewing the dates capable of supporting a finding of loss causation, while not reviewing the dates that could have disproved that hypothesis.  (See Gompers Report (Topper Decl., Ex. F) ¶¶ 50-101.)  That unconventional and unreliable methodology fails to satisfy any of the Daubert factors, and should be excluded.  See Bell v. Ascendant Solutions, Inc., 422 F.3d 307, 311 (5th Cir. 2005) (affirming exclusion of an expert who employed an event study that was "designed to support its . . . conclusion"); Carpe v. Aquila, Inc., No. 02-0388-CV-W-FJG, 2005 WL 1138833, at *4 (W.D. Mo. Mar. 23, 2005) (excluding expert who "failed to follow the accepted methodology of his field, making his opinions in this case inherently unreliable"); Flowserve, 245 F.R.D. at 573 (granting summary judgment on loss causation where expert ignored relevant public data in conducting event study analysis); In re Zonagen, Inc. Sec. Litig., 322 F. Supp. 2d 764, 781-82 (S.D. Tex. 2003) (granting summary judgment and holding that expert report which presumed existence of corrective disclosures "[did] not constitute evidence of loss causation").

**C.     Prof. Saunders Cannot Show That the Alleged Corrective Disclosures Contained New Information.**

Prof. Saunders did not determine whether the allegation-related information (if any) discussed on September 16 and October 8 was "new to the market". <u>Omnicom</u>, 2008 WL 243788, at *5.  That is a necessary step to prove loss causation under the applicable law (<u>id.</u>) and in event studies generally (<u>see</u> Gompers Tr. (Topper Decl., Ex. B) at 25:2-17) because, in an efficient market, only new information can affect stock price.  <u>See</u> <u>Xcelera.com</u>, Civil Action No. 00-11649-RWZ, at 3; <u>Teachers' Ret. Sys. of La. v. Hunter</u>, 477 F.3d 162, 187 (4th Cir. 2007) ("The problem with plaintiffs' theory . . . is that these facts had already been disclosed in public filings, so their revelation . . . could not have caused [the company's] stock price to decline.").[9]  Nevertheless, Prof. Saunders did not even attempt to determine whether the alleged corrective disclosures he identified contained "new" information.

As described above, Prof. Saunders conducted an extremely limited and insufficient review of the public information related to Xerox during the Class Period.  (<u>See</u> <u>supra</u> § II(B).)  As a result, he was incapable of determining whether the information he identified on September 16 and October 8 was previously revealed to the market on some other date during the Class Period.  <u>See</u> <u>Omnicom</u>, 2008 WL 243788, at *5.  If it had been (and indeed it was), it could not possibly have been "new" on the alleged corrective disclosure dates, and thus could not have caused the stock price drop that allegedly caused plaintiffs' loss.  <u>Id.</u>

A loss causation event study that included the generally accepted steps (ignored

---

[9]     Prof. Saunders claims that Xerox stock traded in an efficient market.  Because the revelation of the fraud must cause a negative reaction in the stock price for there to be loss causation, and because in an efficient market the stock price will react only to new information, for there to be loss causation, the revelation of the fraud must be "new to the market".  <u>See, e.g.</u>, <u>Lentell</u>, 396 F.3d at 172-73; <u>Omnicom</u>, 2008 WL 243788, at *5.

by Prof. Saunders) of identifying and reviewing all allegation-related news released during the

Class Period demonstrates that any allegation-related information discussed by the market on the

alleged corrective disclosure dates was not new.  Prof. Paul Gompers, on behalf of defendants,

completed such an analysis.  (See Gompers Tr. (Topper Decl., Ex. B) at 196:3-200:7; Gompers

Report (Topper Decl., Ex. F) ¶¶ 60-63, 73-101.)

        For example, while Prof. Saunders attributed the stock price decline on

September 16 to the revelation of "the ongoing nature of the sales disturbances" from the CBO

Reorganization (Saunders Report (Topper Decl., Ex. A) ¶¶ 72-74 (citing B. Alex Henderson et.

al, Prudential Securities, XRX: Another Salesforce Realignment Slated For 1Q00 at Xerox-

Lowering Target (Sept. 16, 1999) (Topper Decl., Ex. G))), Xerox disclosed the ongoing nature

and root causes of the sales force disturbances to the market on numerous occasions prior to

September 16 (see Gompers Report (Topper Decl., Ex. F) ¶¶ 60-64, Ex. 6).[10]  Accordingly, that

means that any discussion of that issue on September 16 could not possibly have been

responsible for the stock price decline.  See, e.g., Xcelera.com, Civil Action No. 00-11649-RWZ,

at 3; Hunter, 477 F.3d at 187.  Moreover, Prof. Saunders ignores the fact that there was no

discussion of ongoing sales force disturbances--or any other issue potentially related to the CBO

Reorganization or the Worldwide Restructuring--on September 16; instead, false rumors about a

---

[10]  E.g., Xerox Investor Conference (May 14, 1999) (Topper Decl., Ex. D), at 136-37
("[W]e had, as we rolled out our G&A program [i.e., the CBO Reorganization], individual areas
where we caused some lack of focus on our sales force because of our G&A activities.  For
example, we talked about [closing] our Chicago center.  Unquestionably that had some impact on
our sales force.  They had to worry about the billing being done correctly."); Rebecca F. Runkle
& Stacey E. Wexler, Morgan Stanley Dean Witter & Co., Xerox (XRX):  Annual Investor
Meeting Review (May 17, 1999) (Topper. Decl., Ex. H) ("Based on recent results and the
investor meeting, we continue to be somewhat cautious . . . .  The firm's second quarter top-line
performance will likely remain below trend . . . due to the recent salesforce realignment,
administrative consolidation and weakness in Brazil.  We believe investors are likely to remain
somewhat anxious about the possibility of another revenue disappointment until visibility into
the realignment improves." (emphasis added)).

<u>future</u> sales force realignment were discussed on that date.[11]   (<u>See</u> Gompers Report (Topper

Decl., Ex. F) ¶¶ 53-63.)

Similarly, Prof. Saunders attributed the stock price decline on October 8 to the

disclosure of three CBO-related problems:  (1) rising accounts receivable and DSO from order

processing and billing disruptions; (2) sales force productivity issues; and (3) declining customer

satisfaction.  (<u>See</u> Saunders Report (Topper Decl., Ex. A) ¶¶ 14, 17.)  However, Xerox disclosed

each of those issues (to the extent they existed) dozens of times throughout the Class Period.[12]

(<u>See</u> Gompers Report (Topper Decl., Ex. F) ¶¶ 75-101, Ex. 6.)  Those disclosures are sufficient

to render Prof. Saunders's loss causation opinions unreliable because each one was made before

the first alleged corrective disclosure identified by Prof. Saunders; yet, he simply ignored them.

<u>See</u> <u>Omnicom</u>, 2008 WL 243788, at *5; <u>Hunter</u>, 477 F.3d at 187.

---

[11]   The false rumors were about <u>future</u> sales force changes, and did not disclose anything
about the "Sales Force Realignment" announced by Xerox in January 1999, let alone anything
about the CBO Reorganization or Worldwide Restructuring.  (<u>See</u> <u>supra</u> note 1.)

[12]   <u>E.g.</u>, <u>Xerox Corp. Quarterly Report</u> (Form 10-Q) (Nov. 10, 1998) (Topper Decl., Ex. I),
at 22 (documenting "higher accounts receivable due to stronger equipment sales growth and
some increase in days sales outstanding due to the temporary effects from the reorganization and
consolidation of U.S. customer administrative centers"); <u>Xerox Corp. Fourth Quarter Earnings
Release Teleconference</u> (Jan. 26, 1999) (Topper Decl., Ex. J), at 31-32 ("Some of the
restructuring that we did in the United States gave us a dislocation so that our day sales
outstanding went out a bit.  And on a mechanistic basis alone that gives you a bit more in the bad
debts."); Rebecca F. Runkle & Stacey E. Wexler, Morgan Stanley Dean Witter & Co., <u>Xerox
(XRX):  Preliminary Update on Year-End Balance Sheet and Cash Flow Items</u> (Feb. 25, 1999)
(Topper Decl., Ex. K) ("The receivables ballooned as Xerox attempted to restructure several
operations in the US."); <u>Xerox Investor Conference</u> (Topper Decl., Ex. D) at 123 ("The growth
in accounts receivable was primarily the result of the reorganization and restructuring in our US
administrative support activities.  We closed one customer admin center and we reorganized the
remaining three admin centers from a geographic to a customer segment basis. . . . And frankly,
we reduced the headcount as we did that at too fast a rate.  And it was too much change, too fast,
but the problem is being addressed, and you will certainly see improvements as we go through
1999.").  Xerox disclosed the drop in the amount of face time its sales force could spend with
customers throughout the Class Period (<u>see</u>  Gompers Report (Topper Decl., Ex. F) ¶¶ 94-97, Ex.
6), but that did not translate into a decline in customer satisfaction (<u>see</u> <u>id.</u> ¶¶ 98-100).

**D.      Prof. Saunders Did Not Disaggregate Reliably the Effect of Allegation-Related News From Other Factors.**

Even if the allegation-related information discussed by analysts on the alleged corrective disclosure dates could be shown to be new (and it cannot), Prof. Saunders's methodology is still unreliable because he did not disentangle the stock price effects of the allegation-related information from the effects of other, unrelated disclosures made on the same dates.  See Omnicom, 2008 WL 243788, at *7 (holding that impact of disclosures related to alleged fraud must be disentangled from impact of all other disclosures); Fener v. Belo Corp., Civil Action No. 3:04-CV-1836D, 2008 WL 876967, at *2-4 (N.D. Tex. Apr. 2, 2008) (same); Zonagen, 322 F. Supp. 2d at 781-82 (holding that expert's opinion on loss causation was "not relevant" because expert failed to, among other things, "undertake an independent analysis to determine whether and how much any other event might have increased or decreased [defendant's] stock price").  "When multiple negative items are announced contemporaneously, mere proximity between the announcement and the stock loss is insufficient to establish loss causation."  Oscar Private Equity Invs. v. Allegiance Telecom, Inc., 487 F.3d 261, 271 (5th Cir. 2007).

In his report, Prof. Saunders failed even to acknowledge that there was Xerox-related news released to the market on September 16 that had nothing to do with any of plaintiffs' allegations in this case.[13]  For example, analysts on September 16 discussed "currency pressures", the impact of the ramp-up of the Canon ImageRunner line of products, a potential near-term revenue disruption from Y2K and "Brazilian economic problems"--none of which

---

[13]   In fact, none of the information discussed on September 16, including the rumor of a future sales force realignment, was allegation-related.  (See supra § II(C).)

related in any way to the alleged fraud, but any one of which could have been responsible for the stock price decline on that date.  (<u>Compare</u> Henderson (Topper Decl., Ex. G), <u>with</u> Saunders Report (Topper Decl., Ex. A) ¶¶ 72-77; <u>see also</u> Gompers Report (Topper Decl., Ex. F) Ex. 4.) Nevertheless, Prof. Saunders simply assumed that the entire stock price movement on September 16 was attributable to the revelation of "ongoing . . . salesforce disturbances"[14] and was not attributable to any of those other factors.  (<u>See</u> Saunders Report (Topper Decl., Ex. A) ¶¶ 72-77; Saunders Tr. (Topper Decl., Ex. C) at 177:3-12.)[15]  In other words, he made no attempt to disentangle all the potential causes of the stock price decline.  <u>See</u> <u>Omnicom</u>, 2008 WL 243788, at *7-8; <u>Zonagen</u>, 322 F. Supp. 2d at 781-82.

Similarly, even if there were some new CBO Reorganization-related information disclosed to the market on October 8 (and there were not), there undeniably were other non-allegation-related issues disclosed to the market on that date.  Prof. Saunders did not reliably disaggregate the stock price effect of all those disclosures.  Prof. Saunders attempted to disentangle the news on October 8 by attributing 5/11ths of the stock price drop to the disclosure of the alleged fraud.  (<u>See</u> Saunders Report (Topper Decl., Ex. A) ¶ 86; <u>see also</u> Gompers Report (Topper Decl., Ex. F) ¶¶ 105, 106.)  He chose that number based on the speculative assumption that the market reacted only to the earnings miss that Xerox pre-announced on that date, and

---

[14]   He then concluded that 90% of the ongoing sales force disturbances were caused by the CBO Reorganization.  (<u>See</u> Saunders Report (Topper Decl., Ex. A) ¶¶ 72-77.)  But that conclusion is erroneous because it is based on a quote from a document referring to the October 8th pre-earnings announcement, and the issues discussed on that date, and did not have anything to do with the reasons for the stock price drop on September 16.  (<u>See</u> Gompers Report (Topper Decl., Ex. F) ¶¶ 64-67.)

[15]   At his deposition, Prof. Saunders said he "looked at Brazil", but he conceded that he did not even consider the currency pressures, Y2K problems and other issues discussed on September 16.  (Saunders Tr. (Topper Decl., Ex. C) at 195:9-196:19.)  No analysis even of the Brazilian problems appeared in his report.

because the CBO Reorganization problems allegedly accounted for 5/11ths of the earnings miss.[16]  (Saunders Report (Topper Decl., Ex. A) ¶ 86.)

However, Prof. Saunders failed to account for the likelihood that the market reacted more forcefully to the non-allegation-related reasons for the earnings miss, including "negative shift in product mix", "difficult environment in Brazil" and "problems with Fuji Xerox", which (unlike the CBO Reorganization issues that previously had been disclosed) were long-term problems with no easy solutions at hand.  (See Gompers Report (Topper Decl., Ex. F) ¶¶ 105, 106.)  Instead, Prof. Saunders simply assumed that the CBO Reorganization issues would continue to persist, grow at the same rate for the same period of time and be equally important to investors as the other factors.  (Id.)  He did no analysis to support those assumptions, and, as Prof. Gompers shows in his report, they are contrary to the facts.[17]  (Id.)  Thus, Prof. Saunders did not reliably disentangle potentially confounding factors on October 8, and his methodology is unreliable to show loss causation.  Omnicom, 2008 WL 243788, at *8.

**E.    Prof. Saunders Cannot Prove that the Alleged Corrective Disclosures Revealed Some Aspect of the Alleged Fraud.**

Prof. Saunders did not make any attempt in his report to establish any link between the alleged fraud and the specific disclosures on the two dates that he opines caused

---

[16]  Prof. Saunders's assumption that the CBO Reorganization accounted for 5/11ths of the earnings miss was based on an internal Xerox document.  The reliability of that document in this context is questionable at best.  However, that is not an issue that needs to be addressed as part of this motion; even if one assumes that the internal document is being used accurately here, Prof. Saunders still failed reliably to disaggregate the news on October 8, for the reasons discussed now in the text.

[17]  Indeed, the evidence is that the market viewed the CBO Reorganization issues as temporary even after the October 8 pre-earnings announcement.  (See Gompers Report (Topper Decl., Ex. F) ¶¶ 105, 106.)  On the other hand, the market viewed the problems related to product mix shift and increased competition as longer term and more troublesome.  (Id.)

plaintiffs' loss.  See Omnicom, 2008 WL 243788, at *5.[18]  In fact, he made no attempt comprehensively to review the news released during the Class Period to identify the dates (if any) where the falsity of the alleged fraud was revealed to the public.

Instead, Prof. Saunders's report reflects that he merely assumed that the September 16 and October 8 disclosures corrected some aspect of the alleged fraud.  (See Saunders Report (Topper Decl., Ex. A) ¶ 87 ("I have also assumed that the market began to realize the truth about Xerox's condition and outlook on September 16, 1999 . . . . Additionally, I have assumed the announcement on October 8, 1999 . . . amounted to a disclosure that earlier statements . . . had not been fully accurate."); Saunders Tr. (Topper Decl., Ex. C) at 189:5-190:2; 201:12-19.)  That is fatal to his loss causation opinions.  Prof. Saunders should not be permitted to testify that he proved loss causation when he merely assumed that the alleged corrective disclosures exposed some aspect of the alleged fraud.  See Omnicom, 2008 WL 243788, at *5 (requiring expert to show that disclosures "expose[d] the falsity of the fraudulent representation" for loss causation); In re Williams Sec. Litig., 496 F. Supp. 2d at 1265; Flowserve, 245 F.R.D. at 573; Zonagen, 322 F. Supp. 2d at 781-82.

Put another way, if Prof. Saunders seeks merely to assume that the revelation of the alleged fraud caused the stock price movements on the alleged corrective disclosure dates, he should not be allowed to testify that he has proven that the revelation of the alleged fraud caused those movements, as he purports to do in parts of his report.  (See Saunders Report (Topper Decl., Ex. A) ¶¶ 72-86.)  See Flowserve, 245 F.R.D. at 573 (holding that expert's major "flaw" was his "central assumption that the alleged fraud and [the purportedly corrective disclosures]

---

[18]   As discussed above, loss causation requires proof of a direct link between a specific alleged misstatement or omission and a particular disclosure.  Lentell, 396 F.3d at 173.

are, in fact, related", which reduced expert's opinion to mere "well-informed speculation");

Zonagen, 322 F. Supp. 2d at 781-82 (holding that expert report on loss causation was "not

relevant" because expert merely "assumed the very fact he [was] being proffered to prove, i.e.

that the [fraud-related] statements caused Plaintiffs' damages").[19]

### F.      Prof. Saunders Failed to Comply with Fed. R. Civ. P. 26.

Prof. Saunders based his opinions as to loss causation and market efficiency on a

purported event study that he conducted.  That event study was based on an initial regression

analysis that Prof. Saunders used to identify 40 dates with statistically significant returns at the

90% level, which he then used to find the 13 event dates that he ultimately analyzed throughout

his report.  (See Saunders Tr. (Topper Decl., Ex. C) at 104:24-109:11.)  However, in

---

[19]  Plaintiffs have made clear that they will argue that the court's decision not to exclude
Prof. Saunders's opinion in Freeland v. Iridium World Commc'ns, Ltd., Civil Action No. 99-
1002, 2008 WL 906388 (D.D.C. Apr. 3, 2008), justifies any attempt by Prof. Saunders to testify
as to loss causation here.  Plaintiffs are wrong.  The court's holding in Iridium conflicts with the
law in this and other circuits because it allowed an expert to testify that there was loss causation
despite the fact that the expert made no attempt to assess when or whether the alleged fraud was
actually disclosed.  See Omnicom, 2008 WL 243788, at *4, *7 (granting summary judgment for
lack of evidence on loss causation where expert failed to prove corrective disclosures);
Flowserve, 245 F.R.D. at 573 (same); Carpe, 2005 WL 1138833, at *4, *7-8 (same); Zonagen,
322 F. Supp. 2d at 781-82 (same).  Indeed, in Iridium, it appears (though it is not absolutely clear
from some of the underlying briefs) that Prof. Saunders merely assumed the truth of plaintiffs'
corrective disclosure allegations (see Saunders Iridium Report (Topper Decl., Ex. L) at ¶ 37 ("I
also assume that the market became aware of the truth in four stages [on the alleged corrective
disclosure dates].")); yet, the court allowed Prof. Saunders's "testimony to establish loss
causation".  See 2008 WL 906388, at *24, *25.  That is not the law in this Circuit.

Here, it is unclear whether Prof. Saunders seeks to prove--rather than to simply assume--
that the alleged corrective disclosures revealed some aspect of the alleged fraud.  (See Saunders
Report (Topper Decl., Ex. A) at ¶ 87.)  If he purports to testify that there is, in fact, loss
causation, his opinion must be excluded for all the reasons discussed supra in Sections II(A)-(E).
If, instead, he seeks merely to assume that there is loss causation, his testimony should be limited
(at most) to quantifying the amount of the stock price drop absent market and industry effects;
but he should not be allowed to testify that the revelation of the alleged fraud caused Xerox's
stock price to drop.

contravention of Federal Rule of Civil Procedure 26(a)(2)(B) and Plaintiffs' November 13, 2007

agreement with Defendants (see Pls.' 11/13/07 Ltr. (Topper Decl., Ex. M) at 3), Prof. Saunders

and plaintiffs never provided Defendants with that initial regression analysis.  To the contrary,

plaintiffs have represented that Prof. Saunders destroyed it.[20]  (See Pls.' 1/4/08 Ltr. (Topper

Decl., Ex. O).)  Despite our best efforts, Defendants have been unable to replicate it.[21]

        Prof. Saunders's violation of Rule 26's disclosure requirements provides an

independent basis to exclude his testimony in its entirety.  See Fed. R. Civ. P. 37(c); Fyfe v.

Baker, No. 1:06-CV-28, 2007 WL 1866882, at *1 (D. Vt. June 28, 2007) (excluding expert for

failure to comply with Rule 26 and holding that failure to make necessary disclosures "frustrates

the spirit and purpose of Rule 26 expert discovery and threatens to turn the trial into a game of

blindman's bluff"); Major v. Astrazeneca, Inc., Nos. 5:01-CV-618 (Lead) (FJS/GJD), 5:00-CV-

1736 (Member) (FJS/GJD), 2006 WL 2640622, at *3 (N.D.N.Y. Sept. 13, 2006) (excluding

---

[20]  Plaintiffs were on notice to preserve and produce precisely the data that has been overwritten.  Rule 26(a)(2)(B) required Prof. Saunders to disclose in his report "the basis and reasons for [his opinions]" and "the data or other information considered by [him] in forming them".  Prof. Saunders's report did not contain that information, so Defendants asked plaintiffs to comply with Rule 26 by producing, among other things, "copies of all models, analyses and comparisons (including market models, regression analyses, event studies or similar analyses) created or considered by Mr. Saunders".  (Defs.' 11/2/07 Ltr. (Topper Decl., Ex. N) at 1.)  And plaintiffs agreed.  In fact, on November 13, 2007, plaintiffs wrote:  "With respect to your First Request, we will provide you with any models, regression analyses, event studies or similar analyses created or considered by Dr. Saunders in .xls format."  (Pls.' 11/13/07 Ltr. (Topper Decl., Ex. M) at 3.)  There can be no doubt that Prof. Saunders was obligated to preserve and produce the overwritten regression analysis.  Yet, he destroyed it, cannot reproduce it and, consequently, Defendants cannot review it.

[21]  Even Prof. Saunders apparently could not replicate it exactly.  (See Pls.' 1/23/08 Ltr. (Topper Decl., Ex. P) (purporting to attach "an event study that [was] very substantially similar to the First Event Study"); Defs.' 1/30/08 Ltr. (Topper Decl., Ex. Q) at 1 (explaining the differences between the original regression analysis and the re-created one); Pls.' 1/31/08 Ltr. (Topper Decl., Ex. R) (responding to the differences between the original regression and the re-created one by, inter alia, proffering Prof. Saunders's "belie[f]" that his deposition testimony about his original regression was "mistaken".)  Prof. Saunders's inability to replicate and apparent confusion surrounding his own purported regression analysis strengthens Defendants' suspicions that it was flawed.

expert for failing to provide basis for opinion in expert report and for not supplementing report to cure that deficiency).

## III.   MR. BUCHWALD'S TESTIMONY SHOULD BE EXCLUDED IN ITS ENTIRETY.

Mr. Buchwald is an investment banker who has candidly admitted that he is not an expert on operational restructurings of the type at issue in this case.  (See Buchwald Tr. (Topper Decl., Ex. S) at 73:5-74:21.)  Nevertheless, in his report, he opines that (1) "Xerox's 1998 restructuring" had material adverse effects on Xerox during the Class Period; (2) Xerox management knew or should have known about those material adverse effects; and (3) Xerox's public disclosures were not complete and accurate.  (Buchwald Report (Topper Decl., Ex. T) at 1, 18, 24.)  Mr. Buchwald admitted that those are subjective opinions that he reached solely by reviewing a portion of the discovery record in this case.  (Buchwald Tr. (Topper Decl., Ex. S) at 41:2-7; 70:18-72:14.)  It is undisputed that Mr. Buchwald did not conduct any expert analyses or empirical studies, nor did he review any professional articles or academic publications.  (See id. at 70:2-17.)  As a result, Mr. Buchwald's proffered testimony must be excluded.

### A.   Mr. Buchwald Failed to Conduct Any Analysis.

Mr. Buchwald's proffered testimony is not based on any reliable methodology.  In fact, Mr. Buchwald conceded that he did virtually no work (other than reading a set of documents sent to him by plaintiffs' counsel) to form his opinions:

"Q:  [L]et me just see if I understand the method that you used to complete your assignment and write your report . . . . You reviewed those documents [sent to you by plaintiffs' counsel] and you had discussions with plaintiffs' counsel to come to an understanding of the facts of the case, correct?
A:  Yes.
Q:  And then you came to your conclusions and you wrote your expert report, is that right?

A:  Yes.

Q:  Did you do anything else?

A:  No.

Q:  And you used that same general method to reach all three of the opinions that are contained in your report, correct?

A:  Yes."  (Buchwald Tr. (Topper Decl., Ex. S) at 70:18-71:19.)


"Q:  Did you conduct any empirical analyses?

A:  No.

Q:  And you reviewed no academic or professional literature, is that right?

A:  That's right."  (Id. at 84:9-14.)


"Q:  You essentially read the documents [from the case] and then gave your opinion on what the documents showed, correct?

A:  That's correct, yes."  (Id. at 112:17-112:20.)

Mr. Buchwald also admitted that his opinions are entirely subjective and were formed without

reliance on any standards:

"Q:  What standards did you use to determine whether something is material or not?

A:  I didn't have a specific standard.

Q:  So you didn't use standards.  It was your own kind of subjective opinion on whether the impacts were material, correct?

A:  Yes."  (Id. at 96:7-14.)


"Q:  So again, your opinion on the state of mind of Xerox management is really just your subjective assessment of the evidence you reviewed, right?

A:  Yes."  (Id. at 114:10-14.)


"Q:  Can you point me to any standards that exist in [the] general business environment that define when a public disclosure is complete?

A:  No.

Q:  It's basically your subjective opinion of whether the disclosure is complete, correct?

A:  Yes.

Q:  Same thing as accurate; what standards did you rely upon to determine whether a disclosure is accurate?

A:  My opinion."  (Id. at 125:21-126:8.)

Mr. Buchwald also conceded that he presented no testable hypotheses or objective criteria (id. at 97:13-98:6; 113:10-14), that he used no generally accepted theories or techniques (id. at 113:21-24; 126:14-18), that an error rate cannot be calculated because he used no discernible standards (id. at 97:13-98:6; 114:7-9) and that his methods were not "peer-reviewed" in any way (id. at 97:24-98:2).

Mr. Buchwald's failure to take even the most rudimentary steps to obtain and analyze the data related to his purported opinions renders his proffered testimony completely unreliable.[22]  For example, Mr. Buchwald's opinions about the completeness and accuracy of Xerox's public disclosures are based solely on his review of the few disclosures affirmatively cited by plaintiffs in their interrogatory responses (including Xerox's SEC filings). Mr. Buchwald completely ignored the hundreds of additional analyst reports and news releases published by Xerox during the Class Period.  (See Buchwald Report (Topper Decl., Ex. T) Ex. D; Buchwald Tr. (Topper Decl., Ex. S) at 127:11-129:10.)  It is inconceivable that Mr. Buchwald could reliably opine as an expert (or even as a lay person) on the "completeness" and "accuracy" of Xerox's public disclosures when he did not consider the vast majority of them.[23]

---

[22]  That is an independent basis for dismissal.  See Pugliano v. United States, 315 F. Supp. 2d 197, 199-02 (D. Conn. 2004) (excluding expert for relying on inadequate data and for using methodology lacking any "indicia of reliability").

[23]  Indeed, Mr. Buchwald admitted at his deposition that a single public statement that he ignored might potentially disclose all of the facts that he claims were omitted.  (Buchwald Tr. (Topper Decl., Ex. S) at 129:7-130:14.)

Similarly, while Mr. Buchwald seeks to testify that "Xerox's 1998 restructuring" had "material negative impacts" on Xerox's operations (Buchwald Report (Topper Decl., Ex. T) at 18), he completely ignored the fact that there were 149 other initiatives that made up that restructuring (Buchwald Tr. (Topper Decl., Ex. S) at 88:22-89:3).  To the extent that Mr. Buchwald's opinion is that the CBO Reorganization initiative had "material negative impacts" on Xerox, he admitted that he "didn't make a separate analysis of whether there were benefits" from that initiative, including whether that initiative produced cost savings during the Class Period.  (Id. at 91:5-92:8.)  Such a one-sided review of the evidence, coupled with a complete lack of methodology and standards, renders Mr. Buchwald's opinions wholly unreliable under Daubert.  See Daubert, 509 U.S. at 590; Pugliano, 315 F. Supp. 2d at 199 (excluding expert for using methodology grounded in "subjective belief and unsupported speculation"); Hill v. City of New York, 2007 WL 1989261, at *5 (excluding expert for "ipse dixit conclusion . . . not susceptible to testing in any meaningful way"); LaBarge v. Joslyn Clark Controls, Inc., No. 03-CV-169S, 2006 WL 2795612, at *6 (W.D.N.Y. Sept. 26, 2006) (excluding expert for lacking "scientifically tested" method); Smith v. Herman Miller, Inc., No. CV-03-5358 (CPS), 2005 WL 2076570, at *4-5 (E.D.N.Y. Aug. 26, 2005) (excluding expert for using subjective analysis devoid of "calculations, alternative design, testing, or supporting research material").

### B.      Mr. Buchwald Is Not Qualified.

Mr. Buchwald is no more qualified than a lay juror to opine on the topics in his report.  While Mr. Buchwald purports to be an expert on financial restructurings that occur in bankruptcy, he conceded that he is not an expert on operational restructuring--which is the only type of restructuring at issue here.  (See Buchwald Tr. (Topper Decl., Ex. S) at 73:5-74:21.) Moreover, Mr. Buchwald has no discernible expertise in public disclosure or materiality

analysis.  (See id. at 84:23-86:2.)  Mr. Buchwald conceded that, other than his work on this case,

he has never conducted a materiality analysis and has never sought to determine whether a

company's public disclosures were complete and accurate.  (Id.)  Indeed, Mr. Buchwald was

unable to define the term "material" at his deposition or even to explain how he used that term in

his report.  (See id. at 92:15-18; 94:16-21.)

Moreover, Mr. Buchwald is certainly not qualified to opine on what management

knew during the Class Period.  Courts in this circuit have made clear that "the opinions of

witnesses on the intent, motives or states of mind of corporations, regulatory agencies and others

have no basis in any relevant body of knowledge or expertise".[24]  In re Rezulin Prods. Liab.

Litig., 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004).[25]

Finally, because Mr. Buchwald is not an expert, his proffered testimony cannot

provide any specialized knowledge to the jury.  It is well-settled that a district court "should not

admit testimony that is directed solely to lay matters which a jury is capable of understanding

and deciding without the expert's help".  Rieger, 427 F. Supp. 2d at 103.  Mr. Buchwald violates

that rule since the vast majority of his proffered testimony consists of quoting verbatim from

---

[24]  Other Federal courts also have routinely precluded expert testimony on scienter.  See, e.g., AstraZeneca LP v. Tap Pharm. Prods., Inc., 444 F. Supp. 2d 278, 293 (D. Del. 2006) ("Expert witnesses are not permitted to testify . . . regarding [the defendant's] intent, motive, or state of mind, or evidence by which such state of mind may be inferred."); Oxford Gene Tech. Ltd. v. Mergen Ltd., 345 F. Supp. 2d 431, 443 (D. Del. 2004) (precluding expert testimony regarding "intent, motive, or state of mind, or evidence by which such state of mind may be inferred").

[25]  Prof. Saunders, to the extent he purports to do so, also should be prevented from opining on scienter because he is not qualified to determine what management knew or did not know during the Class Period.  (Cf. Saunders Tr. (Topper Decl., Ex. C) at 45:4-9 ("Q:  [Y]our opinion on the artificial inflation relies on your conclusions about what management knew or did not know during the Class Period?  A:  Well, management knew or should have known.").)  See Dreyer, 367 F. Supp. 2d at 425; Rezulin, 309 F. Supp. 2d at 546; AstraZeneca, 444 F. Supp. 2d at 293; Oxford, 345 F. Supp. 2d at 443.

depositions and other documents already in the discovery record--an "analysis" anyone could perform.  (See Buchwald Tr. (Topper Decl., Ex. S) at 112:11-20.)  Indeed, of the twenty-four pages in Mr. Buchwald's report, fifteen are filled with verbatim quotes from documents in the record.  As a result, Mr. Buchwald's proffered "testimony [is] limited to [his] opinions about what happened in this case" and is "based on [his] analysis of the facts in the record, including the chronology of events prepared by plaintiffs' counsel, but nothing more".  (Id. at 45:14-17; 72:9-14.)  Courts in this district have excluded expert testimony under precisely those circumstances.  See, e.g., Rieger, 427 F. Supp. 2d at 104 ("Kleiner states that his opinion is based on his analysis of the facts in the record, including the chronology of relevant events.  Without more, this is an assessment the jury can make without assistance from an expert.").

Mr. Buchwald simply is not an expert on any of the matters in his report, and he must be excluded.  See Dreyer, 367 F. Supp. 2d at 416-17, 425; Baker, 254 F. Supp. 2d at 353-54.

### C.    Mr. Buchwald Attempts to State Ultimate Legal Conclusions.

Mr. Buchwald impermissibly seeks to state his subjective opinions as to how the ultimate legal issues in this case should be decided.  To establish liability under Section 10(b) and Rule 10b-5, plaintiffs must prove five elements:  that Defendants (1) made a misstatement or omission (2) of a material fact (3) knowingly or recklessly (i.e., with scienter) (4) which plaintiffs relied upon and (5) which caused plaintiffs injury.  See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip, 75 F.3d 801, 808 (2d Cir. 1996).

Mr. Buchwald's opinions are nothing more than his subjective view--based solely on speculation and not any relevant expertise or analysis--as to how three of those elements (materiality, scienter and misstatement) should be decided.  (See Buchwald Report (Topper Decl., Ex. T) at 18, 23, 24.)  Moreover, Mr. Buchwald states his opinions in explicitly legal terms.  (See id. at 18 ("the CBO Reorganization had material negative impacts on Xerox's

operations during the class period"); <u>id.</u> at 23 ("In my opinion, Xerox's management was aware of the adverse effects of the CBO Reorganization . . ."); <u>id.</u> at 23-24 ("I found [Xerox's public] statements misleading . . . . In my opinion, the Defendants' public statements . . . were not complete and accurate.").)  That is improper expert testimony.  <u>See</u> <u>United States v. Scop</u>, 846 F.2d 135, 140 (2d Cir. 1988) (excluding expert who drew directly upon the "the language of the statute and accompanying regulations concerning 'manipulation' and 'fraud'"); <u>Rieger</u>, 427 F. Supp. 2d at 103 ("[A]lthough an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts."); <u>Feinberg v. Katz</u>, No. 01 Civ. 2739(CSH), 2007 WL 4562930, at *9 (S.D.N.Y. Dec. 21, 2007) (excluding expert whose purported materiality opinion (in a fraud case) "manages . . . to both usurp the trial judge's function of instructing the jury on the law and tell the jury what result to reach on the facts:  a breathtaking <u>tour de force</u> of inadmissibility"); <u>Hill v. Equitable Bank, Nat'l Ass'n</u>, Civ. A. No. 82-220, 1987 WL 8953, at *2 (D. Del. Mar. 3, 1987) (citing an "impressive list of authority prohibiting a witness-either an expert or a layperson-to testify to the legal significance of a particular set of facts").  For those reasons as well, Mr. Buchwald's testimony must be excluded.

## IV.    MR. DROTT'S TESTIMONY SHOULD BE EXCLUDED IN ITS ENTIRETY.

Mr. Drott is a certified public accountant who seeks to testify that Xerox's disclosures during the Class Period were false and misleading because the Company reported on the benefits of the Worldwide Restructuring, but failed to disclose certain so-called "adverse restructuring effects" allegedly caused by the CBO Reorganization.  However, Mr. Drott provides no credible basis for his opinion that Xerox was required to disclose any of these allegedly adverse effects.  As a result, his opinions must be excluded in their entirety for at least the following reasons.

<u>First</u>, Mr. Drott's disclosure opinions are not based on any reliable theory or methodology.  Indeed, Mr. Drott does not provide any basis--other than his personal views--for his opinion that the Company was required to disclose any of these so-called "adverse restructuring effects" of the CBO Reorganization.  Mr. Drott does not--either in his expert report or in his deposition testimony--cite to (or perform any analysis of) a single provision of Generally Accepted Accounting Principles ("GAAP") that requires, or even suggests, that the Company was under an obligation to make the disclosures he is proposing.  Mr. Drott's only relevant expertise in this case must derive from authoritative accounting literature--<u>i.e.</u>, GAAP.  Mr. Drott's failure to set forth how even a single GAAP provision can be a basis for his opinions requires that his proposed testimony be excluded.  Moreover, Mr. Drott did not conduct a materiality analysis and admits that he failed to look at a substantial portion of public information about Xerox that was available during the Class Period.

Mr. Drott's only purported basis for his opinions about the adequacy of Xerox's disclosure is a vague "analysis"--again, without reference to a single GAAP provision--of certain purported "improper accounting practices" that he claims Xerox used to "conceal[ ] . . . adverse restructuring effects".  (Drott Report (Topper Decl., Ex. U) ¶ 3.1, 3.9, 3.23, 3.35.)  This "analysis" defies logic and falls far short of the requirements of the Federal Rules of Evidence and the standard articulated by the Supreme Court in <u>Daubert</u>.  "The accuracy of [Xerox's] reported financial numbers is obviously an accounting issue--<u>not</u> a disclosure issue."  (Wyatt Report (Topper Decl., Ex. V) ¶ 37.)  In other words, even if Mr. Drott had actually demonstrated (which he did not) that there were inaccuracies in Xerox's financial results, the appropriate remedy would have been to correct those inaccurate numbers--in which case no additional disclosure would have been necessary.  Under no circumstances, however, could the supposed

errors in Xerox's reported financial numbers focused upon by Mr. Drott serve as a basis for requiring Xerox to make <u>disclosures</u> about purported adverse effects of the CBO Reorganization. Of course, as the Court is aware, this is not the accounting case.  In light of many failed attempts in the past to do so, Plaintiffs now know that they cannot in this case delve into supposed improprieties in Xerox's accounting (since that is the subject of a different litigation).  That is why Mr. Drott endeavors to shoehorn accounting issues into disclosures issues.  It does not work.

<u>Second</u>, even to the extent Mr. Drott's "analysis" of these so-called "improper accounting practices" is somehow relevant to his opinion that the Company had an obligation to disclose certain alleged "adverse restructuring effects" of the CBO Reorganization (which it is not), Mr. Drott's analysis of accounting is based upon incorrect factual assumptions that also render his proposed testimony unreliable and require that his opinions be excluded.

<u>Third</u>, Mr. Drott also seeks to opine on "whether the records and testimony which [he] examined reflect that Xerox's management knew of or recklessly disregarded any discrepancies between Xerox's Class Period publicly reported impact of the 1998 restructuring program and actual restructuring results".  (Drott Report (Topper Decl., Ex. U) ¶ 1.1.)  However, as with Mr. Buchwald, Mr. Drott is not qualified (or permitted) to opine on what management "knew of or recklessly disregarded".  As a result, Mr. Drott's testimony should be excluded in its entirety.

### A.   Mr. Drott's Disclosure Opinions Are Not Based on Any Reliable Theory or Methodology.

Mr. Drott fails to provide any objective basis for his conclusions about what Xerox should have disclosed.  His proffered testimony thus fails even a cursory analysis of the <u>Daubert</u> factors and must be excluded.  See <u>Daubert</u>, 509 U.S. at 597; <u>Pugliano</u>, 315 F. Supp. 2d at 199-202; <u>Hill v. City of New York</u>, 2007 WL 1989261, at *5; <u>LaBarge</u>, 2006 WL 2795612, at

*5-6.

      <u>First</u>, Mr. Drott's report does not contain a discussion of any academic literature,

standards or GAAP provisions at all.[26]  After he submitted his report and in response to a request

by defendants (<u>see</u> Defs., 10/22/07 Ltr. (Topper Decl., Ex. X) at 2), Mr. Drott provided

defendants with a list of purported "financial reporting requirements" that he "considered" (<u>see</u>

Drott Tr. (Topper Decl., Ex. W) Ex. 6).  However, Mr. Drott has not connected any of those

supposed "requirements" to his report, nor has he explained the methodology or theory (if any)

he used to make any such connection.  Indeed, Mr. Drott has not articulated (1) what those

supposed "requirements" say; (2) what they mean; (3) why or how they apply here; (4) whether

and why Xerox was obligated to follow them during the Class Period; (5) how Xerox allegedly

violated them; or (6) why any violations would have been material.[27]  In short, there is "too great

an analytical gap" between these supposed "requirements" and Mr. Drott's conclusions and,

since he has provided no basis upon which his disclosure opinions can reliably be founded,

Mr. Drott's testimony must be excluded.  <u>Hill v. City of New York</u>, 2007 WL 1989261, at *4;

<u>see also</u> <u>Smith</u>, 2005 WL 2076570, at *4-5.

      <u>Second</u>, even if Mr. Drott had identified a GAAP provision that could have

required any of the disclosures he proposes, Mr. Drott's report contains no evidence that he

---

[26]  Exhibit B to Mr. Drott's report indicates simply that he "considered and/or relied upon . . . [v]arious professional accounting standards and other literature that were in effect during the Class Period as specifically referenced herein".  (Drott Report (Topper Decl., Ex. U) Ex. B.)  During his deposition, Mr. Drott explained that he wished to correct that passage of his report to strike "as specifically referenced herein".  (Drott Tr. (Topper Decl., Ex. W) at 36:8-20.)

[27]  During his deposition, Mr. Drott claimed for the first time that Xerox had violated GAAP.  None of the provisions that Mr. Drott has referenced since issuing his report is a GAAP provision that requires, or even suggests, that Xerox was under an obligation to make the disclosures Mr. Drott proposes.

conducted any materiality analysis.[28]  Indeed, Mr. Drott admitted at his deposition that he did not

even consider whether the so-called adverse restructuring effects that he opines ought to have

been disclosed were quantitatively material.  (Drott Tr. (Topper Decl., Ex. W) at 126:20-24.)

And, while Mr. Drott testified that he believed the issues were qualitatively material--based

solely on his subjective opinion about a single qualitative factor--he never even attempted to

explain his analysis or how he reached that conclusion.  It is simply his say-so, and--as a matter

of law--that is an insufficient basis for an expert opinion.  See Hill v. City of New York, 2007

WL 1989261, at *5.   Mr. Drott's failure even to conduct a proper materiality analysis is itself a

sufficient ground to require that his testimony be excluded.  See Pugliano, 315 F. Supp. 2d at

199-202; LaBarge, 2006 WL 2795612, at *5-6; Smith, 2005 WL 2076570, at *4-5.

Third, Mr. Drott's "Overall Conclusion [that] Xerox continuously concealed

significant adverse restructuring effects in its Class Period public statements"  (Drott Report

(Topper Decl., Ex. U) ¶ 3.52) relies on incomplete and unreliable data.[29]  As with Mr. Buchwald,

Mr. Drott simply did not conduct a sufficient analysis to opine reliably on what he thinks Xerox

"continuously concealed" during the Class Period.  See Pugliano, 315 F. Supp. 2d at 199, 201-02

(excluding expert for relying on inadequate data).  Indeed, Mr. Drott admitted at his deposition

---

[28]   This is despite the fact that Mr. Drott emphasized during his deposition that whenever he indicated in his report that something was "misleading", that meant that the  item was "materially misstated" (Drott Tr. (Topper Decl., Ex. W) at 267:23-268:4), and that his report repeatedly indicates that the alleged adverse effects about which he opines are "material" (see, e.g., Drott Report (Topper Decl., Ex. U) ¶¶ 3.1, 3.9, 3.21, 3.35).

[29]   Moreover, as is set forth below, Mr. Drott also did not review deposition transcripts that contained undisputed facts that directly contradict his opinions (see infra § IV(B)).  In addition, Mr. Drott had not even read the deposition transcripts of two of the individual defendants-- Messrs. Thoman and Allaire--when he issued his report.  (Drott Tr. (Topper Decl., Ex. W) at 57:9-23.)  While Mr. Drott testified at his deposition that he had subsequently reviewed those two deposition transcripts, he still had not reviewed the exhibits to those deposition transcripts. (Id. at 54:17-55:20.)

that he only reviewed newspaper articles, analyst reports and teleconference transcripts that were

exhibits selected for use by plaintiffs at one of the depositions he reviewed.  (Drott Tr. (Topper

Decl., Ex. W) at 61:19-65:10.)  In short, Mr. Drott admits that he failed to look at a substantial

portion of public information about Xerox that was available during the Class Period.[30]

        In the absence of any discernible methodology (e.g., authoritative standards, a

materiality analysis or even a review of the relevant materials), Mr. Drott's sole basis for his

opinions about Xerox's disclosures are specific areas in which he alleges that the Company's

accounting was improper.[31]  As discussed above, however, the accuracy of the Company's

financial results is an accounting issue that cannot somehow be transformed into a requirement

for the Company to make specific disclosures about the CBO Reorganization.  Put simply, there

is a blatant disconnect between Mr. Drott's "analysis" of the five alleged "improper accounting

practices" and the disclosure conclusions he ultimately purports to reach.  The reason for that

---

[30]  Mr. Drott also certainly cannot be permitted to offer an opinion concerning "the total mix of information" available to investors.  (Drott Tr. (Topper Decl., Ex. W) at 129:2-130:16.)  In fact, his failure to review all available information caused Mr. Drott to form unreasonable and baseless opinions about what was (and was not) disclosed during the Class Period.  In his report, Mr. Drott erroneously indicated that "[i]n its third quarter 1999 public statements, Xerox finally began to partially disclose the negative effects of its 1998 restructuring program".  (Drott. Report (Topper Decl., Ex. U) ¶ 3.46.)  Mr. Drott reiterated during his deposition that he believes that "Xerox continuously throughout the class period talked about the initial and ongoing benefits of its worldwide restructuring but completely failed to talk about any of the negative or adverse information that was available to them".  (Drott Tr. (Topper Decl., Ex. W) at 112:18-24.)  Also, for example, Mr. Drott testified that Xerox did not publicly disclose that it was experiencing increased accounts receivable and days sales outstanding (DSO) until October 1999.  (Drott Tr. (Topper Decl., Ex. W) at 140:8-141:19; 172:21-173:2.)  Mr. Drott is plainly wrong.  Xerox disclosed that it was experiencing increased accounts receivable and DSO, among other things, due in part from the CBO Reorganization, throughout the Class Period.  (See Gompers Report (Topper Decl., Ex. F) Ex. 6.)

[31]  Mr. Drott cannot claim as a basis for his opinions the belief that Xerox did not experience benefits from the Worldwide Restructuring.  Mr. Drott confirmed at his deposition that he undertook no independent analysis concerning that subject and does not "have any reason to believe that there weren't some benefits".  (Drott Tr. (Topper Decl., Ex. W) at 223:5-225:6.)  Indeed, like Mr. Buchwald, Mr. Drott focused on the CBO Reorganization and not on the other 149 initiatives that comprised the Worldwide Restructuring.  (See, e.g., Id. at 103:7-104:11.)

disconnect is clear, based upon Mr. Drott's deposition testimony.  As one would expect from a

witness who is a certified public accountant and whose expertise is in accounting (Drott Report

(Topper Decl., Ex. U) ¶ 1.3; see, e.g., Drott Tr. (Topper Decl., Ex. W) at 13:23-15:9; 89:2-13),

the first draft of his report--which defendants have not seen--focused on "accounting matters

involving the restructuring as opposed to disclosure".[32]  (Drott Tr. (Topper Decl., Ex. W) at

42:12-20.)  However, Mr. Drott changed the "focus" of his report because he was told that those

accounting matters "were no longer part of the case".  (Id. at 42:21-43:4.)  Mr. Drott apparently

tried to salvage his report by attempting to transfigure his accounting opinions into disclosure

opinions.  The result, however, is that Mr. Drott's proposed testimony must be excluded.[33]

### B.    Mr. Drott's Accounting Analysis Is Based on Unsupported Factual Assumptions.

Even if Mr. Drott's analysis of the allegedly "improper accounting practices"

(which also does not cite to any authoritative standards) were relevant, Mr. Drott made patently

unreasonable factual assumptions that render his proposed testimony unreliable.  See Berk v. St.

Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 355 (S.D.N.Y. 2005) ("[A]n expert opinion

inadequately informed about the factual grounding of the subject it is called to address . . . bears

---

[32]  That initial draft did contain citations to accounting standards and literature.  (Drott Tr. (Topper Decl., Ex. W) at 87:6-23.)  When asked why he did not refer to authoritative standards in the issued report, he explained that "while there certainly are standards that deal with disclosure, I just felt that citing the standards wouldn't really add anything.  I'm certainly prepared to talk about them if we need to, but that's my reasoning.  Sometimes I do in cases reference them in the report, sometimes I don't."  (Id. at 73:3-17.)

[33]  Allegations concerning the propriety of Xerox's accounting practices and the accuracy of Xerox's reported financial results during the Class Period are not--and have never been--part of this case.  Mr. Drott's proffered testimony about Xerox's "improper accounting practices" should be excluded on that basis alone.  However, this motion focuses on Mr. Drott's shortcomings as an expert under Rule 702 and Daubert.  Defendants reserve the right to make additional motions in limine restricting plaintiffs' ability to introduce at trial evidence concerning Xerox's accounting.

none of the hallmarks of reliability necessary for the opinion to be admissible under <u>Daubert</u>."); <u>Macaluso v. Herman Miller, Inc.</u>, No. 01 Civ. 11496 (JGK), 2005 WL 563169, at *8 (S.D.N.Y. Mar. 10, 2005) (disregarding expert's testimony "based on incorrect factual assumptions that render[ed] all of his subsequent conclusions purely speculative").

        For example, Mr. Drott claims that he has determined the amount by which Xerox's accounts and notes receivable reserves were understated and Xerox's revenue figure was overstated as a result of allegedly adverse effects caused by the CBO Reorganization during the Class Period.  He also purports to have calculated the amount of additional interest expense Xerox incurred as a result of increased days sales outstanding caused by the CBO Reorganization.  Mr. Drott then takes the position that the specific numbers he calculated should have been disclosed by Xerox during the Class Period.  (<u>See</u> Drott Report (Topper Decl., Ex. U) § III.)  However, despite this being the central conclusion in his report, Mr. Drott made no attempt to determine what portion of the alleged adverse restructuring effects that he identifies and purports to quantify actually were caused by the CBO Reorganization as opposed to other unrelated factors.  Instead, unless he happened to see evidence to the contrary, he simply assumed that the entire amount of the impact he claims to quantify was attributable to the CBO Reorganization.  (Drott Tr. (Topper Decl., Ex. W) at 220:3-220:10.)  Mr. Drott provided no basis for that assumption, and it is demonstrably inaccurate.  For example, numerous fact witnesses have testified that factors other than the CBO Reorganization, including customized billing arrangements and longer payment terms, had a significant impact on Xerox's accounts receivable during the Class Period.  (<u>See</u> Kabureck Tr. (Topper Decl., Ex. Y) at 142:4-14; Fulford Tr. (Topper Decl., Ex. Z) at 205:6-25; Baugher Tr. (Topper Decl., Ex. AA) at 319:8-24; Croessman Tr. (Topper Decl., Ex. BB) at 197:3-6.)  Likewise, numerous witnesses have testified that other

factors contributed to the level of Xerox's billing errors, unbilled revenue and days sales outstanding.  (See Fulford Tr. (Topper Decl., Ex. Z) at 205:12-16; Baugher Tr. (Topper Decl., Ex. AA) at 92:9-12; Croessmann Tr. (Topper Decl., Ex. BB) at 194:2-6.)  Mr. Drott simply ignored those undisputed facts (and failed even to read the depositions of Kabureck, Croessman and Fulford).  His conclusions are therefore "purely speculative" and not sufficiently reliable to be admissible.  See Macaluso, 2005 WL 563169, at *8.[34]

Mr. Drott also relies upon a number of other unsupported factual assumptions as the basis for his purported analysis of the five so-called "improper accounting practices".  For example, Mr. Drott contends that Xerox's accounts receivable reserve was understated during the Class Period because Xerox failed to follow a recommendation made by KPMG with respect to calculating an entirely different reserve--i.e., the notes receivable reserve.  (See, e.g., Drott Report (Topper Decl., Ex. U) ¶ 3.4.)  Mr. Drott does not--because he cannot-- explain how KPMG's recommendation with respect to the notes receivable reserve was relevant to--let alone binding upon--the Company's calculation of the accounts receivable reserve.  Similarly, Mr. Drott claims that Xerox accounted improperly for billing errors because the Company failed to take into account the fact that KPMG "noted a 2.7% extrapolated error rate in Xerox's customer billings based on the results of accounts receivable confirmation test results".  (Drott Report (Topper Decl., Ex. U) ¶¶ 3.6, 3.14, 3.30, 3.41.)  Mr. Drott simply assumes that the Company was somehow obligated to apply that 2.7% error rate, despite the fact that KPMG arrived at that determination after the relevant time period, while doing routine confirmation

---

[34]  Mr. Drott's proffered testimony in this regard is also improper because he does not purport to be an expert concerning operational restructurings (Drott Tr. (Topper Decl., Ex. W) at 91:14-16) and has not demonstrated that he is qualified to offer an expert opinion regarding how the CBO Reorganization impacted Xerox's operations.

testing that KPMG expressly stated was not intended to provide a statistically valid error rate. (Wyatt Report (Topper Decl., Ex. V) ¶¶ 59-61.) Again, Mr. Drott provides no explanation or basis for concluding that this KPMG calculation somehow retroactively caused the Company's accounting to be improper.

### C. Mr. Drott Impermissibly Attempts To Opine on Scienter.

Mr. Drott, like Mr. Buchwald, seeks to opine on what "management knew of or recklessly disregarded" during the Class Period.[35]  (Drott Report (Topper Decl., Ex. U) ¶ 1.1.) As with Mr. Buchwald, Mr. Drott is not qualified to render an opinion on that subject.  (See supra § III(C).)  See Rezulin, 309 F. Supp. 2d at 546.  And, as with Mr. Buchwald, even if Mr. Drott were qualified to testify about what management knew, that testimony would fail to provide any specialized knowledge to the jury, but instead would improperly state Mr. Drott's subjective opinion on how an ultimate legal issue (scienter) should be resolved.  (See supra § III(C).) Rezulin, 309 F. Supp. 2d at 546.  Thus, Mr. Drott's opinions on what management "knew of or recklessly disregarded" must be excluded.  Id.

---

[35]  Mr. Drott confirmed at his deposition that it is his opinion that Xerox knew of or recklessly disregarded that certain financial figures published during the Class Period were wrong and that its disclosures were inadequate, and that the bases for that opinion are the documents and testimony he reviewed.  (See, e.g., Drott Tr. (Topper Decl., Ex. W) at 268:5-269:6 (accounts receivable); 269:7-270:2 (notes receivable); 270:3-23 (billing errors); 270:24-25; 271:20 (unbilled revenue); 271:21-272:5 (days sales outstanding).)  Mr. Drott also verified that he performed no analysis beyond reviewing documents and testimony to determine what Xerox management supposedly knew or recklessly disregarded.  (Id. at 237:22-238:3.)

**Conclusion**

For the foregoing reasons, Defendants respectfully request that the Court exclude the proffered expert testimony of Prof. Saunders, Mr. Buchwald and Mr. Drott in its entirety.

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP

By

/s/ Sandra C. Goldstein
_____
Evan R. Chesler (ct 03177)
Sandra C. Goldstein (ct 24019)
Members of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
echesler@cravath.com
sgoldstein@cravath.com

*Attorneys for Defendant Xerox Corporation*

DAY PITNEY LLP

By

/s/ Thomas D. Goldberg
_____
Thomas D. Goldberg (ct 04386)
Terence J. Gallagher (ct 22415)

One Canterbury Green
Stamford, CT 06901
(203) 977-7300
tdgoldberg@daypitney.com
tjgallagher@daypitney.com

*Attorneys for Defendant G. Richard Thoman*

-37-

WILMER CUTLER PICKERING HALE and DORR LLP

By

/s/ John A. Valentine
John Valentine (ct 25941)

1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000
john.valentine@wilmerhale.com

Alfred U. Pavlis (ct 08603)
DALY & PAVLIS, LLC
107 John Street
Southport, CT 06890
(203) 255-6700
apavlis@dalypavlis.com

*Attorneys for Defendants Paul A. Allaire and Barry D. Romeril*

Of counsel:
Ivy Thomas McKinney (ct 09351)
Xerox Corporation
45 Glover Avenue
P.O. Box 4505
Norwalk, Connecticut 06856-4505
(203) 968-3000

*Attorney for Defendant Xerox Corporation*