UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE XEROX SECURITIES LITIGATION | Civil Action No.  3:99-CV-2374 (AWT)<br><br>March 12, 2009 |

**COMPENDIUM OF UNREPORTED AUTHORITY CITED IN DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

# UNREPORTED CASES

TAB

Collier v. Aksys Ltd., No. 3:04CV1232 (MRK), 2005 WL 1949868 (D. Conn.
Aug. 15, 2005) ................................................................................................  1

Constellation Power Source, Inc. v. Select Energy, Inc., No. 3:04cv983
(MRK), 2007 WL 188135 (D. Conn. Jan. 23, 2007) .........................................  2

George v. U.S. Postal Serv., No. 3:04CV1073 (PCD), 2006 WL 798924 (D.
Conn. Mar. 28, 2006) ......................................................................................  3

In re Bell Atl. Corp. Sec. Litig., Civ. No. 91-0514, 1997 WL 205709 (E.D. Pa.
Apr. 17, 1997) ................................................................................................  4

In re Williams Sec. Litig., No. 07-5119, 2009 WL 388048 (10th Cir., Feb. 18,
2009) ..............................................................................................................  5

Johnson v. Pozen Inc., No. 1:07CV599, 2009 WL 426235 (M.D.N.C. Feb. 19,
2009) ..............................................................................................................  6

McLellan v. Sofamor-Danek Group, Inc., No. 95-CV-0322E(H), 1999 WL
222591 (W.D.N.Y. Apr. 12, 1999) ...................................................................  7

Rowe Entm't, Inc.  v. William Morris Agency, Inc., No. 98 CIV. 8272(RPP),
2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003)...................................................  8

Steiner v. MedQuist, Inc., Civ. No. 04-5487 (JBS), 2006 WL 2827740 (D.N.J.
Sept. 29, 2006) ...............................................................................................  9

Wechsler v. Hunt Health Sys., Ltd., No. 94 Civ 8294 PKL, 1999 WL 672902
(S.D.N.Y. Aug. 27, 1999) ................................................................................  10

**TAB 1**



H Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
Hal O. COLLIER, individually and behalf of all oth-
ers similarly situated, Plaintiff,
v.
AKSYS LTD., et al., Defendants.
No. 3:04CV1232(MRK).

Aug. 15, 2005.

<u>Lee Squitieri</u>, Squitieri & Fearon, New York, NY,
<u>Patrick F. Lennon</u>, Tisdale & Lennon, Southport, CT,
for Plaintiff.

<u>Terence J. Gallagher, III</u>, Day, Berry & Howard,
<u>Timothy G. Ronan</u>, Pullman & Comley, <u>Patrick J.
McHugh</u>, <u>William Morten Tong</u>, Finn Dixon & Her-
ling, Stamford, CT, <u>David A. Fleissig</u>, Dontzin Law
Firm, LLP, <u>Frank J. Lasalle</u>, <u>Harry S. Davis</u>, <u>Jeffrey
P. Wade</u>, Schulte, Roth & Zabel, LLP, New York,
NY, <u>Jaclyn C. Petrozelli</u>, Pullman & Comley,
Bridgeport, CT, for Defendants.

*MEMORANDUM OF DECISION*

<u>KRAVITZ</u>, J.

**\*1** In this securities fraud action, Plaintiff Hal O.
Collier, on behalf of himself and an as-yet uncertified
class of short sellers, claims that Defendants Durus
Capital Management, LLC ("Durus Capital"), Durus
Life Sciences Master Fund Ltd. ("Durus Master
Fund"), and Scott Sacane made material misrepresen-
tations and omissions that artificially deflated the
price of Aksys, Ltd. ("Aksys") stock, in violation of
Section 10(b) of the Securities Exchange Act of
1934, 15 U.S.C. § 78j(b), Rule 10b-5, <u>17 C.F.R. §
240.10b-5(b)</u>, and <u>Sections 20(a)</u> and 20A of the Se-
curities Exchange Act of 1934, <u>15 U.S.C. §§ 78t(a)</u> &
<u>78t-1</u>. Presently before the Court are Defendants'
Motions to Dismiss [docs. # 37 & # 39] all of Mr.
Collier's claims. Defendants argue, among other
things, that even though Mr. Collier has had three
opportunities to do so, he has still failed adequately
to plead "loss causation"-that is, the required "causal

link between the alleged misconduct and the eco-
nomic harm ultimately suffered by the plaintiff."
<u>Emergent Capital Inv. Mgmt., LLC v. Stonepath
Group, Inc.,</u> 343 F.3d 189, 197 (2d Cir.2003), *quoted
in* <u>Lentell v. Merrill Lynch & Co.,</u> 396 F.3d 161, 173
(2d Cir.2005). For the reasons that follow, the Court
agrees with Defendants and grants their motions to
dismiss.

I.

On a motion to dismiss pursuant to Rule 12(b)(6), the
Court must "construe the complaint in the light most
favorable to the plaintiff, accepting the complaint's
allegations as true." <u>Todd v. Exxon Corp.,</u> 275 F.3d
191, 197 (2d Cir.2001)."A complaint should not be
dismissed for failure to state a claim 'unless it ap-
pears beyond doubt that the plaintiff can prove no set
of facts in support of his claim which would entitle
him to relief." ' <u>Id.</u> at 197-98 (quoting <u>Conley v. Gib-
son,</u> 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80
(1957)). Thus, "[t]he issue is not whether a plaintiff
will ultimately prevail but whether the claimant is
entitled to offer evidence to support the claims."
<u>Bernheim v. Litt,</u> 79 F.3d 318, 321 (2d Cir.1996).

Furthermore, on a Rule 12(b) motion, "[a] complaint
is deemed to include any written instrument attached
to it as an exhibit, materials incorporated in it by ref-
erence, and documents that, although not incorpo-
rated by reference, are integral to the complaint."
<u>Sira v. Morton,</u> 380 F.3d 57, 67 (2d Cir.2004) (inter-
nal citations and quotations omitted). A document is
integral to the complaint "where the complaint relies
heavily upon its terms and effect." <u>Chambers v. Time
Warner, Inc.,</u> 282 F.3d 147, 153 (2d Cir.2002) (quo-
tations omitted). As the Second Circuit stated in
<u>Chambers,</u>"a plaintiff's *reliance* on the terms and
effect of a document in drafting the complaint is a
necessary prerequisite to the court's consideration of
the document on a dismissal motion; mere notice or
possession is not enough."*Id.* (emphasis in original).
Finally, and as is relevant to the present case, a court
considering a motion to dismiss may look at "public
disclosure documents required by law to be, and that
have been, filed with the [Securities and Exchange
Commission ("SEC") ]," and at public stock prices.
<u>Rothman v. Gregor,</u> 220 F.3d 81, 88-89 (2d Cir.2000)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1949868 (D.Conn.)
 (Cite as: 2005 WL 1949868 (D.Conn.))

(citations omitted); *see Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,* 369 F.3d 212, 217 (2d Cir.2004) (a court "may also look to public records ... in deciding a motion to dismiss"). In this regard, the Court notes that the parties agreed at oral argument on April 26, 2005 that the Court could take notice of stock quotations and SEC disclosure documents, without transforming Defendants' motions to dismiss into motions for summary judgment.

## II.

### A.

**\*2** Mr. Collier filed his original Complaint [doc. # 1] in this case on July 22, 2004. Shortly thereafter, by agreement of the Parties and with approval of the Court, all claims against Defendant Aksys were dismissed without prejudice. *See* Order [doc. # 9] (approving Stipulated Dismissal of Def. Aksys [doc. # 8]). After filing his Complaint, Mr. Collier moved to appoint himself as lead plaintiff and to appoint the law firms of Squitieri & Fearon, LLP and The Wexler Firm as lead counsel [doc. # 10], which the Court approved. See Order [doc. # 15]. The parties subsequently agreed that Mr. Collier would file an Amended Complaint, and he did so on December 27, 2004. *See* Am. Compl. [doc. # 20]. Defendants filed their motions to dismiss [docs. # 37 & # 39] on February 16, 2005. During the course of briefing on Defendants' motions to dismiss, Mr. Collier filed a Second Amended Class Action Complaint [doc. # 52] in an effort to respond to Defendants' arguments, and the parties agreed at oral argument that the Court should consider the Second Amended Class Action Complaint [doc. # 52] as the operative complaint for purposes of Defendants' motions to dismiss. Furthermore, Mr. Collier confirmed at oral argument that his Second Amended Class Action Complaint [doc. # 52] was his last and best effort to plead a viable cause of action in this case.

### B.

The following facts are taken from the Second Amended Class Action Complaint [doc. # 52] and its attachments, from public disclosure documents filed with the SEC, and from public stock prices.

Aksys is a Delaware corporation with a principal place of business in Lincolnshire, Illinois, which primarily provides dialysis products and services for patients suffering from chronic kidney failure. *See* Aksys Ltd. SEC Form 10-K, filed March 16, 2005 (Annual Report of Aksys Ltd. for the fiscal year ending December 31, 2004), *available at* http://www.sec.gov/Archives/ edgar/data/902600/000110465905011472/a05-4987_110k.htm. Aksys common stock is registered pursuant to Section 12(g) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*l*(g), and trades on the Nasdaq National Market under the ticker symbol "AKSY".*See* Second Am. Compl. [doc. # 52] at ¶ 6. During the relevant period, Aksys had upwards of 29.7 million shares of common stock issued and outstanding. *See id.*

Mr. Collier seeks to represent a class of "all persons and entities that sold shares of common stock of Aksys at any time from December 20, 2001 through July 24, 2003 and suffered damages thereby."*Id.* at ¶ 10.Despite the breadth of Mr. Collier's claim, his counsel confirmed at oral argument that the putative class includes only short-sellers and does not include *all* sellers of Aksys common stock during the relevant time period. Short-selling is a well-established, but extremely risky securities trading practice. As succinctly explained by the Second Circuit, "a short sale involves a customer who ... speculates that a particular stock will go down in price and seeks to profit from that drop."*Levitin v. PaineWebber, Inc.,* 159 F.3d 698, 700 (2d Cir.1998). A short sale transaction

**\*3** begins with the customer selling stock that she does not own. The customer "borrows" the stock to be sold, typically from her broker. The broker obtains the stock that it loans to the customer either from its own reserves or by borrowing it from external sources, such as other brokers or other customers. Later-sometimes considerably later-the customer "covers" the short by buying identical stock and restoring it to the broker-lender. If the price of the stock declines, as the customer hopes, the customer can purchase the stock at a lower price than the one at which she sold the borrowed stock, profiting from the difference between the sale and purchase prices.

*Id.* In sum, a short seller bets that a stock will drop in price; whether he gains or loses on his bet depends upon whether the stock price has dropped or risen

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2005 WL 1949868 (D.Conn.)
 **(Cite as: 2005 WL 1949868 (D.Conn.))**

before the point in time at which he must cover.

Mr. Collier engaged in a series of short sales of Aksys stock over the period December 20, 2001 to July 24, 2003. Mr. Collier initially short-sold 15,000 shares of Aksys stock from February 18, 2003 through February 21, 2003, at prices ranging from $5.85 to $5.90 per share. *See* Plaintiff's Sworn Certification, Ex. 2 attached to Affidavit of Lee Squitieri [doc. # 47]. Mr. Collier covered this first short-sale with a cover purchase of 15,000 shares on February 26, 2003 at prices ranging from $6.00 to $6.14 per share. *See id.*

Mr. Collier then short-sold 13,000 shares of Aksys stock as follows: 5,000 shares on February 26, 2003 at $5.97 per share; 4,000 shares on March 26, 2003 at $6.98 per share; 2,000 shares on May 12, 2003 at $7.86 per share; and 2,000 shares on June 12, 2003 at $10.50 per share. *See id.* Mr. Collier covered this second set of short-sales of 13,000 shares as follows: a cover purchase of 4,000 shares on April 8, 2003 at $7.25 per share; a cover purchase of 2,000 shares on July 24, 2003 at $15.67 per share; a cover purchase of 5,000 shares on February 25, 2004 at $7.80 per share; and a cover purchase of 2,000 shares on February 25, 2004 at $7.80 per share. *See id.*[FN1]

> FN1. It is unclear from the record before the Court which of the two 2,000 share short sales (on May 12, 2003 and June 12, 2003) correspond with the two 2,000 share cover purchases (on July 24, 2003 and February 25, 2004).

Defendant Durus Capital is a Delaware limited liability company with its principal place of business in South Norwalk, Connecticut. *See* Second Am. Compl. [doc. # 52] at ¶ 7. Defendant Durus Capital is the portfolio manager of the Durus Master Fund, a hedge fund.[FN2] *See id.* at ¶¶ 7-8. Defendant Scott Sacane is the managing member of Durus Capital, and he possessed voting and dispositive power over the Aksys stock owned by the Durus Master Fund. *See id.* at ¶ 9. Mr. Sacane also directed the purchases of Aksys stock that are the subject of this lawsuit, and signed documents with the SEC that Mr. Collier alleges contained false and misleading statements and omissions. *See id.* Contrary to Mr. Collier's statement in his Second Amended Class Action Complaint [doc. # 52] at ¶ 63, the parties recently stipulated that

Mr. Collier no longer claims that Mr. Sacane is the managing member of the Durus Master Fund. *See* Supplemental Brief [doc. # 68].

> FN2. According to a recent report of the SEC,
>
> [a]lthough financial service providers, regulators and the media commonly refer to "hedge funds," the term has no precise legal or universally accepted definition. The term generally identifies an entity that holds a pool of securities and perhaps other assets that does not register its securities offerings under the Securities Act [of 1933, 15 U.S.C. § 77et seq.] and which is not registered as an investment company under the Investment Company Act [of 1940, 15 U.S.C. § 80aet seq.]. Hedge funds are also characterized by their fee structure, which compensates the adviser based upon a percentage of the hedge fund's capital gains and capital appreciation.
>
> U.S. Securities and Exchange Commission, *Implications of the Growth of Hedge Funds,* Executive Summary at viii (2003), *available at* http://www.sec.gov/news/studies/hedgefunds0903.pdf (last visited Aug. 8, 2005).

**\*4** Defendants accumulated significant quantities of Aksys stock throughout the class period, with dramatic accumulations from November 2002 until the end of July 2003. Specifically, Defendants owned approximately 8% of the outstanding common shares of Aksys by February 1, 2002, 22% by November 8, 2002, 44% by March 31, 2003, 62% by June 10, 2003, and 77% by July 25, 2003. *See* Second Am. Compl. [doc. # 52] at ¶¶ 8, 17, 25, 26, 27, 33, 37, 46. Aksys publicly disclosed Defendants' ownership interest in Aksys for the first time in a press release on July 25, 2003. *See* Aksys' Form 8-K (dated July 25, 2003), attached to Affidavit of Harry S. Davis [doc. # 41] at Ex. C (disclosing press release issued by Aksys which announced that Aksys was advised by Mr. Sacane that the investors he represents have accumulated in excess of 77% of Aksys' outstanding stock). Pursuant to Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d), and Rule 13d-1, 17

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

C.F.R. § 240.13d-1, Defendants filed Schedule 13Ds with the SEC on July 28, 2003, October 30, 2003, February 26, 2004, and November 18, 2004. *See* Affidavit of Jeffrey P. Wade [doc. # 42] at Ex. 4, 5, 6 & 7. Pursuant to Section 16(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(a), and Rule 16a-3, 17 C.F.R. § 240.16a-3, Defendants also filed Form 3s and numerous Form 4's on July 30, 2003 and October 30, 2003. *See id.* at Ex. 8, 9, 10 & 11. These filings revealed the extent of Defendants' ownership interest in Aksys, and the details of their trades in Aksys stock during the class period.

To better understand the movement of Aksys common stock during the class period, Defendants prepared a graph that Mr. Collier does not dispute sets forth daily closing prices of Aksys stock from December 20, 2001 to December 31, 2004. *See generally* Summary Graph of Historical Daily Price Data for Aksys Stock, attached to Affidavit of Harry S. Davis [doc. # 41] at Ex. B. The graph has been reproduced in an appendix to this decision as an aid to the reader. On December 20, 2001, the beginning of the class period, Aksys stock closed at $4.20 per share. *See* Historical Daily Price and Volume Trading Data for Aksys stock from Thompson Financial / West Group, Exhibit A attached to Affidavit of Harry S. Davis [doc. # 41]. From December 20, 2001 to October 30, 2002, the stock price fluctuated between roughly $4.00 per share to over $8.00 per share, with a high of $8.78 per share (March 28-29, 2002) and a low of $3.90 per share (October 30, 2002).*See id.*The stock steadily climbed from $3.90 per share on October 30, 2002 to a peak of $15.85 per share on July 24, 2003, eventually closing at $15.01 per share on July 24, 2003, the day before Defendants first publicly announced the extent of their ownership of Aksys stock. *See id.*From July 25, 2003, the date of Defendants' press release, to August 8, 2003 the price of Aksys stock plummeted to a low of $6.90 per share, eventually closing at $7.60 per share on August 8, 2003. *See id.*The stock rebounded in September 2003, closing at a high of $12.87 per share on September 23, 2003. *See id.*Since September 23, 2003, however, the stock price has trended downward (with normal fluctuations), closing out the year 2004 at $5.56 per share on December 31, 2004. *See id.*

III.

**\*5** A complaint alleging securities fraud must meet the heightened pleading requirements of Rule 9(b) of the *Federal Rules of Civil Procedure* and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104-67, 109 Stat. 737 (1995), codified at 15 U.S.C. § 78u-4. *See Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 168-69 (2d Cir.2000).

Rule 9(b) of the *Federal Rules of Civil Procedure* requires all claims of fraud and the circumstances of fraud to be pleaded with particularity. The purpose of Rule 9(b)'s specificity requirement is to provide a defendant with fair notice of a plaintiff's claim and adequate information to frame a response. *See generally* 5A Charles Alan Wright et al., *Federal Practice & Procedure Civil 3d* § 1298, at 192 (3d ed.2004). The Second Circuit "has read Rule 9(b) to require that a complaint '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ' *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)).

Similarly, the PSLRA requires that

any securities fraud complaint alleging misleading statements or omission[s] of material fact[s] must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."

 *Rombach,* 355 F.3d at 170 (quoting 15 U.S.C. § 78u-4(b)(1)). As the Second Circuit recently emphasized in *Lentell v. Merrill Lynch & Co., supra,* "[a]ny fraud must be pled with particularity, but the rule is applied assiduously to securities fraud." *Lentell,* 396 F.3d at 168 (citation omitted). "This Circuit's strict pleading requirements in securities-fraud cases were (essentially) codified in the Private Securities Litigation Reform Act of 1995. So no claim should be filed unless and until it can be supported by specific factual allegations."*Id.* (citations omitted).

In *Lentell,* the Second Circuit explained that in order to state a claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. §

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

240.10b-5(b)), securities fraud plaintiffs must plead with particularity that a defendant: " '(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." ' *Lentell*, 396 F.3d at 172 (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir.1998)). The last two requirements are typically referred to as "transaction causation" and "loss causation." *See Lentell*, 396 F.3d at 172-73. Transaction causation is "akin to reliance," and "[i]n the securities fraud context, transaction causation is presumed when a claim rests on a material omission." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir.2001). By contrast, the Second Circuit has "described loss causation in terms of the tort-law concept of proximate cause, *i.e.*, that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission, but the tort analogy is imperfect." *Id.* (internal citations and quotations omitted).

**\*6** Below, the Court addresses each of the five required elements identified in *Lentell*. Although Mr. Collier met most of these pleading requirements, he failed to plead loss causation adequately. Therefore, the Court concludes that Mr. Collier failed to state a claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5(b).

### A. Misstatements or Omissions of Material Fact

As noted above, Mr. Collier must first allege with particularity that Defendants made misstatements or omissions of material fact in connection with the purchase or sale of securities. *Lentell*, 396 F.3d at 172. "For an undisclosed fact to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Castellano*, 257 F.3d at 180 (internal quotations omitted). In his Second Amended Class Action Complaint [doc. # 52], Mr. Collier claims that Defendants made material omissions and fraudulent misstatements when they failed to report properly their increasing accumulation of Aksys stock from February 1, 2002 until July 25, 2003, described in Part II, *supra*, and that Defendants misrepresented their control intentions with

respect to Aksys, all in violation of Sections 13(d), 13(g), and 16(a) of the Securities Exchange Act of 1934, and the corresponding SEC rules. *See* 15 U.S.C. §§ 78m(d) & (g); 15 U.S.C. § 78p(a); 17 C.F.R. § 240.13d-1; 17 C.F.R. § 240.13d-2; 17 C.F.R. § 240.16a-3.

Mr. Collier's allegations primarily center around the filing-or failure to file-Schedule 13D and Schedule 13G forms with the SEC. Section 13(d) of the Exchange Act of 1934 "requires a purchaser of any equity security registered pursuant to § 12 of the Securities Exchange Act, 15 U.S.C. § 78l, to file a Schedule 13D with the [SEC] within 10 days after its purchases have exceeded 5% of the outstanding shares of the security." *Edgar v. MITE Corp.*, 457 U.S. 624, 628 n. 2, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). A Schedule 13G-a short form of a Schedule 13D-"is similar to a Schedule 13D, but it may be filed only by certain classes of purchasers and only if the purchasers have no intent to change or influence the issuer or to act in concert with others who so intend." *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 616 (2d Cir.2002) (citing 17 C.F.R. § 240.13d-1(c)). *See also* Peter G. Samuels, *Schedules 13D and 13G: Reporting Beneficial Ownership of Registered Voting Securities*, 1392 PLI/Corp 493, 496 (Oct.2003).

Mr. Collier alleges that Defendants filed a Schedule 13G on February 1, 2002 that revealed that they owned 8.23% of the outstanding Aksys stock. *See* Second Am. Compl. [doc. # 52] at ¶ 25. Mr. Collier further alleges that during the time period from February 1, 2002 until November 8, 2002, Defendants failed to file, as required under 17 C.F.R. § 240.13d-2, necessary "prompt" amendments to their Schedule 13G as their accumulations of Aksys stock increased from 5% of the company to over 20%. *See* Second Am. Compl. [doc. # 52] at ¶ 26.[FN3] Mr. Collier asserts that once Defendants passed the 20% ownership barrier of Aksys in or about November 2002, Defendants improperly filed a Schedule 13G, rather than a Schedule 13D, as required under 17 C.F.R. § 240.13d-1(c). *See* Second Am. Compl. [doc. # 52] at ¶ 27. *See also* SEC Release No. 34-39538, *published in* 63 F.R. 2854 (January 16, 1998). Mr. Collier also claims that Defendants failed promptly to file necessary amendments to their Schedule 13G (or what should have been a Schedule 13D) as they accumulated approximately 77% of the issued Aksys stock

Not Reported in F.Supp.2d                                                                                                                   Page 6
Not Reported in F.Supp.2d, 2005 WL 1949868 (D.Conn.)
 (Cite as: 2005 WL 1949868 (D.Conn.))

from November 12, 2002 until July 28, 2002, once again all in violation of 17 C.F.R. § 240.13d-2. *See* Second Am. Compl. [doc. # 52] at ¶ 29.

> FN3. Mr. Collier alleges that Defendants should be considered a "group" under Section 13 and thus they all were subject to the reporting requirements of Section 13 jointly. *See* Second Am. Compl. [doc. # 52] at ¶¶ 16, 18, 19. The Court is willing to assume *arguendo* for purposes of this motion to dismiss that Defendants qualify as a group for purposes of the reporting requirements of Section 13. *See* 15 U.S.C. § 78m(d)(3) ("When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection."); 15 U.S.C. § 78m(g)(3) (same); 17 C.F.R. § 240.13d-5(b)(1) ("When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.").*See also Egghead.Com, Inc. v. Brookhaven Capital Mgmt. Co., 340 F.3d 79, 83-84 (2d Cir.2003)* ("Section 13(d) of the Exchange Act requires any entity (*or group of entities* ) which is the beneficial owner of more than five percent of particular types of individual equity securities to disclose that fact to the [SEC]. Under § 13, the definition of beneficial owner is quite broad.... This broad definition of beneficial ownership is consistent with § 13's purpose, which is to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control.") (emphasis added) (internal quotations and citations omitted).

**\*7** In addition to alleging violations of the reporting requirements under Section 13 of the Securities Ex-

change Act of 1934, Mr. Collier also alleges that as a consequence of Defendants' dramatic accumulations of Aksys stock, they became "insiders" and thus violated the reporting requirements of Section 16(a) of the Securities Exchange Act of 1934. *See* 15 U.S.C. § 78p(a)."An 'insider' is defined in the statute as a beneficial owner of more than ten percent of any class of the company's non-exempt, registered equity securities, or a director or officer of the company issuing the stock." *Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir.2001)* (citing 15 U.S.C. § 78p(a) & (b))."Section 16(a) require[s] covered parties to disclose (i) their initial ownership interests, and (ii) subsequent changes thereto, within ten days of a transaction. According to Rule 16a-3, the initial statements of ownership interest are reported on Form 3s; changes in ownership interest are reported on Form 4s." *Litzler v. CC Invs., L.D.C., 362 F.3d 203, 206 (2d Cir.2004)* (footnote omitted) (citing 15 U.S.C. §§ 78p(a)(2)(B)-(C); 17 C.F.R. § 240.16a-3(a)).[FN4]

> FN4. Mr. Collier implicitly alleges that Defendants qualify as a "group" under Section 16 as well as Section 13. *See* Second Am. Compl. [doc. # 52] at ¶ 16, 22; note 3, *supra.*The Second Circuit has recently cautioned that "the rules for determining beneficial ownership under § 16 are less inclusive than those governing determination of beneficial ownership for purposes of § 13." *Egghead.Com, 340 F.3d at 84.* Nonetheless, Mr. Collier asserts that once Defendants passed the 10% ownership barrier in or about February 2002, they failed to file a Form 3 and numerous subsequent Form 4s throughout the time period from February 2002 to July 2003, all as required under the relevant securities laws, and that these failures constituted material omissions regarding Defendants' growing ownership of Aksys stock. *See* Second Am. Compl. [doc. # 52] at ¶¶ 22-23. Once again, for purposes of the motions to dismiss, the Court is willing to assume *arguendo* that Defendants were a "group" under Section 16.

In addition to these alleged material omissions regarding Defendants' alleged failure to file required reports with the SEC, Mr. Collier also claims that in the few reports Defendants did submit to the SEC

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

during the class period, they misrepresented their true intentions regarding control of Aksys. Specifically, Mr. Collier notes that in Defendants' Schedule 13G (filed on February 1, 2002 and Schedule 13G (filed on November 12, 2002), Defendants stated the following:

> The securities referred to above were acquired in the ordinary course of business and were not acquired for the purpose of and do not have the effect of changing or influencing the control of the issuer of such securities and were not acquired in connection with or as a participant in any transaction having such purpose or effect.

*See* Second Am. Compl. [doc. # 52] at ¶¶ 25, 27; *see also* Affidavit of Jeffrey P. Wade [doc. # 42], at Ex. 2 (copy of Defendants' February 1, 2002 Schedule 13G) & Ex. 3 (copy of Defendants' November 12, 2002 Schedule 13G). According to Mr. Collier, this statement was "materially false and misleading since defendants knew that their plan was to continue buying Aksys stock without disclosing the increase in their ownership of the stock of Aksys and to acquire a controlling interest in Aksys."*See* Second Am. Compl. [doc. # 52] at ¶¶ 25, 28. Furthermore, Mr. Collier alleges that when Durus Capital filed a Form 13F quarterly report on May 8, 2003 for the quarter that ended on March 31, 2003, the company misrepresented its ownership of Aksys stock, reporting that it only owned 5,283,248 shares of Aksys, when in fact Durus Capital owned over 10 million shares, or approximately 44%, of Aksys common stock. *See* Second Am. Compl. [doc. # 52] at ¶ 31.

Defendant Durus Master Fund has argued that Mr. Collier has not pleaded alleged misstatements or omissions by Defendants as a group-or Durus Master Fund on its own-with sufficient specificity, even after Mr. Collier filed his Second Amended Class Action Complaint [doc. # 52].*See* Defs.' Mem. in Support of Durus Master Fund's Motion to Dismiss [doc. # 40] at 7; Def. Durus Master Fund's Reply [doc. # 55] at 14.[FN5]The Court disagrees. Mr. Collier has sufficiently pleaded misstatements or omissions by Defendants as a group. However, whether Defendants are appropriately considered a group under Section 13 or Section 16 is an issue that the Court concludes it need not decide because of the Court's ruling regarding loss causation in Part III.D, *infra.*Therefore, for purposes of Defendants' motions to dismiss, the

Court assumes that Mr. Collier has satisfied the pleading requirements for material misrepresentations or omissions by Defendants, who the Court will assume acted as a group in connection with their accumulation of Aksys stock during the class period.

> FN5. Defendants also claim that they filed numerous 13G's, 13D's, Form 3's and Form 4's, which report all the trades and accumulations of Aksys stock during the relevant time period, and that these filings provided the basis for Mr. Collier's allegations in his complaints, thus implying that there were no material omissions. *See* Defs.' Mem. in Support of Durus Master Fund's Motion to Dismiss [doc. # 40] at 7; *see also* Affidavit of Jeffrey P. Wade [doc. # 42] at Exs. 2-11. As Defendants must acknowledge, however, the full, complete, and accurate picture of Defendants' accumulation of Aksys stock from November 12, 2002 until July 25, 2003 was only revealed when Defendants filed their Schedule 13D on July 28, 2003-that is, *after* Defendants had already accumulated the majority of Aksys stock. *See* Affidavit of Jeffrey P. Wade [doc. # 42] at Ex. 4; *see also* Defs.' Mem. in Support of Durus Master Fund's Motion to Dismiss [doc. # 40] at 10 (acknowledging that the Aksys press release on July 25, 2003 was the "first public disclosure of Defendants' substantial holdings in Aksys common stock"). Thus, the Court has difficulty, particularly at the motion to dismiss stage, taking seriously Defendants' implicit suggestion that they hid nothing from the market from December 20, 2001 until July 25, 2003.

### B. Scienter

**\*8** Under Section 101(b) of the PSLRA,

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*

15 U.S.C. § 78u-4(b)(2) (emphasis added)."The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b-5, that the plaintiff must allege is an intent to deceive, manipulate or defraud." *Kalnit v. Eichler,* 264 F.3d 131, 138-39 (2d Cir.2001) (internal quotations omitted)."Scienter is a necessary element of every 10b-5 action, and though it need not be plead with great specificity, the facts alleged in the complaint must give rise to a strong inference of fraudulent intent." *In re Time Warner Inc. Secs. Litig.,* 9 F.3d 259, 268-69 (2d Cir.1993) (internal citations and quotations omitted). A strong inference of fraudulent intent may be established either " '(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." ' *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 187 (2d Cir.2004) (quoting *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995)).

Defendants argue that Mr. Collier has failed properly to plead scienter. *See* Defs.' Mem. in Support of Def. Sacane & Durus Capital Mot. to Dismiss [doc. # 38] at 6-12; *see also* Defs.' Mem. in Support of Durus Master Fund's Mot. to Dismiss [doc. # 40] at 21 (joining co-Defendants' arguments on scienter). However, Mr. Collier clearly alleges that Defendants were aware of the relevant reporting requirements during the class period and that they chose not to not abide by those requirements. *See* Second Am. Compl. [doc. # 52] at ¶¶ 52, 53 & 54(a)-(h). Such an allegation can be enough to create an inference of fraudulent intent, insofar as it raises an inference that Defendants knew that their public statements were inaccurate. *See, e.g., Novak v. Kasaks,* 216 F.3d 300, 311 (2d Cir.2000) (inference of fraudulent intent may arise where the complaint sufficiently alleges that the defendants "knew facts or had access to information suggesting that their public statements were not accurate"); *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.,* 95 F.Supp.2d 169, 174 (S.D.N.Y.2000) ("The fraud alleged in the fourth cause of action is the knowing non-disclosure, in a series of 13D and 13G filings, of the fact that the defendants were part of a group.... [No one could] seriously question ... that sophisticated investors such as these knew of their obligation to disclose that fact and therefore that there is strong circumstantial evidence of conscious misbehavior which amply satisfies both Rule 9(b) and the PSLRA."); *see also Mar-*

*tin v. Durus Capital Mgmt.,* No. 04 C 555, slip op. at 7-8 (N.D.Ill. Mar. 31, 2005) (Gottschall, J.) (finding that plaintiff adequately pleaded scienter by alleging, *inter alia,* specific details of defendants' repeated disregard of reporting obligations with the SEC, that defendants were clearly aware of) (unpublished opinion, attached to Affidavit of Patrick J. McHugh [doc. # 54] at Ex. B).

**\*9** As an additional basis for establishing Defendants' scienter, Mr. Collier also alleges that Defendants' motivation was to drive up the price of Aksys stock for their own personal financial benefit. *See* Second Am. Compl. [doc. # 52] at ¶¶ 53 & 54. Allegations of personal financial benefit can also give rise to an inference of fraudulent intent. *See Novak,* 216 F.3d at 311 (inference of fraudulent intent may arise where the complaint sufficiently alleges that the defendants "benefitted in a concrete and personal way from the purported fraud"). That said, it is also true that certain portions of Mr. Collier's pleadings regarding Defendants' motives-that is, to artificially drive the price of Aksys stock up-may contradict some of Mr. Collier's pleadings on loss causation, since Mr. Collier elsewhere claims that because of Defendants' actions, the "market prices of Aksys' securities were artificially *suppressed* throughout the Class Period."Second Am. Compl. [doc. # 52] at ¶ 55 (emphasis added); *see also id.* at ¶ 32 ("Defendants' concealments, omissions and misrepresentations were intentional and operated as a fraud on the market of Aksys stock and suppressed the price of Aksys stock and induced the plaintiff and the Class to sell at artificially low price levels.").*See Atl. Gypsum Co. v. Lloyds Int'l Corp.,* 753 F.Supp. 505, 514 (S.D.N.Y.1990) ( "Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent."), *cited in Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994).

In the end, the Court concludes that it need not decide whether Mr. Collier has adequately pleaded scienter because of the Court's ruling regarding loss causation in Part III.D, *infra.*Therefore, for purposes of Defendants' motions to dismiss, the Court assumes *arguendo* that Mr. Collier has satisfied the pleading requirements for scienter.

C. Transaction Causation

The Second Circuit has held that at the pleading

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1949868 (D.Conn.)
 **(Cite as: 2005 WL 1949868 (D.Conn.))**

stage, the requirement to plead transaction causation "requires only an allegation that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.' " _Lentell,_ 396 F.3d at 172 (quoting _Emergent Capital,_ 343 F.3d at 197).

Mr. Collier does not allege in this action that he contemporaneously read the alleged misstatements in Defendants' Schedule 13G's on February 1, 2002 and November 12, 2002, and Defendants' Form 13F filed on May 8, 2003, while he was short selling Aksys stock. In fact, Mr. Collier pleaded total ignorance of all Defendants' actual or omitted filings with the SEC. _See_ Second Am. Compl. [doc. # 52] at ¶ 56. Instead, Mr. Collier relies on the "fraud-on-the-market presumption" described in _Basic v. Levinson,_ 485 U.S. 224, 247, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), by specifically pleading that they relied upon the "integrity and efficiency of the market for Aksys' securities."Second Am. Compl. [doc. # 52] at ¶ 56. As recently stated by the Second Circuit:

**\*10** The fraud-on-the-market doctrine, as described by the Supreme Court in _Basic v. Levinson,_ creates a rebuttable presumption that (1) misrepresentations ... affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value. This presumption, if unrebutted, thus allows plaintiffs to satisfy the element of reliance in securities fraud claims under the 1934 Act.

 _Hevesi v. Citigroup Inc.,_ 366 F.3d 70, 77 (2d Cir.2004) (citing _Basic,_ 485 U.S. at 245-47; _In re Ames Dep't Stores Inc. Stock Litig.,_ 991 F.2d 953, 967 (2d Cir.1993)).

Based upon the allegations in the Second Amended Class Action Complaint and the Second Circuit's decision in _Hevesi,_ the Court concludes that Mr. Collier has adequately pleaded transaction causation based on the fraud-on-the-market doctrine.

### D. Loss Causation

Having concluded or assumed that Mr. Collier has adequately plead with particularity four of the five factors delineated in _Lentell,_ the Court views the determinative issue on Defendants' motions to dismiss as whether Mr. Collier adequately pleaded loss cau-

sation-i.e., the "causal link between the [defendant's] alleged misconduct and the economic harm ultimately suffered by the plaintiff." _Lentell,_ 396 F.3d at 173 (internal quotations omitted).

The Second Circuit recently clarified that to adequately plead loss causation in a securities fraud case based on an alleged material misrepresentation or omission, "a plaintiff must allege that the _subject_ of the fraudulent statement or omission was the cause of the actual loss suffered, _i.e.,_ that the misstatement or omission concealed something from the market that, _when disclosed,_ negatively affected the value of the security." _Lentell,_ 396 F.3d at 173 (citation and quotations omitted) (second emphasis added). Therefore, in order to adequately plead loss causation, a plaintiff must plead with particularity that his investment loss was "foreseeable" and was "caused by the _materialization of the concealed risk_"-that is, the revelation of the alleged misstatement or omission. _Id._ (emphasis added).

Moreover, as the Supreme Court recently observed in _Dura Pharmaceuticals, Inc. v. Broudo,_ 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), "an inflated purchase price will not _itself_ constitute or proximately cause the relevant economic loss." _Id._ at 1631 (emphasis added). The Supreme Court cogently explained why this is so:

For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that _at that instant_ possesses equivalent value. Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the market place, an initially inflated purchase price _might_ mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.

**\*11** *Id.* at 1631-32 (emphasis in original).

In other words "[i]t is not enough to allege that a defendant's misrepresentations and omissions induced a purchase-time value disparity between the price paid for a security and its true investment quality." *Lentell,* 396 F.3d at 174. *See also Emergent Capital,* 343 F.3d at 198 ("Plaintiff's allegation of a purchase-time value disparity, standing alone, cannot satisfy the loss causation pleading requirement."); *Merrill Lynch & Co. v. Allegheny Energy, Inc.,* No. 02 Civ. 7689(HB), 2005 WL 1663265, at \*7 (S.D.N.Y. Jul.18, 2005) ("[C]ases have repeatedly shown that overpayment alone does not prove causation and a claimant to collect on such a theory must prove that the breach or misrepresentation resulted in an actual injury or loss not attributable to other factors.") (citing *Dura,* 125 S.Ct. at 1632; *Lentell,* 396 F.3d at 174-75). Instead, Second Circuit precedent makes it clear that "loss causation has to do with the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant." *Lentell,* 396 F.3d at 174. Furthermore "[i]f that relationship is sufficiently direct, loss causation is established, but if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie."*Id.* (internal citations and quotations omitted).

Assessing loss causation in a short selling setting is further complicated because the standard model of a securities fraud class action based on misrepresentations or omissions is inverted. Thus, in order to adequately plead loss causation, Mr. Collier would have to plead with specificity that: (a) Defendants' misstatements and omissions in their SEC filings (described in Part III.A, *supra* ) kept the price of Aksys stock artificially *low* (not high) at the time they were short selling the stock; (b) the price of Aksys stock *rose* (not fell) after materialization of the concealed risk; and (c) Mr. Collier suffered financial losses that were causally linked to the revelation of the previously undisclosed information when he had to cover at the *higher* (not lower) prices.

Mr. Collier did, in fact, plead that the price of Aksys stock was artificially low when he was short selling. *See* Second Am. Compl. [doc. # 52] at ¶¶ 44 & 55.

However, the Court notes that the price of Aksys stock rose dramatically throughout most of the class period. *See* Part II, *supra*.This dramatic rise in Aksys' stock price can hardly be considered a clear sign that the stock was being kept artificially low.

Nevertheless, the Court recognizes that Mr. Collier could argue-at least in theory-that the price of Aksys stock, though rising during the period of short sales, was rising less than it would have due to Defendants' misrepresentations or omissions. As explained above, however, mere allegations that "a defendant's misrepresentations and omissions induced a purchase-time value disparity between the price paid for a security and its true investment quality," are insufficient in and of themselves to establish loss causation on their own. *Lentell,* 396 F.3d at 174;*see also Dura,* 125 S.Ct. at 1631; *Emergent Capital,* 343 F.3d at 198. And unfortunately for Mr. Collier, despite three attempts to amend his complaint, he has still not pleaded facts that sufficiently demonstrate the necessary linkages between this alleged purchase-time value disparity and the material misrepresentations and omissions.

**\*12** To begin with, when the true magnitude of Defendants' ownership interest (the fraudulent omission) and their supposedly true intentions for control of Aksys (the fraudulent misstatement) were revealed to the market on July 25, 2003-that is, when the "materialization of the concealed risk" occurred, *Lentell,* 396 F.3d at 173-the price of Aksys stock precipitously *dropped* roughly 50% in two weeks (from over $15.00 per share on July 24, 2003 to $7.60 per share on August 8, 2003).[FN6] This dramatic fall in Aksys' stock price-a negative reaction by the marketplace but a "positive" reaction in the inverted world of a short seller-is precisely the opposite reaction to the materialization of the concealed risk that Mr. Collier would have needed in order to have adequately pleaded loss causation.[FN7]*See Lentell,* 396 F.3d at 173 (loss causation requires "that the misstatement or omission concealed something from the market *that, when disclosed, negatively affected the value of the security* " ) (emphasis added). Because the alleged material omissions and misstatements revealed to the market by Defendants on July 25, 2003 caused the price to drop-not rise-Mr. Collier cannot show that the "*subject* of the fraudulent statement or omission was the cause of the actual loss suffered" by Mr. Collier and the class of short sellers

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

he purports to represent. *Lentell*, 396 F.3d at 173 (emphasis in original). Indeed, the dramatic drop in Aksys stock should have been the occasion for a short seller to make money, not lose it, since a short seller bets that the stock will fall in price.[FN8]

> **FN6.** Mr. Collier originally alleged that this revelation occurred "[o]n or about June 20, 2003."*See* Am. Compl. [doc. # 20] at ¶ 30. Furthermore, Mr. Collier originally alleged that "[w]hen the truth about defendants' ownership of Aksys was disclosed, the price of Aksys' common stock increased substantially."*Id.* at ¶ 33.While this pleading may have been what was *theoretically* required for a short seller to demonstrate loss causation, the events originally pleaded did not actually occur. Thus, the Court notes the dramatic factual turnaround in Mr. Collier's Second Class Action Complaint [doc. # 52], which now states that the "price of Aksys securities *declined* upon disclosure of defendants' position in Aksys stock *on July 25, 2003....*" *Id.* at ¶ 46 (emphasis added).

> **FN7.** Mr. Collier incongruously attempts to explain this precipitous fall in Aksys' stock price by stating that "it is just as likely that the stock dropped because investors were reacting to the portion of the announcement in which defendants[ ] indicated that they would *not* seek to take control of Aksys."Pl.'s Mem. in Opp'n to Defs.' Mots. to Dismiss [doc. # 48] at 6 n. 4 (emphasis in original); *see also id.* at 11 ("[I]t was not the revelation of defendants' position that caused the stock price to decline, but rather it was the announcement that defendants did *not* seek to take control of Aksys which caused the stock price to decline.") (emphasis in original). If Mr. Collier now argues that Defendants' revelation that they did not intend to take control of Aksys was in fact *true,* such an argument would directly contradict and in fact negate Mr. Collier's allegations that Defendants made material misrepresentations regarding their control intentions for Aksys in their filings with the SEC. However, "a court need not feel constrained to accept as truth conflicting pleadings that

make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371, 405-06 (S.D.N.Y.2001); *see, e.g., Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1095 (2d Cir.1995) (sustaining dismissal of the complaint where "attenuated allegations" supporting a claim "are contradicted both by more specific allegations in the complaint and by facts of which [the court] may take judicial notice"); *In re Bristol-Myers Squibb Sec. Litig.,* 312 F.Supp.2d 549, 555 (S.D.N.Y.2004) ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies.").

> **FN8.** As explained by counsel for Plaintiff at oral argument, a short seller's decision on the best time to cover is usually voluntary (unless the stocks were short-sold on a margin). Thus, as confirmed at oral argument, Mr. Collier voluntarily chose to cover 2,000 shares of his previous short sales on July 24, 2003-at or near the peak of Aksys' stock's dramatic rise-based on his own guess that the stock would continue to precipitously rise. Unfortunately for Mr. Collier, this and other bets on the direction of Aksys' stock did not pay off for him.

Relying on *Fogarazzo v. Lehman Bros., Inc.,* 341 F.Supp.2d 274 (S.D.N.Y.2004), Mr. Collier nonetheless suggests that a negative impact on the price of the stock after a corrective disclosure is not the only way to demonstrate loss causation. *See* Pl.'s Mem. in Opp'n to Defs.' Mots. to Dismiss [doc. # 48] at 14. Instead, Mr. Collier claims that a mere "market correction" can establish loss causation. *See Fogarazzo,* 341 F.Supp.2d at 292. In *Fogarazzo,* the District Court explained that

inflated stock prices can lead to a loss in one of two ways. First, there can be an external correction to the market, such as a corrective disclosure.... Second, there can be a market correction, where ordinary market forces affect the rate of artificial inflation. If, for example, the normal functioning of the securities

market causes the inflationary effect to dissipate over time, a customer who buys and sells at inflated prices will still suffer a loss based on the inflated price at the time of purchase so long as the price was less inflated at the time of sale.

*Id.* (quoting *In re Initial Pub. Offering Sec. Litig.,* 297 F.Supp.2d 668, 673 (S.D.N.Y.2003)). However, *Fogarazzo'* s "market correction" theory of loss causation applies only in *market manipulation* cases. *See In re Initial Pub. Offering Sec. Litig.,* No. MDL 1554SAS, 2005 WL 743550, at *6 (S.D.N.Y. Apr.1, 2005)* ("In market manipulation cases, however, the plaintiff's burden is somewhat different, because of the nature of the artificial inflation caused by manipulative conduct.... 'In market manipulation cases ... it may be permissible to infer that the artificial inflation will inevitably dissipate." ') (footnotes omitted) (quoting *In re Initial Pub. Offering Sec. Litig.,* 297 F.Supp.2d at 674). Because this case is founded on material misstatements or omissions and not on manipulation (as is explained in greater detail below), mere allegations of purchase-time value disparity between the price paid for a security and its true investment quality are insufficient, without more, to establish loss causation. *See Dura,* 125 S.Ct. at 1631; *Lentell,* 396 F.3d at 174.

**\*13** Another flaw in Mr. Collier's pleading of loss causation relates to the timing of Mr. Collier's representative cover purchases. Mr. Collier's cover purchases on February 26, 2003, April 8, 2003, and July 24, 2003 all occurred *before* revelation of the alleged material omissions and misstatements. According to *Lentell,* any losses associated with those pre-revelation cover purchases could not be causally linked to the misstatements and omissions, because the truth relating to Defendants' ownership of Aksys stock had not yet been revealed to the market. *See Lentell,* 396 F.3d at 175 n. 4 ("[Defendant's] concealed opinions regarding 24/7 Media and Interliant stock could not have caused a decrease in the value of those companies before the concealment was made public."). As one district court judge recently observed, "[a] concealed fact cannot cause a decrease in the value of a stock before the concealment is made public." *In re Worldcom, Inc. Sec. Litig.,* No. 02 Civ. 3288 DLC, 2005 WL 375314, at *6 (S.D.N.Y. Feb.17, 2005). In essence, any losses associated with these pre-disclosure cover purchases are the equivalent to a bare allegation of purchase-time value dis-

parity, which cannot by itself demonstrate loss causation. *See Dura,* 125 S.Ct. at 1631; *Lentell,* 396 F.3d at 174; *Emergent Capital,* 343 F.3d at 198.

Furthermore, Mr. Collier's representative cover purchases on February 25, 2004-seven months after the July 25, 2003 revelations regarding Defendants' ownership of Aksys stock-are far too removed in time to be causally linked to the material omissions and misstatements revealed on July 25, 2003. As noted earlier, the Supreme Court in *Dura* emphasized the pitfalls of waiting too far past the initial disclosure of the misstatement or omission to try to establish loss causation. As the Supreme Court stated: "Other things being equal, the longer the time between purchase and sale, the more likely that ... other factors caused the loss." *Dura,* 125 S.Ct. at 1632; *see also Suez Equity Investors v. Toronto-Dominion Bank,* 250 F.3d 87, 96 (2d Cir.2001) ("The loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement. Related factors include whether intervening causes are present, and *the lapse of time between the fraudulent statement and the loss.*") (emphasis added) (internal citations omitted); *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 772 (2d Cir.1994) ("When *a significant period of time has elapsed* between the defendant's actions and the plaintiff's injury, there is a greater likelihood that the loss is attributable to events occurring in the interim.") (emphasis added).

Mr. Collier's representative losses occurred *seven* months after Defendants' revelation, a virtual lifetime in the market. Absent some additional allegations, those losses are simply too remote in time to be causally linked to Defendants' earlier misrepresentations and omissions. *See, e.g., First Nationwide Bank,* 27 F.3d at 772 (affirming district court's dismissal of complaint where a "substantial period" of time "between the [plaintiff's] losses and the defendants' alleged misrepresentations strongly suggests that external factors were a substantial cause of those losses"); *Citibank, N.A. v. K-H Corp.,* 745 F.Supp. 899, 907 (S.D.N.Y.1990) (dismissing securities fraud claim where plaintiff could not establish loss causation where loss occurred "substantially after" the alleged misrepresentation), *aff'd* 968 F.2d 1489 (2d Cir.1992).

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1949868 (D.Conn.)
**(Cite as: 2005 WL 1949868 (D.Conn.))**

**\*14** At oral argument, counsel for Plaintiff rightly pointed out that the price of Aksys stock rebounded in September 2003. As a consequence, Mr. Collier argues that it is possible that some class members covered during September 2003 at prices above their initial short sales and that they would theoretically be able to demonstrate loss causation. *See* Second Am. Compl. [doc. # 52] at ¶ 47. However, Mr. Collier, the sole class representative of this putative class action, did not cover during the September 2003 rise in Aksys' stock price. *See* Part II.B, *supra.* And counsel for Plaintiff have not presented the Court with a class representative that did so, even though they have had plenty of time and complete access to relevant SEC filings to find such theoretical people. Moreover, even if there were individuals who sold short during the class period and covered at a loss during the September 2003 price rise, the Court would still find the causal link between the September 2003 rise and the revelation of Defendants' misstatements and omissions over one month earlier inadequate, without more, to demonstrate loss causation. *See Dura,* 125 S.Ct. at 1632. Indeed, to accept Mr. Collier's theory that the one-month delayed rise in Aksys' stock price in September 2003 was directly caused by the revelation of Defendants' accumulation of Aksys stock on July 25, 2003-and thus completely ignore the dramatic July-August 2003 *fall* in Aksys' stock price immediately following the revelation-would be nonsensical. *Cf. In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d at 405 ("[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent ..."); *Atl. Gypsum Co.,* 753 F.Supp. at 514 ("Plaintiffs' view of the facts defies economic reason").

Ultimately, even Mr. Collier begrudgingly acknowledges that the behavior of Aksys' stock price due to Defendants' July 25, 2003 revelation would not likely demonstrate loss causation in what they term a "pure" misrepresentation or omission case under Rule 10b-5(b). *See* Pl.'s Mem. in Opp'n to Defs.' Mots. to Dismiss [doc. # 48] at 12-13 ("Defendants argue that loss causation ... here will be impossible to prove because of the increasing price of Aksys stock throughout the Class Period and the decline in Aksys stock price after July 25, 2003.... [T]hat argument may have some merit ... in a *pure* misrepresentation or omissions case ...") (emphasis in original) (footnotes and quotations omitted). As a consequence, and in the face of the relatively simple facts of this case

and the clear reaction of Aksys' stock price to Defendants' revelations, Mr. Collier is forced to plead a convoluted and often contradictory tale of how his claim is a hybrid between a "misrepresentation or omission" case and a "market manipulation" case. *See* Pl.'s Mem. in Opp'n to Defs.' Mots. to Dismiss [doc. # 48] at 8, 11-16; *see also* Second Am. Compl. [doc. # 52] at ¶¶ 58-59. In so doing, Mr. Collier attempts to find cover under the somewhat relaxed specificity requirements that pertain to market manipulation claims. *See, e.g., In re Initial Pub. Offering Sec. Litig.,* 2005 WL 743550, at \*4 ("When a plaintiff's 10b-5 claims are based on market manipulation, the specificity requirement is relaxed to compensate for the inherent difficulty in a plaintiff acquiring specific details on a hidden scheme at the pleading stage."); *In re Blech Sec. Litig.,* 961 F.Supp. 569, 585 (S.D.N.Y.1997) ("where ... the principal allegations of wrongdoing involve market manipulation rather than false statements, the level of specificity required by 9(b) is somewhat relaxed").

**\*15** Mr. Collier portrays his "hybrid" claim as follows: "The market price of Aksys' securities increased significantly as the supply of Aksys stock became constrained because of defendants' *manipulative* activity but was still below the level it would have achieved *had investors been aware of defendants' accumulation* of Aksys stock and their concentrated ownership thereof." Second Am. Compl. [doc. # 52] at ¶ 58 (emphasis added). Mr. Collier thus seeks to fuse the alleged depression of Aksys' stock price from the material misrepresentations and omissions to the claimed inflation of the stock price arising from Defendants' alleged manipulatively rapid accumulation of Aksys stock from mid-June 2003 until July 24, 2003. Mr. Collier further argues that when his lawsuit is viewed as a "hybrid" misrepresentation-omission/market manipulation claim, the revelation of Defendants' "hidden" information actually occurred via Defendants' alleged manipulation of Aksys stock during the dramatic run-up in Aksys' stock price from mid-June 2003 until July 24, 2003-that is, *before* the July 25, 2003 press release disclosing Defendants' ownership of Aksys stock. As the Second Amended Class Action Complaint [doc. # 52] puts it: "As market awareness of the decrease in the 'public float' increased in approximately mid-June 2003, the price of Aksys stock began to climb as did the trading volume." *Id.* at ¶ 40; *see also* Pl.'s Mem. in Opp'n to Defs.' Mots. to Dismiss [doc. # 48] at 6 ("On or about June 20, 2003, the revelation of De-

fendants' buying program caused an increase in the price of Aksys stock and the trading volume."). Counsel for Plaintiff readily conceded at oral argument that they have no details to support their theory of alleged "market awareness" of Defendants' conduct pre-July 25, 2003 and that they are merely hypothesizing that this must have occurred from circumstantial evidence. Nonetheless, based on the foregoing characterization of his claim, Mr. Collier argues that he has adequately pleaded loss causation with respect to his representative cover purchase on July 24, 2003-the day before Defendants' press release.

In reality, all Mr. Collier has done through his so-called "hybrid" claim is turn a relatively simple set of facts into a hopelessly complicated, convoluted, and contradictory mess. However, the Court can easily clean up the mess Mr. Collier has made. Simply put, Mr. Collier has not, in fact, pleaded a market manipulation claim under Rule 10b-5(a) and 10b-5(c), 17 C.F.R. § 240.10b-5(a) & (c), either in addition to, or as a hybrid component of, their material misrepresentation or omission claim under Rule 10b-5(b).[FN9] As the Supreme Court has noted, "[m]arket manipulation" is "virtually a term of art when used in connection with securities markets. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480, (1977) (internal quotations and citation omitted). Mr. Collier has asserted no such claims.

> FN9. Therefore, the Court need not decide whether any such so-called "hybrid" claim is, in fact, cognizable.

*16 Moreover, at oral argument, counsel for Plaintiff conceded that Mr. Collier's hybrid market manipulation claim is entirely based on the misstatements and omissions of Defendants. However, as the Second Circuit recently explained in *Lentell,* "where the sole basis for [a market manipulation claim] is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c)"; rather they have simply stated a misrepresentation or omission claim under Rule 10b-5(b). *Lentell,* 396 F.3d at 177 (citing *Schnell v. Conseco, Inc.,* 43 F.Supp.2d 438, 447-48 (S.D.N.Y.1999)

(refusing to characterize allegations as market manipulation claims where allegations concerned an aggregation of material misrepresentations to inflate stock)); *see also In re Initial Pub. Offering Sec. Litig.,* 2005 WL 743550, at *7 ("If plaintiffs' alleged losses were caused by market manipulation, rather than by misstatements and omissions, then plaintiffs face a lighter burden in pleading their claims. However, plaintiffs' strenuous efforts to portray their claims as market manipulation claims are to no avail. The [complaint] clearly alleges numerous misstatements and omissions, but nowhere refers to the sort of conduct that rises to the standard of 'market manipulation' under the securities laws.") (footnote omitted). Thus, Mr. Collier has not stated a market manipulation claim, either standing alone or as a part of any purported "hybrid" misrepresentation-omission/manipulation claim.

Based on the simplest and most logical view of the facts alleged, Mr. Collier has not (and apparently cannot) plead loss causation. The Court hastens to note that by ruling that Mr. Collier failed to plead loss causation, the Court by no means intends to condone Defendants' apparent blatant disregard for the reporting requirements under the Securities Act of 1934, or any other alleged fraudulent activities Defendants may have engaged in with respect to their accumulation of Aksys stock.[FN10]Rather, this is simply a case where the strict pleading requirements for securities fraud class actions adopted by the Congress and implemented by the Supreme Court and the Second Circuit prevent Mr. Collier and the class he purports to represent from stating a claim upon which relief may be granted. *See Dura,* 125 S.Ct. at 1633-34;*Lentell,* 396 F.3d 174.As the Second Circuit explained in *Castellano v. Young & Rubicam, Inc., supra,*"[t]he loss causation requirement is intended to fix a legal limit on a person's responsibility, even for wrongful acts." *Castellano,* 257 F.3d at 186 (internal citation and quotations omitted); *see Shields,* 25 F.3d at 1130 ("While some fraud may go unpunished as a result of Rule 9(b)'s heightened pleading standard, ... we cannot eliminate all opportunities for unremedied fraud without creating opportunities for undeserved settlements."). And as the Supreme Court explained in *Dura,* the securities laws make private securities fraud actions available "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura,* 125 S.Ct. at 1633.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1949868 (D.Conn.)
(Cite as: 2005 WL 1949868 (D.Conn.))

Page 15

FN10. The Court notes that Aksys itself had previously sued the remaining Defendants (and others) for engaging in fraudulent conduct with respect to their purchases of Aksys stock. *See Aksys Ltd. v. Sacane, et al.,* No. 3:03-cv-01349 (RNC). As stated in the Second Amended Class Action Complaint [doc. # 52] at ¶ 39, and as confirmed at oral argument, Defendants settled all claims with Aksys for approximately $48.7 million.

IV.

**\*17** The Court now turns to Mr. Collier's claims under Section 20(a) and Section 20A of the Securities Exchange Act of 1934. *See* 15 U.S.C. §§ 78t(a) & 78t-1(a). Section 20(a) provides that

[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Section 20A of the Securities Exchange Act of 1934 provides a cause of action against "[a]ny person who violates any provision of [the Securities Exchange Act of 1934] or the rules or regulations thereunder by ... selling a security while in possession of material, nonpublic information...." 15 U.S.C. § 78t-1(a).

In order to state a claim under Section 20(a), a plaintiff must plead, *inter alia, "a primary violation* by a controlled person." *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998) (emphasis added). Similarly, in order to state a claim under Section 20A, "a plaintiff must plead *a predicate violation of the '34 Act or its rules and regulations." Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 703 (2d Cir.1994) (emphasis added). Because the Court has already dismissed Mr. Collier's primary Section 10(b) and Rule 10b-5 claims, *see* Part III, *supra,* the Court must also dismiss Mr. Collier's secondary Section 20(a) and Section 20A claims as well. *See, e.g., Jackson Nat. Life Ins.,* 32 F.3d at 703-04 ("Given the

narrow focus of § 20A, we must reject [plaintiff's] invitation to disregard the statute's plain language and apply the statute in the absence of an independent violation of the '34 Act."); *Shields,* 25 F.3d at 1132 ("[B]ecause we find that the primary violation [of § 10(b) and Rule 10b-5] asserted by [plaintiff] is not adequately pleaded and therefore properly dismissed by the district court, we also find no error in the district court's dismissal of the claims of secondary liability under § 20 of the 1934 Act."); *see also In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 541 (3d Cir.1999) ("[C]laims under section 20(A) are derivative, requiring proof of a separate underlying violation of the Exchange Act.... Because plaintiffs have failed to plead a predicate violation of Section 10(b) or Rule 10b-5, the section 20(A) claim must also be dismissed."); *Dresner v. Utility.com, Inc.,* 371 F.Supp.2d 476, 501 (S.D.N.Y.2005) ("Plaintiffs' failure to state a claim for underlying liability eviscerates their controlling-person liability claim pursuant to Section 20.").

V.

To summarize, the Court concludes that Mr. Collier's Section 10(b) and Rule 10b-5 claims fail because he has not adequately pleaded loss causation, and Mr. Collier's Section 20(a) and Section 20A claims fail because he cannot plead a predicate offense. Accordingly, the Court GRANTS Defendants' Motions to Dismiss [docs. # 37 & # 39].

**\*18** "[I]t is often appropriate for a district court, when granting a motion to dismiss ... to give the plaintiff leave to file an amended complaint." *Van Buskirk v. The New York Times Co.,* 325 F.3d 87, 91 (2d Cir.2003); *see Olsen v. Pratt & Whitney Aircraft,* 136 F.3d 273, 276 (2d Cir.1998) ( "Plaintiffs whose complaints are dismissed pursuant to Rule 9(b) are typically given an opportunity to amend their complaint."); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead.")."Although leave to replead is within the discretion of the district court, refusal to grant it without any justifying reason is an abuse of discretion."*Id.*

However, as stated above, Mr. Collier has had three chances to plead viable securities fraud claims, and his counsel conceded at oral argument that the Sec-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1949868 (D.Conn.)
 **(Cite as: 2005 WL 1949868 (D.Conn.))**

Page 16

ond Amended Class Action Complaint [doc. # 52] was Mr. Collier's last, best effort to do so-an effort that this Court has concluded falls well short of the mark. Because Mr. Collier has been given multiple opportunities to amend his complaint and repleading would be unproductive or futile-and because he does not even seek an opportunity to replead-allowing him yet another chance to amend his complaint is not required. *See, e. g., De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 72 (2d Cir.1996) ("[W]e have ... upheld decisions to dismiss a complaint without leave to replead when a party has been given ample prior opportunity to allege a claim."); *Acito,* 47 F.3d at 55 ("One good reason to deny leave to amend is when such leave would be futile."); *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) ("Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend."), *quoted in Lucente v. IBM Corp.,* 310 F.3d 243, 258 (2d Cir.2002); *Mooney v. Vitolo,* 435 F.2d 838, 839 (2d Cir.1970) ("Plaintiffs here were twice given an op-

portunity to replead. Therefore, it was within the sound discretion of the District Court to deny leave to replead on the third attempt."). Given the circumstances of this case, it is far more appropriate at this point for Mr. Collier to take his arguments to the Second Circuit, which, the Court notes, already has pending before it other cases that will likely require that court to explore further the loss causation requirement of securities fraud class actions. *See, e.g., In re Initial Pub. Offering Sec. Litig.,* No. MDL 1554SAS, 2005 WL 743550 (S.D.N.Y. Apr.1, 2005) (notice of appeal filed on June 10, 2005).

The Clerk is directed to enter judgment of dismissal for Defendants and to close this file.

IT IS SO ORDERED.

*Appendix*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1949868 (D.Conn.)
 (Cite as: 2005 WL 1949868 (D.Conn.))

Page 17

# APPENDIX



© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1949868 (D.Conn.)
 **(Cite as: 2005 WL 1949868 (D.Conn.))**

D.Conn.,2005.
Collier v. Aksys Ltd.
Not Reported in F.Supp.2d, 2005 WL 1949868
(D.Conn.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 2



**H**Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
CONSTELLATION POWER SOURCE, INC.
v.
SELECT ENERGY, INC.
**No. 3:04cv983 (MRK).**

Jan. 23, 2007.

Bradford S. Babbitt, Robinson & Cole, Brett J. Bos-
kiewicz, Robinson & Cole-Htfd, Hartford, CT, Eric
N. Macey, Joseph S. Nacca, Richard G. Douglass,
Stephen J. Siegel, Novack & Macey, LLP, Chicago,
IL, for Constellation Power Source, Inc.

Ann H. Rubin, Fatima Lahnin, Giovanna T. Weller,
James K. Robertson, Jr., John R. Horvack, Jr., Car-
mody & Torrance, Waterbury, CT, Duncan Ross
Mackay, Northeast Utilities Service Co., Hartford,
CT, for Select Energy, Inc.

### *MEMORANDUM OF DECISION*

MARK R. KRAVITZ, United States District Judge.

**\*1** On November 14, 2006, the Court issued an opin-
ion, following a bench trial, on the issue of liability.
*See* Memorandum of Decision [doc. # 137]. In what
now appears to have been a fruitless attempt to de-
termine if the parties could in good faith agree upon
all remaining issues, the Court gave the parties until
December 13, 2006 to file a stipulation or, in the ab-
sence of agreement, supplemental briefs on the issue
of damages and pre-judgment interest. Each of the
parties have now filed motions for reconsideration of
this Court's liability decision and briefs on damages,
prejudgment interest, and costs. *See* Defendant's Mo-
tion for Reconsideration and/or Clarification [doc. #
138]; Plaintiff's Motion for Reconsideration [doc. #
139]; Opposition to Plaintiff's Motion for Reconsid-
eration [doc. # 141]; Select Energy, Inc.'s Supple-
mental Post-Trial Brief Regarding Damages [doc. #
142]; Plaintiff's Memorandum on Damages [doc. #
143]; Plaintiff's Reply in Support of its Motion for
Reconsideration [doc. # 144]; Defendant's Opposition

to That Portion of Plaintiff's Memorandum on Dam-
ages Related to Expert Fees [doc. # 145]; Plaintiff's
Reply in Support of Request for Expert Fees [doc. #
146]. This opinion addresses the reconsideration mo-
tions and the issue of damages. The Court assumes
familiarity with the facts and its previous Memoran-
dum of Decision.

### Motions for Reconsideration

1. Plaintiff Constellation Power Source, Inc., now
known as Constellation Energy Commodities Group,
Inc. ("Constellation") moves for reconsideration of a
portion of this Court's decision. In particular, Con-
stellation focuses on the following statement from the
Court's Memorandum of Decision:

 There is no dispute that these portions of the Letter
 Agreement make Constellation responsible for
 LMP; indeed, Constellation readily acknowledges
 this, and accordingly, it paid the LMP it was billed
 by ISO New England during the Post-SMD period.
 But this dispute is not about whether Constellation
 is responsible for LMP absent the proviso. Rather,
 the dispute is about whether Constellation should
 have paid those amounts given Select's position
 that Select was not obligated to do so under the Se-
 lect/CL & P Agreement.

Decision [doc. # 137] at 42. Constellation disputes
that it ever acknowledged that it was responsible for
the marginal losses portion of the LMP Differential
or RMR charges in the Post-SMD period, and thus
asks the Court to reconsider its ruling in that respect.
Select Energy, Inc. ("Select") urges the Court to deny
the motion for reconsideration on the ground that the
Court did not overlook any new facts or law and that,
in any event, there is no basis for altering the Court's
decision.

The Court agrees with Constellation that it did not
acknowledge that it was responsible for the marginal
losses portion of the LMP Differential or RMR
charges in the Post-SMD period and that the Court's
statement to that effect in its decision is in error. The
Court, therefore, grants Constellation's motion for
reconsideration and clarifies that Constellation never

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

acknowledged that it was responsible for the marginal losses portion of the LMP Differential or RMR charges in the Post-SMD period. Having reconsidered these issues in light of the parties' briefing, however, the Court nevertheless adheres to its original decision. The Court is satisfied that the combination of the Product & ISO-NE Settlement Obligations provision and the Losses provision of the Letter Agreement made Constellation responsible in the Post-SMD Period for the marginal losses portion of the LMP Differential and RMR charges, except to the extent those losses and charges were not paid by Select to CL & P.

**\*2** 2. Select also asks the Court to reconsider a portion of its decision-namely, the Court's ruling that Constellation is entitled to its "pro rata share of the LMP Differential that Select received from CL & P in connection with the settlement of the FERC Proceeding, *plus pre-judgment interest as provided by the parties' agreement.*" Decision [doc. # 137] at 52 (emphasis added). According to Select, Constellation is not entitled to prejudgment interest under the parties' agreement because Constellation never claimed that Select owed it a pro rata share of the FERC settlement, never issued an invoice for that precise amount, and never argued in the litigation that it was entitled to that amount. Constellation counters that the parties' agreement provides for pre-judgment interest in the circumstances of this case, and that in any event, it is entitled to pre-judgment interest as a matter of right under New York statutes.

Once again, the Court grants Select's motion to reconsider this issue, since it was not addressed at any length in the parties' initial trial submissions or oral argument to the Court. However, having reconsidered the issue, the Court adheres to its decision that Constellation is entitled to pre-judgment interest. The Court need not address Constellation's statutory argument because the Court finds that Constellation's demands satisfy the provisions of section 4.2 of the Master Agreement, which provides for interest on "overdue payments."

Select argues that since Constellation never billed it for or sought the precise amount awarded by the Court in its Memorandum of Decision, Select cannot be liable for pre-judgment interest. The Court finds that argument contrary to the evident purpose of the parties' agreement as reflected in the language chosen by the parties. At all times material to this case, Constellation made it clear to Select from demand letters and claims in this lawsuit that Select owed Constellation sums attributable to the LMP Differential, including the amounts that Select received from CL & P in the FERC Proceeding. It is true that Constellation sought from Select a much greater sum than the Court ultimately awarded Constellation, but that is no reason to preclude Constellation from recovering pre-judgment interest on the amounts the Court did award Constellation. If Select's argument regarding the Master Agreement were accepted, then unless a court awarded a party the exact amount sought by the party, that party could never obtain pre-judgment interest, even though that party was wrongfully deprived of amounts due it under the parties' agreement. The Court sees no good reason in either the language of the agreements or the evidence to construe the parties' agreement in such a bizarre and counter-intuitive fashion. The evident purpose of the interest portion of the Master Agreement is to allow a party that is due amounts under the parties' agreements to recover interest on the amounts withheld from it and to deprive the party that has withheld those funds from retaining interest earned on the amounts wrongly withheld. Because the Court has now ruled that Select breached the parties' agreement in failing to pay Constellation a portion of the amount Select received from CL & P as a result of the FERC Proceeding, Constellation is entitled to recover pre-judgment interest in accordance with the parties' agreement on the amount awarded, just as Select is entitled to receive pre-judgment interest on the amounts the Court awarded it.

### Damages and Interest

**\*3** As intimated in the opening paragraph of this decision, the parties do not agree on any aspect of the calculation of damages and interest and insist that the Court make each of those determinations.

**1. Select's Pre-SMD Award** In its Memorandum of Decision, the Court awarded Select congestion charges in the Pre-SMD period. In closing arguments before the Court on September 28, 2006, the parties reported that they had agreed to compromise on the amount of preSMD congestion charges due Select and represented to the Court that the amount that the parties had agreed to for congestion charges was $ 2,378,534.61. Mr. Robertson, counsel for Select, re-

ported to the Court that it was his understanding that there had been a $6,000 difference of opinion between the two parties, and that counsel decided to split the difference to $3,000. He then represented to the Court that the Select agreed on the underlying amount of $2,378,534.61. Mr. Douglass, counsel for Constellation, also represented to the Court that Constellation agreed with Select on the principal amount.

In its post-trial memorandum on damages, however, Select now states that there is no agreement on the amount owed because Constellation would not agree with Select's interest calculation. However, it was clear at closing argument that Constellation and Select had not reached agreement on interest, and at no point did Mr. Robertson or anyone else from Select inform the Court that the parties' agreement on congestion charges was contingent or conditional on an agreement on interest. The Court takes seriously representations of counsel and therefore believes that it is appropriate to adhere to the agreement previously reported to the Court. The Court awards Select the principal sum of $2,378,534.61 in pre-SMD congestion charges.

For the calculation of pre-judgment interest, the Court utilizes the parties' Master Agreement. *See, e.g.,* _Trans Atlantic Airlines, Inc. v. Kambi Travel, Int'l,_ No. 05 Civ. 2552(RLE), 2006 WL 1317024, at *2 (S.D.N.Y. May 12, 2006) ("Interest is calculated at the New York State statutory rate of nine percent per annum unless the agreement ... provides a different rate."). Section 4.2 of the Master Agreement provides that overdue payments "accrue interest at the Interest Rate from, and including, the due date to, but excluding, the date of payment."PX 2, § 4.2. "Interest Rate" means "for any date ... two (2) percent over the per annum rate of interest equal to the prime lending rate as may from time to time be published in *The Wall Street Journal* under 'Money Rates'...."*Id.,* § 1.1. Constellation has set forth in an exhibit to its damages brief (Exhibit G) the prime lending rate in effect on the due date of the first unpaid invoice and all later changes in the rate as reported by the *Wall Street Journal* (matters for which this Court can take judicial notice). Using the due dates from Select's invoices, Constellation calculates pre-judgment interest through the date of the Court's liability decision (November 14, 2006) as $786,740.95.

**\*4** Constellation's pre-judgment figure is quite lower

than Select's calculation of pre-judgment interest (through December 1, 2006) of $940,533.62. Constellation points out that Select's calculation is flawed because it does not include rate adjustments keyed to the actual dates on which the prime rate changed but instead uses a single rate of interest each month, regardless of when the prime lending rate changed. In the Court's view, Constellation's method for calculating interest is more consistent with the language of the agreement than Select's. Calculation of interest under the Master Agreement is determined by the rate on "any [due] date," not any month. Also, according to Constellation, Select double-counted some months. *See* Pl.'s Mem. on Damages [doc. # 143] at 10-11. Select has not denied Constellation's allegation of double-counting other than to state that Constellation had ample opportunity during the trial to dispute Select's calculations and did not do so. Yet, if Select's interest exhibit does include double-counting, as Constellation points out, the fact that Constellation did not raise the issue until its brief on the proper calculation of interest is no reason to ignore Constellation's criticism of the exhibit. Therefore, in the absence of any objection from Select regarding Constellation's charge of double-counting, the Court credits Constellation's calculations and awards interest to the date of the Court's liability decision (November 14, 2006) as calculated by Constellation-namely, $786,740.95. The total of congestion charges and pre-decision interest awarded Select is $ 3,165,275.56.

The parties also disagree about the award of interest in the period following the Court's liability decision. Constellation argues that New York's statutory rate of 9%, *see* CPLR 5004, governs, while Select contends that the rate set forth in the parties' Master Agreement controls, particularly in view of section 8.4 of the Master Agreement, which states that the "express remedies and measures of damages provided in this Agreement satisfy the essential purposes hereof [and that for] breach of any provision for which an express remedy or measure of damages is provided, such express remedy or measure of damages shall be the sole and exclusive remedy .... and all other remedies or damages at law or in equity are waived."PX 2, § 8.4.

Since section 4.2 of the Master Agreement provides for the calculation of interest "to, but excluding, the date of payment" (as opposed to judgment) and since section 8.4 states that any express remedy provided in

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 188135 (D.Conn.)
**(Cite as: 2007 WL 188135 (D.Conn.))**

the agreement controls over any other remedy provided "at law or in equity," the Court concludes that the interest provision of the parties' Master Agreement governs the calculation of interest "to, but excluding, the date of payment," regardless of when the judgment is rendered. Therefore, interest shall continue to accrue in accordance with the Master Agreement on the amounts due Select from the due date to, but excluding, the date of Constellation's payment. According to Constellation, interest on the congestion charges accrues under the Master Agreement at $910.56 per day. Therefore, interest will continue to accrue from November 14, 2006, until payment is made (but excluding the date of payment) at a rate of $910.56 per day. *See* Pl.'s Mem. on Damages [doc. # 143] at 14.

**\*5 2. Constellation's Post-SMD Award.**The parties have stipulated that the Court's Post-SMD award to Constellation is 10% of the $40,361,746 that Select received from CL & P-namely, $4,036,174.60. *See* Select Energy, Inc.'s Supp. Post-Trial Brief [doc. # 142] at 2. However, Select argues that the amount of this award is subject to several downward adjustments. The Court disagrees.

Select argues that it is entitled to set-offs for a portion of the Auction Revenue Rights ("ARRs") and grossed-up losses that Constellation received as a consequence of supplying power to CL & P under the Letter Agreement. *See* Decision [doc. # 137] at 50 n. 19. As Select puts it, since, as a result of the Court's decision, Constellation is not required to pay for all congestion charges and losses associated with the CL & P Load Asset, Constellation should not be entitled to retain all of the financial benefits of paying for congestion or accepting responsibility for losses in the Post-SMD Period. Select seeks a set off of 44% of the $243,725.05 in ARRs and $401,037.94 throughout grossed-up losses that Constellation received.

The Court finds that, on the basis of the parties' agreements and the evidence, Select is not entitled to the set-offs it seeks. As the Court explained in its decision, ARRs are distributed by ISO New England to entities that pay congestion costs associated with supplying electricity to serve demand. Decision [doc. # 137] at 10. Select argues that, if Constellation receives a portion of the amounts Select received from CL & P in the FERC Proceeding, Constellation would receive a double recovery. But that is not true.

Constellation has received only a single recovery from Select (which also received ARRs from ISO New England) in accordance with the terms of the Letter Agreement. The Letter Agreement itself says nothing about what, if anything, should be done with payments from ISO New England when adjustments are made between Select and Constellation under their contract. That is, the overpayment (if overpayment it is) came from ISO New England, not Select. Yet, the concept of set-off "allows parties that owe *mutual debts to each other* to assert the amounts owed, subtract one from the other, and pay only the balance." *PC Com, Inc. v. Protean, Inc.,* 906 F.Supp. 894, 903 (S.D.N.Y.1995) (emphasis added).

Select presumably means by the phrase "double recovery" that equity and fairness require that Select receive a set-off for the ARRs Constellation received from ISO New England.[FN1]However, Select cites no case law on point to support its position. Constellation also points out that Select never identified the ARRs as the subject of its set-off claim in answers to contention interrogatories and never supplemented its interrogatory answers to include ARRs. *See* Pl.'s Mem. on Damages [doc. # 143] at 5.[FN2]*See, e.g., Wechsler v. Hunt Health Sys., Ltd.,* No. 94 Civ. 8294(PKL), 1999 WL 672902, at \*2 (S.D.N.Y. Aug. 27, 1999) (explaining that answers to contention interrogatories constitute judicial admissions that "generally estop the answering party from later seeking to assert positions omitted from, or otherwise at variance with, those responses"); *Guadagno v. Wallack Ader Levithan Assocs.,* 950 F.Supp. 1258, 1261 (S.D.N.Y.1997) (same); 8A Wright & Miller, Federal Practice & Procedure § 2181, at 346 ("The court in a proper case may limit the proof in the light of the answers to interrogatories....").

> FN1. The Court notes with some irony that throughout this litigation, Select argued vigorously that Section 8.4 of the Master Agreement precluded the parties from seeking recovery under any equitable doctrine and limited parties to their "direct actual damages only"; that is, the parties were strictly limited to the contractual remedies and could not recover for anything other than the direct actual damages *they* had incurred. Select has not explained how it has sustained direct actual damages by Constellation's retention of the ARRs received from

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 188135 (D.Conn.)
 (Cite as: 2007 WL 188135 (D.Conn.))

ISO New England.

> FN2. In its response to Constellation's proposed findings of fact and conclusions of law, submitted before trial, Select did state in summary fashion that it was entitled to a set-off for the ARRs. *See* Defendant's Response to Plaintiff's Proposed Findings of Fact and Conclusions of Law and Defendant's Supplemental Proposed Findings of Fact and Conclusions of law [doc. # 103] Ex. C at 118 ¶ 75.

**\*6** As to the grossed-up losses, the Court agrees with Constellation that New York's voluntary payment doctrine "bars recovery of payments voluntarily made with full knowledge of the facts, and in the absence of fraud or mistake of material fact or law." *Dillon v. U-A Columbia Cablevision of Westchester, Inc.,* 100 N.Y.2d 525, 526 (2003); *see Newman v. RCN Telecom Servs., Inc.,* 238 F.R.D. 57, 78 (S.D.N.Y.2006) (same); *Morales v. Copy Right, Inc.,* 813 N .Y.S.2d 731, 733 (App.Div.2006) (same). Frank Sabatino of Select testified that Select knowingly paid the grossed-up losses, even though Select believed it was not required to do so:

Q. And why did you continue to pay [grossed-up losses] to Constellation?

A. I think the term I used with my own people is I didn't want to tickle the dragon. I thought Constellation was looking for excuses to walk from the deal and I just wanted to pay their invoices and not give them any excuse to walk.

The Court. Okay. So it wasn't an acknowledgment by you that they were entitled to those monies?

The Witness. No, I think in the post SMD world, they were not.

Pl.'s Mem. on Damages [doc. # 143] at 6 (citing Trial Transcript at 524: 16-24).

There was no mistake; there was no fraud; Select knowingly and voluntarily paid grossed-up losses for which it did not believe it was responsible in order to achieve other goals regarding the parties' relationship. Those facts fit New York's voluntary payments doc-

trine like a glove. Furthermore, as was the case with the ARRs, Constellation asserts (and Select does not dispute) that Select never identified the grossed-up losses as the subject of its set-off claim in response to Constellation's contention interrogatories.

Accordingly, Constellation is entitled to an award of $4,036,174.60 and interest of $816,440.70 to November 14, 2006 for a total of $4,852,615.30. In accordance with the parties' agreement, interest will continue to accrue from November 14, 2006 at a rate of $1,395.96 per day until paid (excluding the date of payment).

**Expert Fees**

Constellation also seeks an award of $21,949.01 under Rule 26(b)(4)(C) of the *Federal Rules of Civil Procedure* because Select served a number of document requests on Constellation's expert, John Reed, and deposed him for six hours. In support of its request, Constellation points out that Rule 26(b)(4)(C) states that "[u]nless manifest injustice will result ... the court *shall* require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery under this subdivision...."[FN3] Select does not argue that requiring payment of Mr. Reed's fees would result in manifest injustice, nor does Select contest Mr. Reed's hourly rate or the hourly rates of his staff. Rather, Select contends that Constellation's request is untimely and procedurally improper and that the amount requested is unreasonable. *See* Def.'s Opposition to That Portion of Pl.'s Mem. on Damages Related to Expert Fees [doc. # 145]; Pl.'s Reply in Support of Request for Expert Fees [doc. # 146].

> FN3. Mr. Reed was deposed in late March 2005. Constellation made demand for payment under Rule 26(b)(4)(C) in June 2006. *See* Pl.'s Mem. on Damages [doc. # 143] Ex. L.

**\*7** Constellation's request is both timely and procedurally proper. Rule 26(b)(4)(C) does not provide a mechanism for seeking the fees authorized by the rule. While the Court does not doubt that it has the discretion to deny a fee request as untimely, *see Ellis v. United Airlines, Inc.,* 73 F.3d 999, 1011 (10th Cir.1996), the request in this case was submitted before judgment and at a time when the Court expected

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 188135 (D.Conn.)
 (Cite as: 2007 WL 188135 (D.Conn.))

Page 6

the parties to brief damages and any other remaining issues following the Court's liability decision. *See* Fed.R.Civ.P. 26 advisory committee's notes ("The court may issue the ... order [to pay fees] as a condition of discovery, or it may delay the order until after discovery is completed."). Other courts have awarded expert fees after trial and even after judgment. *See, e.g,* *Trepel v. Roadway Express, Inc.,* 266 F.3d 418, 427 (6th Cir.2001); *Chambers v. Ingram,* 858 F.2d 351, 360-61 (7th Cir.1988); *Lancaster v. Lord,* 90 Civ. 5843(RLC), 1993 WL 97258, at *2 n. 9 (S.D.N.Y. Mar. 31, 1993).

The amount requested by Constellation is more problematic. As a leading treatise notes, "[t]he basic proposition [underlying Rule 26(b)(4)(C) ] is relatively straightforward-a party that takes advantage of the opportunity afforded by Rule 26(b)(4)(A) to prepare a more forceful cross-examination should pay the expert's charges for submitting to this examination." 8 Wright & Miller, Federal Practice & Procedure § 2034, at 469; *see* *Goldwater v. Postmaster Gen.,* 136 F.R.D. 337, 339 (D.Conn.1991) ("[T]he underlying purpose of Rule 26(b)(4)(C) is to compensate experts for their time spent participating in litigation and to prevent one party from unfairly obtaining the benefit of the opposing party's expert work free of cost."). But, as the authors of the treatise also warn, "potential difficulties and unfairness lurk below the surface." 8 Wright & Miller, Federal Practice & Procedure § 2034, at 469. The party seeking reimbursement bears the burden of establishing the reasonableness of the fees sought. *See* *N.Y. v. Solvent Chem. Co., Inc.,* 210 F.R.D. 462, 468 (W.D.N.Y.2002).

Select first objects to Mr. Reed's delegation of certain discovery tasks to his staff. Since those staff members billed at lower rates than Mr. Reed himself, it is difficult to see how Select is injured by Mr. Reed's sensible delegation to lower-charging staff. This Court should not discourage experts from using lower-billing staff to perform discovery-related tasks that need not be performed by the higher-billing expert himself. *Cf.* *Fisher-Price, Inc. v. Safety 1st, Inc.,* 217 F.R.D. 329, 334 (D.Del.2003). That, of course, does not mean that the hours spent by the staff members were reasonable in light of the discovery required. However, the Court finds it difficult from the materials presented to make that determination. The Court, therefore, urges the parties to confer and

(hopefully) reach agreement on a reasonable sum for staff time. If, after conferring, the parties still cannot agree, they may submit the invoices and the discovery requests to the Court, and the Court will make that determination.

**\*8** Select also objects to reimbursing Constellation for the time spent in preparing the expert for his deposition. Courts appear to be divided on whether Rule 26(b)(4)(C) permits a court to compensate a party for the time its expert spent in preparing for his deposition. *Compare* *M.T. McBrian, Inc. v. Liebert Corp.,* 173 F.R.D. 491, 493 (N.D.Ill.1997) (Rule 26(b)(4)(C) "does not require the party deposing an expert witness to bear the expense of that expert's deposition preparation time ....") *with* *Lent v. Fashion Mall Partners, L.P.,* 223 F.R.D. 317, 318 (S.D.N.Y.2004) ("Rule 26(b)(4)(C) clearly contemplates remuneration for time spent responding to discovery requests, which would include reasonable preparation for a deposition."). According to at least one court, "districts courts in the Second Circuit have consistently held that time spent by an expert preparing for a deposition is compensable under Rule 26(b)(4)(C)." *Solvent Chem. Co., Inc.,* 210 F.R.D. at 471 (citing numerous decisions). While there are good arguments on both sides of this issue, the text of the rule, which is not limited to the time spent in a deposition, but rather is more broadly-phrased to include "time responding to discovery," suggests that a court may allow recovery of deposition preparation costs.

That said, there is also great risk of abuse in compensating a party for his expert's deposition preparation time, since that time usually includes much of what ultimately is trial preparation work for the party retaining the expert. As Wright & Miller suggest, "[T]he open-ended possibility that much ordinary trial preparation might be charged to the opponent by this device warrants caution." Wright & Miller, Federal Practice & Procedure § 2034, at 471. Here, it appears that Constellation seeks reimbursement for a large amount of hours associated with preparation for Mr. Reed's six-hour deposition. While the Court readily concedes that no magic formula exists to guide it, the Court's concern about reimbursing Constellation for what, in essence, would turn out to be ordinary trial preparation suggests that Constellation should not be reimbursed for more hours in preparation for the deposition than the deposition itself consumed-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

here, six hours. Therefore, the Court will permit Mr. Reed to be reimbursed for the time he spent in the deposition and for no more than six hours of his time in preparing for the deposition. The Court will not order Select to pay for the staff time spent in preparing Mr. Reed for his deposition.

Finally, Constellation seeks recovery of $7,900, which it claims are the costs of copying Mr. Reed's file for Select. However, Select responds that it paid a third-party provider $1,917.62 (14 cents per page) for a separate copy of the same documents. The fee sought-$7,900-strikes the Court as excessive. If Mr. Reed decided for his own reasons to copy the file in-house rather than send it out for copying, Select should not have to bear that expense. Rule 26(b)(4)(C) is phrased in terms of a "reasonable" fee, not whatever the expert may choose to charge his client. Therefore, the Court will not require Select to pay $7,900 for the copies sought by Select. While the record is not clear on this issue, assuming that Mr. Reed could have obtained a copy of his file from a third-party provider for 14 cents per page (which seems reasonable to this Court), he should not receive more than that in reimbursement. Once again, the Court will leave the parties to try to reach agreement on this issue, given the guidance the Court has given them.

### Conclusion

**\*9** In sum, the Court GRANTS Select Energy, Inc.'s Motion for Reconsideration and/or Clarification [doc. # 138], as well as Plaintiff's Motion for Reconsideration [doc. # 139], but adheres to its original decision. In addition, the Court grants Constellation's request to award expert fees under Rule 26(b)(4)(C) and directs the parties to confer about the appropriate reimbursement in light of the guidance provided above. The Court urges the parties to reach agreement on this issue, but if the parties cannot agree on an appropriate reimbursement amount, they may file simultaneous briefs and exhibits directed to this issue no later than **January 30, 2007 .**

Having now considered the issue of damages, the Court directs the Clerk to enter Final Judgment as follows:

1. Judgment shall enter in favor of Constellation and against Select on Counts I and IV of Constellation's

Complaint [doc. # 1] in the following amounts: (a) $4,036,174.60; (b) interest of $816,440.70 to November 14, 2006; and (c) interest from and after November 14, 2006 until the amounts owed are paid (excluding the date of payment) at a rate of $1,395.96 per day.

2. Judgment shall enter against Constellation and in favor of Select on Count II of Constellation's Complaint [doc. # 1].

3. Counts III and V of Constellation's Complaint are dismissed as moot in view of the Court's rulings on Counts II and IV.

4. Judgment shall enter in favor of Select and against Constellation on the First Count of Select's Counterclaim [doc. # 12] in the following amounts: (a) $2,378,534.61; (b) interest of $786,740.95 to November 14, 2006; and (c) interest from and after November 14, 2006 until the amounts owed are paid (excluding the date of payment) at a rate of $910.56 per day.

Each party shall bear its own costs. **The Clerk is directed to close this file subject to reopening, if necessary, to address the issue of expert fees.**

IT IS SO ORDERED,

D.Conn.,2007.
Constellation Power Source, Inc. Select Energy, Inc.
Not Reported in F.Supp.2d, 2007 WL 188135 (D.Conn.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**TAB 3**



H

United States District Court,
D. Connecticut.
Vincent GEORGE, Cyril Matthew and George Joseph, Plaintiffs,
v.
UNITED STATES POSTAL SERVICE; John E. Potter, Postmaster General; and National Postal Mail Handlers Union, Defendants.
No. 3:04CV1073 (PCD).

March 28, 2006.

Marc L. Glenn, W. Martyn Philpot, Jr., Law Offices of W. Martyn Philpot, Jr., LLC, New Haven, CT, for Plaintiffs.

Patrick F. Caruso, Victoria S. Shin, U.S. Attorney's Office, New Haven, CT, John M. West, Bredhoff & Kaiser, PLLC, Washington, DC, Martin A. Gould, Gould, Killian & Wynne, Hartford, CT, for Defendants.

*RULING ON MOTION FOR SUMMARY JUDGMENT*

DORSEY, J.

**\*1** Defendant National Postal Mail Handlers Union ("NPMHU") moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on Count IV of Plaintiffs' Complaint. Defendants United States Postal Service and John E. Potter (collectively "USPS") move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on Counts I, II and III of Plaintiffs' Complaint. Plaintiffs object to Defendants' Motions for Summary Judgment, arguing that there are "sufficient genuine issues of material fact" to warrant submission of the claims against Defendants to a jury. For the reasons stated herein, Defendant NPMHU's Motion for Summary Judgment [Doc. No. 35] is granted and Defendants USPS's Motion for Summary Judgment [Doc. No. 39] is granted.

I. BACKGROUND [FN1]

FN1. The statement of facts that follows is derived primarily from Plaintiffs' Complaint and the parties' Local Rule 56 statements and is supplemented, where necessary, by the parties' briefs. To the extent necessary, the facts will be addressed in more detail in the discussion that follows.

Plaintiffs filed this suit on July 1, 2004, alleging that Defendants USPS discriminated against them on this basis of their Indian national origin (Count I) and retaliated against them for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *etseq.,* ("Title VII") (Count II) and violated the collective bargaining agreement ("CBA") pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, between NPMHU and USPS (Count III). Plaintiffs also allege that Defendant NPMHU breached its duty of fair representation and violated Section 301 of the LMRA by declining to prosecute grievances on Plaintiffs' behalf in connection with their contention that they should have been converted from part-time flexible ("PTF") employees to full-time regular ("FTR") mail handlers (Count IV).

Because this case is at the summary judgment stage, this Court views the record in the light most favorable to Plaintiffs, the non-moving party. *See Terry v. Ashcroft,* 336 F.3d 128, 139 (2d Cir.2003). Most of the underlying facts are undisputed. [FN2]

FN2. Plaintiffs' Rule 56(a)(2) Statement admits 42 of the 47 factual assertions set forth in Defendants' Local Rule 56(a)(1) Statement. Local Rule 56(a)(3) requires the party opposing a motion for summary judgment to follow each denial in their Rule 56(a)(2) Statement "by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." D. Conn. Loc. Civ. R. 56(a)(3). Plaintiffs deny statement numbers 13 and 30 without any citations at all. Moreover, their denials of statement numbers 26, 37 and 45 cite deposition transcript that does not adequately support the denials. *See* Pls' Rule 56(a)(2)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2006 WL 798924 (D.Conn.), 179 L.R.R.M. (BNA) 2470, 97 Fair Empl.Prac.Cas.
(BNA) 1513
 (Cite as: 2006 WL 798924 (D.Conn.))

Statement. When a party fails to appropriately deny material facts set forth in the movant's Rule 56(a)(1) statement, those facts are deemed admitted. *See SEC v. Global Telecom Servs. L.L.C.,* 325 F.Supp.2d 94, 109 (D.Conn.2004) ("Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); *Root v. Liston,* 363 F.Supp.2d 190, 191 n. 1 (D.Conn.2005); *Martin v. Town of Westport,* 329 F.Supp.2d 318, 323 n. 1 (D.Conn.2004). Accordingly, the factual assertions set forth in Defendants Rule 56(a)(1) Statement will be admitted, however, the Court notes its continued adherence to the Second Circuit's admonition that "it is incumbent upon a court in a discrimination case to examine 'the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.' " *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 101 (2d Cir.2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)) (citation omitted); *see Zimmermann v. Assocs. First Capital Corp.,* 251 F.3d 376, 382 (2d Cir.2001) (noting that in evaluating the merits of a Title VII case, the task is "to examine the entire record and, in accordance with *Reeves,* make the case-specific assessment as to whether a finding of discrimination may reasonably be made").

Plaintiffs are all individuals of Indian descent (non-Native American) residing in West Hartford, Connecticut. Compl. ¶¶ 1-3.Defendant USPS is a quasi-governmental agency which provides mailing services to the general public, employs over 500,000 individuals and maintains offices throughout the State of Connecticut. *Id.* ¶ 4. Plaintiffs are members of NPMHU, the collective bargaining unit for USPS employees holding mail handler positions.*Id.* ¶ 5. NPMHU and USPS are parties to a CBA which defines the terms, conditions and privileges of the employment relationship between NPMHU members and the USPS. *Id.*

Plaintiffs have been employed with USPS as mail handlers at the USPS Hartford Processing and Distribution Center ("Hartford P & DC") since 1998 and, during their entire tenure, have been designated as PTF employees.[FN3]*Id.* ¶ 6; NPMHU Brief at 1. Plaintiffs allege that as PTF employees, they have "consistently worked in excess of forty (40) hours per week," the equivalent of FTR employees as defined by Article 7.3 of the CBA,[FN4] without being elevated to FTR employee status. Compl. ¶ 7. Plaintiffs contend that pursuant to Article 7.3 of the CBA, other similarly-situated but non-protected class USPS mail handlers have been converted from PTF employees to FTR employees, whereas Plaintiffs have remained PTF employees. *Id.* ¶ 9.[FN5]

> FN3. PTF employees are those most recently hired. USPS Brief at 4. Although PTF employees receive a higher hourly wage than do FTR employees, they have no fixed schedules or workplace assignments, are not guaranteed a certain number of hours per week, have no right to place themselves on the overtime list, have no right to bid on jobs and do not receive paid holidays. *Id.* (citing Morissette Depo. at 10-11; George Depo. at 136); Defs' Rule 50(a)(1) Statement ¶ 9. PTF employees are generally "available to work flexible hours as assigned by the Employer during the course of a service week."CBA Art. 7.1(A2), Morissette Decl. at Exh. A; Defs' Rule 50(a)(1) Statement ¶ 9.

> FN4. Article 7.3 of the CBA provides, in relevant part, that: "A part-time flexible employee working eight (8) hours within ten (10) on the same five (5) days each week over a six-month period will demonstrate the need for converting the assignment to a full-time position."CBA Art. 7.3, Morisette Decl. at Exh. A.

> FN5. There is no evidence in support of this assertion.

**\*2** In or about 2000, the USPS District of Connecticut began, statewide, to automate the processing of "flat mail" by using a mechanized sorter machine, the Automated Flat Sorting Machine 100 Model, and subsequently also began using the Automated Parcel and Package Sorter. *See* Defs' Rule 56(a)(1) State-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2006 WL 798924 (D.Conn.), 179 L.R.R.M. (BNA) 2470, 97 Fair Empl.Prac.Cas.
(BNA) 1513
 (Cite as: 2006 WL 798924 (D.Conn.))

ment ¶ 4 (citing Gillis Aff. ¶¶ 15-16). In addition, in 2001, the USPS projected the consolidation of its Bridgeport and Waterbury facilities, the net result of which would be, over the course of several years, to eliminate the jobs of a number of postal employees, particularly those who sort mail.[FN6] *Id.* The USPS and the unions that represent postal employees have agreed that rather than laying off displaced postal employees, full-time jobs-or "bids"-that become vacant and are not filled by another full-time employee will be "withheld" and reserved for those employees expected to be "excessed" by technology, consolidation, a decrease in mail volume or any other reason. *See* USPS Brief at 3 (citing CBA Art. 12.6, Morissette Decl. at Exh. A; Gillis Depo. at 16; Gillis Aff. ¶ 17-18); Defs' Rule 56(a)(1) Statement ¶¶ 5 (citing Gillis Aff. ¶ 14-22). If a vacant bid was not withheld pursuant to Article 12.6, it would-unless the USPS decided to "revert," or eliminate, the position pursuant to Article 12.2(D8)-normally be filled by converting the most senior PTF employee to FTR status. Defs' Rule 56(a)(1) Statement ¶ 8 (citing Gillis Depo. at 10-11, 15). From February 2001 through July 1, 2004, the date of the Complaint, the USPS District of Connecticut was proceeding under Article 12 and withholding bids that became vacant as specified above. *Id.* ¶ 7 (citing Gillis Aff. ¶ 20).

> FN6. Specifically, Mark Gillis, the Manager of Labor Relations for the USPS's Connecticut District, asserts that "it was anticipated that automation resulting from introduction of the [Automated Parcel and Package Sorter] would, over the course of a few years, eliminate or 'excess' the jobs of 48 USPS 'clerks' in Hartford and 66 USPS 'clerks' in Wallingford."Gillis Aff. ¶ 16; *see also* Defs' Rule 56(a)(1) Statement ¶ 4; Pls' Rule 56(a)(2) Statement ¶ 4.

Defendants explain that PTF employees are typically converted to FTR employees in order of their relative seniority as bids become vacant, which, under "normal circumstances," can happen after working only a few months. *Id.* ¶ 10; *see also* George Depo. at 97-99 (plaintiff George asserting that in 1998, a PTF employee was converted to FTR status after only three months of employment). When the Hartford mail facility was placed under Article 12, however, vacant mail handler bids were withheld for the employees expected to be excessed as a result of the automation

and consolidation of their job functions. As a result of the move toward automation and the resulting consolidation of employees' job functions, no PTF mail handlers were converted to FTR employees during a period of more than four years, from February 2001 through April 2005, at the Hartford P & DC. *See* *id.* ¶ 11; *see also* George Admission No. 4; Joseph Admission No. 4; Matthew Admission No. 4; George Depo. at 18-19; Gillis Depo. at 13-14). Finally, in April 2005, the top four PTF mail handlers on the seniority list at the Hartford P & DC, including plaintiff Joseph, were converted to FTR employees.[FN7] *Id.* ¶ 12; George Depo., Exh. 2 (seniority list); Joseph Depo. at 7-8.

> FN7. Of the 29 PTF employees at the Hartford P & DC, plaintiff Joseph, hired November 7, 1998, ranked second in seniority during the relevant time period, whereas plaintiffs George and Matthew, hired on June 17, 2000 and July 1, 2000, ranked twenty-fourth and twenty-sixth, respectively. Defs' Rule 56(a)(1) Statement ¶ 15 (citing George Depo., Exh. 2; George Admission Nos. 2, 3; Joseph Admission Nos. 2, 3; Matthew Admission Nos. 2, 3; Gillis Aff. ¶¶ 6-7); Pls' Brief at 4.

**\*3** Plaintiffs initiated the Equal Employment Opportunity ("EEO") process on or about February 11, 2004 by submitting requests for pre-complaint counseling and subsequently, on or about March 25 and 29, 2004, filed EEO complaints. *See* Defs' Rule 56(a)(1) Statement ¶ 31-32 (referencing George Depo., Exh. 6, 7; Joseph Depo., Exh. 10, 11; Matthew Depo., Exh. 14, 15). Plaintiffs, in their EEO complaints, raise the conversion concern and claim that Defendants discriminated against them on the basis of their Indian national origin:

While designated as a Part-Time Flexible (PTF) employee, complainant has continuously worked over forty (40) hours per week for several years, yet, complainant has not obtained full-time status in contrast to similarly-situated employees as well as those with less seniority.

George Depo., Exh. 7; *see also* Joseph Depo., Exh. 11; Matthew Depo., Exh. 15.

The CBA provides for the resolution of labor dis-

Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 2006 WL 798924 (D.Conn.), 179 L.R.R.M. (BNA) 2470, 97 Fair Empl.Prac.Cas.
(BNA) 1513
 (Cite as: 2006 WL 798924 (D.Conn.))

putes through arbitration. *See* CBA Art. 15, Moris-sette Decl. at Exh. A. Accordingly, at the same time as they initiated EEO proceedings against USPS, on or about February 11, 2004, Plaintiffs also sent letters to René Morissette, President of NPMHU, Branch 34, asking him to file grievances on their behalf:

I would like to file a grievance, because management did not changing [sic] my employment status part time flexible to full time regular. Last 4 years I was working more than 40 hours a week. Management failer [sic] to follow union agreement. So I wanted to file a grievance against this case.

George Depo., Exh. 4; *see also* Joseph Depo., Exh. 9; Matthew Depo., Exh. 13; Defs' Rule 56(a)(1) State-ment ¶ 33.[FN8]NPMHU claims that upon receipt of these letters, "Morissette checked the plaintiffs' work schedules for the previous six months and reviewed the relevant portions of the collective bargaining agreement between USPS and NPMHU," which "led him to determine that there was no basis under the collective bargaining agreement for the requested grievances."Defs' Rule 56(a)(1) Statement ¶ 34. De-fendants assert, and Plaintiffs admit, that Morissette's investigation revealed that during the six-month pe-riod prior to Plaintiffs' letter, none of the three plain-tiffs had worked eight hours within ten on the same five days each week. *Seeid;* Pls' Rule 56(a)(2) State-ment ¶ 34. Morissette's conclusion that Plaintiffs' complaints had no merit was also based, in part, on a portion of Article 7.3 of the CBA which states that: "The [USPS] shall staff all postal installations which have 200 or more man years of employment in the regular work force as of the date of this Agreement with 90% full-time mail handlers."CBA Art. 7.3, Morisette Decl. at Exh. A. In his letters to Plaintiffs, Morissette explained that this provision "means that the part-time flexible compliment cannot exceed 10%."George Depo., Exh. 4; Joseph Depo., Exh. 9; Matthew Depo., Exh. 13. Morissette goes on to say that the Hartford Installation had, at that time, 331 FTR employees and 29 PTF employees, but would have to have 37 PTF employees (or would need to drop to 260 full-time regular employees) in order to convert one PTF employee to full-time regular status.[FN9]*Id.* Morissette concluded by saying that "[w]hile the Union would love to file a grievance for all part-time flexible[s] to be converted to full-time regulars we are bound by the National Agree-ment...."*Id.*

FN8. Plaintiffs claim that they previously spoke to Morissette about the grievance pro-cedure for failure to convert but assert that he "turned a deaf ear to the plaintiffs' re-quest prior to February 2004."Pls' Brief at 4.

FN9. Plaintiffs admit that, at the time of their Complaint, the Hartford P & DC was in compliance with the ninety percent full-time employment level required by Article 7.3 of the CBA. *See* Defs' Rule 56(a)(1) Statement ¶ 34; Pls' Rule 56(a)(2) Statement ¶ 34.

**\*4** Plaintiff claim that they "raised concerns that bids remained vacant or withheld for unreasonably long periods of time," however, the letters to Morissette reveal no such concern. *See* Pls' Brief at 5; George Depo., Exh. 4; Joseph Depo., Exh. 9; Matthew Depo., Exh. 13. Pursuant to the "bidding process," once a month, a bid listing is posted for FTR employees to bid on jobs, which are awarded based on seniority. *See* Morissette Depo. at 11-12, Pls' Exh. 4. In his deposition, Morissette asserts that when a vacancy persists, bids could be abolished, could be held under Article 12 (if the postal service anticipates a need to excess employees in the "near future") or unassigned FTR employees could be "forced" into the bid posi-tions. *See* Morissette Depo. at 12, Pls' Exh. 4. Plain-tiffs contend that during Morissette's tenure as Branch President, "in excess of twenty (20) vacancies were withheld pursuant to Article 12 of the CBA."Pls' Brief at 5.

## II. FAILURE TO TIMELY RESPOND

Defendants argue that summary judgment should be granted in their favor based on Plaintiffs' failure to timely respond to their summary judgment motion. *See* Defs' Reply at 1-4. Defendants served their mo-tion on Plaintiffs' counsel on July 26, 2005, in con-formity with the Supplemental Order. Defendants waited the allotted twenty-one days, but received no response from Plaintiffs or Plaintiffs' counsel. Ac-cordingly, Defendants filed their summary judgment papers on August 23, 2005, noting that the motion for summary judgment was unopposed. Plaintiffs filed their opposition papers with this court on September 13, 2005, however, they provided no explanation or excuse for their failure to timely file a response. De-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                           Page 5
Not Reported in F.Supp.2d, 2006 WL 798924 (D.Conn.), 179 L.R.R.M. (BNA) 2470, 97 Fair Empl.Prac.Cas.
(BNA) 1513
 (Cite as: 2006 WL 798924 (D.Conn.))

fendants filed a reply on September 21, 2005. Al-
though this court has discretion to decline to consider
submissions not filed in compliance with its rules and
orders, Defendants have not been prejudiced by the
delay and their motion for summary judgment is
granted on the merits. Because Defendants' motion is
granted on other grounds, the court will consider
Plaintiffs' opposition papers.

III. STANDARD OF REVIEW

Summary judgment is appropriate only when "the
pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits, if
any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a
judgment as a matter of law." Fed.R.Civ.P. 56(c). No
genuine issue of material fact exists and summary
judgment is therefore appropriate when "the record
taken as a whole could not lead a rational trier of fact
to find for the non-moving party." Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587
69, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A mate-
rial fact is one which "might affect the outcome of
the suit under the governing law" and an issue is
genuine when "the evidence is such that a reasonable
jury could return a verdict for the nonmoving party."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248,
106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Importantly,
however, "[c]onclusory allegations will not suffice to
create a genuine issue." Delaware & H.R. Co. v.
Conrail, 902 F.2d 174, 178 (2d Cir.1990).

*5 The moving party bears the burden of establishing
that summary judgment is appropriate, Anderson, 477
U.S. at 255, and the court should "draw all factual
inferences in favor of the party against whom sum-
mary judgment is sought, viewing the factual asser-
tions in materials such as affidavits, exhibits, and
depositions in the light most favorable to the party
opposing the motion." Rodriguez v. City of N.Y., 72
F.3d 1051, 1060 (2d Cir.1995) (citations omitted).
Determinations of the weight to accord evidence or
assessments of the credibility of witnesses are im-
proper on a motion for summary judgment as such
are within the sole province of the jury. Hayes v. N.Y.
City Dep't of Corr., 84 F.3d 614, 619 (2d
Cir.1996)."If reasonable minds could differ as to the
import of the evidence ... and if ... there is any evi-
dence in the record from any source from which a
reasonable inference in the nonmoving party's favor

may be drawn, the moving party simply cannot ob-
tain a summary judgment." R.B. Ventures, Ltd. v.
Shane, 112 F.3d 54, 59 (2d Cir.1997) (internal cita-
tions omitted); see also Sologub v. City of New York,
202 F.3d 175, 178 (2d Cir.2000) ("When reasonable
persons applying the proper legal standards could
differ in their responses to the questions raised on the
basis of the evidence presented, the question is best
left to the jury.").

"At summary judgment in an employment discrimi-
nation case, a court should examine the record as a
whole, just as a jury would, to determine whether a
jury could reasonably find an invidious discrimina-
tory purpose on the part of an employer." Byrnie v.
Town of Cromwell, Board of Education, 243 F.3d 93,
102 (2d Cir.2001). Although caution must be exer-
cised before granting summary judgment to an em-
ployer in an ADEA case where discriminatory intent
and state of mind are in dispute, see Carlton v. Mystic
Transp. ., Inc., 202 F.3d 129, 134 (2d Cir.2000),

[i]t is now beyond cavil that summary judgment may
be appropriate even in the fact-intensive context of
discrimination cases...."[T]he salutary purposes of
summary judgment-avoiding protracted, expensive
and harassing trials-apply no less to discrimination
cases than to ... other areas of litigation."

 Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456,
466 (2d Cir.2001) (quoting Meiri v. Dacon, 759 F.2d
989, 998 (2d Cir.1985)); see also Reeves v. Sander-
son Plumbing Prods., Inc., 530 U.S. 133, 148, 120
S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("Trial courts
should not treat discrimination differently from other
ultimate questions of fact").

IV. DISCUSSION

USPS claims that no PTF employees were converted
to FTR status between February 2001 and April 2005
because Connecticut's USPS facilities were "placed
under Article 12" as a result of the projected automa-
tion and consolidation and, consequently, vacant bids
were "withheld" and reserved for FTR clerks and
other FTR employees whose jobs were expected to
be "excessed" as a result of the anticipated changes.
USPS Brief at 4 (citing Gillis Aff. ¶¶ 14-22). USPS
argues that Plaintiffs' employment discrimination and
retaliation claims have no merit and that the failure to
convert Plaintiffs to full-time regular employment

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                     Page 6
Not Reported in F.Supp.2d, 2006 WL 798924 (D.Conn.), 179 L.R.R.M. (BNA) 2470, 97 Fair Empl.Prac.Cas.
(BNA) 1513
 (Cite as: 2006 WL 798924 (D.Conn.))

status was "fully consistent with the collective bar-gaining agreement."*See* USPS Brief at 2, 4.

A. Discrimination

1. *Title VII's Burden Shifting Analysis*

**\*6** Title VII prohibits employment discrimination on the basis of "race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiffs contend that USPS failed to convert them from PTF employees to FTR employees because of their Indian national origin. Compl. ¶ 13.

Title VII claims are analyzed under the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In order to survive a motion for summary judgment, a plaintiff must first make a prima facie case of national origin discrimination by presenting evidence sufficient to create an inference that the employer's decision was based on an illegally discriminatory criterion. *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). If the plaintiff is able to make out a prima facie case of discrimination, the burden then shifts to the defendant to establish a legitimate, nondiscriminatory business reason for its action. *See Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Although the *McDonnell Douglas* framework places the burden on the defendant of producing an explanation to rebut the plaintiff's prima facie case, it is important to remember that the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated on the basis of an impermissible factor remains at all times with the plaintiff.[FN10] *Burdine,* 450 U.S. at 253. If the employer succeeds in articulating such a reason, the presumption of discrimination arising from the establishment of the prima facie case "drops from the picture" and the burden shifts back to the plaintiff to show both that the employer's proffered reason is mere pretext for discrimination *and* that the plaintiff's national origin was the actual motivating factor. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510-11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Abdu-Brisson v. Delta Air Lines,* 239 F.3d 456, 459 (2d Cir.2001).

>    FN10. The presumption operates, in this regard, like all other presumptions, as de-

scribed in Federal Rule of Evidence 301: "In all civil actions and proceedings ... a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast."

2. *Plaintiffs' Prima Facie Case*

To make out a prima facie case of employment discrimination, Plaintiffs must show that: (1) they are members of a protected class; (2) they qualified for the job; (3) they suffered an adverse employment action and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 311-12 (2d Cir.1997); *Shumway v. United Parcel Serv.,* 118 F.3d 60, 64 (2d Cir.1997). Plaintiffs' burden at this stage is not an onerous one; they merely have to present facts sufficient to give rise to a presumption[FN11] of discrimination. *See Burdine,* 450 U.S. at 254; *Abdu-Brisson,* 239 F.3d at 467 ("A plaintiff's burden of establishing a prima facie case is de minimis.").

>    FN11. "To establish a 'presumption' is to say that the finding of the predicate fact (here, the prima facie case) produces a 'required conclusion in the absence of explanation' (here, the finding of unlawful discrimination)." *Hicks,* 509 U.S. at 506-07 (quoting 1 D. Louisell & C. Mueller, Federal Evidence § 67, p. 536 (1977)).

Defendants do not challenge the first three prongs of Plaintiffs' prima facie case, but argue that Plaintiffs cannot establish that Defendants' failure to convert them to FTR status "occurred in circumstances giving rise to an inference of discrimination on the basis of [their] membership in [the protected] class."USPS Brief at 7 (quoting *Stern,* 131 F.3d at 312). The Second Circuit has held that a "showing of disparate treatment," i.e., a showing that similarly situated employees who are not members of the protected class were treated differently, is a "common and especially effective method of establishing the inference of discriminatory intent necessary to complete the prima

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                          Page 7
Not Reported in F.Supp.2d, 2006 WL 798924 (D.Conn.), 179 L.R.R.M. (BNA) 2470, 97 Fair Empl.Prac.Cas.
(BNA) 1513
 (Cite as: 2006 WL 798924 (D.Conn.))

facie case," but is not the only method. *Abdu-Brisson, 239 F.3d at 468* (holding that a showing of disparate treatment is not the only method of making out a prima facie case of employment discrimination because in limited cases, there are no employees similarly situated to the plaintiff). Other permissible means of establishing an inference of discriminatory intent for purposes of the prima facie case include showing that the employer: (1) continued, after discharging the plaintiff, to seek applications for persons of the plaintiff's qualifications to fill the position; (2) criticized the plaintiff's performance in ethnically degrading terms; (3) made invidious comments about others in the plaintiff's protected group; or (4) treated employees not in the protected group more favorably than plaintiff. See *id.* (citing *Chambers v. TRM Copy Ctr. Corp., 43 F.3d 29, 37 (2d Cir.2004)*).

**\*7** Defendants argue that notwithstanding the assertions in their Complaint, Plaintiffs cannot show that they were treated differently than similarly situated employees who were not members of the protected class. USPS Brief at 7 (citing *Abdu-Brisson, 239 F.3d at 467).* Indeed, all three plaintiffs have admitted that no PTF mail handlers, regardless of national origin, were converted to FTR employees at the Hartford P & DC from February 2001 to April 2005. *See* George Admission No. 4 (admitting "that the last conversion of [a] part-time flexible mail handler to full-time regular status at the Hartford P & DC occurred on or about February 9, 2001"); Joseph Admission No. 4 (same); Matthew Admission No. 4 (same); *see also* George Depo. at 18-19 (agreeing that between February 2001 and April 2005, no mail handlers at the Hartford P & DC, of any national origin, were converted); Joseph Depo. at 12-25 (same); Matthew Depo. at 7-9, 15-18. Moreover, it is undisputed that plaintiff Joseph was among the first four PTF mail handlers to be converted in April 2005, *see* Joseph Depo. at 7-8, and that the one mail handler ahead of plaintiff Joseph on the PTF seniority list was white and eleven of the twenty-three mail handlers ahead of plaintiffs George and Matthew were white. *See* George Depo., Exh. 2 (PTF seniority list); Morissette Depo. at 47-48 (identifying the ethnicity of persons on the seniority list). In light of this evidence, and without more, it does not appear that Plaintiffs were treated any differently from employees who were not members of a protected class.

Plaintiffs do not appear to present a prima facie case

of discrimination, however, we need not decide that here. Because, as a matter of law, Plaintiffs cannot meet their ultimate burden of proving that Defendants intentionally discriminated against them on the basis of their national origin, it is assumed arguendo that Plaintiffs have satisfied their burden to establish a prima facie case. *See Roge v. NYP Holdings, 257 F.3d 164, 169 (2d Cir.2001); Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 93 (2d Cir.2001).*

3. *Defendants' Legitimate, Non-Discriminatory Reasons*

Assuming that Plaintiffs have made out a prima facie case of discrimination, the burden then shifts to the employer to establish a legitimate, nondiscriminatory business reason for its action. *See Burdine, 450 U.S. at 254.* Defendant's burden is "one of production, not persuasion[, and] ... involv[es] no credibility assessment." *Reeves, 530 U.S. at 142;see also Hicks, 509 U.S. at 510-11 (1993)* (explaining that "the burden of production determination necessarily precedes the credibility-assessment state"). Defendant "need not persuade the court that it was actually motivated by the proffered reasons .... [as i]t is sufficient if the defendant's evidence raise a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine, 450 U.S. at 254.* To carry its burden and raise a genuine issue of fact, Defendant must, using admissible evidence, set forth reasons which are sufficient to support a finding that unlawful discrimination was not the cause of the employment action. *Id.* at 254-255 and n. 8.

**\*8** Defendants have articulated a legitimate nondiscriminatory reason for their failure to convert Plaintiffs, namely, that no mail handlers, regardless of national origin, on the PTF seniority list were converted to FTR employees at the Hartford P & DC between February 2001 and April 2005 because USPS District of Connecticut needed to withhold bids pursuant to Article 12 of the CBA for FTR employees expected to be displaced by automation and consolidation. *See* Defs' Rule 56(a)(1) Statement ¶ 13 (citing Gillis Aff. ¶¶ 14-22; Gillis Depo. at 18-19). Defendants' reason is well-documented by the evidence.

4. *Evidence that Defendants' Proffered Reasons are Pretext for Discrimination and that Plaintiffs' National Origin was the True Reason for Discharge*

Not Reported in F.Supp.2d                                                                      Page 8
Not Reported in F.Supp.2d, 2006 WL 798924 (D.Conn.), 179 L.R.R.M. (BNA) 2470, 97 Fair Empl.Prac.Cas.
(BNA) 1513
 (Cite as: 2006 WL 798924 (D.Conn.))

Plaintiffs present almost no evidence in support of their contention that Defendants failed to convert them to FTR employees because of their national origin. They argue that "conversions took place in February 2001 despite the practical impact of Article 12 in that vacant bids were withheld" and that "the authority to convert PTF employees was implemented unilaterally by the USPS."Pls' Brief at 16 (citing Exh. 4 at 40). The only evidence submitted by Plaintiffs in support of this argument was Morissette's statement that "management can decide when they're going to convert a PTF." Pls' Exh. 4 at 40. Plaintiffs argue that because the February 2001 and April 2005 conversions complied with the CBA and because management has the authority to convert PTF employees, a reasonable factfinder may conclude that there is sufficient evidence of pretext to defeat summary judgment. Pls' Brief at 16.

Plaintiffs' disbelief of Defendants' reasons is not sufficient to create a triable issue of fact on the discrimination claim. Even if Defendant's reasons are rejected entirely, Plaintiffs still must produce evidence from which a reasonable factfinder could infer that a discriminatory motive played a role in Defendants' failure to convert and that Defendant's asserted reasons were merely a pretext for discrimination. *Fisher v. Vassar Coll.,* 114 F.3d 1332, 1339 (2d Cir.1997). Although the fact that "an employer gives a pretextual reason for its action may indeed give support to the inference of prohibited discrimination,""the mere fact of a pretextual explanation, without circumstances suggesting that the true motivation" was discriminatory, is insufficient to support Plaintiff's case. *McCarthy,* 202 F.3d at 166;*see also Lizardo v. Denny's Inc.,* 270 F.3d 94, 104 (2d Cir.2001) (to withstand summary judgment, plaintiffs needed to do more than "cite to their mistreatment and ask the court to conclude that it must have been related to [discrimination]"). Moreover, in a case such as this, "[b]ecause [Defendants'] stated reasons for the challenged action are strongly supported by the evidence, the burden on plaintiff to prove that they are a pretext for discrimination [is] substantial." *Lucibello v. Yale-New Haven Hosp.,* 2005 U.S. Dist. LEXIS 3604, at *22, 2005 WL 578324, at *7 (D.Conn. Mar.10, 2005); *see also Lieberman v. Gant,* 630 F.2d 60, 65 (2d Cir.1980) (holding that to allow a jury to discredit the defendant's proffered reasons for its actions, the plaintiff must show that defendant's reasons

are "so ridden with error that [the defendant] could not honestly have relied upon [them]"); *Fuentes v. Perskie,* 32 F.3d 759, 765 (3rd Cir.1994) (to discredit the employer's proffered reasons, plaintiff must demonstrate "weaknesses, implausibilities, inconsistencies, or contradictions in [them]").

*9 In this case, the Court finds no evidence showing either that Defendants' asserted reasons are pretextual. Plaintiffs cannot simply rely on the assertion, unsupported by the record, that Defendants' reason is pretext for discrimination. Plaintiffs also argue that Defendants applied the articulated policy inconsistently, however, the Court can find no evidence supporting that contention. *See* Pls' Brief at 17.

Finally, even if Plaintiffs could prove pretext, there is a complete lack of evidence going to show that Plaintiffs' national origin played any role in Defendants' failure to convert them. As discussed above, it is undisputed that no PTF mail handlers, regardless of national origin, were converted to FTR employees at the Hartford P & DC from February 2001 to April 2005. Moreover, it is undisputed that plaintiff Joseph was among the first four PTF mail handlers to be converted in April 2005 and that the one mail handler ahead of plaintiff Joseph on the PTF seniority list was white and eleven of the twenty-three mail handlers ahead of plaintiffs George and Matthew on the seniority list were white. In light of these facts, there is no evidence giving rise to an inference of disparate treatment, as Plaintiffs were treated no differently than similarly situated employees who were not members of the protected group. *See Abdu-Brisson,* 239 F.3d at 468. Accordingly, Defendants' Motion for Summary Judgment as to Plaintiffs' disparate treatment claim is granted.

B. Retaliation

Plaintiffs George and Matthew claim in Count II of their Complaint that they were retaliated against by several USPS supervisors in response to their filing of EEO charges. Their retaliation claim is also analyzed under the three-part burden shifting analysis set forth in *McDonnell Douglas,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. To make a prima facie case of retaliation, Plaintiffs must show by a preponderance of the evidence (1) that they participated in a protected activity known to Defendants; (2) the existence of an adverse employment action; and (3) a causal

Not Reported in F.Supp.2d                                                                    Page 9
Not Reported in F.Supp.2d, 2006 WL 798924 (D.Conn.), 179 L.R.R.M. (BNA) 2470, 97 Fair Empl.Prac.Cas.
(BNA) 1513
 (Cite as: 2006 WL 798924 (D.Conn.))

connection between the protected activity and the adverse employment action. *Terry v. Ashcroft,* 336 F.3d 128, 141 (2d Cir.2003) (citation omitted). Again, a plaintiff's burden at this stage is de minimus. *Id.* Once Plaintiffs have established a prima facie case, the burden shifts to Defendants to show that they had a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 94-95.If Defendants are able to make this showing, then the burden shifts back to Plaintiffs to prove that the proffered reason is merely a pretext for unlawful discrimination. *Id.* at 95.

Defendants argue that Plaintiffs cannot establish a prima facie case of retaliation. Specifically, Defendants contend that Plaintiffs' retaliation claim fails on the second and third prongs, in that the alleged retaliatory actions do not rise to the level of "adverse employment actions" and that the circumstances permit no inference of any retaliatory motivation. Defs' Brief at 26.

**\*10** In their Complaint, Plaintiffs identify one instance of retaliatory discrimination, namely, that "in April 2004 co-plaintiff George was denied a regularly scheduled lunch break and [was] issued a written warning for insubordination when he challenged the denial of the lunch break."Compl. ¶ 13. In their depositions and in their brief, Plaintiffs George and Matthew identify several additional instances of retaliatory acts, which include being denied requested leave time (each Plaintiff was able to identify only one instance where their leave request was denied), George Depo. at 121-25, 132-33, 151, 160-62; Matthew Depo. at 68-69; having their days off changed, Matthew Depo. at 73; having break time shortened, George Depo. at 144-45; and being more frequently assigned to "hard" work places with heavy workloads without assistance, George Depo. at 136, 144-47. *See* Pls' Brief at 18.

None of the employment actions cited by Plaintiff rise to the level of being "adverse." Many of the acts complained of seem to be a function of Plaintiffs' jobs as PTF employees and not retaliatory acts. Plaintiffs admit that as PTF employees, they "have to [work] everywhere," have no fixed schedules or workplace assignments, are not guaranteed a certain number of hours per week, have no right to place themselves on the overtime list, have no right to bid on jobs and do not receive paid holidays. *See* Moris-

sette Depo. at 10-11; George Depo. at 136; Defs' Rule 50(a)(1) Statement ¶ 9. Moreover, PTF employees must be generally "available to work flexible hours as assigned by the Employer during the course of a service week."CBA Art. 7.1(A2), Morissette Decl. at Exh. A; Defs' Rule 50(a)(1) Statement ¶ 9.

Plaintiffs' other allegations regarding alleged "retaliatory" actions also do not approach the level of adverse employment actions. For example, plaintiff George claims that it was retaliatory for his supervisor to give him a "predisciplinary interview" for returning late from his lunch break, for writing him up for being AWOL (Absent Without Leave) when he "got tired" and went home during working hours and for "making" him work until the end of the work day. *See* George Depo. at 166-70, 148-49, 173. Moreover, Plaintiffs present no evidence to show that the "heavy" or "hard" duties assigned were unsuited to their skills or inconsistent with their positions. Indeed, they testified that they were among the duties normally assigned to them as PTF employees and they had performed some of the duties of which they complain prior to filing their EEO complaints. *See* *Morrison,* 363 F.Supp.2d at 591; *see also* George Depo. at 136, 144-47.

None of the actions complained of constitutes a "materially adverse change in the terms and conditions of employment." *Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 446 (2d Cir.1999). Indeed, cases involving similar allegations have held that the similar acts complained of did not constitute "adverse employment actions." *See, e.g., Sanders v. N.Y. City Human Res. Admin.,* 361 F.3d 749, 756 (2d Cir.2004) (negative performance evaluations with no "effect on the terms and conditions of ... employment"); *Morrison v. Potter,* 363 F.Supp.2d 586, 591 (S.D.N.Y.2005) ("denying plaintiff assistance with ... workload," reprimands, even those causing embarrassment and anxiety, close monitoring); *Bond v. City of Middletown,* 389 F.Supp.2d 319, 331 (D.Conn.2005) ("criticisms of [a plaintiff's] work performance"); *Johnson v. State of Connecticut,* 392 F.Supp.2d 326, 340 (D.Conn.2005) (informal counseling); *Hunter v. St. Francis Hosp.,* 281 F.Supp.2d 534, 544 (E.D.N.Y.2003) (negative evaluations, denial of leave request, quantity of work assigned); *Neratko v. Frank,* 31 F.Supp.2d 270, 296 (W.D.N.Y.1998) (scheduling changes).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 10
Not Reported in F.Supp.2d, 2006 WL 798924 (D.Conn.), 179 L.R.R.M. (BNA) 2470, 97 Fair Empl.Prac.Cas.
(BNA) 1513
 (Cite as: 2006 WL 798924 (D.Conn.))

**\*11** Even if the actions Plaintiffs complain of were sufficiently adverse, Plaintiffs have not shown the requisite "causal connection" between the protected activity and the actions claimed to be adverse. It is undisputed that the three supervisors who took the actions of which Plaintiffs complain-Maria Prattson, Bill Schmollinger and Ric Olivia-did not learn of Plaintiffs' protected activity until the spring or summer of 2005.[FN12]*See* Defs' Rule 56(a)(1) Statement ¶¶ 40-42; Pls' Rule 56(a)(2) Statement ¶¶ 40-42. Accordingly, it is undisputed that the supervisors learned of the protected activity *after* all but one of the acts Plaintiffs cite as retaliatory. *See* USPS Mem. at 28-29.[FN13]The alleged retaliatory acts of which Plaintiffs complain happened before-or at least began before-Plaintiffs filed their EEO complaints in March 2004.[FN14]Plaintiffs present no evidence showing that the supervisors were acting at someone else's behest and therefore, the supervisors' undisputed lack of knowledge precludes Plaintiffs from establishing the requisite causal connection and negates any inference that the supervisors' actions were motivated by the Plaintiffs' EEO filings. *See Slattery v. Swiss Reinsurance America Corp.,* 248 F.3d 87, 95 (2d Cir.2001) (When the alleged adverse job actions began before a plaintiff engaged in protected activity, "an inference of retaliation does not arise.").

> FN12. Prattson testified that she did not hear of Plaintiffs' EEO complaints until a few weeks before her May 3, 2005 deposition. *See* Prattson Depo. at 21. Schmollinger did not have knowledge of the EEO complaints until late April or early May 2005. *See* Schmollinger Aff. ¶ 8. Olivia first learned of the EEO complaints from Defendants' counsel on June 13, 2005. *See* Olivia Aff. ¶ 7.

> FN13. The only action shown to occur after Plaintiffs' supervisors learned of their protected activity was the change in Matthew's work schedule, an action that is clearly not "adverse." *See Neratko,* 31 F.Supp.2d at 296.

> FN14. For example, Plaintiff George complains about the denial of leave requests but testified that a number of instances of such denials took place in 2003, prior to his filing of the EEO complaint. *See* George Depo. at 124-25, 132. Moreover, Plaintiffs had

worked in areas they considered "hard" or undesirable before they filed their EEO complaints. *Seeid.* at 136, 145-47.

For the reasons discussed herein, i.e., that the actions complained of were not sufficiently "adverse" and that Plaintiffs' have not shown a causal connection between their protected actions and the actions complained as to Plaintiffs' retaliation claim is granted.

C. Hybrid § 301 / Fair Representation Claims

In Count III of their Complaint, Plaintiffs claim that USPS' failure to convert them from PTF employees to FTR status breaches Article 7.3 of the CBA between USPS and NPMHU and that the continued breach of the CBA violates Section 301 of the LMRA. Compl. ¶ C.11. Plaintiffs also claim, in Count IV, that, pursuant to Section 301 of the LMRA, 29 U.S.C. § 185, NPMHU breached its duty of fair representation in failing to pursue Plaintiffs' grievances. Compl. ¶ D.11.

DFR claims that arise in conjunction with a claim regarding the union's administration of the collective bargaining agreement are typically "hybrid" § 301/fair representation claims which necessarily combine two causes of action: (1) a claim against the employer for breach of the collective bargaining agreement, brought under § 301 of the LMRA, 29 U.S.C. § 185, and (2) a claim against the union for violation of its DFR based on its handling of the employee's grievance. *See DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 164-65, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). Because the grievance and arbitration procedures provided for in the CBA otherwise precludes recourse to the courts for violations of the CBA, an allegation that NPMHU breached its DFR in its handling of Plaintiffs' grievances is a necessary predicate to a § 301 claim against the employer, USPS, in federal court. *Id.* at 163-64; *Wilder v. GL Bus Lines,* 258 F.3d 126, 129 (2d Cir.2001). Similarly, because a union cannot be found to have violated its DFR if the employer did not breach the CBA, a finding that the employer breached the CBA is a necessary predicate to a DFR claim against the union.

**\*12** Due to the interdependent nature of the claims against the employer and the union in a hybrid §

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                      Page 11
Not Reported in F.Supp.2d, 2006 WL 798924 (D.Conn.), 179 L.R.R.M. (BNA) 2470, 97 Fair Empl.Prac.Cas.
(BNA) 1513
 (Cite as: 2006 WL 798924 (D.Conn.))

301/DFR case, the Supreme Court has provided that a plaintiff in such a case must make a two-pronged showing to recover against either the employer or the union:

To prevail against either the company or the Union, employee-plaintiffs must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union. The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both.

 *DelCostello,* 462 U.S. at 165 (internal brackets, citations, ellipses and quotation marks omitted). Accordingly, Plaintiffs in this action must show both that USPS' action violated the terms of the CBA *and* that NPMHU breached its DFR. *SeeTerry,* 494 U.S. at 594.

1. *A Determination that USPS did not Violate the CBA or that NPMHU did not Violate its DFR is Dispositive of the Remaining Claim*

As explained in the preceding section, Plaintiffs must show both that USPS' action violated the terms of the CBA *and* that NPMHU breached its DFR. *SeeTerry,* 494 U.S. at 594. If Plaintiffs are unable to prove that USPS did not violate the terms of the CBA, summary judgment must be granted on the DFR claim, as the Union clearly cannot breach its DFR if the USPS acted in compliance with the CBA. Similarly, if Plaintiffs are unable to prove that NPMHU breached its DFR, they cannot proceed with their claim against the USPS, as the grievance and arbitration procedures of the CBA are the exclusive remedies for claims of breach of that agreement. Such claims are actionable in court only if Plaintiffs can establish that NPMHU breached its DFR in failing to prosecute their grievances. As Plaintiffs are unable to prove *either* claim, as explained below, this provides an additional reason why summary judgment must be granted on both.

2. *NPMHU's Duty of Fair Representation*

The duty of fair representation ("DFR") is a judicially-created doctrine that the Supreme Court found to be implicit in § 9 of the NLRA, 29U.S.C. § 159.[FN15]This provision provides that the union is the exclusive bargaining representative of all employees

in a particular bargaining unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment. 29 U.S.C. § 159(a). In *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), the Supreme Court explained that, "as the exclusive bargaining representative of the employees in [Plaintiffs'] bargaining unit, the Union had a statutory duty fairly to represent all of those employees, both in its collective bargaining with [the employer], ... and in its enforcement of the resulting collective bargaining agreement...." The union's duty requires it "to serve the interests of all [bargaining unit] members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct."*Id.* A union's breach of its DFR "is not limited to intentional conduct ... but may include acts of omission ... [if the acts are] so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate Union interests as to be arbitrary." *NLRB v. Local 282 Int'l Bhd. of Teamsters,* 740 F.2d 141, 147 (2d Cir.1984) (quotation and citations omitted).

> FN15. The NLRA does not apply to public-sector employment by its own terms, however, it is made applicable to postal employment by the Postal Reorganization Act of 1970 ("PRA"), 39 U.S.C. § 1209(a).

*13 The Second Circuit has held that "[a] union breaches its duty of fair representation only where its actions can fairly be characterized as so far outside a wide range of reasonableness that they are wholly arbitrary, discriminatory, or in bad faith." *Wilder,* 258 F.3d at 129 (internal alterations omitted) (quoting *Spellacy v. Airline Pilots Ass'n,* 156 F.3d 120, 126 (2d Cir.1998)); *see also Air Line Pilots Ass'n v. O'Neill,* 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991). Moreover, in *Vaca v. Sipes,* 386 U.S. at 191-92, the Supreme Court said that although "a union may not arbitrarily ignore a meritorious grievance," individual employees do *not* have "an absolute right" to "compel arbitration of a grievance regardless of its merit."A union must, however, administer the grievance and arbitration process and make decisions with regard to the merits of grievances "in good faith and in a nonarbitrary manner." *Id.* at 192-94 (holding that "a union does not breach its duty of fair representation ... merely because it

Not Reported in F.Supp.2d                                                                 Page 12
Not Reported in F.Supp.2d, 2006 WL 798924 (D.Conn.), 179 L.R.R.M. (BNA) 2470, 97 Fair Empl.Prac.Cas.
(BNA) 1513
 (Cite as: 2006 WL 798924 (D.Conn.))

settles the grievance short of arbitration").

As suggested by the case law, a union's decision not to file a grievance or not to take a grievance to arbitration is entitled to considerable deference:

Where the fair representation dispute involves the union's interpretation of the collective bargaining agreement, the test is not whether the grievant's contractual interpretation is correct or more reasonable than the union's. Rather, the essence of fair representation is the reasonableness of the union's interpretation. So long as it acts "according to its own reasonable interpretation of the labor contract," a union may lawfully refuse to arbitrate an employee's grievance....

William W. Osborne, Jr., ed., Labor Union Law and Regulation 330-31 (2003). In determining whether a union violated its DFR, a court's "inquiry is limited to whether the union took a position on the basis of an informed, reasoned judgment regarding the merits of the [employees'] claim in light of the language contained in the collective bargaining agreement." *Spellacy,* 156 F.3d at 127. Importantly, a court need not find, on the merits, that the union's interpretation of the collective bargaining agreement was *correct,* only that such an interpretation was reasonable. *Id.;see also Miller v. USPS,* 985 F.2d 9, 12 (1st Cir.1993) (holding that "[c]ourts may not substitute their own views for those of the union" and must "allow the union great latitude in determining the merits of an employee's grievance and the level of effort it will expend to pursue it").

In light of the considerable deference to be accorded to Morissette's decision not to prosecute Plaintiffs' grievances, it is hard to see how the reasoned decision not to do so could constitute a breach of NPMHU's DFR. Whether or not this decision was ultimately the correct one, the union's interpretation of the CBA was not "unreasonable," as it acted appropriately and responsibly with regard to Plaintiffs' requests that grievances be filed.

**\*14** Specifically, the undisputed evidence shows that when Branch President René Morissette received Plaintiffs' letters in February 2004, he reviewed the CBA and investigated the schedules Plaintiffs worked during the previous six months, in or around August 2003 through February 2004.[FN16]*See* Moris-

sette Decl. ¶ 3. Morissette's review of Plaintiffs' "clock rings" disclosed that none of the Plaintiffs had, during the period of August 2003 through February 2004, worked the schedule specified in Article 7.3-i.e., eight hours within ten, on the same five days each week-that arguably would have provided a basis for a grievance seeking conversion to FTR status. *See* Morissette Depo. at 25-28; Morissette Decl. ¶ 4. Morissette also reviewed the Hartford installation's seniority list and found that the facility was well above the ninety percent full-time employment level required by Article 7.3. Morissette Depo. at 25-28; Morissette Decl. ¶¶ 3-4.

> FN16. The CBA between USPS and NPMHU provides that a grievance must be brought "within fourteen (14) days of the date on which the employee or the Union first learned or may reasonably have been expected to have learned of its cause."CBA Art. 15.2, Morissette Decl. at Exh. A. Accordingly, Plaintiffs' grievances, alleging breach of the CBA based on the hours they claim to have worked during a six-month period, could only be based on the six-month period ending no earlier than 14 days prior to the grievance. Plaintiffs' request that NPMHU file grievances on their behalf was made on or about February 11, 2004. Therefore, the only six-month period on which grievances alleging a breach of Article 7.3 could have been based would be one beginning in early to mid-August 2003 and ending in late-January or early-February 2004. Accordingly, Plaintiffs' work records during earlier periods cannot have form the basis of a claim that NPMHU breached its DFR or that USPS breached the CBA.

Upon completion of his investigation, Morissette responded to Plaintiffs' letters, explaining that none of the Plaintiffs satisfied the requirement of working eight hours within ten on the same five days each week over the relevant six-month period, that the Hartford facility was well above the ninety percent full-time employment level, and that even if the union did win a grievance, the PTF employee working the requisite schedule would not become a FTR employee but rather a full-time bid would be created, which would go to the most senior PTF on the seniority list. George Depo. at Exh. 4; Joseph Depo. at Exh.

Not Reported in F.Supp.2d                                                          Page 13
Not Reported in F.Supp.2d, 2006 WL 798924 (D.Conn.), 179 L.R.R.M. (BNA) 2470, 97 Fair Empl.Prac.Cas.
(BNA) 1513
 (Cite as: 2006 WL 798924 (D.Conn.))

4; Matthew Depo. at Exh. 4. Morissette concluded his letter by saying that, "[w]hile the Union would love to file a grievance for all part-time flexible to be converted to full-time regulars we are bound by the National Agreement," pursuant to which, Morissette explained, the Union could only "file a grievance for conversion ... if the 90/10 ratio was exceeded."*Id.*

A union representative, such as Morissette, is "entitled to decline to put forward an interpretation of the collective bargaining agreement which he and his union reasonably believed was incorrect." *Early v. Eastern Transfer,* 699 F.2d 552, 557 (1st Cir.1983) (citing *Findley v. Jones Motor Freight, Inc.,* 639 F.2d 953, 960 (3d Cir.1981); *Cannon v. Consolidated Freightways Corp.,* 524 F.2d 290, 294 (7th Cir.1975)). Defendants have presented evidence to suggest that such was the situation here, arguing that Morissette "not only saw no contractual basis for the grievances plaintiffs wished to file, but he also believed that to file such meritless grievances would only hurt the union's credibility and make it more difficult to win legitimate grievances."NPMHU Brief at 8 (citing Morissette Decl. ¶ 5).

Plaintiffs argue that they approached Morissette regarding their concerns in 2000 and 2001. The only evidence in support of this assertion is plaintiff George's vague testimony that he communicated with Morissette sometime between June 2000 and September 2001 about his desire to be converted. *See* George Depo. at 44-46. Plaintiffs contend that these communications continued when Morissette became Branch President in 2001. It is undisputed that Plaintiffs each made a written request for Morissette to pursue grievances on their behalf in February 2004, however, there is little evidence supporting their contention that they "shared knowledge of arbitration decisions sustaining the conversion of PTF employees at other USPS installations."Pls' Brief at 9. Plaintiffs' only evidence in this regard is Matthew's assertion, in his deposition, that he told Morissette about arbitration decisions in support of his position that he found "online somewhere," although he did not give him copies of the decisions. *See* Matthew Depo. at 28-30. Plaintiffs also highlight the facts that despite Article 12, conversions took place in February 2001 and April 2005, and that the decision to convert PTF employees to FTR status was within management's discretion based upon the operations needs of the particular installation at issue. Gillis Depo. at 11-12.

*15 Plaintiffs' arguments are insufficient. Even if plaintiff George had spoken with Morissette previously and even if plaintiff Matthew told him about certain arbitration decisions, those facts are irrelevant if, as is shown here, Morissette reasonably believed that there was no basis in the CBA for a grievance. Plaintiffs cannot point to anything showing that Morissette's actions were unreasonable, whereas Defendants have put forth numerous reasons for Morissette's actions, including the fact that he saw no contractual basis for the grievance and feared that filing a meritless grievance would undermine NPMHU's credibility and make it more difficult to win legitimate grievances. NPMHU Brief at 8. Accordingly, Morissette's assessment of the merits of Plaintiffs' complaints and his decision not file grievances appears to have been made "in good faith and in a nonarbitrary manner." *Vaca v. Sipes,* 386 U.S. at 194. If, as Plaintiffs argue, the decision to convert PTF employees is within management's discretion, that fact buttresses, rather than undermines, Defendants' argument that Morissette's belief was reasonable. Accordingly, this Court finds that Plaintiffs have not shown a material issue of fact and grants Defendants' Motion for Summary Judgment as to Plaintiffs' claim that NPMHU breached its duty of fair representation.

### 3. *USPS's Alleged Breach of the CBA*

Plaintiffs claim that USPS's failure to convert them from PTF employees to FTR status breaches the Article 7.3 of the CBA. Compl. ¶ C.11.

#### a. *Plaintiffs George and Matthew Had No Contractual Right to be Converted and Lack Standing*

Plaintiffs George and Matthew were so far down on the seniority list, ranking twenty-fourth and twenty-sixth, respectively, that even if USPS had been obliged to convert three PTF employees to FTR employees, as Plaintiffs contend, Plaintiffs George and Matthew would not have been converted. If a PTF employee is shown to have worked eight hours within ten on the same five days each week during a consecutive six-month period, as required by Article 7.3 of the CBA, this would demonstrate the need for another full-time position, however, that position would be awarded in order of seniority, and would not necessarily go to the specific employee that worked the requisite amount.[FN17]Accordingly, Plain-

Not Reported in F.Supp.2d                                                            Page 14
Not Reported in F.Supp.2d, 2006 WL 798924 (D.Conn.), 179 L.R.R.M. (BNA) 2470, 97 Fair Empl.Prac.Cas.
(BNA) 1513
 (Cite as: 2006 WL 798924 (D.Conn.))

tiffs cannot establish that USPS' failure to convert George and Matthew to FTR employees violated the CBA because even if Plaintiffs' allegations are correct and they had demonstrated the need for three conversions, those three positions would have gone to the first three PTF employees on the seniority list.

> FN17. As discussed above, conversions of PTF employees to FTR status are made in order of seniority. The CBA provides that PTF employees "are placed on a part-time flexible roster in the order of the date of their appointment" and for purposes of conversions, "they shall be taken in the order of their standing on the part-time flexible roster."CBA Art. 12.2(E), Morissette Decl. at Exh. A; *seealso* George Depo. at 13-14 (testifying that twenty-four PTF employees would have to be converted in order for him to get a FTR position).

This can, in the alternative, be considered as a standing issue. Article III of the United States Constitution requires plaintiffs to be able to demonstrate standing in order to bring a federal action. In order to satisfy Article III's standing requirement, Plaintiffs must show: (1) an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) fairly traceable to the challenged action of the Defendants; and (3) must also show that it is likely, as opposed to merely speculative, that the injury will be redressed by a decision in their favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Because converting three PTF employees to FTR status would not have changed George or Matthew's positions in any respect, they have suffered no "injury in fact" and are therefore unable to establish standing to pursue the claim that USPS violated the CBA. *Id.*

b. *The CBA Did Not Require Conversions Based on the Hours Plaintiffs Worked*

**\*16** Plaintiffs also fail to establish that the schedules they worked entitled them to be converted to FTR employees under Article 7.3 of the CBA. Article 7.3 reads, in relevant part:

The Employer shall staff all postal installations which have 200 or more man years of employment in the

regular work force as of the date of this Agreement with 90% full-time mail handlers.... The Employer shall maximize the number of full-time employees and minimize the number of part-time employees who have no fixed work schedules in all postal installations. A part-time flexible employee working eight (8) hours within ten (10), on the same five (5) days each week over a six-month period will demonstrate the need for converting the assignment to a full-time position.

CBA Art. 7.3, Morissette Decl. at Exh. A. Plaintiffs claim that because they "consistently" worked forty-hour weeks, they have a right to conversion under the CBA. The evidence produced by Defendants, however, shows that Plaintiffs failed to meet the requirement in the CBA that they work eight hours within ten, on the same five days each week over a six-month period.

Plaintiffs have presented no evidence showing that any of them worked "eight hours within ten, on the same five days each week" during the relevant six-month period, as required by Article 7.3 of the CBA to demonstrate a need for conversion.[FN18] In their relative depositions, all three plaintiffs agreed that the Time and Attendance Collection System ("TACS")- the timekeeping system used by USPS to record employees' time and attendance information-would be authoritative with regard to the hours and days they had worked. *See* George Depo. at 198; Joseph Depo. at 29; Matthew Depo. at 21-22, 24-26. A review of the TACS records revealed that during the relevant time period, i.e., from February 15, 2003 through February 13, 2004, none of the plaintiffs worked eight hours within ten, on the same five days each week, for a consecutive six-month period. *See* Taylor Decl. ¶ 3. There is no factual dispute on this issue.

> FN18. Although Plaintiffs deny Defendants' assertion that none of them fulfilled this requirement, *see* Pls' Rule 56(a)(2) Statement ¶ 26, they cite only to all three plaintiffs' deposition transcripts in their entirety, none of which provides sufficient support for their denial.

Specifically, from August 2002 to late 2003, plaintiff Matthew worked principally as a supervisor rather than as a mail handler.[FN19] Matthew acknowledged, in his deposition, that during the period he worked as a

Not Reported in F.Supp.2d                                                                                                    Page 15
Not Reported in F.Supp.2d, 2006 WL 798924 (D.Conn.), 179 L.R.R.M. (BNA) 2470, 97 Fair Empl.Prac.Cas.
(BNA) 1513
 (Cite as: 2006 WL 798924 (D.Conn.))

supervisor he did not work any forty-hour weeks as a mail handler. *See* Matthew Depo. at 23-24. A review of the TACS reports reveals that from early 2003 through the end of August 2003, Matthew worked almost exclusively as a supervisor and that from August 2003 through the end of 2003, he continued to work a "large portion of his hours as a supervisor."Matthew only worked forty hours as a mail handler two weeks out of the entire year of 2003 and moreover, during the first ten weeks of 2004, when he worked exclusively as a mail handler, he worked forty-hour weeks only seven times. USPS Brief at 19 (citing Taylor Decl. ¶¶ 4-5). Accordingly, during the relevant six-month period, Matthew only worked nine forty-hour weeks as a mail handler.

> FN19. The hours plaintiff Matthew worked in a supervisory position, which is outside the mail handler "craft," are not relevant in determining whether a mail handler position should be converted under Article 7.3. *See* USPS Brief at 18 (citing Gillis Depo. at 19).

**\*17** Plaintiff Joseph also did not consistently work forty-hour weeks during the relevant six-month period. According to the TACS reports, Joseph worked less than forty hours during eight weeks of the six-month period from early August 2003 through early February 2004. USPS Brief at 19 (citing Taylor Decl. ¶ 6). Accordingly, during the relevant six-month period, Joseph worked only sixteen forty-hour weeks.

Finally, the TACS reports revealed that plaintiff George also did not work eight hours within ten hours, on the same five days each week over the relevant six-month period (February 15, 2003 through February 13, 2004). Taylor Decl. ¶ 3. George also worked the majority of his hours during 2003 as a supervisor rather than as a mail handler, working "almost exclusively as a mail handler through pay period 15 of 2003, and thereafter as a mail handler."*Id.* ¶ 4.

Although arbitrators have held that the fact that a PTF employee did not *strictly* meet the eight hours within ten, on the same five days each week over a consecutive six-month period requirement is not fatal to a claim for conversion, the cases reviewed reveal situations in which the grievants worked schedules deviating only slightly from the stated requirement. *See*USPS and NPMHU, No. J98M-1J-C 99236940

(Feb. 2, 2000) (Benn, Arb.) (Defs' Exh. P; Pls' Exh. 7A) (PTF employee met the requirement with the exception of two days in the six-month period when he worked 5.66 and 4.04 hours); *USPS and NPMHU,* No. E00M-1E-C03140540 SJ1003 (May 26, 2004) (Escamilla, Arb.) (Defs' Exh. Q; Pls' Exh. 7C) (the PTF employee met the requirement, except that "on very infrequent occasions" when he worked six or seven hours per day, however, "the Grievant worked in excess of 40 hours in the weeks when this occurred"); *USPS and NPMHU,* K00M-1K-C 03143829 (Feb. 19, 2004) (Trosch, Arb.) (Pls' Exh. 7D) (granting the greivance as to the two PTF employees who worked less than the requirement only three times and five times out of a thirty-two-week period, but denying it as to a PTF employee who worked less than the requirement seven times out of the thirty-two-week period). The evidence presented by Defendants and not rebutted by Plaintiffs reveals that Plaintiffs' schedules were much less consistent than the ones in the arbitration decisions cited (and less consistent than the grievance *denied* by Arbitrator Trosch, in which the plaintiff worked twenty-five forty-hour weeks in a thirty-two week period). Even without following the "strict" formula laid out in Article 7.3, Plaintiffs' hours are not sufficient to compel the conclusion that the USPS was required to convert three PTF employees to FTR status.

Moreover, even if Plaintiffs' hours were sufficient to require conversion, Plaintiffs ignore the fact that the arbitration decisions they rely on were not dealing with the interaction of Article 7.3 and Article 12.6, as is the case here. When faced with the interaction of the two provisions, National Arbitration precedent provides that although USPS is obliged to fill full-time vacancies under the maximization language of Article 7.3, USPS has an overriding obligation to withhold vacancies under Article 12.6 when it is necessary to do so. *See*USPS and NALC and APWU, No. H7N-3D-C 22267 (Oct. 26, 1990) (Mittenthal, Arb.) (Defs' Exh. S); *NALC, AFL-CIO and USPS and APWU, AFL-CIO,* NC-E-16340 (National) (Dec. 7, 1979) (Gamser, Arb.) (Defs' Exh. T); *USPS and NALC, AFL-CIO,* No. N-S-116 (Regional) (Oct. 24, 1972) (Holly, Arb.) (Defs' Exh. U). Arbitrator Mittenthal reviewed relevant precedent and held, in light of prior decisions, that Article 12.6 takes precedence over Article 7.3:

**\*18** [T]he maximization requirement of Article 7,

Section 3B [including the 90:10 staffing requirement] must defer to the withholding obligation of Article 12, Section 5. Maximization, in other words, does not demand immediate filling of full-time carrier vacancies when Management is at the very same time obliged by Article 12, section 5 to withhold those vacancies in order to protect clerks who are soon to be displaced because of some technological or operational change.

Mittenthal Award at 10-11. Mittenthal extended prior rulings by holding that Article 12's withholding obligation took precedence not only over the general maximization requirement in Article 7.3, but also over its more specific requirement of ninety percent full-time employment at larger facilities. *Id.* at 11.It is easy to reason, in light of this conclusion, that Article 12's withholding obligation would also take precedence of Article 7.3's language regarding hours worked.

According to National Arbitrators Gamser and Mittenthal, the USPS's right to withhold vacancies pursuant to Article 12 is "circumscribed only by the limitation that it do so *reasonably.*"*USPS and NPMHU,* No. MH2002012 (Apr. 16, 2004) (Lankford, Arb.) (Pls' Exh. 7B); *see also* Mittenthal Award at 6-11; Gamser Award at 4. Pursuant to this "rule of reason," such withholding "cannot be extended without limit, else the maximization clause would be rendered meaningless."Holly Award at 8. Accordingly, withholding for a "reasonable period" is appropriate "so long as Management was at the 90-10 staffing ratio at the end of the period."Mittenthal Award at 11. In this case, the USPS asserts that the District of Connecticut was proceeding under Article 12 and withholding bids that became vacant from February 2001 through July 1, 2004. Gillis Aff. ¶ 20. Although it is questionable whether this is a "reasonable time," the fact that the Hartford P & DC was in compliance with the 90-10 staffing ratio at all relevant times and the fact that no Plaintiff demonstrates, based on hours worked, the need for conversion indicates that the failure to convert was not unreasonable.

Adding further support to this conclusion is Arbitrator Gamser's ruling that the USPS "may be permitted to avoid a total maximization of his full-time work force if such action could be justified by some 'standard of practicability.' " Gamser Award at 4. This "standard of practicability" applies to situations in which maximizing the full-time work force would cause "significant increased costs, increased idle time during scheduled tours, or have a detrimental impact upon the efficiency of the operation." Another possible basis for not converting certain PTF positions to FTR status would be "the adverse impact that such conversion would have upon management's flexibility in meeting its responsibility, recognized in the National Agreement, to 'direct the workforce.' " *Id.* Gamser concluded by saying that the USPS can be forced to convert only where the union clearly demonstrates a "flagrant violation" of Article 7.3, or where "the evidence shows manifest failure to deal realistically with some specific, identifiable work assignment." *Id.* If those situations are sufficient to justify a failure to convert, certainly withholding pursuant to Article 12 in anticipation of positions being eliminated or "excessed" due to automation would also be a sufficient basis for not converting PTF employees, especially when those employees are unable to demonstrate a need for conversion. In any event, USPS's failure to convert was certainly not a "flagrant violation" of Article 7.3.

**\*19** Finally, Plaintiffs argue, in reliance on Arbitrator Lankford's ruling, that USPS's failure to provide evidence as to the actual number of USPS employees transferred to the Hartford installation as a result of the automation and consolidation was a breach of the CBA. Pls' Brief at 13. Arbitrator Lankford held that Article 12 requires the USPS to "discuss" with the Union the USPS's continuing decision to withhold positions and that, in that case, its failure to offer an explanation or factual basis for withholding violated Article 12. Lankford Arb. at 4. This argument fails on two grounds. First, the USPS *has* provided an explanation for withholding, namely, that the introduction of the Automated Flat Sorting Machine 100 Model and the Automated Parcel and Package Sorter and the consolidation of the Bridgeport and Waterbury facilities was expected to eliminate, or "excess," the jobs of a number of postal employees, particularly those who sort the mail. *See* USPS Brief at 2. Specifically, Defendants assert that the introduction of the Automated Parcel and Package Sorter alone was expected to eliminate forty-eight clerk jobs at the Hartford P & DC and sixty-six in Wallingford. *Seeid.*(citing Gillis Aff. ¶¶ 15-16). Second, Lankford held that the USPS is required to discuss its decision to withhold with the *Union.*Lankford Arb. at 4. It is Plaintiffs here, not the Union, who is contesting the USPS's decision to withhold. There is no evidence showing that the Un-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 798924 (D.Conn.), 179 L.R.R.M. (BNA) 2470, 97 Fair Empl.Prac.Cas.
(BNA) 1513
 **(Cite as: 2006 WL 798924 (D.Conn.))**

ion asked the USPS for more information regarding
their decision to withhold vacancies or that the USPS
failed to provide relevant information. Moreover,
Rene Morissette, President of Branch 34 of NPMHU,
has indicated his opinion that the USPS was in com-
pliance with the CBA and was under no obligation to
convert Plaintiffs to FTR positions. *See* George
Depo., Exh. 4; Joseph Depo., Exh. 9; Matthew Depo.,
Exh. 13; *see also* Morissette Decl. at ¶¶ 3-5; Moris-
sette Depo. at 25-30, 42-43. Morissette clearly be-
lieved that he had sufficient information from the
USPS to make this determination. Accordingly, De-
fendants' Motion for Summary Judgment as to the
claim that USPS breached the CBA is granted.


V. CONCLUSION

For the foregoing reasons, Defendant NPMHU's Mo-
tion for Summary Judgment [Doc. No. 35] is granted
and Defendants USPS' Motion for Summary Judg-
ment [Doc. No. 39] is granted. The Clerk shall close
the case.


SO ORDERED.


D.Conn.,2006.
George v. U.S. Postal Service
Not Reported in F.Supp.2d, 2006 WL 798924
(D.Conn.), 179 L.R.R.M. (BNA) 2470, 97 Fair
Empl.Prac.Cas. (BNA) 1513


END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**TAB 4**



H

United States District Court,
E.D. Pennsylvania.

In re: BELL ATLANTIC CORPORATION SECU-
RITIES LITIGATION.
This Document Relates To All Actions.
**Civil Action Nos. 91-0514, 91-0673, 93-999, 91-
0518, 91-0737, 91-0531, 91-7048.**

April 17, 1997.

Lawrence Deutsch, Carole A. Broderick, Berger &
Montague, P.C., Philadelphia, PA, Sherrie R. Savett,
Philadelphia, PA, Arnold Levin, Levin, Fishbein,
Sedran & Berman, Philadelphia, PA, for Neil Jokel-
son.

Lawrence Deutsch, Berger & Montague, P.C., Phila-
delphia, PA, for Nancy Jokelson, Joyce Kane.

Lawrence Deutsch, Berger & Montague, P.C., Phila-
delphia, PA, Deborah R. Gross, Law Offices of Ber-
nard M. Gross, P.C., Philadelphia, PA, for Robert P.
Frutkin.

Sherrie R. Savett, Philadelphia, PA, for Adam
Weprin.

Lawrence Deutsch, Berger & Montague, P.C., Phila-
delphia, PA, Harvey S. Kronfeld, Harvey S. Kron-
feld, P.C., Philadelphia, PA, for Claire R. Barsky.

Bruce K. Cohen, Meredith, Cohen & Greenfogel,
P.C., Philadelphia, PA, for Warren Weiner.

*MEMORANDUM OF DECISION*

McGLYNN, Senior District Judge.

**\*1** Presently before this Court is a Motion for Sum-
mary Judgment filed on behalf of defendants, Bell
Atlantic Corporation ("BAC"), BAC's Chief Execu-
tive Officer and Chairman, Raymond W. Smith
("Smith"), and BAC's Chief Financial Officer and
Vice-Chairman, Phillip A. Campbell ("Campbell"),

(collectively "defendants" or "BAC") The plaintiffs
in this class action are purchasers of BAC common
stock seeking to hold defendants liable for violations
of section 10(b) of the Securities Exchange Act of
1934, 15 U.S.C. § 78j (b) (1988); Rule 10b-5, 17
C.F.R. § 240.10b-5(b) (1991) ("Rule 10b-5"); and
section 20(b) of the Act, 15 U.S.C. § 78t(a) ("Count
I"). This court has subject matter jurisdiction over
these claims. 28 U.S.C. § 1331. In addition, plaintiffs
assert a state common law claim for negligent mis-
representation, ("Count II"), with jurisdiction
grounded in 28 U.S.C.A. § 1367 (West Supp.1991),
supplemental jurisdiction.

Defendants now move for summary judgment on the
grounds that, 1.) plaintiffs have not established a
genuine issue of material fact with regard to three
elements of the Rule 10b-5 claim: (a) misrepresenta-
tion or omission of material fact, (b) scienter, and (c)
loss causation; 2.) dismissal of the predicate Rule
10b-5 claim requires dismissal of the § 20 claim; and
3.) this court should decline pendant jurisdiction over
the state law claim for negligent misrepresentation.
For the reasons set forth below, defendants' Motion
will be GRANTED as to both counts.

*I. PROCEDURAL HISTORY*

On January 24, 1991, Neil and Nancy Jokelson and
Bernice Berger filed a complaint in this matter. On
January 31, 1991, they filed an amended complaint as
of right. On February 11, 1991 the district court con-
solidated their case with five others involving the
same subject matter in accordance with Fed.R.Civ.P.
23, and directs that a consolidated complaint be filed.
On March 14, 1991 a Consolidated Amended Com-
plaint ("Cons.Am.Compl.") was filed. The defen-
dants moved to dismiss the Consolidated Amended
Complaint pursuant to Fed. R.Civ.P. 12(b)(6) and the
Motion was granted by an order dated October 30,
1991. *In re Bell Atlantic Securities Lit.,* 1991 WL
2342.36 (E.D.Pa.1991), *rev'd,* 993 F.2d 875 ("Appeal
Opinion").[FN1] Plaintiffs filed a Motion to Amend the
judgement and for leave to file a Second Consoli-
dated Amended Complaint ("Compl."). This court
denied the motion on the grounds that 1.) the plain-
tiffs had previously amended and 2.) the proffered
complaint could not survive a motion to dismiss.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Plaintiffs appealed.

> FN1. The district court dismissed the Consolidated Amended Complaint for three reasons: (1) the information provided by Bell in the first three quarters of 1990 revealed that expenses were increasing at an increasing rate and revenues were increasing at a decreasing rated and nothing else alleged in the complaint gave rise to a duty to predict a decrease in earnings or return on investment in the fourth quarter; (2) with respect to the affirmative predictions of October 1990, the predictions of a 15-20% increase in return on average common equity for 1990 and of a 6-9% growth in "normalized earnings for 1990" turned out to be not materially different from the actual results and no bad faith was alleged; and (3) the complaint lacked sufficient allegations that the defendants knew at the time of predicting a 10 cents per share write-down that the ultimate write down would be 15 cents per share and, in any event, the difference was not material under accepted accounting principles.

The Court of Appeals reversed and remanded to the district court holding that leave to amend should have been granted pursuant to Fed.R.Civ.P. 15(a) because 1.) the Complaint was the first relevant attempt to amend the Cons.Am. Compl.<u>FN2</u> and 2.) the Complaint stated a cause of action under § 10b and Rule 10b-5 by alleging that (a) defendants made a series of misrepresentations in order to give the impression that the trend of increased earnings experienced by BAC prior to fiscal year 1990 would continue throughout that year, (b) defendants made the misrepresentations knowing them to be false or with reckless indifference as to whether they were false, (c) the market considered those misrepresentations significant in evaluating BAC stock, (d) BAC stock is traded on an open market, and (e) as a result of those misrepresentations, plaintiffs purchased BAC stock at an artificially inflated price. *In re Bell Atlantic Sec. Lit.,* 993 F.2d 875 (3d Cir.1993) ("Appeal Opinion"). Accordingly, the Court granted defendants leave to amend.

> FN2. The Third Circuit found that the fact that some of the Plaintiffs had earlier amended as a matter of right within days of

their original filing was irrelevant and did not prejudice or inconvenience defendants; and the Second Cons.Am Compl., which alleged new facts obtained in discovery between April and October 1991, was aimed at curing deficiencies identified by the district court as lacking in specificity. The Court reasoned that only if the proffered complaint did not succeed in curing identified deficiencies would the district court have been correct in denying the motion to amend.

*2 In its opinion, the Third Circuit stated that it would have affirmed the dismissal of the Consolidated Amended Complaint if there had been no prompt attempt to amend following the district court's dismissal because the complaint lacked sufficient allegations of scienter and the facts alleged therein did not require defendants to disclose more than they did about the expected fourth quarter results. Appeal Opinion at 10.

Further, while not specifically ruling that the Rule 12 proceedings should have been converted into Rule 56 proceedings because the district court relied on material outside the pleadings <u>FN3</u>, the Court of appeals stated that summary judgement proceedings would have been a "safer course" and added that the parties contentions were more appropriately resolved in a Rule 56 proceeding. Appeal opinion at 11. This Motion for Summary Judgment was filed on March 29, 1996. The Court will now proceed with an analysis of the parties contentions according to the standard set forth in Rule 56.<u>FN4</u>

> FN3. In analyzing the complaint, the district court consulted the full text of the documents alleged to be misleading, a transcript of the entire speech to the securities analysts, and Bell's filings with the SEC.

> FN4. The Court of Appeals observed in this regard that the defendants proffered explanations for 1.) an alleged retroactive credit that transformed a third quarter earnings decline into a reported earnings gain, 2.) an alleged misrepresentation concerning the expected amount of the write-off, and 3.) for other allegations of wrongdoing, were "plausible" and suggested that "it may be that the defendants can create a summary

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

judgement record establishing that their reports and pronouncements were not misleading, that any inaccuracies taken singly and as a whole, were not material, or that they acted with pure heart and rational basis." Appeal Opinion at 14-15.

### II. *Rule 56 Standard of Review*

Summary judgment procedure is properly regarded as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The inquiry performed is the threshold inquiry of determining whether there is a need for trial. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.[FN5]

> FN5. When the question for decision concerns drawing inferences from undisputed evidence, or interpreting and evaluating evidence to derive legal conclusions, a trial may not be necessary. William Schwarzer, Alan Hirsch, David Barrans, *The Analysis and Decision of Summary Judgement Motions: A Monograph on Rule 56 of the Federal Rules of Civil Procedure,* The Federal Judicial Center at p. 39 (1991).

Fed.R.Civ.P. 56(c) provides that a court may grant summary judgement when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The record, and all reasonable inferences drawn therefrom, must be viewed in the light most favorable to the party opposing summary judgment. *Anderson v. Liberty Lobby,* 477 U.S. 242, 255-56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita,* 475 U.S. at 587. If there is a "disagreement about material facts or the conflicting inferences to be drawn from them, a trial is required to resolve the conflicting versions." *Peterson v. Lehigh Valley Dist. Council,* 676 F.2d 81, 84 (3d Cir.1982). In determining the motion, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version. *McDaniel's v. Flick,* 59 F.3d 446, 453 (3rd Cir.1995).

A disputed fact is *material* when it could effect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).[FN6] A dispute is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.; Anderson,* 477 U.S. at 250. In other words, if proved at trial, the facts proffered by the nonmovant, have to be sufficient to survive a motion for directed verdict or judgment notwithstanding the verdict. *Id;* See also, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

> FN6. When confronted with an asserted factual dispute, therefore, the court must examine the elements of the claims and defenses at issue on the motion and determine whether a resolution of the factual dispute could effect the disposition of any of those claims or defenses.

**\*3** According to the trilogy of cases decided by the Supreme Court in 1986, *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the moving party must first demonstrate the absence of a genuine issue of material fact. That burden may be discharged by pointing out to the court that there is an absence of evidence in the record to support the nonmoving party's case.[FN7] *Celotex,* 477 U.S. at 323. A defendant meets his burden under Rule 56(c) when he "conclusively shows that the facts upon which the plaintiff relied to support his allegation were not susceptible to the interpretation which he sought to give them." [FN8]

> FN7. The movant may either claim that the nonmovant has not offered enough proof to establish a requisite element of its case *or* the movant may attempt to negate an essential element of the nonmovant's case. The Supreme Court in *Celotex,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), rejected the traditional view that the movant must offer affidavits of similar materials *negating* matters on which the nonmovant will bear the burden of proof at trial.

Fed.R.Civ.P. 56(e) Advisory committee's notes (amended 1989).

FN8. In this regard, *Matsushita* demands that the inferences drawn from the non-moving party's evidence be reasonable in order to reach the jury. If the opponents' theory is senseless, no reasonable jury could find in their favor and summary judgment may be granted. *Eastman Kodak Company v. Image Technical Services,* 504 U.S. 451, 469-470, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). On the other hand, if there is evidence in the record from which a reasonable inference in the nonmoving parties favor may be drawn, the moving party cannot obtain summary judgement. *Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 364 (3d Cir.1987).

Once the moving party has demonstrated the absence of a genuine issue, the nonmovant must go beyond the pleadings and come forward with "specific facts, by affidavits, depositions, answers to interrogatories or admissions on file showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(c)).[FN9] *Matsushita,* 475 U.S. at 586. ("the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts"). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 249-50. Conversely, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, summary judgment must be denied. *Big Apple BMW v. BMW of North America,* 974 F.2d 1358, 1363 (3d Cir.1992), cert. denied, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). The ultimate burden of persuasion remains with the moving party. There can be no "genuine issue as to any material fact" when, after adequate time for discovery, a party fails to establish the existence of an element essential to the nonmoving party's case on which the party will bear the burden of proof at trial. *Celotex v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265. In a securities fraud case, summary judgment is improper if a plaintiff shows a genuine issue of material fact with regard to one particular statement by the company or its insiders". *In Re World's of Wonder,* 35 F.3d 140, 1412 (9th Cir.1994), cert. denied, 116 S.Ct. 185 (1995) and 116 S.Ct. 277

(1995). *In Re Convergent Technologies,* 948 F.2d 507, 512 (9th Cir.1991).

FN9. This sentence describing the non-movant's burden in opposing the motion was added in 1963 to overrule a line of cases that had denied summary judgment motions on the strength of well pleaded allegations even though the opponent had produced little or no evidentiary matter to establish that there is a genuine issue for trial. The advisory committee notes explain those cases were incompatible with the "very mission of the summary judgement procedure ... to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed.R.Civ.P. 56(e) advisory committee's notes (amended 1963).

III. *STATEMENT OF FACTS*

This action was filed on behalf of purchasers of the common stock of BAC between June 14, 1990 and January 22, 1991, ("class period"). According to the complaint,[FN10] BAC artificially inflated the price of its common stock during the class period by issuing false and misleading public statements about the company's financial performance, earnings trends, and anticipated earnings growth in contravention of § 10, Rule 10b-5, § 20, and Pennsylvania common law. By these statements, BAC allegedly intended to give the impression that the trend of increased earnings experienced by BAC prior to fiscal year 1990 would continue throughout that year. Specifically, the statements created or prolonged market misconceptions that BAC would continue to experience 6-9% earnings growth, as forecasted, leading to higher earnings and return on equity, and that BAC's non-communications businesses (particularly the financial services segment) were doing well. To that end, defendants also manipulated the timing of revenues and expenses, and concealed the amount of reported revenues and expenses that were non-recurring or out-of-period.[FN11]

FN10. All subsequent references to plaintiffs' "complaint" in this opinion are to the "Second Consolidated Amended Complaint ".

FN11. Thus, plaintiffs claim is based, in

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                    Page 5
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
 **(Cite as: 1997 WL 205709 (E.D.Pa.))**

part, on manipulative accounting practices employed by defendants.

**\*4** On January 22, 1991, the end of the class period, the Defendant's issued a press release relating the financial results for the fourth quarter of 1990 and for that fiscal year. That day, BAC common stock declined $4 dollars per share, closing at $50. The market price continued to drop an additional $2.375 per share the next day, closing at $47.625 per share. This lawsuit followed.

The undisputed facts as developed from the depositions, documents and pleadings submitted to the court are as follows. BAC is a regional telecommunication company. It is one of the seven regional Bell operating companies ("RBOC's") created in 1984 as a result of the breakup of AT & T. During the class period, BAC conducted its business through a group of highly-regulated local telephone companies (collectively referred to as the "network services group" or "NSG"),[FN12] a non-regulated cellular telephone business,[FN13] and several non-telecommunications businesses.[FN14] BAC stock is actively traded on the New York, Philadelphia, Boston, Pacific, Midwest, London, Zurich, Geneva, Basil, Frankfurt and Tokyo stock exchanges.[FN15]

> FN12. The NSG consisted of the following seven operating telephone subsidiaries: Bell Telephone Company of Pennsylvania, Diamond State Telephone Company (serving Delaware), New Jersey Bell Telephone Company, and four Chesapeake and Potomac Telephone Companies (serving Washington DC, Maryland, Virginia, and West Virginia). The NSG provided traditional and cellular mobile communications services to the Mid-Atlantic region of the United States and accounted for 88% of Bell's 1990 revenue.

> FN13. BAC's provided cellular telephone service and marketed mobile equipment throughout the MidAtlantic region of the United States.

> FN14. These business segments included: (1) Financial Services (comprehensive equipment leasing, corporate financial services, and real estate investment and devel-

opment); (2) Business Systems (computer and computer maintenance services, software support, and disaster recovery services); and (3) International (telecommunications consulting, software development, systems integration services, computer maintenance/repair outside the U.S., and investments in the New Zealand telephone company (Telecom Corporation of New Zealand) and in a Czech. cellular joint venture)).

> FN15. The fraud on the market theory's presumption of reliance is only available if Bell stock was traded on an "open and developed" efficient market. *Basic v. Levinson*, 485 U.S. 224, 247, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Hayes v. Gross*, 982 F.2d 104, 107 n. 1 (3d Cir.1992) (quoting *Cammer v. Bloom*, 711 F.Supp. 1264 (D.N.J.1989). In this case, it is

In 1990, the year pertinent to this litigation, BAC had assets over 27 billion, total operating revenues (communications services as well as financial and real estate services) of over 12 billion, operating expenses of over 9 billion, and net income of 1.3 billion. Return on average common equity was 14.8%. [DX-Tab 2, BA1000851-910] (1990 Annual Report at 26).

As a publicly traded company, BAC is required to file reports with the Securities Exchange commission.[FN16] Using the calendar year as its fiscal year, BAC files quarterly reports of its financial performance within 45 days after the close of each quarter on Form 10-Q and an annual report within 90 days after the end of the fiscal year on Form 10-K.[FN17]In addition to the requisite SEC undisputed that Defendant Bell's securities are traded on an open market. filings, BAC announces earnings to the public by press release for each quarter and for year end as soon as the results are finalized.[FN18] Management projections are also available to professionals through press conferences and speeches to analyst societies.

> FN16. In its own press releases and quarterly and annual SEC filings, BAC reported all subsidiary financial information, including that for Bell Atlantic Mobile Systems ("BAMS/cellular") and Bell Atlantic Sys-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tems Leasing ("BASLI/financial services"), on a consolidated basic in accordance with GAAP. The NSG telephone company subsidiaries also filed their own Forms 10-Q and 10-K, each containing an MD & A. (Tomlinson dep. 24).

FN17. The general requirements for these reports are prescribed by SEC Regulation S-K and in the instructions for each form. The reports include current financial statements, footnotes to those financial statements, and a section entitled Managements Discussion and Analysis of Financial Condition and Results of Operations("MD & A"). Item 303 of Regulation S-K prescribes the format and content of the MD & A. This section contains an analysis of current financial results (including changes in financial condition) and a comparison of the current results to the results of prior periods, usually the comparable period of the prior year. Form 10-K contains more detailed descriptions of various aspects of the company's businesses, and includes or incorporates financial statements also contained in the Annual Report to shareholders. Instructions to Form 10K (D3) request that registrants indicate whether the financial statements in the reports reflect a change from the preceding year in any accounting principles or practices or in the method of applying those accounting principles.

FN18. Press releases are two to three page announcements of key financial results and particularly newsworthy aspects of those results.

BAC's financial accounting methodology is governed by and must comply with Generally Accepted Accounting Principles(GAAP), a set of accounting policies determined by the Financial Accounting Standards Board ("FASB"). The SEC defers to these standards. See, *Accountants SEC Practice Manual,* (CCH) 1523 ("The SEC regards principles, standards and practices promulgated by the [FASB] ... as binding upon registrants filing financial statements with the SEC and upon the certifying accountants").

A. *Financial Reporting Procedure*

During the time period under scrutiny, BAC's internal structure and reporting system was rather complex. Monthly, raw financial data was collected from each of BAC's subsidiaries and consolidated by the Corporate Accounting Department, headed by Assistant Vice President of Finance, William Tomilson. (Tomilson Dep. 15). That department transmitted this data to Financial Analysis, headed by Assistant Vice President, Ronald E. Von Stetina, which added analytical information and disseminated the results to management and those involved in the financial disclosure process in the form of a monthly "Flash Report".Id. In addition to this procedure, Financial Analysis would prepare preliminary monthly and then final Quarterly Analysis Packages which more completely analyzed "flash report" data in preparation for reporting quarterly results. (Tomilson Dep. at 14). These packages, as well as any updates of that information, formed the basis for the quarterly earnings press release and the MD & A. (Ciango Dep. 28). In order to compensate for any lag time in current information created by a delay in printing or circulation of this package, Manager of Corporate Media Relations, Cynthia Ciango, ("Ciango"), would obtain any updates of the package information directly from the departments in verbal or handwritten form before issuing the press release. *Id.*

1. The earnings press release

**\*5** The earnings press release was initially drafted by Ciangio, following a "pre-meeting" with the Director of Investment Relations, Peter D. Crawford ("Crawford"). (Ciangio Dep. 18). This draft was critiqued by Crawford and a second draft was then drawn up by Ciango to be disseminated to a "team" of representatives of various departments.[FN19] That team would then convene in order to discuss the quarterly analysis package and issues raised by the results. (Ciango dep. 18), (Ludlow dep. 138),(Bulliner dep. 40),(Lynch dep. 102); See also (B2006307, TAB 10). The team would continue to comment on subsequent drafts. (Ciangio dep. 21);(Tomlinson dep. 152);(Von Stetina dep. at 41);(Bulliner dep. 25, 38). Eventually, a version incorporating comments from the various departments was submitted to senior members William Bardeen, Vice President for Finance and Controller, and Carolyn Burger, Vice President Secretary and Treasurer. (Ciango dep. 21-23); (Bardeen dep. 8-9);(Burger dep. 61). Ultimately, the draft was submit-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ted to Campbell and Smith for their approvals. (Ciangio dep. 21-23);(Buliner dep. 34-35). If any changes were made to the draft at any point, the draft was submitted to the legal department "just to make sure that nothing was changed that would create any misunderstanding in terms of public information and accuracy." [FN20] (Ciangio dep. 22-23). Finally, BAC consulted with Coopers & Lybrand, BAC's outside a countants, to discuss any "issues that would possibly impact the earnings release." (CL2010328, DX TAB 11). For example, in preparation for the issuance of the press release for the third quarter 1990, Ludlow held a conference call with accounting representatives of each of the subsidiaries. *Id.* The notice of the meeting advised that "your Coopers & Lybrand representative should be present during the calls." (CL2010328, DX TAB 11). The Coopers & Lybrand notes of the October 17, 1990 meeting reflect that, on behalf of the parent, Ludlow and two subordinates attended, as well as Coopers & Lybrand Audit partner, William Walsh and Audit Manager, Mitchell Cohen. (CL2010326, TAB 12). Various issues were discussed by this group with each subsidiary's representative and that subsidiary's C & L counterpart. This procedure was followed for the first quarter press release and the second quarter press release as well. *See also,* (CL2000018-19, TAB 13) (First quarter meeting held April 18, 1990), (CL200974, TAB 14)(Second quarter meeting held July 20, 1990).

> FN19. The team was comprised of the following departments and representatives: Investor Relations (Crawford); Financial Analysis (VonStetina); Corporate Accounting (Tomlinson, Ludlow); and Legal. (Ciangio Dep at 13, 18);(Ludlow Dep 36).

> FN20. BAC required approval of all earnings press releases by the legal department before issuance. (Ludlow dep. 79-81).

#### 2. The Quarterly and Annual Report

For 1989 and 1990, the Management's Discussion and Analysis (MD & A) section of the 10Q was prepared by the Financial Analysis department following the issuance of the quarterly earnings press release. (Ludlow dep. 40);(Tomlinson. 22-23). The initial draft was distributed to "at least twenty people" for review and comment. (Ludlow Dep 76, 138; See also VonStetina dep. 127). Like the press release, the MD

& A drafts were reviewed by managers Bardeen, VonStetina, Tomlinson, and Burger, and the legal department, before final review by Campbell, BAC's Chief Financial Officer. (VonStetina dep. 128); (Bulliner dep. 26, 39); (Burger dep. 61);(Lynch dep. 20, 25); (Ludlow dep. 77). Drafts would also be disseminated to Financial Analysis counterparts at the subsidiaries who had provided initial input for their subsidiary to the quarterly analysis package for comment. (Lynch dep. 18-19). This process was designed to identify all disclosure issues. There were no rigid policies as to what should be disclosed and no typical areas were regularly discussed in the MD & A. (Smith dep. 87-88); (Lynch dep. 24,37-38). Decisions about what to include were based on judgment and the perceived materiality of the disclosure. (Burger dep. 36-37); (Lynch dep. 22-23 & 51) (determination turned on whether there was a "significant impact on net income, revenues or expenses");(Crawford Dep 38) ("went from rule of thumb that it represented 10% of corporate earnings to qualitative judgment that the information could result in a change in the. trading value of the security"). Further, the form of disclosure was dictated to some degree by the way information was aggregated in the company's financial statements. (Burger dep. 133). Disclosure issues were reviewed and discussed with Coopers & Lybrand. (Tomlinson dep. 140-41 & 147; Cohen dep. at 6). In addition, the company would answer questions from analysts regarding any disclosure. (Burger dep. 42). The policy was err on the side of more rather than less disclosure. (Von Stetina dep. 125-29) ("we tried to be as open as possible"..."tried to put more in, rather than less"..."underlying objective in all of this was to disclose as much as possible to the public about what was going on in the business"); (Bulliner dep. at 51) (where uncertain, "we tended to err on the side of disclosing"); (Burger dep. 35-36) ("Our intent was to always be clear to our investment community").

**\*6** Cooper's & Lybrand, after assessing "the accounting principles used and significant estimates made by management," certified both 1989 and 1990 financial statements as "in conformity with generally accepted accounting principles". (DX-TAB 146, B1000495, (1989)); (DX-TAB 2, BA1000907, (1990)).

#### B. *Incentive Compensation*

Since 1986 or 1987, BAC had short-term incentive

Case 3:99-cv-02374-AWT   Document 459   Filed 03/12/09   Page 56 of 171

Not Reported in F.Supp.                                                                                    Page 8
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
 (Cite as: 1997 WL 205709 (E.D.Pa.))

compensation plans by which all management em-
ployees could earn annual bonus payments. (Bulliner
dep. 128). The amount of the payments or employees'
entitlement thereto was tied, in part, to BAC's earn-
ings per share growth. Earnings growth, however,
was only one of several criteria by which Company
performance was measured for this purpose. (Smith
dep. 76); (Aquino dep. 21); (Bulliner dep. 124, 128);
(Campbell dep. 54-55). Further, in some years, earn-
ings per share growth was adjusted before determin-
ing amount of incentive compensation for that por-
tion of the growth attributed to factors "external to
the company" such as a change in accounting princi-
ples. (Bulliner at 125-126). A comparable plan ex-
isted for union employees. (Von Stetina dep. 304).
For 1990, incentive compensation amounted to 30 to
40% of the annual compensation of BAC's senior
management.[FN21] (Albertini dep. 108). Without this
compensation some BAC employees would have
been paid at below market rates for their positions.
(Von Stetina dep. 97).

>    FN21. Incentive compensation is compensa-
>    tion that is tied in part to the financial per-
>    formance of a corporation.

C. The Statements

Plaintiffs contend that defendants engaged in a grand
scheme to falsely portray the true financial condition
of BAC in order to inflate the price of the corpora-
tion's stock. The primary thrust of plaintiff's case is
that BAC reported and predicted earnings growth for
the year 1990 as compared to 1989 results while con-
cealing the fact that most or all of this growth derived
merely from non-recurring accounting adjustments
and other one-time events rather than from operating
performance.[FN22] Thus, according to plaintiffs, BAC
successfully concealed the fact that "real" earnings
were not growing at the rate reported or predicted. In
furtherance of this deceptive scheme, defendants
overstated 1990 results and understated 1989 results
by manipulating the timing of "reversals of overac-
cruals" and "retroactive credits" for various liabilities
[FN23] and failing to disclose that reported revenues and
expenses included non-recurring or out-of period
amounts. [FN24]

>    FN22. Plaintiffs do rot allege that the ac-
>    counting underlying these adjustments vio-
>    lated GAAP and conceded that defendants

were entitled to make these adjustments. In-
stead, they allege that statements reporting
and predicting earnings growth, circulated in
press releases, speeches to analysts, finan-
cial statements, and SEC filings were mis-
leading because such adjustments were not
disclosed.

>    FN23. As described in detail later in this
>    opinion, these accounting decisions relate to
>    certain liabilities to long distance carriers
>    ("84-800 and NECA") and for certain em-
>    ployee benefits (ie, pension and medical).

>    FN24. For example, as discussed later, BAC
>    allegedly did not disclose that fourth quarter
>    1990 earnings per share included $.05 cents
>    from an accounting change (ESOP), and did
>    not disclose that a $.10 charge to fourth
>    quarter earnings would be an additional
>    $.05.

In support of their theory, plaintiffs identify the fol-
lowing representations made by the defendant's dur-
ing the class period as false or misleading.[FN25]

>    FN25. The documents containing these
>    statements are located in the record as fol-
>    lows: First quarter April 19 press release
>    (DX-TAB 3) May 16, 1990 Form 10-Q
>    (DX-TAB 4), second quarter July 23, 1990
>    press release and quarterly report to share-
>    holders (DX-TAB 5), Third Quarter October
>    18, 1990 press release (DX-TAB 7), October
>    25, 1990 presentation to NYSSA (DX-TAB
>    36), October 25, 1990 press release (DX-
>    TAB 107), November 9, 1990 Form 10Q
>    (DX-TAB 8, BA1000573); January 22, 1990
>    press release (DX-TAB 9, 123).

1.) PREDICTION OF 6-9% EARNINGS GROWTH
IN 1990

BAC repeatedly represented that earnings per share
would grow 6-9% [FN26] when, in fact, (1) by June
1990, defendants internally estimated growth for
1990 of less than 6% and as low as 4.8%; (2) the
NSG was only expected to contribute 3% to 1990
earnings growth (internally referred to as "the busi-
ness problem") and the non-telecommunications
segments were performing poorly (3) access line

Not Reported in F.Supp.                                                                      Page 9
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
 **(Cite as: 1997 WL 205709 (E.D.Pa.))**

growth and revenue growth was slowing while expense growth was increasing; (4) growth results for the first three quarters of 1990 were overstated and results for 1989 were understated due to non-recurring events, listed and described in more detail below, so that defendants did not expect the 6% growth to come from "operations".

> FN26. For example,

>> (1) In the first quarter meeting with New York analysts on January 26, 1990, Campbell described charges in the fourth quarter of 1989 which had reduced earnings for that year and then stated,

>> "normalized ongoing results for the 1989 year ... would have been $6.67 ($3.33 after a two for one stock split during the first quarter of 1990) per share on net income of $1.3 billion. This is the benchmark level for our industry planning process and from which we will resume *our 6-9% earnings growth target* and we fully expect to see some acceleration toward the u,per end of that range in the longer term" (DX TAB 32);

>> (2) In a third quarter speech for New York analysts on July 25, 1990 Campbell stated that, "with growth of just over 6% we are still near the lower end of *our target range of 6-9 percent...* we expect to be at the lower end of this growth range until at least next year" (DX TAB 202); and

>> (3) In a fourth quarter meeting with the NYSSA analysts on October 25, 1990, Campbell stated he expected to achieve the "lower end" of its target for earnings growth of "six to nine percent" in the 1990-92 time frame. He also quantified the expectations for year end:

>> "Last year we indicated to you that we expected normalized per share earnings of $3.33-excluding some one-time writedowns of inventories and goodwill ... and that's exactly where we ended the year. And we said that earnings would grow from that base to the lower half of our 6-

9% objective in the '90-'92 time frame. We're solidly on that path despite some weakening demand due to the economic slowdown in some parts of our region. *We expect normalized earnings for 1990 to be about 6 percent higher than last year without special adjustments.*" (DX TAB 36).

### 2.) *JULY 23, 1990 GROWTH STATEMENTS*

**\*7** Defendants represented that, as compared to the second quarter of 1989, the second quarter of 1990 showed growth [FN27] when, in fact, the results for the second quarter 1990 included non-recurring accounting adjustments, described below.

> FN27. The press release and quarterly report stated that, in the second quarter net income increased 6.2%, total operating revenues increased 6.7%; earnings per share at .92 increased 5.7% as compared to the second quarter of 1989. As compared to the first half of 89, net income grew 6.8%, revenues grew 7.9%, and EPS grew 6.4%. (PX 2004434, DX TAB 5). The report also stated, "Revenues reflected continued growth in volumes in both our telephone and non-telephone businesses and demonstrated the continued strength and resiliency of our regional services based economy."

### 3.) *THIRD QUARTER STATEMENTS: October 18, 1990*

#### a. Financial Results

Defendants, in reporting results for the thir quarter of 1990, again represented that the company experienced growth as compared to the third quarter and first six months of 1989, when in fact, results for the first, second, and third quarter of 1990 were overstated by non-recurring accounting adjustments, and the calculation and reporting of "growth" by reference to results for the third quarter of 1989 was misleading because results for the third quarter of 1989 had been negatively impacted by the effects of a strike.[FN28]

> FN28. The press release, in reporting third

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

quarter results, stated, as compared to 3089, "net income increased 4.2%, total operating revenues increased 6.5%, total operating expenses increased 5.2%, earnings per share (EPS) ($.91) increased 5.8%, return on equity was 16.6% (14.6 in 89). For the first nine months of 1990, net income grew 5.9%, revenue grew 7.4%, expenses increased 6.3%, and EPS grew 6.2%. total access lines grew 3.2%, business access lines increased 5.1%. (DX TAB 7) Form 10Q for the third quarter was filed on August 10, 1989 repeated those representations. (DX TAB 6).

### b. Cellular

The Defendants represented that Bell Atlantic Mobile Systems ("BAMs"), BAC's cellular subsidiary, was experiencing "positive results" and "continued growth in volumes" when, in fact, cellular telephoneusage per customer had been weakening, average minutes of use per customer had been declining since October 1989, and BAMs had suffered losses in the first two quarters of 1990.[FN29] (Campanella at 272-83);(PX 167).

> FN29. The press release stated, "Revenues also reflected continued growth in volumes in our non-telephone businesses "... Total usage grew at a "reduced rate" in September 1990. "In September, customer usage and demand for service grew at a reduced rate due to sluggishness in the economy." (TAB 7) ..."We experienced strong business volumes in our local telephone companies, as well as in our wireless communication (cellular) and leasing businesses ... These positive results, at a time when economic weakness exists, are indicative of the underlying strength of our businesses." The October 25, 1990 release stated that "Bell Atlantic Mobile Systems is solidly profitable now, and will be even more so in the future."

### c. Expense Controls

The defendants also represented that revenue growth was due to measures taken to reduce expenses when, in fact, reported growth was not due to expense controls employed by BAC, but to nonrecurring events.[FN30]

> FN30. Regarding expense measures, the release stated, "Tight expense measures contributed to net operating revenue growth of 11.2%" .and we are confident that we have the controls in place to guide our company through this period of economic uncertainty.).. As a prudent measure against future economic uncertainty, all employees are redoubling their efforts to cut expenses." The October 25, 1990 release stated, "our expense controls continue to produce strong operating performance, like the 11.4% growth for the first three quarter of the year ".

### d. Access Lines

Defendants represented that access lines had grown when, in fact, access line growth was slowing.[FN31] (Campanella at 45-50).

> FN31. Regarding access lines the release noted, "Business Access Lines increased 5.1% for the quarter over the third quarter of 1989, while total access lines grew 3.2%, reaching nearly 17.3 million." The October 25 release stated, "Our revenue growth, is driven by a solid information based economy that is producing consistent demand for network services even now, in difficult economic times." "Access line growth has been particularly strong."
>
> However, the Court notes that the document also states, "our network usage may be reflecting some economic slowdown, as both interstate minutes of use, at 5.4% for the third quarter and intrastate minutes of use at about 8% are growing but they are growing at a moderate level and slightly slower rate than they were before."

### 4.) *THIRD QUARTER STATEMENTS: October 25, 1990*

In an October 25, 1990 presentation to the New York Society of Securities Analysts ("NYSSA") (DX-TAB 36), BAC reported growth in third quarter, when in

Not Reported in F.Supp.                                                                                          Page 11
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
  **(Cite as: 1997 WL 205709 (E.D.Pa.))**

fact, third quarter results were, again, overstated by nonrecurring accounting adjustments.[FN32]

> FN32. This document also stated that EPS (2.73 for 9 months) is a 6.2% increase over last year. The difference between operating results at 11.4% and EPS at 6.2% is interest expense, ESOP and New Zealand. (PX 181 at A00045).

### a. Anticipated Fourth Quarter Results:ESOP

BAC represented its expectations for the fourth quarter as follows: BAC could "sustain [its] strong operating performance as [it] moved towards year end" and "fourth quarter financial results would continue to reflect the strong performance registered by the company for the first nine months." Another statement represented that BAC "continue[d] to have very strong results and expect[ed] a record year from [bits] operating units even during uncertain economic times." In making these representations, however, BAC failed to disclose that $.05 of anticipated earnings per share for the fourth quarter of 1990 would include five cents attributable to a tax benefit for an Employee Stock Ownership Plan (ESOP) rather than from operating earnings; $.04 of the $.05 cents was attributable to the first three quarters of 1990; and expenses related to the ESOP were reclassified on BAC's books. Further, these predictions of fourth quarter results z -led to disclose that a.) Fourth quarter earnings would decline 18-30% from the performance registered for the first three quarters of 1990 and decline significantly from the fourth quarter of 1989 as evidenced by a November 2, 1990 internal document that noted that 1990 EPS would be only 2% higher than adjusted EPS for the fourth quarter of 1989 (3.44). This 2% was due to a change in accounting for BAC's ESOP; b.) that earnings in the fourth quarter would be lower than .81 EPS (10 cents per share less than the company's earnings for the first three quarters of the year.[FN33] c.) earnings were declining; revenues, while continuing to increase, were increasing at a decreasing rate (1st Q=9%, 2nd Q=6.7%, 3rd Q=6.5%); and expenses were rising at an increasing rate, and based on revenue and expense trends it was reasonable to anticipate that BAC would earn less (less income and less return on equity) in the fourth quarter than in the first half of 1990. Plaintiffs claim that the drop in the fourth quarter was known by October 1990.

> FN33. The average of the first three quarters = $.91. $.91 minus $.10 charge =.81 EPS in fourth quarter of 1990. Following the October 25, 1990 meeting, the mean of analyst estimates of earnings for the fourth quarter of 1990 was .86 cents per share, as reflected in a December 12, 1990 Zacks investment research report. (Compl. at 566-68).

### b. Fourth Quarter Charge of $.10:(Goodwill Write-down)

**\*8** Regarding a fourth quarter writedown in the goodwill of Bell Atlantic Systems Leasing, ("BASLI"), BAC represented [FN34] that an expected charge to fourth quarter earnings would only be $.10; that there would be "no further bookings of this sort"; and that the motivation for the charge was to reflect the market value of the financial services businesses more conservatively when, in fact, by November 2, 1990, the writedown was estimated to be $.15 ($60 million) rather than $.10 ($40 million); and the motivation for the writedown was not conservatism but, rather, a method to record the expected loss on the potential sale of one of the financial services businesses, Bell Atlantic Systems Leasing, BASLI.[FN35]

> FN34. The release stated that "[We] expect to book a minor goodwill charge of approximately $.10 cents per share in our financial services organization ... as you know we always look very hard at year end to insure that our assets and liabilities are accurately reflected ... we do expect to book a minor adjustment related to goodwill, and that will bring us slightly below some expectations ... I want to make it clear that we do not have an asset exposure ... Financial companies generally are undergoing significant devaluation. As you know we have in the past and we intend in the future to state the value of all of our businesses, including financial services in the most conservative possible way. So we will take a charge against goodwill to fully reflect the conservative market value of this business. *And this is the source of approximately $.10 cents charge that we will take to fourth quarter earnings ... We don't anticipate in 1990, 1991 or beyond-any further bookings*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*of this sort.*"... "the charge is merely a continuation of our conservative accounting practice to reflect lower market values in the financial services industry".

FN35. Plaintiffs also claim that failure to disclose this information in Form 10-Q for the third quarter filed on November 9, 1990 violated Item 303 of Regulation S-K of the Securities Exchange Commission, 17 C.F.R. § 229.303.

c. Return on Equity

The defendants represented that 15-17% return on average common equity was "sustainable" and would be 15-20% in 1990 when, in fact, the target would not be achieved and actual return on equity was 10.5% for the fourth quarter and 14.8% for the year, lower than the 16.4% average return on equity reported in the first nine months of 1990.FN36

FN36. With regard to return on equity for the year, BAC stated, "Returns for the nine months show a 16.4% return on equity ... we're comfortable and confident that the higher returns we're now realizing, in that 15-17% range, are sustainable and do create value for our owners. And returns on equity-we believe can yet improve in the 15-20% range.

5.) *FOURTH QUARTER OF 1989 NONRECURRING CHARGES*

In a press release issued January 23, 1990, defendants represented that the funding of an employee benefits that was one-time charge when, in fact, the trust was to be a recurring expense.FN37

FN37. The press release described charges taken in the fourth quarter of 1989 as follows. "1989 earnings at $5.43 per share compared with $6.65 per share in 1988, an 18% decrease ..."our performance would have compared favorably with 1988 except for the approximately $320 in special charges against earnings we recorded at the end of 1989. These charges, *which were of a one-time nature* were associated with the re-

valuation of assets at some of the company's unregulated subsidiaries, the cost of an organizational realignment that included incentives for managers to retire early or voluntarily leave, and debt ref financing at several of the companies telephone subsidiaries"... "*In addition* the company *began* to accrue for and fund a trust to help cover the future cost of medical and dental benefits for nonmanagement retirees".(TAB 207).

6.) *REAL ESTATE, FINANCIAL SERVICES, AND INTERNATIONAL BUSINESSES*

Defendants represented that each of the non-telephone subsidiaries was doing well when, in fact, those businesses experienced an aggregate loss. Specifically, Bell Atlantic Properties (BAP) lost $13 million; by July, 1990, Bell Atlantic Systems Leasing Inc.'s, ("BASLI"), "growth trend [had] softened"; and by September 1990, BASLI was experiencing an "ongoing revenue decline".FN38

FN38. a.) In an April 19, 1990 press release, Campbell stated, "in addition, non-telephone businesses continued to grow at a very satisfactory rate." (DX-TAB 1);, b.) September 20, 1990 in San Franciscs, "I'm now looking forward to equally gratifying results during the next five years. As you know, that's a critical time frame for us, a period in which we expect to grow our international business to about 1.5 million dollars in revenues."; April 23, 1990 speech to Baltimore Institutional Investors, "It may take some time, but we expect international to be a big part of Bell Atlantic's Future."; c.) In an October 25, 1990 release, commenting on financial services business, "our properties business, our real estate business is appraised well above book, and in fact, Bell is the principle tenant. The residual values in our leasing companies are conservative and we have no unusual credit problems."

7. *THE ACCOUNTING ADJUSTMENTS: REVERSALS OF ACCRUALS AND RETROACTIVE CREDITS*

Plaintiffs allege that the defendants, when reporting and predicting growth for 1990, failed to disclose that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                    Page 13
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
 **(Cite as: 1997 WL 205709 (E.D.Pa.))**

the results for the first three quarters of 1990 were inflated by nonrecurring charges, as follows. In the First Quarter of 1990, 1.) Income was reduced by $11.4 million as a result of a $42 million settlement; 2.) Income was increased by $20 million due to a mathematical error discovered in the fourth quarter of 1989 that was improperly corrected in first quarter of 1990 [FN39]; 3.) Income was also increased by $57 million due to reversals of accruals for various liabilities [FN40]; and 4.) A statement in January 1990 describing non-recurring charges taken in 1989 failed to disclose that the funding of the retirees benefits trust was a recurring charge rather than a non-recurring charge.

> FN39. Plaintiffs also claims that, by delaying the correction of this error, defendants successfully understated results for the fourth quarter of 1989, as well.

> FN40. This claim challenges accruals for certain liabilities that are particular to the communications industry, NECA and 84-800 liability.

In the Second Quarter of 1990, revenues were increased by $24 million as a result of a recoupment of employee benefits.

In the Third Quarter of 1990, reversals of accruals in connection with pension and medical benefits and reclassification of BAC's Employee Stock Option Plan ("ESOP") decreased expenses by $42 million. Net income and earnings were thereby increased by that amount.[FN41]

> FN41. Plaintiffs claim that failure to disclose the fact and amount of the 42.1 million adjustment in expenses in Form 10-Q for the third quarter filed on November 9, 1990 violated Item 303 of Regulation S-K of the Securities Exchange Commission, 17 C.F.R. § 229.303.

**\*9** In sum, Plaintiffs allege that any statements of historical fact quoted above, were 1.) misleading, when made, in that they fail to disclose additional information, or 2.) correct when made, but rendered misleading by after-acquired knowledge by the defendants of material information. Plaintiffs also allege that, based on the undisclosed information, all predictive statements were issued without a reason-

able basis or without a good faith belief in the statements' truth.

### D. A Closer Examination

A detailed examination of the events leading up to BAC's public statements and any underlying accounting transactions follows.

#### 1.) 6-9% Earnings Growth

As noted above, throughout 1990, the defendants repeatedly represented that earnings would grow 6-9%.[FN42] Internal reports for 1990, listed below, reflect presentation made to BAC's Board of Directors and to various Board committees, and the contents of financial reports used by senior management:

> FN42. The defendants publicly stated that the source of thc earnings growth would be the network services group (basic telephone). For example, in an April 1990 meeting with institutional investors, Crawford stated, "we have major businesses in three different stages of the life cycle, with three different growth patterns, risk profiles, and earnings characteristics. This still robust business supports an ability to earn at the lower end of our earnings objective of six to nine percent." (DX TAB 34); At an October 25, 1990 NYSSA meeting, Cambell stated that the NSG presently contributed "four to six" percent of earnings growth. (DX TAB 36). In deposition, Crawford stated that, "in any single year, results in any single business segment could be more or less than our target ranges". (Crawford dep. 181-82). The network business had the capacity over the several years following 1990 to account entirely for "the lower end" of the 6-9% target." *Id.* On July 25, 1990, based on second quarter results, "We expect to be at the lower end of this growth range until at least next year at which time the results from our development activities will begin to make a visible and sustainable contribution". (DX TAB 202).

a.) On March 27, 1990 Campbell told the Board of Directors that that "management expected to be on target at 6% growth above normalized 1989 perform-

Not Reported in F.Supp.                                                                                                          Page 14
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
  (Cite as: 1997 WL 205709 (E.D.Pa.))

ance." (DX-TAB 41).

b.) On April 3, 1990, William Bardeen, Vice President of Finance and Controller, sent a "pre-flash" analysis of preliminary March results to Smith stating, "Based upon our trend analysis, we anticipate that we will exceed our Commitment View by $7.0 million and post net income of $1,404 million ($3.57 EPS) for the year." (DX-TAB 42).

c.) On May 11, 1990, Bardeen circulated the April flash report, commenting that net income for April was "over budget" by $36 million, and that net income of the first four months of the year was $6.2 million over budget and 7.3% higher than the corresponding 1989 period. "Earnings to share for the year to date were $1.20, a 6.2% increase over the same period last year." (DX-TAB 43).

On June 26 1999, Campbell reviewed financial results for the period ending May 31, 1990 with BAC's executive committee. He stated that, "the Corporation's financial performance was on target for both the month of May and year to date 1990" and that cumulative earnings per share of $1.53 were above the targeted level. (DX-TAB 44).

e.) On July 3, 1990, Bardeen sent Smith a "pre-flash" analysis of expected June and year-to-date results. June net income was below budget but year-to-date earnings were still estimated to be two cents over budget and a 6.4% increase over 1989. Based on current projections, Bardeen predicted that BAC would post net income of $1397 million ($3.55 EPS) for the year, equal to budget and representing a 6.6% EPS growth over normalized 1989. (DX-BA1008542, TAB 45).

f.) On July 24, 1990, Campbell addressed the Board stating, "earning per share for the first six months of the year totalled $1.82-2 cents above targeted EPS and $.11 (6.4%) higher than the same period in 1989 ... we are still striving to achieve our 1990 EPS target of $3.55 which would produce 6.6% growth over normalized 1989 EPS of $3.33". He also noted that the weakening regional economy, as well as investments made in various business development projects, would make achievement of that target more difficult than in previous years." (DX TAB 46).

**10** g.) On July 25, 1990, Bardeen sent Smith a Key

Financial Information Report updated for June 1990. The report states that the "Network companies" operating results continue to exceed the budget due principally to higher access revenues." Bardeen noted' that the weakening regional economy was becoming evident in those companies' volumes and concluded, "our current best view of the year indicates that 1990 earnings per share will total $3.54 or a 6.3% increase over 1989, as opposed to targeted EPS and EPS growth of $3.55 and 6.6%."(DX-TAB 47).

h.) On August 24, 1990, Bardeen sent Smith a Key Financial Information Report updated for July 1990. The letter stated that "the Network companies' operating results continue to exceed the budget due principally to higher access revenues," although volumes were beginning to fall below budgeted levels due to the weakening regional economy. Bardeen again repeated that "our last best view for the year indicated that 1990 earnings per share will total $3.54, or a 6.3% increase over 1989." (DX TAB 49).

i.) On October 3, 1990, Bardeen sent Smith a Projected Earnings Report. This showed that income for the month of September would probably be less than budgeted, although revenues were still higher than anticipated at the NSG. Bardeen also noted that third quarter net income would probably by $13 million below budget. He estimated year-to-date net income as $5 million below budget but still 5.5% ahead of 1989, and year to date earnings as $2.74, a 6.6% increase over 1989 and still one cent over budget. He concluded that total EPS for the year would be reported at $3.55 or a 6.6% growth over 1989. (DX-TAB 50).

j.) On October 18, BAC announced third quarter earnings by press release of $.91 per share, a 5.8% increase over the third quarter of 1989. Year to date earnings were § 2.73 per share, an increase of 6.2% over 1989.(DX-TAB 7).

k.) An "Earnings Update," dated October 23, 1990, predicted year-end normalized earnings per share growth of 6.3%. (TAB 51).

l.) On November 14, 1990, Bardeen circulated the flash report for October 1990. The report indicated that net income was $10.8 million below budget for that month, but Network Services was still overrunning its budget due to higher-than-budgeted network

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

access volumes and rates. (DX-TAB 52).

m.) On November 14, 1990, Bardeen separately summarized for Smith what he considered the "earnings per share that should be expected by the investment community based on your recent presentations to Wall Street analysts versus where our best view of EPS for the year currently stands." That summary reflected a "market expectation" of $3.43 ($3.53 minus a $.10 cent charge) compared to a best estimate as of that date of $3.42. Bardeen stated that "we will work to bring results in at the market expectation of $3.43." (DX-TAB 39).

n.) On December 13, 1990, Bardeen circulated the flash report for November 1990. The report indicated that net income for November was $17.1 million below budget, but that December results needed to exceed the budget by only $4 million to achieve 6% normalized growth. (DX-TAB 53).

*11 o.) On December 18, 1990), management informed BAC's Executive Committee that the Company was "on track" to meet its growth target of 6% growth in earnings, excluding the special charge. (DX-TAB 54).

p.) On January 4, 1991, Bardeen sent Smith a Projected Earnings Report stating that his best estimate was that December's net income, before deduction of the special charge, would be $5.6 million over budget, and that projected EPS without the charge would be $3.53 and even possibly $3.54. (DX-TAB 55).

q.) On January 14, 1991, Bardeen circulated the flash report for December 1990. The report stated that, excluding the special charge taken for that month, full year EPS totaled $3.53, representing 6.0% growth over normalized 1989 results. The report also noted that Network Services overran its budget by $6.1 million. (DX-TAB 56).

Plaintiffs submit, however, a June 1990 internal report that projected earnings per share growth of 4.8% for the year, (BA10008563, DX-TAB 60) [FN43] ; an internal report estimating "4-6% growth in the NSG for 1990 and 2-3% growth potential" from the non-telecommunications companies (cellular and business systems); and an internal report reflecting BAC's concern, referred to as "the business problem", that

NSG growth at only 3% per year would not support the achievement of 6% overall growth.

> FN43. The document that allegedly reveals that defendants had knowledge in June 1990 that BAC would not achieve the 6-9% EPS forecast, is dated June 25, 1990. It is entitled "Bell Atlantic Corporation 1990 Short Term Compensation" and is part of a multi-page draft entitled "Projected Earnings Report". (DX BA1008563, TAB 60). Two columns each of net income and earnings estimates are aligned under the heading "Entity Estimates". "Book" EPS growth under "Entity Estimates" is 4.8%. The document shows that an aggregation of subsidiary estimates, (i.e. "entity's" expected final booked net income as translated into earnings per share), produced EPS growth of 4.8%. (VonStetina dep. 140-41) ("entity view" represents consolidation of estimates given by each of the entities. It's simply "adding them up"); (Von Stetina dep. 147) ("snap shot in time of what total years earnings could look like, based on knowledge as of that day.").

### 2.) FOURTH QUARTER: ESOP

#### a.) $.05 TAX BENEFIT INCLUDED IN FOURTH QUARTER EARNINGS

In 1989, BAC established two leveraged Employee Stock Ownership Plans ("ESOP's"). [Def's B2006140, TAB 92] The ESOP's took a loan to purchase BAC common stock.[FN44] The stock was to be used over a ten year period, beginning on January 1, 1990, as BAC's matching contribution to its employee savings plans. [Def's B2006080, TAB 79]. For each quarter of 1990, BAC paid dividends on the stock held by the ESOP's.[FN45] These dividends were tax deductible by BAC pursuant to section 404(k) of the Internal Revenue Code.[FN46] BAC included the tax deduction attributable to the entire year in reported earnings per share for fourth quarter of 1990 rather than restating the first three quarters to reflect a tax deduction of $.02 for the first quarter, $.01 for the second quarter, and $.01 for the third quarter. As a result of the accounting treatment applied by BAC to the deduction, reported fourth quarter earnings per share were increased by $.05 per share.

FN44. Specifically, the ESOP's borrowed $790 million which was used to purchase 8.2 million shares of BAC common stock from the company's treasury and 8.8 million shares on the open market.

FN45. [CL100081, TAB 80]

FN46. Pursuant to section 404(k) of the Internal Revenue Code in effect in 1990, dividends paid on common shares held by an ESOP were tax deductible if the dividends were used to make payments on a loan, the proceeds of which had been used to acquire the employer's stock for the ESOP. Tax deductions confer a benefit on shareholders by reducing the company's overall tax liability.

In 1990, when the company first began accounting for the tax benefit generated by the payment of dividends, the accounting treatment was governed by APB Opinion No. 11 (Accounting for Income Taxes) and FASB EITF 86-4. These standards provided for the credit of the tax deduction directly to retained earnings without running the benefit through the income statement to reduce expense and increase income.[FN47] In December 1987, FASB issued Statement 96 (Accounting for Income Taxes) ("SFAS 96") superseding APB Opinion 11 and Issue 86-4, [DXB2007886-2007887, TAB 83] and scheduled to become effective beginning December 15, 1988, allowing the inclusion of the tax benefit in the calculation of net income, and thereby into the computation of earnings per share. However, in the fall of 1988, and again in December 1989, the effective date of SFAS 96 was deferred until December 1991 by the FASB due to considerable debate on the issue[FN48] and the FASB decided to modify certain provisions of SFAS 96. *Id.* Beginning in 1990, a question arose as to whether companies still reporting under APB Opinion 11 could calculate their net income and then add the amount of the tax deduction to that figure solely for the purposes of computing earnings per share. (DX-B2000281, B2006150, B2006080-B2006084, B2007884-B2007890, TABS 86, 87, 8b, 89). See also Ludlow Dep. 91-92. Deliberations of the EITF concerning the calculation of EPS under APB Opinion No. 11 continued but a consensus was not reached by June 1990. In August 1990, Louis Miller, a specialist in BAC-, Corporate Accounting department, concluded that there was authoritative

support for including the tax deduction in the calculation of EPS and that the APB Opinion 11 permitted, and the EITF sanctioned, diversity in accounting treatment of the tax benefit as long as there was disclosure. [DX B2006174-B2006176, TAB 93]. On September 11, 1990 Miller advised Jane Ludlow that Bell Walsh, C & L audit partner, did not object to inclusion of the tax in the earnings per share calculation. [Def's B2006137, TAB 100]. In early October, BAC decided to postpone the inclusion of the tax benefit in the calculation of EPS for the third quarter of 1990. [DX TAB 101, B2006125]. On December 14, 1990, the EITF issued a statement acknowledging that diversity in practice on the issue was permissible under GAAP. (Ludlow dep 69). In addition, the AICPA terminated its discussion of the issue. (Ludlow dep. at 94 Tomlinson dep 90-91). Accordingly, BAC included the benefit when calculating earnings per share, but not in the calculation of net income. The accounting treatment complied with GAAP. Further, after determining that the amount attributable to the first three quarters was immaterial, and gaining the approval of Coopers & Lybrand, BAC included the deduction for the entire year fourth quarter earnings. (CL2001516, TAB 102) ("We also concur that the effect on EPS is immaterial and restatement of quarterly earnings per share computation is not necessary"). Because the benefit was not included in income, the accounting treatment applied to the deduction for contiutions complied with GAAP. The fact that BAC's accounting treatment had changed was not disclosed until February 15, 1991 in BAC's 1990 Annual Report[FN49] (DX-TAB 2 at 29, 54). However, on January 23, 1991, Dean Witter reported that fourth quarter earnings included a one time charge and "a positive $.05 per share benefit from ESOP accounting." (DX-TAB 103); Lehman Brothers similarly reported on the same day that the company's fourth quarter results included the benefit derived from the ESOP. (TAB 104). In sum, GAAP permitted BAC to include this tax benefit in earnings per share and C & L accepted that accounting treatment.[FN50]

FN47. Pursuant to APB Opinion No. 11 and EITF 86-4, "the resulting tax benefit from ESOP dividends distributed to employees should be credited directly to retained earnings." without running the tax benefit through the Income Statement. [B2006167, TAB 81]. *See also* Accountants SEC Practice Manual (Financial Statements) 4543 at

4457 (June 1990) ("ESOP" sponser reports the tax benefit from dividends paid to the ESOP as a credit directly to retained earnings in accordance with APB No. 11"). [DX TAB 82, B2006172-2006173). In December 1987, FASB issued Statement 96 (Accounting for Income Taxes)(("SFAS 96"), superseding APB Opinion 11 and Issue 86-4, and proposing that the tax deduction be recognized as a reduction of income tax expense rather than credited directly to retained earnings. [Def's B2007886-2007887, TAB 83].

FN48. In March of 1988, the FASB convened a series of meetings to consider requests to amend SFAS 96.

FN49. The disclosure occurred in the section headed "Significant Accounting Policies" and in Note 15 to the consolidated financial statements. The report stated that "effective in 1990, for purposes of computing EPS, net income is increased by the tax benefit related to dividends paid on shares held by the Company's ESOP". The footnote stated "EPS for the fourth quarter included 5 cents ... the first three quarters were not restated because the change would not be material". (Annual Report at 29,54 TAB 2).

FN50. Plaintiffs also submit an internal company document, purportedly revealing that BAC knew that numbers reported throughout 1990 were misleading. That document states, "during 1990, the company reported $95 million in *revenues* which were non-recurring, or reported *out-of-period*" and "strong yr/yr growth somewhat misleading". However, this statement, referring only to revenues and not earnings for 1990, is irrelevant to Plaintiff's claim regarding the treatment of BAC's ESOP.

### b.) EXPENSE RECLASSIFICATION: ESOP

**\*12** During 1990, BAC re-classified the expense incurred for matching employee contributions to BAC's savings plan. The background of this change is as follows. BAC offers employees a 401(k) savings plan in which BAC matched employee contributions to the plan up to a set maximum figure. During 1989, BAC

matched employees contributions, with cash so that the expense of those contributions was booked as "Employee Expense". The two ESOP's Instituted by BAC in 1989, described above, obtained a loan to purchase shares of DAC stock. (TAB 92). This loan was evidenced by a note guaranteed by BAC so that the debt is accounted for as a liability on BAC's consolidated financial statements and interest payments on the loan are recorded as "Interest Expense". (TAB 2 at 36). In 1990, BAC changed its method of matching employee contributions to the savings plan from cash to the BAC shares that were purchased by the ESOP's for this purpose. The ESOP's paid interest on the debt they incurred to buy those shares with funds from BAC's contributions to the ESOP trusts. *Id.* at 48-9. As required by ESOP accounting rules, these contributions were classified as "Interest". *Id.* at 35. As a result employee expense figures decreased. "Employee Expense" is a category of "Operating Expense" and "Interest Expense" is not. "Operating Income is the difference between "Operating Revenues" and "Operating Expenses". Plaintiffs complain that this change led the market to believe that BAC's "Operating Inc me" was growing faster than it actually was.

Plaintiffs also claim that, until BAC issued the 1990 Annual Report 10-K, the changed treatment of BAC's matching contributions and the substantial increase to operating income and interest expense remained undisclosed.[FN51] BAC's Form 10-Q for the second quarter of 1989 described the establishment of the ESOP's "for two BAC savings plans" in Note 6 to the Consolidated Financial Statements. The footnote explains the purchase of the stock with debt and states that "the shares of common stock acquired by the ESOP trusts will be used over a ten year period, beginning January 1, 1990, *to provide the company's matching contributions to such employee savings plans* and concluded that because the notes evidencing the debt are guaranteed by the company, they would be included in the financial statements as *long term debt.* (TAB 159 at 6); (TAB 160 at 6). In addition, the first quarter 1990 Form 10Q, noted that interest expense grew by 10.5% over the first quarter of 1989 because "interest recognized on debt associated with the leveraged employee stock ownership plans established by the company in 1989". (TAB 4 at p. 8); See also (10Q10Q), TAB 8 at p. 9) 3Q10Q TAB 8 at p. 10); TAB 161 (Crawford speech 9/19-9/21 1990, "interest expense is higher due to our leveraged ESOP"). The expense continued to be fully accounted for, albeit in

Not Reported in F.Supp.                                                                                     Page 18
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
 **(Cite as: 1997 WL 205709 (E.D.Pa.))**

a different account, and the ultimate earnings per share was not affected.

> FN51. That report states, "employee costs decreased approximately $41. million 'during 1990 as a net result of the effects of accounting for the Company's leveraged employee stock ownership plans (ESOP's) which became effective January 1, 1990, and an increase in the Companys' matching contributions percentages to the savings plans in 1990. *Under ESOP accounting rules, the portion of the Company's contributions representing accrued interest on the ESOP debt, which totaled $64 million in 1990, is classified as interest expense.* This decrease in employee costs was partially offset by a $23 million increase in the companys' contributions to the savings plan." (TAB 2 p. 35, and Note 8). C & L determined that this disclosure fully complied with the recommendations for ESOP accounting made by FASB's Emerging Issues Task Force, in Issue 89-8. (DX TAB 162).

### 3.) *PREDICTED GOODWILL [FN52] WRITEDOWN (BASLI)*

> FN52. Goodwill is the excess of cost of an acquired enterprise over the sum of identifiable net assets. Accounting for an intangible asset involves determining an initial carrying amount, accounting for that amount after acquisition under normal business conditions, and accounting for that amount if the value declines substantially and permanently. FASB Accounting Standards Current Text § 160.401, 1991).

**\*13** At an New York Society of Securities Analysts meeting on October 25, 1990; in a press release issued that day; and in BAC's third quarter Form 10Q, issued on November 9, 1990,[FN53] the defendants announced their intention to take an "approximately $.10 cents" charge against fourth quarter earnings ... and that they expected "no additional writedowns". Also, the 10Q for the third quarter stated, "In the fourth quarter, the company announced that it would revalue the amount of goodwill in its Financial Services Group. This revaluation is expected to reduce 1990 net income by approximately $40 million ($.10

EPS)." The charge ultimately taken in the fourth quarter 1990 was $.15 cents ($60 million).

> FN53. MD & A at p. 11.

This charge was related to the valuation of one of BAC's financial services businesses, Bell Atlantic Systems Leasing ("BASLI"). By October of 1990, BAC was engaged in non-public negotiations with General Electric Capital Corporation to sell BASLI. These negotiations were still ongoing in January 1991. A sale at BASLI's book value would have produced a loss of *approximately* $40 million (.10 per share). (Bardeen dep. 83-84). The sale of BASLI was not consummated during 1990 and was not sold until several years later because the company could not obtain an acceptable price. (TAB 110); (Albertinini dep. 39-41); (Von Stetina dep. 169) ("We turned them [GE] down because we didn't feel like their offering price was fair"); (Bulliner dep 59-60); (Campbell dep. 155-56). The record reveals that, by late October, it appeared that a sale was likely to be consummated but an agreement as to price had not been reached. Despite this fact, Campbell decided to make an announcement so that analysts would be aware that the asset was likely to be revalued. (Campbell dep. 156); (Crawford dep. 118) ("description of charge intended to convey financial information without going into actual negotiations"). In January 1991, the company determined that it would accept less than book price. Some of that loss would be due to uncollectible loans to BAC officers. The charge ultimately taken to earnings in connection with the revaluation of BASLI was $.15 per share, a five cent difference between the projected and actual writedown (1.5% of 1990 earnings)

During an October 23, 1990 presentation to the Finance Committee of the Board, Bardeen discussed a "negative impact on earnings in the $40 million dollar range" arising out of the sale of BASLI. He also recommended $.10 to Campbell as the best estimate for the announcement, (Campbell dep. 156), an estimate based on the company's "test assessment of the market value of this entity and any related tax settlements." (TAB 114).

That day, November 2, 1990, Bardeen wrote to William Walsh, the Coopers & Lybrand partner in charge of auditing BAC. That letter confirms that the decision to disclose the "probable fourth quarter 1990

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

charge related to Financial Services" was triggered by continuing discussions for the sale of BASLI and stated that "we are beginning to recognize that disposition at or near current book value ($105 million) would still produce a tax charge of $40 million ($.10 EPS) ... even if negotiations breakdown, we will want to consider a valuation adjustment prior to year end" (Nov. 2, 1990, DX TAB 108).

**\*14** Plaintiffs submit that the Defendants knew that the charge would be an additional five cents by November 14, 1990. A document dated that day, lists the BASLI writedown as $.10 and the current best view of earnings per share at $3.42. It states, "we will work to bring results in at the market expectation of $3.43"..."Please remember, if we decide to consummate the sale of BASLI at the current proposed purchase price, earnings per share would be reduced by an additional $.05".[FN54] (DX-TAB 115). Deposition testimony reveals that the company did not consider public disclosure of a figure higher than $.10 in November because a decision as to sale price had not yet been made." (Campbell dep. 152-53); (Crawford dep. 112) (company had expectations of bettering price).

> FN54. Plaintiffs claim that this document allows a reasonable inference that the Company's estimates of the expected loss were $60 million, equal to 15 cents per share.

On November 27, 1990, Campbell informed the Board that discussions as of that date had yielded a proposed price below the expectations held at the time the 5.10 charge had been announced [FN55] but also confirmed that management was working to bring the price back up toward the initial target. (BA1000334-41, TAB 117). A November 30, 1990 internal document revealed that the charge was estimated as a range running between $40 million ($.10) and $60 million ($.15). (TAB 118). The record reveals that uncertainty continued into January 1990, when Ciango was directed to prepare two drafts of the fourth quarter release, one announcing the $.10 charge, and one announcing the .15 charge. (TAB 119, 120). The final decision was made "shortly" before the earnings announcement on January 21, 1990 when management determined that the Company could no longer expect to get its originally anticipated price for BASLI. (Crawford dep. 108).

> FN55. GE quotes this price in a letter dated

December 19, 1990, summarizing its understanding of the status of the discussions for the sale of BASLI. (TAB 121).

Coopers & Lybrand audited the treatment of the charge and "concurred with Management's disclosure of this matter in the financial statements and the MD & A. (TAB 111).

On January 22, 1991, the Finance Committee of the Board recommended a sale at a maximum loss of $60 million. (TAB 116). The sale did not take place until several years later.

### 4.) *THIRD QUARTER 1989 STRIKE*

In the third quarter of 1989, BAC experienced a strike/work stoppage by its unionized employees. Plaintiffs claim that reporting growth for third quarter 1990 as compared to third quarter 1989 was misleading because defendant's failed to disclose the quantifiable adverse impact of the 1989 strike on 1989 net income. Regarding the overall increase in employee costs as compared to the third quarter 1988, the Form 10Q for the third quarter 1989 reported that, "these increases were partially offset *by* a net reduction in employee costs resulting from a month-long strike by nonmanagment employees of the Network Services companies. However, strike-related increases in other operating expenses offset this reduction in employee costs." (TAB 146 at 8).[FN56] In addition, newspapers reported the strike. (DX TAB 203) (New York Times, August 7, 1989).

> FN56. The NSG, also disclosed the fact of a strike in their own forms. For example, Bell of Pennsylvania's Form 10Q states, "A reduction in non-management wage expense as a result of the August 1989 work stoppage was more than offset by additional overtime pay to management employees during the work stoppage and an increase in post-strike non management overtime to relieve the backlog of work orders."

**\*15** Although plaintiffs claim that the strike reduced 3Q89 reported income by $20.6 million (14 million lost revenues and $6.6 million increased expenses) (TAB 1)[FN57] an internal document, (DX-TAB 204, Exhibit 112, PX-91), reveals that BAC estimated lost revenues at $14 million, and a net expense impact,

after offsetting management overtime and wage sav-ings, of only $1.3 million.

> FN57. If accepted as accurate estimates, $14 million in revenues is 1.2% of BAC's local service operating revenues for the quarter and $6.6 million represents .03% of operating expenses for that period. (Def.'s Mot.Sum.Judgement. at 115).

BAC considered the calculation of the effect of the strike extremely speculative due to numerous offsetting factors. (Smith dep. 143) (final impact "impossible" to determine "with all the gives and takes that go on in our business"); (Smith dep. 144, 146) (The revenues lost during the strike as a result of "pent-up" demand would be quickly replayed after the strike's end and thus the strike will have little overall impact). BAC determined that the impact was immaterial so that further discussion of the strike in 1990 was unnecessary. (Lynch dep. at 57), (DX-TAB 205). In evaluating the 1989 disclosure documents, Coopers & Lybrand also found the effect to be immaterial. (TAB 206, CL4001123) ("and the immaterial impact of the work stoppage on the financial statements"); See also, (Smith dep. 143) ("strike impact minimal"); (Campanella dep. 25, 56) (did not effect net income or revenue "very much"..."did not have any significant impact").

### 5.) *CELLULAR*

The average cellular minutes of use per customer declined over the course of 1990.[FN58] The fact that average cellular minutes of use declines as the customer base grows is a well known phenomena in the cellular telephone industry in every region and in all cellular businesses.[FN59] (Smith dep. at 135). BAC disclosed the decrease in monthly minutes of use per customer. At the October 25, 1990 NYSSA conference, in response to question about the decline in cellular growth in the third quarter, Smith stated,

> FN58. Average usage minutes per customer during 1990 were: January-166; February-150; March-162;April-151; May-157;June-148;July-134; August-136; September-128; October-140; November-124; December-116.

> FN59. The first customers to sign on are

those with the greatest need. As the price of the service and equipment goes down, additional customers subscribe but use the service less. (Burger dep. at 25; Campbell dep. at 269; VonStetina dep. at 155-56).

When you compare year over year were about the same that we've been in the past and we don't see any substantial turndown. *We see some weakening in the minutes of use, but that is very predictable according to the charts we've been looking at all along, in terms of the maturation of the customer base.* We expect that if we do get into a more significant recession than we've seen, then we'll see things slow down a bit further ... basically it has been statistical at this point ..."We're looking at this time to see whether we'll be disclosing more information, we haven't made that decision yet") (DX-TAB 36).

Market analyst reports acknowledged awareness of declining cellular minutes of use. For example, John Baur, an analyst for Kidder Peabody, released a report on August 3, 1990, noting "*a marked deterioration in the average monthly bill paid by the industries' customers.*"[FN60] The fourth quarter decline was more pronounced than that of the first three quarters.[FN61]

> FN60. (KP 000605-06, TAB 190); (DX-TAB 9) (October 30, 1990 report-"revenue per subscriber continues to fall"); (TAB 192) (November 13, 1990 Report noting "This drop is probably due to the continuing evolution in customer mix-as cellular penetration increases, more lower revenue users are added which tends to bring the average revenue per subscriber down").

> FN61. The January 22 release noted "a fourth quarter economy driven downturn in demand" (TAB 9)

At no time did BAC disclose profit margins, expense, or net income figures for BAMS alone.[FN62] BAC reported its revenues each quarter from "Other Communications and Related Services" and "Other Operating Expenses" which included certain BAMS revenues and costs and explained any significant components of those results.

FN62. Smith, Barney 1/4/91, p. 6 TAB 72
("BEL does not release financial results for
its cellular operation; however, the company
does disclose operating statistics.")

6.) *REVENUE DECLINE, EXPENSE INCREASE*

**\*16** Throughout the year, while not explicitly stating
that revenues were continuing to increase but increas-
ing at a decreasing rate and that expenses were rising
at an increasing rate, BAC disclosed the historical
figures. For example, BAC disclosed revenues for the
first quarter of $3.02 billion a 9% growth, (TAB 3),
for the second quarter, $3.08 billion, a 6.7% growth,
(TAB 5), and for the third quarter, a growth of 6.5%.
In addition, BAC disclosed figures showing that ex-
penses were rising at an increasing rate. In 1990,
BAC reported that, first quarter expenses were $2.36
billion, an 8.2% growth; second quarter expenses
were 2.39 billion, a 5.6% growth; and third quarter
expenses were 2.42 billion.(tab 7).

7.) *ACCESS LINES*

BAC never forecasted or predicted future access line
growth. While access line growth was slowing, there
was a significantly sharper downturn in access line
growth and other demand indicators in the fourth
quarter.[FN63] In the 10-Q for each quarter, BAC accu-
rately reported actual access line growth, both in per-
centage rates and raw operating statistics, throughout
1990. (TAB 4, TAB 5, TAB 7, TAB 8). This data
shows that for the first three quarters that the rate of
growth was slowing slightly. The net overall growth
was 3% and a 5-6% growth in business lines.

FN63. A fourth quarter, economy driven
downturn in demand was evidence by lower
growth in access lines and toll volumes and
lower cellular usage per customer. (TAB
123).

8.) *NONRECURRING EVENTS:*

*FIRST QUARTER: REVENUE DECREASE $11*
*MILLION SETTLEMENT SECOND QUARTER:*
*REVENUE INCREASE $24 MILLION EMPLOYEE*
*BENEFITS*

In the first quarter of 1990, revenues were decreased
by $11 million and in the second quarter, revenues
were increased by $24 million as a result of certain
one-time events. Plaintiffs claim that failing to dis-
close these one-time events is misleading.

However, first quarter 1990 press release disclosed
that,

"the first quarter results include accounting for a pro-
posed settlement with the Pennsylvania Office of
consumer advocate and Attorney Generals Office
relating to an inquiry into Bell of Pennsylvania's
past sales and marketing activity." (TAB 3).

Form 10-Q for that quarter further stated that,

"these increases [in revenues] were partially offset by
an additional accrual of $11.4 million recorded for
a tentative settlement reached between Bell of
Pennsylvania, the Pennsylvania Attorney General's
Office, and the Office of Consumer Advocate re-
lated to past sales and marketing activities."(tab 4).

In addition, the possibility of a recoupment of $24
million in the first quarter was disclosed in Form 10Q
for that quarter:

"On April 2, 1990 the company filed an employee
discount revenue recovery plan with the PUC. The
plan requests a one time recoupment of $24 million
representing past due revenues retroactive to the
date of the rate case order. The company expects
the PUC to rule on this plan by June 1990." (TAB
148)

Furthermore, the second quarter Form 10-Q provides
that,

"The quarterly and year to date increases were en-
hanced by the recognition in May 1990 of $24 mil-
lion in revenue by Bell of Pennsylvania in connec-
tion with the retroactive recoupment of costs in-
curred to provide discounted employee telephone
service" (TAB 6 at MD & A p. 7)

**\*17** On November 9 1990, third quarter Form 10Q
was filed with SEC. That document stated,

"The year to date increases were also enhanced by
the recognition in May 1990 of § 24.1 million in

Not Reported in F.Supp.                                                                              Page 22
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

revenue by Bell of Pennsylvania in connection with the retroactive recoupment of costs incurred to provide discounted employee telephone service. This increase was partially offset by decrease in revenue of $11.4 million related to settlements reached between Bell of Pennsylvania, the Pennsylvania Attorney General and the Office of Consumer Advocate related to past sales and marketing activity".[FN64]

> FN64. (DX-TAB 8, BA1000573 at 8)

### 9.) NONRECURRING EVENTS:REVERSALS OF ACCRUALS & RETROACTIVE CREDITS

Plaintiffs contend that, in 1989 and 1990, the timing of certain accounting adjustments was intentionally manipulated by BAC in order to create the appearance of growth. In sum, the accounting treatment applied to each of these events complied with GAAP, was accepted by Coopers & Lybrand, and was disclosed to the market. These types of adjustments were a regular part of BAC's accounting processes, as they were for all other RBOCs.[FN65]

> FN65. For example, the 1989 annual report stated that "revenue adjustments recorded to reflect estimated rates of return on certain interstate services also contributed to the increase in access revenues in 1989." (TAB 146).

#### a.) Liability for Access Revenue: "84-800 liability"

In 1990, the FCC regulated the rates local telephone companies could charge long distance carriers for access to the local network. (Beville dep. 12-13). During the 1980's, the FCC regulated these rates by setting the amount of return a telephone company could earn on its capital investment costs. (Beville dep. 11) (the "authorized rate of return"). Regulated companies used the FCC rates to set their rates so that projected revenues were limited to the authorized rate of return on capital costs. (Oliver dep. 10). In practice, actual revenues and expenses were not identical to the projected revenues and expenses that were used to calculate rates and telephone companys would earn more than was allowed under governing regulations. The 84-800 docket dictated how the regulated companies were required to treat revenues earned over and above the FCC's prescribed rates of

return. (McGarvey dep. 28; Hanley dep. 177).

#### b. First Quarter: 84-800

During 1989, BAC and AT & T, BAC's largest long-distance carrier, entered negotiations to settle BAC's liability to refund access charges to AT & T. On October 31, 1989, BAC and AT & T entered into an agreement whereby BAC would pay AT & T approximately $9.9 million on or before January 31, 1990 in settlement of its liability so long as the FCC did not issue new rules which changed the calculation of the refund liability.[FN66] (TAB 140). The rules did not change and BAC made the required payment in the first quarter of 1990. *Id.* BAC reversed any remaining accruals for liability to AT & T.

> FN66. at agreement provided, "Pay to AT & T on or before January 31, 1990 that amount provided that the commission does not revise the automatic refund rules invalidated in *AT & T v. FCC,* 836 F.2d 1386 (D.C.Cir.1988). (PX 15).

In addition, in March 1990, BAC modified its method for estimating the refund liability based on parameters set out in an order issued by the FCC on January 9, 1990. Once refund liability was resized for any reason, GAAP (APB 20 (changes in estimates), and FAS statement NO. 5 (accounting for contingent liabilities)), required the reversal of any accrual in excess of the newly calculated liability. BAC reversed a total of approximately $37.5 million of accruals in the first quarter of 1990.[FN67] Upon reviewing the financial statements for that quarter, Coopers & Lybrand expressly concurred that the accounting treatment was in accordance with APB # 20 and with the decision by BAC not to disclose the adjustments in the financial statements based on immateriality.[FN68] (TAB 147) ("The accruals made were reasonable and disclosures made were adequate"). The first quarter 10-Q, MD & A, disclosed the adjustments and the 1990 impact. That report states, "Adjustments recorded to reflect revised estimates of access revenue liabilities *increased revenues approximately $62 million during the quarter.*" (TAB 4). This figure represents the sum of reversals relating to net 84-800 adjustments and NECA liability, described below.

> FN67. (TAB 142, 143)

Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

FN68. (TAB 146, 2) ("An audit included assessing the accounting principles used and significant estimates made by management").

c. First Quarter accrual reversal:NECA

($20 million Mathematical Error)

**\*18** As part of the 1989 year-end audit process conducted in the beginning of 1990, C & L performed a "detailed review of documentation supporting a $20.8 million NECA contingency accrual." [FN69] (TAB 155). This review revealed that Bell of Pennsylvania had made a mathematical error. *Id.*; (Horn dep. 13). The error occurred when "someone picked up a number when adding the schedule across incorrectly." (Horn dep at 41.) To correct the error, Coopers and Lybrand concluded that the $20.8 million should be reversed. *Id.*[FN70] However, at the time the error was detected, BAC's financial books were cied for 1989, and adjustments could no longer be made to the financial statements within the computer system. (Horn dep. at 35) ("We would have had to try to reopen the systems, which would have been-which was physically impossible at the time ... once we cleared or closed the books and generated the financial results, the system closes down and starts counting for transactions in the following month.") C & L determined that the error was too immaterial to require the extraordinary and costly step of reopening the financial statements, or even "separate disclosure". (Horn dep. at 32; CL2001506, TAB 156). Therefore, the error was corrected by reversing the accrual during the first quarter of 1990 with C & L's concurrence. As noted above, the first quarter 10Q for 1990 stated, "Adjustments recorded to reflect revised estimates of access revenue liabilities increased revenues approximately $62 million during the quarter."

FN69. During the first quarter of 1989 Bell of Pennsylvania concluded it owed $9.4 million contingent liability to NECA. TAB 155. In December 1989, Bell of Pennsylvania reviewed the existing accruals and "as a result, increased contingent liability to $20.8 million." *Id.* Von Stetina dep at 233.

FN70. In correcting the error, C & L determined that Bell of Pennsylvania actually should have no NECA contingent liability.

d. Third Quarter reversals

Plaintiffs allege that "approximately $13.5 million of BAC's reported operating revenues for the third quarter of 1990 resulted from the reversal of accruals for 84-600 liabilities." (No 19, TAB 1) The actual amount of access revenue liability reversed in the third quarter was $12.1 million. The impact was disclosed in the MD & A for the third quarter. That document states, "adjustments, recorded to reflect revised estimates of access revenue liabilities in both 1989 and 1990 decreased access revenues approximately $13 million during the quarter." [FN71]

FN71. This disclosure compared the effect of such adjustments for the third quarter of 1989 with that of 1990. In 1989, BAC reversed $25.1 million. The difference in the impact on revenues in 3Q89 (increase of 25.1M) and in 3Q90(increase of 12.1m) is approximately 13 million. (TAB 8 at p. 8).

BAC's Third quarter report stated, "Adjustments recorded to reflect revised estimates of access revenue liabilities in both 1989 and 1990 decreased access revenues approximately $13 million during the quarter but *increased* year to date revenues approximately $32 million". (DX TAB 8, BA1000573)

e. Fourth Quarter *[1989]:*

Medical Benefits Trust and Pension Benefits $320-million in previously announced special charges against earnings were recorded in 1989. A press release issued on January 23, 1990 (TAB 207) described those charges as follows. "1989 earnings 5.43 per share compared with 6.65 per share in 1988 an 18% decrease ..."our performance would have compared favorably with 1988 except for the approximately $320 in special charges against earnings we recorded at the end of 1989. These charges, *which were of a one time nature* were associated with the revaluation of assets at some of the company's unregulated subsidiaries, the cost of an organizational realignment that included incentives for managers to retire early or voluntarily leave, and debt refinancing at several of the companies telephone subsidiaries"... "*In addition* the company *began* to accrue for and fund a trust to help cover the future cost of medical and dental benefits for nonmanagement retirees. only

Not Reported in F.Supp.                                                                                    Page 24
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

a portion of the expense in setting up the retirees trust in 1989, referred to in the second sentence, would be nonrecurring. (Campbell dep. 118-120). The funding of the trust, for the most part, was the first installment of a recurring expense. An internal document dated January 24, 1990, from Gary Delson, Director of Financial Reports to his supervisor, Mr. Tomlinson, (B20232242, TAB 207), explains that this press release was "unclear" as to whether the funding of the trust was a recurring or non-recurring charge to earnings and that the final draft omitted the word "primarily" from the sentence "these charges which were (primarily) of one-time nature despite notations on drafts that the trust was a recurring charge. The document acknowledged that the adverse consequences of the error is that financial community could anticipate 1990 EPS to be $7.50.[FN72] The report noted that "in fact, we expect to achieve 7.09 next year 6% growth over "true" normalized 1989 EPS of $6.67". One newspaper article reported the entire $320 million as a non-recurring charges. (TAB 207).

> FN72. This incorrect figure would be derived by analysts calculating "normalized" 1989 EPS in the following way: $320 million is 1.62 EPS. (5.43 + 1.62 = $7.05) $7.50 is 6% growth over $7.05.

**\*19** Further, on January 26, 1990, Campbell, addressing a group of New York analysts, stated that the purpose of the meeting is "to walk you through the specifics for each of the nonrecurring initiatives and how each affected our results. He identified each of the charges BAC had included in his "normalized" 1989 results, concluding that "normalized results for the year, adjusting reported EPS for these charges, were $6.67 per share, and that number would be the "benchmark level" for BAC business planning process and from which it would measure its 6% earnings growth. (TAB 209). Campbell also stated that he "deliberately avoided including any mention of the charges we incurred for funding the Post Employment Benefits Trust because I wanted to focus only on *non-recurring* events which effected 1989 results". *Id.* (emphasis in original). He described that the funding of the trust with an annual amount of $137 million, which accounted for and impact of $.38 cents on 1989 EPS. "Since *this item represents an annual expense,* the quarterly results were retroactively restated to recognize the charge. *Id.* On January 25, 1990, an analyst, Mr. Toole issued a report

for Merryl Lynch comparing BA reported earnings to the Merryl Lynch estimate and noted, "Exclusive of charges of a nonrecurring variety, EPS would have been $6.67 per share, and exclusive of the recurring trust expenses earnings would have been $7.05. (Toole dep. 66-67). (TAB 71).

#### f. Third Quarter 1990 Adjustment to Accruals Medical and Pension Benefits

In May 1990, BAC became aware of higher than expected accruals resulting from its funding of medical benefits trust. In September 1990, BAC became aware of overfunding of pension benefits trusts. A task force was formed to determine the reason for this and in August 1990, the task force completed its report documenting the cause of the problem, and prepared instructions for journalizing entries to correct the overfunding of the trusts. The adjustments were booked in the third quarter of 1990. C & L concurred. Third quarter Form 10Q disclosed the adjustments. These adjustments reduced expenses and thereby increased income by 42.1 million. Earnings per share for the third quarter also increased by $.10 (EPS would have been .81 compared to .86 in third quarter of 1989. Reported EPS for the third quarter was $.91).[FN73]

> FN73. As noted previously, an internal document analyzing the company's 1990 earnings "the company's revenues and income as reported in 1990 were "misleading ".

Plaintiffs note that a Brown Brother's Harriman & Company report dated Oct 26, 1990 remarked that third quarter operating expenses rose only 5.2%, and viewed this as a positive element of the company's financial results. Bear Stearns, commenting on the company's third quarter performance, noted in a report dated Oct 26, 1990, "In terms of operating expenses, we were impressed with the 1% decline in employee costs and other benefits."

#### Medical Trusts

BAC created VEBA [FN74] trusts for company expenditures for medical, dental, and vision benefits for active management, active nonmanagement, and retired management employees. (B2006882, B2006852, TAB 163,164). Through the close of 1989, the trusts

Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467

**(Cite as: 1997 WL 205709 (E.D.Pa.))**

Page 25

were funded in an amount equal to the bills for medical claims that BAC received from its carriers. The only exception was December when the company would fund the trust for estimated claims incurred but not yet processed for the balance of the calendar year ("the pipeline accrual" or "PA"). The company received a tax deducution in the year of funding the PA. The PA recorded on the company's books was "trued-up" twice a year based on actual claims paid.[FN75] (TAB 166,167,L68,169) (Bardeen dep. at 98)

> FN74. VEBA stands for "voluntary employee beneficiary association" a type of trust provided for in section 501(c)(9) of the Internal Revenue Code.

> FN75. While adjustments to true-up accruals for medical and pension trusts were routine practice at BAC, they were not previously reported because they were determined to be immaterial. However, adjustments made in 1990 were considered to be more significant because of the overfunding the company experienced in the period January through July 1990 as a result of the implementation of "ghost premiums."

**\*20** In addition, BAC established the Retiree Health Care Trust in November 1989 to provide benefits to nonmanagment retirees. (TAB 165). In January 1990, BAC changed the method used to fund the VEBA trusts and began to accrue for trust liabilities based on a "ghost premium" developed by BA's insurance carrier Blue Cross/Blue Shield, Aetna, Prudential, and Vision Services.(TAB 167, 172).[FN76] In early 1990, BAC Human Resources Group began to review the claims data and the most recent estimates of the PA to determine whether the "ghost premium" rates were correct. (TAB 174). It became apparent in May 30, 1990, that the company was overfunding for medical and pension benefits relative to actual expenditures. As a result of this finding, Corporate Accounting initiated a study of the accounting for 1990 medical benefits expenses. (B2000026-B20,0031, B2006763, TAb 173, 179). Initial analysis indicated that the overfunding was the result of the premium rates being set too high by the insurance carriers. (B200029, TAB 173). By late June 1990, Aetna provided revised ghost premiums but they were determined, upon review, to be improperly calculated. *Id.* Bene-

fits accounting experts analyzed the problem to determine whether an adjustment was necessary and the study was completed in August of 1990. (Von Stetina dep at 137-38). Results were reported in a comprehensive memorandum prepared by Jane Ludlow describing the problems and the impact on expenses. (B2007132, TAB 182). The review of liability revealed other errors that would further reduce expenses. The one-time adjustment necessary to true-up the medical benefits trust would decrease previously booked expenses by approximately $10.7 million. (B2007132-B2007137, DX-TAB 182). The adjustments were booked during the third quarter. (B2007022, TAB 183).

> FN76. Until January 1990, BAC funded the trust based on an interim accrual rate developed by outside actuaries. The accrual rate would be trued-up later in the year based on the claims-paid experience with the trust. (B2006842, B2000015, TAB 167, 170). The new premium was based on prior years claims experience and health care trends.

Pension

Until September 1990, pension expenses continued accruing at the 1989 annual rates, until September 1990, when BAC received adjusted 1990 pension expense data from Bell Atlantic Trust Administration. (DX TAB 184). Once the new rates were received, a retroactive adjustment was necessary in order to true-up the year-to-date expense accounts as of September 1990. Accordingly, the estimates were booked in the third quarter.[FN77] True-ups are characteristic of the nature of pensions and benefits. (Von Stetina dep. at 220). C & L concurred. (see, CL2010541-42, TAB 186) (The third quarter audit papers state, "C & L has reviewed the company's calculations and allocations among their subsidiaries and agrees that they are reasonable and consistent with prior years. The amounts listed below represent the adjustments which should be recorded in September of 1990."). C & L also concurred with an adjustment of $9.4 million in the third quarter to reverse overaccruals for medical dental and vision benefits. (CL2010456, TAB 187). Furthermore, Form 1OQ for the third quarter disclosed that, "Pension and benefit expenses decreased 20.0% and 8.8% in the third quarter and year-to-date, respectively, as the impact of a September 1990 adjustment to pension accrual

rates and the above mentioned early retirement plan at Network Services more than offset business growth-related increases at the subsidiaries." Analysts were aware of the adjustment. (Toole dep. 76-77.)

> FN77. For Bell Atlantic Management Pension Plan, the retroactive adjustment was estimated at $15, 115,926 and for the non-management plan the estimate was $11,247,522. Notice was forwarded to the regional telephone companies on september 24, 1990. VonStetina at 220.

### 10.) FINANCIAL SERVICES, REAL ESTATE (BAP). INTERNATIONAL

**\*21** BAC never published detailed financial information about these companies. Rather, as with BAMs cellular, it published on a consolidated basis. Each 10-Q contained a section on revenues of the "Financial Services and Real Estate Services Companies". BAC never published its budgets. BAMs third quarter 100 stated "Revenues of the Financial and Real Estate Services companies increased 11.6% and 14.1% for the three and nine month periods ended September 30, 1990, due principally to the growth of the Company's lease financing subsidiaries." (DX-TAB 8). This statement was accurate. (CL2010597, CL2010598 TAB 193) ($20.5M/$177.4M=11.5558%) ($71.SM/$510M = 14.0784%) [FN78]

> FN78. "profitable". Through the third quarter of 1990, TriCon earned $25.3 million (B2037369 TAB 194) and BASLI showed a year to date income of $5.7 million. (B20337370, B2038098, TAB 194, 197). BASLI's growth trends were "softening" and experienced an "ongoing revenue decline" by October, BASLI had a stronger than anticipated fourth quarter and met its budget for the year. (B2038091, B2038098, TAB 199, 197).

BAP lost $13 million by the end of the third quarter. The Defendants note, however, that BAP was budgeted to lose $15 million so that actual loss was less than budgeted loss. (B2037373, TAB 194); (Campbell dep. 261); (TAB 195).

Arguably, these financial services businesses were

An October 25, NYSSA statement described the financial services and real estate subsidiaries and the companies decision to re-value and de-emphasize. (SEE BA1004853, TAB 36).

In support of their contention that BAC withheld information about BASLI, Plaintiffs note that an internal document dated after the October 25, 1990 NYSSA meeting announcing the $.10 writedown, states, " As a hardworking actor myself, I am heartened to know I have a good scriptwriter behind me." The author of this note is an actor.

### JANUARY 22, 1990: REPORTED FINANCIAL RESULTS

On January 22, 1991 BAC issued a press release reporting that for the year ending December 31, 1990 earnings per share were $3.38. This is the figure calculated after subtracting a $.15 charge taken in the fourth quarter for the BASLI writedown. The press release stated that "earnings per share growth after eliminating nonrecurring charges in both years was 6%."Thus, factoring out the S.15 charge and charges taken in the fourth quarter of 1989, "normalized" 1990 earning per share ($3.53) exceeded 1989 "normalized" earnings per share ($3.33) by 6%. Total net income for the year was $1.31 billion and operating revenues of 12.3 billion had increased 7.4% over the prior year. (BA1000194, DX-TAB 9).

For the fourth quarter, the January 22, 1991 press release reported that income had declined to $.65 cents per share, from 91 cents in the third quarter of 1990 and an average of 91 cents per share in the preceding nine months. BAC's return on average common equity for the quarter declined to 10.5% and to 14.8% for the year, lower than the 16.4% represented at the October 25, 1990 meeting with analysts and the 16.4% average return on equity reported in the first nine months of 1990. In the following year, 1991, the companies income declined to 2.61 per share in the first nine months of the year (excluding a gain on the sale of an investment) from 2.73 per share in the same 1990 period and the market price fell further to § 43-$46 per share. (Compl. at 22).

### IV. THE APPLICABLE LAW

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

A. *Section 10(b) and Rule 10b-5*

**\*22** The 1934 Act was designed to ensure a fair and
honest market for the trading of securities and protect
investors against manipulation of stock prices. See
S.Rep.O.792, 73d Cong., 2d Sess., 1-5 (1934). The
Supreme Court has "repeatedly described the 'fun-
damental purpose' of the Act as implementing a phi-
losophy of full disclosure" *Santa Fe Industries v.
Green,* 430 U.S. 462, 477-78, 97 S.Ct. 1292, 51
L.Ed.2d 480 (1977). In order to prove a violation of
Rule 10b-5,[FN79] promulgated by the Securities Ex-
change Commission under § 10b of the Securities
Exchange Act of 1934, 15 U.S.C. § 78j(b), a plaintiff
must establish the following by a preponderance of
the evidence:

> FN79. Rule 10b-5 provides: It shall be
> unlawful for any person, directly or indi-
> rectly....
>
> (a) To employ any device, scheme, or artif-
> ice to defraud,
>
> (b)To make any untrue statement of mate-
> rial fact or to omit to state a material fact
> necessary in order to make the statements
> made, in light of the circumstances under
> which they were made, not misleading, or
>
> (c)To engage in any act, practice, or
> course of business which operates or
> would operate as a fraud or deceit upon
> any person,
>
> in connection with the purchase or sale of
> any security.
>
> 17 CFR § 240.10b-5 (1990)
>
> Neither § 10(b) nor Rule 10b-5 explicitly
> provides a private right of action, but the
> courts have inferred one. *Basic,* 485 U.S.
> at 229. A plaintiff has standing by virtue
> of being a purchaser or seller of a security
> who has traded shares between the time
> the alleged misrepresentations were made
> and the time the truth was revealed.

(1) that defendants, acting with scienter, an intent to
deceive, manipulate or.defraud, *Ernst & Ernst v.
Hochfelder,* 425 U.S. 185, 194-214, 96 S.Ct. 1375,
47 L.Ed.2d 668 (1976), either

(2) employed a manipulative or deceptive device,
scheme or artifice to defraud. Rule 10b-5(c) or

(3) made a misleading statement or omission, *Santa
Fe Industries, Inc. v. Green,* 430 U.S. 462, 476-77,
97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Schreiber v.
Burlington Northern, Inc.,* 472 U.S. 1,7-8, 105 S.Ct.
2458, 86 L.Ed.2d 1 (1985);

(3) of material fact, *TSC Industries, Inc. v. Northway,
Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d
757 (1976);

(4) upon which plaintiff, a purchaser or seller of the
security, *Blue Chip Stamps v. Manor Drug Stores,*
421 U.S. 723, 731-55, 95 S.Ct. 1917, 44 L.Ed.2d 539
(1975), (5) relied upon in completing a transaction,
*Basic v. Levinson,* 485 U.S 224, 243 (1975);

(6) which caused economic loss to the plaintiff. *In re
Phillips Petroleum Sec. Lit.,* 881 F.2d 1236, 1244 (3d
Cir.1989); *Bastian v. Petren Resources Corp.,* 892
F.2d 680, 683-86 (7th Cir.1990).

The absence of either the scienter or the materiality
elements is sufficient to support a motion for sum-
mary judgment. *Bryson v. Royal Business Group,* 763
F.2d 491, 493 & n. 3 (1st Cir.1985). The defendants
seek summary judgment on the basis of the absence
of an actionable misleading statement or omission
and/or the absence of scienter, materiality, and loss
causation.

*DUTY TO DISCLOSE*

It is well established that in the absence of a duty to
disclose, there is no liability under these provisions
for failing to disclose material information. *Chiarella
v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63
L.Ed.2d 348 (1980). Thus, the mere possession and
nondisclosure of material facts does not impose li-
ability. However, Rule 10b-5 creates a statutory duty
to speak the full truth when defendant undertakes to
say anything".[FN80] *First Virginia Bankshares v. Ben-
son,* 559 F.2d 1307, 1317 (5th Cir.1977), cert. denied,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                                                           Page 28
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
  (Cite as: 1997 WL 205709 (E.D.Pa.))

435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978); *Huddleston,* 640 F.2d at 543-44. In addition, there is a duty to correct prior statements, if the prior statements were true when made, but will mislead if left unrevised in light of subsequent events.[FN81] *In Re Phillips Petroleum,* 881 F.2d 1236, 1245 (3d Cir.1989); *Time Warner Inc. Sec. Lit.,* 9 F.3d 259, 267-68 (2d cir.1993), cert. denied, 114 S.Ct. 1397 (1994). A duty to disclose arises whenever secret information renders prior public statements materially misleading. *Id.* The timing of a correction to an earnings prediction or similar statement involves some discretion. The question of whether a correction is sufficiently prompt must be determined in each case based upon the particular facts and circumstances surrounding the prior disclosure and the material changes which trigger the duty to correct.[FN82] *In re Phillips Petroleum,* 881 F.2d 1236, 1246 (3d Cir.1989). The correction may have to be made when it can be calculated "with substantial certainty". *Good v. Zenith Electronics Corp.,* 751 F.Supp. 1320, 3322 (N.D.Ill.1990). A fact question as to when information "solidified" bars summary judgment for defendants. *Id.*[FN83] Generally, there is no duty to make predictions or economic prognostications. While the SEC encourages such disclosures[FN84] it does not mandate management projections or other forward-looking statements either in its filings or in general.[FN85] *Krim v. Banctexas Group, Inc.,* 989 F.2d 1435, 1446 (5th Cir.1993) (no general duty to volunteer an economic forecast and affirming summary judgment for defendant); *Arber v. Essex Wire Corp.,* 490 F.2d 414, 421 (6th Cir.), cert. denied, 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56 (1974)(same). There is no duty to disclose general economic conditions because federal securities laws do not compel disclosure of the obvious).*In re Trump Casino,* 7 F.3d at 377; *Krim,* 989 F.2d at 1446 (compliance with securities laws requires issuers to disclose material firm-specific information regarding predictions but information concerning general economic facts and conditions is presumed to be known to investors and analysts). There is also no duty to disclose internal forecasts to the public. As the Ninth circuit has explained, 'it is just good business practice ... to generate projections for internal corporate use." *In Re Convergent Technologies Securities Lit.,* 948 F.2d 507, 516 (9th Cir.1991). Thus, issuers need not reveal all projections. Any firm generates a range of estimates internally or through consultants. It may reveal the projection it thinks best while withholding others, so long as the one revealed rests upon a reasonable basis-a

question on which other estimates may reflect without automatically depriving the published one of foundation. *In Re Stac Electronics,* 89 F.3d 1399, 1411 (9th Cir.1996). *Weiglos v. Commonwealth Edison,* 892 F.2d 509, 516 (7th Cir.1989) (Corporations need not disclose tentative internal estimates, even though they conflict with published estimates, unless the internal estimates are so certain that they reveal the published figures as materially misleading.) Further, it is well established that mere inquiries, preliminary discussions or communications preparatory to a possible acquisition of one company by another do not require disclosure under § 10b. Disclosure is required only where there are firm offers for acquisition or an acquisition seems reasonably assured at the time. As noted in *Staffin v. Greenburg,* 1980 WL 1404 (D.C.Pa.), such matters are not material and need not be disclosed because public disclosure of tentative, indefinite, and contingent facts, would itself be misleading. In the corporate world, as elsewhere, the initial ruminations of executives must complete a circuitous course before becoming if ever, actuality.

> FN80. See also *Rand v. M/A-Com, Inc.,* 824 F.Supp. 242 (D.Mass.1992) (A duty to disclose arises (1) when a corporate insider trades on confidential information; (2) when a corporation has made inaccurate, incomplete or misleading prior disclosures, whether voluntary or required; and (3) when a statute or regulation requires disclosure).

> FN81. See also, *Backman v. Poloroid,* 910 F.2d 10, 17 (1st Cir.1990)"); *Rudolph v. Arthur Anderson & Co.,* 800 F.2d 1040, 1043 (11th Cir.1986); cert. denied, 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987); *Isiquith v. Middle South Utilities,* 847 F.2d 205 n. 13 (discussing SEC position that issuers must correct predictive statements that no longer have a reasonable basis and the complex inquiry necessary to remove adequacy of disclosure issue from the jury); *First Virginia Bankshares v. Benson,* 559 F.2d 1307, 1314 (5th Cir.1977)cert. denied, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978) (holding that duty to disclose the whole truth arises when a defendant undertakes to disclose material information).

> FN82. In *Flynn v. Bass Bros. Enterprises,*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                          Page 29
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
 (Cite as: 1997 WL 205709 (E.D.Pa.))

*Inc.*, 744 F.2d 978 (3d Cir.1984), the Third Circuit held that ascertaining a duty to disclose soft information should be made by the courts on a case by case basis. The factors to be considered are: 1.) the facts upon which the information is based; 2.) the qualifications of the fact compilers; 3.) the original intended purpose of the information; 4.) relevance to the stockholders and their decisions; 5.) degree of possible subjectivity in the information preparation; 6.) uniqueness of the information; 7.) other, perhaps more reliable, sources of information. *Id.* at 988.

FN83. See also, *Kulicke & Soffa Indus. Inc Sec. Lit.*, 747 F.Supp. 1136, 1139-42 (E.D.Pa.1990) (correcting an earnings forecast by making a press release 9 days after the company's CEO received data indicating the forecast could not be met was not reckless. Plaintiff's JNOV denied).

FN84. The SEC published a statement encouraging the disclosure of management projections. *See* Guides for Disclosure of Projections of Future Economic Performance, Securities Act Release No. 5992, [1978 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 81, 756 (Nov. 7, 1978). The SEC permits certain companies to issue forward-looking statements in the documents they file with the SEC, statements made prior to filing but reaffirmed therein, without being held liable under the antifraud securities laws. *See,*Safe Harbor Rules for Projections, Securities Act Release No. 6084, [1979 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 82, 117 (July 5, 1979). *See also*17 C.F.R. 240.3b-6 (1991).

FN85. Corporations, most likely prefer disclosing only soft information of a high degree of certainty to avoid transgressing Rule 10b-5 and investors would prefer the disclosed information be reliable, since investing in securities entails risks.

### False or Misleading Statements

**\*23** A statement is false or misleading if it is factually inaccurate, or additional information is needed to clarify it. An omission can also satisfy this element where silence would make other statements misleading or false.[FN86] Misrepresentations of historical fact clearly satisfy this requirement. In addition, statements of soft informations [FN87] (i.e., forecasts, predictions, or statements of opinion) may be actionable. *Kline v. First Western Government Sec.*, 24 F.3d 480, 486 (3d Cir.1994). The Third Circuit has squarely held that opinions, predictions, and other forward-looking publications of soft information may be actionable misrepresentations if the speaker does not genuinely and reasonably believe them.[FN88] *In re Donald Trump Casino Sec. Lit.*, 7 F.3d 357, 368-69 (3d Cir.1993), cert. denied, *Gollomp v. Trump*, 116 S.Ct 1219 (1994).[FN89] Thus, in order to determine whether a forward looking statement can be deemed untrue, the court must examine whether the speaker, at the time it is made, (1) actually believed the statement to be accurate, or whether (2) there is a factual or historical basis for that belief. *Kline,* 24 F.3d at 486. Past results are typically the most reasonable basis for predictions. See e.g., *Craftmatic Sec. Lit.*, 890 F.2d 628, 642 n. 19 (3d Cir.1989) (predictions of increasing revenues, earnings, and market share by telephone company were reasonably based upon MCI's long history of positive earnings including through three of the four quarters in the class period); *Weiglos v. Commonwealth Edison,* 892 F.2d 509, 575 (7th Cir.1989). Small differences between stated earnings goals and internal earnings estimates do not alone deprive statements of a reasonable basis where the company repeatedly emphasized that a certain factor could affect fiscal earnings. *Roots Partnership v. Lands End Inc.*, 965 F.2d 1411, 1418 (7th Cir.1992) (plaintiffs only entitled to an inference that the defendants statements implied that its earnings goals of 10% were within the company's reach.[FN90] Projections of performance not worded as guarantees are generally not actionable under the securities laws. *Raab v. General Physics Corp.*, 4 F.3d 286, 289(4th Cir.1993); *Krim,* 989 F.2d at 1446). Statements relating to long term prospects are not necessarily actionable because of negative short term results. *Apple Computer,* 886 F.2d 1109, 1113 (9th Cir.), cert. denied, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990) ("even if defendants were aware of facts suggesting that Caere's first quarter earnings might be depressed, they easily could have 'genuinely believed' that Caere's long term outlook was good, and there could have been a reasonable basis for that belief"). Finally, failure of the predictions to come true is not proof of fraud or lack of a reasonable basis. *See*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Santa Fe Indus. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (faulty economic predictions issued in good faith or with a reasonable basis do not give rise to section 10(b) liability); *Eisenberg v. Gagnon,* 766 F.2d 770, 775 (3d Cir.1985) (inaccurate predictions are not generally actionable based solely on inaccuracies contained therein).

FN86. In sum, a statement is potentially actionable if, when read in light of all the information then available to the market or a failure to disclose particular information, it conveyed a false or misleading impression.

FN87. Soft information is defined as "statements of subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward looking statements, such as earnings projections, estimates, and forecasts." *Craftmatic Sec Litig. v. Kraftsow,* 890 F.2d 628, 642 (3d Cir.1989).

FN88. See also, *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 281-83 (3d Cir.), cert. denied, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *Herskowitz v. Nutrisystem,* 857 F.2d 179, 184 (3d Cir.1988), cert. denied, 489 U.S. 1054, 109 S.Ct. 1315, 103 L.Ed.2d 584 (1989); *Eisenberg v. Gagnon,* 766 F.2d 770, 776 (3d Cir.), cert. denied, *Wasserstrom v. Eisenberg,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985).

Other circuits have a more fully articulated standard: [A prediction is actionable] ... (3) if the speaker is aware of undisclosed facts tending to seriously undermine the statement's accuracy. However, if the speaker is aware of such seriously undermining facts, there is no reasonable basis for the belief that the prediction is true. Thus, the requirement that the statement must have a "reasonable basis" encompasses this situation. *In re Apple Computors Sec. Lit.,* 886 F.2d 1109, 1113 (9th Cir.1989), cert. denied, 110 S.Ct. ---- (1990); *Hanon v. Dataproducts,* 976 F.2d 497, 503-04 (9th Cir.1992).c*See also, Kaplan v. Rose,* 49 F.3d 1363, 1375 (9th Cir.1994); *Rubenstein v. Collins,* 20 F.3d

160,166 (5th Cir.1988), --- U.S. ---- (citing, *Isiquith v. Middle South Utilities,* 847 F.2d 186, 203-4 (5th Cir.), cert. denied, 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988)).

FN89. Plaintiffs must put forth sufficient facts to call either the reasonable basis and good faith issues into question. *Roots Partnership v. Lands End Inc.,* 965 F.2d 1411, 1418 (7th Cir.1992)

FN90. The Court in *Roots* noted that Plaintiffs had not allege that the company could not have met its earnings goals even with reasonable strong Christmas sales, a factor the company repeatedly emphasized could affect its fiscal earnings. The statements made throughout year expressed a goal to earn 10% net pre-tax profits over the next 5 years, including the current year. Some of the statements expressed uncertainty about the current year until the Christmas season results were known. When the statements were made, internal projections for the current year varied from 9.9% to 9.38%.

Presumed Reliance

**\*24** The Supreme Court recently has endorsed the application of a presumption of reliance in Rule 10b-5 cases. *Basic v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).[FN91] Upon determining that defendants have made a misstatement or omission of material fact, a Rule 10b-5 Plaintiff is entitled to a rebuttable presumption of reliance where the security involved is actively traded in an open and developed market. *Basic v. Levinson,* 485 U.S. 245, 247-250 (1988); *Virginia Bankshares Inc. v. Sandberg,* 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991).[FN92] An active and open market is one in which there are a large number of traders, a high level of activity and frequency of trades which rapidly reflects new information in the price. The plaintiffs meet the burden of proof on the element of reliance if they demonstrate that the defendants made material misrepresentations or withheld material information. The court will then presume that the misrepresentation occasioned an increase in the stock value that, in turn, induced the plaintiffs to purchase the stock. *Peil v. Speiser,* 806 F.2d 1154, 1160 (3d

Not Reported in F.Supp.                                                                                    Page 31
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
 (Cite as: 1997 WL 205709 (E.D.Pa.))

Cir.1986).[FN93] The presumption is based on the fraud on the market theory, which, in turn, is based on the efficient capital markets hypothesis which assumes that material information about a company is immediately reflected in the price of the stock. Purchasers or sellers rely upon the integrity of this price by assuming it is based on proper information. *Peil v. Speiser,* 806 F.2d 1154 (3d Cir.1986); See also, *Provenz v. Miller,* 102 F.3d 1478 (9th Cir.1996). Plaintiff need only allege only that he suffered injury in his capacity as a purchaser or seller in the security. *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 261-83 (3d Cir.), cert. denied, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). Defendants do not dispute plaintiffs' allegations of reliance.

FN91. The purpose of requiring a showing of reliance is to establish a connection between plaintiff's harm and defendants conduct. *Rosenberg v. Digilog Inc.,* 648 F.Supp. 40, 43 (E.D.Pa.1985).

FN92. The presumption is supported by the fraud on the market theory. This theory recognizes that, in an efficient market for stock, the market price of the stock reflects all available, credible information concerning the company and its business. Investors are entitled to rely upon the integrity of the market price as reflecting only true information. *Peil v. Speiser,* 806 F.2d 1154 (3d Cir.1986). A plaintiff's who relies on the integrity of the stock price, also relies on statements made to the market, including fraudulent statements that cause the market to misvalue (or overvalue) that stock.

The failure to disclose material negative information about a company or its subsidiaries or the making of false positive statements, will cause a company's stock to sell at a higher price than that at which it would have sold if the true facts had been known. An investor who trades stock at the price set by the market is entitled to rely on the integrity of that price; that is, he relies on that price to reflect only true information about the stock. Because Plaintiff trades in reliance upon the integrity of the market price of the stock, if plaintiff proves that a public misrepresen-

tation or omission is material, it is presumed that the plaintiff relied on it. Such a presumption is consistent with the Acts policy of requiring full and fair disclosure and fostering reliance on market integrity.

FN93. The presumption can be rebutted by showing that either: 1.) the misrepresentations did not affect the market price of the stock (i.e., price was not in fact inflated by misrepresentations, complete and truthful information had credibly entered the market so that the market price of the stock was corrected and did not respond to the misrepresentation or omissions); or 2.) plaintiffs would have purchased the stock even at the price it would have been at but for the misrepresentations. Essentially, defendant must prove there is no link between any alleged misrepresentation and the price plaintiff paid for the stock or the decision to trade at a fair price. The burden of proof is probably merely just shifted to defendant to prove no reliance.

In the case at hand, Plaintiff's rely on the fraud on the market theory. It is undisputed that Plaintiffs are purchasers of a security that is traded over national securities exchanges and thus, is actively traded in an open and developed market. Thus, Plaintiffs reliance is not on defendants fraudulent actions directly, but on the marketplaces's reflection of the value of the stock.

An essential corollary to this theory, is the principle of "truth on the market". *Weiglos,* 892 F.2d 509 (7th Cir.1989) ("Prompt incorporation of news into stock price is the foundation for the fraud on the market doctrine and supports a truth on the market doctrine as well"). This doctrine recognizes that, in a fraud on the market case, a defendants' misrepresentations or omission of material information is not material to the reasonable investor's decision to trade if accurate information has been made available to the market by other sources. *Raab v. General Physics Corp.,* 4 F.3d 286, 289 (4th Cir.1993) (citing, *In re Apple Computer Sec. lit.,* 886 F.2d 1109, 1115 (9th Cir.1989), cert. denied, 496 U.S. 953 (1990); *Weiglos v. Commonwealth Edison Co.,* 892 F.2d 509, 516 (7th Cir.1989); *In re Kulicke & Soffa Indus. Sec. Lit.,* 697 F.Supp. 183, 186 (E.D.Pa.1988)).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                      Page 32
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
 (Cite as: 1997 WL 205709 (E.D.Pa.))

Materiality and the "Total Mix"

**\*25** The Supreme Court defined materiality as a substantial likelihood that, under all the circumstances, the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available to him." [FN94] *TSC Industries,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Basic v. Levinson,* 485 U.S. 224, 231-232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (Information is material only if its disclosure would have "significantly altered the total mix of facts available to the investor" and if "there is a substantial likelihood that a reasonable investor would have considered the fact important to his investment decision"). That mix of information includes what is already part of the public domain. *Weiglos,* 892 F.2d at 516; *Provenz* 102 F.3d 1478) (citing, *Convergent Technologies,* 948 F.2d at 513) (In a "fraud on the market" case, "an omission is materially misleading only if the information has not already entered the market ... If the market has become aware of the allegedly concealed information, 'the facts allegedly omitted by the defendant would already be reflected in the stock price the market will not be misled."); *Associated Randall Bank v. Grifin, Kubik,* 3 F.3d 208, 213-14 (7th Cir.1993). Further, the false or omitted information not involve a material fact because it will not "effect the total mix of information." *United Paperworks Intern. v. International Paper,* 985 F.2d 1190, 1199 ("widely reported in readily available media, and shareholders may be deemed to have constructive notice of the facts reported").

> FN94. The Court established a narrow definition of materiality because an unnecessarily low standard for materiality would subject the corporation and its management to liability for insignificant omissions or misstatements and management's fears of exposing itself to liability may cause it simply to bury the shareholders or investors in an avalanche of trivial information-a result that is hardly conducive to informed decision making. *TSC Industries,* 426 U.S. at 448, 449. Although the Court in *Northway* defined materiality in the context of a proxy statement that allegedly violated SEC Rule 14a, the same definition applies equally to

determinations of materiality under the anti-fraud provisions of the federal securities laws. *Healy v. Catalyst Recovery,* 616 F.2d 641 (3d Cir.1980).

The question of materiality is one of mixed law and fact, involving as it does the application of a legal standard to a particular set of facts. See *TSC Industries inc. c. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Although a determination of materiality "requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him,"*Id.,* materiality is appropriately resolved as a matter of law, and summary judgment should be granted when "reasonable minds cannot differ on the question of materiality." *Id.* at 450 (quoting *Johns Hopkins University v. Hutton,* 422 F.2d 1124, 1129 (4th Cir.1970), cert. denied, 416 U.S. 916 (1974); *Gould v. American Hawaiian SS Co.,* 535 F.2d 761, 771 (3d Cir.1976); *Harnett v. Ryan Homes,* 496 F.2d 832 (3d Cir.1974)) ("To deny a defendant in a securities case alleging nondisclosure of material facts the benefit of summary judgment procedures would cause a wholly innocent person to incur enormous legal expenses in defending an unmeritorious and frivolous lawsuit at trial. Such a result cannot by countenanced by our judicial system"). The court will examine each of plaintiffs contentions to determine whether there can be a reasonable difference of opinion on materiality.

Pursuant to the "truth on the market doctrine" a statement's potential to mislead and its materiality to the investment decision of reasonable investor can be nullified if the representation is accompanied by cautionary language within the document or the correct information has been revealed by some other disclosure.[FN95]

> FN95. Summary judgement may also be based on the "bespeaks caution doctrine" when "reasonable minds cannot disagree as to whether the mix of information *in the document* is misleading. This doctrine provides a mechanism by which a court can rule as a matter of law that defendants forward looking statements contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud. *Provenz* (citing, *WOW,* 35 F.3d at

1413.) It is not new but a reformulation of two fundamental concepts in securities fraud law: reliance and materiality. *Id.* Blanket warnings are insufficient.

> The bespeaks caution doctrine was explicitly adopted by third circuit in *In re Trump Casino,* 7 F.3d 357, 364. The court concluded that under the "bespeaks caution" doctrine, "a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law. When the bespeaks caution doctrine is applied to the fraud on the market theory, it is clear that optimistic forecasts in one document are not actionable if the market was sufficiently warned in a *prior or simultaneous* document that those forecasts might not be fulfilled. See *Raab* 4 F.3d at 289; *Arazie v. Mullane,* 2 F.3d 1456, 1467 (7th cir 1993); *Provenz v. Miller,* 102 F.3d 1478 (9th Cir.1996)(citing, *In Re Worlds of Wonder Securities Lit.,* 35 F.3d 1407, 1413-15 (9th Cir.1991)).

**\*26** According to the "truth on the market" doctrine, even if the Court determines that, in isolation, defendants statements or forecasts are actionable as misrepresentations or omissions of material fact, defendants may avoid liability by establishing that the market was aware of the allegedly concealed information. *Weiglos v. Commonwealth Edison,* 892 F.2d 509, 516 (7th Cir.1989). Thus, a defendant can avoid liability for a false statement or one that reveals less than the truth by showing that the market was not affected by the representation because the truth of the matter was known already and had been factored into market prices. John Newman, Basic Truths: "The Implications of the Fraud on the Market Theory for Evaluating the "Misleading' and "Materiality" Elements of the Securities Fraud Claims, 20 J.Corp.L. 571, 576 (1995).

Before the truth on the market defense can be applied, the defendants must prove that the information withheld or misrepresented was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by one-sided representations." *Provenz v. Miller,* 102 F.3d 1478 (9th Cir.1996).

*Scienter*

Scienter is a necessary element of a Rule 10b-5 action and is an independent basis for granting summary judgment. *O'Connor v. Lafferty,* 965 F.2d 893, 900 (10th Cir.1992). To establish scienter, plaintiffs must show that defendants had a mental state embracing an intent to deceive manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Interpreting the Supreme Courts scienter requirement with regard to predictive statements, the Third Circuit has explained that "an opinion must not be made with reckless disregard for its truth or falsity or with a lack of genuine belief that the information disclosed is accurate and complete in all material respects." *Kline v. First Western,* 24 F.3d 480, 486 (3d Cir.1994). Thus, simply establishing that the predictive statement at issue did not have a reasonable basis, that is, they were negligently made, would not entitle plaintiffs to recover. Rather, it must be proved that defendant knew or was "recklessly indifferent to the fact that the statement did not have a reasonable basis."

Plaintiff can establish scienter by proving either actual knowledge or recklessness. *Software,* 38 F.3d 1088. In this Circuit, reckless conduct is limited to those highly unreasonable omissions involving not merely "simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *McLean v. Alexander,* 599 F.2d 1190, 1197 (3d Cir.1979); *Eisenburg v. Gagnon,* 766 F.2d 770, 776 (3d Cir.), cert. denied, 455 U.S. 938 (1985). The element is satisfied by conduct that presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." *Id.* Negligent conduct alone, whether gross, grave, or inexcusable does not suffice. *Hochfelder,* 425 U.S. at 194-314.

**\*27** Scienter may be proved by "facts establishing a motive to commit fraud and an opportunity to do so" or by alleging "facts constituting circumstantial evidence" of recklessness or conscious misbehavior. *Acito v. Imerca Group, Inc.,* 47 F.3d 47 (2d Cir.1995). The mere publication of inaccurate accounting figures, or a failure to follow GAAP without more, does not establish scienter. *Software,* 38 F.3d at 1089. An allegation that defendants were motivated to defraud the public because an inflated stock

price would increase their compensation is also insuf-
ficient to create a reasonable inference of scienter. If
scienter could be pleaded on that basis alone, virtu-
ally every company in the United States that experi-
ences a downturn in stock could be subject to securi-
ties fraud. *Acito,* 47 F.3d at 53 (2d Cir.1995);
*Tuchman v. DSC Communications,* 14 F.3d 1061,
1068-69 (5th Cir.1994). Further, mismanagement or
poor business judgement in coping with a downturn
in the economy or in the particular industry does not
create liability under Rule 10b-5. Rather there must
be the element of deception or scienter. *Serbian v.
Amoskeag Bank Shares,* 24 F.3d 357 (1st Cir.1994)

## V. *DISCUSSION*

### I. § 10b and Rule 10b-5 Claims

### 1. Earnings Growth Target

It is undisputed that, throughout 1990, the defendants
predicted that BAC earnings would grow 6-9%.[FN96]
Plaintiffs claim that defendants' predictions of 6-9%
earnings growth lacked a reasonable basis because 1.)
a June 1990 internal report projected earnings per
share for the year of 4.8% and because 2.) past re-
ported growth was due merely to non-recurring
events, discussed below, rather than to "operating"
earnings, 3) an internal estimate revealed that Defen-
dants expected only 4-6% growth from the NSG and
only 2-3% from BAC's other businesses which were
operating at a loss (PX-6, B2042299.1), and 4.) an
internal document revealed that the NSG, BAC's core
business could not support 6% growth (referred to
therein as the "business problem"). (PX 209,
B2051648).

> FN96. The defendants also publicly stated
> on various occasions that the source of the
> earnings growth would be the NSG. For ex-
> ample, in April 1990, Crawford stated, "we
> have major businesses in three different
> stages of the life cycle, with three different
> growth patterns, risk profiles, and earnings
> characteristics. This still robust business
> supports an ability to earn at the lower end
> of our earnings objective of six to nine per-
> cent." (DX TAB 34); At a meeting with the
> New York Society of Securities Analysts
> (N.Y.SSA) on October 25, 1990, Cambell
> stated that the network services business

presently contributed "four to six" percent of
earnings growth. (DX TAB 36). In deposi-
tion, Crawford explained that "in any single
year, results in any single business segment
could be more or less than our target
ranges". Crawford dep. 181-82. The network
business had the capacity over the several
years following 1990 to account entirely for
"the lower end" of the 6-9% target. *Id.* "We
expect to be at the lower end of this growth
range until at least next year at which time
the results from our development activities
will begin to make a visible and sustainable
contribution". (DX TAB 202).

Arguably, this is not a failed forecast. The defendants
publically indicated that the base from which one
should measure the 6-9% growth is "normalized"
earnings of $3.33 for 1989.[FN97] Simple calculations
show that, by these statements, defendants were pre-
dicting earnings per share for 1990 of approximately
106% of $3.33, or $3.53, before subtracting special
charges. Actual results for the fourth quarter and for
the year were disclosed by press release on January
22, 1991. In that release, BAC reported a special
charge of fifteen cents and reported earnings per
share of $3.38 and stated that "earnings per share
growth after eliminating non-recurring charges in
both years was 6%"[FN98] BAC's outside auditor. Coo-
pers & Lybrand verified this press release as accu-
rate. (DX-CL2001595, TAB 40). Thus, ostensibly,
the forecast of at least six percent growth in 1990 was
met. Furthermore, there is evidence in the record that
BAC achieved 6% growth even after eliminating the
effect of non-recurring and one-time adjustments,
discussed below.[FN99]

> FN97. In October, BAC stated, "Last year
> we indicated to you that we expected nor-
> malized per share earnings of $3.33-
> excluding some one-time write-downs of in-
> ventories and goodwill ... and that's exactly
> where we ended the year. And we said that
> earnings would grow from that base to the
> lower half of our 6-9% objective in the '90-
> '92 time frame ... We expect normalized
> earnings for 1990 to be about 6 percent
> higher than last year without special adjust-
> ments." At the same meeting, Cambell an-
> nounced a charge of approximately ten cents
> to 1990 fourth quarter earnings. This state-

ment is challenged by the plaintiffs but will be considered by the court later in this opinion under the heading "goodwill write-down". (DX TAB 36).

FN98. Factoring out the $.15 cents charge, reported earnings per share of $3.38 would be $3.53.

FN99. The document, dated January 23, 1991, reflects that one-time items that increased earnings were subtracted and those that decreased expenses were added back in to the figuresfor 1989 and 1990 so that only "operating" earnings remain for comparison. The resulting figure, a percentage representing earnings growth for 1990 over 1989 attributible only to operations, is 6.1%. (BA100082). Plaintiff does not contest anything in this document. Instead, Plaintiff has submitted a document that purportedly contradicts the growth percentage. However, this submission does not permit a reasonable inference that 6% growth for 1990 was not achieved and, therefore, does not create a genuine issue of fact. The document reports "normalized 1990 net income as $1,318.5 ($3.34 EPS according to Plaintiff's calculations compared to $3.33 EPS for 1989), a figure markedly lower than the $1,375.1 figure that produced 6.1% growth according to the January 23 document, referred to above. However, this document compares 1990 to 1991 rather than to 1989. Because "normalizing" is a process by which years are equalized for comparison purposes and different years are characterized by different accounting events, normalizing 1990 results for adjustments taken in a year other than 1989 will produce different normalized base figure for 1990. We note that, because these documents were generated after the end of the class period, they do not provide a reasonable basis for defendants predictions nor do they negate the existence of a reasonable basis therefor. The January 23 document merely demonstrates that BAC, in fact, experienced 6% growth without the challenged one-time adjustments, contradicting Plaintiff's claim that defendants were aware that growth for 1990 would come only from the challenged adjustments rather than from operations.

**\*28** The forecast of 6-9% was issued with a reasonable basis. Historical performance itself can provide a reasonable basis for future growth. *In re Craftmatic,* 890 F.2d at 642 n. 19 (Management projections of profit and growth can have a reasonable basis if there is a history of profitable operations.) BAC's Annual Report for 1990 issued on February 15, 1991 reported 6% earnings growth in 1990 and that "the total value of your investment in Bell grew for the seventh consecutive year." (DX-TAB 2). In addition, an analyst report issued by Nomura securities on BAC stated "our confidence in BAC management is very high ... Management has delivered at least its targeted 6-9% earnings growth on a normalized basis every year since divestiture."(DX BA1000133, TAB 25).

Throughout 1990, BAC generated internal estimates of earnings growth for the year. The prediction of 6-9% for the year was consistent with all reliable estimates. Plaintiffs claim that several internal estimates were inconsistent with the prediction and deprive it of a reasonable basis. Plaintiffs first quote an internal document predicting 4.8% growth for 1990, but fail to point to record evidence that this estimate is reliable, certain, or that it represents an inescapable fate.[FN100] Defendants, on the other hand, have provided ample evidence that this estimate was not considered to be reliable or certain by BAC.[FN101] Because this estimate was not considered reliable by management, this document did not represent the company's view. Such evidence can not undermine the reasonable basis or good faith belief for the defendants projections of 6-9% earnings growth provided by other internal estimates. Another internal estimate cited by the Plaintiffs, estimates 4-6% growth from the NSG. Again, as long as the attainment of 6% growth is within reach, it has not been foreclosed, and the prediction is not deprived of a reasonable basis.

FN100. As noted above. (See, type print p. 35).

FN101. These "Entity Estimates" were not considered by management to be reliable projections of the company's actual performance because they do not take into account decisions made at the corporate headquarters level or acceptable expense levels.

Not Reported in F.Supp.                                                                 Page 36
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
 (Cite as: 1997 WL 205709 (E.D.Pa.))

See (DX-BA 1008542, TAB 62) (July 3, 1990 "pre flash" analysis by Bardeen, concluding that net income for the year would equal budget and 6.6% EPS growth: In so concluding, Bardeen noted that "estimates provided by the companies result in a lower projected net income. Their lower forecast can be attributed to expense estimates which exceed those of my staff. We have also recognized anticipated medical expense accrual reversals which have not been communicated to the companies.") The "Administrative View", an estimate that takes into account these corporate factors, is a more accurate reflection of the Company view. This estimate projected EPS growth of 6.6%. (DX-BA1008557, TAB 60); (Von Stetina dep. 142) (administrative view "based on what entities provided plus information that we were cognizant of that they might not have been aware of at that point in time").

Moreover, defendants' awareness of what is referred to internally as the "business problem," does not undermine a reasonable basis or good faith belief in the prediction of 6-9% growth for 1990. Undisputed deposition testimony reveals that the "business problem" was a long term concern that the earnings growth from the NSG would not be sufficient, in itself, to achvieve the 6-9% growth forecasted each year. (Bardeen dep. 76) ("limited long term growth from the basic core businesses"); (VonStetina dep. 242) ("The long term business problem was that the [NSG] growth rates in earnings would not be sufficient in and of themselves to achieve 6-9% each year. and ... growth would have to come from the nonregulated businesses"). Plaintiffs put forth no evidence showing that this was not a long term problem or that the estimate of only 3% growth applies to 1990. Documents reflecting that BAC anticipated that growth in the NSG would be insufficient to meet yearly predictions in the future, does not erode the Defendants' reasonable basis or good faith belief in the achievement of this target in the short term. Indeed, the record reveals that the NSG had the capacity to account for the lower end of the 6-9% range for several more years. (Crawford dep. 181-82) (NSG has capacity over the several years following 1990 to account entirely for "the lower end" of the 6-9% range); (TAB 34) ("this still robust business supports an ability to earn at the lower end of our earnings objective of 6-9%").

*29 Plaintiffs contend that certain nonregulated business segments were performing poorly (i.e., BAP, the real estate subsidiary lost $1.3 million in 1990 and the growth trend in BASLI, the Financial Services subsidiary, was "softening" throughout that year). However, in light of the fact that the defendants expected 6% of the earnings growth to derive from the NSG, some negative information about the other subsidiaries would not deprive the predictions of 6-9% growth of a reasonable basis or defendants of a good faith belief in the truth of their statements.

Finally, other events, discussed below, allegedly deprived the prediction of 6% growth from having a reasonable basis and also rendered any quarterly statements reporting attained growth misleading. However, those nonrecurring events were sufficiently disclosed, were not material, or defendants had no duty to disclose the information.

## 2. Reversals of Accruals and Retroactive Credits

Plaintiffs complain that any growth expected for the year would come, not from operating performance, but from accounting manipulations that allowed defendants to overstate earnings for 1990 and understate 1989 earnings. Plaintiffs do not challenge the underlying accounting and concede that Defendants were entitled to make these accounting adjustments under GAAP. Instead, they claim only that defendants intentionally manipulated the timing of the adjustments in order to show at least 6% growth in 1990 over the results reported for 1989. This can be translated into a claim that statements made regarding growth in 1990 as compared to 1989 were misleading in that they failed to disclose the amount of growth attributable to non-recurring and out-of-period transactions, and that predictions of 6-9% growth for 1990 lacked a reasonable basis because defendants knew that growth would not be from operations. However, the record reveals that the timing of the adjustments was reasonable. There is no evidence that BAC delayed making a reversal, despite discovering that an overaccrual existed and sizing the amount of the overaccrual. Regardless of when it occurs, reversing an over-accrual, as required under GAAP, will always have a "ballooning" effect on financial res Its.

Furthermore, even if these adjustments were intentionally timed by defendant to show earnings growth,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                    Page 37
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

the adjustments were disclosed to the market so that no reasonable investor would be' misled about the effect of these adjustments on reported earnings. In other words, no reasonable investor would be misled into thinking that.the improvement in the reported financial results of the company was caused only by improved operating revenues.

### a. Second and Third Quarter

The first group of challenged adjustments, involves the reversal of an accrual, an estimation made by management of future expenses or liabilities that must be "reversed", i.e. added back in to revenues, if eventually proved to be inaccurate by the actual expenses or liabilities, or by subsequent changes in rates used to calculate the accrual.

**\*30** Nothing in the record indicates that the overaccruals were anything more than poor business judgement. "Mere failure to provide adequate reserves (or to perform competently other management tasks) does not implicate the concerns of the federal securities laws and is not normally actionable." *Serbian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357 (1st Cir.1994) (citing, *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 281 (3d Cir.1993). The accounting, explicitly approved by independent outside auditors, was in compliance with GAAP.

This court agrees that information about the source of a company's reported growth may be material in some cases. Certainly, if the amount of growth derived from accounting adjustments rather than an improvement in the business is material, that information must be disclosed if it will render statements misleading. *See e. g, Weeks Dredging & Contracting v. American Dredging,* 451 F.Supp. 468, 479 (E.D.Pa.1978). In this case, however, the challenged adjustments were disclosed to the market. While the drafting of some of the documents that disclosed these transactions may have been inartful at times, there was sufficient disclosure from which the market could deduce the amount and effect of one-time events.

### b. First Quarter Reversal of Accruals [FN102]: $20 Million Mistake

> FN102. The plaintiffs challenge another one-time charge in the first quarter, the AT

& T settlement. However, the information is immaterial because the amount and effect of the AT & T settlement was disclosed prior to the class period.

Plaintiffs claim that a mathematical error that resulted in an overaccrual for NECA liability should have been corrected in the fourth quarter of 1989 rather than the first quarter of 1990. The error was detected in January 1990 during the routine year-end audit by Coopers & Lybrand. Plaintiffs claim that Defendants were able to boost first quarter earnings by reversing the accrual in 1990 despite knowing that the reversal was necessary before the financials were issued for the fourth quarter of 1989. By overstating 1990 revenues and understating 1989 revenues, BAC was able to show revenue growth in the 1990 compared to the 1989. The reversal of this error and of additional overaccruals detected while investigating the error, caused $20.8 million in revenues to be added to 1990 financial results.

However, nothing indicates that this decision as to the timing of the reversal represents anything more than the difference between two permissible judgments. By the time BAC and Coopers & Lybrand knew that a reversal was necessary and quantified the amount, the "books were already closed for 1989" and there was testimony that it would have been physically impossible to change the financial, statements in the computer system. Cooper's and Lybrand determined that the error was immaterial so that reversal in the 1989 financial statements was unnecessary.

Furthermore, apart from the timing of the reversal, there can be no liability imposed for the mathematical error because the mere publication of inaccurate accounting figures (or failure to follow GAAP) without more, does not establish scienter. *Provenz v. Miller,* 102 F.3d 1478, 1489 (9th Cir.1996). Further, as noted above regarding the second and third quarter, there is also no liability for the overaccrual itself. *Serbian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357 (1st Cir.1994) (citing, *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 281 (3d Cir.1993) ("Mere failure to provide adequate reserves does not implicate the concerns of the federal securities laws and is not normally actionable").

**\*31** Moreover, as discussed in connection with the

other reversals during 1990, this adjustment was disclosed before the end of the class period. The first quarter 10-Q for 1990 contained the statement, "Adjustments recorded to reflect revised estimates of access revenue liabilities increased revenues approximately $62 million during the quarter."

### 3. *Access Line, Revenues, Expenses*

Plaintiffs contend that the Defendants made positive statements regarding access line growth during the class period, but failed to disclose that access line growth was slowing so consistently that it was perceived as a "trend" by October 1990.

Defendants' statements regarding access line growth are not material. The historical figures were accurately disclosed from which a reasonable investor could deduce that access lines were growing at a reduced rate. Each quarter, BAC's 10-Q reported actual access line growth, both in percentage rates and raw operating statistics. (DX-TAB 4, 5, 7, 8) Because the defendants never predicted or forecasted future access line growth, there was no duty to provide interim figures.[FN103] *Chiarella v. United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) ("A duty to disclose does not arise from the mere possession of non-public information").

> FN103. Neither the statements quoted by Plaintiff's, nor the reporting of quarterly figures amounted to a partial disclosure or a prediction of future growth. Thus, Plaintiff's have not provided evidence demonstrating that defendant's had a duty to disclose additional information.

In addition, Plaintiffs contend that various statements and reports failed to disclose that revenues were increasing but at a decreasing rate, and expenses were increasing, at an increasing rate. However, as with access line growth, BAC disclosed the actual figures necessary to make this simple calculation. (TABs 3, 5, 7).

As a matter of law, there is no genuine issue of material fact as to any statement regarding the rate of growth in access lines, revenues, or expenses. Accordingly, summary judgment may be granted as to these claims.

### 4. *Third Quarter 1989 Strike*

Plaintiffs complain that the Defendants, when reporting results for the third quarter of 1990, failed to disclose the quantifiable adverse impact a 1989 strike had on 3Q89 net income. This omission allegedly made the reporting of growth for the third quarter of 1990 as compared to the same quarter of 1989 misleading. However, there was no duty to disclose this information and it is immaterial.

BAC disclosed the fact of a strike in Form 10-Q for the third quarter of 1989. (TAB 146 at 8). Once disclosed, there was no duty to re-report this fact or to disclose BAC's internal estimate of the strikes' impact. (DX-TAB 204). There is no evidence that BAC considered the estimate to be reliable or certain. The defendants have offered testimonial evidence to the contrary. (Smith dep. 143, 144-46) (final impact "impossible" to determine with all the "gives and takes that go on in our business "... revenues lost due to "pent up" demand would be quickly replaced at the strikes end and thus, it will have little overall impact); (Lynch dep. at 57) (DX-TAB 205, 206) (Both BAC and C & L determined that the impact was immaterial). Furthermore, the fact that a strike will have a negative impact on business is commonly known. This is not the industry-specific information that the securities laws require be disclosed. Finally, because BAC disclosed actual income, revenue, and expense figures both in third quarter, 1989 and in third quarter, 1990, the figures for a reasonable investors analysis and comparison were available.

### 5. *Goodwill Writedown*

**\*32** Plaintiffs contend that, at the time of announcing a $.10 writedown or sometime thereafter, BAC knew but failed to disclose that the writedown would actually be $.15. There is no evidence in the record that defendants knew that the writedown would be $.15 at the time it was announced. Thus, this prediction did not lack a reasonable basis. However, because BAC predicted that there would be "no further writedowns in 1990, 1991, or beyond," the defendants made a prediction which must be corrected if it becomes materially misleading.

Plaintiffs point to an internal document that purportedly creates a factual issue as to when BAC decided

to writedown goodwill an additional $.05 cents. (DX-TAB 115).[FN104] However, the wording of that document, and internal documents drafted later in the year, belies any reasonable inference BAC had decided, with such certainty that a duty to disclose was triggered. The document states "*If* we decide to sell BASLI at the current proposed purchase price, earnings per share *would* be reduced by an additional $.05." (DX-TAB 115). Even assuming that the internal documents create a factual issue as to when the decision was made, the difference between the projected and the actual writedown, 1.5% of 1990 earnings, was not material and would not likely influence the decision-making of a reasonable investor. (DX 39, 108). Furthermore, another internal memo quoted by the Plaintiffs, does not give rise to a reasonable inference of scienter. The typewritten portion of the memo, drafted by Crawford, dated October 29, 1990, states that, "$.10 did not nave significant impact on our stock price" and attached analyst reports. One of those receiving the reports hand-wrote back, to Crawford in the margin: "Good Reviews! Thanks for all your hard work in the engineering process. As a hardworking actor myself, I am heartened to know that I have a good script writer behind me". (DX-TAB 122). Plaintiffs claim that the notation on the memo proves that defendants had consciously "fooled" the analysts as to the amount of the charge announced at the October 25, 1990 meeting. However, even reading the evidence in light most favorable to the plaintiffs, this notation cannot give rise to a reasonable inference of scienter. The allusion to "acting" does not refer to conscious deception but to the author's hobby. The author, in fact, appears frequently in dramatic performances. (DX-213) The Supreme Court has made clear that strained or inconclusive inferences alone should not defeat summary judgment. *Anderson v. Liberty Lobby,* 47 U.S. 242, 252-57 (1986); See also, *Vaughn v. Telodyne,* 628 F.2d 1214, 1218-22 (9th Cir.1990).

> FN104. The Court notes that the use of the qualifier, "approximately," in the original announcement of a .10 cents writedown on October 25, 1990, discloses at least some uncertainty as to the amount of the writedown.

Plaintiffs also contend that Defendant's statements regarding the writedown were misleading because they failed to disclose that the writedown only related

to BASLI, rather than to the Financial Services segment as a whole. A variation on this claim is that Defendants failed to disclose that the writedown related to a sale of BASLI and a potential loss realized therefrom. However, this information is clearly not material. As long as the amount, purpose, and effect of the charge was disclosed, no reasonable investor would have considered the basis for the charge significant. *Vosgerichian v. Commodore Int'l, Inc.,* 832 F.Supp. 909, 911-912 (E.D.Pa.1993), *vacated on other grounds,*662 F.Supp. 1371 (E.D.Pa.1994). Further, there is no general duty to disclose any information about negotiations regarding a potential acquisition or other extraordinary corporate transaction. *Basic v. Levison,* 485 U.S. 224, 234, 238-41, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); See e.g., *In re General Motors Class E. Stock Buyout Sec. Lit.,* 694 F.Supp. 1119, 1128-29 (D.Del.1988) (corporation did not have a duty to disclose negotiations concerning sale of subsidiary). The statements made regarding the writedown did not constitute a public denial of the fact that negotiations were pending. See e.g., *Basic,* 485 U.S. at 239 n. 17.Further, there is no information in the record that the parties to the negotiation had come to an agreement. Accordingly, BAC did not have a duty to disclose the fact that non-public negotiations for the sale of BASLI were being conducted.

### 6.) *Expense Measures*

**\*33** Defendants complain that Plaintiffs' statements regarding the effect of expense measures taken in 1990 failed to disclose that reported growth was due to nonrecurring items rather than to expense measures. This is not an actionable omission. Rather, statements about expense measures were literally true. Expense controls were merely one of a number of factors "contributing to net operating revenue growth". No reasonable investor would understand defendants' statements to mean that "expense measures" were the only reason for the net operating revenue growth and nothing in the record demonstrates that the defendants' knew, at the time of making the announcement, that expense measures had been completely ineffective.

### 7. *Bell Atlantic Employee Stock Ownership Plan ("ESOP")*

Five cents of fourth quarter EPS was attributable to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the ESOP tax benefit and .04 of that was attributable to the first three quarters of 1990. Plaintiffs contend that BAC violated GAAP by including the tax benefit from dividends paid to the ESOP in the company's reported income. However, consistent with GAAP, the $.05 benefit was only included in the calculation of earnings per share for the year, not in the calculation of net income. While, this increase in EPS was not disclosed until after the class period, nothing in the record suggests that this inclusion was unreasonable.

Plaintiffs, thus, challenge the timing of the change in the fourth quarter and the decision to include the entire years tax benefit in the fourth quarter. However, Coopers & Lybrand concurred with the inclusion of the $.04 from the first three quarters of 1990 in the fourth quarter and determined that the amount was immaterial so that the first three quarters need not be restated. While the inclusion was not explicitly disclosed by BAC until the issuance of the Annual Report 10-K in February 1991, analyst reports issued on January 23, 1990, the day after the class period, shows awareness that $.05 was added to fourth quarter earnings as result of ESOP accounting. (DX TAB 103, 104). Furthermore, even if the timing of the disclosure was unreasonable, the amount of the tax benefit is immaterial.

The second claim regarding BAC's ESOP accounting finds fault with a change in the account in which ESOP expenses are listed. Plaintiff's argue that because "Employee Expense" is a category of "Operating Expense" and "Interest Expense" is not, the market was led to believe that BAC's "Operating Income" (the difference between "Operating Revenues" and "Operating Expenses"), was growing faster than it actually was. GAAP mandates that this expense must be listed in the interest expense account and the change was disclosed to the market. In the first quarter MD & A for 1990, BAC noted that interest expense grew by 10.5% over the first quarter of 1989 because of "interest recognized on the debt associated with the leveraged employee stock ownership plans established by the company in 1989."(TAB 4), (TAB 8 at 9, second quarter);(tab 8 at 10, third quarter).

## 8.) *Cellular (BAMs)*

**\*34** Plaintiffs claim that defendant's positive statements regarding "non-telephone companies" failed to

disclose that cellular minutes of use per customer was declining at BANs, BAC's cellular subsidiary. However, the fact that cellular minutes of use was declining was disclosed at the October 25, 1990 NYSSA conference in response to questions from analysts, and is, therefore, immaterial. (DX-TAB 36)

Furthermore, the statements are not misleading. The statements that total cellular usage grew at a "reduced rate" in September 1990 and that "revenues grew approximately $10 million and $45 million respectively" are not misleading. (TAB 8). Because the decline in minutes of use was disclosed, the growth in revenues would be understood to be the result of growth in total customer usage rather than minutes of use. Plaintiffs also claim that the defendants failed to disclose materially lower profit margins, or expense or net income figures for BAMs in 1990. However, BAC never disclosed this information on BAMs. Rather, it reported only noteworthy results from subsidiaries and their general results on a consolidated basis. There is no duty to disclose even the most material information absent undertaking to speak on the particular subject.

## 9.) *Return on Equity*

Plaintiffs claim that Defendants' prediction that they could sustain a return on equity of 15-17% was fraudulent.-Actual return on equity was 14.8% for the year. There is nothing in the record to show that the defendants knew that the 15-17% figure would not be achieved or that the prediction lacked a reasonable basis. The difference between actual and predicted results is immaterial as a matter of law.

## 10) *Funding of the Medical Benefits Trust*

Plaintiffs claim that defendant's press release statements regarding the funding of the trust in 1989 was misleading because it implied that the trust was a one-time charge instead of the first installment of a recurring expense. Defendants argue that the press release clearly separates the indisputably non-recurring charges relating to asset writedowns and restructuring from the trust funding.[FN105] However, even if this press release was unclear as to the amount of charges that would continue through 1990, there would be no misunderstanding as to the normalized basis upon which BAC assessed its 1990 earnings growth. On January 26, 1990, Campbell stated

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
 **(Cite as: 1997 WL 205709 (E.D.Pa.))**

that normalized results for the year, adjusting re-ported EPS for these [nonrecurring] charges, were $6.67 [3.33 after stock split] per share, and that that number would be the benchmark level from which BAC would measure its 6% earnings growth (TAB 209).[FN106]

> FN105. They argue that charges expressly identified as of a one-time nature are item-ized in the first sentence while, the second sentence, beginning "*in addition,*" notes that the company "*began* " to accrue for and fund the trust."

> FN106. Plaintiffs have submitted the affida-vit of Harris Devor, and the affidavit of John Torkelson, in opposition to defendants Mo-tion for Summary Judgment. As a general rule, summary judgment is inappropriate where an expert's testimony supports the non-moving parties case. However, where the record is clear, the court is not required to defer to the contrary declarations of plain-tiffs' experts. *In Re Apple Computer Sec. Lit., 886 F.2d 1109, 116 (9th Cir.1989); Provenz, 102 F.3d 1478 (1996); In Re Adobe Systems, 787 F.Supp. 912 (N.D.Cal.1992).*

**11.) *BASLI and BAP***

Plaintiffs contend that statements failed to disclose that Bell Atlantic Properties ("BAP"), the real estate subsidiary, lost $13 million in the third quarter and that BASLI's growth trends were softening and was experiencing an ongoing revenue decline. This can-not form the basis for a claim of fraud. The defen-dants never disclosed detailed financial information for the subsidiaries. Rather, it disclosed only note-worthy information on a consolidated basis. Further-more, some of the alleged undisclosed information was actually positive news that would not undermine a positive statement. For example, with respect to BAP, while it did lose $13 million, it was budgeted to lose $15. Finally, there is no evidence of scienter with respect to statements about these subsidiaries aside from the motive provided by the existance of incentive compensation. As noted previously, evi-dence of incentive compesation, without more, is insufficient to defeat summary judgment.

**\*35** Based on the foregoing analysis, the Defendant's

Motion for Summary Judgment must be granted.

## II. *Control-Person Liability under Section 20(a)*

Plaintiffs allege in Count I that the individual defen-dants, Raymond W. Smith and Phillip A. Campbell are liable as controlling persons of BAC by virtue of their corporate positions pursuant to Section 20(a) of the 1934 Act. That section provides that "(a) every person who, directly or indirectly, controls any per-son liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and *to the same extent as such controlled person* to any person to whom such controlled person is liable." Section 20(a) broadly defines control as any indirect means of discipline or influence short of actual direction: or "ability to exert influence, directly or indirectly over the decision making process of another person." Culpable partici-pation in the violation is required for control person liability, and the plaintiff must prove (in the case of inaction) that inaction was deliberate and done inten-tionally to further the fraud. § 20(a) expressly pro-vides a defense if the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Liability under section 20 is predicated on an inde-pendent violation of the Securities laws. The individ-ual defendants can be held liable under § 20 only if an independent Rule 10b-5 violation by Bell has been proven.

Because I have granted summary judgement in de-fendants favor on the § 10 and Rule 10b-5 claim, section 20(a) liability is precluded and summary judgment will be granted as to that claim as well.

## III. *Count II Negligent Misrepresentation*

The plaintiffs also contend that this court has the power to exercise supplemental jurisdiction over Plaintiffs' state common law claim of negligent mis-representation. This court has power to exercise pen-dant jurisdiction over state claims that are "so re-lated" to the federal claims that they form part of the same case or controversy. State claims are part of the same constitutional case if they "derive from a com-mon nucleus of operative fact" and "are such that [the plaintiff] would ordinarily be expected to try them in

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
 **(Cite as: 1997 WL 205709 (E.D.Pa.))**

one judicial proceeding". *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The power to exercise supplemental jurisdiction exists when a Plaintiff makes a § 10b and Rule 10b-5 claim and state law claims based on the same allegedly fraudulent conduct (case). The court however, has broad discretionary powers to decline pendant jurisdiction pursuant to § 1367(c). Under the statute, district courts are expressly authorized to decline to exercise supplemental jurisdiction over a claim under subsection (a) if (c) the district court has dismissed all claims over which this court has original jurisdiction. Because I have dismissed the federal claims in the action, I will exercise my discretion to decline supplemental jurisdiction. Accordingly, Count II negligent misrepresentation claim is dismissed without prejudice.

## VI. *Conclusion*

**\*36** For the reasons stated above, I conclude that plaintiffs have not established a genuine issue of material fact regarding essential elements of their Rule 10b-5 claim (Count I) and defendants are entitled to judgment as a matter of law. Accordingly, Defendant's Motion for Summary Judgement will be GRANTED as to Count I of the Second Consolidated Amended Complaint. Because the Rule 10b-5 claim has been dismissed, Plaintiff's derivative claim pursuant to § 20(a) against Defendants Campbell and Smith (Count I) must fail as well. Finally, pursuant to § 1367(c)(3) I decline to exercise supplemental jurisdiction over the state common law claim for negligent misrepresentation and Count II will be dismissed without prejudice.

## ORDER

AND NOW, this 16th day of April, 1997, upon consideration of the Motion for Summary Judgment submitted on behalf of Defendants Bell Atlantic Corporation, Raymond W. Smith, and Phillip A. Campbell; Plaintiff's Memorandum in Opposition to Defendants' Motion; Defendants Reply Memorandum in Support of their Motion; and Plaintiffs Supplemental Memorandum in Opposition to Defendants' Motion, for the reasons stated in the attached memorandum, it is ORDERED that Defendant's Motion for Summary Judgment is GRANTED. Judgment is hereby entered in favor of the Defendants and against the Plaintiffs in Count I. Count II is dismissed without prejudice.

E.D.Pa.,1997.
In re Bell Atlantic Corp. Securities Litigation
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 5



**H**Only the Westlaw citation is currently available.

United States Court of Appeals,
Tenth Circuit.
In re WILLIAMS SECURITIES LITIGATION-
WCG SUBCLASS.
**No. 07-5119.**

Feb. 18, 2009.

**Background:** Investors that bought stock or notes issued by telecommunications corporation between date on which corporation's spin-off from its parent company was announced and date on which corporation filed for bankruptcy protection brought securities fraud class action. The United States District Court for the Northern District of Oklahoma, <u>Stephen P. Friot</u>, J., <u>496 F.Supp.2d 1195</u>, granted summary judgment for defendants. Investors appealed.

**Holdings:** The Court of Appeals, <u>McConnell</u>, Circuit Judge, held that:
<u>(1)</u> determination that expert's loss causation theory premised upon unspecified leakages of corrective information was unreliable was not abuse of discretion;
<u>(2)</u> determination that expert's loss causation theory premised on corrective disclosures was unreliable was not abuse of discretion; and
<u>(3)</u> investors failed to establish loss causation.

Affirmed.

West Headnotes

**[1] Securities Regulation 349B** **60.18**

<u>349B</u> Securities Regulation
    <u>349BI</u> Federal Regulation
        <u>349BI(C)</u> Trading and Markets
            <u>349BI(C)7</u> Fraud and Manipulation
                <u>349Bk60.17</u> Manipulative, Deceptive or Fraudulent Conduct
                    <u>349Bk60.18</u> k. In General. <u>Most Cited Cases</u>
In a private securities fraud action, plaintiff must prove (1) that defendants made a material misrepresentation or omission, (2) with scienter, (3) in connection with the purchase or sale of a security, (4) upon which plaintiff relied, (5) that plaintiff suffered an economic loss, and (6) that the material misrepresentation was the cause of that loss. Securities Exchange Act of 1934, § 10(b), <u>15 U.S.C.A. § 78j(b)</u>; <u>17 C.F.R. § 240.10b-5</u>.

**[2] Securities Regulation 349B** **60.47**

<u>349B</u> Securities Regulation
    <u>349BI</u> Federal Regulation
        <u>349BI(C)</u> Trading and Markets
            <u>349BI(C)7</u> Fraud and Manipulation
                <u>349Bk60.43</u> Grounds of and Defenses to Liability
                    <u>349Bk60.47</u> k. Causation; Existence of Injury. <u>Most Cited Cases</u>
Alleging that stock price has been inflated as a result of a misrepresentation is not enough to prove loss causation element of securities fraud claim, even if plaintiff has suffered a loss, unless plaintiff can identify a causal connection between the loss and the misrepresentation. Securities Exchange Act of 1934, § 10(b), <u>15 U.S.C.A. § 78j(b)</u>; <u>17 C.F.R. § 240.10b-5</u>.

**[3] Securities Regulation 349B** **60.47**

<u>349B</u> Securities Regulation
    <u>349BI</u> Federal Regulation
        <u>349BI(C)</u> Trading and Markets
            <u>349BI(C)7</u> Fraud and Manipulation
                <u>349Bk60.43</u> Grounds of and Defenses to Liability
                    <u>349Bk60.47</u> k. Causation; Existence of Injury. <u>Most Cited Cases</u>

**Securities Regulation 349B** **60.62**

<u>349B</u> Securities Regulation
    <u>349BI</u> Federal Regulation
        <u>349BI(C)</u> Trading and Markets
            <u>349BI(C)7</u> Fraud and Manipulation
                <u>349Bk60.60</u> Evidence
                    <u>349Bk60.62</u> k. Presumptions and Burden of Proof. <u>Most Cited Cases</u>
Securities fraud plaintiff bears the burden of showing

--- F.3d ----

--- F.3d ----, 2009 WL 388048 (C.A.10 (Okla.))

**(Cite as: 2009 WL 388048 (C.A.10 (Okla.)))**

that his losses were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price, and plaintiff cannot succeed without showing a causal connection that specifically links losses to misrepresentations. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[4] Evidence 157 ☞508**

157 Evidence
   157XII Opinion Evidence
     157XII(B) Subjects of Expert Testimony
      157k508 k. Matters Involving Scientific or Other Special Knowledge in General. Most Cited Cases

**Evidence 157 ☞555.2**

157 Evidence
   157XII Opinion Evidence
     157XII(D) Examination of Experts
      157k555 Basis of Opinion
       157k555.2 k. Necessity and Sufficiency. Most Cited Cases
Before admitting expert testimony, district court must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[5] Evidence 157 ☞555.2**

157 Evidence
   157XII Opinion Evidence
     157XII(D) Examination of Experts
      157k555 Basis of Opinion
       157k555.2 k. Necessity and Sufficiency. Most Cited Cases
In performing its gatekeeper role with regard to admission of expert testimony, district court must assess the reasoning and methodology underlying the expert's opinion, then determine whether it is scientifically valid and applicable to a particular set of facts. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[6] Federal Courts 170B ☞823**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent

      170BVIII(K)4 Discretion of Lower Court
       170Bk823 k. Reception of Evidence. Most Cited Cases
Court of Appeals reviews district court's decision to admit or deny expert testimony for abuse of discretion. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[7] Evidence 157 ☞555.5**

157 Evidence
   157XII Opinion Evidence
     157XII(D) Examination of Experts
      157k555 Basis of Opinion
       157k555.5 k. Cause and Effect. Most Cited Cases
Determination that expert's loss causation theory, which was premised upon unspecified leakages of corrective information concerning corporation's financial condition that led to gradual exposure of defendants' purported fraud, was unreliable, and thus inadmissible, was not abuse of discretion in investors' securities fraud class action, given expert's failure to explain how truth regarding defendants' alleged misrepresentations was revealed to the market and to link that revelation of the truth to a corresponding loss. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5; Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[8] Securities Regulation 349B ☞60.47**

349B Securities Regulation
   349BI Federal Regulation
     349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
       349Bk60.43 Grounds of and Defenses to Liability
       349Bk60.47 k. Causation; Existence of Injury. Most Cited Cases
Loss causation theory offered to establish securities fraud claim must include some mechanism for how truth was revealed to the market; plaintiff cannot simply state that the market had learned the truth by a certain date and, because the learning was a gradual process, attribute all prior losses to the revelation of the fraud. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[9] Securities Regulation 349B ☞60.63(2)**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.60 Evidence
                    349Bk60.63 Weight and Sufficiency
                        349Bk60.63(2) k. Misrepresenta-
tion, Nondisclosure, and Insider Trading. Most Cited
Cases
Although expert's testimony that a security's value
has been inflated by fraud throughout the class period
for securities fraud claim may be relevant for show-
ing transaction causation, it does not show loss causa-
tion. Securities Exchange Act of 1934, § 10(b), 15
U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.


**[10] Securities Regulation 349B** 🗝️**60.47**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.43 Grounds of and Defenses
to Liability
                    349Bk60.47 k. Causation; Existence
of Injury. Most Cited Cases
Any reliable theory of loss causation using corrective
disclosures offered in support of securities fraud
claim must show both that corrective information was
revealed and that this revelation caused the resulting
decline in price, and, to be corrective, the disclosure
need not precisely mirror the earlier misrepresenta-
tion, but it must at least relate back to the misrepre-
sentation and not to some other negative information
about the company. Securities Exchange Act of 1934,
§ 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.


**[11] Evidence 157** 🗝️**555.5**

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.5 k. Cause and Effect. Most
Cited Cases
Determination that expert's loss causation theory
premised on corrective disclosures was unreliable,
and thus inadmissible, in securities fraud class action
was not abuse of discretion, given that theory failed
to identify the mechanism by which alleged fraud
was revealed to the market, that expert conceded that

market already knew of alleged misrepresentations
before four disclosures upon which he relied had oc-
curred, and that expert did not account for fact that
such disclosures contained non-fraud-related infor-
mation which could also have affected corporation's
value. Securities Exchange Act of 1934, § 10(b), 15
U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5; Fed.Rules
Evid.Rule 702, 28 U.S.C.A.


**[12] Securities Regulation 349B** 🗝️**60.47**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.43 Grounds of and Defenses
to Liability
                    349Bk60.47 k. Causation; Existence
of Injury. Most Cited Cases
There was no evidence that declines in value of cor-
poration's stock and notes was caused by revelations
of defendants' alleged fraud, such that fraud caused
investors' loss, rather than some other factor, as re-
quired for investors to establish securities fraud
claims. Securities Exchange Act of 1934, § 10(b), 15
U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.
Jonathan E. Bridges, Susman Godfrey LLP, Dallas,
TX (William Christopher Carmody, John W. Turner,
and Jeremy J. Brandon, Susman Godfrey LLP, Dal-
las, TX; Joshua H. Vinik, Matthew A. Kupillas, and
Kent A. Bronson, Milberg Weiss LLP, New York,
NY; and Behram V. Parekh, Yourman Alexander &
Parekh LLP, Los Angeles, CA, with him on the
briefs), for Plaintiffs-Appellants.


James L. Kincaid, Crowe & Dunlevy, Tulsa, OK
(Michael J. Gibbens, Victor E. Morgan, Susan E.
Huntsman, Crowe & Dunlevy, Tulsa, OK and Mary
H. Tolbert, Crowe & Dunlevy, Oklahoma City, OK,
with him on the brief) for Defendants-Appellees
Howard E. Janzen, Scott E. Schubert, Kenneth Kin-
near II, Matthew W. Bross, Bob F. McCoy, Howard
S. Kalika, John C. Bumgarner Jr., and Frank M.
Semple.


Theodore J. Boutrous, Jr., Gibson, Dunn & Crutcher
LLP, Los Angeles, CA (Julian W. Poon, Gibson,
Dunn & Crutcher LLP, Los Angeles, CA; Timothy
K. Roake and Ethan D. Dettmer, Gibson, Dunn &
Crutcher LLP, Palo Alto, CA; and Graydon Dean
Luthey, Jr. and Sarah Jane Gillett, Hall, Estill, Hard-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

wick, Gable, Golden & Nelson, P.C., Tulsa, OK, with him on the brief), for Defendants-Appellees The Williams Companies, Inc. and Keith E. Bailey.

Before McCONNELL, ANDERSON, and BALDOCK, Circuit Judges.

McCONNELL, Circuit Judge.

**\*1** On July 24, 2000, The Williams Companies, Inc. ("WMB") announced that it would be spinning off its telecommunications subsidiary, Williams Communications Group ("WCG"), in a move that it called "the best way to ensure that both our energy and communications businesses have the efficient and effective access to the capital necessary to pursue the substantial growth that each enjoys."Not two years later, on April 22, 2002, WCG filed for bankruptcy and its stock hit $0.06. A nationwide class of plaintiffs who purchased stock or notes issued by WCG between those dates brought fraud claims under § 10(b) and § 20(a) of the Securities Exchange Act and Rule 10b-5. The district court found genuine issues of material fact as to falsity, materiality, and scienter in connection with numerous alleged misrepresentations, but granted the defendants' motion for summary judgment on the issues of loss causation and damages. The plaintiffs had attempted to prove the latter with the expert testimony of Dr. Blaine Nye, but the court found his testimony unreliable under _Daubert_ because his theories of loss causation could not distinguish between loss attributable to the alleged fraud and loss attributable to non-fraud related news and events. The plaintiffs appeal the exclusion of Dr. Nye's testimony and the grant of summary judgment.[FN1]We affirm.

## I. BACKGROUND

### A. The Rise and Fall of WCG

As an energy company that produces and transports natural gas, WMB owns a large network of pipelines. In the 1980s, it began running fiber-optic cable through decommissioned pipelines and formed a telecommunications subsidiary that built a coast-to-coast network. It sold that subsidiary in 1995 and entered into a temporary non-compete agreement that prevented it from reentering the telecommunications industry until 1998. During this interim, telecommunications stocks continued to rise, with the Telecom

Index growing from 215.71 at the beginning of 1997 to 306.60 by that year's end, an increase of 42%. When the non-compete agreement expired, WMB formed a new subsidiary, WCG, that set out to build a nationwide fiber-optic network using the decommissioned pipeline that WMB still owned. In October, 1999, when the Telecom Index had reached 616.80, WCG conducted an IPO to raise additional capital for its network expansion. Over the next few months both WCG's share price and the Telecom Index climbed even higher, with WCG peaking at $61.81 on March 7, 2000, and the Telecom Index peaking three days later at 1248.06.

At that point, WCG's stock price began to decline, and by July 21, 2000 had fallen more than 50% to $29.38. During that same period the Telecom Index declined 28%. On July 24, 2000-the first day of the class period-WMB announced that it would spin off WCG, making it a stand-alone company. WCG's stock was trading at $28.50 that day.

The plaintiffs allege that WMB, WCG, and various corporate officers publicly misrepresented the reasons for the spin-off, the prospects for WCG's survival as a stand-alone company, and the adequacy of WCG's capitalization. Publicly, for instance, WMB issued a press release saying, "Our energy and communications businesses have tremendous opportunities before them. Creating the most effective and efficient access to capital will help fuel that growth, and we believe that can best be achieved by creating two independent businesses."Private discussions within the WMB board, however, seem to show that the true reason for the spin-off was that WCG's growing capital needs were a drain on WMB's balance sheet, and that WMB needed to "heave the junk called WCG overboard as fast as possible."WMB's CEO, Defendant Keith Bailey, told shareholders that WCG was "strongly positioned for success" with "the financial resources in place to enable it to deliver on the promise of a very bright future."He announced that WCG was "pre-funded for their capital needs ... to carry them to that point of EBITDA positive," and during the road show, senior executives said that the spin-off "better enables each company to execute its respective business plan"; "optimizes access to capital"; and "creates a Win-Win for WMB and WCG shareholders."Internally, however, there seems to have been much more pessimism about the continuing availability of enough capital to satisfy WCG's appetite. Offi-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

cers were warning that WCG was "still approxi-
mately $800 million under-funded through the end of
2001," and that WCG did not have "any choice at this
point other than going on a rigid, essential need only
capital diet while [it] restore[d] capital capacity
through operating performance and selling non core
assets."In short, Plaintiffs allege that the Defendants'
public statements painted a rosy view of WCG's fu-
ture prospects as an independent company, when in
reality its need for capital and growing debt not only
called future profitability into doubt, but was indeed
the motivation for the spin-off itself.

**2** This gap between the public statements and inter-
nal assessments continued up to and after the spin-off
occurred on April 23, 2001. In August 2001, for in-
stance, WCG publicly announced that it "continues to
project ... becoming free cash flow positive by year-
end 2003," and its CEO, Howard Janzen, said that,
"With funding that takes us into 2004, a plan to be
free cash flow positive by the end of 2003, and the
right team and strategy in place, we are positioned to
not only survive the current shakeout, but thrive in
the years to come."At the same time, internal assess-
ments recognized that WCG's lack of funding was
growing more and more worrisome in light of its
large amount of debt. A presentation to the board in
August 2001 said that, "[f]rom a financial standpoint
we realize the cash generated from our business is
insufficient to service our debt."The WCG board
considered a number of options for generating addi-
tional cash to service the company's debt, but none
seemed feasible. WCG's stock price continued to
decline, and by the end of 2001 it was trading at
$2.35 per share. The Telecom Index had fallen to
236.63.

On January 29, 2002, WMB issued a press release
announcing the delay of its 2001 earnings report
pending assessment of WMB's contingent obligations
with respect to WCG. WCG's stock fell from $1.63 to
$1.34. That same day, one of WCG's competitors
wrote down $3.2 billion worth of assets, and the day
before another of WCG's competitors announced
bankruptcy. Also that day, Milberg Weiss filed the
first of the lawsuits that would later be consolidated
into the present case. On February 4, 2002, WCG
issued a press release announcing that its lenders had
informed WCG that it might be in default, and that
WCG was performing a review of the possible im-
pairment of its long-lived assets. The stock price fell

from $1.42 to $1.00. On February 25, 2002, WCG
issued another press release. This time it announced
that it was considering the potential benefits of a
Chapter 11 bankruptcy. The stock price fell to $0.22.
After the market closed on April 22, 2002, WCG
filed for bankruptcy. At the end of the next day, its
stock closed at $0.06.

**B. Dr. Nye's Testimony**

The controversy in the present case concerns the
Plaintiffs' ability to present a theory of loss causation.
While the district court agreed that triable issues of
fact existed with regard to whether the defendants
made misrepresentations, whether they knew they
were false, and whether those misrepresentations
were material, the Plaintiffs also bore the burden of
demonstrating that the decline in the price of WCG
stock and notes was attributable to a draining of the
fraud premium. Their one expert on the subject, Dr.
Nye, presented two basic scenarios.[FN2]

**1. Scenario 1**

In Scenario 1, Dr. Nye used a "leakage theory" to
identify the losses that could be attributed to the dis-
closure of the fraud. Under this theory, the fraud was
not revealed to the market by a single corrective dis-
closure, but instead "the leakage of WCG's true fi-
nancial condition and prospects during the Class Pe-
riod revealed the risks that had been concealed by the
prior misrepresentations."Nye Rpt. ¶ 110. The losses
"were caused by the materialization of the concealed
risks, specifically that WCG's assets were overstated,
that WCG was in default of its debt covenants, and
that there was significant uncertainty about WCG's
ability to continue as a going concern."Id. Scenario 1
posited that WCG's true value, had the defendants not
made their rosy statements about WCG's prospects,
was its value upon declaring bankruptcy. Dr. Nye
therefore began with the $0.06 at which WCG was
trading upon filing for bankruptcy, and then incorpo-
rated the movements of the market and industry back
to July 24, 2000, the first day of the class period. Do-
ing this, he concluded that WCG's true value on the
day WMB announced the spin-off was not $28.50,
but $0.56. Id. at ¶ 108.Under Scenario 1, Dr. Nye
attributed almost all of WCG's value-ninety-eight
percent-to the fraud, and assumed that almost the
entire decline in price was the result of the truth
gradually leaking into the market, despite the fact that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----
--- F.3d ----, 2009 WL 388048 (C.A.10 (Okla.))
 **(Cite as: 2009 WL 388048 (C.A.10 (Okla.)))**

the decline in WCG share price closely correlated with the overall decline in the telecommunications industry as a whole.

**\*3** The district court found Scenario 1 an unreliable method for identifying the loss attributable to the alleged fraud. For one thing, while Dr. Nye claimed to remove the market and industry effects on the value of WCG stock and notes, he "[did] not even purport, in Scenario 1, to have removed the effects of '[n]onfraud company-specific information.' " Dist. Op. at 113. Instead, Scenario 1 attributed any decline in WCG's value that was independent of market and industry effects to the exposure of the fraud. This "fail[ed] to differentiate between losses rooted in causes cognizable under loss causation doctrine, on one hand, and, on the other hand, losses attributable to industry-specific stresses, the meltdown in the telecommunications sector, and other negative developments unrelated to the alleged fraud."*Id.* at 114.The district court's second objection to Scenario 1 was that Dr. Nye had not identified any public disclosures before January 29, 2002 that even arguably alerted the market to the fraud, other than to say that disclosures occurred "every day." *Id.* at 113."Thus, remarkably, he has not identified either fraud or non-fraud related news (much less parsed the effects of the two) for the class period through January 28, 2002," even though loss causation requires proof that a market decline was the result of the revelation of a misrepresentation or omission. *Id.* at 114.

### 2. Scenario 2-alternative

Scenario 2-alternative (and the corresponding Notes Scenario 2) was based upon a "corrective disclosure" theory. Here, Dr. Nye focused on the price declines after four specific public disclosures: WMB's delay of its earnings report on January 29; WCG's February 4 announcement that it might be in default; WCG's February 25 announcement that it was considering bankruptcy; and WCG's actual filing for bankruptcy on April 25, 2002. Dr. Nye calls these four announcements "partial disclosures," as they did not precisely mirror the alleged misrepresentations but nonetheless "revealed the risks that had been concealed by the prior misrepresentations and omissions," and therefore "Plaintiffs' losses were caused by the materialization of the concealed risks."Nye Rpt. at ¶ 121. Dr. Nye attributed the decline in value after each corrective disclosure, net of market and

industry effects that he purported to isolate through a regression analysis,[FN3] to the revelation of fraud.

The district court found Scenario 2-alternative unreliable because "it is not supported by a showing of material, new, company-specific and fraud-related information that became available to the efficient market on January 29, 2002 or on the three subsequent corrective disclosure dates proposed by plaintiffs."Dist. Op. at 121. The "new" was in reference to the fact that Milberg Weiss had filed the *Cali* complaint on that day, alleging the very fraud that was allegedly exposed. The district court believed that if the information had been sufficiently exposed such that Milberg Weiss was able to file its detailed allegations of fraud, then Dr. Nye's claim that "new" information was being revealed to the market was dubious-especially considering that the share price did not significantly drop. *Id.* at 116-18.Furthermore, Scenario 2-alternative suffered from the same flaws as Scenario 1: Dr. Nye did not distinguish between declines attributable to disclosures of fraud and declines attributable to non-fraud-related company-specific information.

### C. Summary Judgment

**\*4** After excluding Dr. Nye's expert testimony as unreliable under *Daubert,* the district court determined that the Plaintiffs had "failed to present evidence sufficient to raise a triable issue as to loss causation."*Id.* at 162.For largely the same reasons that it excluded Dr. Nye's testimony, the court found that the Plaintiffs had failed to present evidence of a causal connection between the decline in value and the exposure of the misrepresentations, and had failed to separate fraud-related losses from losses attributable to other factors. It therefore granted the Defendants' motion for summary judgment. *Id.* at 163.The Plaintiffs now appeal both the court's *Daubert* ruling and the grant of summary judgment.

### II. DISCUSSION

### A. Loss Causation Under *Dura*

[1] In a private securities fraud action the plaintiff must prove that the defendants (1) made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) upon which the plaintiff relied; (5) that the plain-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tiff suffered an economic loss; and (6) that the material misrepresentation was the cause of that loss. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, -- - U.S. ----, 128 S.Ct. 761, 768, 169 L.Ed.2d 627 (2008).* The sixth element is commonly referred to as "loss causation." *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 197 (2d Cir.2003)* ("Loss causation ... is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."); *cf.Pasley v. Freeman,* 100 Eng. Rep. 450, 457 (1789) (" If, indeed, no injury is occasioned by the lie, it is not actionable: but if it be attended with a damage, it then becomes the subject of an action.").

[2] Before 2005, there was some confusion amongst the courts as to what exactly plaintiffs had to show in order to prove loss causation, with the Ninth Circuit holding that a plaintiff need only show "that the price on the date of purchase was inflated because of the misrepresentation," *Knapp v. Ernst & Whinney,* 90 F.3d 1431, 1438 (9th Cir.1996), and other circuits holding that an "allegation of a purchase-time value disparity, standing alone, cannot satisfy the loss causation pleading requirement," *Emergent Capital,* 343 F.3d at 198.The Supreme Court resolved the confusion in *Dura Pharmaceuticals, Inc. v. Broudo* by rejecting the Ninth Circuit approach and holding that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." 544 U.S. 336, 342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Alleging that price has been inflated as a result of a misrepresentation is not enough-even if the plaintiff has suffered a loss-unless the plaintiff can identify a "causal connection" between the loss and the misrepresentation. *Id.* at 347, 125 S.Ct. 1627.

[3] Even if the truth has made its way into the marketplace, *Dura* requires that a plaintiff show that it was this revelation that caused the loss and not one of the "tangle of factors" that affect price. *Id.* at 343, 125 S.Ct. 1627.

**\*5** When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.

*Id.* at 342-43, 125 S.Ct. 1627.The securities laws are not meant to "provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Id.* at 345, 125 S.Ct. 1627.The plaintiff bears the burden of showing that his losses were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price. Without showing a causal connection that specifically links losses to misrepresentations, he cannot succeed.

**B. Dr. Nye's Testimony**

[4][5][6] Before expert testimony can be admitted, Federal Rule of Evidence 702 requires the district court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)."In performing this gatekeeper role, the judge must assess the reasoning and methodology underlying the expert's opinion, then determine whether it is scientifically valid and applicable to a particular set of facts." *Burlington Northern and Santa Fe Ry. Co. v. Grant,* 505 F.3d 1013, 1030 (10th Cir.2007).*See also Daubert,* 509 U.S. at 591, 113 S.Ct. 2786 (instructing district courts to consider the relevance, or "fit," of the testimony in resolving the factual dispute). The question before us is whether either of Dr. Nye's methods could reliably link the class's losses to the revelation of the alleged misrepresentations, as *Dura* requires. We review the district court's decision to admit or deny testimony for abuse of discretion. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Burlington Northern,* 505 F.3d at 1030.

**1. Scenario 1**

Loss causation is easiest to show when a corrective disclosure reveals the fraud to the public and the price subsequently drops-assuming, of course, that the plaintiff could isolate the effects from any other intervening causes that could have contributed to the decline. *See, e.g., In re Winstar Commc'ns,* 2006 WL 473885, at *15 (S.D.N.Y. Feb.27, 2006). *Dura* did not suggest that this was the only or even the preferred method of showing loss causation, though; it acknowledged that the relevant truth can "leak out,"

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Dura,* 544 U.S. at 342, 125 S.Ct. 1627, which would argue against a strict rule requiring revelation by a single disclosure. *See In re Seitel, Inc. Sec. Litig.,* 447 F.Supp.2d 693, 711 (S.D.Tex.2006) ("[T]he Supreme Court did not adopt the argument that a plaintiff must show that the stock price declined due to a specific corrective disclosure or financial restatement."); *In re Bradley Pharm., Inc. Sec. Litig.,* 421 F.Supp.2d 822, 828 (D.N.J.2006) (rejecting argument that *Dura* mandates a corrective disclosure method for proving loss causation); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.,* 439 F.Supp.2d 692, 701 (S.D.Tex.2006). By premising Scenario 1 on a leakage theory rather than a corrective disclosure theory, therefore, Dr. Nye's methodology does not automatically run afoul of *Dura.*

**\*6** [7][8] To satisfy the requirements of *Dura,* however, any theory-even a leakage theory that posits a gradual exposure of the fraud rather than a full and immediate disclosure-will have to show some mechanism for how the truth was revealed. *See In re Worldcom Inc. Sec. Litig.,* 2005 WL 2319118, at \*23 (S.D.N.Y. Sept.21, 2005) ("[Plaintiff must] establish that his losses were attributable to *some form of revelation to the market* of the wrongfully concealed information") (emphasis added). A plaintiff cannot simply state that the market had learned the truth by a certain date and, because the learning was a gradual process, attribute all prior losses to the revelation of the fraud. The inability to point to a single corrective disclosure does not relieve the plaintiff of showing how the truth was revealed; he cannot say, "Well, the market *must* have known."

It was precisely this failure to describe how the market was alerted to the fraud between July 24, 2000 (the first day of the class period) and January 29, 2002 (the day of the first potential corrective disclosure) that led the district court to reject Scenario 1 as unreliable. At one point Dr. Nye argued that a number of tiny corrective disclosures occurred each and every day of the class period, which had the cumulative effect of gradually disclosing the fraud.

A [Dr. Nye]: I think under Scenario 1 I say that corrective disclosures are throughout the Class Period on the beginning of the Class Period.

Q: Okay. And on what days were there corrective disclosures under Scenario 1?

A: Scenario 1, every day. In other words, the whole thing is a manipulated period.

Nye Dep. 51. He even submitted a 1300-page compendium of news articles, reports, and SEC filings that was supposed to show "numerous instances of leakage of corrective information concerning WCG's true financial condition."Dist. Op. 99 The majority of these allegedly corrective disclosures, however, were actually either news that was generally applicable to the telecommunications industry as a whole, or was an upbeat rather than negative statement about WCG. Dist. Op. 99-100. As it would be difficult to characterize an announcement that contained no negative information about WCG as revelatory of the truth about WCG's grim prospects, we cannot say that the district court abused its discretion in rejecting the theory that these disclosures leaked the truth to the market.

The primary justification for Scenario 1, however, was not that any specific disclosure alerted the market to the fraud, but that the fraud was revealed once the previously concealed risks materialized. According to Dr. Nye, "Plaintiffs' losses were caused by the materialization of the concealed risks, specifically that WCG's assets were overstated, that WCG was in default of its debt covenants, and that there was significant uncertainty about WCG's ability to continue as a going concern."Nye. Rpt. ¶ 110. The problem is that Dr. Nye identifies no point between July 24, 2000 and January 29, 2002 when these concealed risks *did* materialize. While the truth could be revealed by the actual materialization of the concealed risk rather than by a public disclosure that the risk exists, *see Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 173 (2d Cir.2005) (loss can be caused by "materialization of the concealed risk"), any theory of loss causation would still have to identify when the materialization occurred and link it to a corresponding loss.

**\*7** [9] Plaintiffs argue that Scenario 1 was "reasonable in light of Nye's premise that WCG's true, non-inflated share price on each day of the class period was very low."Aplt. Br. 60. In other words, because Dr. Nye opined that WCG's true value was at the level the company was trading on the day it declared bankruptcy, any decline in price before bankruptcy must have resulted from the draining of the fraud

premium. While an expert's testimony that a security's value has been inflated by fraud throughout the class period could be relevant for showing transaction causation, it does not show loss causation. *See Lentell,* 396 F.3d at 175 (allegations that "market price of [the] securities was artificially inflated" and that "securities were acquired at 'artificially inflated prices' " may establish transaction causation, but do not establish loss causation). Loss causation requires a showing of more than an artificially inflated price and subsequent decline. *Dura,* 544 U.S. at 342, 125 S.Ct. 1627. Until the fraud is revealed the purchasers actually *benefit* from the inflation and therefore have no legally compensable injury.

Dr. Nye's Scenario 1 bootstraps from the conclusion that WCG was essentially valueless from the start to a scenario where any decline was a "recognition" of this truth and therefore a draining of the fraud premium. He fails, however, to identify any causal link between the revelation of the truth and the decline in price from July 24, 2000 to January 28, 2002. WCG's share price fell from $28.50 to $1.63 during that period, and while Dr. Nye could not explain how the market learned of the fraud over that year-and-a-half, he claimed that the decline must have resulted from its revelation and not from the "tangle of factors" that affect a company's stock price-despite the fact that the same period witnessed the bankruptcies of WCG competitors, a decline in the telecommunications industry as a whole, and the overall market declines that followed the 9/11 terrorist attacks. *See Dura,* 544 U.S. at 343, 125 S.Ct. 1627 ("Other things being equal, the longer the time between the purchase and sale, the more likely that ... other factors caused the loss."). This failure to show a causal connection between the fraud and the loss would turn the securities laws into just the sort of "broad insurance against market losses" that *Dura* rejected. *Id.* at 345, 125 S.Ct. 1627. We cannot say that the district court abused its discretion in finding that Dr. Nye's failure to explain how the truth was revealed to the market and failure to then link the revelation of truth to a corresponding loss made his theory unreliable.

## 2. Scenario 2-Alternative

While Plaintiffs preferred Scenario 1 because it would allow them to recover for the entire decline in WCG stock price, including the year-and-a-half decline from $28.50 to $1.63, Dr. Nye also provided a more modest method for demonstrating loss causation that would identify specific corrective disclosures rather than conclusively assert a leakage of the relevant information. He identified four such disclosures that occurred in the early months of 2002: WMB's January 29 announcement that it was assessing its contingent obligations related to WCG; WCG's February 4 announcement that its lenders had informed WCG that it might be in default; WCG's February 25 announcement that it was considering Chapter 11; and WCG's April 22 filing for said bankruptcy. The district court found Dr. Nye's attempt at identifying corrective disclosures inadequate, however, because Scenario 2-alternative was "not supported by a showing of material, new, company-specific and fraud-related information that became available to the efficient market on January 29, 2002 or on the three subsequent corrective disclosure dates proposed by the plaintiffs." Dist. Op. at 121. In other words, Dr. Nye had not shown why these disclosures should be considered "corrective" such that corresponding losses could be reliably attributed to the revelation of fraud rather than other factors.

**\*8** [10] Any reliable theory of loss causation that uses corrective disclosures will have to show both that corrective information was revealed and that this revelation caused the resulting decline in price. To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company. *See Caremark, Inc. v. Coram Healthcare Corp.,* 113 F.3d 645, 649 (7th Cir.1997) (stating that loss causation can be proved by showing defendant "made a fraudulent misstatement and that *this misstatement* was responsible for its damage") (emphasis added). Dr. Nye himself, however, could not tie these four particular disclosures to any of the alleged misrepresentations or describe why they should be considered "corrective." In his deposition, he admitted, "I have not tied those four things specifically to allege[d] misrepresentations." Nye Dep. at 140. Plaintiffs offer an explanation for his failure: that these four disclosures revealed the same relevant truth, which was that "WCG likely would not be able to repay its debt as scheduled and, therefore, its assets likely would not provide a return to equity investors." Aplt. 47.

At its heart, Scenario 2-alternative suffers from the same defect as Scenario 1: because Dr. Nye begins

with the assumption that WCG was virtually value-less and that any decline in value drained the fraud premium, he labels any negative information about WCG a corrective disclosure and attributes all result-ing losses to the revelation of fraud rather than other possible factors. As with Scenario 1, we must again be careful not to connect each and every bit of nega-tive information about a company to an initial mis-representation that overstated that company's chances for success. *See* In re Motorola Sec. Litig., 505 F.Supp.2d 501, 546 (N.D.Ill.2007) ("[T]he standard cannot be so lax that every announcement of negative news becomes a potential 'corrective disclosure.' "). At the same time, if we are too exacting in our de-mands for a connection between the initial misrepre-sentation and subsequent revelation-for instance, by imposing a mirror image requirement, or insisting that the sources of the two disclosures be the same-then we would eliminate the possibility of 10b-5 claims altogether. The Second Circuit has described the balancing act as asking whether "the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." Lentell, 396 F.3d at 173 (ital-ics omitted).

Scenario 2-alternative alleges that the fraud was re-vealed by four public announcements that gradually unveiled the truth that WCG was virtually worthless. While the scenario depends upon the cumulative ef-fect of all four disclosures, we will discuss each of them individually. A close inspection of each alleg-edly corrective disclosure shows that the district court did not abuse its discretion in finding that the truth they revealed was not sufficiently within the zone of risk such that Dr. Nye could show that it was the revelation of the fraud, and not other factors, that caused the subsequent declines in price.

### a. January 29, 2009 Disclosure

*9 Dr. Nye's first corrective disclosure is a press re-lease in which WMB announced it would delay the reporting of its fourth-quarter and year-end financial statements while it re-evaluated the status of certain contingent liabilities it had with respect to WCG. The share price fell 17.8% that day, from $1.63 to $1.34, though Dr. Nye acknowledges that "it was not a sig-nificant [negative] return as the market fell 2.5% that day, and the industry was down that day."Nye Rpt. 43. That same day, Milberg Weiss filed its *Cali* com-

plaint, the first suit in the present case, which, as the district court said, "read together with the Milberg, Weiss press release of the same date, leaves very little to the imagination."Dist. Op. 116. The coinci-dence of the *Cali* complaint with Dr. Nye's first iden-tified corrective disclosure calls into question whether that day's drop in price can reliably be attrib-uted to the revelation that WMB and WCG had mis-represented WCG's financial viability and not some other factor.

While an announcement that WCG could be in de-fault on its debt obligations might fall within the zone of risk obfuscated by the alleged misrepresentations, the district court questioned whether Dr. Nye had any basis for saying that the January 29 announcement revealed new information to the market such that the disclosure can be said to have caused that day's loss. The fact that Milberg Weiss was able to assemble a complaint that very day and identify the very misrep-resentations in question would suggest that the mar-ket already had at least some knowledge of the fraud. Dr. Nye himself admits as much in his deposition:

Q: ... Did you ever consider whether the clients who have hired you in this case if they were able to make those allegations on January 29th, 2002, whether the rest of the market had information that they could have reached the same conclusions on that date?

A [Dr. Nye]: Did I ever think that?

Q: Yes.

A: Well, to the extent that Milberg Weiss came to that conclusion based on public information, then I-then I suppose the market could, too. Is that what the question was?

Q: Yes.

A: Seems like it, yeah. If indeed these are based on public information, then it's public information.

Q: And under your definition of an efficient market, [the *Cali* ] lawsuit and the factual allegations of that lawsuit would have been factored into the market price of WCG's securities, correct?

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

A: I think my definition of efficiency is the same pretty much as the definition of efficiency, and that is that the price-the market price reflects all publicly available information. So by definition, if it's publicly available information, it would be reflected in the market price.

Nye Dep. 38-39. Dr. Nye's acknowledgment that the market already knew of the alleged misrepresentations on the very day of the first corrective disclosure is in some tension with his claim that the market's movements that day were a reaction to the disclosure and not something else.

**\*10** There is of course a difference between public speculation of potential misrepresentation and insider confirmation. WMB's acknowledgment that WCG might be in default would likely affect the market more than the hunches of investors. That being said, this expert admittedly believed that the market *did* know this information prior to the January 29 disclosure, and the fact that the market seems already to have had at least some knowledge of the true condition of WCG's debt does suggest that an analysis of the January 29 drop should carefully consider whether other factors might have been at play. In fact, we know of at least one factor that was certainly at play-the filing of this lawsuit. Cf. *Teachers' Retirement Sys. of La. v. Hunter*, 477 F.3d 162, 187-88 (4th Cir.2007) (holding that the losses following the filing of a lawsuit were not a result of the facts disclosed in that suit but "more logically occurred because the market feared that a lawsuit" would independently harm the corporation). Scenario 2-alternative, however, makes no allowance for other non-fraud related causes for the January 29 losses. Thus, despite the fact that Dr. Nye believed that the market already had at least some knowledge of the fraud and the fact that he knew of other non-fraud related negative events that day, he made no attempt to show why those losses were entirely attributable to the revelation of fraud and nothing else. This is another manifestation of his belief that all negative information about WCG was a revelation of the fraud-he saw no need to separate fraud-related from non-fraud-related losses, because he assumed any and all losses were of the former variety.

### b. February 4, 2002 Corrective Disclosure

Dr. Nye's second corrective disclosure was a WCG

press release that contained two announcements: 1) that WCG's lenders had informed the company that it might be in default under its credit arrangements, and 2) that WCG was performing a review of the possible impairment of its long-lived assets. Again, as with the January 29 announcement, Dr. Nye's attribution of all of that day's losses to the revelation of fraud without considering other factors is unreliable, especially when there were clear indicators that other factors were at play. While Dr. Nye believed that by February 4 the market had at least some knowledge of the misrepresentations, and while the February 4 announcement included a significant piece of information that was unrelated to the fraud-that WCG was reviewing the possible impairment of its long-lived assets-he nonetheless drew a causal link between that day's decline in price and the market's learning of the fraud. He offered no explanation for why one would allot all of the February 4 decline to the revelation of fraud and not to another significant piece of negative information that was released that day. Cf. *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir.2007) ( "Plaintiffs have not alleged facts to show that [Defendant's] misstatements, among others ... that were much more consequential and numerous, were the proximate cause of plaintiffs' loss; nor have they alleged facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [Defendant's] misstatements."); *In re Omnicom, Inc. Sec. Litig.*, 541 F.Supp.2d 546, 553 (S.D.N.Y.2008) ("Plaintiffs nevertheless cannot demonstrate that the market reacted negatively to the disclosures, rather than to other information simultaneously released to the market."). Dr. Nye's failure to show why the February 4 losses should be attributed to the revelation of fraud and not other non-fraud related news renders his methodology unreliable.

### c. February 25 and April 22 Corrective Disclosures

**\*11** Dr. Nye's final two corrective disclosures were WCG's February 25 announcement that it was considering bankruptcy and its April 22 decision to actually file for Chapter 11. Plaintiffs argue that WCG's bankruptcy was within the zone of risk concealed by its earlier misrepresentations and that the losses that followed the bankruptcy can therefore be attributed to the revelation of the fraud. The risks had not fully materialized, they contend, until WCG actually filed for bankruptcy.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The zone of risk, however, is not infinite in size. The causal connection between false statements about a company's prospects and that same company's eventual bankruptcy years later is too remote to constitute a corrective disclosure. Cf. *D.E. & J. Ltd. P'ship v. Conaway,* 133 Fed. App'x 994, 1000 (6th Cir.2005) ("[T]he filing of a bankruptcy petition by itself does not a security fraud allegation make."). Bankruptcy might have been a possibility from the moment of the spinoff, and might even have been a likely possibility, but there are simply too many potential intervening causes to say that bankruptcy was WCG's legally foreseeable destiny such that its trading price at bankruptcy equaled its true value on the day the spinoff was announced. The alleged misstatements involved the risks of defaulting on debt and the true reasons that WCG was spun off from WMB; they did not involve the certainty of a bankruptcy. There are too many intervening factors at play-including the total meltdown of the telecommunications industry-to allow Dr. Nye to reliably equate bankruptcy with the risks that the original misstatements concealed. To do so would transform the securities laws into the kind of downside insurance policy that *Dura* warned against.

[11] Like his leakage theory, Dr. Nye's corrective disclosure theory fails to identify the mechanism by which fraud was revealed to the market. Though he points to four disclosures, he simultaneously concedes that the market knew of the misrepresentations even before those disclosures, and also makes no account for the fact that these disclosures contained non-fraud related information that would have also affected WCG's value. The district court did not abuse its discretion in finding Scenario 2-alternative an unreliable method for proving loss causation.

### C. Summary Judgment

[12] Plaintiffs argue that even if the district court did not abuse its discretion in excluding Dr. Nye's expert testimony, there was still a genuine issue of material fact as to loss causation such that the case should have proceeded to the jury. They contend that the jury could have reasonably drawn the very conclusions that Dr. Nye did and found that the losses were a result of either the leakage of the truth or the revelations made in the four corrective disclosures. These conclusions, however, would be no less speculative

and unreliable if reached by jurors than when reached by Dr. Nye. The fatal flaw still remains, which is that Plaintiffs have failed to present evidence suggesting that the declines in price were the result of the revelation of the truth and not some other factor. Given the evidence that the parties have presented, there is "simply no way for a juror to determine whether the alleged fraud caused any portion of Plaintiffs' loss." *In re Omnicom,* 541 F.Supp.2d at 554 (granting summary judgment). As Plaintiffs are unable to meet their burden under *Dura Pharmaceuticals,* we find that the district court appropriately granted the defendants summary judgment on the issue of loss causation.

### III. CONCLUSION

*12 The scenarios that Plaintiffs offered to explain loss causation failed to identify a causal nexus between the revelation of the previously-concealed truth and the decline in value of WCG securities. Because loss causation demands that plaintiffs show that their losses were caused by a revelation of the fraud and not some non-compensable cause, these scenarios do not adequately address the issue of loss causation. We therefore **AFFIRM** the district court's exclusion of Dr. Nye's expert testimony which employed these scenarios, and **AFFIRM** the grant of summary judgment for Defendants.

> FN1. Plaintiffs have also appealed the district court's award of deposition and copying costs to Defendants under 28 U.S.C. § 1920. *See In re Williams Securities Litigation,* Case No. 08-5100.That issue was separately briefed and will be addressed in a separate opinion.

> FN2. Dr. Nye actually presented three scenarios to explain the loss causation as related to the stock-Scenario 1, Scenario 2, and Scenario 2-alternative-and two similar scenarios to explain loss causation as related to the notes-Notes Scenario 1 and Notes Scenario 2. Scenario 2 and Scenario 2-alternative were both premised on a "corrective disclosure" theory, but Scenario 2 used a "constant percentage" method for measuring damages while Scenario 2-alternative used a "constant dollar" method. The Plaintiffs do not appeal the district court's rejec-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2009 WL 388048 (C.A.10 (Okla.))
 **(Cite as: 2009 WL 388048 (C.A.10 (Okla.)))**

tion of Scenario 2's constant percentage
method.

FN3. One distinction between the second
scenario as applied to the notes and the stock
is that Dr. Nye did not apply this regression
analysis to the notes and therefore did not at-
tempt to remove market and industry effects.
*See* Nye Rpt. ¶ 138.

C.A.10 (Okla.),2009.
In re Williams Securities litigation-WCG Subclass
--- F.3d ----, 2009 WL 388048 (C.A.10 (Okla.))

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**TAB 6**



**H**Only the Westlaw citation is currently available.

United States District Court,
M.D. North Carolina.
Brian JOHNSON, on Behalf of Himself and All Oth-
ers Similarly Situated, Plaintiff(s),
v.
POZEN INC., John R. Plachetka, Marshall Reese,
William L. Hodges, and Peter J. Wise, Defendant(s).
**No. 1:07CV599.**

Feb. 19, 2009.

Leslie Bruce McDaniel, McDaniel & Anderson, LLP,
Raleigh, NC, for Plaintiff.

Nicholas I. Porritt, Wilson Sonsini Goodrich &
Rosati, P.C., Washington, DC, Pressly McAuley Mil-
len, Womble Carlyle Sandridge & Rice, Raleigh, NC,
Barry M. Kaplan, Wilson Sonsini Goodrich & Rosati,
Seattle, WA, for Defendants.

**MEMORANDUM OPINION, RECOMMENDA-
TION, AND ORDER**

WALLACE W. DIXON, United States Magistrate
Judge.

**\*1** This matter is before the court on a motion to dis-
miss filed by Defendants Pozen Inc., John R. Pla-
chetka, Marshall Reese, William L. Hodges, and Pe-
ter J. Wise (docket no. 50).[FN1] Also pending before
the court is a request by the moving Defendants for
judicial notice of certain documents attached to the
motion to dismiss (docket no. 56), as well as a corre-
sponding motion filed by Plaintiffs to strike various
exhibits attached to Defendants' motion to dismiss
(docket no. 59). Also before the court is a request for
oral argument on the motion to dismiss filed by De-
fendants (docket no. 58). Finally, Plaintiffs have re-
quested that, in the event the Amended Complaint
does not allege a claim for securities fraud, they be
given the opportunity to amend the Amended Com-
plaint.

> FN1. Also referred to the court was a pend-
> ing motion to dismiss filed separately by

Defendant Peter Wise on June 26, 2008
(docket no. 52). On August 27, 2008, Plain-
tiffs voluntarily dismissed Wise as a Defen-
dant pursuant to Rule 41(a)(1) of the Federal
Rules of Civil Procedure (docket no. 64).
Therefore, the separate motion to dismiss by
Defendant Wise has been rendered moot.

*BACKGROUND*

This is a class action lawsuit in which the plaintiff
investors are suing a pharmaceutical company and
several of its officers for securities fraud. Lead Plain-
tiffs Plumbers' Union Local No. 12 Pension Fund and
Gilbert Rodriguez bring this securities class action on
behalf of themselves and a Class consisting of all
purchasers of the publicly traded securities of Pozen
Inc. between July 31, 2006, and August 1, 2007, in-
clusive (the "Class Period"), against Pozen and cer-
tain of its top officers seeking to recover damages
caused by Defendants' alleged violations of federal
securities laws and to pursue remedies under the Se-
curities Exchange Act of 1934 (the "Exchange Act").
(*See* Amended Compl., docket no. 47.)Plaintiffs al-
lege specifically that their claims arise under and
pursuant to sections 10(b) and 20(a) of the Exchange
Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5
promulgated thereunder (17 C.F.R. § 240.10b-5). The
Amended Complaint names as Defendants Pozen and
several of its top officers, including CEO John Pla-
chetka. Defendants have filed a motion to dismiss the
complaint.

*Plaintiffs' Motion to Strike Defendants' Exhibits on
Defendants' Motion to Dismiss*

I first note that Plaintiffs have filed a motion to strike
various exhibits attached to Defendants' motion to
dismiss. These exhibits include, among other things,
SEC filings, newspaper articles, Pozen press releases,
transcripts from conference calls, and a public FDA
guidance. Defendants have requested that the court
take judicial notice of these exhibits. In support of the
motion to strike the exhibits, Plaintiffs primarily ar-
gue that these exhibits are not properly before the
court on a motion to dismiss. Plaintiffs request that
the court strike these documents; alternatively, Plain-
tiffs ask the court to allow further discovery and to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

convert the motion to one for summary judgment.

Plaintiffs' motion to strike is denied. As Defendants note, because the motion to dismiss is brought in a securities fraud case that is governed by the pleading standards of the Private Securities Litigation Reform Act ("PSLRA"), the strict requirements of a typical Rule 12(b)(6) motion do not apply. That is, the court may and must consider a plaintiff's allegations in a securities fraud case in the context of the entire record. Indeed, in light of the recent Supreme Court case of _Tellabs, Inc. v. Makor Issues & Rights, Ltd.,_ 127 S.Ct. 2499 (2007), this circuit's court of appeals has observed:

**\*2** Plaintiffs insist that we should rely solely on their discrete allegations, and they urge us not to look beyond the complaint for additional facts. In particular, the complaint quotes selectively from various reports by investment analysts, and plaintiffs argue that we should not consider the reports in full. That argument is erroneous. While we must accept plaintiffs' factual allegations as true, the Supreme Court in _Tellabs_ held that we should not decide the issue of scienter by viewing individual allegations in isolation. Rather, we must examine the facts as a whole, including facts found in "documents incorporated into the complaint by reference."_Id._ Furthermore, plaintiffs nowhere challenge the authenticity of the analyst reports attached to defendants' motion to dismiss and cited in plaintiffs' complaint. Our consideration of such documents is undoubtedly proper.

_Cozzarelli v. Inspire Pharms., Inc.,_ 549 F.3d 618, 625 (4th Cir.2008).

Significantly, here, Plaintiffs do not dispute the accuracy of any of the exhibits submitted by Defendants on the motion to dismiss. Furthermore, the exhibits at issue are either explicitly referenced in the complaint, part of the public record, or included in the information that was publicly available to investors at the time of the alleged fraud. Here, Plaintiffs are alleging "fraud on the market." (_See_ Amended Compl. ¶¶ 154-55.) As Defendants note, in securities fraud cases courts routinely take judicial notice of newspaper articles, analysts reports, and press releases in order to assess what the market knew at particular points in time, even where the materials were not specifically referenced in the complaint. _See, e.g., In re Inspire_

_Pharms., Inc. Sec. Litig.,_ 515 F.Supp.2d 631, 637 (M.D.N.C.2007) (assessing the plaintiffs' falsity allegations in light of pre-class period disclosures by defendants and analyst reports describing clinical trial results); _Benak v. Alliance Capital Mgmt. L.P.,_ 435 F.3d 396, 401 n. 15 (3d Cir.2006) (taking judicial notice of newspaper articles to establish what the market knew).

As this circuit's court of appeals noted in _Cozzarelli,_ the Supreme Court in _Tellabs_ clarified that in a securities fraud case a court must consider alleged false statements in the context of the entire record, and this may include the same types of documents that Defendants have presented to support their motion to dismiss. Therefore, I will deny the motion to strike and consider the motion to dismiss in light of all of the evidence in the record.[FN2] The following facts, while taken primarily from Plaintiffs' Amended Complaint, also incorporate various exhibits presented by Defendants in support of the motion to dismiss.

> [FN2.] To this extent, I grant the moving Defendants' request to take judicial notice of the documents attached to the motion to dismiss. _See_FED.R.EVID. 201. Furthermore, I note that the Amended Complaint is 79 pages long with no less than 180 paragraphs. The parties have narrowed down the pertinent issues and facts in their respective briefs. I, therefore, will recite only the relevant facts and highlights of Plaintiffs' allegations regarding Defendants' alleged securities fraud.

_FACTS_

Defendant Pozen is a pharmaceutical company with its principal place of business in Chapel Hill, North Carolina. (Amended Compl. ¶ 16.) Pozen develops innovative drugs to treat pain in partnership with larger pharmaceutical companies such as Glaxo Smith-Kline ("GSK"). (_See id._ ¶¶ 2-3; 32-33.) During the Class Period-between July 31, 2006 and August 1, 2007-the lead migraine drug being sold in the U.S. market was Imitrex, which was marketed by GSK. Imitrex was set to lose its patent protection, however, by February 2009. Therefore, GSK was hoping, with the help of Pozen, to market a new migraine drug before Imitrex lost its patent protection. (_See id._ ¶¶ 2-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

3; 40.)

**\*3** The new drug that GSK sought to market was called Trexima, which is a combination of two drugs already approved by the FDA. The first is sumatriptan (or "triptan"), the migraine pain medication sold by GSK as Imitrex. (*Id.* ¶ 39.)The second is naproxen (a non-steroidal anti-inflammatory drug, or "NSAID"), an over-the-counter pain medication sold under the name Aleve. (*Id.*) The two drugs complement each other in a manner that provides superior pain relief to either alone. (*Id.* ¶¶ 39, 57.)Pozen owns the patents on the combination of Imitrex and naproxen. (*Id.* ¶ 41.)More specifically, Pozen holds a patent on the clinical use of triptans and NSAIDs in combination; thus, any pharmaceutical company wishing to develop such a combination drug must go through Pozen. (*Id.*)

*The GSK Partnership Agreement*

In June 2003, Pozen signed an agreement with GSK for the development and commercialization of Trexima. (*Id.* ¶ 37.)Under the agreement, Pozen was responsible for the development of Trexima, while GSK was responsible for manufacturing and commercialization. (*Id.*) As part of the agreement, GSK agreed to pay Pozen upon the achievement of certain development, regulatory, and commercial "milestones," as well as royalties on sales. (*Id.* ¶ 38.)As of August 2007, GSK had paid Pozen approximately $60 million and agreed to pay $20 million more upon FDA approval of Trexima, with further payments and royalties, depending on Trexima sales volume. (Defs.' Ex. 27 to Porritt Decl., at 18, docket no. 54.)

*The Drug Testing and Approval Process*

*Preclinical Testing and Genotoxicity*

On average, it takes twelve years for an experimental drug to travel from the laboratory to a pharmacy. (Amended Compl. ¶ 43.) Testing on a potential new drug occurs in stages. First, a drug candidate is subjected to laboratory testing to identify mechanism of action and determine safety. (*Id.* ¶ 44.)These tests are usually *in vitro,* meaning they occur in cell cultures or can be animal studies, and they are referred to as "preclinical" or "nonclinical" because they do not involve human testing. (*Id.*)

Preclinical tests take about three and a half years. If preclinical testing supports the safe use of the drug candidate in humans, the drug candidate may proceed to clinical, or human, testing. (*Id.* ¶¶ 45-50.)On average, only five in 5,000 compounds that enter preclinical testing ever make it to human testing. (*Id.*) Moreover, only one in every five drugs that makes it to human testing is ever approved. (*Id.*)

During preclinical testing, the drug's active ingredients are subjected to *in vitro* tests intended to evaluate whether the drug damages DNA. Agents that damage DNA are called genotoxicants and have the potential to cause cancer. (*See id.* ¶ 67.)There are several types of genotoxicity tests. One is the Chinese Hamster Ovary, or "CHO," test. (*Id.* ¶ 66.)The CHO test involves the introduction of extremely high doses of the drug candidate to cells originally derived from Chinese hamster ovaries. (*See* Defs.' Ex. 26 to Porritt Decl., at 9-10.) Because the extremely high doses of a drug can sometimes kill the cells that are to be evaluated, the CHO test is not always reliable. (Amended Compl. ¶ 136; Defs.' Ex. 26 to Porritt Decl., at 8-10.)

**\*4** A second type of genotoxicity test is the mouse lymphoma assay, which is reliable enough to be "considered an acceptable alternative to the direct analysis of chromosomal damage in vitro."(*Id.* ¶ 68 n. 3.) The fact that a drug candidate yields a positive result in one type of test is not definitive. Rather, the FDA will examine whether there is evidence confirming this result, such as from another type of test. (Defs.' Ex. 6 to Porritt Decl., at 2-3.) In a January 2006 "Guidance for Industry and Review Staff" titled *Recommended Approaches to Integration of Genetic Toxicology Study Results* (hereinafter the "FDA guidance"), the FDA has stated that with regard to positive results in a CHO study, "a positive finding in an *in vitro*chromosomal aberration assay that is not corroborated by the matching exposure regimen of the mouse lymphoma assay could also call into question the significance of the positive finding."(*See* Defs.' Ex. 6 to Porritt Decl., at 3.) In other words, a positive result in a CHO study is not necessarily significant if the mouse lymphoma assay yields a negative result.

*The IND after Preclinical Testing*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

After completing preclinical testing, the company files an Investigational New Drug Application ("IND") with the FDA to begin to test the drug in humans. (Amended Compl. ¶ 45.) The IND automatically becomes effective as long as the FDA does not disapprove it within thirty days after filing. (*Id.*) The IND shows results of previous experiments, how, where, and by whom the new studies will be conducted; the chemical structure of the compound; how it is thought to work in the body; any toxic effects found in the animal studies; and how the compound is manufactured. (*Id.*)

*Clinical Trials*

After the IND becomes effective, the company developing the new drug conducts three phases of clinical trials, which progressively involve more patients and longer durations and study the drug's efficacy and safety. (*See id.* ¶ 46.)A clinical trial is a comparison test of a medication versus a placebo, other medications, or the standard medical treatment for a patient's condition.(*Id.*) Phase I clinical trials study a drug's safety profile, including the safe dosage range. (*Id.* ¶ 48.)The Phase I studies also determine how a drug is absorbed, distributed, metabolized, and excreted, and the duration of its action. (*Id.*) Phase I clinical trials take about a year and involve about 20 to 80 normal, healthy volunteers. (*Id.*)

After the Phase I clinical trials are conducted, Phase II clinical trials begin. In Phase II, controlled studies of about 100 to 300 volunteer patients assess the drug's effectiveness. (*Id.* ¶ 49.)Finally, Phase III clinical trials are conducted on the new medication. Phase III trials last about three years and usually involve 1,000 to 2,000 patients in clinics and hospitals, with doctors monitoring patients closely to determine efficacy and to identify adverse reactions. (*Id.* ¶ 50.)

**\*5** After completion of all three phases of clinical trials, the company analyzes all of the data and-assuming the data successfully demonstrate safety effectiveness-files a New Drug Application ("NDA") with the FDA. (*Id.* ¶ 51.)The NDA must contain all of the scientific information that the company has gathered regarding the medication. By law, the FDA is allowed six months to review the NDA. (*Id.* ¶ 51.)Review of the NDA is generally the last step in the approval process; if the NDA is approved, the drug can then be marketed and sold.

*In 2002, Pozen Receives a Positive Result for Genotoxicity during Preclinical Testing*

The test results at issue in this case were from tests conducted during *preclinical* testing, as described above. In 2002, Pozen ran three genotoxicity tests on Trexima, which was called "MT-400" at that stage of the drug's development. Two of the genotoxicity tests yielded negative results (i.e., no potential to cause cancer). One of the tests, however-the CHO test-yielded a positive result (i.e., potential to cause cancer).(*Id.* ¶ 66; Defs.' Ex. 26 to Porritt Decl., at 15.) Pozen warned investors in its November 2002 Form 10-Q that the CHO study raised potential genotoxicity concerns, by stating "recent results from a genotoxicity study involving MT 400 may require us to conduct chronic toxicology and carcinogenicity studies."(Defs.' Ex. 1 to Porritt Decl., at 9.)

Despite the positive CHO test result, Pozen was allowed to proceed with clinical trials, which showed Trexima to be effective in treating migraines. (Amended Compl. ¶¶ 53-57.) Pozen filed a NDA for Trexima on August 8, 2005.(*Id.* ¶ 58.)The CHO test result was included in the NDA. (Defs.' Ex. 26 to Porritt Decl., at 6.)

*The June 2006 Approvable Letter*

On June 9, 2006, Pozen received an approvable letter from the FDA. (Amended Compl. ¶ 59.) An approvable letter states that if the drug sponsor can satisfy certain conditions, its NDA may be approved. (*Id.*) These conditions can typically range from small discussions on labeling to requirements for further clinical studies, with a consequent delay of weeks or months for a product launch. (*Id.*) The Approvable Letter dated June 9, 2006, requested additional information regarding Trexima's cardiovascular safety.[FN3](*Id.* ¶ 65.)The Approvable Letter also instructed Pozen to perform additional, *nonclinical* studies regarding genotoxicity. (*Id.* ¶¶ 61, 68.)These additional studies included a second CHO study, plus a mouse lymphoma TK assay. (*Id.*)

> FN3. More specifically, the FDA noted that the rate of vasospasm for Trexima appeared to be higher than the other drugs in the class of triptan-based migraine medicines. (Amended Compl. ¶ 61.) As the Amended

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Complaint explains, coronary vasospasm, or coronary artery spasm, refers to the narrowing of a blood vessel, usually an artery, by tightening or spasm of the muscles within the vessel's wall. (*Id.*) This narrowing imposes a restriction in the volume of blood flowing through the vessel. (*Id.*) As a result, coronary artery spasm can cause shortness of breath and chest tightness. (*Id.*) Generally, vasospasm is considered a class effect of all triptan-based migraine medications.

On July 26, 2006, Pozen and GSK met with the FDA to discuss the requests made in the Approvable Letter. (*Id.* ¶ 69.)At that time, GSK was completing its Phase IIIb clinical studies, which included a study involving 1,700 additional Trexima patients. (*Id .*) The study showed no serious cardiovascular adverse events, and the FDA agreed to accept this additional study, but the FDA also requested certain information on Imitrex to fulfill the additional data requested in the 2006 Approvable Letter. (*Id.*) Specifically, the FDA required a more detailed analysis of patient baseline characteristics to compare Trexima's safety profile to that of Imitrex. (*Id.*)

**\*6** The Class Period begins on July 31, 2006. (*Id.* ¶ 89.)On that date, Pozen issued a press release titled "Pozen to Submit Full Response to Trexima Approvable Letter During the Fourth Quarter ."(*Id.*) The press release noted that Pozen planned to submit a full response to the Approvable Letter and that the response would include additional "safety" information that had been requested by the FDA. (*Id.*) The July 31, 2006, press release did not specifically mention the FDA's concerns over "genotoxicity" or the results of the CHO Study. (*See id.*)

As a result of the press release dated July 31, 2006, Pozen's stock price rose 27 percent to $10.55 per share. (*Id.* ¶ 90.)The *Raleigh News & Observer* newspaper noted that "analysts and investors considered the announcement to be an encouraging sign that the migraine treatment may come to market next year."(*Id.*) Plaintiffs allege that the investment community interpreted the information in the press release as positive news for Pozen, given the likelihood that the Company would not have to conduct any new clinical trials.(*Id.* ¶ 91.)On August 1, 2006, Wachovia Securities wrote to investors that "[w]e view this as potentially good news for POZN, as the fairly quick

turnaround on the submission suggest[s] no new clinical studies are necessary, and POZN likely has the requisite safety data already in its possession."(*Id.*) On that same date, HSBC Global Research issued an analyst report titled, "A Significant Step on the Road to Trexima," in which HSBC advised investors that the time line on the Trexima submission indicated that "no further safety trials are needed to complete the full response."(*Id.*)

On August 3, 2006, during an investor conference call, Pozen disclosed that it would be performing two *in vitro* studies regarding Trexima (referring to the CHO study and the mouse lymphoma assay regarding genotoxicity), and that it would submit those results along with the cardiovascular data that the FDA had requested. (*Id.* ¶ 92.)In the conference call CEO Plachetka discussed Pozen's response to the Approval Letter and stated, in part, that "[o]ur cash position should improve assuming Trexima approval in 2007 which generates our $20 million milestone payments along with royalties for whatever portion of the year Trexima is marketed."(*Id.*) Plachetka further stated in the conference call:

Let's turn to Trexima for a few minutes. The approval letter was received on the expected ... date, ... the FDA acknowledges the efficacy criteria had been met. So that question was taken away. At the same time, *the FDA requested some additional information relating to ... safety ... of Trexima before final approval could be granted.*

Now the update in progress since then, we've met with the FDA July 26, showed them some of the new clinical safety data that we intend to submit and agreed upon a response framework that we and they feel should successfully address the question. Of course, there is never any guarantee that this response will be adequate and it's always possible that additional questions could arise during their review. But as of now we and GSK feel very good about the response we are preparing.

**\*7** The majority of the new clinical safety information comes from Phase IIIb clinical trials already completed by GSK but not yet compiled in the final report. We're putting that data into the agreed designated format the FDA requested in order to facilitate their review of it so we're cooperating closely with GSK on the construction of this re-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

sponse. As to the question of what other safety in-
formation is being included, *I can tell you that two
in vitro nonclinical studies are being conducted
and those results will be included in the response
also.*

(*Id.*) (emphasis added). Thus, Plachetka referred to
the nonclinical studies-the CHO study and the mouse
<u>lymphoma</u> assay-regarding <u>genotoxicity</u> in the con-
ference call, although he did not specifically use the
word "<u>genotoxicity</u>" in referring to the studies, nor
did he specifically discuss the prior <u>genotoxicity</u> find-
ings.

Defendant Plachetka also went on to state in the con-
ference call that he was "confident" that the FDA
would approve Trexima sometime in the second
quarter of 2007, stating, "I think mid year is a pretty
reasonable best case for this action."(*See id.* ¶
93.)According to Plaintiffs, Plachetka "further condi-
tioned the market to expect FDA approval for
Trexima in 2007" when he told *BioWorld* that Pozen
had "a very clear path to follow at FDA," adding that
Defendants had "shown them most of the data that
we're going to put in our full response, and after see-
ing that data, they said they didn't need any new data,
which was great."(*Id.* ¶ 94.)Finally, Plaintiffs also
note that in the August 3, 2006, investor conference
call regarding the anticipated launch date of Trexima,
Pozen's CFO Bill Hodges stated, "As a developmen-
tal stage company, one of the things you learn early is
that cash is king and that you want to have more
money in the bank than you need to spend.... [W]ith
the expected approval of Trexima in May 2007 ... our
cash and profitability will continue to improve."(*Id.* ¶
92.)

On September 20, 2006, Pozen issued another press
release, summarizing the results of Pozen's ongoing
studies that were undertaken because of the 2006
Approvable Letter. The press release stated, among
other things, that Trexima was well tolerated across
both studies and that adverse events were "generally
mild with the most common being dry mouth, nau-
sea, and dizziness across all attacks treated in both
studies" and that "[n]o serious drug-related adverse
events were reported."(*Id.* ¶ 96.)Also on September
20, 2006, Pozen issued another press release touting
the efficacy of Trexima when taken at the first onset
of a migraine and reiterating that Trexima was "well
tolerated" in all studies. (*Id.* ¶ 97.)Plaintiffs allege

that Defendants' "false and misleading" statements
were intended to counter the impact of the 2006 Ap-
provable Letter and that they succeeded, resulting in
positive reports from analysts and a further rise in the
Company's stock prices. (*Id.* ¶¶ 98-99.)

**\*8** On October 31, 2006, Pozen released its third
quarter financial results and made further statements
regarding the status of the Trexima NDA during an
analyst conference call. (*Id.* ¶ 100.)In the conference
call, Plachetka noted that the Company was submit-
ting additional safety information, including the re-
sults from the two *in vitro* nonclinical studies, in re-
sponse to the FDA's approval letter. Plachetka pre-
dicted that the Company would submit its response
by November 2006 and that the Company anticipated
a six-month review, which would give an FDA ap-
proval date of sometime late in the second quarter of
2007. (*Id.*) Plachetka went on to state that "assuming
that Trexima is approved in mid 2007, we expect to
receive the $20 million milestone payment [from
GSK], along with royalties for whatever portion of
the year Trexima is marketed.... Therefore, we ex-
pect to remain in a pretty solid cash position next
year."(*Id.*) Plachetka further continued to tout
Trexima as a blockbuster drug, and Pozen stock rose
as a result. (*Id.* ¶¶ 100-04.)

When Pozen and GSK conducted the second CHO
study, the CHO study again produced a positive re-
sult at very high dosages. (*Id.* ¶ 70.)The mouse
<u>lymphoma</u> test, however, produced a negative result.
(*Id.* ¶ 136.)Defendants did not disclose in either the
October 31, 2006, conference call or the subsequent
press release that the second CHO study had yielded
another positive result. Indeed, as noted previously,
Defendants did not refer specifically to
"<u>genotoxicity</u>" at all when discussing in conferences
and press releases that further *in vitro* studies were
being conducted.

In February 2007, Defendants submitted the results
of both *in vitro* tests to the FDA, along with the car-
diovascular data. (*Id* . ¶ 112.)Once its response was
accepted by the FDA, the expected FDA action date
was clarified as August 1, 2007. (*Id.* ¶
115.)Defendants also disclosed Pozen's revenue fore-
casts, assuming Trexima approval in August 2007,
with a launch of the drug later that year. (*Id.* ¶¶ 93,
108, 111-12, 121.)Like Defendants, GSK also an-
nounced that it anticipated a Trexima launch in the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

second half of 2007. (*Id.* ¶¶ 112-13.)Based on GSK's statements regarding the anticipated date of FDA approval in August 2007, analysts were bullish about Pozen stock, predicting among other things that "Trexima will be the new gold standard treatment of migraine headaches" and that Trexima would capture significant market share in the migraine market by converting its sales to Trexima before the patent ran out on <u>Imitrex</u>. (*See id.* ¶ 130.)

*The August 2007 FDA Approvable Letter*

As it turns out, the FDA did not approve Trexima on the anticipated date of August 1, 2007. Instead, on August 1, 2007, Pozen received a second FDA Approvable Letter for Trexima. This letter did not request any additional cardiovascular information, but it did require Pozen to further address the positive CHO test results regarding <u>genotoxicity</u> before approval could be granted. (*Id.* ¶ 133.)Pozen disclosed the letter to the public on August 2, 2007. (*Id.*) On that day, Pozen's stock price decreased by about 43 percent (from $17.45 to $9.23), on abnormally high trading volume, when it became clear that Trexima was not going to be approved on the anticipated date. (*Id.* ¶ 159.)According to Plaintiffs, "the rapid decline in Pozen's stock price following the August 2, 2007, revelations was a direct and foreseeable consequence of the revelation of the falsity of Defendants' Class Period misrepresentations and omissions to the market."(*Id.* ¶ 161.)Plaintiffs note that, in response to the second Approvable Letter, at least one analyst warned that GSK could decide to "scrap" the Trexima program altogether if there was much more delay in obtaining approval because a later approval would shorten the amount of time that GSK had to switch patients to Trexima before the patent on <u>Imitrex</u> ran out. (*Id.* ¶ 135.)

**\*9** Plaintiffs further note that during an August 2, 2007, investor conference call with investors and analysts, Defendant Plachetka admitted that the <u>genotoxicity</u> issue was not a surprise to Pozen, stating:

> Well, they asked us to do [two] in vitro studies in the [June 2006] approvable letter ... and this was essentially a repeat of the [CHO] test. And then a second study which was also a gene tox study that if it had turned out positive, it would have essentially said yes, now, you have two tests that are positive. But

in this situation what I have been told by experts is when you have one positive test, you look at the whole battery. And it was our interpretation that as the Agency asked us to do a second test and we already had another-I think we had another two already in the NDA that were negative, that if we ended up confirming that this was unique to the CHO test, which it appears to be unique to the CHO test, and negative in the other three tests that our experts and GSK's experts are saying that is just an anomaly of the way that the compound interacts in that particular test.

And it does not foreshadow that this is going to be a problematic situation. And I think as I mentioned before, there are a high degree of positives in a particular test, but what the Agency has written about in their own guidance is that they look at where there is confirming gene toxicity in more than one test.

So I don't want to say that this was a surprise. It wasn't a surprise. We knew this was there, but we also thought that this was not as important as the clinical issues [i.e., the cardiovascular test] because [the FDA] had spent most of their time talking about the clinical issue and because we had all of these offsetting negative results..... [T]he new test that we did was called the mouse <u>lymphoma</u> test, and it was negative, but the study that was positive in our NDA, the [CHO] test which they cited in their approvable letter, was reproducibly positive. But again, we think that that is because during the course of this test as you raise the concentrations of the drugs, something kills the cells and that makes the data much more difficult to interpret.

Now, I'm not a toxicologist and I don't want to start the discussion of what is right in the interpretation of data and how it all came about. But reasonable scientists have looked at these data and said, gee, I don't think [this] really indicates chromosomal problems here. This looks to me to be unique to this particular test.

(*Id.* ¶ 136.)Plaintiffs allege that analysts and the investing public were "shocked" by Plachetka's revelations regarding the <u>genotoxicity</u> tests "and quickly realized the Defendants had misrepresented or omitted material information."(*Id.* ¶ 137.)Plaintiffs note, for instance, that on August 2, 2007, *TheStreet.com*

Senior Writer Adam Feuerstein, in an article titled
"Pozen Pounded on FDA's Trexima Delay," wrote:
I spoke this morning with a hedge fund analyst who
was short Pozen going into Thursday's decision be-
cause she believed safety concerns would hold up
approval. Now, she wasn't counting on potential
chromosome damage as being the direct cause for
an FDA rejection, *but she did believe that neither
Pozen nor [GSK] was completely transparent
about the reasons for Trexima's first approvable
letter in June 2006.*

**\*10** (*Id.* ¶ 137.)Moreover, on August 3, 2007, an ana-
lyst noted in his report that
... the key safety concern that formed the basis for the
company's second approvable decision [was] signs
of genotoxicity observed with Trexima in a single
type of in-vitro assay. Even though the company
disclosed yesterday that this FDA concern arose
even during the 1st FDA approvable decision, this
was not relayed clearly to investors, in our view,
prior to yesterday's announcement.

(*Id.* ¶ 138.)

*Trexima Receives FDA Approval in April 2008*

In response to the FDA's second Approvable Letter,
Pozen and GSK submitted results of three additional
*in vitro* studies on October 15, 2007. (Defs.' Ex. 28 to
Porritt Decl.) Pursuant to the FDA's suggestion,
Pozen and GSK also conducted a short-term, human
volunteer study, and submitted the results to the FDA
on January 15, 2008. (*Id.;* Ex. 29.) The FDA ap-
proved Trexima on April 15, 2008, and GSK made
the $20 million milestone payment on April 28, 2008.
(*See* Amended Compl. ¶ 9 & Ex. 30.) Trexima is
currently being marketed under the brand name
Treximet. (*See* Ex. 29.)

As noted, Trexima was ultimately approved by the
FDA in April 2008. Plaintiffs, therefore, *do not con-
tend* in this lawsuit that Defendants made false state-
ments regarding whether Trexima would receive
FDA approval. Rather, Plaintiffs' allegations center
around Defendants' representations and predictions
regarding *when* Trexima would be approved as well
as Defendants' silence regarding results of the *in vi-
tro* genotoxicity tests that ultimately pushed the an-
ticipated approval date of August 2007 to April 2008.
Plaintiffs allege that "Defendants' fraudulent scheme

and false statements artificially inflated Pozen's stock
price by failing to disclose that approval of Trexima
by the FDA was not likely to occur during August
2007."(Amended Compl. ¶ 156.) Plaintiffs contend
that by issuing false and misleading statements re-
garding the anticipated launch of Trexima in mid-
2007, Defendants caused Pozen's stock to trade at
artificially inflated levels throughout the Class Pe-
riod, "causing millions of dollars of damages to the
Class when the truth was revealed and the artificial
inflation was released from Pozen's stock price."(*Id.* ¶
140.)Plaintiffs also allege that Defendants concealed
the following "true facts" that Defendants allegedly
omitted in their representations regarding Trexima
and its anticipated launch date of August 2007:

(a) Preclinical test data that Pozen had provided to
the FDA raised serious questions as to whether
combining sumatriptan and naproxen, the two
components of Trexima, increased the risk of
chromosomal or gene damage-which made it
highly unlikely that the FDA would be able to
thoroughly vet the safety issues within the six
month time frame prescribed by law to review De-
fendants' submission/response to the 2006 Approv-
able Letter;

(b) The approvability of the NDA for Trexima in
mid-2007 was in serious doubt since the clinical
study data submitted fell far short of current FDA
standards;

**\*11** (c) Defendants knew but concealed from the
market that their agreement with the FDA in July
2006 included a promise to conduct additional test-
ing on Trexima's effects on blood pressure, render-
ing their July 2006 statements that no further test-
ing was required for approval false and misleading;

(d) Safety studies required to properly address the
adverse effects of Trexima would substantially in-
crease development costs for and FDA risks of
non-approval in mid-2007;

(e) The approvability of the NDA for Trexima by a
date certain was further complicated by the strict
regulatory environment following the VIOXX
withdrawal;

(f) Even if/when Trexima received approval, Defen-
dants' market checks with physicians had revealed

that only half were planning to prescribe Trexima to their patients, and then to only 25 % of their patients, in part because payors were likely to saddle Trexima with a high co-payment;

(g) As a result of the factors detailed in (a)-(f) above, Defendants knew or had reason to know the Company would not receive $20 million in milestone payments or additional royalties during fiscal [year] 2007 and that Trexima would not add to Pozen's 2007 revenues or profitability and as a result the Company's stock was overvalued in the market; and

(h) Any significant delay in Trexima receiving approval (whether resulting from the FDA's request for additional information/testing, the need to fully vet possible safety issues, and/or the regulatory environment post-VIOXX) would materially compromise the potential commercial success of Pozen's "niche product" as it would not have sufficient time to establish itself as Imitrex's successor prior to generics flooding the market.

(*Id.* ¶ 114.)

*DISCUSSION*

*Plaintiffs' Claims Pursuant to Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5*

Plaintiffs allege specifically that their claims arise under and pursuant to sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F .R. § 240.10b-5). Under section 10(b) of the Exchange Act, it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe...."15 U.S.C. § 78j(b). Pursuant to section 10(b), the SEC has promulgated Rule 10b-5, which makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the cir-

cumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Section 10(b) creates a private right of action for purchasers or sellers of securities who have been injured by the statute's violation. *See, e.g., Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 13 n. 9 (1971). Moreover, section 20(a) of the Exchange Act provides that

*\*12* [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Here, Plaintiffs seek to impose joint and several liability against the individually named Defendants, all officers of Pozen, as "controlling persons" under section 20(a).

To establish securities fraud liability under section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must prove that the defendant (1) made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused plaintiff's damages. *See In re PEC Solutions, Inc. Sec. Litig.,* 418 F.3d 379, 387 (4th Cir.2005). A fact is material "if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact."*Id.* Scienter may be proven by either intentional misconduct or recklessness, but not mere negligence. *Id.*

*Standard of Review-Pleading Standards under the PSLRA*

Because section 10(b) of the Exchange Act prohibits

fraud, claims brought pursuant to that section have historically been governed by Rule 9(b) of the Federal Rules of Civil Procedure, rather than under Rule 8. Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."FED.R.CIV.P. 9(b).Rule 9(b) is an exception to the general requirement under Rule 8(a) that a plaintiff need only set forth a "short and plain statement of the claim" showing that the plaintiff is entitled to relief. SeeFED.R.CIV.P. 8(a).

Because courts had inconsistently applied Rule 9(b) in securities fraud lawsuits, in 1995 Congress enacted the PSLRA in an effort to strengthen and clarify pleading requirements and to discourage frivolous securities claims. Specifically, the PSLRA states in pertinent part that, with regard to a private action based on misleading statements and omissions,

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). Thus, the PSLRA requires plaintiffs to plead specific facts to support any claim of material misrepresentation under section 10(b) of the Exchange Act or Rule 10b-5. The PSLRA goes on to state:

*13 In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

Id. § 78u-4(b)(2). The PSLRA further states that "[i]n any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of [the above two paragraphs requiring specific allegations of misleading facts and specific allegations of scienter] are not met."Id. § 78u4(b)(3)(A). Finally, the PSLRA also provides that during the pendency of any private action brought under the PSLRA, "all discovery and

other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party."Id. § 78u-4(b)(3)(B).

Thus, in the context of a Rule 12(b)(6) motion, the PSLRA represents a clear departure from the general scheme of Rule 8(a). In 2007, the Supreme Court in Tellabs, Inc. v. Makor Issues & Rights, Ltd. set forth three rules for applying the "strong inference" requirement of the PSLRA. 127 S.Ct. 2499 (2007). The Court held first that a court should "accept all factual allegations in the complaint as true." Id. at 2509.The Court emphasized that the analysis should focus on allegations of facts and plausible inferences from those facts, observing that "omissions and ambiguities count against inferring scienter." Id. at 2511.Second, courts "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss," such as documents incorporated by reference or subject to judicial notice. Id. at 2509.Third, the scienter analysis necessarily requires courts to engage in a "comparative" inquiry, and a court addressing a motion to dismiss must consider "not only inferences urged by the plaintiff ... but also competing inferences rationally drawn from the facts alleged." Id. at 2504.For an inference of scienter to be considered "strong," it must be "more than merely 'reasonable' or 'permissible'-it must be cogent and compelling, thus strong in light of other explanations." Id. at 2510.

With regard to the Supreme Court's interpretation of the PSLRA in Tellabs, this circuit's court of appeals very recently observed:

To be sure, by no means did the PSLRA or the Supreme Court eliminate the private right of action in § 10(b), which remains "an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the [SEC]." Tellabs, 127 S.Ct. at 2504. The "strong inference" requirement is not meant to prevent litigants with meritorious claims from continuing to uncover fraud and ensure confidence in the securities markets. Rather, the requirement aims to weed out meritless claims at the pleading stage, without forcing defendants to go through a

potentially costly discovery process.

**\*14** Thus, as directed by *Tellabs,* we must analyze the factual allegations raised by the plaintiffs, as well as other evidence in the record, and determine what plausible inferences we can draw from them. Having drawn all plausible inferences, we may reverse the district court only if we find the inference that [Defendants] acted with scienter "at least as compelling" as the inference that the defendants lacked the required mental state. In this endeavor, we "must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs,* 127 S.Ct. at 2510.

*Pub. Employees' Ret. Ass'n of Colo. v. Deloitte & Touche LLP.,* No. 07-1704, 2009 WL 19134, at \*7 (4th Cir. Jan. 5, 2009). With respect to the burden requiring proof of scienter, this circuit's court of appeals has held that a securities fraud plaintiff may allege scienter by pleading not only intentional misconduct, but also recklessness. *Ottmann v. Hanger Orthopedic Group, Inc.,* 353 F.3d 338, 344 (4th Cir.2003). The issue before this court, then, on Defendants' motion to dismiss

is whether the allegations in the complaint, viewed in their totality and in light of all the evidence in the record, allow [the court] to draw a strong inference, at least as compelling as any opposing inference, that [Defendants] either knowingly or recklessly defrauded investors.... If [the court finds] the inference that [D]efendants acted innocently, or even negligently, more compelling than the inference that they acted with the requisite scienter, [the court] must [grant Defendants' motion to dismiss].

*Pub. Employees' Ret. Ass'n of Colo. v. Deloitte & Touche LLP.,* 2009 WL 19134, at \*8.

Finally, in addition to the pleading standards, the PSLRA also includes a Safe Harbor provision to protect forward-looking statements, such as discussions of future plans, expectations, and financial projections. More specifically, forward-looking statements are immunized from liability if they contain "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s]." 15 U.S.C. § 78u5(c)(1)(A)(i). Even if a forward-looking statement is not accompanied by cau-

tionary language, liability *only* attaches if the speaker had *actual* knowledge that it was false when made. *Id.* § 78u-5(c)(1)(B)(i); *see also In re Lab. Corp. of Am. Holdings Sec. Litig.,* No. 1:03CV591, 2006 WL 1367428, at \*3 (M.D.N.C. May 18, 2006). The PSLRA defines "forward-looking statement" to include "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items," as well as "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. § 78u-5(i)(1). Furthermore, under Fourth Circuit law that predates the PSLRA, forward-looking statements are not actionable if they do not guarantee any particular results. *See Raab v. Gen. Physics Corp.,* 4 F.3d 286, 290 (4th Cir.1993). With these principles in mind, the court now addresses the parties' respective arguments on the motion to dismiss.

*Plaintiffs' Allegations regarding Defendants' Alleged Fraudulent Statements and Failure to Disclose Material Facts regarding Trexima Approval during the Class Period*

**\*15** I first note that, in support of the motion to dismiss, Defendants characterize Plaintiffs' complaint as a "classic example of a 'puzzle-style' complaint," and Defendants contend that dismissal is proper for this reason alone. (*See* Defs.' Br. 10.) Defendants contend, for instance, that Plaintiffs set forth lengthy block quotes from Pozen press releases, SEC filings, investor conference call transcripts, news articles, and analyst reports, but Plaintiffs never specify what portions of the statements they are challenging. Defendants note that after every few block quotes Plaintiffs simply include a paragraph that purports to identify the "true facts" on various topics that Defendants allegedly failed to disclose. According to Defendants, Plaintiffs never attempt to tie any specific "true fact" to any particular statement made by Defendants. Defendants note that the PSLRA requires Plaintiffs to identify with specificity the statements they allege are misleading and the facts that render those statements misleading, and Defendants contend that Plaintiffs' failure to make clear what portion of each quotation constitutes a false representation is clearly deficient under the PSLRA's stringent pleading standards. *See In re Alcatel Sec. Litig.,* 382 F.Supp.2d 513, 534

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(S.D.N.Y.2005) ("Plaintiffs neglect to make it clear what portion of each quotation constitutes a false representation, or which statements link up with which issues in the laundry list, placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts. This method is deficient under the pleading standards.").

In response to the motion to dismiss, Plaintiffs have winnowed down the statements made by Defendants that were allegedly false or misleading, and Plaintiffs' response makes clear that the gist of Plaintiffs' securities fraud case is based on Defendants' failure to provide full disclosure regarding the genotoxicity results and tests; Defendants' repeated statements regarding purported lack of safety concerns by the FDA over Trexima and the overall safety of Trexima; Defendants' failure to disclose that there were "serious doubts" regarding the anticipated approval date of August 2007; and Defendants' statements regarding anticipated revenues in 2007 as a result of the anticipated August 2007 approval. To this extent, Plaintiffs appear to have abandoned their arguments that Defendants made false misrepresentations as to at least the "true facts" listed in (b), (c), (d), (e), (f), and (h), listed *supra.*For instance, Defendants contend, and Plaintiffs appear to concede, that Plaintiffs are not pursuing their fraud claims based on the fact that there was a strict regulatory environment after the withdrawal of Vioxx from the market or that physicians had stated that they did not intend to prescribe Trexima to their patients.[FN4]The court will, therefore, focus on the parties' arguments regarding the genotoxicity tests. To this extent, the court narrows its focus to the parties' genuine dispute and does not focus on irrelevant facts in the Amended Complaint that have nothing to do with the alleged misrepresentations of Defendants.[FN5]

FN4. In any event, as Defendants note, they cannot be held liable for fraud based on facts that were already known to the market, such as the fact that the FDA tightened standards after the pharmaceutical company Merck pulled Vioxx from the market over concerns over cardiovascular effects of Vioxx. (*See* Defs.' Br. 16.)

FN5. For example, Plaintiffs allege in the Amended Complaint that a physician being

used as a "confidential witness" was unsure how commercially successful Trexima would be, given that there would be problems getting insurance companies to pay for an expensive proprietary combination of triptan with a NSAID rather than two generic drugs independently. (*See* Amended Compl. ¶ 81.) In their brief opposing the motion to dismiss, Plaintiffs do not address Defendants' contention that Plaintiffs fail to tie this fact to any alleged misrepresentation or failure to disclose by Defendants, or how it is otherwise relevant to Defendants' alleged misrepresentations regarding the genotoxicity test results and the anticipated approval date of August 2007.

*Defendants' Alleged Failure to Disclose Specific Material Facts regarding the Results of the Two In Vitro Studies regarding Genotoxicity*

**\*16** It is well settled that there can be no liability under Rule 10b-5 in the absence of a false statement or an omission of a material fact. A defendant must make "a public misrepresentation for which it may be found primarily liable." *Gariety v. Grant Thornton, LLP,* 368 F.3d 356, 369 (4th Cir.2004). Furthermore, where plaintiffs allege that a defendant omitted material information, they must identify specific public statements and identify how any omitted facts render those statements misleading. *See Longman v. Food Lion, Inc.,* 197 F.3d 675, 682 (4th Cir.1999). Finally, a plaintiff cannot bring a claim for securities fraud based on the omission of information that was already known to the market. *Id.* at 684.

Here, Plaintiffs first contend that, throughout the Class Period, Defendants failed to disclose that the FDA issued the June 2006 Approvable Letter in part because of genotoxicity concerns raised by the findings in the First CHO Study. (*See* Amended Compl. ¶¶ 88-95.) Plaintiffs further allege that Defendants also concealed from the investing public that, as a result of the FDA's concerns, additional genotoxicity tests were to be conducted-and that the FDA had made clear that those tests were a precondition to Trexima approval.(*Id.* ¶¶ 68-69.)Plaintiffs note that by October 2006, Defendants knew that the Second CHO's Study's results replicated those yielded in the First CHO Study. In other words, the Second CHO Study was also positive for genotoxicity (i.e., poten-

tially underlined cancer causing). Plaintiffs allege that Defendants concealed these material facts from investors by failing to disclose these findings, and even assured investors that, among other things, the FDA had not expressed *any concern* regarding the long-term safety of Trexima, and that the data submitted in response to the June 2006 Approvable Letter had in fact *strengthened* Trexima's chances for FDA approval. (*Id.* ¶¶ 100, 107-08, 112-13, 121-22.)

Plaintiffs contend that Defendants' disclosure that "two *in vitro* nonclinical studies are being conducted and those results will be included in the response [to the June 2006 FDA Approvable Letter]" could not have alerted investors of the FDA's genotoxicity concerns with respect to Trexima or that the two *in vitro* studies were a consequence of those concerns, let alone that the studies were even being conducted to study genotoxicity. Plaintiffs note that medical researchers conduct a wide array of *in vitro* nonclinical studies to evaluate issues other than genotoxicity. Plaintiffs further note that Defendants "do not, and cannot, point to a single securities analyst report or statement by a market professional to support their contention that the market understood that the purpose of the *in vitro* tests was to study the genotoxicity of Trexima."(Pls.' Br. 14.)

Plaintiffs further allege that Defendants continued to inform investors that they expected the FDA to approve Trexima on August 1, 2007 (the FDA action date), and that Pozen would at that time receive $20 million in milestone payments along with royalty payments from GSK, which would have amounted to around 40 percent of Pozen's full-year revenue for 2007. (*Id.* ¶¶ 100, 108, 111-12, 121.)Plaintiffs allege that as a result of these materially misleading statements, "the market was all but certain that the FDA would grant the NDA application for Trexima by August 2007."(Pls.' Br. 5.)

**\*17** Plaintiffs contend that Pozen "shocked" the investment community by issuing a press release before the market opened on August 2, 2007, announcing that, rather than approving the NDA for Trexima, the FDA has issued a second Approvable Letter for Trexima. (*See* Amended Compl. ¶ 133.) Plaintiffs note that during the Company's August 2, 2007, conference call, investors and analysts learned for the first time that the FDA had issued the June 2006 Approvable Letter in part because of genotoxicity con-

cerns arising out of the positive test result from the First CHO Study. (*Id.* ¶ 136.)During that same conference call, Defendants also disclosed for the first time that the results observed in the Second CHO Study had corroborated concerns about genotoxicity. (*Id.*) Plaintiffs contend that although the market was shocked by these revelations, Defendants acknowledged that the genotoxicity issue was not a surprise to them. (*See id.*)

Plaintiffs contend that the language set forth in Pozen's quarterly report filed with the SEC just days after the FDA issued the second Approvable Letter on August 1, 2007, highlights Defendants' failure to disclose the FDA's genotoxicity concerns during the Class Period. Plaintiffs note that, in contrast to Pozen's quarterly reports filed with the SEC during the Class Period, the Company's Form 10-Q filed with the SEC on August 7, 2007, includes explicit language concerning the FDA's genotoxicity concerns:

> The FDA has expressed concern about the potential implications from one preclinical in vitro chromosomal aberration study, one of four standard genotoxicity assays, in which genotoxicity was seen for the combination of naproxen sodium and sumatriptan. The companies intend to request a meeting with the FDA as quickly as possible to discuss the steps necessary to address the FDA's concerns. However, until we meet with the FDA, it is unknown if we will be able to adequately address their concerns.

(*See* Pls.' Ex. 2 to Bernstein Decl., at 29, docket no. 63.)Plaintiffs note that, notwithstanding that these concerns were identical to the FDA's genotoxicity concerns that gave rise to the June 2006 Approvable Letter, at no point during the Class Period did Defendants disclose those initial concerns to investors. Plaintiffs note, furthermore, that although Defendants announced in October 2006 that they had received the results from the two in vitro nonclinical studies and that they were submitting them to the FDA, Defendants not only concealed those findings from investors, but also failed to disclose then and throughout the Class Period that the results from the Second CHO Study were identical to the findings observed in the First CHO Study.

*Plaintiffs' Contention that Defendants Made Affirma-*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*tive Misstatements Concerning Trexima's Safety Profile and the Genotoxicity Concerns Expressed by the FDA*

Plaintiffs further contend that Defendants made specific, unqualified statements during the Class Period that misrepresented the FDA's concerns over the long-term safety of Trexima and, consequently, the time line for the drug's approval. Plaintiffs point to the statement by Defendant CEO Plachetka confirming an "assessment" by an analyst during an October 31, 2006, conference call "that the FDA has in fact not expressed any concern regarding the long-term safety of Trexima."(*See* Amended Compl. ¶ 100.) Plaintiffs point to additional, affirmative misstatements by Defendants that led investors to believe that additional safety information, including the results of the *in vitro* studies, that Pozen was submitting in response to the June 2006 Approvable Letter strengthened Trexima's NDA application. Plaintiffs contend that these statements were false and misleading because, in truth, the FDA had informed Defendants of their long-term safety concerns over Trexima (i.e., concerns over cancer), which were due to the genotoxicity findings observed in the First CHO Study, which were then replicated in the Second CHO Study. Plaintiffs contend that it is "incomprehensible how Defendants could have had a good faith belief that the FDA would approve Trexima in mid-2007 when the genotoxicity data observed in the Second CHO Study replicated the initial results."(*See* Pls.' Br. 19.) Plaintiffs note that, nevertheless, Defendants continued to falsely assure the market throughout the Class Period that, among other things, they "believed" Trexima was "on track" for launch in the second half of 2007, and that they "expected" revenue "for the 2007 to be in the range of $50 million to $55 million," which included the $20 million in revenue from milestone payments from GSK for Trexima. (*See id.* ¶¶ 100, 112, 121.)Plaintiffs contend, therefore, that they have alleged with great particularity why Defendants' alleged stated beliefs, including those concerning the likelihood that the FDA would approve Trexima in mid-2007 and resulting revenues that would flow to Pozen, lacked a reasonable basis when made and were undermined by facts Defendants knew or recklessly disregarded. Plaintiffs allege that these statements are clearly actionable under the federal securities laws.

*Plaintiffs' Allegations of Scienter*

*18 In addition to showing misrepresentation, a plaintiff must also allege scienter in a securities fraud case. Plaintiffs contend that the Amended Complaint alleges particularized facts evidencing Defendants' actual knowledge or reckless disregard of the falsity of their statements regarding the FDA's concerns over the genotoxicity issue and the impact of the genotoxicity tests on the time line for Trexima's approval. Plaintiffs contend, for instance, that the Amended Complaint details how Defendants had actual knowledge of the genotoxicity issue; were informed by the FDA that it viewed the genotoxicity issue as a significant impediment to approval; and were aware that Trexima had virtually no chance of being approved by mid-2007 in light of the fact that the genotoxicity findings observed in the Second CHO Study replicated the results seen in the First CHO Study. Plaintiffs contend that these allegations clearly establish Defendants' scienter.

Plaintiffs further contend that Trexima's fundamental importance to Pozen's financial condition and prospects compels a powerful inference that the Company's senior management knew that Trexima's significant genotoxicity risks made it highly unlikely that the FDA would approve Trexima in August 2007. Plaintiffs contend that the individual Defendants' positions in Pozen, as senior executive officers who were closely involved with and had direct responsibility for important issues affecting the Company's business, support a strong inference of scienter.

Plaintiffs further contend that the stock sales by the Company's CEO Defendant Plachetka further support a strong inference of scienter.[FN6]Plaintiffs contend that the sheer magnitude of sales of Pozen stock by Plachetka-280,000 shares of Pozen stock for almost $4.54 million and the significant percentage (28 percent) of Plachetka's common stock holdings that he sold (in relation to the common stock holdings that he was authorized to sell during the Class Period) give rise to a strong inference of scienter. Plaintiffs maintain that the fact that Plachetka's stock sales were governed by the terms of a Rule 10b5-1 trading plan supports a strong inference of scienter because the plan provided Defendants with a specific motive to conceal the truth concerning the genotoxicity issue from investors. That is, Plaintiffs contend that Plachetka was able to sell a substantial number of Pozen

shares because, as a result of Defendants' material misrepresentations throughout most of the Class Period, the price of Pozen stock traded at prices higher than $15, i.e., the trigger price authorizing Plachetka to sell Pozen stock under the plan. Plaintiffs contend that, notably, since Defendants revealed the truth concerning Trexima and the regulatory review process on August 2, 2007, Plachetka has been precluded from selling his shares as the price of Pozen stock has remained under $15. Plaintiffs further note that on August 1, 2007, the trading day before Pozen disclosed that the FDA had issued the second Approvable Letter, Defendant Plachetka sold more than 30,000 of his shares of Pozen stock for more than $517,000.

> FN6. The Amended Complaint also points to stock sales by former Defendant Wise as evidence of alleged scienter, but Plaintiffs have voluntarily dismissed Wise as a Defendant.

*ANALYSIS*

**\*19** For the following reasons, I find that Plaintiffs have failed to state a claim for securities fraud. First, Plaintiffs have failed to plead a requisite element-that Defendants made a false or misleading statement, or failed to disclose material information about the timing of the FDA's approval of Trexima. As to Plaintiffs' allegations regarding Defendants' alleged failure to sufficiently disclose the results of the two *in vitro* genotoxicity tests, Defendants contend that Plaintiffs' securities fraud claim here "boils down to" the complaint that Defendants used the word "safety" rather than "genotoxicity" to describe the FDA's concerns in the June 2006 Approvable Letter. On this point, it is true that Defendants could certainly have provided more details when discussing the *in vitro* studies. As Defendants note, however, there is no requirement to use any particular words as long as the words are accurate and not misleading. *See Inspire Pharms.*, 515 F.Supp.2d at 638. Defendants did not have a duty to disclose every detail of its FDA correspondence or to use any specific words in their disclosures. Rule 10b-5 requires disclosure only when the omitted information would render other affirmative statements misleading or false. *Taylor v. First Union Corp. of S. C.*, 857 F.2d 240, 243-44 (4th Cir.1988). Here, Plaintiffs have failed to identify any reason why a "genotoxicity" concern is more or less

serious than any other "safety" concern raised by the FDA, nor have Plaintiffs alleged any facts showing that genotoxicity concerns have particular adverse consequences for a drug's approval. Therefore, Defendants' failure to offer more details about the genotoxicity test results was not misleading.

Moreover, Defendants *did* warn the market that preclinical testing had raised various safety concerns generally, even before the Class Period, and they also repeatedly warned that FDA approval of Trexima was not guaranteed and could be delayed. Pozen's Form 10-Q filed with the SEC on November 13, 2002, disclosed that "recent results from a genotoxicity study involving MT 400 may require us to conduct chronic toxicology and carcinogenicity studies ."(Defs.' Ex. 1 to Porritt Decl., at 9.) Pozen provided updated versions of this disclosure in every subsequent periodic SEC report. Pozen's SEC filings also included extensive warnings about the FDA approval process, including warnings that "there can be no guarantee that the FDA will approve our NDA based on the information contained in our response to the approvable letter, or at all," and that there are "no guarantees ... that additional testing will not be required for approval."(*See* Ex. 13, at 13, 25, 30; Ex. 16, at 13, 27, 32.)

When the FDA informed Pozen during their July 26, 2006, meeting that it would require Pozen to conduct additional genotoxicity studies, Defendants promptly disclosed this fact. In the August 3, 2006, conference call, Defendant Plachetka stated that "two in vitro nonclinical studies are being conducted and those results will be included in the response also."(Amended Compl. ¶ 92.) Dr. Plachetka told investors during the August 3, 2006, call that "[o]f course, there is never any guarantee that this response will be adequate and it's always possible that additional questions could arise during [the FDA's] review."(*Id.*) Pozen repeated the disclosure regarding the two *in vitro* studies during an October 31, 2006, investor conference call. (*Id.* ¶ 100.)Furthermore, in both a December 13, 2006, press release and conference call, Defendant Marshall Reese stated, "[t]here is no certainty that these revisions coupled with the original NDA will lead to approval of the Trexima NDA."(*Id.* ¶¶ 107, 108;*see also id.* ¶¶ 92, 112.)

**\*20** As Defendants note, the market was, therefore, aware that Trexima's preclinical studies had raised

safety concerns, that Pozen was conducting addi-
tional *in vitro* studies to submit to the FDA in re-
sponse to the June 2006 Approvable Letter, and that
there was no guarantee that the FDA would accept
this data, meaning that additional testing might be
necessary. Plaintiffs' allegation that Pozen withheld
this information, therefore, has no merit, as there can
be no claim for securities fraud where allegedly con-
cealed facts have already been disclosed publicly. *See
Longman,* 197 F.3d at 684; *Inspire,* 515 F.Supp.2d at
637.

The crux of Plaintiffs' securities fraud claim is that
Defendants made false statements regarding *when,*
not *if,* the FDA would approve Trexima. Signifi-
cantly, however, Plaintiffs allege no facts to support
their allegation that because of the CHO test results it
was highly unlikely that the FDA would approve
Trexima in August 2007. Therefore, Defendants' fail-
ure to offer more details with regard to the CHO test
results does not render misleading their anticipatory
statements about when Trexima would be approved.
In other words, Plaintiffs have alleged *no specific
facts* to support their blanket assertions that "it is
incomprehensible how Defendants could have had a
good faith belief that the FDA would approve
Trexima in mid-2007," or that the FDA had "in-
formed [Defendants] that it viewed the genotoxicity
issue as a significant impediment to approval" so that
"Trexima had virtually no chance of being approved
by mid-2007," or that Defendants "must have
known" the preclinical data would not support FDA
approval in 2007. (*See* Reply. Br. 6, quoting Pls.' Br.
Opp. 17, 18-19, 21-22.) Contrary to Plaintiffs' asser-
tions, Defendants' opinion that Trexima could be ap-
proved in August 2007 did have a reasonable basis.
As Defendants note, the relevant FDA Guidelines
expressly permitted FDA approval of Trexima de-
spite the positive results of the two CHO studies, and
it is undisputed that the FDA ultimately *did* approve
Trexima, despite the two positive results. Here, Plain-
tiffs assert that the FDA expressed grave concerns
over the long-term safety of Trexima because of the
positive results of the CHO study, but the record re-
veals no such statements by the FDA. Based on the
FDA's own guidelines, merely requiring further stud-
ies on the genotoxicity issue in the face of a positive
CHO is not necessarily a warning bell by the FDA
that the drug will not be approved because of long-
term safety issues. To this extent, the facts in this
case are different from cases in which the FDA had
indicated to the defendants that it was not going to

approve the NDA at issue. For example, in *In re
Connetics Corp. Sec. Litig.,* No. C 07-02940 SI, 2008
WL 3842938 (N.D.Cal. Aug. 14, 2008), the plaintiffs
alleged specific facts showing that a drug candidate
was highly unlikely to be approved based on its pre-
clinical testing results, including an opinion from an
expert panel that "they did not know of any drug that
exhibited [similar results] that had ever been ap-
proved by the FDA."*Id.* at *1. Other allegations in-
cluded specific facts regarding a conference between
the drug company and the FDA where the FDA
communicated "serious concerns" about the drug. *Id.*
at *7. The FDA ultimately did not approve the drug.
Under these specific facts, the court concluded that
the company's statements that the drug was safe were
incomplete and inaccurate. *Id.* at *7-8.Such specific
allegations are wholly absent here. Here, Plaintiffs do
not allege anywhere that the FDA has ever failed to
approve a drug that yielded positive results from two
CHO studies where two other studies (the mouse
lymphoma assays) had yielded negative results, and
here the FDA ultimately approved Trexima in April
2008. In sum, because Plaintiffs' assertions are not
supported by any facts, let alone *particularized* facts,
they are entitled to no weight. *See Teachers' Ret. Sys.
of La. v. Hunter,* 477 F.3d 162, 174 (4th Cir.2007).

**\*21** In any event, most of the challenged statements
are forward-looking statements about Defendants'
expectations regarding the timing of the FDA ap-
proval process and what revenue Pozen would re-
ceive *if* Trexima were approved in 2007. As noted
above, under the PSLRA's Safe Harbor provision,
forward-looking statements are immunized from li-
ability if they contain "meaningful cautionary state-
ments identifying important factors that could cause
actual results to differ materially from those in the
forward-looking statement[s]."15 U.S.C. ¶ 78u-
5(c)(1)(A)(i). Even if a forward-looking statement is
not accompanied by cautionary language, liability
*only* attaches if the speaker had *actual* knowledge
that it was false when made. *Id.* § 78u-5(c)(1)(B)(i);
*see also In re Lab. Corp. of Am. Holdings Sec. Litig.,*
No. 1:03CV591, 2006 WL 1367428, at *3 (M.D.N.C.
May 18, 2006). Furthermore, even before the Safe
Harbor provision was passed, the Fourth Circuit had
held that forward-looking statements are not action-
able if they do not guarantee any particular results.
*See Raab,* 4 F.3d at 290.

The forward-looking statements at issue here fall into

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

two categories: (1) those forecasting when Pozen would submit its response to the June 2006 Approvable Letter and when and how the FDA would respond; and (2) those forecasting the launch dates for Trexima and sales and revenues in the event that the FDA approved Trexima. These statements expressly warn that there was no guarantee that the FDA would accept Pozen's submission. Furthermore, Defendants' forward-looking statements were accompanied by meaningful, cautionary language, and Plaintiffs have not shown that Defendants had any actual knowledge that the statements were false when made. As I have already discussed, Plaintiffs have failed to sufficiently allege facts showing that Defendants had reason to believe that the FDA would *not* approve Trexima in August 2007.

Furthermore, as to Plaintiffs' contention that Defendants' cautionary statements were not meaningful because they were merely boilerplate, this argument has no merit. Cautionary language is meaningful if it is "enough to properly warn an investor of significant risks similar to that actually realized so as to put the investor on notice."*Lab. Corp.,* 2006 WL 1367428, at *5. Here, Defendants specifically warned in their forward-looking statements that preclinical data had raised genotoxicity concerns as to Trexima that could cause developmental delays and increased expenses and that the preclinical data could cause the FDA to deny or delay approval of Trexima due to differing interpretations of the FDA guidance. (*See* Defs.' Mem. at 20-21.)

Plaintiffs contend, however, that some of the challenged statements, including statements regarding the anticipated launch date of August 2007, are not "forward-looking" because they were based on concealment of then-existing facts-for instance, that the June 2006 Approvable Letter was based, at least in part, on the FDA's genotoxicity concerns (Amended Compl. ¶¶ 66-68); that the FDA required additional genotoxicity testing as a precondition to Trexima's approval (*Id.* ¶¶ 60, 92, 100, 133, 136); and that the genotoxicity findings observed in the Second CHO Study replicated the results seen in the First CHO Study, compelling the FDA to issue the June 2006 Approvable Letter (*Id.* ¶¶ 66, 68, 133, 136). According to Plaintiffs, Defendants concealed these facts while at the same time making misleading statements concerning Trexima's safety record, Defendants' communications with the FDA with respect to that

record, and the data that Pozen was submitting in response to the June 2006 Approvable Letter. Plaintiffs contend that these statements concealed historic facts about Trexima and are, therefore, not "forward-looking."

**\*22** Plaintiffs' argument fails, as "[t]he statutory definition of 'forward-looking statement' does not refer at all to the defendants' knowledge of the truth or falsity of the statement." *Harris v. Ivax Corp.,* 182 F.3d 799, 807 n. 10 (11th Cir.1999). Thus, whether a statement is forward-looking is determined by examining the statement, not the fact allegedly omitted. Indeed, as Defendants note, to accept Plaintiffs' argument would swallow the entire Safe Harbor provision of the PSLRA, as well as pre-existing Fourth Circuit law regarding forward-looking statements, because any claim based on forward-looking statements can be characterized as a claim about omissions of existing facts. *See Marsh Group v. Prime Retail, Inc.,* 46 Fed. Appx. 140, 146-47 (4th Cir.2002). In sum, for all these reasons, Plaintiffs have failed to show that Defendants either misrepresented material facts or failed to disclose material facts regarding the results of the two *in vitro* studies involving genotoxicity and the anticipated approval date for Trexima.

The only other factual statements Plaintiffs specifically mention in their brief opposing the motion to dismiss have nothing to do with genotoxicity and, therefore, cannot create any duty to disclose additional information about preclinical genotoxicity testing. For instance, Plaintiffs allege that Defendant Plachetka stated in a conference call that the FDA had not requested any long-term *cardiovascular* studies. (*See* Amended Compl. ¶ 100.) Defendants contend that this was a correct statement and, furthermore, that the FDA had never requested any long-term genotoxicity studies either. In any event, this statement is immaterial to Plaintiffs' claim of fraud based on Defendants' alleged misrepresentations regarding the two *in vitro* genotoxicity studies.

Plaintiffs also refer to a statement by Defendant Plachetka in which he opined that Trexima had an "unblemished" record. As Defendants note, this quote was taken from a lengthy exchange between several Defendants and an analyst regarding how GSK planned to market the drug, in which Plachetka described the fact that Trexima had beaten its compo-

nent drug, Imitrex, in head-to-head trials. (See Amended Compl. ¶ 113.) Neither of these statements constitute "false" statements. Furthermore, using a mere descriptive term such as "unblemished" is simply too vague to constitute a statement of material fact. It is well settled that indefinite statements of corporate optimism, also known as "puffery," are immaterial as a matter of law. See Raab, 4 F.3d at 289.

In addition to the fact that Plaintiffs have not alleged sufficient facts showing how Defendants made false or misleading statements, after applying the heightened pleading standards of the PSLRA, I also find that Plaintiffs' claims fail because Plaintiffs have not established a strong inference of scienter. Plaintiffs contend that Defendants did not discuss more specifically the genotoxicity test results because they were intentionally trying to mislead investors about the likelihood of Trexima being approved in August 2007, if at all. It is more compelling, however, to infer that Defendants merely viewed the positive results of the CHO study as minor and that they honestly believed that the positive results would not pose a barrier to approval in August 2007. As already noted, an FDA guidance document regarding genotoxicity states that "a positive finding in an in vitro chromosomal aberration assay that is not corroborated by the matching exposure regimen of *the mouse lymphoma assay* could also call into question the significance of the positive finding."(See Defs.' Ex. 6 to Porritt Decl., at 3.) As Defendants explain, because the mouse lymphoma assay is considered to be the most reliable test, a negative result-such as the one here-may counter a positive CHO test result, and the weight of evidence would therefore support approval of the drug. In other words, a positive result in one of the genotoxicity tests does not necessarily doom approval of a drug as potentially cancer causing. Therefore, one may plausibly infer that Defendants did not more specifically discuss the genotoxicity tests because they did not consider them to be impediments to approval; Defendants may simply have viewed the genotoxicity issue as minor, given the FDA guidance. Defendants have themselves stated that they always considered the positive results in the CHO studies to be an "anomaly."

**\*23** Therefore, I agree with Defendants that the FDA guidance supports a completely plausible inference of non-culpable conduct because it shows that Defen-

dants had a reasonable basis to believe the FDA would find Pozen's 2006 submittal of genotoxicity data to be sufficient and that Trexima would be approved on the anticipated date of August 2007.[FN7] *See Constr. Laborers Pension Trust v. Neurocrine Biosciences, Inc.,* No. 07CV1111-IEG-RBB, 2008 WL 2053733, at *6-7 (S.D.Cal. May 13, 2008) (stating that an FDA guidance document supported an inference of non-culpable conduct).

> FN7. Plaintiffs' assertion that the guidance document raises factual questions that cannot be resolved at the motion to dismiss stage ignores their pleading burden, which is to plead facts supporting an inference of scienter that is "cogent and compelling" in the face of "plausible nonculpable explanations for the defendant's conduct." *Tellabs,* 127 S.Ct. at 2510.

Here, Plaintiffs' theory of scienter rests primarily on Defendant Plachetka's statement during the August 2, 2007, investor conference call that the genotoxicity issue "wasn't a surprise." (See Pls.' Opp. Br. 21.) As Defendants note, however, in this conversation Plachetka was referring to the FDA's genotoxicity concerns and not to any expectation that the FDA would request additional data in August 2007. Defendant Plachetka stated that Pozen and its experts believed that the CHO test results were an anomaly caused by idiosyncrasies in the CHO test procedure while other, more reliable, tests showed no genotoxicity issues. (See Amended Compl. ¶ 136.) More specifically, in the conference call dated August 2, 2007, Plachetka stated, in pertinent part, in discussing the two *in vitro* studies:

[I]t was our interpretation that as the Agency asked us to do a second test and we already had another-I think we had another two already in the NDA that were negative, that if we ended up confirming that this was unique to the CHO test, which it appears to be unique to the CHO test, and negative in the other three tests that our experts and GSK's experts are saying *that is just an anomaly of the way that the compound interacts in that particular test.*

*And it does not foreshadow that this is going to be a problematic situation.*And I think as I mentioned before, there are a high degree of positives in a particular test, but what the Agency has written about

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

in their own guidance is that they look at where there is confirming gene toxicity in more than one test.

So I don't want to say that this was a surprise. It wasn't a surprise. *We knew this was there, but we also thought that this was not as important as the clinical issues [i.e., the cardiovascular test] because [the FDA] had spent most of their time talking about the clinical issue and because we had all of these offsetting negative results..... [T]he new test that we did was called the mouse lymphoma test, and it was negative, but the study that was positive in our NDA, the [CHO] test which they cited in their approvable letter, was reproducibly positive.*But again, we think that ... is because during the course of this test as you raise the concentrations of the drugs, something kills the cells and that makes the data much more difficult to interpret.

Now, I'm not a toxicologist and I don't want to start the discussion of what is right in the interpretation of data and how it all came about. *But reasonable scientists have looked at these data and said, gee, I don't think [this] really indicates chromosomal problems here. This looks to me to be unique to this particular test.*

**\*24** (*Id.*) (emphasis added). As Dr. Plachetka's explanation here makes clear, although Defendants were aware of the results of the two genotoxicity studies, the Company nevertheless believed that it had sufficiently answered the FDA's genotoxicity concerns in 2006 and that Trexima would be approved in August 2007. (*See* Defs.' Ex. 26 to Porritt Decl., at 13, 15.) That is, Defendants did not admit that the FDA's failure to approve Trexima in August 2007 was not a surprise; rather, they merely admitted that the genotoxicity issues were not a surprise. In sum, Plaintiffs have failed to present facts showing that Defendants had advance knowledge that the FDA would not approve Trexima in August 2007.

In attempting to establish scienter, Plaintiffs also emphasize the fact that certain analysts expressed "shock" over the second Approvable Letter and that some analysts opined that Defendants had not been entirely "transparent" about the CHO studies regarding genotoxicity. Again, it is reasonable to infer that Defendants did not provide more details about the CHO studies because they considered the positive

results to be "anomalies" and "trivial." In the August 2, 2007, conference call, Plachetka stated:

And putting things in perspective, the cardiovascular safety issue *was the dominant issue by far during all our interactions with the [FDA]* since our first approvable letter, including our only face-to-face meeting with them last July.

....

The in vitro studies that we conducted ... were last year's suggestion by the FDA as to how to address this issue.... The one study confirmed the result which we felt and still feel is due to cytotoxicity in the assay probably unique to the two components which makes interpretation of the results funky.

And then when you are in that situation it was our interpretation that the FDA said if that happens again, go to the next step and do what is known as a mouse lymphoma assay. *If that would have been positive, then we would have had to go back to the [FDA] and say, yes, you know there is a concern here. And then we will talk about what would go on. But in that circumstance[ ], that test was negative.*

*And so we were here ... with three negative gene tox tests, and one positive that we felt was an aberrancy, and unique to the situation we found for the two drugs. But not indicative of a clastogenic effect of the product in the long-term exposure situation. So we thought we'd adequately addressed it and the scientists that reviewed the situation told us that was a mainstream opinion.*

(*Id.*, Ex. 26, at 5, 17) (emphasis added). Based on this statement by Plachetka, it is reasonable to infer that Defendants were not recklessly or intentionally attempting to defraud investors by failing to disclose more details regarding the genotoxicity tests. Rather, it appears that Defendants simply did not consider the positive results to be a barrier to approval or even particularly ominous. Therefore, even if Defendants were less than "transparent" with regard to the genotoxicity tests, and even if the failure to disclose was misleading, Plaintiffs still cannot establish the essential element of scienter. That is, the more compelling inference here is that Defendants acted innocently, or even negli-

gently, with regard to disclosure of the
<u>genotoxicity</u> tests, as opposed to acting recklessly
or with fraudulent intent.

**\*25** It is undisputed that Defendants here ultimately
satisfied the FDA's concerns through a short-term
clinical study after the 2007 Approvable Letter.
Moreover, analysts did appear to understand *gener-
ally* that the FDA had expressed safety concerns that
prompted the further preclinical testing, and courts
have observed that analysts' claims, especially on
matters involving scientific knowledge, are not al-
ways reliable. *See Inspire,* 515 F.Supp.2d at 638 (ob-
serving that analysts are not scientists and that ana-
lysts' assertions as to scientific data were "well out-
side of their realm of knowledge and expertise). As
already noted, Plaintiffs do not allege anywhere in
the complaint, nor do they contend in their brief, that
a positive test in a CHO study necessarily precludes
FDA approval of a drug. Therefore, certain analysts'
"surprise" over Defendants' failure to disclose the
<u>genotoxicity test</u> results could have resulted from the
analysts' own misunderstanding regarding the signifi-
cance of the positive results. In other words, due to
their lack of scientific expertise, analysts could have
wrongly assumed that the positive results in the
<u>genotoxicity tests</u> were more significant than they
were-after all, in the end the FDA gave its approval
despite the two positive test results. In sum, I do not
find scienter based on certain analysts' opinions that
Defendants were not as "transparent" as they should
have been with regard to the <u>genotoxicity</u> results.

In any event, the most salient point is that Plaintiffs
offer *no evidence* to show that Defendants doubted
that the FDA would approve Trexima in August
2007, or that they had any indication themselves that
the FDA would require more information after the
results of the Second CHO study were submitted.
Therefore, even if Defendants had disclosed every
single detail about the two *in vitro* studies, Plaintiffs
have alleged no facts to show that Defendants' state-
ments regarding their anticipated launch date of Au-
gust 2007 and their anticipated revenues for 2007
would have been any different. This fact is important
because Plaintiffs are claiming damages arising out
of Defendants' statements regarding the anticipated
approval date of August 1, 2007, and the FDA's fail-
ure to approve Trexima on that date. Finally, Defen-
dants point out that if they had known in 2006 that
the FDA would require an additional study beyond

the Second CHO study, Pozen would have conducted
the study then, therefore speeding up FDA approval.
Indeed, this argument makes sense because Trexima's
commercial success depended, in part, on entering
the marketplace well before the patent on <u>Imitrex</u>
expired so that GSK would have time to switch its
<u>Imitrex</u> customers to Trexima. *Accord <u>Cozzarelli,</u>
549 F.3d at 627* ("It is improbable that [Defendant]
would stake its existence on a drug and a clinical trial
that the company thought was doomed to failure.").

I further find that the mere fact that Defendant Pla-
chetka sold stock during the Class Period does not
give rise to an inference of scienter in this case, given
the amount that he sold. For stock sales to support an
inference of scienter, the timing and amount must be
"unusual and suspicious." *<u>Hunter,</u> 477 F.3d at 184.*
As Defendants note, Plachetka sold only 6.7 percent
of his Pozen stock; his sales were made pursuant to a
Rule 10b5-1 plan; and the two remaining individual
Defendants, William Hodges and Marshall Reese, did
not sell any stock.[FN8] Therefore, the stock sales here
were neither unusual nor suspicious. *See <u>In re PEC
Solutions, Inc. Sec. Litig.,</u> 418 F.3d 379, 390 (4th
Cir.2005)* (stating that sales by the defendants of 13
percent or less of their total holdings were not "un-
usual or suspicious" but were "nearly *de minimis*");
*<u>Inspire,</u> 515 F.Supp.2d at 640* (stating that sales of
"only 12, 13, and 3 percent" did not support scienter).

> FN8. Plaintiffs argue that Defendant Pla-
> chetka sold "28%" of his shares based on the
> fact that his Rule 10b5-1 plan included
> 1,000,000 of his 4,177,134 total Pozen
> shares, and he sold 280,000 of those shares
> (the 1,000,000 Rule 10b5-1 shares) during
> the Class Period. As Defendants note, this
> calculation is incorrect because it reflects
> only the percentage of shares sold under
> Plachetka's Rule 10b5-1 plan and fails to ac-
> count for all shares that were saleable during
> the Class Period. *See <u>Inspire,</u> 515 F.Supp.2d
> at 640* (taking into account total shares and
> vested options in determining the percentage
> of shares sold for purpose of establishing
> scienter). Plaintiffs also note that Plachetka
> sold some of his shares on August 1, 2007,
> the day that Pozen received the second Ap-
> provable Letter, and one day before Pozen
> disclosed the second Approvable Letter to
> the investing public. Although this fact

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

could possibly implicate insider trading, it does not support Plaintiffs' theory that Plachetka knew before August 1, 2007, that the FDA was not going to approve Trexima on the anticipated date of August 1, 2007. Indeed, it appears to indicate the opposite.

**\*26** Finally, in an attempt to show scienter, Plaintiffs point to the fact that Pozen is a small company and that its officers were integrally involved in all of its operations and therefore the individual Defendants must have known about the positive results from the two *in vitro* studies. I agree with Defendants that this fact is irrelevant, since the issue is not whether the individual Defendants knew about the <u>genotoxicity test</u> results, but whether Defendants "knew" that there was "virtually no chance" that the FDA would approve Trexima in August 2007. In sum, the facts as a whole "more plausibly suggest that [Defendants] acted innocently-or even negligently-rather than with intent or severe recklessness." <u>Cozzarelli,</u> 549 F.3d at <u>625</u>. Therefore, Plaintiffs have failed to sufficiently plead scienter to support a claim for securities fraud.

*CONCLUSION*

For all the reasons stated herein, it is therefore **RECOMMENDED** that the court **GRANT** the motion to dismiss the Amended Complaint filed by Defendants Reese, Hodges, Pozen, Plachetka, and Wise (docket no. 50). The separate motion to dismiss the Amended Complaint filed by Defendant Wise (docket no. 52) should be dismissed as **MOOT,** as Plaintiffs have filed a notice of voluntary dismissal as to Defendant Wise, *see* note 1. Furthermore, Plaintiffs' motion to strike (docket no. 59) is **DENIED.**To the extent that Plaintiffs have requested alternatively in their brief that the court allow Plaintiffs to amend the Amended Complaint to redraft the complaint to get over the pleading hurdles of Rule 12(b)(6) and the PSLRA, the motion should be **DENIED** as futile. Finally, Defendants' request for oral argument on the motion to dismiss pursuant to the court's Local Rule 7.3(c)(1) (docket no. 58) is **DENIED.**

M.D.N.C.,2009.
Johnson v. Pozen Inc.
Slip Copy, 2009 WL 426235 (M.D.N.C.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**TAB 7**



C Only the Westlaw citation is currently available.

United States District Court, W.D. New York.
Mark McLELLAN, Plaintiff,
v.
SOFAMOR-DANEK GROUP, INC., Danek Group,
Inc. and Danek Medical, Inc., Defendants.
**No. 95-CV-0322E(H).**

April 12, 1999.

Judge John T. Elfvin, Jeffrey S. Krajewski, Esq., c/o
Siegel, Kelleher & Kahn, Buffalo, for the Plaintiff.

Kathleen M. Kaczor, Esq., c/o Pepper Hamilton LLP,
New York, Philip Lebowitz, Esq., c/o Pepper Hamil-
ton LLP, Philadelphia, PA, Samuel Goldblatt, Esq.,
c/o Nixon, Hargrave, Devans & Doyle LLP, Buffalo,
for the Defendant.

MEMORANDUM and ORDER

ELFVIN, S.D.J.

**\*1** Plaintiff McLellan, a New York resident, com-
menced this products liability action April 27, 1995
by filing a Complaint containing claims for negli-
gence, breach of express and implied warranties and
strict liability against Sofamor-Danek Group, Inc., an
Indiana corporation,[FN1] and Danek Medical, Inc., a
Tennessee corporation, arising out of injuries he al-
legedly sustained as a result of defects in a spinal
fixation device that had been sold by the defendants
and implanted in him in 1992. Jurisdiction is prem-
ised upon diversity of citizenship. 28 U.S.C. § 1332.
The defendants filed an Answer on June 12, 1995 and
the case was thereafter transferred to the United
States District Court for the Eastern District of Penn-
sylvania for pretrial proceedings in coordination with
several other lawsuits brought against the defendants
(and others) arising out of the manufacture and sale
of orthopedic bone screw products. 28 U.S.C. § 1407.
While the case was in such Court, the parties com-
pleted all factual discovery and so-called "generic"
expert discovery-*i.e.,* discovery of general expert
opinion "associated with the overall science associ-
ated with the use of screws in pedicles of the spine."

*In re Orthopedic Bone Screw Products Liability Liti-
gation,* M.D.L. 1014, 1998 WL 118060, \*6
(E.D.Pa.1998) (Pretrial Order No. 1235). Upon trans-
ferring this and other cases back to the Courts from
which they had respectively come, District Judge
Louis C. Bechtle issued a general Order directing
each plaintiff in a certain group of cases [FN2]-including
this one-to identify an expert who would provide
opinion evidence as to causation in that plaintiff's
case within 20 days after the case had been remanded
to and docketed by the transferee court. *In re Ortho-
pedic Bone Screw Products Liability Litigation,*
M.D.L. 1014, 1997 WL 688805, \*2 (E.D.Pa.1997)
(Pretrial Order No. 1120),*as amended by* 1997 WL
857174 (E.D.Pa.1997) (Pretrial Order No. 1201). The
case was returned to this Court and re-opened on
March 2, 1998. After a pre-trial conference, the un-
dersigned issued a Scheduling Order dated April 16,
1998 directing that discovery was to be completed by
October 2nd. Presently before this Court are the de-
fendants' October 23, 1998 motion for a summary
judgment pursuant to Rule 56 of the Federal Rules of
Civil Procedure ("FRCvP") and their November 25,
1998 motion to strike the affidavit and expert report
of one Dr. Lance Owen Yarus, which were submitted
by McLellan in opposition to the summary judgment
motion. For the reasons that follow, both motions
will be granted and this case will be closed.

The following facts are undisputed. McLellan, now
31 years old, started experiencing constant pain in his
back and left leg in the late 1980s. He sought medical
treatment therefor in approximately 1989 and has
since been under medical care for various back ail-
ments. In January 1991 he underwent a left L4-5 par-
tial discectomy, which failed to completely alleviate
his pain. Since that surgery, he has been completely
disabled and unable to work.

**\*2** In December of 1991 McLellan came under the
care of Dr. Edward D. Simmons, Jr., who examined
the plaintiff and diagnosed that he was suffering from
degenerative disc disease and spondylolysis-a disc
fracture. Dr. Simmons recommended spinal fusion
surgery in the plaintiff's lower back, with the atten-
dant implantation of screw fusion instrumentation.
McLellan consented and, on April 28, 1992, Dr.
Simmons performed such surgery at Buffalo General

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Hospital. During the operation, Dr. Simmons implanted the TSRH System, a device distributed by Danek Medical, Inc. consisting of screws, hooks, rods, transverse traction devices, connectors and other components whose design allows surgeons to fashion customized constructs suited to a patient's circumstances.

Dr. Simmons characterized the surgery as "very successful." Deposition Testimony of Dr. Edward D. Simmons, Jr. attached as Exhibit M to the Affirmation of Kathleen M. Kaczor, Esq. sworn to October 22, 1998 ("Dr. Simmons Deposition"), at 30. However, McLellan reports feeling "a lot more pain" than he had suffered before. Immediately after the surgery, he felt his level of pain had increased; thereafter the pain "gradually, slowly, got worse." At the time of his deposition in December of 1995, he reported feeling an "aching, stabbing pain."

In support of the defendants' motion for summary judgment, it was initially argued that the plaintiff's subjective reports of pain alone were insufficient to establish that a defect in the TSRH System had caused him injury. They submitted a report from an orthopedic surgeon-a Dr. P. William Haake-and portions of the transcript of the February 13, 1996 deposition of Dr. Simmons in support; both opine that the TSRH System had not caused the plaintiff to suffer any injury.[FN3] In response to the defendants' motion, McLellan has for the first time produced an expert report and affidavit from an osteopathic physician and surgeon who avers that, in his reasonably certain medical opinion, the implantation of the subject device "contributed to the proximate cause of Plaintiff's increase in symptomatology and lack of response to the procedure." Affidavit of Dr. Lance Owen Yarus sworn to November 16, 1998, ¶¶ 1, 8. The defendants argue that Dr. Yarus's report and affidavit are insufficient as a matter of law to create a genuine issue of material fact regarding whether the plaintiff had been injured by a defect in the subject device. Furthermore, they ask this Court to strike and/or preclude such expert opinion evidence because the plaintiff had not previously produced such and because that opinion evidence is inadmissible under Rule 702 of the Federal Rules of Evidence ("FRE").

For expert opinion evidence to be admissible, it must be helpful to the factfinder in attempting to understand the evidence or in determining a fact in issue.

FRE 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 591 (1993). In deciding whether such requirement has been met, this Court must undertake "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* at 592-593. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595.

**\*3** Dr. Yarus's opinion that a defect in the TSRH System caused McLellan to suffer from increased pain after the implantation is premised solely upon his review of McLellan's medical records and deposition testimony. Specifically, his expert report cites a post-operative report by Dr. Simmons dated April 28, 1992, x-ray reports from November and December of 1992, various records and reports from other doctors or medical professionals prepared in November of 1992 and February, October and December of 1993 and a partial transcript of McLellan's December 1995 deposition testimony. Aside from Dr. Simmons' post-operative report, none of the medical records is said to refer to the implantation of the TSRH System.[FN4] In fact, according to Dr. Yarus's report, an October 25, 1993 report prepared by a neurologist after examining McLellan indicates that "[t]here was no change in his symptomatology with the disc surgery of 1991 or after the fusion surgery by Dr. Simmons in 1992." Only McLellan's deposition testimony is cited as evidence that his condition had worsened after the 1992 surgery. Dr. Yarus's report concludes:

"It is my opinion to a reasonable degree of medical certainty that the application of TSRH instrumentation at L5-S1 contributed to the proximate cause of Mr. McLellan's increase in symptomatology and lack of response to the procedure. He had developed pain which was severe in the left lower extremity and over the area of cervical fusion. He continued to suffer numbness and pain in the left lower extremity which was more significant than that of his preoperative condition. He was clear in his testimony that this was the case. It is my opinion to a reasonable degree of medical certainty that there is a proximate cause and effect relationship between the ongoing impairment and disability and the application of metallic implantation utilizing the TSRH system for Mr. McLellan's back condition. There are no indications in the body of the record reviewed that this type of procedure was

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 1999 WL 222591 (W.D.N.Y.)
**(Cite as: 1999 WL 222591 (W.D.N.Y.))**

warranted."Exhibit C attached to Affidavit of Jeffrey S. Krajewski, Esq. sworn to November 17, 1998.

Dr. Yarus's affidavit restates the findings and conclusions contained in his report.

This Court need not entertain "opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 519 (1997). Dr. Yarus provides no rationale for his conclusion, aside from the plaintiff's reports of increased pain after the 1992 surgery, that a defect in the TSRH System caused him to suffer an injury. This Court finds Dr. Yarus's report and affidavit to be utterly unhelpful and therefore inadmissible under FRE 702. The defendants' motion to strike will be granted; the expert opinion evidence of Dr. Yarus will be disregarded.[FN5]

A motion for summary judgment must be granted when the record presents no genuine issue of material fact and, based upon the undisputed facts, the moving party is entitled to judgment as a matter of law. FRCvP 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986). The existence of a factual dispute between the parties will not prevent the entry of a summary judgment unless it is a "*genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986). An issue of fact is genuine only where the evidence taken as a whole would allow a reasonable jury to return thereupon a verdict in favor of the non-moving party; whether such issue is material is governed by applicable substantive law. *Id.* at 248.In considering a motion for summary judgment, this Court's duty is to determine whether a genuine issue of material fact exists which must proceed to trial and not to resolve any such. *Id.* at 249.In doing so, this Court must accept as true evidence provided by the non-moving party and, in considering the evidence as a whole, any ambiguities must be resolved and all reasonable inferences therefrom must be drawn in the light most favorable to such party. *Id.* at 255; *Adickes v. Kress & Co.,* 398 U.S. 144, 157 (1970). However, only admissible evidence need be considered in ruling on a motion for summary judgment. *Nora Beverages v. Perrier Group of America,* 164 F.3d 736, 746 (2d Cir.1998) (expert opinion evidence found inadmissible is properly disregarded at summary judgment stage); *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997) (same).

**\*4** In this diversity action, New York law governs all outcome-determinative. issues presented by the defendants' summary judgment motion. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 79-80 (1938); *McCarthy v. Olin Corp.,* 119 F.3d 148, 153 (2d Cir.1997) (applying New York law to products liability action against out-of-state defendants). To establish any of the claims alleged herein-negligence, breach of warranty and strict products liability-the plaintiff must demonstrate that a defect in the subject device, or some wrongful act by a defendant, was a substantial factor causing him to suffer an injury. *Amatulli v. Delhi Constr. Corp.,* 77 N.Y.2d 525, 532 (1991); *Voss v. Black & Decker Manuf. Co.,* 59 N.Y.2d 102, 107 (1983); *Tardella v. RJR Nabisco, Inc.,* 576 N.Y.S.2d 965, 966 (App.Div., 3d Dept.1991). When the determination whether an injury was caused by some event or conduct is "presumed not to be within common knowledge and experience," competent medical opinion evidence is necessary to enable a jury to find the requisite causation. *Meiselman v. Crown Heights Hospital,* 285 N.Y. 389, 396 (1941), cited in *Fane v. Zimmer, Inc.,* 927 F.2d 124, 131 (2d Cir.1991). When competent medical opinion evidence is required, a judgment as a matter of law is appropriate if the plaintiff fails to adduce such. *Fane,* at 131-132.

This Court finds the issue of causation in this case to be outside the scope of common knowledge and experience. The plaintiff's allegation that he suffered more pain after the 1992 surgery than he had felt before is, under the circumstances, insufficient to support a rational jury's verdict in his favor.[FN6] His claims cannot withstand the defendants' summary judgment motion.[FN7]

Accordingly, it is hereby *ORDERED* that the defendants' November 25, 1998 motion to strike the affidavit and report of Dr. Lance Owen Yarus is granted, that the defendants' October 23, 1998 motion for a summary judgment is granted, that the Complaint is dismissed and that this case shall be closed.

> FN1. Danek Group, Inc. is the former name of such corporation.

> FN2. The plaintiffs in such group-approximately 500 in all-had, in accordance with one of Judge Bechtle's prior Orders, submitted affidavits and/or reports from a purported "causation expert"-a Dr. Merril

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Reuter. After allegations had been made attacking the methodology and reliability of such reports and Dr. Reuter had consequently withdrawn from M.D.L. 1014 in all respects, Judge Bechtle ordered that his reports be stricken and precluded their use in this litigation. 1998 WL 118060, *8.

FN3. Dr. Simmons testified that he was reasonably medically certain that the TSRH System had not failed. Dr. Simmons Deposition, at 88. He opined that McLellan's "main problems aren't his lower back [-where the device had been implanted]. It's [his] upper thoracic and cervical spine."*Id.* at 37.Apparently, the plaintiff suffers from 21-degree thoracic scoliosis and wedging of the apical vertebrae, which Dr. Simmons described as a "[t]otally separate problem" from his lower back. *Id.* at 38.

FN4. Of the medical records cited in Dr. Yarus's report, only Dr. Simmons' post-operative report has been submitted.

FN5. This Court does not reach the defendants' contentions that Dr. Yarus is unqualified to render an expert opinion in this case and that the plaintiff should be barred from using Dr. Yarus's expert opinion evidence due to the plaintiff's noncompliance with Judge Bechtle's Order.

FN6. Even if Dr. Yarus's opinion evidence were not excluded, this Court would nevertheless find that no rational jury could find that the plaintiff had been injured by a defect in the TSRH System. As discussed *supra,* Dr. Yarus's opinion lacks sufficient foundation and would not support a rational jury's returning a verdict in McLellan's favor. *See Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349 (6th Cir.1992) (summary judgment was proper where scientific evidence that supported plaintiff's expert's opinion that Bendectin causes birth defects in humans-while admissible-was not sufficient to allow a rational jury to find in plaintiff's favor), cited with approval in *Daubert,* 509 U.S. at 596 (judgment as a matter of law and summary judgment are "appropriate

safeguards [against jury consideration of 'pseudoscience,' even] where the basis of scientific testimony meets the standards of Rule 702"), and in *General Elec. Co.,* 118 S.Ct. at 519 ("[a] court may conclude that there is simply too great an analytical gap between the data and the opinion offered").

FN7. Due to the plaintiff's failure to adduce sufficient evidence of causation, this Court need not address the defendants' contention that there is insufficient evidence that the TSRH System was defective.

W.D.N.Y.,1999.
McLellan v. Sofamor-Danek Group, Inc.
Not Reported in F.Supp.2d, 1999 WL 222591 (W.D.N.Y.)

END OF DOCUMENT

**TAB 8**



**H** Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
ROWE ENTERTAINMENT, INC., et al., Plaintiffs,
v.
The WILLIAM MORRIS AGENCY, INC., et al.,
Defendants.
**No. 98 CIV, 8272(RPP).**

Sept. 15, 2003.

Black concert promoters brought action against book-
ing agencies, alleging they were underutilized by the
agencies as result of race discrimination. On defen-
dants' motion to exclude testimony of plaintiffs' ex-
pert, the District Court, Robert P. Patterson, Jr., J.,
held that: (1) expert's conclusion that plaintiff's were
underutilized by defendants due to race discrimina-
tion did not satisfy *Daubert*'s standards of reliability
for expert testimony involving a scientific technique,
and (2) expert's calculation of damages did not satisfy
*Daubert*'s standards.

Motion granted.

West Headnotes

**[1] Evidence 157** 555.4(1)

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.4 Sources of Data
                    157k555.4(1) k. In General. Most
Cited Cases
Expert's conclusion that black concert promoters
were underutilized by defendant booking agencies
due to race discrimination did not satisfy *Daubert*'s
standards of reliability for expert testimony involving
a scientific technique; expert relied on plaintiffs' pre-
selected contracts, their oral information about black
and white concert promotion businesses active in
three state region during period in question, and their
amended complaint for estimated percentage of mar-
ket share attributed to defendants, without taking

steps to verify accuracy of the data. Fed. Rules
Civ.Proc.Rule 26(a)(2)(B), 28 U.S.C.A.

**[2] Evidence 157** 555.9

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.9 k. Damages. Most Cited
Cases
Expert's calculation of damages suffered by black
concert promoters as result of race discrimination by
defendant booking agencies did not satisfy *Daubert*'s
standards of reliability for expert testimony involving
a scientific technique; expert took no steps to verify
the accuracy of the data plaintiffs provided to him,
and improperly used a proportionate number as the
real number of black concert promotion businesses
active throughout period in question, vastly increas-
ing his calculation of plaintiffs' potential share of
revenues to which in his opinion black concert pro-
motion businesses in the period should have been
entitled. Fed.Rules Civ.Proc.Rule 26(a)(2)(B), 28
U.S.C.A.
Ivie, McNeill & Wyatt, Los Angeles, CA, by Rickey
Ivie, Gary, Williams, Parenti, Finney, Lewis,
McManus, Watson & Sperando, Stuart, FL, for Plain-
tiffs.

Loeb & Loeb LLP, New York, NY, by Charles M.
Miller, Helen Gavaris, for William Morris Agency,
Inc.

Weil Gotshal & Manges, LLP, New York, NY, by
Jeffrey Kessler, Jeffrey Klein, for Creative Artists
Agency, Inc.

Parcher, Haues & Snyder, P.C., New York, NY, by
Steven M. Hayes, for Renaissance Entertainment,
Inc.

Emmett, Cobb, Waits & Kessenich, New Orleans,
LA, by Matthew F. Popp, Esq., James A. Cobb, Jr.,
Esq., for Beaver Productions, Inc.

Piper Rudnick LLP, Chicago, IL, by: George L.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22124991 (S.D.N.Y.)
 **(Cite as: 2003 WL 22124991 (S.D.N.Y.))**

Page 2

Grumley, Esq., James D. Roberts, Esq., Monica Petraglia McCabe, Esq., for Jam Productions.

**OPINION AND ORDER**

ROBERT P. PATTERSON, JR., District Judge.

**\*1** The motion, pursuant to the Federal Rules of Evidence 401, 402, 702 and 703, of Defendants Creative Artists Agency LLC ("CAA"), The William Morris Agency, Inc. ("WMA") and Renaissance Entertainment, Inc.'s ("Renaissance") (collectively, the "Booking Agency Defendants") to exclude the expert testimony of Dr. Gerald Jaynes that (1) Plaintiffs have been under-utilized by the Booking Agency Defendants creating an inference of racial discrimination; and (2) Plaintiffs have suffered damages of $29 million as a result, is granted, and the motion by the Booking Agency Defendants to strike the supplemental affidavit of Dr. Jaynes, pursuant to Federal Rules of Evidence 26(a) and 37(c), is denied as moot.

**1. Dr. Jaynes's conclusion of underutilization of black promoters**

**A. *The sampling used by Dr. Jaynes was not representative.***

[1] Dr. Jaynes's Report concludes that the four Plaintiffs, Rowe Entertainment, Inc. ("Rowe"), Lee King Productions ("King"), Summit Management Corporation ("Summit"), and Sung Song Productions ("Sung") have been underutilized as concert promoters due to racial discrimination. This determination, however, is unreliable because the evidence shows that the sample Dr. Jaynes utilized was not a random sample or other representative sample of Defendants' contracts as a whole.

Expert testimony involving a scientific technique must meet standards of reliability set forth in *Daubert v. Merrill Dow Pharmaceuticals, Inc.* 509 U.S. 579, 593, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).*Daubert* enunciates four key issues as relevant "in determining whether a theory or technique is scientific knowledge that will assist the trier of fact."*Id.* These considerations are: (1) "whether [the theory or technique] can be (and has been) tested,"*id.,* (2)"whether the theory or technique has been subjected to peer review and publication,"*id.,* (3)"in the

case of a particular scientific technique ... the known or potential rate of error ... and the existence and maintenance of standards controlling the technique's operation,"*id.* at 594, (4) whether the theory or technique has "general acceptance" in the scientific community. *Id.* As discussed infra, Dr. Jaynes's Report fails to meet these standards.

According to the *Reference Manual on Scientific Evidence,* when using "sample data to characterize a population":

[T]he population is the whole class of units that are of interest; the sample is a set of units chosen for detailed study. Inferences from the part to the whole are justified only when the sample is representative....

Federal Judicial Center, *Reference Manual on Scientific Evidence* 90 (2d ed.2000). As the court in *Guardians Ass'n of New York City Police Department, Inc. v. Civil Service Commission of City of New York* stated, "[n]ecessity often dictates that the composition of a given population be estimated by projecting data gathered by less than optimal means from only a sample of that population." 633 F.2d 232, 240 (2d Cir.1980). While use of such a sample is permissible, to be properly admitted into evidence, "the sample [must be] adequate, the data gathering techniques reliable, and the conclusions drawn demonstrated to be statistically significant."*Id.*

**\*2** Dr. Jaynes's expert report dated July 31, 2002 states that he based his study on a sample of 1,561 contracts. (Declaration of Maria Sperando, dated March 19, 2003, Ex. 2, expert report of Gerald Jaynes ("Jaynes Report") at 5.) However, Dr. Jaynes did not obtain his sample set in a manner that provided assurance that it was representative of the contracts entered into by the Booking Agency Defendants during the study period, 1994-2001. During argument on the motions on June 11, 2003, it developed that of the 1,561 contracts relied on in Dr. Jaynes's Report, 1,214 were contracts obtained and copied by Plaintiffs and Plaintiffs' counsel out of the tens of thousands of contracts, possibly over 100,000, produced by the Defendants' talent agencies. (Hrg. Tr. at 14-15; Jaynes Report at 9.) FN1 Dr. Jaynes testified at his deposition that Plaintiffs' counsel told him "they didn't have any method of determining what contracts they were selecting. Whoever was doing the selecting was choosing contracts that looked interesting to

them."(Declaration of Pierre Armand, dated February 24, 2003, Ex. 2 ("Jaynes Dep.") at 288.) In support of his position that the sample was fair and representative, Dr. Jaynes reasoned that as Plaintiffs and Plaintiffs' counsel were unaware of how he would conduct his analysis when they selected the contracts, they would not know how to create a biased group of contracts. (*Id.* at 289, 349.)

> FN1. There were two sets of contracts turned over by Plaintiffs' counsel to Dr. Jaynes: 1,214 hard copies, and a computer disk ("WMA CD Rom") of contracts in the files of WMA (New York only) from which Dr. Jaynes selected one in every six contracts until he stopped at 342, due to both time constraints and because he felt that the CD Rom was over represented by black artists. (Jaynes Dep. at 358-59, 506-07.) It is unclear if "342"contracts referred to in the deposition is accurate or rather if "347" contracts were reviewed since "347" plus "1,214" equals the "1,561" contracts Jaynes states he relied upon.

In their responsive motion papers, Plaintiffs' counsel attempted to buttress this testimony by the inclusion of a declaration by Laura L. Mall, Esq., dated April 22, 2003 ("Mall Decl."), stating that she attended the inspections of WMA contracts and of two promoters, Jam Productions and Beaver Productions.[FN2] (Pls.' Response Mem of Law in Opp. to Defs.' Motion to Exclude Pls.' Expert Witness, Dr. Gerald D. Jaynes's Affidavit ("Pls.' Response Mem.") at Ex. 7, ¶¶ 3, 7, 10.) Ms. Mall maintains that the several persons conducting the inspections of Defendants' documents were instructed to employ a broad selection process in determining what contracts to copy from the thousands presented by Defendants for their inspection. (*Id.* at ¶¶ 4-9.)This selection process was intended to obtain a broad sampling of contracts representative of major and lesser artists, black and white artists, non-Defendants and Defendant promoters, non-Plaintiff and Plaintiff promoters, and non-Defendant and Defendant agencies, as well as "specific artists named in the Amended Complaint."(*Id.* at ¶¶ 4-5.)Ms. Mall also states that she believes Plaintiffs, Rowe and King, and other attorneys and paralegals engaged in selecting contracts for copying followed the same selection procedure. (*Id.* at ¶¶ 4-8.)

> FN2. These inspections were conducted long before Dr. Jaynes was retained, and included the contracts of booking agents and promoters who are no longer defendants in the case. Defendants assert, without contradiction, that Ms. Mall does not purport to have reviewed the thousands of contracts in the concert files of CAA and Renaissance or the CD Rom of the contract files of WMA in New York from which 342 (or 347) contracts were copied.

Ms. Mall's testimony, however, is inadequate to demonstrate the reliability or representative quality of Dr. Jaynes sample, for the following reasons: (1) Ms. Mall presents no description of the utilization of any control mechanism to show that the contracts selected by each document reviewer were balanced in the manner the alleged selection process intended; (2) Ms. Mall presents no description of how the contracts selected by each document reviewer were counterbalanced with the contracts selected by another document reviewer to achieve the balance intended; (3) finally, Ms. Mall does not show that the contracts copied from each Booking Agency Defendant were balanced by means of any control mechanism to show they were indeed representative of all the contracts entered into by the Booking Agency Defendants during the period studied.

**\*3** By allowing the contracts to be selected on the basis of the "specific artists named in the Complaint," (i.e., those contracts in which white promoters were selected for concerts and the Plaintiffs were not selected), the "sample" received by Dr. Jaynes would be neither "random" nor representative. Instead, the sample would, perforce, be biased or weighted towards the concert contracts for those artists whose business Plaintiffs wanted but did not get. Indeed, Dr. Jaynes's results are proof that the contracts selected by Plaintiffs and Plaintiffs' counsel were not representative. Dr. Jaynes concluded, based on his study of the 1,561 contracts and information provided by Plaintiffs, that black-owned firms were awarded only seven of the 1,561 contracts during the study period 1994-2001 and promoted no music events featuring a white act or featuring a major black act during that period. (Jaynes Report at 5 .) All seven of the contracts with black promoters came from the 342 WMA contracts copied by Dr. Jaynes.[FN3](Jaynes Dep. at 502.) Accordingly, the 1,214 contracts selected by

Plaintiffs and used in Dr. Jaynes's sample of 1,561 contained no contracts by black promoters for white or black acts. In short, the only contracts selected by Ms. Mall and the other reviewers were contracts with white promoters.

> FN3. Dr. Jaynes should have been aware of this discrepancy since he admitted one of the reasons he discontinued making a random examination of WMA's CD Rom was his determination the CD Rom was over represented with black artists. (Jaynes Dep. at 507.)

Since over three-quarters of the sample used by Dr. Jaynes was not representative of concert contracts entered into in the concert promotion industry, the entire sample would not be representative and appropriate for use in Dr. Jaynes's statistical study. When he made the decision to utilize the 1,214 contracts which Plaintiffs Rowe and King and Plaintiffs' legal team had selected for copying, Dr. Jaynes failed to observe a basic tenet of a statistical study: to maintain professional autonomy, i.e., the same objectivity as he would apply in his other studies. *See Reference Manual, supra,* at 88 (stating that experts who conduct research in the context of litigation should proceed with the same objectivity that they would apply in other contexts); *Kumho Tire Company, Ltd. v. Patrick Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (stating that the objective of Daubert's gatekeeping principles "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

**B. *Dr. Jaynes's information about the race of the promoters in his sample was not based on independent or reliable study.***

The sample of contracts used by Dr. Jaynes was further compromised by his reliance, not on his own independent study and analysis of the concert promotion industry, but on Plaintiffs' information about the black and white promoters considered as active in the 1994-2001 period in the 1,561 contracts he examined. Dr. Jaynes acknowledged that he was not an expert in the concert music business. (Jaynes Dep. at 6.) Regardless, any expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply. *See Supply & Building Co. v. Estee Lauder International, Inc.,* 2001 WL 1602976, *4 (S.D.N.Y.2001) (dismissing "[a]ssumptions based on conclusory statements of the expert's client, rather than on the expert's independent evaluation" as unreasonable) (citing to *Argus, Inc. v. Eastman Kodak Co.,* 612 F.Supp. 904, 926 (S.D.N.Y.1985)).

**\*4** Dr. Jaynes's Report states that he based his findings on data from the 1,561 contracts which he had entered into a Microsoft Access database.[FN4] (Jaynes Report at 9.) From this database, he concluded that black promoters represented nine out of the ninety promoters ready, willing, and able to promote concerts throughout the period 1994-2001. (Jaynes Dep. at 303, 345) As the ethnicity of the promoters or artists was not indicated in the contracts, Dr. Jaynes depended on Plaintiffs to provide this information. (Hrg. Tr. at 53.) At his deposition, Dr. Jaynes stated that he did not know what criteria had been used to select the nine black promoters.[FN5] (Jaynes Dep. at 47-48, 64-66). He also disclosed that the original number of eleven was arrived at in consultation with counsel and Mr. Rowe. (*Id.* at 66.) Dr. Jaynes then later testified that eleven was a typographical error or mistake and that the number of black promoters should be reduced from eleven to nine, as in his Report he concluded that the four Plaintiffs constitute 44% of the nine black promoters. (*Id.* at 303.)

> FN4. This database consisted of fifteen fields: (1) talent agency name, (2) artist name, (3) artist ethnicity, (4) promoter name, (5) promoter ethnicity, (6) city of show, (7) state of show, (8) show date, (9) # of shows, (10) artist guarantee, (11) artist bonus, (12) ticket price, (13) capacity, (14) gross potential, and (15) advance payment to artist. (Jaynes Report at 9.)

> FN5. Dr. Jaynes's Report lists thirteen such black promoters (Jaynes Report at 10), but states that "[a]ctive black promoters number eleven."(Jaynes Report at 6.) During his deposition by the Booking Agency Defendants, Dr. Jaynes reduced this number first to eleven, and then, to nine. (Jaynes Dep. 303, 345-351, 469.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                     Page 5
Not Reported in F.Supp.2d, 2003 WL 22124991 (S.D.N.Y.)
 (Cite as: 2003 WL 22124991 (S.D.N.Y.))

It developed at the hearing that Dr. Jaynes had also reduced the number of white promoters in his sample from a total of about 140 to 81. (Hrg. Tr. at 83.) Plaintiffs' counsel stated that Dr. Jaynes reached this figure by eliminating not-for-profit promoters, talent buyers, and corporate promoters.(*Id.* at 83-87.)Since these categories are not contained in the Microsoft database used by Dr. Jaynes, that information must have been supplied to Dr. Jaynes by Plaintiffs, the only source of information used by Dr. Jaynes other than the 1,561 sample contracts. (*Id.* at 53.)

In his supplemental affidavit dated March 19, 2003, Dr. Jaynes maintains he validated his results by use of the Pollstar data and cites to his deposition at pages 284, 289-291. (Declaration of Maria P. Sperando, dated March 19, 2003, Ex. 3 at 24 ("Jaynes Aff.").) However, the Pollstar data is merely a list of artists' concerts at venues having a seating capacity of 3,000 seats or more from June 1998 to May 1999, contained in Exhibit A to the Amended Complaint for which Pollstar collected Box Office results. (Amended Complaint ¶ 65.) Plaintiffs then conducted their own study of the Pollstar concerts breaking down concert promoters and artists on racial lines .[FN6](Hrg. Tr. at 109-10, 114-16.) Given that Plaintiffs were the source of what Plaintiffs refer to as the "Pollstar data" on the race of the artists and promoters (*id.*), and Plaintiffs were the source of Dr. Jaynes's determinations in his Report of race of the artists and promoters, Dr. Jaynes's reliance on the Pollstar data in the amended complaint does not constitute an independent validation of his results.

> FN6. As was admitted at the oral argument, Pollstar did not provide information on racial composition of promoters or artists. (Hrg. Tr. 113-14.) There was no suggestion that the Pollstar data identified the Booking Agent or the selector of the promoter of the concert.

> As the amended complaint states, it was Plaintiffs who examined the Pollstar box office results for June 1998 to May 1999. (Amended Complaint ¶ ¶ 65.) Plaintiffs estimated that: (i) Promoter Defendants (then twenty-six) and uncharged promoter conspirators conducted 65 percent of the 2,460 major concerts in the one year pe-

riod (*id.* at ¶¶ 66-67); (ii) of the concerts by white acts, black promoters promoted none (*id.* at ¶ 69); and (iii) of the concerts by black artists, black promoters promoted less than 3% for each. (*Id.* at ¶ 72).

Accordingly, the conclusion in Dr. Jaynes's Report that black promoters have been underutilized is not based on an independent study but is based solely on material provided by Plaintiffs. Although Plaintiffs may have some information about some promoters' ownership and availability throughout the 1994-2001 period, Dr. Jaynes should have verified this information with each of the promoters-not an overwhelming task given the small numbers-to comply with the standard in <u>City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989)</u>, which Plaintiffs claim Dr. Jaynes was following. (Hearing at 120; see also Jaynes Aff. at 14-15.) Dr. Jaynes's failure to do so makes his opinions undependable. As the *Reference Manual on Statistics* states, "[a]n analysis is only as good as the data upon which it rests[,]" and "it is important to verify the accuracy of the data collection."*Reference Manual, supra,* at 90.

*I. Dr. Jaynes's characterization of "active black promoters" is unreliable.*

**\*5** Dr. Jaynes not only failed to independently verify Plaintiffs' information as to the race of the artists and promoters in his 1,561 contract samples, he relied on Plaintiffs to advise him as to the degree to which other promoters in the sample were active throughout the 1994-2001 period. In his Report, Dr. Jaynes concluded that, based on his study of the 1,561 contracts and information provided by Plaintiffs, black-owned firms represented ten percent of the concert promoters active throughout the period 1994-2001. (Jaynes Report at 6.) Dr. Jaynes based this conclusion on the finding that in his sample, there was a weighted average number of nine black concert promotion businesses out of a total number of ninety concert promotion businesses active throughout the period.[FN7](Jaynes Dep. at 315-319). The activity of concert promotion businesses throughout the period necessarily involves obtaining information not contained in the microsoft database of the 1,561 contracts Dr. Jaynes studied. Nowhere in his Report, affidavit or testimony, however, does Dr. Jaynes provide a breakdown of how he arrived at his figures of nine

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and ninety. Nor did he provide such a breakdown for the Defendants in discovery.[FN8] (Hrg. Tr. at 46-47, 94-96.)

> FN7. Dr. Jaynes stated that to determine the 10% percentage his "calculation used methods [he] helped develop and have been used by other researchers for more than a decade."(Jaynes Aff. at 16.) For support he refers to his deposition (Jaynes Aff. at 16), which merely reiterates that "the procedures that [Dr. Jaynes] utilized for constructing these numbers is a standard procedure for constructing the market set of ready and able firms for a given set of buyers," but does not explain what that procedure actually is. (Jaynes Dep. at 349.)

> FN8. Under Rule 26(a)(2)(B) of the Federal Rules of Procedure, expert testimony must include a written report which "contain[s] a *complete* statement of all opinions to be expressed and the basis and reasons thereof."Fed.R.Civ.P. 26(a)(2)(B) (emphasis added). Plaintiffs failed to provide a "complete statement of ... the basis and reasons" as required by Rule 26(a)(2)(B) for Dr. Jaynes's opinion that there were nine black concert promotion businesses out of a total of ninety concert promotion businesses in his sample. Plaintiffs failed to remedy this deficiency during oral argument. Without such a breakdown, the validity of his conclusions cannot be checked.

In his March 19, 2003 affidavit, Dr. Jaynes stated that the relevant market for the Booking Agency Defendants is the entire United States (Jaynes Aff. at 18), and defined the concert music promoter as "a for-profit business that engages in the promotion of concerts of contemporary music by ... buying talent and putting up risk capital"(*id.*), and additionally "arranges for the marketing of the concert, secures the venue and the concert production, transportation and housing of artists, etc."(*Id.* at 18 n. 2.) Dr. Jaynes then defined a black concert promoter as "a concert promotion business that is *majority owned and controlled* by African Americans"(*id.*(emphasis in original)), and a qualified promoter as "a concert music promoter that is 'ready, willing, and able.' " (*Id.* at 18) According to Dr. Jaynes, "Ready refers to time.

A firm that is ready is immediately available at the time the services are needed." (*Id.*) Dr. Jaynes applied a weighting procedure for those firms which were available only in some years. (*Id.*) "Willing refers to inclination. A willing firm is available in the sense that it is inclined to perform the *services* of a concert music promoter *where* and *for whom* they are required .... in at least a large multi-state region of the U.S." (*Id.* at 19 (emphasis in original).)) "Able refers to capability and experience."[FN9] (*Id.*)

> FN9. At oral argument, this definition was limited to those producers "ready, willing, and able" to do concert promotions in at least three states.

During his deposition, Dr. Jaynes explained his number nine as follows:

[In] a nice, simple beautiful world where you could say there existed on January 1, 1994, a given set of promoters, black promoters, which you could take through a list of criteria and they'd all qualify, or if they didn't you can strike them. And on December 31, 2001, you had the same list. And so everything would be nice and simple to do. But, in fact, that is not the way business operates, as we all know.

**\*6** As a consequence, you're going to have situations where individuals are in and out of the business. They may be in the business for the initial part of the period. They may not be in. They may not be there in the second part of the periods or the middle. There may be individuals who are not there at all in the beginning part of the period and are there towards the end of the period.

So what you're really trying to do is come up with a *proportion,* throughout the period, of promoters who are black.

(Pls.' Response Memorandum of Law in Opposition, dated April 23, 2003, Ex. 4 at 315-316 (emphasis added).)

In response to questioning as to why one black promoter, Al Haymon, was not included, he partially explains the process he attempted to utilize:

What I said was that under the strict definition of

Not Reported in F.Supp.2d                                                                Page 7
Not Reported in F.Supp.2d, 2003 WL 22124991 (S.D.N.Y.)
 (Cite as: 2003 WL 22124991 (S.D.N.Y.))

what is a black promotion company that I was utilizing in determining my 9 as the representative number through that period, I would said (sic) that, strictly speaking, Al Haymon or Haymon Entertainment would be recognized as a black promoter up until the time it was acquired by SFX.... After that period, it wouldn't be.[FN10]

> FN10. Thus, Haymon Entertainment was apparently not considered a "black promoter" during the entire 1994-2001 period, while each of the Plaintiffs was counted as a "black promoter" throughout the entire period.

(Id. at 319.)

Dr. Jaynes did not provide a list, as required by Rule 26(a)(2)(B), of how he weighed the other active black promoters active during the period as to arrive at his proportion figure of nine.[FN11]

> FN11. Nor was such a list provided at oral argument. At his deposition, Dr. Jaynes stated that he had received a larger list of black promoters from Plaintiffs' counsel. (Jaynes Dep. at 303.) However, he was unable to explain what reasons had been used to eliminate a number of identified black promoters from the list. (Id. at 46-60; 64-66.)

Dr. Jaynes admitted that he did not do any independent analysis to check Mr. Rowe's information, such as going to speak to third parties or looking at books containing listings of concert promoters. (Jaynes Dep. at 62.) Thus, when Dr. Jaynes concluded that nine was a proportion or representation of the black concert promotion businesses as to the total of ninety concert promotion businesses in his sample active throughout the 1994-2001 period, Dr. Jaynes relied on Plaintiffs' information as to the degree and nature of activity of both black and white concert promoters contained in the 1,561 contracts studied.

Were one to test Dr. Jaynes's definition of whether a concert promotion business was "ready, willing and able" during the years 1994-2001, one would have to: (1) inquire of each concert promoters doing business in those years in all fifty states as to their availability to do business in a large multi-state region (or three

states) and their willingness and readiness to do business in each year; and (2) then determine whether such a business meets Dr. Jaynes's test for a concert promotion business, his regional test market test and his test for whether such promoter should be weighted as a whole promoter or less than one. In violation of Rule 26(a)(2)(B), Dr. Jaynes provides no documents indicating he did such an analysis; nor does his Report, his affidavit or his testimony[FN12] suggest such an analysis was made in order to reach his conclusion that black promoters constituted 10% of the total concert promoters in the United States active throughout the study period. As a result, his technique for reaching such a conclusion cannot be tested. Since he has not divulged the methodology he used to reach the conclusion, it cannot be subjected to peer review, nor can it be tested for known or potential rate of error. Dr. Jaynes does not cite to any standards controlling his methodology nor does he show that there is general acceptance within the relevant scientific community for conclusions reached in this manner. Accordingly, Plaintiffs have not shown that any of the Daubert factors, _Daubert v. Merrill Dow Pharmaceuticals, Inc._, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), are met by Dr. Jaynes's conclusion that a "representation" of nine black concert promoters and a "representation" of ninety total concert promoters were active throughout his study period.[FN13]

> FN12. Other than referring to the weighing appraisal for businesses not 51% black owned throughout the period, e.g. Haymon Entertainment

> FN13. Despite numerous direct questions during oral argument, Plaintiffs' counsel could not detail how Dr. Jaynes reduced the number of white promoters, active throughout 1994-2001, to 140 and to 81. (Hrg. Tr. at 93-95.) Despite Rule 26(a)(2)(B), no discovery of this process was provided to Defendants. (Id. at 46-47.)

II. _Dr. Jaynes's conclusion about the number of black promoters as a percentage of all active promoters is faulty._

*7 Based on his study of the 1,561 contracts, Dr. Jaynes found that nine black concert promotion businesses (as defined and weighted for years of activity),

Not Reported in F.Supp.2d                                                                                          Page 8
Not Reported in F.Supp.2d, 2003 WL 22124991 (S.D.N.Y.)
 **(Cite as: 2003 WL 22124991 (S.D.N.Y.))**

to ninety total concert promotion businesses (as de-fined and weighted for years of activity), was a fair breakdown of the promoters in his sample, willing, ready and able to promote concerts during 1994-2001. Accordingly, he concluded that black concert promotion businesses constituted 10% of the total concert promotion businesses for all the concerts per-formed during the period.

These percentages of black and white promoters are utilized in his damages calculation, which states:

We therefore estimate that major concerts featuring artists represented by defendant booking and talent agencies accounted for $734.4 million (64% of $1.1 billion). We arrive at an estimate of black promoters' competitive share of this last total in the following manner. Active black promoters number eleven (11).[FN14] This is approximately 10% of the organiza-tions promoting concert events featuring artists repre-sented by the defendant talent and booking agencies during 1994-2001. In the absence of discrimination, it is reasonable to assume that as a group black promot-ers would have earned net revenues proportional to their availability of 10%.

> FN14. Dr. Jaynes testified that the number eleven actually should be nine. (Jaynes Dep. 303, 345-51, 469.). Contrary to the Report, nowhere in the amended complaint is it stated that 64% of the concerts were by art-ists represented by the "defendant booking and talent agencies". (*See, e.g.,* Amended Complaint at ¶ 71.)

(Jaynes Report at 6.) [FN15]

> FN15. Dr. Jaynes's finding that discrimina-tion caused the "underutilization" of black promoters does not attempt to take into con-sideration so called "confounding variables" such as lack of financing, or lack of suffi-cient organizational support with respect to each of the several promoters included in his "representative" number of nine.*Reference Manual, supra,* at 92.However, lack of con-sideration of "confounding variables" might go more to the weight that should be given to Dr. Jaynes's testimony than to its admis-sibility, although Dr. Jaynes acknowledged that he was not an expert in the concert mu-

sic business and thus does not have the background to make such an analysis. (Jaynes Dep. at 6.)

In his reply affidavit dated March 19, 2003, Dr. Jaynes makes clear that he was making a calculation of the proportion of black promoters to white pro-moters in his sample who were fully active during the period:

... The number 9 (and 90) are *representations* of the average numbers of black and total independent con-cert promoters existing throughout the period 1994-2001....

I calculated that black independent promoters repre-sent about 10% of all independent concert promoters during the period 1994-2001.... The proportions were calculated using a weighting procedure that produces an average *proportion of ready, willing, and able black promoters* active throughout the period. "Rep-resentative" numbers for this proportion are 9 and 90 respectively....

Defendant is well aware that my definitions of a "black concert promoter" and a concert promoter generally are materially different from the one defen-dant uses to determine the number and proportion of promoters of concert music who are black. My defi-nition of a black promoter for purposes of the case is based on what is a black concert promotion *business* and applies standard practices for making such a de-termination....

(Jaynes Aff. at 16 (citations omitted) (emphasis added).)

Nowhere in his Report, his affidavit or his testimony does Dr. Jaynes provide the basis or calculations by which he reaches his opinions that black concert promotion businesses represented "10% of the or-ganizations promoting concert events featuring artists represented by the defendant talent and booking agencies during 1994-2001."(Jaynes Report at 6.) At oral argument, when Plaintiffs' counsel was pressed for this information, she came up with evasions and unresponsive answers even after a recess to confer with Dr. Jaynes. (Hrg. Tr. 111-116.) During his depo-sition, Dr. Jaynes admitted he did not consult directo-ries of concert promoters. (Jaynes Dep. at 62.) Since Dr. Jaynes admitted that he arrived at his figure of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

eleven based on information supplied by Plaintiffs and Plaintiffs' counsel (*id.* at 39, 66), one can only conclude that Dr. Jaynes also made his estimates of the proportion of black to total concert promotion businesses active in the period based on information from Plaintiffs' counsel. (Hrg. Tr. 109-110.) This does not constitute an independent study.

**\*8** Furthermore, one cannot simply use a sample of 1,561 contracts to calculate the number of active promoters in a given period. Nonetheless, in his affidavit of March 21, 2003, Dr. Jaynes states he did just that, that he "used a sample size of more than 1,500 contracts to calculate the number of active promoters."(Jaynes Aff. at 21.) Using such a sample to calculate the total number of black and white concert promotion businesses "ready, willing and able" to engage in the concert promotions, without making any further calculations, is not a proper statistical method to arrive at the total of such businesses active during the period. A sample can properly be used to show the characteristics of the overall group. A sample, however, cannot determine the total number within the group. Nowhere in his Report or deposition does Dr. Jaynes make a calculation of the total number of concert promotion business active during 1994-2001 nor does he ascertain what percentage the sampled 1,561 contracts is of all concert contracts for 1994-2001 Calculation of the total number of concert promotion businesses active in the period cannot be determined based on his sample, unless other calculations are made; Dr. Jaynes does not provide any such calculations.

## II. Dr. Jaynes's calculation of damages is illogical and fallacious.

[2] Based on his conclusion that black concert promotion businesses represented 10% of the concert promotion businesses "ready, willing and able" to promote concerts in a tri-state area throughout the 1994-2001 period, Dr. Jaynes's Report also makes a determination of the lost net profits which black concert promotion businesses, including Plaintiffs, sustained. His calculations of gross concert revenues during the 1994-2001 period rely on a Moss Adams, LLP's (certified public accountants) study of gross revenues of major concert tours based on the Pollstar data for the years 1994-1997 of concerts performed at venues with at least 3,000 seats. (Moss Adams Report dated July 15, 1998 ("Moss Adams Report") at

9.) In his Report, Dr. Jaynes makes reference to the gross concert revenues published by Pollstar on July 28, 2000, but he does not use these figures in his calculations of damages. (Jaynes Report at 5-6.) Instead, Dr. Jaynes accepts the Moss Adams Report gross concert revenues for the years 1994-1997 and assumes that gross ticket sales for 1995 were representative of the four years from 1998 through 2001. (*Id.*) In this manner, he calculates the total concert revenues for the 1994-2001 study period. To obtain annual net revenues for the total concert promotion business, his Report uses a 32.5% figure for promoter expenses based on Moss Adams' calculation of 30-35% for those expenses. Dr. Jaynes concludes that total net revenues for 1994 through 2001 for all promoters from major concerts were $1.1 billion. (*Id.* at 6.) Dr. Jaynes then reduces total net revenues to 64% to reflect the market share of revenues from concerts by artists represented by the Booking Agency Defendants.[FN16](Jaynes Report at 6.) The resulting figure was $734.4 million. (Jaynes Report at 6.) Next, however, Dr. Jaynes moves to his separate conclusion, based on his 1,561 contract sample, that black promoters represented 10% of the ninety concert promotion businesses active throughout 1994-2001. (*Id.*) He then states that, but for discrimination, "nine" black promoters should have earned $73.4 million, 10% of his calculations of net revenues of all promoters contained in the Moss Adams Report. (*Id.*) His reasoning overlooks the fact that the number nine is not an actual number, as Dr. Jaynes's affidavit of March 19, 2002 makes clear, but is a proportionate number based on the 1,561 sample. (Jaynes Aff. at 16.) It does not represent the total number of black concert promotion businesses active throughout the period, but only those in the sample active throughout the period. The Report concludes that, since the Plaintiffs constitute four black concert promotion businesses, they comprise 44% of the black promoters (four of nine), and that their fair share of profits for the years 1994-2001 was $32 .3 million or 44% of $73.4 million, and whereas their total net revenues in that period had been only $3.2 million, they are entitled to total damages of $29.1 million. (Jaynes Report at 6 7.) He then calculated each individual Plaintiff's damages by deducting each Plaintiff's net revenues during the period from one quarter of the $32.3 million. (*Id.*)

FN16. This number is based on Plaintiffs' estimate of the Booking Agency Defendants' market share during Plaintiffs' test period

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22124991 (S.D.N.Y.)
**(Cite as: 2003 WL 22124991 (S.D.N.Y.))**

Page 10

(June 1998-May 1999). (Amended Complaint ¶ 65.) Only three of the Booking Agency Defendants included in the 64% market share are defendants going to trial. (Hrg. Tr. at 129.) Dr. Jaynes has concluded that no adjustment need be made to the damages he finds in his Report due to this substantial miscalculation because the damages cited in his Report is a conservative number based on his review of defendant's expert report. (Jaynes Dep. at 216.)

**\*9** This calculation mixes oranges and apples. Dr. Jaynes used a sample of 1,561 contacts and had a family of ninety active concert promotion businesses within his sample. He made no calculations of the total number of African-American concert promotion business active in the period or the total number of concert promotion businesses, but only calculated the proportion of black promoters to total promoters in his sample. As number nine is only a proportionate number based on the sample-not an actual number based on a study of the racial makeup and activity of all concert promotion business during the period-Dr. Jaynes has provided no basis for his conclusion that nine is the total number of black concert promotion businesses who were active throughout the 1994-2001 period. Nor does he provide any basis for his conclusion that the four Plaintiffs constitute 44% of the black concert promotion businesses which Dr. Jaynes finds should have earned 10% of the net revenues. Dr. Jaynes also errs in concluding that the total number of promoters in Dr. Jaynes's sample active throughout the period earned the concert revenues included in the Moss Adams Report. The Moss Adams and Pollstar concert revenues included revenues from concerts by promoters who were not active throughout the period; there was no reduction made for those promoters who would not qualify as a whole concert promotion business under Dr. Jaynes's test. Additionally, there is no limitation of Dr. Jaynes's revenue calculations for revenues attributable to those regional areas in which the Plaintiffs' black concert promotion businesses were not "ready, willing, and able" to promote concerts.

As stated in *Boucher v. U.S. Suzuki Motor Corp.,* "expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison.' " 73 F.3d 18, 21 (2d Cir.1996) (citations omitted). Dr. Jaynes's Report falls within this standard.

**Conclusion**

The Jaynes Report and proposed testimony does not meet the *Daubert / Kumho* standards. Dr. Jaynes has failed to provide a complete statement of the basis and reasons for his opinions as required by Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. He has also failed to maintain the professional autonomy required by the *Reference Manual on Scientific Evidence,* supra: 1) by relying on Plaintiffs' preselected contracts; 2) by relying on Plaintiffs' oral information about black and white concert promotion businesses active in a three state region during the period 1994-2001 to arrive at his calculation of a total of ninety concert promoters and nine black promoters active in the 1994-2001 period; and 3) by relying on Plaintiffs' amended complaint for the estimated percentage of market share of 64% attributed to the Booking Agency Defendants. (Jaynes Dep. at 130.) Moreover, in each of these three determinations critical to both his underutilization analysis and his damage analysis, Dr. Jaynes took no steps to verify the accuracy of the data Plaintiffs provided to him.[FN17] (*Id.* at 90, 98.)Furthermore, in his damage analysis, he improperly uses a proportionate number, nine, as the real number of black concert promotion businesses active throughout the 1994-2001 period, thereby vastly increasing his calculation of the four Plaintiffs' potential share of revenues to which in his opinion the black concert promotion businesses in the period should have been entitled. For all these reasons, Dr. Jaynes's underutilization analysis and his damage analysis are found unreliable and his testimony based on his Report is excluded.

> FN17. The Court only notes that Dr. Jaynes made no attempt to show that any of the "ready, willing and able" "nine" black promoters were ready, willing and able to promote the concerts included in the Moss Adams Report.

**\*10** Defendants' motion regarding Dr. Jaynes's testimony is granted. Defendants' motion to strike Dr. Jaynes's affidavit of March 19, 2003 is denied as moot.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22124991 (S.D.N.Y.)
 **(Cite as: 2003 WL 22124991 (S.D.N.Y.))**

IT IS SO ORDERED.

S.D.N.Y.,2003.
Rowe Entertainment, Inc. v. William Morris Agency, Inc.
Not Reported in F.Supp.2d, 2003 WL 22124991 (S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**TAB 9**



Not Reported in F.Supp.2d                                                                          Page 1
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
 (Cite as: 2006 WL 2827740 (D.N.J.))

C

United States District Court,
D. New Jersey.
William STEINER, individually and on behalf of himself
and all others similarly situated, Plaintiffs,
v.
MEDQUIST INC., Brian J. Kearns, David A. Cohen,
John A. Donohoe, Ethan Cohen, John W. Quaintance,
Ronald F. Scarpone, KPMG LLP and Arthur Anderson,
Defendants.
Civil No. 04-5487 (JBS).

Sept. 29, 2006.

Joseph J. DePalma, Esq., Janet Rita Bosi, Esq., Lite De-
palma Greenberg & Rivas LLC, Newark, NJ, for Liaison
Counsel.

Samuel H. Rudman, Esq., David A. Rosenfeld, Esq., Ler-
ach Coughlin Stoia Geller Rudman & Robbins LLP, Mel-
ville, NY, for Plaintiffs.

Marc J. Gross, Esq., Adam Brian Kaplan, Esq.,
Greenbaum, Rowe, Smith & Davis LLP, Roseland, NJ,
Neal R. Marder, Esq., Gail J. Standich, Esq., Winston &
Strawn LLP, Los Angeles, CA, for Defendants MedQuist
Inc. and Ronald Scarpone.

David A. Kotler, Esq., Megan Elizabeth Zavieh, Esq.,
Dechert LLP, Princeton, NJ, Robert J. Jossen, Esq.,
Dechert LLP, New York, NY, for Defendant David A.
Cohen.

John H. Lewis, Jr., Esq., John J. Levy, Esq., Janice G.
Dubler, Esq., Montgomery, Mccracken, Walker &
Rhoads, LLP, Cherry Hill, NJ, for Defendant Ethan
Cohen.

Scott A. Resnik, Esq., Joel W. Sternman, Esq., Anthony
L. Paccione, Esq., Katten Muchin Rosenman LLP, New
York, NY, for Defendant John A. Donohoe.

Christopher M. DiMuro, Esq., Latham & Watkins, LLP,
Newark, NJ, Edward J. Shapiro, Esq., Gregory A. Harris,
Esq., Joshua K. Chandler, Esq., Latham & Watkins, LLP,
Washington, D.C., for Defendant Brian Kearns.

Brian J. McCormick, Jr., Esq., Buchanan Ingersoll,
Princeton, NJ, Howard D. Scher, Esq., Paul C. Madden,
Esq., Buchanan Ingersoll, Philadelphia, PA, for Defen-
dant John W. Quaintance.

Martin Wendel, Esq., Eliot Lauer, Esq., Michael J. Mo-
scato, Esq., Daria M. Ciaputa, Esq., Curtis, Mallet-
Prevost, Colt & Mosle LLP, New York, NY, for Defen-
dant Arthur Anderson, LLP.

David J. Sheehan, Esq., James M. Lee, Esq., Michael R.
McDonald, Esq., Gibbons, Del Deo, Dolan, Griffinger &
Veccione, P.C., Newark, NJ, for Defendant KPMG LLP.

OPINION

SIMANDLE, District Judge.

| I. FACTUAL BACKGROUND | | | 6 |
|---|---|---|---|
| | A. Background | | 6 |
| | B. Defendants | | 7 |
| | | 1. Brian J. Kearns | 7 |
| | | 2. David A. Dono-hoe | 8 |
| | | 3. David A. Cohen | 8 |
| | | 4. Ethan Cohen | 9 |
| | | 5. John W. Quaint-ance | 9 |

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                      Page 2
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
 **(Cite as: 2006 WL 2827740 (D.N.J.))**

|  |  |  |  |
|---|---|---|---|
|  |  | 6. Ronald F. Scarpone | 10 |
|  |  | 7. Arthur Anderson, LLP | 10 |
|  |  | 8. KPMG LLP | 10 |
|  | C. Billing Scheme |  | 10 |
|  | D. Billing Disputes |  | 12 |
|  | E. MedQuist Acquisitions and Philips Merger and Insider Sales |  | 13 |
|  | F. Material Misrepresentations and Omissions |  | 14 |
|  | G. Audit Reports |  | 15 |
|  | H. Public Disclosures |  | 16 |
|  |  | 1. March 16, 2004 Dow Jones Alert | 16 |
|  |  | 2. March 24, 2004 Press Release | 17 |
|  |  | 3. March 31, 2004 Press Release | 18 |
|  |  | 4. May 14, 2004 Dow Jones Alert | 18 |
|  |  | 5. May 24, 2004 Press Release | 18 |
|  |  | 6. June 15, 2004 Press Release Announcing Nasdaq Delisting | 20 |
|  |  | 7. Post-Class Period Disclosures | 20 |
|  | I. Procedural History |  | 21 |
| II. RULE 12(b)(6) STANDARD OF REVIEW |  |  | 22 |
| III. DISCUSSION |  |  | 22 |
|  | A. Rule 10b-5 Claims |  | 22 |
|  |  | 1. Materiality | 25 |
|  |  | a. March 16, 2004 Dow Jones Alert | 27 |
|  |  | b. March 24, 2004 | 28 |

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                     Page 3
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
 (Cite as: 2006 WL 2827740 (D.N.J.))

|                                  | Press Release                                        |    |
|                                  | c. March 31, 2004 Press Release                      | 28 |
|                                  | d. May 14, 2004 Dow Jones Alert                      | 29 |
|                                  | e. May 24, 2004 Press Release                        | 29 |
|                                  | f. June 15, 2004 Press Release Announcing Nasdaq Delisting | 30 |
|                                  | 2. Misrepresentations or Omissions                   | 37 |
|                                  | 3. Scienter                                          | 47 |
|                                  | 4. Loss Causation                                    | 53 |
| B. Rule 10b-5 (a) and (c) Scheme Liability |                                           | 58 |
| C. Section 20(a) Claims          |                                                      | 61 |
| D. Auditors                      |                                                      | 62 |
| IV. CONCLUSION                   |                                                      | 66 |

*1 MedQuist, Inc. ("MedQuist" or the "Company") is a provider of medical transcription and healthcare information services. In this putative class action under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act"), Plaintiffs allege a two-part scheme whereby MedQuist, six of its principal officers ("Individual Defendants"), and two of its outside auditors ("Auditor Defendants") (1) manipulated the Company's billing scheme to unlawfully overcharge its customers and underpay its employees for its medical transcription services; and (2) knowingly reported false increased revenues and profits between March 29, 2000 and June 14, 2004 ("Class Period").

Defendants have moved to dismiss the Second Amended Complaint ("SAC") under Rule 12(b)(6), Fed.R.Civ.P., arguing primarily that the Complaint is not pleaded with the requisite particularity under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, and Rule 9(b) of the Federal Rules of Civil Procedure. For reasons explained in this Opinion, the motions by the Company and the six Individual Defendants will be denied, and the Court will grant the motions by the Audi-

tor Defendants who will be dismissed from this case.

# I. FACTUAL BACKGROUND

In this Rule 12(b)(6) dismissal motion, the Court will, as it must, accept as true the well-pleaded allegations contained in the SAC and consider the documents incorporated by reference therein. See In re Suprema Specialities, Inc. Sec. Litig., 438 F.3d 256, 264 (3d Cir.2006).

A. Background

MedQuist is a national provider of medical transcription outsourcing and hospital document management services, including digital dictation, transcription, Web-based coding, speech recognition and document delivery systems. (SAC ¶ 33.) In the late 1980's through the early 1990's, senior management at MedQuist instructed personnel to "pad headers and footers" to achieve desired billing amounts. (Id. ¶ 34.)The fraudulent billing scheme became more complex in 1998 when MedQuist began programming ratios and formulas into its various billing systems.[FN1]Using that software, MedQuist "backward billed"

Not Reported in F.Supp.2d                                                                                                                Page 4
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
 (Cite as: 2006 WL 2827740 (D.N.J.))

its clients by setting the desired revenue profit amount and inflating its customer bills to achieve those results. (*Id.* ¶ 39.)

> FN1. The SAC details how the allegedly fraudulent billing scheme worked. (SAC ¶¶ 44-59.) In short, the software utilized by MedQuist had the ability to count characters, lines and other invisible keystrokes or codes embedded in a document, instead of billing customers based on an AAMT line, defined as any line having 65 "characters." *See also Kanter v. Barella,* 388 F.Supp.2d 474, 475-76 (D.N.J.2005) (explaining cost per line contract).

**B. *Defendants***

Plaintiffs have alleged securities fraud claims against the Company, six of its principal officers, and two outside auditors retained to conduct independent audits.[FN2]

> FN2. Greater Pennsylvania Carpenters Pension Fund purchased MedQuist publicly traded securities during the Class Period. On March 11, 2005 the Court appointed Greater Pennsylvania Carpenters Pension Fund as lead plaintiff. (SAC ¶ 19.)

**1. *Brian J. Kearns***

Defendant Kearns was at all relevant times, until his resignation on July 30, 2004, MedQuist's Executive Vice President and Chief Financial Officer. Kearns joined MedQuist as Senior Vice President, Treasurer and CFO on October 16, 2000. Kearns was responsible for managing all accounting, treasury and investor relations functions. (*Id.* ¶ 21.)

Kearns drafted, prepared, reviewed and signed the Forms 10-Q filed with the Securities Exchange Commission ("SEC") on August 14, 2002, November 14, 2002, May 13, 2003, August 12, 2003, and November 12, 2003, as well as the Form 10-K filed on March 25, 2003.[FN3]Additionally, Kearns signed the Sarbanes-Oxley Act of 2002 certifications attached to these financial statements.

> FN3. As discussed in more detail below, Plaintiffs allege the statements contained in these filings were materially false or misleading.

**\*2** Kearns participated in conference calls on April 23, 2002, July 25, 2002, October 23, 2002 and February 13, 2003 in which the fraudulent billing scheme was discussed. (*Id.*)

**2. *David A. Donohoe***

Defendant Donohoe served as a MedQuist executive since 1994, first as Executive Vice President of medical transcription, and from 1995 through March 19, 2002 as Chief Operating Officer.[FN4](Pls. Opp. Br. at 10 n. 6) After resigning, Donohoe remained at the Company as an advisor to MedQuist's management team through March 2004. (SAC ¶ 23.)

> FN4. Plaintiffs acknowledge in their opposition papers that Donohoe was not the Company's CEO, as the SAC alleges.

**3. *David A. Cohen***

David Cohen was MedQuist's Chief Executive Officer and President at all relevant times until his July 6, 2003 resignation. From that date until at least April 4, 2004, Cohen continued his service with the Company as a "Special Advisor" to the Board of Directors. (*Id.* ¶ 22.)

David Cohen drafted, prepared, reviewed and signed the Form 10-K filed with the SEC on March 25, 2003, which Plaintiffs have alleged contained materially false and misleading statements. Mr. Cohen also signed the Sarbanes-Oxley Act of 2002 certifications on the March 25, 2003 Form 10-K, as well as the Forms 10-Q filed on August 14, 2002, November 14, 2002 and May 13, 2003. (*Id.*)

David Cohen participated in the April 23, 2002, July 25, 2002, October 23, 2002 and February 13, 2003 conference calls in which the fraudulent billing scheme was discussed. (*Id.*)

**4. *Ethan Cohen***

Ethan Cohen was serving as Chief Technology Officer of MRC Group, Inc. in December 1998 when that company merged with MedQuist. (*Id* . ¶ 24.)Mr. Cohen joined MedQuist as its Senior Vice President and CTO in 1998 and served in that capacity until he was promoted to Executive Vice President in October, 2002. Until his resignation on October 31, 2004, Ethan Cohen served as

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                Page 5
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
 (Cite as: 2006 WL 2827740 (D.N.J.))

MedQuist's Executive Vice President and CTO. *Id.)*

5. *John W. Quaintance*

Mr. Quaintance was MedQuist's Executive Vice President and Chief Operating Officer until his resignation on January 31, 2005, having joined the Company in 1986. In February 2004, Mr. Quaintance was appointed COO responsible for all activities supporting implementation and delivery of MedQuist's transcription technology and services to its clients. His primary accountability was for profit, customer satisfaction and customer relationships for over 2000 North American customers. Mr. Quaintance signed the Sarbanes-Oxley Act of 2002 certifications on the Form 10-Q filed on August 12, 2003. (*Id.* ¶ 25.)

6. *Ronald F. Scarpone*

Mr. Scarpone joined MedQuist in 1994 and, until his retirement on October 31, 2004, served as MedQuist's Executive Vice President of Marketing and Business Development. (*Id.* ¶ 26.)

7. *Arthur Anderson, LLP*

Arthur Anderson, LLP ("Anderson") is an international accounting firm that provided auditing services for the Company for fiscal years 1999, 2000 and 2001, and certified MedQuist's Forms 10-K for those fiscal years. In addition, Anderson verified the Company's Form S-8 filed on July 26, 2002. (*Id.* ¶ 28.)

8. *KPMG LLP*

**\*3** KPMG LLP ("KPMG") is an international accounting firm that provided auditing services for MedQuist for fiscal year 2002. (*Id .* ¶ 27.)

C. *Billing Scheme*

As part of MedQuist's fraudulent billing scheme, CTO Ethan Cohen worked with COO Donohoe and CEO David Cohen to create technology to program the Company's computerized billing codes to overcharge its hospital customers for vital transcription services. (*Id.* ¶¶ 51-57.)The programs created a summary bill with no details, thereby making it virtually impossible for customers to verify the accuracy of the bills. The software had been created by Ethan Cohen when he was CTO of the MRC Group, Inc., before its merger with MedQuist in 1998. Once Ethan

Cohen became CTO of MedQuist in 1998, he used that software to manipulate the billing formulas for MedQuist. (*Id.* ¶¶ 50-57.)

MedQuist personnel had discussions with Defendants Donohoe and David Cohen about "what they wanted to be able to do, and then what they were doing" to use formulas and ratios to overcharge customers and underpay the Company's transcriptionists. (*Id.* ¶¶ 218, 228.)Throughout the Class Period, Donohoe and David Cohen instructed personnel to manipulate a higher billing result.(*Id.*) Specifically, David Cohen and Donohoe delegated to the remaining Individual Defendants the task of implementing the billing and revenue scheme.(*Id.* ¶¶ 52-57, 71-79.)For example, Donohoe directed Quaintance to "jack up" formulas to increase revenues and profit margins for Defendant Quaintance's region while he was Senior Vice President. Billing summaries from that region reflect that Quaintance indeed utilized formulas to increase billings. (*Id.* ¶ 78.)

MedQuist employees said Donohoe was the "mastermind" of the manipulated billing scheme. (*Id.* ¶¶ 75-76, 122, 218, 228, 256.)At MedQuist's annual regional management meeting in Philadelphia in 2000, for example, Donohoe spoke to roughly 150 MedQuist managers and "bragged" about the way he used formulas to inflate billing revenue. (*Id.* ¶ 76.)Moreover, Donohoe called MedQuist's Warmister office every month to direct increases and other adjustments in the billing formulas to carry out the scheme. (*Id.* ¶ 77.)

Defendant Scarpone was also intimately familiar with the fraudulent billing scheme: he gave instruction to Ethan Cohen about individual customer inflation levels and changes in those levels, met with programmers and personally reviewed the analyses created by programers analyzing the disputed bills.(*Id.* ¶ 62.)

D. *Billing Disputes*

Eventually, billing disputes arose with a number of the Company's major clients including Duke University, USC Medical Center, Welborn Medical Clinic, Kaiser Hospitals, Concentra Hospitals, Sutter Hospitals and Children's Hospital of Orange County. (*Id.* ¶¶ 61-66.)

Scarpone reviewed the disputed bills and ultimately, the Company issued a credit to at least one of its clients. (*Id.* ¶ 60.)Moreover, Welborn filed a lawsuit against MedQuist.[FN5]The Company has been authorized by its Board

Not Reported in F.Supp.2d                                                                              Page 6
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
 (Cite as: 2006 WL 2827740 (D.N.J.))

to offer up to $65 million as an "accommodation" to settle additional unresolved disputes. (DePalma Decl. at 8.)

> FN5. The suit by Welborn eventually settled after Welborn arranged during mediation to have the Company transcribe and bill ten documents Welborn had, unbeknownst to MedQuist, previously submitted for billing. MedQuist billed Welborn a different amount the second time around and the lawsuit subsequently settled. (*Id.* ¶¶ 66-69; 118.)

E. *MedQuist Acquisitions and Philips Merger and Insider Sales*

**\*4** MedQuist began an "acquisition binge" on April 6, 2000 with an announcement that it planned to acquire a 20% stake in A-Life Medical, Inc., an advanced natural language processing technology firm. That announcement was followed by a series of acquisitions beginning in October 2000 and continuing through 2003.[FN6](*Id.* ¶¶ 97-99.)

> FN6. The SAC identifies the specifics of each transaction. (SAC ¶¶ 97-99.)

In January 2000, MedQuist announced that it was looking for "new partners." By May, a suitor had materialized and Koninklijke Philips Electronic N.V. ("Philips") had acquired 60% of MedQuist's shares-57% under the tender offer and 3% from MedQuist's senior management. (*Id.* ¶ 102.)On May 22, 2000, Philips entered into Shareholder Agreements with Defendants David Cohen, Ethan Cohen, Donohoe and Scarpone, whereby Philips directly purchased MedQuist shares: David Cohen sold 779,530 shares for proceeds of $39,756,030; Donohoe sold 124,224 for $6,335,424; Scarpone sold 74,570 for $3,803,070; and Ethan Cohen sold 39,489 for $2,013,939. (*Id.* ¶ 103.)The Shareholder Agreements further provided that insiders, including the Individual Defendants here, were precluded from transferring or selling any additional MedQuist stock for at least two years beginning May 22, 2000.[FN7](*Id.*)

> FN7. Plaintiffs claim that Defendants David Cohen, Ethan Cohen, Scarpone and Donohoe were obligated by contract to continue their employment with MedQuist through May 2003 and, thus, had incentive to inflate financial results so as to maintain high share price. (SAC ¶ 103.)

As announced in the Company's Schedule 14-A filing on April 28, 2003, Defendant Kearns was granted options to purchase 40,000 shares at $51.00 per share and 40,000 shares at $70.00, in addition to an award of options to purchase 30,000 shares at a strike price of $17.06. Scarpone and Ethan Cohen were each granted 25,000 shares at a strike price of $51.00 and another 25,000 shares at a strike price of $70.00. (*Id.* ¶ 106.)On September 6, 2002, Scarpone sold MedQuist shares yielding $317,508 in sales proceeds. (*Id.* ¶ 107.)

F. *Material Misrepresentations and Omissions*

Plaintiffs allege that in addition to fraudulently billing its customers, MedQuist misled its investors by reporting inflated financial results without disclosing the fraudulent billing scheme. Instead, during the Class Period MedQuist attributed its financials to other legitimate business factors such as "increased sales to existing customers, sales to new customers and additional revenue from acquisitions."(SAC ¶¶ 114, 120, 136, 154, 163, 174, 183, 188, 196, 205 and 219.) Such allegedly misleading statements appeared in the March 29, 2000 Form 10-K, the May 11, 2000 Form 10-Q, the August 11, 2000 Form 10-Q, the November 13, 2000 Form 10-Q, the March 16, 2001 Form 10-K, the May 11, 2001 Form 10-Q, the August 9, 2001 Form 10-Q, the November 9, 2001 Form 10-Q, the March 22, 2002 Form 10-K, the May 14, 2002 Form 10-Q and the August 14, 2002 Form 10-Q. Similarly, MedQuist attributed its increased revenues to acquisitions without disclosing the underlying improper billing scheme in its November 14, 2002 Form 10-Q and May 13, 2003 Form 10-Q. (*Id.* ¶¶ 230, 253.)

The SAC additionally identifies a number of other allegedly false and misleading statements issued throughout the Class Period. (*Id* . ¶¶ 113-274.)

G. *Audit Reports*

**\*5** Plaintiffs further allege that during Anderson's and KPMG's respective audit reviews of MedQuist's financials, the assigned auditor was shown documents that clearly indicated the Company's bills were not counting characters, but instead using ratios and formulas to improperly inflate billing. Nevertheless, neither Anderson nor KPMG followed up with MedQuist regarding the discrepancies between the actual billing terms and its customer contracts, even though both were provided to the auditors. (SAC ¶ 80.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                      Page 7
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
 (Cite as: 2006 WL 2827740 (D.N.J.))

Anderson issued Independent Auditors' Reports attached to the Forms 10-K for February 8, 2000, March 26, 2001, and March 20, 2002, and KPMG did so for the fiscal year 2002, stating that their audits were conducted in accordance with generally accepted auditing standards in the United States. (*Id.* ¶ 115, 165, 197.)The audit reports also stated the auditors' professional opinions that the financial statements filed by MedQuist fairly presented their operations and cash flows for the respective periods. (*Id.*)

H. *Public Disclosures*

1. *March 16, 2004 Dow Jones Alert*

As customer and employee complaints mounted, Defendants' alleged scheme began to unravel, causing MedQuist on March 16, 2004 to file a Form 12b-25 Notification of late filing with the SEC disclosing that the filing of its Form 10-K for the year ending December 31, 2003 would be delayed pending completion of an independent review of the Company's billing practices. (SAC ¶¶ 275-77.)

The 12b-25 filing was reported by a Dow Jones Alert issued after the market close on March 16. The Dow Jones Alert stated that MedQuist would delay the filing of its Annual Report on Form 10-K with the SEC pending a continuing review of "potential improper billing practices." (SAC ¶ 275.) According to that report, MedQuist announced that "a company employee raised issues on potential improper billing practices," and the Company "believe[d] some clients [had] been overcharged while others [had] been undercharged."(*Id.*) The Company also declared its intention to file the Form 10-K on or before March 30. Finally, MedQuist "said it will record a reserve of $1.5 million regarding the billing issues," pending adjustment upon completion of a review by PricewaterhouseCoopers ("PwC").(*Id.*)

2. *March 24, 2004 Press Release*

In a March 24, 2004 press release issued by MedQuist at 7:51 P.M. (EST), the Company reported that it would not be able to timely file its Form 10-K with the SEC by the March 30 extended filing deadline. (SAC ¶ 277.) The Company further stated that it would be "unable to predict when it will be in a position to file its Form 10-K."

MedQuist also announced that it was undergoing an audit of its billing practices with the assistance of outside counsel, Debevoise & Plimpton LLC ("Debevoise") and an

independent auditor, PwC. (*Id.* ¶¶ 277-78.)Citing "concerns as to the progress of the review" being conducted by PwC, MedQuist announced that its Board of Directors had "assumed responsibility for completing the review of billing practices and related matters...." (SAC ¶ 277.) Moreover, the Company stated that it would be unable to assess whether its review of billing practices "may have a material impact on its reported revenues, and consolidated results of operations and financial position."(*Id.*)

3. *March 31, 2004 Press Release*

**\*6** On March 31, 2004, MedQuist issued a press release at 6:35 P.M. (EST), announcing that it had received a Nasdaq Determination letter informing the Company that it was subject to delisting for its failure to timely file its Form 10-K Annual Report. MedQuist also announced its intention to request a hearing so as to avoid automatic delisting.

4. *May 14, 2004 Dow Jones Alert*

On Friday, May 14, 2004 a Dow Jones Corporate Filings Alert issued at 6:00 A.M. announced that the Company would delay filing its Form 10-K for the year ending December 31, 2003, and that it would not be able to estimate the impact of the review. (SAC ¶ 280 .) Moreover, the Company stated that it did not know when the review of its billing practices would be complete. (*Id.*) Finally, the Company announced that it filed its Form 10-Q for the quarter ending March 31, 2004 out of time.

5. *May 24, 2004 Press Release*

After the market closed on Monday, May 24, 2004, MedQuist issued a press release entitled "MedQuist Receives Nasdaq Staff Determination," which stated that on May 18, 2004 it had received a Notice of Additional Delinquency from the Nasdaq Listing Qualifications Hearings Department indicating that, in addition to the Company's previously disclosed filing delinquency, MedQuist had failed to timely file its Form 10-Q for the quarterly period ending March 31, 2004.[FN8](SAC ¶ 282.) That letter also "serve[d] as formal notification that the company's common stock is subject to delisting ... as a result of the company's failure to timely file the Form 10-Q...."(*Id.*)

> FN8. As already noted, the May 14 Dow Jones Alert had disclosed that MedQuist's Form 10-Q was not timely filed.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                                  Page 8
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
 (Cite as: 2006 WL 2827740 (D.N.J.))

The Dow Jones Alert also stated that the Nasdaq Listing Qualification Panel had conducted a hearing on April 29, 2004 regarding the Form 10-K filing delinquency, at which MedQuist requested its common stock continue to be listed on Nasdaq. Moreover, the press release stated that the Company had supplemented its previous submissions to the Panel on May 24, 2004 in response to the Notice of Additional Delinquency. Finally, MedQuist announced that it would not be able to file its delinquent Form 10-K and Form 10-Q with the SEC until after completion of an independent review of its billing practices. (*Id.*)

6. *June 15, 2004 Press Release Announcing Nasdaq Delisting*

On June 15, 2004, MedQuist announced that it received notice that shares of its common stock would be delisted from Nasdaq. Immediately following the announcement, shares of MedQuist "plunged" 17% to $10.53. *See* http:// www.marketwatch.com/News/Story/Story.aspx?guid= # 27F8CCD1"3332"42F3"B5FC" 25187178958B' & symb= MEDQ & sid=8798 & siteid=NYT & dist=NYT & osymb=MEDQ. Shares of MedQuist stock closed that day at $11.70 from the previous day's close of $12 .81. The stock price slightly declined the following day to $11.60 and increased by the close of the market on June 17 to $11.75. Moreover, shares traded on exceptionally high volume for those days-926,400 shares, 1,338,000 shares, and 783,500 shares respectively.[FN9]

> FN9. The Court can take judicial notice of Med-Quist's stock prices even on a motion to dismiss because these facts are "not subject to reasonable dispute [and are] capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned." *In re Merck & Co. Sec. Litig.,* 432 F.3d 261, 264 n. 3 (3d Cir.2005) (quoting *Ieradi v. Mylan Lab., Inc.,* 230 F.3d 594, 600 n. 3 (3d Cir.2000)).

7. *Post-Class Period Disclosures*

**\*7** On July 30, 2004, MedQuist revealed the conclusions of the Debevoise and PwC audits, and acknowledged that ratios and formulas instead of the contracted AAMT line counts were used for billing. The Board of Directors subsequently disciplined David Cohen, Donohoe, Scarpone, Kearns, and Ethan Cohen.[FN10](SAC ¶¶ 7-9; 285-86.) That same day, MedQuist announced that the SEC Commis-

sion had commenced a formal investigation against the Company. (*Id.* ¶¶ 10; 287.)

> FN10. By Opinion and Order dated September 21, 2005, the Court dismissed a shareholder derivative action under Rules 23.1 and 12(b)(6), Fed.R.Civ.P., against MedQuist's Board of Directors. *Kanter,* 388 F.Supp.2d 474.

On November 2, 2004, MedQuist issued a press release announcing that its Board of Directors had concluded that the Company's previously issued financial statements included in its Form 10-K for the fiscal year ending December 31, 2002, its Form 10-Q filed during 2002 and 2003, and all earnings releases and similar communications relating to such periods, should no longer be relied upon. (*Id.* ¶¶ 290-92.)

I. *Procedural History*

Plaintiffs filed this putative class action on November 8, 2004. By Order dated March 11, 2005, the Court appointed Greater Pennsylvania Carpenters Pension Fund as Lead Plaintiff. Plaintiffs amended the complaint on August 16, 2005 and again on November 15, 2005. These motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure followed. The Court heard oral argument on August 17, 2006.

## II. RULE 12(b)(6) STANDARD OF REVIEW

A Rule 12(b)(6) motion must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). A district court must accept any and all reasonable inferences derived from those facts. *Glenside West Corp. v. Exxon Co., U.S.A., Div. of Exxon Corp.,* 761 F.Supp. 1100, 1107 (D.N.J.1991); *Gutman v. Howard Sav. Bank,* 748 F.Supp. 254, 260 (D.N.J.1990).

However, a Complaint should be dismissed if, accepting all plaintiff's allegations and the reasonable inferences to be drawn therefrom, no relief could be granted under any set of facts to be proved. *Watts v. Internal Revenue Service,* 925 F.Supp. 271, 275 (D.N.J.1996). Although this Court must for the purposes of a Rule 12(b)(6) motion read the Complaint indulgently, the Court is not required to accept as true unsupported conclusions and unwarranted inferences. *Schuylkill Energy Resources v. PP & L.*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

113 F.3d 405, 417 (3d Cir.1997). There must be an actual, actionable claim underlying the Complaint's allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

## III. DISCUSSION

### A. *Rule 10b-5 Claims*

Section 10(b) of the Exchange Act prohibits the " 'use or employ, in connection with the purchase or sale of any security, ... [o]f any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe....' " *In re IKON Office Solutions, Inc. Sec. Litig .,* 277 F.3d 658, 666 (3d Cir.2002) (quoting 15 U.S.C. § 78j(b)) (alteration in original). Pursuant to this statutory authority, the Commission promulgated Rule 10b-5, creating a private right of action for investors harmed by materially false or misleading statements. *In re Suprema,* 438 F.3d at 275 (citing *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 535 (3d Cir.1999)). Under Rule 10b-5, it is unlawful for any person "to make any untrue statement of a material fact or to omit to state a material fact necessary to make the statement made[,] in light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." *Id.* (quoting 17 C.F.R. § 240.10b-5(b)).

**\*8** The elements of a claim under Section 10(b) of the Exchange Act are

(1) a material misrepresentation (or omission); (2) scienter, i.e. a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation;" (5) economic loss; and (6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss.

*Id.* (quoting *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336 (2005)) (citations omitted).[FN11] Pursuant to the PSLRA, a Section 10(b) claim must "specify each statement alleged to have been misleading, the reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."15 U.S.C. § 78u-4 (b)(1)(B).

FN11. Defendants here do not challenge that the

alleged misstatements or omissions were made in connection with the purchase of securities, that Plaintiffs relied on those misstatements or omissions, or that they suffered economic loss.

In addition to the PSLRA requirements, "[c]omplaints alleging securities fraud must also comply with Rule 9(b)" of the Federal Rules of Civil Procedure, *In re Advanta,* 180 F.3d at 531, which provides in part, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."Fed.R.Civ.P. 9(b)."Rule 9(b) requires a plaintiff to plead (1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." *In re Rockefeller Center Prop. Sec. Litig.,* 311 F.3d 198, 216 (3d Cir.2002) (internal quotation marks and citation omitted).

### 1. *Materiality*

"Rule 9(b) requires a plaintiff to plead ... a specific false representation [or omission] of *material fact*...." In re *Rockefeller Center Prop. Sec. Litig.,* 311 F.3d at 216. "[E]stablishing materiality is the 'first step' for a plaintiff with a section 10(b) claim." *In re Merck & Co. Sec. Litig.,* 432 F.3d 261, 268 (3d Cir.2005) (citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1417 (3d Cir.1997)).

Material information is "information that would be important to a reasonable investor in making his or her investment decision." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1425. Undisclosed information is generally considered material if "there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having significantly altered the total mix of information available to that investor." *Oran v. Stafford,* 226 F.3d 275, 282 (3d Cir.2000) (citing *In re Westinghouse Sec. Litig.,* 90 F.3d 696, 714 (3d Cir.1996)); *see Basic Inc. v. Levinson,* 485 U.S. 224, 231-232 (1988).

The Third Circuit's "1997 *Burlington* opinion created a standard for measuring the materiality of statements in an efficient market.[FN12]In 2000, [the court] ratified the *Burlington* standard post-PSLRA in *Oran v. Stafford,*" *In re Merck,* 432 F.3d at 269, where the court explained:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN12. Class Plaintiffs "need[ ] the market to be efficient. With an efficient market [they] can use the fraud-on-the-market theory, which allows [them] to meet [their] section 10(b) reliance requirement." *In re Merck,* 432 F.3d at 270 n. 8 (citing *Burlington,* 114 F.3d at 1415 n. 1, 1419 n. 8). The fraud-on-the-market theory supposes that " 'the price of a company's stock is determined by the available material information regarding the company and its business.' " *Basic Inc.* 485 U.S. at 241 (quoting *Peil v. Speiser,* 806 F.2d 1154, 1160 (3d Cir.1986)). The Third Circuit, "as compared to the other courts of appeals, has one of the 'clearest commitments' to the efficient market hypothesis." *In re Merck,* 432 F.3d at 269.

**\*9** In *Burlington*... [the Third Circuit] fashioned a special rule for measuring materiality in the context of an efficient securities market. This rule was shaped by the basic economic insight that in an open and developed securities market like the New York Stock Exchange, the price of a company's stock is determined by all available material information regarding the company and its business. In such an efficient market, "information important to reasonable investors ... is immediately incorporated into the stock price." *Burlington,* 114 F.3d at 1425. As a result, when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock. Because in an efficient market "the concept of materiality translates into information that alters the price of the firm's stock," if a company's disclosure of information has no effect on stock prices, "it follows that the information disclosed ... was immaterial as a matter of law." *Burlington,* 114 F.3d at 1425.
 *Oran v. Stafford,* 226 F.3d at 282. In other words, for information to be material, a company's disclosure of information must have a negative effect on stock prices.[FN13] *See In re NAHC, Inc. Sec. Litig.,* 306 F.3d 1314, 1330 (3d Cir.2002) (finding disclosed information immaterial as a matter of law where there was "no negative effect" on company's stock price immediately following disclosure); *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 175 (2d Cir.2005) (explaining plaintiffs must allege that "the market reacted negatively to a corrective disclosure" to state a claim under Section 10(b)).

FN13. Plaintiffs and Defendants here both rely on *Oran v. Stafford,* 226 F.3d at 282, for the

proposition that in an efficient securities market, to be deemed "material" a company's disclosure of bad news must cause a decline in stock price. For reasons explained, a rise in share price does not preclude a finding that the information was material as a matter of law, so long as the share price was otherwise "negatively affected." For example, information may be material where its disclosure causes a stock to increase by less than it otherwise would have; or stay constant where it would have otherwise increased. *See Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 343 (2005); Michael J. Kaufman, *At a Loss: Congress, The Supreme Court and Causation Under the Federal Securities Laws,* 2 N.Y.U. J.L. & Bus. 1, 46-48 (2005) (explaining that "economic loss" under *Dura* requires at minimum a showing that investor suffered loss by purchasing securities at artificially inflated price without mitigating that loss by reselling those securities at that same inflated price; for example, plaintiff who purchases at $100, but resells at $125 at some point after misrepresentations are disclosed, may suffer economic loss if sale price would have been higher in absence of fraud).

Here, Plaintiffs allege that the price of the stock was negatively affected immediately following a series of partial disclosures.

a. *March 16, 2004 Dow Jones Alert*

First, as already noted, on March 16, 2004 Dow Jones reported that MedQuist announced it would delay the filing of its Annual Report on Form 10-K with the SEC pending a continuing review of "potential improper billing practices" that may have resulted in some clients being overcharged and others being undercharged. The report also announced that MedQuist "said it will record a reserve of $1.5 million regarding the billing issues," pending adjustment upon completion of a review by PwC.

The day following this disclosure, shares of MedQuist common stock fell to $15.78 from the previous day's close of $15.95, and then to $15.74 by March 18, 2004, representing a total decline of roughly 1.3% in the stock price.[FN14] (Pls.Ex.3.)

FN14. That the price of the stock may not have declined more significantly does not preclude a finding of materiality as a matter of law espe-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
 (Cite as: 2006 WL 2827740 (D.N.J.))

cially considering that Plaintiffs allege these were only partial disclosures and that the negative information may have been offset by what the market perceived as positive news.

b. *March 24, 2004 Press Release*

Next, following the March 24, 2004 press release in which the Company reported it would not be able to timely file its Form 10-K with the SEC by March 30, MedQuist shares dropped from $15.79 to $15 .51, and then to $15.35 the following day on particularly heavy volume as compared with the several weeks prior.

c. *March 31, 2004 Press Release*

**\*10** Following the March 31 press release announcing that MedQuist had received a Nasdaq Staff Determination letter informing the Company that it was subject to delisting, shares of MedQuist stock rose to $16.31 on Thursday, then $16.49 on Friday, with approximately 40,000 and 54,000 shares being traded on those days. When the market opened the following Monday, April 5, 2004, shares fell to $16.15, to $16.11 on Tuesday, and finally to $15.51 on Wednesday. Volume was moderate for all trading days except for April 6, 2004, when the volume roughly doubled to 102,900 shares traded.

d. *May 14, 2004 Dow Jones Alert*

Following the Friday, May 14 Dow Jones Alert reporting that MedQuist would delay filing its Form 10-K and that it would not be able to estimate the impact of the review of its billing practices, shares rose on moderately light trading to $13.87 from the previous day's close of $13.03. When the market opened the following Monday, the volume doubled the previous two weeks' average, and share prices fell to $12.92. The share price continued to fall each day that week until a close of $12.24 on May 21.

e. *May 24, 2004 Press Release*

After the market closed on Monday, May 24, 2004, MedQuist issued a press release stating it had received a Notice of Additional Delinquency, and that MedQuist would not be able to file its delinquent Form 10-K and Form 10-Q with the SEC until after completion of an independent review of its billing practices. The next day, on light trading, shares rose to $13.18 from the previous day's close of $12.38. Shares continued to trade at low volumes (30,150

to 37,590) for the remainder of the week, and the stock price ultimately dropped to $12.33, below the predisclosure price.

f. *June 15, 2004 Press Release Announcing Nasdaq Delisting*

Finally, on June 15, 2004, MedQuist announced that it received notice that shares of its common stock would be delisted from Nasdaq. Immediately following the announcement, shares of MedQuist "plunged" 17% to $10.53. *See* http:// www.marketwatch.com/News/Story/Story.aspx?guid= # 27F8CCD1"3332"42F3"B5FC" 25187178958B' & symb= MEDQ & sid=8798 & siteid=NYT & dist=NYT & osymb=MEDQ. Shares of MedQuist stock closed at $11.70 from the previous day's close of $12.81. The stock price slightly declined the following day to $11.60 and increased by the close of the market on June 17 to $11.75. Moreover, shares traded on exceptionally high volume for those days-926,400 shares, 1,338,000 shares, and 783,500 shares respectively.

Plaintiffs argue that based on the foregoing they have pleaded materiality with the requisite particularity. Defendants argue that the Third Circuit's decision in *Ieradi v. Mylan Labs., Inc.,* 230 F.3d 594 (3d Cir.2000), "lays each of Plaintiff's arguments to rest ."(MedQuist Reply Br. at 6.) This Court disagrees with Defendants. In that putative class action, plaintiff brought claims under Section 10(b) based on the alleged failure by defendant Mylan Laboratories, Inc. ("Mylan"), a leading drug manufacturer, to disclose certain information relating to an FTC investigation stemming from increases in the prices of several of Mylan's drugs. The plaintiff there purchased Mylan stock on October 26, 1998, several months after the investigation by the FTC had been publicly disclosed on July 6, 1998. Following the initial disclosure, the company's stock price fell sharply from a closing high of $35 on July 17, 1998, and continued to decline every successive day thereafter but one, until its close at $25 on August 4, 1998.

**\*11** On December 5, 1998, a little over one month after plaintiff purchased stock in the company, the public learned that the FTC had notified Mylan that it was preparing to sue the company. Immediately following that disclosure, the stock price again dropped, from $34-3/8 on Friday, December 4, to $31-5/16 on Monday, December 7. Plaintiff then filed a putative class action alleging that Mylan's failure to attribute its continued growth and in-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                              Page 12
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
 (Cite as: 2006 WL 2827740 (D.N.J.))

creased revenue to two exclusive supply contracts artificially inflated Mylan's stock price. According to plaintiff, by failing to disclose the existence of those contracts Mylan artificially inflated the stock price by concealing from investors the risk that the FTC investigation would materialize into a civil antitrust action.

The district court dismissed the complaint, finding that the failure to disclose the exclusive supply contracts was not material. In "find[ing] support for the District Court's conclusion that disclosure of the two exclusive contracts was immaterial in the action of the stock market that followed the FTC investigation," the Third Circuit noted that the drop of ten points following the initial disclosure of the investigation in July was "more than 300 per cent in excess of the 3 1/6 'plummet' that occurred several months after the plaintiff purchased stock on October 26, 1998."*Id.* at 599-600.In other words, the court upheld the district court's conclusion that disclosure of the two supply contracts would not have significantly altered the "total mix" of information made available to investors because the December price decline was insignificant compared with the substantial drop following disclosure of the FTC investigation months before. *Id.*

Defendants here rely on *Ieradi* for the proposition that once a risk is publicly disclosed, that the same risk may eventually materialize is insignificant for purposes of Section 10(b) liability. Thus, Defendants argue, the June 15, 2004 announcement that MedQuist would be delisted was not material because the market already knew of that risk based on earlier disclosures. Indeed, Defendants contend, not only did the market know that delisting was a risk, the market did not care, as reflected in the slight increase in stock price following the March 31 and May 24 announcements that MedQuist was subject to delisting. This Court finds *Ieradi* distinguishable for a number of reasons.

First, the market's reaction to the initial disclosure of the risk in *Ieradi* was markedly different than it was here. In *Ieradi,* as already noted, the stock price sharply declined once it was disclosed that the FTC was investigating Mylan-in other words, once the risk of a lawsuit was announced. Here, on the other hand, the market hardly reacted to news that MedQuist was subject to delisting; instead the stock price actually increased in the days immediately following the March 31 and May 24 disclosures trading on very light volume-approximately 20,000 to 50,000 shares per day. The movement in the stock price following the disclosures was therefore relatively insig-

nificant. Moreover, in *Ieradi* the market reaction to the second disclosure announcing the lawsuit-that the risk had materialized-was relatively insignificant. Here, in contrast, as reported on June 15, 2004, MedQuist's shares "plunged" some 17% to $10.53 following news that the company's stock would be delisted. *See* http://www.marketwatch.com/News/Story/Story.aspx?guid =# 27F8CCD1"3332' 42F3"B5FC"25187178958B' & symb= MEDQ & sid=8798 & siteid=NYT & dist=NYT & osymb=MEDQ.

**\*12** In light of the above, this Court is not willing to find, as Defendants are essentially asking it to, that *Ieradi* announced some per se rule that once a risk is disclosed to investors, the materialization of that risk, without more, is necessarily immaterial. While the materialization of a previously disclosed risk was immaterial in *Ieradi* based on the market's reaction to news of the FTC suit, the undisputed historical data here reflects a quite different scenario. Here, while investors found the threat of delisting relatively *unimportant* (the stock price moved only slightly on light volume following the March 31 and May 24 announcements), the market's reaction to the June 15, 2004 announcement indicates that news that the Company would actually be delisted significantly altered the total mix of information available to investors (the stock price "plunged" on very heavy volume). Accordingly, the Court finds that Plaintiffs here have pleaded with particularity that information disclosed in the June 15 announcement was material.[FN15]

> FN15. To the extent Defendants argue that the June 15 disclosure did not directly relate to the unlawful billing scheme, the issue is not one of materiality but of loss causation, which the Court will discuss below.

Additionally, the Court finds it important that information relating to the underlying fraud here is alleged to have been revealed through a series of partial disclosures rather than a single corrective disclosure.[FN16]In such circumstances, where only tidbits of information are being released to the public at a time, the concomitant market reaction will likely be similarly restrained. Here, for example, while the Company revealed on March 16 that it was reviewing its billing practices, it also stated that it believed that some customers may have in fact been undercharged. (SAC ¶ 275.) Moreover, MedQuist stated that it would record a reserve of only $1.5 million regarding the billing issues, far less than the appropriate amount according to Plaintiffs' allegations here. Because, as

Plaintiffs allege, these partial disclosures did not reveal the true extent of the underlying billing scheme, the inflation was not completely removed from the stock price upon these announcements. The company's disclosure that the billing problems may have resulted in a net overcharge of just $1.5 million, whereas Plaintiffs allege that the actual overbillings were many multipliers of that figure, does not provide a reliable benchmark with which to conclude that the earlier financial misstatements were immaterial.

> FN16. The parties here agree that a single corrective disclosure is not necessary to state a 10(b) cause of action.

Defendants point to the market's reaction in the days following the March 31 and May 24 disclosures as support for their argument that investors simply did not care about the alleged underlying fraud; indeed, Defendants point out, the stock price actually rose immediately following those disclosures. In the first instance, however, as explained above, the share price declined immediately following those price increases. Moreover, relatively light volume accompanied the price increases while the subsequent price declines occurred upon higher volume.

Finally, as revealed above, at least to a certain degree the March 31 and May 24 disclosures contained information that had previously been disclosed. For instance, by March 31 investors already knew from previous disclosures that the Company would not timely file its Form 10-K Annual Report. Likewise, by May 24 investors knew that the Form 10-Q for the period ending March 31 would not be filed on time. Therefore, to the extent that Defendants rely on the stock price increases in the days following March 31 and May 24 as support for their position that investors did not care about the underlying fraud, such reliance is misplaced, especially considering the market's reaction to the other partial disclosures cited by Plaintiffs.

*13 While significant price declines following disclosures would make for an easier case for plaintiffs, companies required to make truthful and accurate financial disclosures do not escape 10(b) liability simply by leaking incomplete information into the marketplace over a period of time, rather than all at once. After all, the securities laws were enacted to protect "the investing public and the national economy through the promotion of 'a high standard of business ethics ... in every facet of the securities industry.' " *Bateman Eichler, Hill Richards, Inc. v.*

*Berner,* 472 U.S. 299, 315 (1985) (citing *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186-87 (1963)).

For these reasons, the Court finds that based on the pleadings as well the trading activity of MedQuist shares from 2000 through 2004, of which this Court has taken judicial notice, Plaintiffs here have sufficiently pleaded materiality under the standard articulated by the Third Circuit in *Burlington,* 114 F.3d at 1425.[FN17]

> FN17. In any event, because that information was *not* so obviously unimportant to investors, the Court must let a jury decide this issue. *Ieradi,* 230 F.3d at 599 (citing *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 281 n. 11 (3d Cir.), *cert. denied,* 506 U.S. 934 (1992)and *Ballan v. Wilfred Am. Educ. Corp.,* 720 F.Supp. 241, 249 (E.D.N.Y.1989) (explaining where there is room for differing opinions on issue of materiality, question should be left for jury determination)).

2. *Misrepresentations or Omissions*

As already noted, Section 10(b) claims are subject to the requirements of the PSLRA as well as Rule 9(b) of the Federal Rules. Under the PSLRA, a Section 10(b) claim must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."15 U.S.C. § 78u-4(b)(1)(B). Moreover, Rule 9(b) requires plaintiffs to identify the source of the allegedly fraudulent misrepresentation or omission and, "at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'-that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema,* 438 F.3d at 276-77 (quoting *In re Rockefeller,* 311 F.3d at 217).

Here, Plaintiffs allege multiple misstatements/omissions by Defendants during the Class Period contained in fifteen press releases, four annual reports, twelve quarterly reports, and a number of conference calls with analysts and stockholders. Plaintiffs claim that Defendants' failure to disclose that the Company's revenues were inflated as a result of a fraudulent billing scheme rendered those statements false.

Not Reported in F.Supp.2d                                                                                                Page 14
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
 (Cite as: 2006 WL 2827740 (D.N.J.))

Defendants argue that Plaintiffs have failed to plead with particularity facts that show any of the challenged statements were false or misleading when made because Plaintiffs have not alleged that the financial disclosures themselves were false. As a result, Defendants contend, Defendants had no duty to disclose the allegedly fraudulent billing scheme. In short, Defendants maintain that "[a]bsent some nexus between the alleged representations and the underlying alleged misconduct, there is simply no duty to disclose...." (MedQuist Br. at 45.)

**\*14** In support of their position, Defendants cite several cases standing for the proposition that there can be no Section 10(b) liability as a matter of law when there is no allegation by Plaintiffs that MedQuist did not receive and book the dollar amounts reported. (*Id.* at 38.)In other words, Defendants argue that isolated statements of factual revenues allegedly generated by improper activities do not give rise to Section 10(b) liability.

 *In re Sofamor Danek Group, Inc.,* 123 F.3d 394, 401 n. 3 (6th Cir.1997), held that while a securities violation could be premised on false or misleading "hard information," "[i]t is clear that a violation of federal securities law cannot be premised upon a company's disclosure of *accurate* historical data."(emphasis added) (citing I *n re Convergent Tech. Sec. Litig.,* 948 F.2d 507, 512-13 (9th Cir.1991)). In that case the plaintiffs did *not* challenge the accuracy of the "hard" numbers pertaining to publicly reported sales and earnings. *Id.* at 401.Instead, the plaintiffs alleged that they paid inflated prices for the company's stock where, among other things, the company failed to disclose that it was engaging in illegal promotion of its products when it helped fund a particular non-profit foundation. The court affirmed the dismissal of the complaint under Rule 12(b)(6), holding that whether the company's activities were lawful was a matter of opinion, which the company had no duty to disclose unless such "predictions" were "substantially certain to hold," and the court held they were not. *Id.* at 402.

Defendants also cite *Greenstone v. Cambex Corp.,* 975 F.2d 22, 24 (1st Cir.1992), a pre-PSLRA case, which held that "accurate" "statements ... of figures" including revenue, income, profit and balance sheets could not be misleading as a matter of law "unless, given the circumstances, an investor would normally have expected to find some kind of qualification of the figures, disclosing a significant potential liability."Thus, for example, the court there held that a company's financial statements need not disclose "potential liability" arising from a particular

practice "unless ... it is considered probable that a claim will be asserted and there is a reasonable probability that the outcome will be unfavorable."*Id.* (citing Financial Accounting Standards Board Statement No. 5, § 10). Because in that case the court found that the defendant company and its officers did not know that a particular lawsuit that had not yet been filed was "probable" at the time, the court found the company's financial statements could not give rise to Section 10(b) liability. *See also Kushner v. Beverly Enterprises, Inc.,* 317 F.3d 820 (8th Cir.2003) (affirming dismissal of complaint where statements regarding company's belief that it was in substantial compliance with Medicare regulatory requirements were insufficient as matter of law to form basis of Section 10(b) claim because they were based on " 'soft information,' " which company was not required to disclose").

**\*15** These cases stand for the proposition that isolated statements of revenues can not give rise to Section 10(b) liability, even when allegedly generated by improper activities, if the figures reported are factually accurate. These cases are not inconsistent, however, with the proposition that Section 10(b) liability can arise when defendants know that statements putting the source of the company's revenue at issue are false or misleading, even though the financials themselves are otherwise accurate. Plaintiffs have pleaded facts consistent with this theory of 10(b) liability.

*In re Par Pharm., Inc. Sec. Litig.,* 733 F.Supp. 668, 677 (S.D.N.Y.1990), held that statements that were "literally true" could be found by a reasonable jury to be "false and misleading," thereby giving rise to Section 10(b) liability, "if a reasonable investor, in the exercise of due care, would have received a false impression from the statement."In that case, "Plaintiffs allegedly purchased Par's stock at inflated prices because Par's public statements and filings with the Securities and Exchange Commission failed to disclose that Par and its subsidiary had made illegal payments to government officials to expedite approval of the companies' applications for permission to manufacture certain drugs." *Id.* at 672.Plaintiffs there cited, among others, Par's statements in a series of public filings that the company's ability to secure speedy FDA approval for its products was because of its "legitimate business acumen and ingenuity," rather than the illegal bribery scheme alleged by the plaintiffs. *Id.* at 673.

Noting that under Rule 10b-5 corporate officers are obligated to speak truthfully on a matter once they undertake to make certain statements and are required to make such

Not Reported in F.Supp.2d                                                                                                          Page 15
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
 **(Cite as: 2006 WL 2827740 (D.N.J.))**

additional disclosures as are necessary to avoid rendering the statements made misleading, the court concluded:

A reasonable jury could find that, by extolling Par's ability to obtain FDA approvals, by comparing Par's success in this regard to other companies in the industry and to its own previous performance, and by projecting continued success in obtaining rapid approvals, the statements conveyed to a reasonable investor the false impression that Par had a particular expertise in obtaining FDA approvals constituting a legitimate competitive advantage over other companies and that this advantageous expertise was responsible for its success in obtaining FDA approvals.

*Id.* at 677-78.For these reasons, *In re Par Pharm.* held that a reasonable jury could find these statements misleading to a reasonable investor. *Id.*

*In re Van Der Moolen Holding N.V. Sec. Litig.,* F.Supp.2d 388, 400-01 (S.D.N.Y.2005), held that "although a defendant does not have a Rule 10b-5 duty to speculate about the risk of future investigation or litigation, if it puts the topic of the cause of its financial success at issue, then it is 'obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information.'" (quoting *In re Prividian Fin. Corp. Sec. Litig.,* 152 F.Supp.2d 814, 824-25 (E.D.Pa.2001) (citing *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 281-82 (3d Cir.1992)* (when defendant affirmatively characterizes management practices as, for example, "adequate," "conservative," "cautious," and the like, "the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations"); *United Paperworkers Int'l Union v. Int'l Paper Co.,* 801 F.Supp. 1134, 1143 (S.D.N.Y.1992)).*In re Van Der Moolen Sec. Litig.,* 405 F.Supp.2d at 392, involved a complaint that alleged the defendant company failed to disclose that throughout the class period its majority-owned subsidiary derived a substantial share of its revenue from illegal trading practices and that subsequent declines in the company's revenues were directly attributable to the apparent cessation of such practices. For example, the plaintiffs alleged that the company's CEO stated, "in exceedingly turbulent market circumstances we were able to maintain our second quarter result at almost the level we achieved in the first quarter. The development of our NYSE business showed once again that trading volumes and price volatility determine our opportunities to trade."*Id.* at 401.The court held that "[s]tatements such as these put the sources of ... revenue

at issue" and, thus, "[u]nder the circumstances[ ] the alleged failure to disclose the true sources of such revenue could give rise to liability under Section 10(b)."*Id.*

**\*16** Recently, *In re Marsh & McLennan Co. Sec. Litig.,* 2006 U.S. Dist. LEXIS 49525, at \*36 (S.D.N.Y. July 19, 2006), noted that while the proposition underlying the court's holding in *In re Van Der Moolen* "is reasonable," that decision "may be interpreted to hold that the statements which put the sources of revenue at issue triggered a general duty to disclose the role of improper conduct in generating that revenue."Accordingly, *In re Marsh & McLennan* clarified that while "the isolated statement of actual revenues allegedly generated by improper activities does not create Section 10(b) liability," liability may nonetheless attach to the misleading statement itself. *Id.* at \*37-39 (citing *In re Sofomor,* 123 F.3d at 401). In other words, a company's misleading statements about the source of its revenues may give rise to liability but will not itself make the company's financial statements untrue or misleading. Therefore, in that case the court dismissed the plaintiffs' claims under Section 10(b) that the defendant company had misstated its earnings solely by virtue of its failure to disclose the existence of steering and bid manipulation. *Id.* at \*39.

Here, the Court holds that Plaintiffs have adequately pleaded that Defendants' statements putting the source of the Company's revenue at issue were misleading, thereby stating a Section 10(b) cause of action. Specifically, in a number of public filings reporting revenue, MedQuist failed to disclose its billing scheme, instead attributing its revenues to legitimate business factors such as "increased sales to existing customers, sales to new customers and additional revenue from acquisitions."That statement was included in each of the following financials: the March 29, 2000 Form 10-K, the May 11, 2000 Form 10-Q, the August 11, 2000 Form 10-Q, the November 13, 2000 Form 10-Q, the March 16, 2001 Form 10-K, the May 11, 2001 Form 10-Q, the August 9, 2001 Form 10-Q, the November 9, 2001 Form 10-Q, the March 22, 2002 Form 10-K, the May 14, 2002 Form 10-Q, the August 14, 2002 Form 10-Q, the November 14, 2002 Form 10-Q and the May 13, 2003 Form 10-Q. (SAC ¶¶ 114, 120, 136, 154, 163, 174, 183, 188, 196, 205, 219, 230 and 253.) These statements put the source of MedQuist's revenue at issue and, therefore, the Company's failure to disclose a major source of that revenue-the improper billing scheme-was misleading.

Plaintiffs also argue that the Company's statements were

Not Reported in F.Supp.2d                                                                                                   Page 16
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
**(Cite as: 2006 WL 2827740 (D.N.J.))**

necessarily false considering the Company's November 2, 2004, press release announcing that its Board of Directors had concluded that the Company's previously issued financial statements included in its Form 10-K for the fiscal year ending December 31, 2002, its Form 10-Q filed during 2002 and 2003, and all earnings releases and similar communications relating to such periods, should no longer be relied upon. (*Id.* ¶¶ 290-92.)

Plaintiffs cite *In re Peritus Software Services, Inc. Sec. Litig.,* 52 F.Supp.2d 211 (D.Mass.1999), for the proposition that a restatement of earnings, or the intention to do so, is evidence that the statement of earnings was false when made. In *Peritus,* the class plaintiffs alleged an improper revenue recognition scheme and brought a securities fraud suit challenging as misleading eight statements made by the company that contained representations regarding the company's financial results for four quarters, which were eventually restated downward. Each of the eight statements was alleged to have been misleading for improperly recognizing revenue-i.e., plaintiffs alleged that in one particular quarter the revenue report recognized revenue for sale of a product that was never actually sold, and that for a different quarter the company had reported revenue on a particular transaction that should not have been recorded in any quarter. *Id.* at 222.The court there held that "[b]ecause [the class] is able to cite particular transactions," the plaintiffs had properly alleged that the challenged financial statements were materially misleading based solely on the later corrective accounting action. *Id.* at 223.

**\*17** Here, Plaintiffs have alleged that throughout the Class Period MedQuist overcharged its customers by improperly utilizing formulas and ratios rather than counting characters as defined by the customer contracts. The Court finds that the Second Amended Complaint pleads with particularity how the scheme was devised, who devised it, and how it was implemented. (SAC ¶¶ 33-79.) Taken together with the undisputed fact that the Company's Board of Directors informed investors not to rely upon the financial statements included in the Company's Form 10-K for the fiscal year ending December 31, 2002, its Form 10-Q filed during 2002 and 2003, and all earnings releases and similar communications relating to such periods, the Court finds that Plaintiffs have pleaded with particularity that a number of Defendants' statements and public filings during the Class Period were false or misleading.

3. *Scienter*

The PSLRA also requires that a Section 10(b) plaintiff plead scienter with particularity.[FN18] *See* *GSC Partners CDO Fund v. Washington,* 368 F.3d 228, 237 (3d Cir.2004). It is well-settled within this Circuit that scienter may be established in either of two ways: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[FN19] *In re Suprema,* 438 F.3d at 276 (quoting *Burlington,* 114 F.3d at 1418).

> FN18. Specifically, the PSLRA states in pertinent part:
>
>> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act of omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.
>
> 15 U.S.C. § 78u-4(b)(2)."To the extent that Rule 9(b)'s allowance of general pleading with respect to mental state conflicts with the PSLRA's requirement that plaintiffs state with particularity facts giving rise to a strong inference that the defendant acted with scienter, 15 U.S.C. § 78u-4(b)(2), the PSLRA 'supersedes Rule 9(b) as it relates to Rule 10b-5 actions.'" *In re Suprema,* 438 F.3d at 277 (quoting *In re Advanta,* 180 F.3d at 531 n. 5).

> FN19. Where plaintiffs claim that defendants had the motive and opportunity to commit securities fraud, fraudulent intent will not be inferred from the mere sale of stock by some officers. *In re Suprema,* 438 F.3d at 277. However, sales of company stock by insiders that are "unusual in scope or timing ... may support an inference of scienter."*Id.* (quoting *In re Advanta,* 180 F.3d at 540). Whether a sale is "unusual in scope" depends on factors including "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved."*Id.* (quoting *Wilson v. Bernstck,* 195 F.Supp.2d 619, 635 (D.N.J.2002)) (citations omitted). Courts should also consider in deter-

Not Reported in F.Supp.2d                                                                                          Page 17
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
 (Cite as: 2006 WL 2827740 (D.N.J.))

mining whether a stock sale is unusual in scope whether the profits were substantial relative to the seller's ordinary compensation. *Id.* (citing *In re Burlington Coat Factory,* 114 F.3d at 1423).

Here, the Court finds Plaintiffs' allegations of motive and opportunity in connection with officers' sale of stock to be insufficient, especially considering that the Individual Defendants were precluded from transferring or selling MedQuist stock until at least May, 2002. Additionally, the SAC alleges only a single transaction after that time by Defendant Scarpone, which yielded only approximately $317,000. The Court finds nothing unusual about this stock sale supporting an inference of scienter. However, as explained below, Plaintiffs have otherwise adequately pleaded scienter.

Additionally, the Third Circuit has endorsed "a variant of the totality of circumstances approach," but only on "those occasions ... presenting unusually suspicious circumstances." *In re Rockefeller Center Properties, Inc.,* 311 F.3d at 224; *see In re Suprema, supra* (noting for section 10(b) claims against an auditor that liability can arise based on a showing that "specific and not insignificant accounting violations collectively raise an issue of scienter"); *see also In re Cabletron Sys., Inc.,* 311 F.3d 11, 39 (1st Cir.2002) (holding "plaintiff may combine various facts and circumstances indicating fraudulent intent-including those demonstrating motive and opportunity-to satisfy the scienter requirement" under Section 10(b))."When the alleged fraud is based on non-disclosure of facts, evidence that the defendants had actual knowledge of the facts is sufficient to show scienter."*In re Great Atlantic Tea Co. Sec. Litig.,* 2004 U.S.App. LEXIS 14175, at *11 (3d Cir. July 9, 2004).

Finally, "a complaint can meet the pleading requirement dictated by [the PSLRA] by providing sufficient documentary evidence and/or a sufficient description of the personal sources of the plaintiff's beliefs." *California Public Employees' Ret. Sys. V. Chubb Corp.,* 394 F.3d 126, 147 (3d Cir.2004)."[W]here plaintiffs rely on confidential personnel sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." *In re Cabletron,* 311 F.3d at 29 (quoting *Novak v. Kasaks,* 216 F.3d 300, 314 (2d Cir.2000)).

*18 Defendants here argue that the allegations in the Complaint are conclusory such that they cannot as a matter of law give rise to the requisite strong inference of scienter. To the contrary, the Court finds that Plaintiffs have alleged particularized facts that constitute at the very least strong circumstantial evidence of conscious misbehavior or recklessness on the part of the Individual Defendants. *In re Suprema,* 438 F.3d at 276 (quoting *Burlington,* 114 F.3d at 1418).

The Second Amended Complaint alleges with particularity that each of the Individual Defendants knowingly implemented the scheme through their actions and, thus, each was aware of its existence. As detailed at length in the Complaint, CTO Ethan Cohen worked with COO Donohoe and CEO David Cohen to create the technology to program the Company's computerized billing codes to overcharge its hospital customers. (*Id.* ¶¶ 51-57.)Moreover, the programs Ethan Cohen used created a summary bill with no details, thereby making it virtually impossible for customers to verify the accuracy of the bills.

MedQuist personnel had discussions with Defendants Donohoe and David Cohen about "what they wanted to be able to do, and then what they were doing" to use formulas and ratios to overcharge customers and underpay the Company's transcriptionists. (*Id.* ¶¶ 218, 228.)Throughout the Class Period, Donohoe and David Cohen instructed personnel to manipulate a higher billing result and they delegated to the remaining Individual Defendants the task of implementing the billing and revenue scheme. (*Id.* ¶¶ 52-57, 71-79.)For example, Donohoe specifically directed Quaintance to "jack up" formulas to increase revenues and profit margins for Defendant Quaintance's region while he was Senior Vice President. Moreover, billing summaries from that region reflect that Quaintance indeed utilized formulas to increase billings. (*Id.* ¶ 78.)

MedQuist employees said Donohoe was the "mastermind" of the manipulated billing scheme. (*Id.* ¶¶ 75-76, 122, 218, 228, 256.)At MedQuist's annual regional management meeting in Philadelphia in 2000, for example, Donohoe spoke to roughly 150 MedQuist managers and "bragged" about the way he used formulas to inflate billing revenue. (*Id.* ¶ 76.)Moreover, Donohoe called MedQuist's Warmister office every month to direct increases and other adjustments in the billing formulas to carry out the scheme. (*Id.* ¶ 77.)Finally, the Complaint alleges that certain of the Individual Defendants participated in con-

Not Reported in F.Supp.2d                                                                    Page 18
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
 (Cite as: 2006 WL 2827740 (D.N.J.))

ference calls on April 23, 2002, July 25, 2002, October 23, 2002 and February 13, 2003, at which times the fraudulent billing scheme was discussed.

The Court finds that based on these allegations, especially considering the controlling positions of the Individual Defendants within the Company, Defendants Ethan Cohen, Kearns, Quaintance, Scarpone, Donohoe and David Cohen had direct knowledge of the fraudulent billing scheme at the time they issued the false or misleading statements described above.[FN20] Accordingly, Plaintiffs have sufficiently pleaded scienter.

> FN20. Plaintiffs here argue that scienter can be established solely by way of the "group pleading" doctrine.
>
> The group pleading doctrine "allows plaintiffs to 'rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company.' " However, the doctrine "is extremely limited in scope. Courts ... have construed the doctrine as applying only to clearly cognizable corporate insiders with active daily roles in the relevant companies or transactions."
>
> *In re Van der Moolen,* 405 F.Supp.2d at 398-99 (citations omitted) (noting the majority rule in the Second Circuit is that the group pleading doctrine has survived the PSLRA).*But see Southland Sec. Corp. v. INSpire Soln. Inc.,* 365 F.3d 353, 364 (5th Cir.2004) (noting that the Fifth Circuit never adopted the group pleading doctrine, even before the PSLRA, but that the doctrine cannot withstand the PSLRA's specific pleading requirements in any event).
>
> In light of the Court's holding here that Plaintiffs have otherwise sufficiently pleaded scienter, the Court need not address whether allegations based *solely* on group pleading can establish a strong inference of scienter. The Court notes, though, that if the group pleading doctrine remains viable, this case likely falls within its limited scope as Plaintiffs have alleged that the corporate insider defendants here had "active daily roles" in MedQuist and

the relevant overbilling transactions. *But see In re Bio-Technology Gen. Corp. Sec. Litig.,* 380 F.Supp.2d 574, 584 (D .N.J.2005) ("The Third Circuit has not expressly determined whether group pleading has survived enactment of the PSLRA. Nevertheless, the prevailing authority within this District counsels that group pleading has been abolished.") (citing cases); *Majer v. Sonex Research, Inc.,* 2006 U.S. Dist. LEXIS 49531, at *27-28 (E.D.Pa. July 19, 2006) ("Group pleading, as opposed to the specific identification of who made alleged misrepresentations, is insufficient under the Reform Act.") Nonetheless, this Court's holding is independent of the viability, if any, of the group pleading doctrine.

### 4. *Loss Causation*

**\*19** "Under section 10(b), plaintiffs have to plead loss causation-i .e., that the misrepresentation caused the stock price drop."[FN21] *In re Merck & Co. Sec. Litig.,* 432 F.3d 261, 274 (3d Cir.2005) (citing *Oran v. Stafford,* 226 F.3d at 277). The test in the Third Circuit for loss causation requires a plaintiff to show a "sufficient causal nexus between the loss and the alleged [nondisclosure]."*Newton,* 259 F.3d at 181 n. 24 (quoting *Semerenko v. Cendant Corp.,* 223 F.3d 165, 184 (3d Cir.2000)).[FN22]"In other words, to establish loss causation, a claim must demonstrate that the fraudulent conduct proximately caused or substantially contributed to causing plaintiff's economic loss."[FN23]*Id.* (citations omitted); *see Lentell,* 396 F.3d at 173 (holding loss causation will be established if relationship between plaintiff's investment loss and information concealed by defendant is "sufficiently direct"). The "causation issue becomes most critical at the proof stage. Whether the plaintiff has proven causation is usually reserved for the trier of fact." *EP Medsystems, Inc. v. EchoCath, Inc.,* 235 F.3d 865, 884 (3d Cir.2000).

> FN21. Actually, causation under Rule 10b-5 is two-pronged. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 172 (3d Cir.2001) (citing *Huddleston v. Herman & MacLean,* 640 F.2d 534, 549 n. 24 (5th Cir.1981), *aff'd in part, rev'd in part on other grounds,* 459 U.S. 375 (1983); James D. Cox, Robert W. Hillman & Donald C. Langevoort, Securities Regulation: Cases and Materials 769-71 (3d ed.2001); 5 A. Jacobs, The Impact of Rule 10b-5 § 64.01[a], at 3-221 to 3-222 (Supp.1980)). In

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                                                     Page 19
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
 (Cite as: 2006 WL 2827740 (D.N.J.))

addition to loss causation, plaintiffs must also demonstrate reliance, or "transaction causation." *Newton,* 259 F.2d at 172. Transaction causation "establishes that but for the fraudulent misrepresentation, the investor would not have purchased or sold the security."*Id.* (citing *Suez Equity Investors, L.P. and SEI Assocs. v. Toronto-Dominion Bank,* 250 F.3d 87, 95-96 (2d Cir.2001); *Weiner v. Quaker Oats Co.,* 129 F.3d 310, 315 (3d Cir.1997)). Defendants here do not contest the sufficiency of the pleading of transaction causation.

FN22. Following *Newton,* the Supreme Court decided *Dura, supra,* which examined the ways in which a plaintiff may satisfy the loss causation requirement. However, *Dura,* 544 U.S. at 346, left open the issue of whether the pleading of loss causation is governed by Rule 8(a) or Rule 9(b) of the Federal Rules of Civil Procedure. Defendants here argue that the pleading standard is not dispositive in this case in any event as Plaintiffs have failed "to specifically identify a significant price decline 'after the truth became known.' " (MedQuist Reply Br. at 13, citing *Dura,* 544 U.S. at 347. Contrary to Defendants' argument, however, *Dura* held only that "[t]he complaint's failure to claim that Dura's share price fell significantly after the truth became known *suggests that the plaintiffs considered the allegation of purchase price inflation alone sufficient.*The complaint contains nothing that suggests otherwise." (Emphasis added). In other words, the Court did not *require* plaintiffs in a Section 10(b) action to allege a significant price decline caused by the alleged misstatement.

FN23."The PSLRA codified [the] judge-made requirement" of loss causation:

>  In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violated this chapter caused the loss for which the plaintiff seeks to recover damages.

> *Emergent Capital,* 343 F.3d at 197 (quoting 15 U.S.C. § 78u-4(b)(4)).

Here, Defendants argue that the SAC is deficient as a matter of law because it does not allege "[a] material decline in stock price following a corrective disclosure-*i.e.,* a release of information directly related to the alleged fraud...." (MedQuist Br. at 33.) Initially, however, as already noted above, the stock price need only *negatively respond* to the disclosures; a significant drop in the price is not required. Moreover, as Plaintiffs point out, "a firm that lies about some assets cannot defeat liability by showing that other parts of its business did better than expected, counterbalancing the loss."*Goldberg,* 890 F.2d at 966. Indeed, as the Supreme Court in *Dura* recognized in dictum, a plaintiff may sustain a Section 10(b) action where a share's higher price is actually lower than it would otherwise have been so long as the plaintiff can show that "the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss."[FN24] 544 U.S. at 346.

FN24. To be sure, as already noted, *Dura* held that a complaint's failure to claim that the company's share price fell significantly after the truth became known may suggest that the plaintiffs consider the allegation of purchase price inflation alone sufficient, which it is not. 544 U.S. at 347. However, the Court there also recognized that even in the absence of allegations that share price significantly decreased, a complaint may otherwise suggest that the economic loss was caused by more than mere purchase price inflation. *Id.*

Here, Plaintiffs allege that certain negative disclosures were offset by positive news, thereby masking the negative effect on the stock price. For example, following a March 16, 2004 Dow Jones Corporate Filings Alert stating that MedQuist believed that "some clients have been overcharged *while others have been undercharged,*" the stock, trading on unusually high volume, decreased from a close price of $16.250 the prior day to $15.740 on March 18. According to the SAC, this partial disclosure[FN25] resulted in a price decline that was less than it would have been absent the offsetting "positive information" that certain clients were undercharged. Moreover, the immediate market response to this press release indicates that the disclosure proximately caused the alleged economic loss.

FN25. The parties agree that revelation of the truth may occur through a series of disclosing events rather than a single complete disclosure. (MedQuist Reply Br. at 15.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                 Page 20
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
 (Cite as: 2006 WL 2827740 (D.N.J.))

**\*20** Additionally, the SAC is replete with allegations that the stock price was negatively affected following a number of partial disclosures revealing the fraudulent billing scheme:

• Following the March 16, 2004 Dow Jones Alert, shares dropped to $15.74 from the previous day's closing price of $15.95.

• On March 24, 2004, following a MedQuist press release disclosing that it would not meet the SEC filing deadline for its Annual Report on 10-K and that the Company would be engaging independent outside counsel to conduct a review of billing practices, the stock price declined over the course of three days from $15.82 to $15.35 on unusually heavy trading.

• Following a May 14, 2004 report in which MedQuist was reported as saying it could not estimate when its internal review, its audit for the 2003 fiscal year and its preparation of unaudited financial statements for the quarter ending March 31 would be complete, the share price dropped from $13.87 to $12.24 over the course of several days.

• On June 15, 2004, following news that MedQuist's common stock would be delisted by Nasdaq because the investigation into its unlawful billing practices prevented it from timely filing its Form 10-Q for the quarterly period ending March 31, 2004, the share price significantly declined on heavy trading.

(Pls.Ex.3.)

Defendants also argue that the disclosure that MedQuist would be delisted did not directly relate to the underlying fraud and, thus, Plaintiffs cannot prove loss causation. (MedQuist Reply Br. at 12.) Plaintiffs argue, and the Court agrees, that the June 15 press release "provides direct linkage" to the fraud because the decision to delist the stock was caused directly by the investigation into the Company's billing practices. While the March 31 and May 24 press releases publicly disclosed that MedQuist's SEC filings would be delayed because of an internal investigation into improper billing practices, MedQuist continued to withhold from the market the seriousness and the extent of that alleged fraud. Indeed, as already noted, MedQuist stated publicly that while some clients had been overcharged, others had been undercharged. In fact,

through the date of oral argument herein, MedQuist has not made known the true extent of its improper (or at least incorrect) billing practices.

As compared with prior disclosures, however, the June 15 announcement gave investors greater insight into the magnitude of the potential scheme as well as the complexity of the internal investigation, which had by that time spanned over three months with no end in sight. In other words, the June 15 announcement revealed previously undisclosed information to the market that investors found to be significant, as reflected in the immediate negative market reaction. The Court finds that at the very least, Plaintiffs have provided Defendants with "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura,* 544 U .S. at 348. Accordingly, the Court holds that Plaintiffs have properly pleaded loss causation.

### B. *Rule 10b-5 (a) and (c) Scheme Liability*

**\*21** Plaintiffs argue that the Individual Defendants may also be held liable on the basis of "scheme liability" for their manipulative conduct as well as their false statements and omissions. (Pls. Opp. Br. at 38.) Defendants argue that Plaintiffs cannot succeed on that theory of liability because they have not plead facts alleging that Defendants used a device other than alleged misrepresentations to artificially inflate the price of MedQuist's stock. (MedQuist Reply Br. at 27.)

Under Rule 10b-5:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
 (Cite as: 2006 WL 2827740 (D.N.J.))

Page 21

17 C.F.R. § 240.10b-5. There can be no aiding and abetting liability under this Rule. *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164 (1994).

The Eighth Circuit recently held that "any defendant who does not make or affirmatively cause to be made a fraudulent misstatement or omission, or who does not directly engage in manipulative securities trading practices,[FN26] is at most guilty of aiding and abetting and cannot be held liable under § 10(b) or any subpart of Rule 10b-5." *In re Charter Communications, Inc., Sec. Litig.,* 443 F.3d 987, 991-92 (8th Cir.2006).

> FN26. As used by the Supreme Court in the securities context, manipulative trading practices is a "term of art" that refers to illegal trading practices such as "wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 476-77 (1977).

*In re Lernout & Hauspie Sec. Litig.,* 236 F.Supp.2d 161, 173 (D.Mass.2003), held that "the better reading of § 10(b) and Rule 10b-5 is that they impose primary liability on any person who substantially participates in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (like the creation or financing of a sham entity) intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market."

Likewise, the Ninth Circuit recently held that "[i]f a defendant's conduct or role in an illegitimate transaction has the principal purpose and effect of creating a false appearance of fact in the furtherance of a scheme to defraud, then the defendant is using or employing a deceptive device within the meaning of § 10(b)," *Simpson v. AOL Time Warner Inc.,* 452 F.3d 1040 (9th Cir .2006), regardless of whether that individual has made a material misstatement or omission. ("We see no justification to limit liability under § 10(b) to only those who draft or edit the statements released to the public.") The Court here finds this reasoning persuasive, and concludes that Plaintiffs here have also adequately pleaded scheme liability under Section 10(b).

**\*22** As recounted at length above, the Complaint includes particularized allegations that each of the Individual De-

fendants knowingly implemented the billing scheme through their actions. For example, Plaintiffs allege that Ethan Cohen, at the direction of David Cohen and Donohoe, created and modified the software that MedQuist used to overcharge its customers. (SAC ¶¶ 5, 55-57.) Similarly, Plaintiffs allege that Defendants Donohoe, David Cohen, Quaintance, Kearns and Scarpone specifically instructed Defendant Ethan Cohen and members of his department about individual customer inflation and changes in those levels. (*Id.* ¶¶ 52, 70-79.)

The Court finds these allegations sufficient to make out a claim for Section 10(b) scheme liability.

C. *Section 20(a) Claims*

Finally, Plaintiffs seek to hold the Individual Defendants liable as "control persons" under Section 20(a) of the Securities and Exchange Act of 1934. That provision imposes joint and several liability upon one who controls a violator of Section 10(b).[FN27] 15 U.S.C. § 78t(a); *see In re Suprema,* 438 F.3d 256. "In addition to control, culpable participation must be proved before control person liability for misrepresentations attaches." *In re MobileMedia Sec. Litig.,* 28 F.Supp.2d 901, 940 (D.N.J.1998) (citing *Rochez Bros., Inc. v. Rhoades,* 427 F.2d 880, 890 (3d Cir .1975)).

> FN27. Section 20(a) provides:
>
>> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
>
> 15 U.S.C. § 78t(a).

Defendants here argue that Plaintiffs' Section 20(a) claim, alleging that the individual defendants are liable as "control persons," fails as a matter of law because (1) Plaintiff has not sufficiently pled a primary violation of the securities laws; and (2) Plaintiff has not alleged facts demonstrating that the individuals were controlling persons. For reasons already explained, the Court finds that Plaintiffs

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                Page 22
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
 (Cite as: 2006 WL 2827740 (D.N.J.))

have sufficiently alleged primary violations of Section 10(b).

Moreover, the Court finds that Plaintiffs have adequately detailed the manner in which the Individual Defendants are alleged to have controlled MedQuist's business and operations and, for reasons already explained, acted as culpable participants in the fraud. Accordingly, the Court finds that Plaintiffs have sufficiently pled that the six principal officer Defendants were control persons within the meaning of Section 20(a).

D. *Auditors*

Plaintiffs also seek to hold Defendants KPMG LLP and Arthur Anderson, LLP liable under Section 10(b). "When a professional opinion is issued to the investing public by those in a position to know more than the public, there is an obligation to disclose data indicating that the opinion may be doubtful." *In re Suprema,* 438 F.3d at 279 (citing *Eisenberg v. Gagnon,* 766 F.2d 770, 776 (3d Cir.1985)). When such opinion is

based on underlying materials which on their face or under the circumstances suggest that they cannot be relied on without further inquiry, then the failure to investigate further may "support[ ] an inference that when [the defendant] expressed the opinion that it had no genuine belief that it had the information on which it could predicate that opinion."

**\*23** *Id.* (quoting *McLean v. Alexander,* 599 F.2d 1190, 1198 (3d Cir.1979)) (alteration in original).

"A showing that an auditor either lacked a genuine belief that its representations were supported by adequate information or engaged in auditing practices so shoddy that they amounted at best to a 'pretended audit' has traditionally supported a finding of liability, even in the face of assertions of good faith." *In re Suprema,* 438 F.3d at 279. So too have allegations of Generally Accepted Accounting Standards violations, coupled with allegations that "significant 'red flags' " were ignored. *Id.* However,

the mere second-guessing of calculations will not suffice' [plaintiffs] must show that [the auditor]'s judgment-at the moment exercised-was sufficiently egregious such that a reasonable accountant reviewing the facts and figures should have concluded that [the company]'s financial statements were misstated and that as a result the public

was likely to be misled.

*Id.* (quoting *In re IKON,* 277 F.3d at 673). Of course, the allegations must be pled with particularity. *Id.* at 281 (holding claims against auditor sufficient where complaint alleged thirty significant "red flags").

Here, Plaintiffs seek to hold liable Anderson and KPMG for their Independent Auditor's Reports accompanying the Company's Form 10-K on February 10, 2000, March 26, 2001, March 20, 2002, and March 3, 2003. (SAC ¶¶ 115, 165, 197, 244.) For the following reasons, Plaintiffs' allegations against the Defendant Auditors are insufficient.[FN28]

> FN28. Additionally, as to KPMG the Court notes that the only statement which Plaintiffs claim was false or misleading was issued *after* the start of the Class Period. "Because [Plaintiffs] have failed to allege valid claims [against KPMG] based on statements made before they purchased their [MedQuist] stock, the post-purchase statements cannot be a basis for liability." *Klein v. General Nutrician Companies, Inc.,* 186 F.3d 338, 345 (3d Cir.1999). Accordingly, for this reason as well Plaintiffs' claims against KPMG must fail as a matter of law.

First, Plaintiffs allege that the assigned auditors were shown but essentially ignored "documents that clearly indicated MedQuist's billings were not counting characters, but rather using ratios and formulas."(SAC ¶¶ 80, 249.) Second, Plaintiffs argue that the auditors should have known of the underlying fraud as a result of the lawsuits that had been filed by customers. Finally, Plaintiffs cite mounting customer complaints as evidence of Defendants' sufficiently egregious auditing practices.

The Court agrees with Defendants that the three "red flags" cited by Plaintiffs are not significant and, therefore, are insufficient as a matter of law. First, as to the documentary "red flags" Plaintiffs have not alleged what documents were shown to the auditors, nor how those documents standing alone suggested that they were unreliable. Indeed, Plaintiffs allege that MedQuist withheld material information from the auditors and lied about the Company's fraudulent billing practices. In other words, Plaintiffs' theory of liability is self-defeating in that the SAC alleges a fraudulent billing scheme that utilized "secret" codes, which left no "paper trail," thereby making it "impossible" for the auditors to "compare and analyze

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979
 (Cite as: 2006 WL 2827740 (D.N.J.))

Page 23

MedQuist's reports in relation to billings."[FN29](Anderson Reply Br. at 5, citing SAC ¶¶ 3, 50-53.)

> FN29.*In re Suprema* permitted a similar argument to go past the pleading stage, but there the plaintiffs had additionally alleged roughly thirty "not insignificant accounting violations." 438 F.3d at 281. Here, on the other hand, Plaintiffs have only cited three "red flags," none of which this Court finds sufficient as a matter of law.

Next, Plaintiffs argue that mounting customer complaints and lawsuits by customers challenging MedQuist's billing practices should have alerted the auditors to the underlying billing scheme. However, Plaintiffs allege only a single lawsuit by Welborn Medical Center. (SAC ¶¶ 66-69.) Likewise, Plaintiffs have identified only a handful of customer complaints. (*Id.* ¶ 61.)Considering that MedQuist had a customer base numbering in the thousands, these alleged red flags are insignificant as a matter of law.

**\*24** For these reasons, even accepting as true all the allegations and the reasonable inferences to be drawn therefrom, Plaintiffs have not alleged significant red flags that should have alerted the Defendant auditors to the fraud. Plaintiffs have not pled scienter as to the Auditor Defendants with the requisite particularity and, therefore, the Complaint will be dismissed as to KPMG and Anderson for failure to state a claim on which relief may be granted.

## IV. CONCLUSION

As explained above, although Rule 9(b) and the PSLRA were designed to erect barriers to frivolous strike suits, they were not intended to make meritorious claims impossible to bring. *Cabletron,* 311 F.3d at 30. The Company and the Individual Defendants here, however, are attempting to make Plaintiffs prove their claims at the pleading stage. Because Plaintiffs have pleaded their securities fraud claims against Defendants MedQuist, Scarpone, David Cohen, Ethan Cohen, Quaintance, Kearns and Donohoe with the requisite level of particularity and specificity, their motions to dismiss will be denied.

However, for reasons explained the Court finds the Second Amended Complaint deficient as to the Auditor Defendants. Accordingly, the motions to dismiss by Anderson and KPMG will be granted.

The accompanying Order will be entered.

D.N.J.,2006.
Steiner v. MedQuist Inc.
Not Reported in F.Supp.2d, 2006 WL 2827740 (D.N.J.), Fed. Sec. L. Rep. P 93,979

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**TAB 10**



**H**Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Raymond H. WECHSLER, Administrative Trustee
of the Towers Financial Corporation Administrative
Trust, Plaintiff,
v.
HUNT HEALTH SYSTEMS, LTD., P & G Enter-
prises, Inc., MHTJ Investments, Inc., Esperanza
Health Systems, Ltd. and Friendship, Inc., Defen-
dants.
**No. 94 CIV. 8294 PKL.**

Aug. 27, 1999.

*MEMORANDUM ORDER*

LEISURE, J.

**\*1** This diversity case involves the purchase and sale
of accounts receivable, a transaction frequently re-
ferred to in business parlance as "factoring". Plaintiff,
the administrative trustee overseeing the assets of the
bankrupt Towers Financial Corp. ("Towers"), brings
this action against Hunt Health Systems, Ltd. ("Hunt
Health") and affiliated entities for alleged breach of
contract and fraudulent conveyance in connection
with the parties' factoring arrangements. Defendants
have counterclaimed, asserting, in essence, that Tow-
ers's alleged breach of certain agreements between
the parties damaged Hunt Health and justified its
subsequent refusal to perform.

By Opinion & Order dated June 16, 1999 (the "June
16 Opinion" or "Opinion"), the Court, *interalia,*
granted partial summary judgment to plaintiff and
denied defendants' motion for summary judgment.
*See Wechsler v. Hunt Health Systems, Ltd.,* 1999 WL
397751 (S.D.N.Y. June 16, 1999). One of the many
breach-of-contract claims addressed in the Opinion
was Hunt Health's assertion that Towers breached a
letter agreement (the "Letter Agreement") between
the parties by failing to make a $60,000 payment
Hunt Health allegedly requested on February 25,
1993. *Seeid.* at *10- *14. Plaintiff responded, among
other things, that the Letter Agreement had expired
by the time of the alleged request and, thus, could not

have been breached. *Seeid.* at *11- *12. That retort
prompted defendants to cry foul; in reply to plaintiff's
opposition to their summary judgment motion, de-
fendants claimed plaintiff had not previously raised
the expiration argument and, in particular, had not
disclosed it in response to relevant contention inter-
rogatories served by defendants at the direction of
Magistrate Judge Pitman, who oversaw discovery in
this action.[FN1]*Seeid.* at *11. Due to the alleged lack of
notice, defendants argued that plaintiff should be
estopped from asserting the expiration argument.
*Seeid.*

> FN1. The interrogatories, among other
> things, asked plaintiff to state the reasons
> Towers ceased advancing funds to Hunt
> Health pursuant to the Letter Agreement.
> *See Wechsler,* 1999 WL 397751, at *11; *see
> also* Affidavit of Jeffrey B. Finnell, Esq.,
> dated July 12, 1999 [hereinafter "Finnell
> Aff."], Exhibit B.

In the June 16 Opinion, the Court commented that
under applicable precedent defendants' failure to dis-
close the expiration argument in response to the per-
tinent contention interrogatories was likely to "result
in preclusion of ... [that] theory".*Id.* at *11. The Court
declined at that time, however, actually to rule on the
issue because defendants raised it for the first time in
their reply papers and plaintiff had not, consequently,
had an opportunity to respond. *Seeid.*Pursuant to a
briefing schedule established by the Court, defen-
dants subsequently filed a formal motion to preclude
plaintiff from asserting the expiration argument. In
opposing the motion, plaintiff concedes he did not
explicitly raise the argument in responding to defen-
dants' interrogatories or, indeed, at any point prior to
the close of discovery.

DISCUSSION

Contention interrogatories issued pursuant to Rule 33
of the Federal Rules of Civil Procedure are one of
many discovery tools designed to assist parties in
narrowing and clarifying the disputed issues and re-
ducing the possibility of surprise at trial. Such inter-
rogatories may seek a variety of information from a
party to the litigation, including identification of a

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

party's legal positions regarding a given issue and the evidence on which those contentions are based.

**\*2** As is the case regarding other modes of discovery, the party answering a contention interrogatory is obligated "to respond truthfully and completely". *Weiss v. Chrysler Motors Corp.,* 515 F.2d 449, 456 (2d Cir.1975). Toward that end, the answering party is usually afforded ample opportunity fully to reflect on the question, to consult all pertinent sources of information bearing on it, and to seek the advice and assistance of counsel in order to craft answers that provide a full and accurate disclosure. *See Guadagno v. Wallack Ader Levithan Assocs.,* 950 F.Supp. 1258, 1261 (S.D.N.Y.), aff'd, 125 F.3d 844 (2d Cir.1997), *cert. denied,* 118 S.Ct. 1066 (1998). The answers to the interrogatories are then set forth in writing and are treated by courts in this Circuit as "judicial admissions" that generally estop the answering party from later seeking to assert positions omitted from, or otherwise at variance with, those responses. *See Wechsler,* 1999 WL 397751, at \*11.

The treatment of contention interrogatory responses stands in sharp contrast to that of responses to depositions, which are generally considered mere "evidentiary admissions" subject to later clarification or even contradiction. *See Guadagno,* 950 F.Supp. at 1261. The reasons for this distinction are at least three-fold. First, depositions occur through a relatively spontaneous process in which a single individual answers questions orally, immediately, without direct assistance from counsel and often in an adversarial environment. *Seeid.*Thus, while perhaps obtaining more candid answers, depositions provide somewhat less assurance of the answers' precision and exhaustiveness. Second, in many situations the deposition is not of a party or its representative and, thus, does not, unlike the contention interrogatory response, necessarily reflect the views of a party to the litigation. Finally, and related to the second reason, depositions, like ordinary interrogatories, often seek discovery of purely factual material as opposed to disclosure of arguments or positions being taken in the litigation.

In this case, plaintiff does not dispute that failure to disclose a position in response to a contention interrogatory can result in preclusion of that position. Instead, plaintiff argues that that rule of law is inapplicable in this case because the interrogatories served by defendants allegedly were not intended to constitute contention interrogatories. Plaintiff further contends that, in any event, estoppel should not apply because there is no indication that defendants would be unfairly prejudiced by proffer of the expiration argument. For the reasons that follow, the Court rejects each of plaintiff's contentions.

I. Proper Characterization of the Interrogatories

Plaintiff argues that the interrogatories served by defendants are not contention interrogatories but, instead, constitute written deposition testimony immune from estoppel. In support of that contention, plaintiff points to a provision in a November 24, 1997 scheduling order issued by Judge Pitman stating in pertinent part that plaintiff's interrogatory answers "shall constitute admissions to the same extent that answers at a deposition taken pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure would be deemed admissions, unless an objection is interposed and sustained by the Court."

**\*3** The scheduling order is somewhat ambiguous as to whether the answers to the interrogatories are intended to constitute contention interrogatories with attendant preclusive effect. Were the scheduling order the only material relevant to decision of this issue, the Court might be inclined to refer the dispute to Judge Pitman for illumination of the meaning of that language. The order does not, however, comprise the entire record on the issue. On January 14, 1998, the parties appeared at a discovery conference before Judge Pitman to address defendants' concerns regarding alleged deficiencies in interrogatory answers provided by plaintiff pursuant to the scheduling order. *See* exhibits submitted in support of defendants' motion for summary judgment, Exhibit 75. One of defendants' principal objections was that plaintiff had failed adequately to set forth his position regarding various issues raised by the litigation. *Seeid.* at 6. In the course of addressing those concerns, Judge Pitman made perfectly clear, several times, that, because the parties were near the end of discovery, the interrogatories in issue constitute "contention interrogatories" and plaintiff would be precluded from later making arguments not identified in response to applicable questions. *Seeid.* at 25-28, 33-36. Judge Pitman noted in addition that this was the meaning he ascribed to the quoted provision of the scheduling order. *Seeid.* at 26. Plaintiff agreed with Judge Pitman's understanding of the order and his view that the inter-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

rogatories are preclusive. *See id.*

The Court finds that the comments made during the January 14 conference unmistakably establish that the interrogatories at issue constitute contention interrogatories and are preclusive. *See Weiss,* 515 F.2d at 456 (noting significance of trial court's admonitions to consideration of whether interrogatory answers are preclusive).

II. Prejudice

Plaintiff further contends that even if his omission of the expiration argument from the interrogatories normally would be preclusive, estoppel should not apply here because defendants have not shown they would be unfairly prejudiced by assertion of the argument. The Court disagrees. First, proof of unfair prejudice by defendants is not a prerequisite to preclusion. The estoppel principles applied in this Circuit to contention interrogatory responses implicitly presume unfair prejudice will result if the responding party subsequently alters his position. *See The Prince Group, Inc. v. MTS Products,* No. 95 Civ. 1160, 1998 WL 273099, at *3 (S.D.N.Y. May 27, 1998); *Guadagno,* 950 F.Supp. at 1261.

Second, and in any event, the Court finds that defendants would likely be unfairly prejudiced if the expiration argument were allowed. Plaintiff did not disclose the argument until after discovery was closed. There is no indication that, in light of plaintiff's omission of the argument from his contention interrogatory responses made toward the end of discovery, the specific issue of whether the Letter Agreement had expired as of February 25, 1993 was fully developed during that phase. Thus, allowance of the argument now would force defendants to litigate, on a less than ample record, an argument they properly assumed was a non-issue.[FN2]

> FN2. The Court rejects plaintiff's additional contention that his statement in an interrogatory response that "[d]uring the Fall of 1992, ... Hunt Health requested and Towers approved a ninety day 'increase, whereby the amount of Accounts [Hunt Health] offer[s] us under the Contract can result in maximum initial payments outstanding from Towers to Hunt [Health] of One Million ($1,000,000) Dollars" ' put defendants on

notice that plaintiff would assert the Letter Agreement had expired as of February 25, 1993. Finnell Aff., Exhibit C, ¶ 38 (quoting Letter Agreement). Disclosure through what is at best innuendo is not what is contemplated by the discovery rules, nor is it consistent with Judge Pitman's admonition that plaintiff clearly and completely set forth his positions.

**\*4** Accordingly, the Court finds that plaintiff is precluded from asserting the expiration argument at trial.

CONCLUSION

For the reasons stated above, the Court hereby GRANTS defendants' motion to preclude plaintiff from asserting that the Letter Agreement had expired as of February 25, 1993, when Hunt Health allegedly requested a payment of $60,000 pursuant to its terms.

SO ORDERED.

S.D.N.Y.,1999.
Wechsler v. Hunt Health Systems, Ltd.
Not Reported in F.Supp.2d, 1999 WL 672902 (S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.