# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
----------------------------x
                            :
                            :
IN RE XEROX CORPORATION     :        Civil Action No.
SECURITIES LITIGATION       :        3:99CV02374 (AWT)
                            :
                            :
----------------------------x
```

## RULING ON MOTION TO EXCLUDE THE PROFFERED EXPERT
## TESTIMONY OF ANTHONY SAUNDERS, LEE BUCHWALD AND CHARLES DROTT

For the reasons set forth below, the Motion to Exclude the Proffered Expert Testimony of Anthony Saunders, Lee Buchwald and Charles Drott is being granted in part, and denied in part. The motion is being granted with respect to Lee Buchwald and any proffered testimony by Anthony Saunders or Charles Drott as to scienter.

## I. BACKGROUND

The court assumes familiarity with the factual background of the case. See In re Xerox Corp. Sec. Litig., 165 F. Supp. 2d 208 (D. Conn. 2001). In brief, as alleged in the Amended Consolidated Class Action Complaint (Doc. No. 42), Xerox Corporation ("Xerox") is purported to have misrepresented the impact of a reorganization of its Customer Business Organization (the "CBO Reorganization"), which was part of a worldwide restructuring by Xerox in 1998 (the "Restructuring"), thereby

artificially inflating the price of Xerox common stock.  The
plaintiffs contend that problems created by the CBO
Reorganization largely negated the benefits resulting from the
Restructuring.

## II. <u>LEGAL STANDARD</u>

"Preliminary questions concerning the qualification of a
person to be a witness, the existence of a privilege, or the
admissibility of evidence shall be determined by the court. .
. ."  Fed. R. Evid. 104(a).  "Under [Rule 104], the proponent has
the burden of establishing that the pertinent admissibility
requirements are met by a preponderance of the evidence."  Fed.
R. Evid. 702 advisory committee's note, 2000 Amendments (citing
<u>Bourjaily v. United States</u>, 483 U.S. 171 (1987)); <u>see also</u>
<u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 592 n.10
(1993) (citing <u>Bourjaily</u> for the proposition that "[p]reliminary
questions concerning the qualification of a person to be a
witness . . . should be established by a preponderance of
proof.").

Federal Rule of Evidence 702 sets forth the standard to be
used by the court in evaluating the admissibility of expert
testimony:

>     If scientific, technical, or other specialized
> knowledge will assist the trier of fact to understand
> the evidence or to determine a fact in issue, a witness

qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In Daubert, the Supreme Court held that Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  509 U.S. at 597.  With respect to reliability, the Supreme Court identified four factors that, while not definitive, are ones a district court might consider: "whether a theory or technique has been and could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation."  Ruggiero v. Warner-Lambert, 424 F.3d 249, 253 (2d Cir. 2005) (citing Nimely v. City of New York, 414 F.3d 381, 397 (2d Cir. 2005).  Expert testimony is relevant only if it will assist the jury.  See Hill v. City of New York, No. 03-CV-1283 (ARR)(KAM), 2007 WL 1989261, at *5 (E.D.N.Y. July 5, 2007).  Expert testimony is not relevant if it is directed towards lay matters that the jury can understand on its own.  See Rieger v. Orlor, Inc., 427 F. Supp. 2d 99, 103 (D. Conn. 2006).

Whether the expert bases testimony on professional studies or personal experience, he must employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999). In Kumho, the Court emphasized the relevance/reliability standard in determining the admissibility of expert testimony, stating that Rule 702 "establishes a standard of evidentiary reliability . . . requir[ing] a valid connection to the pertinent inquiry as a precondition to admissibility . . . [and] a reliable basis in the knowledge and experience of the relevant discipline." Id. at 149 (internal quotations and citations omitted).

A court must undertake "a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand. A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible. The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002)(internal citations omitted). The Daubert Court "expressed its faith in the power of the adversary system

to test shaky but admissible evidence, and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable." Borawick v. Shay, 68 F.3d 597, 610 (2d Cir. 1995) (internal citation and quotation omitted). But "[w]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Amorgianos, 303 F.3d at 266.

The Second Circuit has noted "the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." Nimely v. City of New York, 414 F.3d at 397 (citing Daubert, 509 U.S. at 595). Rule 403 provides that evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading a jury." Fed. R. Evid. 403.

## III. **DISCUSSION**

### A. Anthony Saunders

To quantify any "artificial inflation" in the stock price caused by allegedly false and misleading statements made by certain Xerox executives, the plaintiffs hired Professor Anthony Saunders, former Chairman of the Department of Finance at the

Stern School of Business at New York University and a specialist in financial economics, to prepare a report.  (See Expert Report of Professor Anthony Saunders, Oct. 15, 2007 (Doc. No. 388, Ex. A)("Saunders Rpt."))  Prof. Saunders conducted an event study to quantify the effects, if any, of the statements made during the Class Period, i.e. October 22, 1998 through October 7, 1999. Based on his findings, Prof. Saunders calculated the artificial inflation of the stock from the start of the Class Period through September 15, 1999 as being $8.72 per share, and from September 16, 1999 through October 7, 1999 as being $4.84 per share.

As mentioned above, to arrive at these figures, Prof. Saunders conducted an event study.  An event study "refers to a regression analysis that examines the effect of an event on some dependent variable, such as a corporation's stock price."  RMED Int'l, Inc. v. Sloan's Supermarkets, Inc., No. 94 Civ. 5587 PKL RLE, 2000 WL 310352 at *6 (S.D.N.Y. Mar. 24, 2000) (citing Jon Koslow, Estimating Aggregate Damages in Class Action Litigation Under Rule 10B, 59 Fordham L. Rev. 811, 822 & n.50 (citing studies));  see also In re Flag Telecom Holdings, Ltd. Sec. Litig., 245 F.R.D. 147, 170 (S.D.N.Y. 2007) ("[N]umerous courts have held that an event study is a reliable method for

determining market efficiency and the market's responsiveness to certain events or information.").[1]

An analyst will look for abnormal returns during those event periods, usually days, when a stock moves differently than predicted based upon market and industry factors. It is then determined whether these abnormal returns are fraud or non-fraud related. See Jay W. Eisenhofer, Geoffrey C. Jarvis, & James R. Banko, Securities Fraud, Stock Price Valuation, and Loss Causation: Toward A Corporate Finance-Based Theory of Loss Causation, 59 Bus. Law. 1419, 1425-26 (Aug. 2004). To estimate the normal daily returns on Xerox's stock so that he could identify what he deemed to be the abnormal returns, Prof. Saunders used data for the period from October 23, 1997 through

_____

[1] A useful event study will rely on the efficient market hypothesis, the premise that the current price of stock reflects the time and risk discounted present value of all expected future cashflows. While there are several types of market forms, Prof. Saunders opines that establishing the semi-strong form, which assumes that "all material publicly available information is quickly and fully reflected in securities prices", would justify the "fraud on the market" theory (Saunders Rpt. at ¶ 9.) Thus, the price and the value of a security should move in sync except during times when there is release of company-specific information that can influence the price of the stock.

The defendants do not challenge in the instant motion whether Prof. Saunders established that Xerox's stock traded in an efficient market during the Class Period, except to argue that he did not meet his disclosure obligations. (See Def.'s Br. at 3 n.4.)

three months after the end of the Class Period, i.e. January 7, 2000. (See Saunders Rpt. at ¶ 23.) He regressed the daily returns on Xerox stock on the daily returns of the Bloomberg S&P 500 stock price index and on the daily returns of the S&P Technology Hardware Equipment index. Prof. Saunders concluded that there had been 13 different events that cause large, statistically significant movements in the price of Xerox common stock in response to the arrival of new, material information about the corporation. (See Saunders Rpt. at ¶ 27.)[2]

After studying the various disclosures on what he termed these Significant Class Period Event Days (Saunders Rpt. at Table 1), Prof. Saunders concluded that the 9.2% drop in the price of the stock on September 16, 1999 and the 24.9% drop on October 8, 1999, were statistically significant with a p-value of less than 1% respectively. See id.

On September 16, 1999, Prudential Securities analyst Alex Henderson had reported that the 1999 sales staff realignment had not been completed and said that "most people thought they had

_____

[2]He determined that these events were statistically significant by way of measuring the p-value, which refers to the probability of getting a test statistic as extreme or more extreme than the observed value. Fed. Jud. Center, Reference Manual on Scientific Evidence at 225 (2d ed. 2000). In general, to be termed statistically significant, a 95% level (that is a p-value of 5% or less) is most commonly used. Something may be deemed to be "highly significant" if the p-value is less than 1%. See id. at 124.

done the bulk of the sales force realignment earlier. . . ."
(Saunders Rpt. at ¶ 72.)  News reports at the time picked up the
story.  Through his analysis of what was revealed to the market,
Prof. Saunders concluded that the market had not been apprised of
the "ongoing nature of the sales disturbances.  The magnitude and
root cause of the disturbances remained undisclosed.  At that
point in time, the market still believed these sales disturbances
were due to the 1999 sales force realignment, not the 1998
customer administration restructuring." (Saunders Rpt. at ¶ 74.)

To create an estimate of how much of this drop was due to
the 1998 customer administration restructuring, Prof. Saunders
looked at a remark attributed to CEO Richard Thoman, who told an
interviewer that "[t]he sales reorganization is less than 10% of
the issue . . . the problem [is] resulting from sales people
taken off the street to deal with the administration issues of
orders and billings."  (Saunders Rpt. at ¶ 75.)  According to
Prof. Saunders, this implied that at least 90% of the
disturbances could be attributed to the 1998 customer
administration restructuring.  He thus took 90% of the $4.31
negative impact on stock price for September 16 to arrive at his
$3.88 estimate to account for the abnormal reduction in Xerox's
stock price for that alleged corrective disclosure date.

Prof. Saunders also looked at October 8, 1999, when Xerox pre-announced that its third quarter earnings would be approximately 10% to 12% lower than the prior year. The market had expected third quarter earnings of 58 cents, but the earnings would now be 47 cents. (<u>See</u> Saunders Rpt. at ¶ 78.) Xerox's press release attributed this to an unfavorable product mix, increased competitive pressure, continued problems with currency devaluation and economic weakness in Brazil, lower earnings in a Fuji-Xerox joint venture, and "sales productivity [which] was affected by the continued realignment to an industry-oriented approach and in the U.S. by the ongoing impact of the customer administration restructuring." (Saunders Rpt. at ¶ 78.) The value of Xerox shares closed 24.9% ($10.65) lower. Prof. Saunders, using remarks by Rick Thoman on an earnings call on October 18, 1999, created a table that shows that of the 10% to 12% decrease (equivalent to 47 cents), about 5 cents was attributable to the customer administration restructuring. (<u>See</u> Saunders Rpt. at Table 2.) Prof. Saunders also found relevant an internal document prepared by Thoman in preparation for a board meeting in which he attributed to the customer administration restructuring a reduction in earnings of a total of 10 cents. (Saunders Rpt. at ¶ 82.)

Prof. Saunders then used the theory of "earnings surprise", which charts the linear relationships to estimate the link between the announcement and the stock price change. (Saunders Rpt. at ¶ 85.) Because Xerox had warned that it would miss earnings by approximately 11 cents, and Thoman had attributed 10 cents of the 11 cent miss to the 1998 customer administration restructuring, Prof. Saunders believed that 10/11 of the $10.65 drop in the stock price, or $9.68, could be attributed to the problems with the customer administration restructuring. However, Prof. Saunders decided to attribute 5 cents of the 11 cents to the customer administration restructuring, based upon Thoman's discussion on the earnings call, making it $4.84 (Saunders Rpt. at ¶ 86.)

Using this information, Prof. Saunders estimated that from the beginning of the Class Period until September 15, 1999, the price of Xerox common stock was inflated by $8.72 per share ($4.84 plus $3.88). He estimated that, from the period of September 16, 1999 through October 7, 1999, the price was inflated by $4.84 per share. (Saunders Rpt. at ¶ 88.)

As a preliminary matter, the court notes that in their reply memorandum the defendants argue that Prof. Saunders's Declaration prepared in response to the instant motion (Decl. of Anthony Saunders (Doc. No. 409)) should be excluded because it is a

second expert report and is improper for other reasons.  The
court does not construe the Declaration as a second expert
report.  Rather the defendants make particular assertions about
what Prof. Saunders did or did not do in the course of preparing
his report.  The plaintiffs respond to those assertions, and in
support of their arguments as to what Prof. Saunders did, rely on
Prof. Saunders's statements as to what he did or did not do in
the course of preparing his report.  However, the defendants do
raise a valid point with respect to Exhibit B to the Declaration,
and the court has not considered Exhibit B.

The defendants attack Prof. Saunders's analysis on several
grounds, as discussed below.

### 1. Whether Saunders methodology is reliable to prove loss causation

Loss causation is established either where "the market
react[s] negatively to a corrective disclosure or . . . the
materialization of the risks that were concealed by the alleged
misrepresentations or omissions proximately caused plaintiffs'
loss."  In re Omnicom Group, Inc. Sec. Litig., 541 F. Supp. 2d
546, 551 (S.D.N.Y. 2008)(citing Lentell v. Merrill Lynch & Co.,
396 F.3d 161, 175 (2d Cir.2005)).  To identify a corrective
disclosure, one must show that "[a] disclosed fact [was] new to
the market" and that it "reveal[ed] some aspect of the alleged
fraud.  Id.  A price decline before disclosure of the fraud may

not be attributed to the defendants.  See Akerman v. Oryx Comm.,
Inc., 810 F.2d 336, 342 (2d Cir. 1987).

The defendants argue that Prof. Saunders's technique is
contrary to generally accepted methodology, and therefore
unreliable, because he "limits his search for potential
corrective disclosure dates to the 13 dates during the Class
Period" which exhibited statistically significant abnormal
returns.  (Def.'s Mem. Supp. Mot. to Exclude (Doc. No. 388)
("Def.'s Br.") at 9.)  From there, the defendants argue that
because Prof. Saunders did not comprehensively review other dates
in the Class Period to find potential disclosures of the fraud
alleged in the complaint, he missed those dates that could have
shown when the alleged fraud might have been disclosed to the
market.  Thus, according to the defendants, "[b]y restricting his
corrective disclosure analysis to those dates on which he pre-
determined the stock price movement to be statistically
significant, Prof. Saunders avoided reviewing the dozens of dates
during the Class Period that would have disproved loss causation
because the stock price did not exhibit a statistically
significant return in response to news that discussed the alleged
CBO Reorganization problems."  Id. at 11.

However, as reflected in Appendix B of his report, where he
lists "documents considered," Prof. Saunders reviewed all the

news releases and the performance of Xerox's stock price throughout the Class Period. Thus, Prof. Saunders did not neglect to review information about other dates. He conducted an event study, which is an accepted methodology. Prof. Saunders had a sound basis for concluding the other dates were not relevant and therefore did not comprehensively review them. As to the defendants' contention that he missed dozens of dates when news was disclosed about the alleged CBO Reorganization problems, Prof. Saunders and the defendants simply disagree whether the disclosures made on other dates were materially less informative, in both quality and depth.

In support of their argument that the failure to analyze all dates is problematic, the defendants cite In re Xcelera.com Sec. Litig., Civil Action No. 00-11649-RWZ (D. Mass. Apr. 25, 2008). In that case, the  court disallowed the use of an expert witness's event studies for several reasons. Among them was the fact that the court found that the expert's use of dummy variables for every date on which there was any news at all about the company was contrary to the generally accepted literature. The district court also found that the expert failed to use relevant dates. In that case, the expert took an event that was disclosed during the evening, but failed to make the next day (when trading would begin and the market would react to the

event) part of the study.  Id. at *2.  Prof. Saunders's analysis suffers from neither of these flaws.

The rest of the authorities the defendants cite support the general proposition that poorly designed event studies should be excluded, but none of the authority cited, academic or legal, persuades the court that the design of Prof. Saunders's study was not the result of the use of reliable principles and methods.

Nor have the defendants shown that there is a specific model that one must use in event studies, or that Prof. Saunders's choice was wrong.  In his deposition, Prof. Saunders states that he used the "Schipper-Thomson" regression model to do his event study (Saunders Dep. at 92:18-19, Dec. 20, 2007 (Doc. No. 388, Ex. C.))  The defendants have not shown that it was improper to use this model to do the event study, and they do not show that he strayed from the proper use of that particular model.

Finally, to the extent the defendants find Prof. Saunders's choices in setting up of the study to be subjective, courts have recognized that "even a statistical event study involves subjective elements.  A researcher performing an event study must identify which company-specific events to study, and in the process, categorize those events as fraud or non-fraud related." RMED Int'l, 2000 WL 310352, at *8.

### 2. Whether Prof. Saunders can show that the alleged corrective disclosures contained new information

The defendants argue that Prof. Saunders cannot show that the alleged corrective disclosures contained new information. This is necessary to prove loss causation because in an efficient market, as explained above, only new information can affect stock prices. Here again, the defendants argue that Prof. Saunders conducted an extremely limited and insufficient review of the public information related to Xerox during the Class Period. From there, the defendants' argument goes, he could not have followed the generally accepted steps of identifying and reviewing all allegation-related news released during the Class Period.

The plaintiffs point to Prof. Saunders's conclusion that the allegation-related news not emphasized in his analysis was materially less informative. As discussed above, the court is not persuaded that Prof. Saunders's review of information about Xerox during the Class Period was not sufficiently comprehensive. Therefore, the court concludes that Prof. Saunders could show that the alleged corrective disclosures contained new information that was material.

For example, the defendants cite an annual investor meeting review where it was stated that "[b]ased on recent results and

the investor meeting, we continue to be somewhat cautious. . . .
The firm's second quarter top-line performance will likely remain
below trend . . . ." (Def.'s Br. at 13, n.10) (emphasis omitted).
 The defendants neglect to include the part of the statement that
they were being somewhat cautious "about the near-term and more
optimistic about the intermediate-to-longer term." (Rebecca F.
Runkle & Stacey E. Wexler, Morgan Stanley Dean Witter & Co.,
<u>Xerox (XRX): Annual Investor Meeting Review</u> (May 17,
1999)(Topper. Decl., Ex. H.)(Doc. No. 388)).  The next sentence,
then, refers to the second quarter.  Prof. Saunders identifies
corrective disclosure dates as September 16 and October 8, 1999.

### 3. Whether Prof. Saunders's study disaggregated reliably the effect of allegation-related news from other factors

The defendants argue that Prof. Saunders did not
disaggregate reliably the effect of allegation-related news from
the effects of the other, unrelated disclosures made on the same
dates.  One must "distinguish the alleged fraud from the tangle
of other factors that affect a stock's price." <u>Omnicom</u>, 541 F.
Supp. 2d at 553 (internal citations and quotations omitted).
While plaintiffs do not have to quantify fraud related loss, they
must "ascribe some rough proportion of the whole loss to [the
alleged] misstatements."  <u>Lattanzio v. Deloitte & Touche LLP</u>,
476 F.3d 147, 158 (2d Cir. 2007).  Thus, a plaintiff is

"compensated for its net loss stemming from a defendant's fraud without making the defendant an insurer against market-related risk."  See RMED Int'l, 2000 WL 310352, at *6.

In support of their position, the defendants cite Fener v. Belo Corp., 560 F. Supp. 2d 502 (N.D. Tex. 2008).  There, the expert's opinion was faulty because it improperly conflated all the sources of a stock's decline to an alleged misrepresentation. See id. at 506-07.  The defendants contend that Prof. Saunders "failed even to acknowledge that there was Xerox-related news released to the market on September 16 that had nothing to do with any of plaintiffs' allegations in this case."  (Def.'s Br. at 15.)  The defendants point out that analysts also discussed on that day topics such as currency pressures, the impact of the Canon Image Runner line of products, Y2K issues, and Brazilian economic problems.  However, Prof. Saunders makes clear that his focus was on what he determined to be the material information newly disclosed to the market, as opposed to issues discussed by analysts, on that day.  Having concluded that there were two causes of the stock price decline, Prof. Saunders used statements by Xerox's CEO as the basis for disaggregation.  As for the alleged October 8 corrective disclosure, the defendants and Prof. Saunders once again disagree about the concept of new material information being disclosed to the market.  Prof. Saunders

specifically focused on disaggregation, using statements by Thoman, a document prepared by Thoman in preparation for a board meeting, and an "earnings surprise" model which is an approach that is recognized in the literature.

### 4. Whether Prof. Saunders can prove that the alleged corrective disclosures revealed some aspect of the alleged fraud

The defendants contend that Prof. Saunders did not make any attempt in his report to establish any link between the alleged fraud and the specific disclosures of September 16 and October 8, 1999, and that instead, he merely assumed that the September 16 and October 8 disclosures corrected some aspect of the alleged fraud. The defendants point in particular to the second and third sentences of ¶ 87 of Prof. Saunders's report. The plaintiffs respond that:

> Defendants misconstrue Prof. Saunders's report and testimony to mean that he assumed that the information disclosed on the corrective disclosure dates revealed at least some of the fraud without making an independent determination. (Def. Br. at 18.) Prof. Saunders assumed only that the information about the magnitude of the problems related to the CBO organization was available to management at a time prior to its disclosure. (Saunders Decl. ¶ 30.) In fact, Prof. Saunders sets forth empirical evidence that the market considered the later-disclosed information as material and the quantification of the impact on Xerox's stock price from its release. (Saunders Decl. ¶¶ 33-34; Saunders Rpt. (Levine Decl., Ex. A) ¶¶ 44, 77, 78.) Prof. Saunders clearly conveys that it was the ongoing nature of the problems with the CBO, the magnitude of the problems and the causes of those

-19-

> problems, that were first disclosed in that latter part
> of the Class Period.  (Id.)

(Pl.'s Mem. Opp. Def.'s Mot. to Exclude (Doc. No. 405) (Pl.'s Opp.) at 13.)  Although the court finds the presence of the language used in the second and third sentences of paragraph 87 of Prof. Saunders's report incongruous, considering Prof. Saunders's report as a whole, the court agrees with the plaintiffs that he does set forth evidence in support of his conclusion that there was a link between the alleged fraud and the information disclosed between September 16 and October 8 and his conclusion that those disclosures corrected some aspect of the alleged fraud.  Even the defendants recognize that in parts of his report Prof. Saunders "purports to" prove that the revelation of the alleged fraud caused the stock price movements on the alleged corrective disclosure dates. (Def.'s Br. at 18.)

### 5. Whether Prof. Saunders Failed to Comply with Rule 26

As the initial step in the event study, Prof. Saunders ran the Schipper-Thomson regression model independently for every day in the event period. From that he identified 40 dates where there were statistically significant returns.  To do so, he used SAS (Statistical Analysis System) code.  The original file containing the preliminary SAS code was reused and superseded by the final SAS code which implemented the regression analysis presented in

Prof. Saunders's report.  These 40 event dates, which are listed in Exhibit C to the report, were the event dates that Prof. Saunders then worked with to identify the 13 significant class period event days, i.e. days on which there were events that caused large statistically significant movements in the price of Xerox common stock.  Because the preliminary SAS code was overwritten, the plaintiffs were unable to produce it to the defendants.  Nor has either side been able to replicate it.  The defendants argue that Prof. Saunders's testimony should be excluded in its entirety because the event study "was based on an initial regression analysis . . . used to identify 40 dates with statistically significant returns at the 90% level", but the defendants were never provided with the analysis in contravention of Fed. R. Civ. Proc. 26(a)(2)(B).  (Def.'s Br. at 19-20.)  The plaintiffs counter that Prof. Saunders did not rely on the preliminary event study with respect to his opinions, and that he did not destroy it, but it was merely reused and superseded by the final analysis which led to the 13 event dates that corresponded to the 95% confidence level.

Rule 26(a)(2)(B) requires that an expert's report contain, inter alia, "the data or other information considered by [an expert] in forming [the expert's opinions]."  Fed. R. Civ. P. 26(a)(2)(B).  The defendants cite to Jung v. Neschis, No. 01-Civ.

6993 (RMB)(THK), 2007 WL 5256966, at *8-15 (S.D.N.Y. Oct. 23, 2007), where the court found "disturbing", inter alia, the failure to produce the specific tape recordings that a medical expert relied on for his opinion and precluded his testimony. However, the instant case is more akin to the situation in Cook v. Rockwell Int'l Corp., 580 F. Supp. 2d 1071 (D. Colo. 2006). In that case, the defendants asserted that Rule 26(a)(2) "was violated, because, they argue, without the detailed working notes, intermediate results and computer records they requested, their rebuttal expert could not replicate all of [the expert's] results when he reviewed and tested the methodology set forth in [the expert's] report and other disclosures." Id. at 1121. The court's analysis was:

> Rule 26(a)(2)'s requirements that the expert's report include his opinions and reasoning and "the data or other information considered by the witness in forming the opinions" do not, however, require that the expert report contain, or be accompanied by, all of the expert's working notes or recordings. Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 35 (1st Cir. 2004). Nor is there any suggestion in Rule 26(a)(2) that an expert report is incomplete unless it contains sufficient information and detail for an opposing expert to replicate and verify in all respects both the method and results described in the report.

Id. at 1121-22.

The court concludes that it was not necessary for the initial regression analysis to be contained in the report. As

Prof. Saunders testified, and his report reflects, "at the end of the day [he] relied on the 13 events that were significant and the two particularly significant in September and October." (Saunders Dep. at 346:17-21, Sept. 4, 2008 (Doc. No. 428-2, Ex. CC.)  Moreover, even assuming that the initial regression analysis was required to be disclosed, precluding Prof. Saunders's testimony would be a disproportionate sanction.  The plaintiffs made a good faith effort to recreate the analysis.  Also, although the defendants assert they have been prejudiced because there can not tell whether Prof. Saunders chose the correct 13 dates to analyze for market efficiency and artificial inflation, it appears to the court that the real prejudice is that without the initial regression analysis the defendants can not attack the process of the creation of the subset of 40 dates as opposed to the selection of the 13 dates which Prof. Saunders's testimony indicates appeared in every stage of the many replications he tried.

### 6.  Whether Prof. Saunders Opines on Scienter

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (internal citations omitted); see also S. Cherry St., LLC v. Hennessee Group LLC, 573 F.3d 98, 108 (2d Cir. 2009).  "In addition to intent,

recklessness is a sufficiently culpable mental state for securities fraud in [the Second Circuit]." ECA, Local 134 Ibew Joint Pension Trust v. JP Morgan Chase, 553 F.3d 187, 198 (2d Cir.). When defendants "knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who kenw or should have known they were misrepresenting material facts with respect to the corporate business." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2d Cir. 2001). Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004). See also AstraZeneca LP v. Tap Pharm. Prods., Inc., 444 F. Supp. 2d 278, 293 (D. Del. 2006) ("Expert witnesses are not permitted to testify . . . regarding [the defendant's] intent, motive, or state of mind, or evidence by which such state of mind may be inferred.").

In the Memorandum of Law of the Individual Defendants in Support of Defendants' Motion to Exclude the Proffered Expert Testimony of Anthony Saunders, Lee Buchwald and Charles Drott (Doc. No. 389) ("Def.'s Ind. Br."), the individual defendants state that while Prof. Saunders did not directly address the state of mind of the individual defendants, he did make reference in his deposition testimony to what he felt "management knew or

should have known" (Def.'s Ind. Br. at 2 n.1) and such testimony should be excluded. Based on the context in which Prof. Saunders made this statement and the fact that his report does not purport to address the state of mind of the defendants, it is apparent that he was not purporting to opine on what management knew or should have known. In any event, he would not be allowed to give testimony at trial as to what management knew or should have known.

**B. Lee Buchwald**

The defendants seek to exclude the expert report of Lee Buchwald. Buchwald has an MBA and has "worked in the fields of investment banking, mergers and acquisitions, corporate restructuring and corporate finance." (See Expert Report by Lee Buchwald, Dec. 18, 2007, ("Buchwald Rpt.") at ¶ B.) He was retained by the plaintiffs to:

> serve as a designated expert to give [his] opinion on the following: (i) Did Xerox's 1998 restructuring have a material impact on Xerox's operations? (ii) If so, were these effects either known to the Defendants or so obvious that the Defendants should have known? (iii) Were the Defendants' public statements about the impacts of the restructuring on Xerox's operations complete and accurate?

(Id. at ¶ A.)

Buchwald's report gives a narrative description of the surrounding events, including quotes from various press releases and other documents. He opines that Xerox's management was aware

of the inadequacies of its existing billing system.  He then
discusses the purpose and scope of the CBO Reorganization,
including the consequential disruptions to the sales force, the
human resource issues and the billing issues.  He also discusses
the cash flow impacts, customer impacts and financial
implications.  He gives his opinion that "the CBO reorganization
had material negative impacts on Xerox's operations during the
class period."  (Id. at ¶ L.)

Buchwald adds that "it seems clear that Xerox's Management
knew or should have known about the adverse effects of the CBO
Reorganization on Xerox's operations." (Rpt. at ¶ M.)  In support
of this conclusion, Buchwald cites various memoranda exchanged
between KPMG and Xerox, and Xerox's internal communications.

In ¶ O, Buchwald concludes, based on his review of public
statements made by the defendants, that the statements were
"misleading in terms of the nature of the information presented
as well as the information regarding the adverse effects of the
CBO reorganization which was omitted."  (Rpt. at ¶ O.)

After a review of Buchwald's report and his deposition
testimony, the court concludes that his proffered expert
testimony should be excluded.  Buchwald is not qualified as an
expert by knowledge, skill, experience, training or education.

Nor is his proffered testimony based on sufficient facts or data or the product of reliable principles and methods.

Buchwald is offered as an expert based on his experience, which is not sufficient to qualify him as an expert in the areas in which he seeks to testify and give opinions.  The plaintiffs contend that as an investment banker and financial advisor Buchwald has on many occasions reviewed and commented on business documents, including prospectuses, registration statements, SEC filings and disclosure statements.  They contend that as the result of doing so Buchwald has experience with disclosure requirements for accurately describing a company or transactions. However, Buchwald's concessions during his deposition establish that he does not.

Buchwald has never been employed in an operational role at any company.  He could not identify any transaction in which he had been involved that involved an operational as opposed to a financial restructuring.  Although he has served as a director, he has not served as a director of any company that is required to make any kind of public disclosures.  He has never worked in the compliance department of a company or in the legal department of a company.  Nor has he ever been in charge of making public disclosures for a company.  Buchwald has never made a determination of materiality other than his work in this case.

He has never made a determination of whether a restructuring had a material impact on the operations of a company.  In addition, other than his work on this case, he has never made a determination after the fact of whether the public statements of a publicly traded company were complete and accurate.

Thus, Buchwald has experience reviewing documents prepared by individuals who have made determinations of materiality.  But the court concludes that he does not have experience, certainly not sufficient to qualify as an expert in this case, making such determinations himself.

In addition, Buchwald's testimony is not based upon sufficient facts or data and is not the product of reliable principles or methods.  There is no authority requiring an expert to review every piece of public information.  See SEC v. Johnson, 525 F. Supp. 2d 70, 75 (D.D.C. 2007) (failing to review all relevant evidence is not ground for excluding expert testimony; rather, it provides subject matter for cross-examination).  However, here, Buchwald offers an opinion on whether the CBO Reorganization had a material impact on Xerox's operations.  He did not do anything to determine whether there were any benefits from the CBO Reorganization.  In addition, he did not use any standard for materiality.  He testified:

> Q: . . . What standards did you use to determine whether something is material or not?
> A: I didn't have a specific standard.
> Q: So you didn't use standards. It was your own kind of subjective opinion on whether the impacts were material, correct?
> A: Yes.
> Q: Did you do anything else to define the world "material"?
> A: No.

(Buchwald Dep. at 96:7-17, Dec. 18. 2007 (Doc. No. 406-8)

("Buchwald Dep.").)

Kumho Tire is instructive: "[A]n expert, whether basing testimony upon professional studies or personal experience, [should employ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 526 U.S. at 152. Here, it is clear that Buchwald's methods depart from the level of intellectual rigor that characterizes the practice of the expert in the relevant field. This is not a situation where there is a "minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method." Amorgianos, 303 F.3d at 267. Rather, Buchwald's opinion is based on "a methodology . . . that [is] simply inadequate to support the conclusion reached." Id. at 266. Thus, Daubert and Rule 702 mandate the exclusion of his testimony. See id.

## C. Charles R. Drott

Charles R. Drott was asked to determine "[w]hether Xerox's Class Period public statements regarding the impact of the 1998 restructuring fairly described the effects of such restructuring, and, if not, whether Xerox failed to report adverse restructuring effects which resulted in false and misleading Class Period public statements" and "[w]hether the records and testimony [] examined reflect that Xerox's management knew of or recklessly disregarded any discrepancies between Xerox's Class Period publicly reported impact of the 1998 restructuring program and actual restructuring results." (Expert Report of Charles R. Drott at ¶ 1.1, Oct. 15, 2007 (Doc. No. 406, Ex. G) ("Drott Rpt.").)

Drott points to several accounting practices he claims were improper, including, "(1) failure to recognize appropriate levels of reserves for uncollectible accounts receivable; (2) failure to recognize appropriate levels of reserves for uncollectible notes receivable; (3) failure to recognize billing errors and related overstated revenue; (4) overstatement of unbilled revenue; and (5) failure to disclose excess Days Sales Outstanding (DSO) interest expense." (Expert Report of Arthur R. Wyatt, Mar. 17, 2008 (Doc. No. 388, Ex. V) ("Wyatt Rpt") at 4).

Among Drott's conclusions are that certain representations about the ongoing benefits from the Restructuring were "misleading and deceptive to Xerox's investors, securities analysts and the SEC." (Drott Rpt. at ¶ 2.3.)  He also concludes that while Xerox management "was aware of or recklessly disregarded these problems," it still made "inadequate" disclosures.  (Id. at ¶ 2.2.)  He further concludes that the impact on Xerox's operations was "continuously concealed" from Xerox's investors (id. at ¶ 2.3) and that the company used "a variety of improper accounting practices" (id. at ¶ 3.1).  His overall conclusion is that Xerox "continously concealed significant adverse restructuring effects in its Class Period public statements.  As a result, such public statements were unreliable and deceptive because they deprived investors of vital information."  (Id. at ¶ 3.52.)

The defendants raise three principal objections to Drott's report and testimony: (i) his opinions are not reliable; (ii) his accounting analysis is based on unsupported factual assumptions; and (iii) he impermissibly attempts to opine on scienter.

### 1. Reliability

The defendants contend that Drott's testimony should be excluded because his report does not contain a discussion of any academic literature, standards or "Generally Accepted Accounting

Principles" ("GAAP") provisions. However, the record shows that in reaching his conclusions, Drott employed his professional experience and a methodology routinely relied upon by professionals in his field of expertise when investigating possible fraudulent financial reporting and disclosures. Drott submitted a supplemental list of nine financial reporting requirements he considered in doing his work, all of which are reliable sources of standards for the topics on which Drott is offering opinions. In addition, although his report does not set forth the details, Drott's deposition testimony shows that his proffered opinions were formulated by applying reliable principles and methods.

The defendants contend that Drott's testimony should be excluded because his report contains no evidence that he conducted any materiality analysis. However, Drott's deposition testimony reflects, at several points, that he did perform a materiality analysis.

The defendants contend that Drott's overall conclusion that Xerox continuously concealed adverse restructuring effects in its public statements relies on incomplete and unreliable data. To the extent that the defendants believe Drott failed to review particularly important items of evidence, that is a proper subject for cross examination, as opposed to a ground for

excluding Drott's testimony.  See Johnson, 525 F. Supp. 2d at 75 ("Failing to review all relevant evidence is not a ground for excluding [an expert]'s testimony; rather, it provides subject matter for cross-examination.").

### 2. Whether Mr. Drott's analysis is based upon incorrect factual assumptions

The defendants argue that Drott's testimony should be excluded because he made patently unreasonable factual assumptions that render his proposed testimony unreliable.  The defendants cite to <u>Berk v. St. Vincent's Hosp. & Med. Ctr.</u>, 380 F. Supp. 2d 334, 355 (S.D.N.Y. 2005).  In that case, the court found that a medical expert's report contained "several factual errors," including the presence of an additional symptom, not found in either parties' evidence.  See id. at 353-55.  Here, the defendant's objection is based on the fact that Drott attributed all of the Restructuring's adverse effects to the CBO Reorganization, as opposed to other unrelated factors; that Drott made no connection between KPMG's recommendations concerning the notes receivable reserve and the accounts receivable reserve; and that Drott assumed that Xerox was obligated to apply KPMG's 2.7% error rate with respect to customer billings and their impact on accounts receivable.  As to each of these matters, Drott and the defendants disagree as to the appropriate approach.  Drott

defended his approach as to each item during his deposition.
Although the defendants point to contradictory evidence, some of
which they characterize as being undisputed, their objections do
not transform Drott's factual assumptions into factual errors, as
was the situation in Berk. These contentions go to the weight,
not the admissibility of Drott's testimony. See Tyler v.
Bethlehem Steel Corp., 958 F.2d 1176, 1188 (2d Cir.), cert.
denied, 506 U.S. 826 (1992). Moreover, "the Court [in Daubert]
expressed its faith in the power of the adversary system to test
shaky but admissible evidence." See Borawick v. Shay, 68 F.3d
597, 610 (2d Cir. 1995) (internal quotations omitted).

### 3. Whether Mr. Drott impermissbly opines on scienter

Scienter is defined as "a mental state embracing intent to
deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues
& Rights, Ltd., 551 U.S. 308, 319 (2007) (internal citations
omitted); see also S. Cherry St., LLC v. Hennessee Group LLC, 573
F.3d 98, 108 (2d Cir. 2009). "In addition to intent,
recklessness is a sufficiently culpable mental state for
securities fraud in [the Second Circuit]." ECA, Local 134 Ibew
Joint Pension Trust v. JP Morgan Chase, 553 F.3d 187, 198 (2d
Cir.). When defendants "knew facts or had access to non-public
information contradicting their public statements, recklessness
is adequately pled for defendants who kenw or should have known

they were misrepresenting material facts with respect to the corporate business." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2d Cir. 2001). Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004). See also AstraZeneca LP v. Tap Pharm. Prods., Inc., 444 F. Supp. 2d 278, 293 (D. Del. 2006) ("Expert witnesses are not permitted to testify . . . regarding [the defendant's] intent, motive, or state of mind, or evidence by which such state of mind may be inferred.").

Notwithstanding the fact that Drott's report states that he was asked to determine whether Xerox's management "knew of or recklessly disregarded" discrepancies between the actual Restructuring results and the publicly reported impact of the Restructuring, when Drott was questioned at his deposition about his opinions about what Thoman "knew or recklessly disregarded," Drott responded that his testimony would be limited to who had overall responsibility for Xerox's financial reporting. He elaborated:

> Well, [my testimony] would simply be that the CEO and the CFO and the chief accounting officer or controller normally have direct responsibility for the financial reporting of a company. I mean, it would be about that simple, really. And that's based on this case as well as my whole experience.

(Drott Dep. at 275:8-14, Jan. 24, 2008 (Doc. No. 406, Ex. G).)
Therefore, based on his deposition testimony, Drott will not be
allowed to give testimony as to scienter.

## IV. CONCLUSION

For the reasons set forth above, the Motion to Exclude the
Proffered Expert Testimony of Anthony Saunders, Lee Buchwald and
Charles Drott (Doc. No. 388) is GRANTED in part, and DENIED in
part.  The motion is granted with respect to Lee Buchwald, and
granted as to any testimony by Anthony Saunders or Charles Drott
with respect to scienter, and otherwise denied as to Saunders and
Drott.

It is so ordered.

Dated this 30th day of September, 2010 at Hartford,
Connecticut.

                                    /s/AWT
                              Alvin W. Thompson
                         United States District Judge