## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
-----------------------------x
                             :
                             :
IN RE XEROX CORPORATION      :         Civil Action No.
SECURITIES LITIGATION        :         3:99CV02374 (AWT)
                             :
                             :
-----------------------------x
```

### RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiffs bring this class action on behalf of all persons who purchased common stock from Xerox Corporation ("Xerox") during the period from October 22, 1998 through October 7, 1999, alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act"). The plaintiffs bring their claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a) respectively, and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated by the Securities and Exchange Commission pursuant to Section 10(b). The defendants, Xerox Corporation ("Xerox") and Xerox executive officers Barry Romeril, Paul A. Allaire and Richard Thoman, move for summary judgment on all claims in the plaintiffs' Amended Consolidated Class Action Complaint (the "Complaint"). For the reasons set forth below, the defendants' motion for summary judgment is being granted.

1

# I.   FACTUAL BACKGROUND

## A.   The Worldwide Restructuring

On April 7, 1998, Xerox announced a company-wide restructuring (the "Worldwide Restructuring").  The Worldwide Restructuring consisted of 150 initiatives in Europe, Africa, Latin America, Asia and the United States.  Xerox announced:

> As a result of a six-month planning process involving more than 50 teams, Xerox will implement some 150 specific projects.  Among them:
>
> - Streamline and rationalize worldwide manufacturing, logistics, distribution and service operations.  For example, Xerox will centralize and consolidate U.S. parts depots and outsource storage and distribution.
> - Move from country-centric operations in Europe to a more "pan-European" structure to provide more efficient customer support.  The company will rationalize and consolidate functions and locations to reduce duplication and to increase speed of response to the marketplace.
>
> - Overhaul administrative processes and associated resources to achieve significantly greater productivity and speed of implementation.  For example, Xerox will close one of four geographically-organized U.S. customer administrative centers with the remaining three re-focused by customer segment, enabling improved customer support at lower cost.
>
> When fully implemented the ongoing pre-tax savings from the initiatives will be approximately $1 billion annually. Initially, more than half of the savings will be reinvested to implement process and systems changes in order to enable the restructuring, and in ongoing efforts to broaden and strengthen marketing programs and distribution channels to enhance revenue growth.  Paybacks will be spread over three of four years, particularly in Europe where the process of implementation is more

2

complex.

Press Release, Xerox Corp., <u>Xerox Announces Worldwide Restructuring To Enhance Competitiveness in the Digital World: Company Will Eliminate 9,000 Jobs and Take $1 Billion After-Tax Charge</u> IRX-PROD-0033970-71 (Apr. 7, 1998) (Levine Decl. Ex. 3).

### B.   The 1998 Customer Business Organization Reorganization

Xerox's July 1998 reorganization of its Customer Business Organization ("the CBO Reorganization") was one of the Worldwide Restructuring initiatives.  The Customer Business Organization provided administrative support to Xerox's U.S. sales force, also known as the North American Solutions Group ("NASG").  There were two major components of the CBO Reorganization.  First, Xerox closed one of its four Customer Administration Centers and redistributed business among the remaining three centers, which it renamed Customer Business Centers ("CBCs").  CBC employees entered customer orders, recorded revenue, sent out bills, and answered customer questions.  Second, Xerox removed Customer Business Representatives ("CBRs") from its 36 regional sales offices (the Customer Business Units or "CBUs") and transferred their duties, including order entry and processing and scheduling and delivery of equipment, to employees at the three remaining CBCs.  CBRs were redeployed into other assignments at the CBUs. New employees were hired at the CBCs to perform the CBRs' former duties.

As Senior Vice President of Xerox's Customer Business Operations, Kenneth Baugher, observed in September 1999 that service level problems arose following the CBO Reorganization:

<u>Background</u>
In mid 1998, the Customer Business Centers (CBCs) were restructured to reduce General & Administrative costs consistent with Corporate priorities. Specifically, all order processing was centralized from the Customer Business Units (CBUs) into the Business Centers and equipment management was transferred from the CBUs to the Integrated Supply Chain (ISC). The number of Centers was reduced from 4 to 3 and the customers handled by each Center were realigned by customer type rather than by Sales District. As part of this restructure, roughly 500 heads were captured.

<u>The Problem</u>
Service level problems started to materialize immediately after the [CBO Reorganization] (especially in Chicago – our largest Center – which had undergone the largest degree of change). Order processing errors were frequent, order times stretched out to unacceptable levels, and Sales Reps could not get to the right people in the CBCs to resolve issues. Days Sales Outstanding (DSO) and Aged Receivables started to climb, billing errors increased, and customers could not reach anyone to answer their questions. As a result, Sales Reps were drawn into the gulf to try to get orders processed, equipment delivered, and invoices corrected. Additionally, CBC workload, overtime, and pressure increased to intolerable levels and turnover increased, which exacerbated the problem.

<u>Root Causes</u>
Root causes for the problem are lack of resources, loss of skills, and disruption. Specifically, we lacked the systems and process improvements to support the resource reduction. Additionally, we lost hundreds of man-years of experience when we redeployed the highly experienced Customer Business Representatives into other assignments in their local CBUs and hired many completely new people in the Centers.

CBC Background Summary IRX-PROD-0110462 (Levine Decl. Ex. 87).[1]
Compounding these problems, Xerox assigned billing and collection
personnel to order entry, so that there were fewer employees
available to fix the bills and collect on them.  By December
1998, A/R aged more than 120 days had increased 450% from $50
million in December 1997 to $225 million.  DSO increased 17% from
the second quarter of 1998, the quarter immediately preceding the
implementation of the CBO Reorganization, to the third quarter of
1998, the first quarter following its implementation.

**C.   The 1999 Sales Force Realignment**

On January 6, 1999, Xerox "announced a series of initiatives
designed to allow the company to better capitalize on growing
digital market opportunities and create greater value for
customers and shareholders" (the "1999 Sales Force Realignment").
Press Release, Xerox Corp., Xerox Realigns Operations to Better
Capitalize on New Growth Opportunities in the Digital Marketplace
(Jan. 6, 1999) (Levine Decl. Ex. 22).  Xerox planned to realign
its sales force territories from geography-based selling to
industry-based selling and realign its document processing
business under four operations: Industry Solutions, General
Markets, Developing Markets and Business Group Operations.  The

---

[1] Accounts receivable, or A/R, refers to outstanding bills
that were recorded as revenue but not yet collected.  Days sales
outstanding, or DSO, is a measure of the average number of days
it takes to collect on a bill once a sale is recorded.

process would evolve over the course of a "couple of years," with "no significant changes to sales force territories or compensation" planned in 1999. Id.  Xerox began the planning and implementation of some aspects of the Sales Force Realignment in the first quarter of 1999.  By the middle of 1999, there was unrest in the sales force as a result of the sales reorganization.

### D.   Internal Communications

Problems arising out of the CBO Reorganization were discussed or alluded to in various Xerox internal documents relied upon by the plaintiffs.

On September 25, 1998, Margaret Tytheley, a 26-year Xerox employee emailed Paul Alaire and Richard Thoman, stating that "It appears very [l]ittle planning, if any, went into this transition. Segment centers were not prepared for the magnitude of customer calls and inquiries."  Email to Paul Allaire IRX-PROD-0036150 (Sept. 25, 1998) (Levine Decl. Ex. 9).

The plaintiffs have proffered a conclusion of their accounting expert, Charles R. Drott, that Xerox had established an accounts receivable reserve of only $16.6 million for the third quarter of 1998, which resulted in an understatement of reserves for uncollectible accounts that quarter of $20 million; Drott is critical of the fact that the reserve had only been increased by $3 million.  See Charles R. Drott, Expert Report of

Charles R. Drott ¶ 3.3, at 8 (Oct. 15, 2007) (Levine Decl. Ex. 111).  Drott relies on an October 14, 1998 memorandum from Gary Kabureck, Vice President, Financial Services, to Daniel S. Marchibroda, the subject of which is "Third Quarter 1998 Reserve Reviews."  In that memorandum, Kabureck observes that there has been "a significant reduction in the volume of write-off activity," with respect to both notes receivable and trade receivables, "due directly to the disruption resulting from the recent re-organization of the USCO Customer Administration Organization."  Memorandum from Gary Kabureck to Daniel S. Marchibroda KPMGGIA002637B (Oct. 14, 1998) (Levine Decl. Ex. 10). However, Kaburek also notes that the third quarter trade receivable write-offs had also declined fairly significantly and concludes: "While we do not believe we have additional risk to the 6+6 provision outlook of $3.0M greater than Plan, we will continue to closely monitor balance of the year write-offs, recoveries and file aging to ensure the reserve balance is adequate."  Id.

On October 26 and 27, 1998, accounting firm KPMG visited the Xerox North Texas customer administration center.  Under the heading "CBC Transition Issues," an internal memo documenting that visit states:

> Sales representatives are very unhappy with the lack of face to face interaction with the CBRs. . . .
>
> Bill believes the CBC transition has directly impacted

the CBU's performance.  Since the transition their best
sold revenue day is approximately $600K.  Prior to the
transition $1 million sold revenue days were common. . .
.

Customer service has been impacted significantly by the
restructuring.  All the CBC's have high call response
times.  In addition, there is a large percentage of
abandoned calls.  None of the CBC's are close to the
KB&CA metrics established for this area.  The lack of
tenured personnel is evident in the length of time it
takes to complete each call.

Memorandum from KPMG on Xerox North Texas CBU Summary Memo

KPMGGIA 008857-58 (Nov. 6, 1998) (Levine Decl. Ex. 116).

A November 6, 1998 internal memorandum prepared by Philip D.

Fishbach and sent to the Operations Committee, which was received

by defendants Allaire, Thoman and Romeril, states:

Accounts receivable funds usage was $390 million through
September 30, 1998, which is $224 million worse than
prior year and $77 million worse than plan.  Accounts
receivable as a percent of revenue is currently at 12.3%,
which is (0.4) pls. worse than plan.  USCO and XBS both
show significant deterioration in DSO since Q2.  USCO and
XBS's DSO at September 30, 1998 is 51.5 days and 48.9
days, respectively, which is 8.2 days and 7.4 days worse
than plan and 7.7 and 5.4 days worse than Q2,
respectively.  The deterioration is largely driven by the
reorganization of the customer administration centers in
the U.S.

Memorandum from Philip D. Fishbach on Document Processing Non-

financing Funds September YTD and Q4 Assessment to Operations

Committee IRX-PROD-0142783 (Nov. 6, 1998) (Levine Decl. Ex. 117).

The memorandum showed "Restructure savings" of $55 million.  Id.

at IRX-PROD-0142782.

On November 23, 1998, Tim White, Tim Egan and W.P. Tehan of

KPMG visited the Xerox Chicago customer administration center. An internal memorandum to file, authored by Tehan, states that after the realignment the Chicago CBC handled 60% of Xerox's customer volume.  However, 51% of the employees in Chicago had "less than one year of Xerox experience" which was a

> "significant challenge because it [took] at least 18 months for an individual to become familiar with Xerox'[s] systems and OTI procedures," and that "several customer care metrics were noticeably below plan and the prior year.  For instance, average call response time, percentage of calls abandoned and overall customer satisfaction had declined significantly from June 1998."

Pl's. 56(A)(2) Statement ¶ 23 (quoting Anthony Saunders, <u>Expert Report of Professor Anthony Saunders</u> 23 n.75 (Oct. 15, 2007) (Levine Decl. Ex. 113)) (alterations in original).

On December 2, 1998, Tehan of KPMG drafted an internal memorandum documenting the KPMG field visit to the Chicago CBC. Under the heading "Customer Care," Tehan states:

> During our visit to the North Texas CBU KPMG noted that several customer care metrics were noticeably below plan and the prior year.  For instance, average call response time, percentage of calls abandoned and overall customer satisfaction declined significantly from June 1998. Although this process may not have an immediate financial statement impact, continued deterioration in overall Customer Care performance could present problems in the future.

Memorandum from W.P. Tehan to File, KPMG Field Visit to the Chicago Customer Business Center (CBC) KPMGGIA009730 (Levine Decl. Ex. 20).  Under the heading, "Billing Quality," Tehan identified "[p]rocess errors," "[d]ata errors (i.e., human

input)," "[d]elays in processing (market code or pricing table updated in Sale Range, but not updated in EBS)," and "[p]ricing (too complex)" as "[t]he top billing quality issues." Id. at KPMGGIA009731.  He also stated that Lindsey Bates, a Billing Quality Manager at Xerox "concurred with problems associated with invoices not mailed in a timely fashion (this has been a re-occuring theme during our confirmation routine)." Id.  Under the heading "Accounts Receivable," it states: "As of October 1998 Chicago's trade DSO was 59 days (an increase of approximately 2 weeks over the prior year).  At October 1998 $110 million of their trade A/R file was aged greater than 120 days." Id.

On December 9, 1998, A. Barry Rand, Xerox's Executive Vice President, Customer Operations, sent an internal memo to Allaire, Buehler, Romeril and Thoman observing that he had discussed with them several times the need to minimize sales force disruption. See Memorandum from A. Barry Rand to Distribution IRX-PROD-0108847 (Dec. 9, 1998) (Levine Decl. Ex. 18).  He pointed out that in 1993 and 1995 when Xerox had "major ground plans and/or sales compensation changes," sales force disruptions led to a decrease in revenues.  Id.  He stated that "change management is key to minimize disruption," and pointed to a number of factors with respect to 1999: "Public Sector created; CBC Impacts; NAM organization realigned and verticalized; Centralization of house accounts; Hybrid marketing launched; Entity/CBU resizing; Anxiety

of changes to come." Id. at IRX-PROD-0109150-51.

> In a Xerox internal memo dated December 17, 1998, Xerox's
> Director of Customer Satisfaction and Loyalty Peter
> Garcia states that Xerox was "not meeting customer
> expectations for maintaining relationships with them,
> [were] not meeting customer expectations for Digital
> products, support and/or service and that [Xerox had] not
> done a good job in minimizing the customer impacts of
> [Xerox's] operational process changes."

Pl's. 56(A)(2) Statement ¶ 29 (quoting Anthony Saunders, Expert Report of Professor Anthony Saunders 24-25 (Oct. 15, 2007) (Levine Decl. Ex. 113)) (alterations in original).

On January 6, 1999, defendant Thoman gave a presentation to Xerox executives. One part of the presentation is entitled "Much to be worried about." Presentation IRX-PROD-0141480 (Jan. 6, 1999) (Levine Decl. Ex. 21). In that section, he discussed digital players requiring high growth. He stated that "Restructuring is enabling us to deliver on earnings growth," and also stated that "Revenue growth has hit a wall." In addition, he stated "Our performance does not equal our promise." Id.

William Buehler sent a May 3, 1999 memorandum to Thomas Dolan, with copies to defendants Romeril and Thoman, reviewing issues related to the CBO Reorganization:

> Tom, thanks again for a very thoughtful 3+9 Review. Your
> analysis clearly demonstrates the top issues that we must
> address to get NASG back on a successful track - namely:
> • 	Customer Satisfaction
> • 	Top Line Growth
> • 	Sales Coverage/Productivity
> • 	Service Performance CBC and Receivable Performance.
>
> The submitted Full-Year profit assessments are nearly

> $500 million worse than plan (of which NASG is $200 million) and would deliver a year over year decline in profits in both Q2 and Full Year, which is obviously unacceptable.

Memorandum from William F. Buehler to Thomas Dolan on 3+9 Direction IRX-PROD 0252096 (May 3, 1999) (Levine Decl. Ex. 52).

In an internal memo dated May 21, 1999, William Buehler stated that "'Sales people spend 25-35% of each day on the administrative duties (equivalent to 1800 full time people).'" Pl's. 56(A)(2) Statement ¶ 30 (quoting Anthony Saunders, Expert Report of Professor Anthony Saunders 29 (Oct. 15, 2007) (Levine Decl. Ex. 113)).  Buehler also stated that "Customers [are] refusing to pay bills that are 4-6 months late. . . . [It is] difficult to collect on an inaccurate, late bill."  Id. ¶ 31 (quoting Anthony Saunders, Expert Report of Professor Anthony Saunders 26 (Oct. 15, 2007) (Levine Decl. Ex. 113)).  Buehler further stated that "[t]he overriding issue in North America is the terrible condition of our administrative processes– CBC and ISC."  Id. (quoting Memorandum from William Buehler on Roundtable Meetings to Al Dugan IRX-PROD-0015597 (May 21, 1999) (Levine Decl. Ex. 114)).

An internal Xerox document prepared in May 1999 states "CBR's in Chicago are a problem.  –Don't know what they are doing – Don't return phone calls – Don't know where to get help." Pl's. 56(A)(2) Statement ¶ 32 (quoting Anthony Saunders, Expert Report of Professor Anthony Saunders 25 (Oct. 15, 2007) (Levine

Decl. Ex. 113)).

In a July 1, 1999 internal memorandum from Patrick Fulford to Baugher, Ciaschi and others not including any of the individual defendants, with the subject line "NASG State of Emergency," Fulford stated:

> I have just spent the last two days reviewing a preliminary 6+6 NASG Outlook. This outlook was developed by the finance staffs working with members of your organizations. I apologize if you haven't seen any of this yet, but I thought it was important to get it out as quickly as possible. Although we will be spending time on this matter in early July, I felt compelled to give you a 'heads-up' to a very serious situation.
>
> I've summarized the key problems included in the 6+6 Outlook . . . . In short, this outlook indicates approximately a $310 profit risk to the 3+9 Outlook taking our full year plan miss to $507M. Our year-over-year profit decline would be 8% (yes, it takes my breath away too).
>
> Clearly, we will work together in early July to scrub the numbers but the risks are real unless we intervene immediately. In my view, this is a crisis and represents a state of emergency. . . .
>
> We need to review every investment area. The review should include investments under way and those planned for second half start-up. A state of emergency mind-set would dramatically reduce the investment profile with maybe 1 or 3 initiatives surviving. We also need to consider a full hiring freeze in all areas including Selling (probably excluding the CBC's).

Memorandum from Patrick Fulford on NASG State of Emergency IRX-PROD-0254292 (July 1, 1999) (Levine Decl. Ex. 67).

An internal Xerox presentation document dated July 22, 1999 discusses problems related to the CBO Reorganization. The first line addresses headcount. The three bullet points at the bottom

read:

- "Too far too fast" ahead of enablers
- 6+6 adds back 275 of 420 heads removed in 1998 + outsourcing
- Still may not be enough
  - massive backlog (aged receivables, customer inquiries, billing errors)
  - less experienced workforce
  - more complex business (CPC/Pooling, etc.)

Strategy Contract Slides IRX-PROD-0222989 (July 22, 1999) (Levine Decl. Ex. 70).  The next slide discusses the "Current State." One portion of it reads: "We have a five alarm fire – major impact on customers and sales productivity." Id. at IRX-PROD-0222990.  The slide discusses "Characteristics" and "Results" of those characteristics, with four bullet points under the Results:

- LOS at all time low:
  - Order Processing
  - Fulfillment
  - Billing Timeliness/Accuracy
  - Customer & Field Inquiries
- Excessive cash (Receivables & Inventory) usage
- Sales Productivity impacted as reps backstop process failures and respond to customers
- Employees under severe duress
  - Crisis on multiple fronts - causing unstable priorities
  - Workload/Pressure
  - Do not feel successful

Id.  A subsequent slide, captioned "CBO Performance Gap Root Causes," identified four categories, "Reduced resources without major enablers," "Loss of experience/skill," "Disruption," and "Loss of alignment with Sales."  Id. at IRX-PROD-0222991.  The presentation then set forth a "90 Day Recovery Plan," which included adding headcount as had been reflected in the [6+6

14

projection].  Id. at IRX-PROD-0222993.

On July 26, 1999, Kenny R. Baugher, who had joined CBO as a senior vice president in the NASG Customer Business Operations the prior month, sent a memorandum to Customer Business Operations Employees on the subject of "CBO Recovery." Memorandum from Kenny R. Baugher on CBO Recovery to Customer Business Operations Employees IRX-PROD-0250787 (July 26, 1999) (Levine Decl. Ex. 73).  Among other things, he stated:

> First, we obviously have gone through a massive change in the last 12 months.  We took a significant reduction in resources and lost substantial experience and tenure. There were few process or technology improvements to enable this reduction, and we did not test or pilot the strategy.  Senior management has acknowledged we went "too far, too fast". [sic]
>
> That now leaves us with serious issues.  Our customers are unhappy because we cannot issue invoices on a timely and accurate basis, and we cannot respond to their calls and / or written questions promptly.  The CBU's are unhappy because they are not getting the level of support they received previously and are now spending substantial amounts of time on administrative issues.  Our stockholders are unhappy that our cash usage has gotten much worse with increasing DSO.  And our employees are generally frustrated with the workload and pressure trying to keep the "ship" afloat.  It is a tough picture. But an honest assessment is the first step to recovery. (Id. at IRX-PROD-0250787.)

He then summarized the steps that had been taken in three areas: improving "support to the CBU's and their effort to drive revenue growth," improvement with respect to DSO, which had reached an all time high in the second quarter of 1999, and improvements in the area of billing accuracy and timeliness.  Id. at IRX-PROD-

0250788.

On August 10, 1999, Romeril sent an internal memorandum to Thoman and Buehler, which had in the subject line "$165 mn Restructuring Reserve/XE/2000 Annual Plan."  Romeril wrote:

> Puzzling as to why our financial performance appeared to inadequately reflect the huge restructuring we took in 1998, the following is of general note and analysis lends credence to the expectation that Europe should be in a period of very substantial profit growth.
>
> . . .
>
> (ii) The reserve charge for NASG was $116 mn, which is very small compared to that for ESG/XE at $644 mn (numbers are 6+6 outlook rather than originals).  The current estimate of savings are similarly proportioned with NASG at $103 (net of $30 mn reinvestment in CBCs) and ESG/XE at $534 mn with the NASG savings much more front-loaded and XE much more back-loaded.
>
> . . .
>
> (iv) Overall for Xerox Corporation, the estimated total savings by year 2001 will be $1,018 mn p.a.  By end Q2 1999 we had only reached $363 mn so most savings are yet to come.  This adds further need/ability to achieve H2 1999 and 2000 earnings direction assuming, of course, a reasonable level of revenue growth.

Memorandum from B.D. Romeril on $165 mn Restructuring Reserve/XE/2000 Annual to G.R. Thoman & W.F. Buehler IRX-PROD-0124662 (Aug. 10, 1999) (Levine Decl. Ex. 77).

On September 17, 1999, a "CBC Background Summary," which had been reviewed by Baugher was distributed to certain NASG personnel in connection with internal presentations to be made by Buehler.  The background summary included a summary of the background of the reorganization of the CBCs, the problems as of

16

that date, and the root causes of those problems, as quoted
above.  See supra Section I.B.  After a discussion of the root
cause, the summary discussed the priorities: "The restoration of
CBC service has been established as a major Corporate priority.
Bill Buehler is deeply involved, as is Tom Dolan.  The
organization has new leadership with Ken Baugher now reporting
directly to Tom Dolan.  An intensive recovery effort is now
underway."  CBC Background Summary IRX-PROD-0110462 (Levine Decl.
Ex. 87).  The summary also contained an assessment of the current
status of efforts to address the problems:

> Current Status
> Sales feedback indicates that order processing
> responsiveness is now improving.   Recently issued
> response time commitments have been very well received.
> Continued improvement is expected over the balance of the
> year.
>
> Billing timeliness (number of customers invoiced as a
> percent of those who should have been invoiced) has
> improved from 80% in March to 87% in August.  (Reasons
> for not billing center on missing meter reads, and
> suspended invoicing due to XBS conversions, P.O.
> renewals, disputes, etc.) Billing errors are still a
> concern, and a team is working aggressively to deal with
> underlying issues, such as cost/copy pooling and XBS
> conversions.   The ability to respond to customer calls
> has improved dramatically in July and August and will
> continue to improve.
>
> DSO growth has been contained and reductions are expected
> for 4Q99, although the rate is behind targeted levels.
> Therefore, DSO is currently the area with the highest
> level of operational focus.
>
> Net Conclusion
> The CBC problems are well understood and aggressive
> actions are underway to fix this issue on a priority
> basis.   While there are still many problems, we have

17

> "turned the corner" and started to show improvement on
> essentially all fronts.  Input from the Sales Advisory
> Council and CBU Roundtables have confirmed this
> conclusion.

Id. at IRX-PROD-0110463.

On September 27, 1999, Thoman sent a memorandum to the

Operations Committee, the subject of which was "Headcount

Approval."  He stated:

> During August, we had over 1200 gross hires, including
> 950 non-XBS production heads.  I am extremely
> disappointed in your manpower management, especially in
> light of the hiring restrictions put in place and the
> Company's current financial situation.  As a result of
> our failure to strictly control resources, we have, in
> essence, spent much of the benefit of the restructuring
> action.  While we can argue that we have filled sales
> territories and upgraded skills shortages, we must not
> lose sight of the fact that we now have a cost base that
> is unaffordable given our current revenue growth in the
> low single digits.

Memorandum from G. Richard Thoman on Headcount Approval to

Operations Committee Members IRX-PROD-0241963 (Sept. 27, 1999)

(Levin Decl. Ex. 89).  He then informed the recipients that, with

certain exceptions, all hires must be approved in advance by a

member of the strategy committee.  He concluded: "We must regain

control of manpower and I expect each of you to lead the way."

Id.

On October 6, 1999, Romeril sent an internal memorandum to

Thoman sharing some thoughts and questions in preparation for the

phone-in on the following day of preliminary third quarter

results, which would be followed by a meeting later in the day at

which Romeril did not have good news.  One of the questions he
asked, with the expectation that it would help frame the
discussion at the meeting, was: "What happened to restructuring
benefits? If they were real, they must have been spent, delayed
or offset by deterioration elsewhere."  Memorandum from B.D.
Romeril to G.R. Thoman IRX-PROD-0020863 (Oct. 6, 1999) (Levine
Decl. Ex. 90).

     In an October 18, 1999 internal Xerox memo, Thoman stated
"Sales reps tell me that up to 40 percent of their time is spent
dealing with admin-type problems -- at [a] time when they should
be freed up to be out selling."  Pl's. 56(A)(2) Statement ¶ 39
(quoting Anthony Saunders, Expert Report of Professor Anthony
Saunders 29 (Oct. 15, 2007) (Levine Decl. Ex. 113)).

     An internal Xerox presentation document dated October 20,
1999 estimated that "'Sales Disruption' resulted in "3%-5% lower
field sales for 1999."  Pl's. 56(A)(2) Statement ¶ 40 quoting
Anthony Saunders, Expert Report of Professor Anthony Saunders 29
(Oct. 15, 2007) (Levine Decl. Ex. 113)).

     **E.    External Communications**

     During the relevant time period there were numerous
statements made by the defendants, in the form of press releases,
public filings, statements during investor conferences or
teleconferences and interviews with analysts, as well as reports
that were issued by analysts who followed Xerox and newspaper

19

articles.

In an April 17, 1998 press release concerning the Worldwide
Restructuring, Xerox predicted that "[w]hen fully implemented the
ongoing pre-tax savings from the initiatives will be
approximately $1 billion annually."  Press Release, Xerox Corp.,
Xerox Announces Worldwide Restructuring To Enhance
Competitiveness in the Digital World: Company Will Eliminate
9,000 Jobs and Take $1 Billion After-Tax Charge IRX-PROD-003971
(Apr. 7, 1998) (Levine Decl. Ex. 3).

On October 22, 1998, Xerox issued a press release that
stated, among other things, financial results for the company's
third quarter 1998 ended September 30, 1998.  See Press Release,
Xerox Corp., Xerox Earnings Up 18 Percent in Third Quarter: Eight
Consecutive Quarter of Double-Digit Operating Earnings Growth
IRX-PROD-0161430-41 (Oct. 22, 1998) (Levine Decl. Ex. 12).  The
October 22, 1998 press release stated, among other things, that
"Xerox Corporation's third quarter diluted earnings per share
["EPS"] increased 18 percent to $1.05 and income increased 19
percent to $381 million, primarily as a result of outstanding
growth in digital product revenues and improved operating
margins, including the initial benefits from the worldwide
restructuring program," and that "Operating profit margin
improved by 1.7 percentage points in the quarter, reflecting the
company's continued focus on productivity and the initial

benefits of the Restructuring program announced in April." <u>Id.</u>
at IRX-PROD-0161430.  The press release also stated:

> Income from continuing operations increased 19 percent to
> $381 million in the 1998 third quarter from $320 million
> in the 1997 third quarter, primarily as a result of
> outstanding growth in digital product revenues and
> improved profit margins including the initial benefits
> from the worldwide Restructuring program.
> . . .
> Diluted earnings per share from continuing operations
> increased 18% to $1.05 in the third quarter.

<u>Id.</u> With respect to a decrease in the number of employees, the
press release stated: "In connection with the restructuring
program, 1,700 employees left the company during the third
quarter, bringing the total to 3,200.  Approximately 9,000 jobs
will be eliminated . . ." <u>Id.</u> at IRX-PROD-0161435.

In its 1998 Third Quarter 10-Q, filed with the Securities
and Exchange Commission on November 10, 1998, Xerox stated:

> (a)   "Income from continuing operations increased 19 percent
>       to $381 million in the 1998 third quarter from $320
>       million in the 1997 third quarter, primarily as a
>       result of outstanding growth in digital product
>       revenues and improved operating profit margins,
>       including the initial benefits from the worldwide
>       restructuring program."

Xerox Corp., <u>Form 10-Q</u> 11 (Nov. 10, 1998) (Goldstein Decl. Ex.
20).

> (b)   "Approximately 55 percent of 1998 third quarter
>       equipment sales was due to products introduced since
>       1997 . . . . Equipment sales in the first nine months
>       of 1998 grew 14 percent primarily due to excellent
>       growth in digital products."

<u>Id.</u> at 13.

(c) SAG was 27.7 percent of revenue in the 1998 third quarter and 27.6 percent of revenue for the first nine months of 1998, 1.8 percentage points better than the 1997 third quarter and the first nine months of 1997 due to continuing productivity initiatives and expense controls, including the initial benefits from our worldwide restructuring program.

Id. at 15.

(d) When fully implemented, the ongoing pre-tax savings from the restructuring initiatives will be approximately $1 billion annually. Initially, more than half of the savings will be reinvested to implement process and systems changes in order to enable the restructuring, and in ongoing efforts to broaden and strengthen marketing programs and distribution channels to enhance revenue growth.

Selling, administrative and general expenses as a percentage of revenue will move from the high 20's to the low 20's over time, driven primarily by large reductions in overhead costs.

Id. at 16.  In addition to the foregoing, Xerox disclosed that there had been some increase in DSO as a result of the CBO Reorganization:

Cash usage was $1,115 million and $173 million during the first nine months of 1998 and 1997, respectively. Net income before depreciation and amortization, restructuring charges, and the change in deferred income taxes increased $154 million to $1,542 million for the first nine months of 1998. However, this was more than offset by cash expenditures against the 1998 restructuring reserve, increased inventory investment in support of accelerated digital product sales growth, higher accounts receivable due to stronger equipment sales growth and some increase in days sales outstanding due to the temporary effects from the reorganization and consolidation of U.S. customer administrative centers, and settlement in 1998 of compensation obligations.

Id. at 22.

On November 20, 1998, Romeril, Xerox's Chief Financial Officer, met with Dave Ravera of Putnam Securities.  Romeril said that Xerox had not done well on inventory and receivables management but also "[said] it's temp & we're all over it." Notes of Leslie F. Varon IRX-PROD-0062963 (Nov. 20, 1998) (Varon Aff. Ex. A).  Romeril further indicated that the consolidation of the U.S. administrative centers, i.e. the CBO Reorganization, resulted in the loss of tenured employees and controls. According to Romeril, the problem would be temporary, and in 1999, Xerox would go back to the ratios it had in 1997 and go forward from there.  The meeting notes also indicate that Romeril told Ravera: "Have sent Europeans to US for lesson learned." Id.

On December 14, 1998, Romeril met with Kirk Mayer, a securities analyst at Wellington Management.  Romeril indicated that there was a temporary disruption in receivables in the United States due to the administrative restructuring, which would be fixed by the end of 1999.  Notes of Leslie F. Varon IRX-PROD-0062956-57 (Dec. 14, 1998) (Varon Aff. Ex. B).  On December 16, 1998, Romeril met with Steven Milunovich of Merrill Lynch. Romeril told Milunovich that Xerox's poor cash flow in 1998 was caused in part by a receivables problem stemming from the U.S. consolidation in customer administration and changes in collection processes.  He also observed that DSO had temporarily increased, that it was not a "write-off" issue and that Xerox

would "claw back."  Notes of Leslie F. Varon IRX-PROD-0062944

(Dec. 16, 1998) (Varon Aff. Ex. C).

According to Xerox's December 31, 1998 Form 10-K,

Key initiatives of the restructuring include[d]:

> 1. Consolidation of 56 European customer support centers into one facility and implementing a shared services organization for order entry, invoicing, and other back-office and sales operations.
>
> 2. Streamlining manufacturing logistics, distribution and service operations.  This will include centralizing U.S. parts depots and outsourcing storage and distribution.
>
> 3. Overhauling our internal processes and associated resources, including closing one of four geographically-organized U.S. customer administrative centers with the remaining three refocused by customer segment, enabling improved customer support at lower cost.

Xerox Corp., Annual Report (Form 10-K) 13 (Mar. 22, 1999)

(Goldstein Decl. Ex. 40).

On January 6, 1999, Xerox announced a new initiative to

realign its sales force to provide industry-oriented global

document solutions, i.e. the Sales Force Realignment.  See Xerox

Realigns Operations to Better Capitalize on New Growth

Opportunities in the Digital Marketplace, Business Wire, Jan. 6,

1999 (Levine Decl. Ex. 22).  Thoman stated: "This migration to an

industry global account and solutions focus will evolve over the

next couple of years.  In 1999, there will be no significant

changes to sales force territories or compensation."  Id.

On January 26, 1999, Xerox held its earning release conference for the fourth quarter of 1998.  At that conference, Romeril made the following statements:

>　(a)　I'll address some of the underlying trends in Xerox . . . .  Our fourth quarter document processing earnings increased by 16 percent to $1.69 a share [a]nd income increased 17 percent to $615 million.  This is primarily as a result of outstanding growth in digital product revenues, improved operating margins, and the ongoing benefits from our worldwide restructuring program.

Barry Romeril, Xerox Corporation Fourth Quarter Earnings Release Teleconference 3:21-4:7 (Jan. 26, 1999) (Levine Decl. Ex. 30).

>　(b)　"Fourth quarter pre-currency . . . , revenue growth, was 7 percent.  That included 11 percent growth in the United States . . . ."

Id. at 4:20-23.

>　(c)　"Let's move on to productivity.  Operating profit margin improved by 160 basis points in the fourth quarter, reflecting our focus on productivity, and the ongoing benefits of our worldwide restructuring."

Id. at 10:5-10.

>　(d)　"Gross margin improved by 110 basis points in the quarter to 48.1 percent.  As manufacturing and service productivity was only partially offset by reduced competitive price pressures. Our unit manufacturing cost productivity in 1998 was by far the best recorded in decades."

Id. at 10:10-17.

>　(e)　"We've also taken what we believe is an appropriate posture with bad debt reserves given the environment. And this impacted the fourth quarter SG&A to revenue ratio by about 60 basis points."

25

Id. at 11:16-20.

> (f)   "[A]s we implement the worldwide restructuring, SG&A as
>        a percent of revenue will move from the high 20s to the
>        low 20s, driven primarily by large reductions in G&A
>        overhead costs."

Id. at 11:21-25.

Alex Henderson of Prudential Securities asked Romeril: "I was

wondering if you could give us some input on where you are with

respect to the restructuring."   Id. at 29:14-16.   In response,

Romeril stated:

> [I]n Europe . . . we're still in the relatively early
> phases of moving from the country centric to the Pan
> European basis.  And we have had to put in a lot of costs
> to get the systems and the back offices up and running in
> the center as they were. . . . So I would say in the
> fourth quarter the evidence is that we reinvested most,
> if not all of the savings.  But in a calculated way, both
> that which we had to do for the front end loading in
> Europe, and that which was somewhat discretionary in
> advertising and marketing programs, which go well beyond
> advertising.

Id. at 30:19-31:9.  With respect to selling, general and

administrative expense, Romeril stated as to DSO and other

matters:

> In the fourth quarter, we were 40 basis points better on
> a ratio of SG&A to revenue.  That would have been 100
> basis points better, but for the bad debts. Now given the
> growth in the business, you would expect probably some
> increase in the bad debts. We felt it was appropriate
> looking around particularly in some of the more difficult
> economies. Brazil and Russia. Some of the restructuring
> that we did in the United States gave us a dislocation so
> that our day sales outstanding went out a bit.  And on a
> mechanistic basis alone, that gives you a bit more in the
> bad debts. And we felt that that was appropriate.

Id. at 31:14-32:3.  In response to a question as to when costs would actually start to accrue, Romeril responded "Second half of 1999 I would say." Id. at 32:18-19.

On January 26, 1999, Xerox issued a press release that stated the benefits and impact of the Worldwide Restructuring on Xerox's financial performance for its fourth quarter ended December 31, 1998 and year ended December 31, 1998.  See Press Release, Xerox Corp., Xerox Earnings Up 16 Percent in Fourth Quarter: Board Approves 11 Percent Dividend Increase, 2-For-1 Stock Split IRX-PROD-005100-02 (Jan. 26, 1999) (Levine Decl. Ex. 29).  The press release contained, among others, the following statements regarding the Worldwide Restructuring:

> (a)  "Xerox Corporation's fourth quarter diluted earnings per share ["EPS"] increased 16 percent to $1.69 and income increased 17 percent to $615 million, primarily as a result of outstanding growth in digital product revenues, improved operating margins and ongoing benefits from the worldwide restructuring program."

Id. at IRX-PROD-0005100.

> (b)  "The operating profit margin improved by 1.6 percentage points in the quarter, reflecting the company's continued focus on productivity and the benefits of the restructuring program announced in April."

Id.

In discussing the "Outlook for 1999 and Beyond," the press release stated "'While economic uncertainty could hinder our ability to achieve double-digit revenue growth in the near term, the global growth opportunities for document processing products

and solutions remain substantial.'" Id. at IRX-PROD-0005101
(quoting Rick Thoman, Xerox President and Chief Operating
Officer).  With respect to headcount, Xerox reported that 2,300
employees left the company during the fourth quarter, making a
total of 5,500, and approximately 9,000 jobs would be eliminated
as part of the Worldwide Restructuring.  Id.

Also on January 26, 1999, Romeril spoke with Rebecca Runkle
of Morgan Stanley.  He told her that Xerox had experienced a
growth in receivables because of the restructuring in the United
States.  He stated: "We were too optimistic believing [that the]
DSO spike in [the] US would be too temp[orary]."  Notes of Leslie
F. Varon IRX-PROD-0062940 (Jan. 26, 1999) (Varon Aff. Ex. D).  He
also stated that Xerox had been "too ambitious," that it had "put
some resources back," and that "[he had] no doubt it's
temp[orary]."  Id.  On January 27, 1999, Runkle issued a report
warning investors that Xerox was experiencing increased levels of
receivables and DSO:

> In addition, we raise a cautionary eyebrow at Xerox's
> working capital performance in 1998.  While full details
> have yet to be disclosed, management stated that both
> inventory levels/turns and receivables/Days Sales
> Outstanding proved disappointments in 1998.  We believe
> that DSO's increased by about 5 days and that inventory
> turns fell to less than three times.  This is both below
> Xerox's historical performance and industry benchmarks,
> according to management.  So, while unit manufacturing
> costs reached all time lows in the period, it seems XRX
> will have to "pay the piper" in the first-half o[f] 1999.

Rebecca Runkle, Morgan Stanley Dean Witter, <u>Xerox: Xerox Swaggers</u>
<u>On - Reiterate Outperform</u> IRX-PROD-0042746, IRX-PROD-0042748
(Jan. 27, 1999) (Goldstein Decl. 34).  Under the heading
"Restructuring Update --- Benefits Continue to Show," the report
further stated: "Worldwide employment decreased by 200 in the
quarter to 92,700 (down from 92,900 in 4Q98 and 91,400 in 4Q97)."
(<u>Id.</u> at IRX-PROD-0042752.)  She noted, however, that "[t]he
decrease of 2,200 employees due to the restructuring program was
partially offset by the net hiring of 2,000 employees . . . ."
<u>Id.</u>

On February 16, 1999, Runkle reiterated that
"receivables/days' sales outstanding proved disappointments in
1998."  Rebecca Runkle, Morgan Stanley Dean Witter, <u>Xerox (XRX):</u>
<u>Xerox Swaggers On - Reiterate Outperform; Raise Target</u> MS00038,
MS00039 (Feb. 16, 1999) (Goldstein Decl. Ex. 35).  Runkle issued
another report on February 25, 1999, which stated:

> Xerox's A/R balance increased 25% year-over-year, to $2.7
> billion. The receivables ballooned as Xerox attempted to
> restructure several operations in the US. The
> reorganization and reorientation of business units (from
> geographical to customer focused) led to the disruption
> in billing cycle productivity.  Once again, management
> remains committed to reducing receivable levels back to
> those found in 1997 by year-end 1999.

Rebecca Runkle, Morgan Stanley Dean Witter, <u>Xerox (XRX):</u>
<u>Preliminary Update on Year-End Balance Sheet and Cash Flow Items</u>

IRX-PROC-0000222, 0000223 (Feb. 25, 1999) (Goldstein Decl. Ex. 36).

On March 1, 1999, Romeril met Philip Rueppel, a securities analyst with BT Alex. Brown. Notes from the meeting indicate that Romeril discussed the "[r]eceiv[ables] issue in [the] US assoc[iated] w[ith] restruc[turing]." Notes of Leslie F. Varon IRX-PROD-0062471 (Mar. 1, 1999) (Varon Aff. Ex. E). Romeril stated that the issue "[would] reverse in '99." Id. On March 2, 1999, Rueppel issued a report stating:

> One area of concern has been the poor cash flow results in 1998, driven especially by working capital issues -- receivables and inventory turns. Management was refreshingly frank about the core issue --internal execution, rather than citing external factors. Management attention to both areas has been elevated significantly, with compensation tied to improvement, and we would be surprised not to see consistently better DSO and inventory turns metrics throughout 1999. We remain comfortable with our assessment that the balance sheet deterioration does not point to any competitive or product issues.

Philip C. Rueppel, Alex Brown, XRX: Meeting With CFO Confirms Positive Business Tone – Brazil Remai[n]– Strong Buy, IRX-PROD-0011038, IRX-PROD- 0011039 (Mar. 2, 1999) (Goldstein Decl. Ex. 37).

Also on March 2, 1999, Henderson of Prudential Securities issued a report, which stated:

> Xerox experienced a substantial spike in inventories during 1998, DSOs were up and turns down. We believe this is a function of overzealous ordering in a couple of critical lines as well as the disruption caused by earlier and deeper than expected G&A cuts. Management

believes the disruptions to operations in Brazil and the U.S. as a result of the G&A cuts cost six to seven days of DSOs.  It expects a rapid snap back on this line.

B. Alex Henderson, Prudential Securities, <u>XRX: Xerox Accelerating Cost Cutting Beyond Restructuring – Reiterating Strong</u> IRX-PROD-0000264, IRX-PROD-0000268 (Mar. 2, 1999) (Goldstein Decl. Ex. 38).  On March 15, 1999, Runkle issued a report stating:

> Xerox's A/R balance increased 25% year-over-year, to $2.7 billion.  The receivables ballooned as Xerox attempted to restructure several operations in the U.S.  The reorganization and reorientation of business units (from geographical to customer-focused) led to the disruption in billing cycle productivity.  Once again, management remains committed to reducing receivable levels back to those found in 1997 by year-end 1999.

Rebecca Runkle, Morgan Stanley Dean Witter, <u>Xerox (XRX): Preliminary Update on Year-End Balance Sheet and Cash Flow Items</u> MS00054, MS00055 (Mar. 15, 1999) (Goldstein Decl. Ex. 39).

In its Form 10-K for 1998, dated March 22, 1999, Xerox disclosed: "Accounts receivable growth reflects strong equipment sales in 1998 and some increase in days sales outstanding due to temporary effects from the reorganization and consolidation of U.S. customer administrative centers."  Xerox Corp., <u>Annual Report (Form 10-K)</u> 53 (Mar. 22, 1999) (Goldstein Decl. Ex. 40).

On April 19, 1999, the Center for Financial Research and Analysis ("CFRA") issued a report stating that Xerox was experiencing "Rapid Receivables Growth."  Ctr. for Financial Research & Analysis, Inc., <u>CFRA Company Report: Xerox Corporation</u> IRX-PROD-0060214 (Apr. 19, 1999) (Goldstein Decl. Ex. 41).  The

CFRA report identified "[s]igns of possible operational deterioration for XRX during 1998 includ[ing] a surge in receivables and inventory relative to revenue and a growing operating cash flow shortfall."  Id.  It also reported that Xerox "attributed the December-to-December DSO increase to temporary effects from the reorganization and consolidation of U.S. customer administrative centers."  Id.

In a press release dated April 22, 1999, Thoman stated "Although we are pleased that we achieved earnings growth of 14 percent, our revenue performance in the quarter was clearly disappointing but not indicative of our expectations for the full year."  Press Release, Xerox Corp., Xerox Earnings Up 14 Percent in First Quarter: Tenth Consecutive Quarter of Double-Digit Operating Earnings Growth IRX-PROD-0060120 (Apr. 22, 1999) (Levine Decl. Ex. 45).  He stated "'The turmoil in Brazil and the economic slowdown in other Latin American countries, combined with several operational factors in the U.S. and Europe, depressed our first quarter revenues.'"  Id. (quoting Rick Thoman, Xerox President and Chief Executive Officer).  He further stated:

> "The initiatives we announced in January to provide industry-oriented global document solutions for major customers required substantial one-time investments, including enhanced sales training and development, and some changes in customer relationships, which impacted first quarter sales productivity more than anticipated" . . . "We are very confident that revenue growth will improve as the year progresses."

Id. (quoting Rick Thoman).  In discussing Xerox's operating profit margin, the press release stated that "The operating profit margin of 12.8 percent in the quarter represented a 1.1 percentage point improvement."  Id. at IRX-PROD-0060121. Thoman further stated that "The operating margin improvement reflects the benefits of our restructuring program . . ."  Id.  When discussing headcount in connection with the Worldwide Restructuring, the press release stated that "1,000 employees left the company in the first quarter, bringing the total to 6,400."  Id.

During an April 22, 1999 earnings release teleconference for the first quarter of 1999 Romeril stated: "I would encourage you to focus on the total growth of service, outsourcing and rental, rather than the constituent parts, as looking at the total, avoids the possibility of misinterpretation about any constituent part where substitution may have been an important driver in any year-over-year comparison."  Barry Romeril, Xerox Corporation First Quarter Earnings Release Teleconference 7:15-21 (Apr. 22, 1999) (Levine Decl. Ex. 46).  He further stated:

> Overall, for the shortfall in revenues, versus expectations was very much a known goal.  If we didn't quite shoot ourselves in the foot, we certainly hit several toes.  Activity rather than price was therefore the real culprit.  And we are confident that there will be a significant rebound in the coming months.

Id. at 10:12-19.  In discussing headcount changes associated with the Worldwide Restructuring, Romeril stated: "In connection with the restructuring program, 1,000 employees left the company during the first quarter, bringing the total to 6,400 since the program was announced." Id. at 11:24-12:3.  During the teleconference, Henderson asked, "So you're really characterizing the miss here in the revenues in the first quarter as a one-time event.  And you are going to snap back fully in the second quarter." Id. at 19:6-10.  Romeril responded: "We're going to come back Alex, significantly.  And we're going to see the sort of number – you gave us a nice range.  I'm not sure that I want to get into forecasting precise numbers. But it will be a significant rebound." Id. at 19:11-16.  Later, Runkle asked: "Is it fair to expect that the DSO's in the inventory balances net net still going to take another I would say two quarters or so to really normalize back down to levels that you're happy with?" Id. at 21:19-23.  Romeril answered "Yes" and stated that "The run rate we should be significantly better as we exit the year than we were last year.  And I mean significantly.  It's the path there that you know, is not a necessarily a smooth one everywhere around the world." Id. at 21:24-22:4.

On April 23, 1999, Lehman Brothers reported:

Xerox does not expect to have any significant share repurchases in 1999, given what it would take to have a meaningful impact on EPS.  The company instead will focus on cash flow generation, which was weak in 1998.  The

34

company did not provide preliminary balance sheet data,
but acknowledged that there was little improvement in
receivables and inventories in the quarter.  Working
capital remains a priority for the company, although it
may be another quarter or two before there is meaningful
improvement in DSOs and inventories.

Lehman Bros., <u>Xerox: Renewed Focus on Top Line; We Regard 1Q Slip</u>

<u>As Temporary</u> IRX-PROD-0000454 (Apr. 23, 1999) (Goldstein Decl.

Ex. 42).

On April 23, 1999, Milunovich of Merrill Lynch issued a

report stating:

> Xerox's revenue growth was hurt by sales force and
> restructuring initiatives, a self-inflected [sic] wound.
> Xerox is moving to an industry solutions approach similar
> to IBM's, so spent time on sales force training, which
> reduced their time spent with customers.  Some sales
> people spent almost half their time away from customers.
> In Europe, management spent time complying with pan-
> European regulations while in-country facility
> consolidations also hurt customer focus.
> . . .
> The company estimates that it can reduce inventories by
> $300-400 million (no write-offs) and improve DSOs through
> faster collections.  The company expects DSOs to improve
> by year-end.

Steven Milunovich, Merrill Lynch, <u>Xerox Corporation: Revenue</u>

<u>Challenged</u> 2 (Apr. 23, 1999) (Goldstein Decl. Ex. 75).

On April 27, 1999, *Investor's Business Daily* reported that

Rick Thoman, Xerox's chief executive said "'We had salespeople

away from customers more than we should have . . . . But we

should see benefits going forward.'"  Michael Lyster, <u>Digital</u>

<u>Copiers:  Xerox Ticket to Networking Service Plans</u>,

Investor's Bus. Daily, Apr. 27, 1999, at A6, IRX-PROD-0050433
(quoting Rick Thoman) (Goldstein Decl. Ex. 43).  The article also
states: "Thoman blames the [revenue] drop on Xerox's ongoing
restructuring and the realignment of its sales force.  Financial
trouble in Brazil, a key market, didn't help either."  Id.

On April 27, 1999, *The Wall Street Journal* reported that
"Xerox has reorganized its 14,000-person sales force away from
geographical coverage toward coverage of specific industries. . .
.  Xerox said last week that sales retraining was part of the
reason its first-quarter earnings were disappointing."  Alec
Klein, Xerox Reorganizes Sales Force in Push to Bundle Services
to Corporate Clients, Wall St. J., Apr. 27, 1999, at B15, IRX-
PROD-0050431 (Levine Decl. Ex. 49).

On May 6, 1999, Stephen Weber, a securities analyst with SG
Cowen Securities Inc., issued a report stating that Xerox's
"revenues grew just 3% . . .  in Q1, owing to extra sales
training (i.e., time not on the street) and organizational
dislocations, both in the U.S. and Europe." Steven Weber, SG
Cowen, Xerox Corporation: The Tenets of This Growth Story Very
Much Intact IRX-PROD-0012720 (May 6, 1999) (Goldstein Decl. Ex.
44).  The report also states that "[a]s Q1's disrupting factors
abate, we think revenue growth will accelerate markedly."  Id.

On May 14, 1999, Xerox hosted its annual Investors
Conference which was attended by Henderson of Prudential

Securities, Ben Reitzes of PaineWebber, Weber of SG Cowen, Jerry
Hersch from MTD, Steven Raphael from RBC Dominion Securities,
Jack Kelly from Goldman Sachs, Milunovich from Merrill Lynch,
Flay Lewis from Compton Capital, John Rosenthal from Salomon
Smith Barney, Pete Enderlin from FAC\Equities, Ted Kuntz from
Needham, Runkle from Morgan Stanley, Peter Boyson from Lazard
Asset Management and Fred Weiss from Pell Rudman.  See Barry
Romeril, Xerox Corporation Investor Conference 134:18-19,
140:22-23, 147:16-17, 152:22-23, 154:25-155:1, 156:8-9, 159:3-4,
161:6-7, 164:5-6, 175:19-20, 180:18, 186:22-23, 196:16-17,
200:5-6 (May 14, 1999) (Goldstein Decl. Ex. 45).  Romeril stated
the following:

> But 1998 cash generation was clearly unsatisfactory. And
> it was principally caused by a deterioration in
> receivables, in day sales outstanding and our inventory
> performance. The growth in accounts receivable was
> primarily the result of the reorganization and
> restructuring in our US administrative support
> activities. We closed one customer admin center and we
> reorganized the remaining three admin centers from a
> geographic to a customer segment basis. Much along the
> lines that we're doing for the business as a whole. And
> frankly, we reduced the headcount as we did that at too
> fast a rate. And it was too much change, too fast, but
> the problem is being addressed, and you will certainly
> see improvements as we go through 1999.

Id. at 122:23-123:15.  At the same conference, Thoman stated:

> [T]here was no question that we had, as we rolled out our
> G&A program, individual areas where we caused some lack
> of focus on our sales force because of our G&A
> activities.  For example, we talked about our Chicago
> center. Unquestionably that had some impact on our sales
> force.  They had to worry about the billing being done
> correctly.  In Paris for example, we literally moved

everybody, everybody moved their office. And that takes
as you know when you do that it takes about a month to
settle down those of you who've done that. I suspect a
lot of you in this room have.

And then the last thing is sales productivity. Part of
which was affected by the G&A activity, but most of it
really was the fact that we let people plan their own
training programs, and other things. And we didn't get
enough feet on the street focused in front of customers.

Id. at 136:24-137:19.

The plaintiffs highlight that Romeril edited one portion of

his notes for the conference.   That portion of his notes

originally read:

There were actually two similar problems that impacted
the sales force:
- Too much time in training
- Too much time fixing customer problems because of our
consolidation of admin centers
That translated into a 5 percent sales productivity hit
in the first quarter, we wouldn't be having this
conversation.  So the real question is: Can we get that
back on track and the answer is yes.

Remarks for Rick Thoman  IRX-PROD-0056273  (May 14, 1999) (Levine

Decl. Ex. 57).   After the edits that portion of his notes read:

There were actually problem that impacted the sales
force.  The key was too little sales time in front of
customers, eg.
- Too much time in training
That translated into a 5 Percent sales productivity hit.
If we hadn't had a 5 percent sales productivity hit in
the first quarter, we wouldn't be having this
conversation.  So the real question is: Can we get that
back on track and we think the answer is yes.

Id.

In its Form 10-Q for the first quarter of 1999, filed with

the SEC on May 14, 1999, Xerox stated:

> (a)  First quarter revenue growth in both the U.S. and
>       Europe was disappointing, slowing significantly
>       from prior quarters due to substantial one-time
>       investments, including enhanced sales training and
>       development, and some changes in customer
>       relationships, associated with the initiatives
>       announced in January 1999 to provide
>       industry-oriented global document solutions for
>       major customers.  These initiatives temporarily
>       reduced sales time with customers and impacted
>       sales productivity more than anticipated.

Xerox Corp., Form 10-Q: Quarterly Report 13 (May 14, 1999)

(Goldstein Decl. Ex. 26).

> (b)  "Income from continuing operations increased 14 percent
>       to $343 million in the 1999 first quarter from $301 in
>       the 1998 first quarter. The increase was primarily due
>       to improved operating margins that reflected ongoing
>       benefits from the company's worldwide restructuring
>       program . . . ."

Id. at 12.

> (c)  "Selling, administrative and general expenses (SAG)
>       declined 2 percent in the 1999 first quarter from the
>       1998 first quarter driven by a substantial decline in
>       general and administrative expenses reflecting the
>       benefits of our 1998 restructuring program . . . ."

Id. at 16.

> (d)  "On April 7, 1998, we announced a worldwide
>       restructuring program associated with enhancing our
>       competitive position and lowering our overall cost
>       structure . . . .  There have been no material changes
>       to the program since its announcement in April 1998"

Id. at 16-17.

On May 17, 1999, Runkle issued a report stating "the US and
Europe each fell short by about $75-80 million due to low sales
productivity and the consolidation of Xerox's administration

efforts.  Management believes these were one-time issues and that

the company will get back on its growth track going forward —--

with material improvement in the second quarter."  Rebecca

Runkle, Morgan Stanley Dean Witter, <u>Xerox (XRX): Annual Investor</u>

<u>Meeting Review</u> IRX-PROD-0000675 (May 17, 1999) (Goldstein Decl.

Ex. 46).  Also on May 17, 1999, Enderlin of FAC\Equities

reported:

> About $150 million-$160 million of the revenue miss of
> 1Q99 occurred in the U.S. and Europe, primarily due to
> diversion  of  the  sales  force  for  training  and
> restructuring.  Xerox will now re-emphasize the customer
> interface, and the effects of the restructuring should
> diminish.  Management also said that the weakness at the
> low  end  of  the  digital  color  copier/printer  market
> resulted from a lag in new product development, which has
> now been partially addressed with the introduction of the
> very successful NC60 color laser printer.
> Absent  the  factors  that  temporarily  depressed  revenue
> growth in 1Q99 in management's view, Xerox believes it
> can resume double-digit revenue growth on a pre-currency
> basis, given a reasonable economic environment.

Pete Enderlin, FAC\Equities, <u>XRX -- Xerox Projects Double-Digit</u>

<u>Revenue Growth</u> IRX-PROD-000666 (May 17, 1999)(Goldstein Decl. Ex.

76).

On May 17, 1999, CIBC World Markets issued an analyst report

recommending Xerox stock with a "Strong Buy" rating, stating that

cash flow in 1999 was expected to rebound to 1997 levels, one of

two topics the author found "encouraging."  Rudolf A. Hokanson,

CIBC World Markets, <u>XRX Holds Investor Meeting, Raising Target to</u>

<u>$82 Per Share</u> IRX-PROD-0097419 (May 17, 1999) (Levine Decl. Ex.

61).  On May 26, 1999, Runkle of Morgan Stanley reported:

Further Insight into the March Quarter.

Management started off the meeting with more details about its first-quarter performance. Brazil's economy and recent devaluation hurt revenue growth by about 4 percentage points. In addition, management now believes it had about $40 million in excess inventory that hurt the Channels Group performance in the period. Finally, the US and Europe each fell short by about $75-80 million due to low sales productivity and the consolidation of Xerox's administration efforts.

Management believes these were one-time issues and that the company will get back on its growth track, with material improvement in the second quarter.

Rebecca Runkle, Morgan Stanley Dean Witter, <u>Xerox (XRX): Annualy Investor's Meeting Review</u> MS00107 (May 26, 1999) (Goldstein Decl. Ex. 47).

On June 1, 1999, Romeril met with Jonathan Rosenzweig of Salomon Smith Barney. <u>See</u> Notes of Leslie F. Varon IRX-PROD-0060244 - 47 (June 1, 1999) (Varon Aff. Ex. F). Romeril (who is identified as "BDR") stated that Xerox "took out too many admin people-didn't heed warning signs." <u>Id.</u> at IRX-PROD-0060244. Romeril also explained that Xerox was "[h]iring back with good payback over time (about 150 people)," and that it did not expect to see improvement in cash flow until the second half of 1999. <u>Id.</u> In that meeting, Romeril also discussed the status of the Worldwide Restructuring efforts in the United States, Canada and Europe. <u>Id.</u> at IRX-PROD-0060245.

On June 2, 1999, Rosenzweig issued a report stating:

(3) RESTRUCTURING HAS LONG WAY TO GO. Most of the restructuring appears to be complete in North America,

including facilities and workforce reductions.  However,
Europe requires more focus. . . . [C]ost savings should
really begin to accumulate after 1999 as investments in
the pan-European infrastructure start to pay off.  New
workforce reductions in Europe so far have been minimal
and probably will be until early 2000.  At that point,
savings really begin to accumulate.  In its total
restructuring, we estimate that Xerox is eliminating
11,000 positions gross, partially offset by 2,000 new
hires.

(4) CASH FLOW OUTLOOK SOLID FOR SECOND HALF.  While the
second quarter could be seasonally weak, management
expects cash flow to improve dramatically in the second
half of the year.  The company has added back 150 people
in the U.S. customer administrative centers, where it had
become too thin in an effort to improve inventories and
receivables quickly.  In Europe, the focus is on reducing
the absolute DSO figure given how high it is relative to
domestic levels.

Rosenzweig & Kalinowski, Salomon Smith Barney, <u>XRX: Introducing

Fortune 500 Survey and Mtg. w/ Mgmt.</u> IRX-PROD-0099513 (June 2,

1999) (Goldstein Decl. Ex. 48); <u>see also</u> Rosenzweig & Kalinowski,

Salomon Smith Barney, <u>XRX: Introducing Fortune 500 Survey and mtg

w/ Mgmt. Part 2</u> 2 (June 4, 1999) (Goldstein Decl. Ex. 50).

   On June 3, 1999, Romeril spoke at the Prudential Imaging

Technology Conference.  He stated:

1998 cash generation was clearly unsatisfactory,
principally caused by deterioration in our receivables
and inventory performance.  The growth in accounts
receivable is primarily the result of the reorganization
and restructuring of our U.S. administrative support
activities, where we closed one customer administration
center and reorganized the remaining three customer
administration centers from a geographic to a customer-
segment basis, much along the line as we're doing for the
business as a whole.

Frankly, we reduced headcount in this function by 30
percent, too much change, too fast.  This problem has

been addressed, and you will see improvement [as] we go
thru '99.

Barry Romeril, Xerox Vice Chairman & CFO, Remarks at Prudential

Imaging Technology Conference IRX-PROD-0027213 - 14 (June 3,

1999) (Goldstein Decl. Ex. 49).

On June 4, 1999, Romeril told Ben Reitzes of PaineWebber

that the United States had experienced a training and

administrative disruption as a result of the CBO Reorganization

and that DSO had increased by about 10 days.  Notes from the

meeting also state: "[b]y end '99/Q1 '00 will get to '97 yrend

DSO.  Will begin Q3" and "[c]urrently hiring/training admin

people to fix. Lots of sr. mgt focus."  Notes of Leslie F. Varon

IRX-PROD-0060223 (June 4, 1999) (Varon Aff. Ex. G).

On June 7, 1999, Reitzes issued a report stating:

- Xerox's sales force is responding as planned, after
  an intensive training program and reorganization in
  1Q 1999. Distractions from restructuring appear to
  be on the decline, in both the U.S. and Europe.
- Mr. Romeril demonstrated the strongest conviction
  we have seen to date in Xerox's ability to improve
  DSO's and inventories, improving cash flow by at
  least $500 - $600 million by year-end 1999 . . . .
                        . . .
- All in all, the meeting eased many of our concerns
  and we continue to believe that XRX is positioned
  for a strong second half 1999 performance.

Ben Reitzes, PaineWebber, <u>XEROX: Meeting With CFO Eases Many of

Our Concerns</u> IRX-PROD-0000313 (June 7, 1999) (Goldstein Decl. Ex.

51).  He further stated: "Xerox's sales force intensity is

improving on plan, after an intensive training program and

reorganization in 1Q 1999.  In addition, distractions from restructuring appear to be on the decline . . . ." Id. at IRX-PROD-0000315.  Reitzes also reported on the impact of the CBO Reorganization program on the company's receivables in the fourth quarter of 1998 and the first quarter of 1999:

> It appears [sic] that Xerox's restructuring program in the US had quite an adverse effect on the company's receivables in 4Q 1998 and 1Q 19[99]. In the second half of 1998, XRX reduced its US administrative centers to 3 from 4 previously, reducing administration headcount by 30% in the process.  The 3 administrative centers were reorganized to specialize on General Markets (channel, agent, concessionaire and tele-web sales), the public sector and other (direct sales force included). As a result of the significant disruption from moving and layoffs, the company's order and invoicing processes experienced significant delays and even errors, pushing up receivables. In fact, XRX is now in the process of re-hiring some laid off personnel in an effort to improve the order process at the 3 new administration centers.

Id.  The report also states that "[i]mprovements are already underway and Xerox expects significant improvement in receivables by second half 1999." Id.

On June 8, 1999, Romeril met with Milunovich of Merrill Lynch.  Notes from that meeting read:

> US DSO deteriorated 9-10 days in Q3/Q4 '98.  Discussed 4 cust admin changes.  Have added resources – need about 2 mo. training, some sys enablers delayed to 2nd half (automating order checking).  Hope to stabilize DSO in US in Q2 + back/almost back to '97 levels by Q4.  Will capture about $400 m.  Have changed Euro sequencing to avoid repeating these issues.

Notes of Leslie F. Varon IRX-PROD-0060241 (June 8, 1999) (Varon Aff. Ex. H).

On June 9, 1999, Merrill Lynch reported that "[t]he cash conversion cycle is under intense scrutiny," that "[m]anagement thinks it can reduce inventories by $300-400 million" for both 1999 and 2000, that "[r]eceivables could also improve by about $400 million," and that "[c]ash flow improvements should put share repurchases back on the radar screen early next year." Steven Milunovich, Merrill Lynch IRX-PROD-0051058 (June 9, 1999) (Goldstein Decl. Ex. 52).

On June 9, 1999, Reitzes of PaineWebber reported:

It appears that Xerox's restructuring program in the U.S. had quite an adverse effect on the company's receivables in fourth quarter 1998 and first quarter 199[9]. In the second half of 1998, the company reduced the number of its U.S. administrative centers to three from four, reducing administration headcount by 30% in the process. The three administrative centers were reorganized to concentrate on general markets (channel, agent, concessionaire and teleweb sales), the public sector and other (direct sales force included). As a result of the significant disruption from moving and layoffs, the company's order and invoicing processes experienced significant delays and even errors, pushing up receivables. In fact, Xerox is now in the process of rehiring some laid-off personnel in an effort to improve the order process at the three new administration centers. Programs are already under way and management expects significant improvement in receivables by second half 1999.

Benjamin Reitzes, PaineWebber, Xerox Corporation: Meeting with CFO Eases Many of Our Concerns 2 (June 9, 1999) (Goldstein Decl. Ex. 53).

On June 28, 1999, Henderson of Prudential Securities issued a report based on Romeril's remarks at the June 3, 1999 Prudential Imaging Technology Conference.  Henderson reported:

> The two items here that I want to concentrate on are inventories and receivables, which is where the disappointment in 1998 came.  The difference between our inventory and receivables performance in 1998 over 1997 is, in order of magnitude, $700 or $800 million.  In other words, if we'd achieved the levels of inventory in 1998 which we achieved in 1997, than we would have been $700-$800 better.
>
> There were a number of reasons, mostly self induced, why this occurred.  On the receivables side, we cut back too fast and too many in the administrative side as we restructured in the United States.  And on the inventory side, we over forecast the demand.
>
> The good news is that I can assure you that we have initiated an aggressive working capital improvement program.  It is our intention to exit this year at 1997 levels in terms of the Cash Conversion Cycle (days sales outstanding plus days sales inventory less days payable).  If we do that, we will achieve in 1999 the sort of cash flow performance on the working capital line that you saw in 1997.  Therefore, our cash flow should get back to the $1 billion level.
>
> This is a turn around that management is focused on.  I personally have a lot of focus in this area.  And although you didn't see any progress in this in the 1Q (there won't be much, if any, in the second quarter), by the end of the year, we have most of the programs in place today and this will yield the cash flow performance in the order of magnitude similar to what you saw in 1997.  And the momentum will be to get the inventory turns up to produce an even better performance next year.

B. Alex Henderson, Prudential Securities, <u>Xerox Delivers Upbeat</u>

<u>Presentation At Prudential Securities' 2nd Annual Imaging</u>

Technology Conference AS- PROD-00309 (June 28, 1999) (Goldstein
Decl. Ex. 54).

On July 1, 1999, Henderson reported: "No Distractions-No
Excuses.  Xerox cited a laundry list of distractions which
encumbered the sales force in 1Q. Many sales offices were closed
or moved as a result of the restructuring.  Salespeople were
distracted by too many training programs."  B. Alex Henderson,
Prudential Securities, XRX: We Expect XRX to Report at Least the
First Call Consensus and Believe a Strong 2Q Could Lift Shares
Higher IRX-PROD-0011190 (July 1, 1999) (Goldstein Decl. Ex. 55).
Henderson also reported, though, that "Management sent out an
edict to the sales force to double face time with clients, and we
think this will deliver better revenue growth in 2Q."  Id. at
0011190.  Henderson reported Xerox's belief that the
"stabilization of [its] back office" would contribute to "a
fairly sharp rebound in the top line."  Id. at IRX-PROD-0011192.
Henderson further reported:

> In an effort to compensate for the difficult operating
> environment in Brazil during the quarter, management
> accelerated consolidation of branches and, at the same
> time, moved forward in at least one critical region with
> the relocation of a major office.  Management believes
> the distraction of this activity contributed to the
> decline in salesforce productivity.  With the back office
> stabilized, and the early-year training done, management
> believes the salesforce should quickly pick up momentum.

Id. at 0011192.  The report also states: "The stabilization and
recovery of Brazil, stabilization of back-office operations, and

the cessation of salesforce training cost which caused roughly a
5% 1Q decline in salesforce productivity should drive a fairly
sharp rebound in the top line." Id.

On July 22, 1999, Xerox held a teleconference with analysts
concerning second quarter 1999 earnings.  Romeril stated:

(a)  Now second quarter earnings per share increased by
15 percent to 62 cents a share and income increased
13 percent to $448 million before last year's
restructuring charge.  The earnings increase
reflects improved revenue growth, particularly in
the United States and Europe, and ongoing benefits
from our worldwide restructuring program . . . .

Barry Romeril, Xerox Corporation Second Quarter Earnings Release
Teleconference 3:23-4:6 (July 22, 1999) (Levine Decl. Ex. 72).

(b)  SG&A expenses declined 2 percent in the quarter, driven
by a substantial decline in G&A, the general and admin
expense category, and that reflected the benefits of
our 1998 restructuring program . . . .

Id. at 11:14-19.

(c)  Our restructuring provision provides for large savings
and the significant proportion of which we have to
reinvest in the first year of two to enable those
savings. Particularly in Europe, as we centralized our
front and back office operations.

Id. at 12:10-16.

(d)  [O]ur SG&A commitments as a percentage of revenue are
not in question.

Id. at 12:22-23.

(e)  With receivables, we have had to work through the
bow wave of U.S. customer administration
dislocation, and we are now looking forward to
substantial improvements in the coming months in
the United States, to complement the improvement

> that we have already seen in the second quarter in
> Europe.

Id. at 15:5-11.

During the question and answer portion of the teleconference,

Romeril also stated:

> In the receivables side, it's still turning.  The bow
> wave took longer to get to stabilization, but I have
> reviewed this recently and we will be looking for a very
> considerable [decrease] in day sales outstanding, in the
> remaining part of this year. The plans are in place, the
> people to the extent there was a resources issue, are in
> place.  There are incentives to do it, and we just are
> better placed and much more focused in that area.

Id. at 24:6-17.  In talking about the restructuring in Europe,

Romeril stated: "We're a little more cautionary how we've gone

about some of the customer admin things there to make sure we

don't repeat any of the United States experiences, but I would

say that is not significant."  Id. at 31:5-11.

On July 22, 1999, Xerox issued a press release which

announced financial results for Xerox's second quarter ended June

30, 1999.  The press release stated:

> (a)   Xerox Corporation's second quarter diluted earnings
>        per share increased 15 percent to 62 cents and
>        income increased 13 percent to $448 million, before
>        last year's restructuring change.  The earnings
>        increase reflects improved revenue growth,
>        particularly in the United States and Europe, and
>        ongoing benefits from the company's worldwide
>        restructuring program . . . .

Press Release, Xerox Corp., Xerox Earnings Up 15 Percent in

Second Quarter: Significant Revenue Growth Improvement in U.S.

<u>and Europe</u> IRX-PROD-0010509 (July 22, 1999) (Levine Decl. Ex. 71).

      (b)    [Thoman said] While we remain focused on improving pre-currency revenue growth and achieving mid- to high teens earnings-per-share growth, any continuation of the current weak European exchange rates together with ongoing weakness in Brazil and Japan, make this earnings growth a much more challenging objective for the remainder of the year. . . .

              Longer term, our growth will be driven by our expanding product, document outsourcing and solutions offerings as well as indirect distribution channels, and by realizing the ongoing benefits of the restructuring program . . . .

<u>Id.</u> at IRX-PROD-0010510.

      (c)    Income increased 13 percent to $448 million in the 1999 second quarter from $395 million in the 1998 second quarter, before the 1998 worldwide restructuring program charge of $1,107 million. The increase reflects improved revenue growth, particularly in the United States and Europe, and ongoing benefits from the company's worldwide restructuring program. . . .

                    . . .

              Diluted earnings per share increased 15 percent to $0.62 in the 1999 second quarter from $0.54 in the 1998 second quarter, before the 1998 restructuring charge.

<u>Id.</u> at IRX-PROD-0010514.

      (d)    [SAG] declined 2 percent in the 1999 second quarter from the 1998 second quarter driven by a substantial decline in general and administrative expenses reflecting the benefits of our 1998 restructuring program . . . .

<u>Id.</u> at IRX-PROD-0010515.

Xerox's Form 10-Q for the Second Quarter of 1999, filed with the SEC on August 11, 1999, included the following statements:

(a) Income increased 13 percent to $448 million in the 1999 second quarter from $395 million in the 1998 second quarter, before the 1998 worldwide restructuring program charge of $1,107 million. The increase reflects improved revenue growth, particularly in the United States and Europe, and ongoing benefits from the company's worldwide restructuring program.

Xerox Corp., Form 10-Q: Quarterly Report 11-12 (Aug. 11, 1999) (Levine Decl. Ex. 76).

(b) Selling, administrative and general expenses (SAG) declined 2 percent in the 1999 second quarter from the 1998 second quarter and 2 percent in the 1999 first half from the 1998 first half driven by a substantial decline in general and administrative expenses reflecting the benefits of our 1998 restructuring program, our continued focus on productivity and expense controls to mitigate the impact of the economic turmoil in Brazil . . . .

Id. at 15.

On August 13, 1999, Rosenzweig of Salomon Smith Barney reported:

Accounts receivable also seemed to be an area of concern. The figure rose by 21% year-to-year and 5% sequentially from Q1.  While disappointing, this should not have come as too much of a surprise, since management has indicated repeatedly that receivables would start to come down more in the second half than the first.  The company is adding over 100 people back to its customer admin centers, in part to help bolster collections efforts, which were damaged by headcount reductions during the restructuring. This will be an important issue to monitor for improvement in Q3 and Q4.

Rosenzweig & Kalinowski, Salomon Smith Barney, <u>XRX: Comments on the 10Q</u> IRX-PROD-0010522 (Aug. 13, 1999) (Goldstein Decl. Ex. 56).

Notes from an August 16, 1999 meeting between Romeril and Rosenzweig state: "[b]y Q4, [we] hope DSO is at/slightly better than a [year] ago--w[ith] signif[icant] momentum going into 2000/2001." Notes of Leslie F. Varon IRX-PROD-0059675 (Aug. 16, 1999) (Varon Aff. Ex. I); <u>see also</u> Varon Aff. ¶ 11.  On the same day, under the heading "Cash Flow Should Improve in Second Half," Rosenzweig reported:

> Accounts receivable rose dramatically in the second quarter, largely due to the U.S. operations. DSOs, which were up by 20% year-over-year in Q2, should start coming down sequentially in the third quarter, as new hires in collections begin to take hold.  By the end of 1999, DSOs actually could be even or down versus last year, and by 2000, the average could approximate 1997 levels.

Rosenzweig & Kalinowski, Salomon Smith Barney, <u>XRX: Upbeat Conversation with Management</u> IRX-PROD-0000175 (Aug. 16, 1999) (Goldstein Decl. Ex. 57).

On August 16, 1999, Weber authored a report stating: "Revenue growth rebounded to 4% in constant currency terms in Q2 (+7% ex Brazil), as Q1's disruptive factors - extra training, reorganizations, channel inventory adjustments - abated and the growth in recurring revenue accelerated by a full point to 4%." Stephen R. Weber, SG Cowen, <u>Growth Prospects Still Terrific; Stock Very Undervalued</u> 5 (Aug. 16, 1999) (Goldstein Decl. Ex.

72).  On the same page, the report also states in the margins "Overcoming Major Obstacles" and "Should be back on track."  Id.

On August 18, 1999, Romeril met with Henderson of Prudential Securities.  Notes from that meeting read:

> Impact of Q1 sls disruption gradually fading?
> -    Impact is gradually fading
> -    Admin disruption impact on sls force (billing
>      queries)
> -    Will manifest itself on rev growth + DSO
> -    Not using sls force to reign in DSO? No
> -    Puts pressure on overhead costs - yes, but
>      offset in other areas.

Notes of Leslie F. Varon IRX-PROD-0059676 (Aug. 18, 1999) (Varon Aff. Ex. J).

The plaintiffs assert that there were two corrective disclosures.  The first corrective disclosure they identify is a September 16, 1999 report by Henderson, a Prudential Securities analyst.  Under the heading "Xerox to Implement Another Round of Salesforce Realignments in 1Q00-Lowers Revenue Visibility and Likely to Pressure XRX Until Impact can be Determined" the report states:

> Our field contacts are indicating that Xerox is readying another round of salesforce account realignment similar to the program which disrupted the first half 1999 revenue performance.  We confronted Xerox's management and they acknowledged that another round is planned for 1Q 2000 and indicated the number of people involved and accounts involved would be larger than the 1Q 1999 realignment which was cited as a large portion of the cause for the 1H 1999 revenue shortfall.  Xerox's management must be cognizant of the painful experience they had last year, and they are indicating they are taking every possible step to minimize any disruption from this move.  While we believe this program is the

correct one for Xerox over the long-term, the history of salesforce compensation [and] account realignments has been one of consistent disruption. We believe this issue will cause considerable investor concern over the next several quarters until the impact size and impact can be quantified.

Extending The Current Uncertainty Into 2000- This Is The Last Thing Xerox's Battered And Weary Shareholders' Need. We believe investors deserve adequate forewarning of changes in the salesforce structure since this has historically caused material perturbations in Xerox's revenues and earnings. In fact, its [sic] rare for companies in this industry to materially alter compensation or sales coverage without missing the revenue/earnings expectations.

. . .

Can't Afford More Problems-Management Should Know They Need to Deliver. We seriously doubt the impact of a new sales realignment program will be as disruptive as last years [sic].

-First, the restructuring program has advanced substantially and likely will not compound problems in 2000 the way it did in 1Q99.

. . .

-Third, Xerox claims the disruption last year came primarily from the lack of prospecting at accounts which were being left by the salesforce and they are implementing a program to insure the salespeople being reassigned are incented to continue to work the accounts they are leaving until they actually leave.

A. Henderson, Prudential Securities, <u>XRX: Another Salesforce Realignment Slated for 1Q00 At Xerox</u> IRX-PROD-0000292 - 93 (Sept. 16, 1999) (Goldstein Decl. Ex. 30).

On September 16, 1999, Reuters published an article entitled "Xerox shares tumble amid fresh growth concerns." Eric Auchard,

<u>Xerox Shares Tumble Amid Fresh Growth Concerns</u>, Reuters News, Sept. 16, 1999, 1 (Levine Decl. Ex. 79).  The article stated:

> Shares of Xerox Corp. Fell more than 10 percent on Thursday after an analyst warned that sales-force changes at the No. 1 copier equipment maker could further delay any pickup in its stalled revenue growth.

> Spokesmen for the Stamford, Conn.-based company confirmed that it had announced new sales-force changes internally a week ago, but they said the moves were merely a continuation of restructuring plans Xerox had set in motion in January.

<u>Id.</u>  The article quoted Henderson as stating, "Most people thought they had done the bulk of the sales-force realignment earlier this year."  <u>Id.</u> "'These new moves extend the uncertainty for another six months,' he said, referring to the first half of [2000]."  <u>Id.</u> The article also stated: "'I am not sure that the world was privy to the entire plan in January,' the Xerox spokesman allowed, but said that the scope of the plan had been communicated to company employees.  He said the latest sales changes involved no job cuts."  <u>Id.</u>

On the same day, Dow Jones Business News Reported that "Xerox Shares Tumble On Word Of Plan To Further Realign Sales Force," noting "that the second phase of a sales-force realignment will pressure earnings in the first half of 2000." Dow Jones Business News, <u>Xerox Shares Tumble on Word of Plan to Further Realign Sales Force</u>, Sept. 16, 1999, 1 (Levine Decl. Ex. 81).  It mentioned "that the company made an internal announcement [the preceding] week that it would expand the sales-

55

force realignment it began in January to include all 4,300 sales employees." Id.

Reitzes of PaineWebber issued a report dated September 17, 1999 entitled "Xerox: What Did we Learn That is New?" See Ben Reitzes, PaineWebber, Xerox: What Did We Learn That is New? 1 (Sept. 17, 1999) (Levine Decl. Ex. 85). Under "Key Points," the following were stated:

> Yesterday, concerns surfaced regarding the stability of Xerox's salesforce in the first half of 2000. In early 1999, Xerox announced it would realign its salesforce to focus by industry group (over the course of a few years), including Government, Manufacturing, Financial Services and Graphic Arts. The company has acknowledged that a move to complete this restructuring is slated for January 2000.
>
> What's new are some of the details regarding this reorganization. The investment community had hoped that the 1Q 1999's sales productivity hit of 500 basis points from increased training and administrative issues were the last we had heard of any disruption attributable to reorganization. However, we now know that the large Government industry group is the only sales unit almost fully organized to date- and the manufacturing, financial and graphic arts groups are yet to be formed.
>
>                     . . .
>
> But what is really new since yesterday besides the details above? To be fair, have we forgotten that every office equipment company is restructuring its copier salesforce toward selling digital "solutions"? IKON, Pitney Bowes, Danka and even Canon's own direct sales force are in the midst of transitions- - and unlike IKON, Xerox is doing its reorganization work rather quickly. In fact, do we really know all the fine details of all of these other restructurings? It is likely that if we got ahold of internal memos regarding these restructurings, we would find something that lends uncertainty to the performance of each sales team . . .

Id.

During a September 22, 1999 teleconference with securities analysts that began at 11:30 a.m., Romeril stated:

(a)  As I said at the second quarter earnings teleconference, though I reiterated last week, we are targeting to have somewhat higher revenue growth in the third quarter than the second quarter's pre-currency, pre-Brazil growth, which was 7 percent. You'll recall we reported 3 percent growth, currency was 1 point unfavorable, and Brazil was 3 points unfavorable.  In the third quarter, currency has worsened in continental Europe. I haven't checked today's rates, because it's very volatile, but definitely a weakness in Brazil, and that includes the economic activity there.

Barry Romeril, Xerox Corporation Tektronix Announcement 4:16-5:3 (Sept. 22, 1999) (Goldstein Decl. Ex. 58).

(b)  And that's literally the arithmetic of using two month actuals and one month estimated for the exchange rates.  And we kept Brazil at about 3 points adverse, the same as in the second quarter. So the pre-currency pre-Brazil target was therefore still the eight to eight and a half, nine percent growth.  No change at all to earlier statements, despite several reports to the contrary.  But, as I said, it all hangs, obviously, on the last few weeks of the quarter.  Now regarding the direct sales force, there seems to have been some misconception that we announced a new restructuring of the sales organization, last week.  No such announcement occurred.  The previous week, we had made an internal presentation and communication to U.S. managers.  In fact, we simply took another step implementing the direction we announced last January.  In January, we said we were migrating our direct sales force to an industry and solutions focus over several years, and we announced the first four industry sectors.  Financial services, graphic arts, manufacturing, and the public sector. Building on this announcement, in April of this year, we unveiled the first 17 industry solutions.

> In January next year, we'll complete the alignment of our North American and European sales forces by industry.

Id. at 5:6-6:9.

> (c) What will this mean for the business? In the short term, all customer sales force relationship changes than in an average year. The U.S. is an example of roughly two-thirds of our direct sales force, will be aligned by industry. The rest- it will map around an industry doesn't exist in reasonable proximity- to cover customer, we will continue to cover customers geographically. Of the U.S. sales reps, who have an industry alignment next January, about 80 percent currently have over half their customers in one industry today. In the past, revenue disappointments associated with sales force changes have resulted in part due to a lack of prospecting by the sales rep who's losing a customer account. Therefore, the new sales rep has to both develop customer relations and new prospects. To mitigate a portion of this problem, we're contemplating in the first quarter in 2000, compensation for prospects developed in the fourth quarter, for which business end up being closed in the first quarter of the following year. It is also very clear that we significantly underestimated the revenue impact in the first quarter of this year of all the customer administration changes we made in the USA last year. The amount of customer face time our sales representatives had was substantially curtailed as they dealt with administrative rather than sales issues. And that was in addition to, and compounded by, all the training and communications that we had surrounding the industry and solutions changes. This customer administration problem will obviously and clearly not be repeated in 2000.

Id. at 6:20-8:5 (emphasis added).

At 3:19 p.m. on September 22, 1999, Weber of SG Cowen

reported:

> Investor Concerns Seem Overblown - - Past problems in sales have almost always been associated with changes in

the sales comp plan, not the organization per se.  While
Xerox will be completing shift to an industry-focused
selling model in Q1, we expect no meaningful change in
sales incentives other than to institute a reward for
sales consummated in Q1 that were proposed by the former
sales person in Q4.  Morever, the disruption in Q1:99
caused by extra training and necessary attention in the
U.S. to curing billing glitches should not repeat.  Thus,
given the very easy base for comparison, we are
optimistic re double-digit top-line growth in Q1:2000 and
beyond.

Stephen R. Weber, SG Cowen, <u>XRX/The Acquisition A Solid Move</u> IRX-

PROD-0011066 (Sept. 22, 1999) (Goldstein Decl. Ex. 59).  There

was no specific reference in the report to the Worldwide

Restructuring or the CBO Reorganization.

On September 22, 1999, Moody's Investors Services reported

"The rating agency said that it expects . . . continued

investment requirements and some sales force disruption stemming

from its ongoing restructuring activities commenced in mid 1998."

Press Release, Moody's Investors Serv., <u>Moodys Confirms Credit</u>

<u>Ratings of Xerox Corporation and its Supported Subsidiaries</u>

<u>(Senior at A2)</u> IRX-PROD-0027058 (Sept. 22, 1999) (Goldstein Decl.

Ex. 60).  There was no other reference in the Moody's press

release to the Worldwide Restructuring or the CBO Reorganization.

On October 8, 1999, Xerox announced that it would miss its

projected earnings for the third quarter of 1999.  Press Release,

Xerox Corp., <u>Xerox Announces Preliminary Third Quarter Results</u>,

Business Wire IRX-PROD-0095847 (Oct. 8, 1999) (Goldstein Decl.

Ex. 31).  The press release stated:

Xerox Corporation announced today that it expects to report essentially flat revenues for the third quarter and about a 10-12 percent decline in diluted earnings per share from 53 cents in the 1998 third quarter.

Overall, revenue was weaker than anticipated both in the United States and Europe, particularly in September. The earnings shortfall is a combination of weaker revenues together with unfavorable product mix and increased competitive pressures, which significantly impacted operating margins. Sales productivity was affected by the continued realignment to an industry-oriented approach and in the U.S. by the ongoing impact of the customer administration restructuring. In addition, results in Brazil were hurt by the continuing effects of the currency devaluation and economic weakness. Fuji Xerox results were lower than anticipated.

Id.

F.    **Communications Following the October 8, 1999 Pre-Announcement**

Kunstler of J.P. Morgan issued a report later in the day on

October 8, 1999.  He stated:

Xerox's pre-announcement of a revenue and earnings below expectations and, in the case of earnings, lower than last year is a very big disappointment. Our chagrin is less a function of arithmetic magnitude of the earnings shortfall, and more tied to how badly our confidence has been shaken. Let's take what we know piece by piece.

1.    Brazil is hurting, but we knew this . . .

2.    Fugi Xerox is weaker than anticipated. . . .

3.    Competition is hurting revenues and margins. . . .

4.    Xerox has allowed competition to be more effective by failing to keep its sales force on line. While further realignment of the sales force to comply with Xerox'[s] vertical industry focus was expected, the impact of more tinkering was to be modest and to be felt, if at all, past this last quarter. In fact, the sales force issue in 3Q was not about the realignment per se, but rather, tied

60

> to poor back office support in the wake of administrative centralization instituted a year ago. The sales force was compelled to do the admin work on outstanding orders and shipments, rather than focus their full attention on selling. This just at the time when competitors were starting to get their act together. Taking this a step further, we have to ask ourselves in what kind of mood this puts the sales force. While they are not selling, not only does Xerox suffer the opportunity cost – and judging from 3Q it is immense – but sales people lose out on bonuses, which are tied to performance versus quota.

Daniel Kunstler, J.P. Morgan Securities Inc., Our Disappointment is Bigger Than the 3Q Miss IRX-PROD-001139A - 001139B (Oct. 8, 1999) (Levine Decl. Ex. 92).

On October 11, 1999, Reitzes of PaineWebber issued a research note entitled "XRX: What We Learned & What to Look for Going Forward." Benjamin Reitzes, PaineWebber, XRX: What We Learned & What to Look for Going Forward (Oct. 11, 1999) (Levine Decl. Ex. 93). Under the heading "The Perils of Restructuring Too Much, Too Fast (A Look at Management's Major Moves Since 1998)," he stated:

> FIRST, in April 1998, Xerox announced that it was taking a $1 billion restructuring charge (after-tax). Xerox consolidated its U.S. administration centers from four to three and reorganized them among industry groups and European administrative and customer service operations began to centralize in Ireland. While cost savings began to pour in, the rapid administrative changes caused accounts receivables to balloon by year-end 1998. SECOND, management announced that it was reorganizing the company toward providing industry specific solutions in January 1999, including a salesforce realignment to cater to different industry groups. Investors now know that the only group realigned in 1Q 1999 was the Government sector. In early September 1999, an internal Xerox memo

surfaced stating that the remainder of its salesforce
would be realigned by industry effective January 2000.
It now appears that this memo had a disruptive effect
sooner than anyone had realized.  THIRD, in September
1999, Xerox announced its intention to acquire
Tektronix's Color Printing & Imaging division . . . .

Given the magnitude of Xerox's pending sales misses, we
now fear that the infamous "September salesforce memo"
included or hinted at a pending change of sales force
compensation, not just account realignment.  Friday's
pre-announcement also reveals the destructive effects of
an overly aggressive restructuring program: management
has clearly impaired its ability to monitor and predict
its own business.

Id. at 2.

## G.   Savings Realized as a Result of the Worldwide Restructuring

The plaintiffs contend that although Xerox realized $550

million in savings as a result of the Worldwide Restructuring

during the Class Period, those savings were offset by at least

$775 million in costs caused by the CBO Reorganization during the

Class Period.  Because there were no net savings from the

Worldwide Restructuring, the plaintiffs argue, the defendants'

statements regarding the benefits of the Worldwide Restructuring

were materially misleading.  The defendants contend that the

plaintiffs' analysis with respect to the savings realized as a

result of the Worldwide Restructuring (net of costs caused by the

CBO Reorganization) contains numerous errors, and that there was

$613 million in undisputed Worldwide Restructuring savings during

the Class Period while the total maximum costs caused by the CBO

Reorganization during the Class Period was $154 million dollars.

Thus, the defendants contend, their statements were not just literally true, but entirely accurate and not misleading.

Drawing all inferences in favor of the plaintiffs, the court concludes that Xerox realized savings from the Worldwide Restructuring of $254.5 million during the Class Period, which does not include $63 million in undisputed pre-Class Period savings.

The plaintiffs contend that the court should consider $50 million per quarter as a "conservative sales loss" amount when determining the net benefit realized by Xerox from the Worldwide Restructuring.  This amount appears to be speculative and without support in the record.  As a result, the court does not consider the plaintiffs' figure for sales losses during the Class Period.

The plaintiffs contend that the court should consider $100 million of alleged accounting manipulations occurring during fiscal years 1998 and 1999.  The plaintiffs' claims as to accounting manipulations were the subject of a separate lawsuit and are no part of this case.  Therefore, there should not be any offset for alleged accounting manipulations.

The plaintiffs have submitted the report of their accounting expert Charles R. Drott (the "Drott Report").  See Levine Decl. Ex. 111.  Drott opines as to the amount of adverse restructuring effects resulting from the CBO Reorganization for the fourth

quarter of 1998 and the first and second quarters of 1999.[2]
Drott opines with respect to four categories: inadequate reserves
for uncollectible accounts receivable, inadequate reserves for
uncollectible notes receivable, billing errors and excess DSO
interest.  Drott concludes that, during the Class Period, Xerox
incurred adverse restructuring effects of $49.6 million in
inadequate reserves for uncollectible accounts receivable, $35.6
million in inadequate reserves for uncollectible notes
receivable, $87.8 million in billing errors and $19.5 million in
interest on the increase in DSO, for a total of $192.5 million.

The defendants have submitted a chart prepared by Xerox
employee Patrick Fulford (the "Fulford Chart"), which quantifies
many expenses that are included in the Drott Report for calendar
year 1999.[3] (See Goldstein Decl. Ex. 63.)  The Fulford Chart
includes expenses for accommodations, bad debt/bad notes, higher
general and administrative expenses, billing adjustments, sales
disruption and interest on higher DSO.  The Fulford Chart shows
that during the Class Period Xerox incurred expenses of $10
million for accommodations, $42 million for bad debt/bad notes,
$25 million for higher general and administrative expenses, $15

---

[2] Drott also opined on the amount of such adverse effects for the third
quarter of 1998.  However, the third quarter of 1998 is not part of the Class
Period.

[3] The Fulford Chart includes additional costs incurred during the fourth
quarter of 1999.  However, the fourth quarter of 1999 is not part of the Class
Period.

million for billing adjustments, $32 million for sales disruption and $23 million for interest on DSO, for a total of $147 million.

Together the Fulford Chart and the Drott Report indicate that approximately $339.5 million in expense was incurred during the Class Period as a result of the CBO Reorganization. However, both the Fulford Chart and the Drott Report include estimated amounts for the first and second quarters of 1999. Furthermore, both the Fulford Chart and the Drott Report include amounts for uncollectible bad notes and accounts receivable, billing adjustments and interest on DSO. Therefore, to avoid double-counting expenses with respect to the first half of 1999 that are included in both the Drott Report and the Fulford Chart, the amount of the expense must be decreased by $29 million in bad debts and $15 million in interest on DSO.[4] Therefore, together the Drott Report and the Fulford Chart show a total combined expense of $295.5.

According to the plaintiffs, Xerox recognized an undisputed $550 million in cost savings for the Worldwide Restructuring. Therefore, Xerox had a net cost savings from the Worldwide Restructuring of at least $254.5 million.

---

[4] Because the court draws all inferences in favor of the plaintiffs, it subtracted the lower Fulford Chart expenses rather than the Drott Report expenses in those categories where there was a risk of double-counting.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(a).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).  Rule 56(a) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury.  The court, therefore, may not try issues of fact.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge."  Anderson, 477 U.S. at 255.  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in

66

short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Id. As the Court observed in Anderson: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id. Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment. See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)).  Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence.  "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment." Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (internal quotation marks omitted) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)).  Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which [a] jury could reasonably find for the [nonmovant]." Anderson, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists.  See Celotex Corp., 477 U.S. at 324.  "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact,"

68

<u>Weinstock</u>, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial." <u>Aslanidis v. United States Lines, Inc.</u>, 7 F.3d 1067, 1072 (2d Cir. 1993)(quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." <u>Weinstock</u>, 224 F.3d at 41. If the nonmovant fails to meet this burden, summary judgment should be granted.

### III. DISCUSSION

The plaintiffs claim that the defendants violated Sections 10(b) and 20(a) and Rule 10b-5 of the Exchange Act by misrepresenting the success of the Worldwide Restructuring. The plaintiffs contend that the defendants' statements were materially false and misleading because they claimed the benefits of the Worldwide Restructuring without disclosing problems associated with the CBO Reorganization that negated those benefits. The plaintiffs claim the defendants were required to, but did not, disclose the negative impact of the CBO Reorganization on Xerox's administrative operations in the areas of order processing, billing and collections; the negative impact of the CBO Reorganization on the performance of Xerox's sales

69

force; and the ongoing nature of the problems associated with the CBO Reorganization.[5]

The defendants argue that they are entitled to summary judgment based on the fact that their statements about the Worldwide Restructuring were at all times accurate because the Worldwide Restructuring produced millions of dollars of benefits during the Class Period.  Also, the defendants contend that they had no duty to disclose the operational problems associated with the CBO Reorganization but, despite not having a duty to do so, did fully disclose the allegedly concealed problems.  In addition, the defendants argue that they are entitled to summary judgment because the plaintiffs cannot establish loss causation.

To prevail on a Section 10(b) and Rule 10b-5 claim, the plaintiffs must prove six elements:

(1)  a material misrepresentation (or omission);

(2)  scienter, i.e., a wrongful state of mind;

---

[5] The plaintiffs' damages expert, Professor Anthony Saunders, identified the negative impact on administrative operations as both "[t]he damage to customer relationships from the delayed and inept customer response of the restructured customer administration centers" and "[a]n increase in errors in the billing and order process, resulting in the reduced ability of Xerox to collect receivables in a timely manner."  Anthony Saunders, Expert Report of Professor Anthony Saunders 8 (Oct. 15, 2007) (Levine Decl. Ex. 113).  Professor Saunders identified the negative impact on the performance of Xerox's sales force as an "impaired ability of sales staff to generate revenue due to lower support levels and reduced time in the field."  Id.  Finally, Professor Saunders identified as a category of omitted facts information regarding "[t]he ongoing nature of the problems associated with the reorganization."  Id.

> (3)  a connection with the purchase or sale of a security;
>
> (4)  reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation;
>
> (5)  economic loss; and
>
> (6)  "loss causation," i.e., a causal connection between the material misrepresentation and the loss.

Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341 (2005) (internal citations omitted).

The court concludes that, even if the defendants had a duty to disclose, the plaintiffs cannot show an actionable misrepresentation or omission, and in addition, that the plaintiffs cannot establish loss causation.

**A. Duty to Disclose**

The defendants argue that there is no evidence that their statements about the benefits of the Worldwide Restructuring were false and also that their statements about the benefits of the Worldwide Restructuring did not create a duty to disclose information about the CBO Reorganization.

With respect to the defendants' argument concerning a duty to disclose, "a duty to update opinions and projections may arise if the original opinions or projections have become misleading as

the result of intervening events."   In re Time Warner Inc. Sec.

Litig., 9 F.3d 259, 267 (2d Cir. 1993).

> But a corporation is not required to
> disclose a fact merely because a reasonable
> investor would very much like to know that
> fact. Rather, an omission is actionable under
> the securities laws only when the corporation
> is subject to a duty to disclose the omitted
> facts. As Time Warner pointedly reminds us, we
> have not only emphasized the importance of
> ascertaining a duty to disclose when omissions
> are at issue but have also drawn a distinction
> between the concepts of a duty to disclose and
> materiality. It appears, however, that the
> distinction has meaning only in certain
> contexts. For example, where the issue is
> whether an individual's relationship to
> information imposed upon him a duty to
> disclose, the inquiry as to his duty is quite
> distinct from the inquiry as to the
> information's materiality. On the other hand,
> where the disclosure duty arises from the
> combination of a prior statement and a
> subsequent event, which, if not disclosed,
> renders the prior statement false or
> misleading, the inquiries as to duty and
> materiality coalesce. The undisclosed
> information is material if there is a
> substantial likelihood that the disclosure of
> the omitted fact would have been viewed by the
> reasonable investor as having significantly
> altered the total mix of information
> available. If a reasonable investor would so
> regard the omitted fact, it is difficult to
> imagine a circumstance where the prior
> statement would not be rendered misleading in
> the absence of the disclosure. As Glazer
> makes clear, one circumstance creating a duty
> to disclose arises when disclosure is
> necessary to make prior statements not
> misleading.

Id. at 267-68 (citations ommitted).

The defendants argue that they had no duty to speak out about the CBO Reorganization's problems, even assuming those problems would have been material to investors, because (i) the alleged misstatements refer to the Worldwide Restructuring as a whole, (ii) the defendants never touted the benefits of the CBO Reorganization or any of the other individual initiatives that comprised the Worldwide Restructuring and (iii) there is no evidence that the defendants ever misstated the impact of the Worldwide Restructuring.  The defendants contend that the law is clear that under such circumstances, they had no duty to disclose.  They rely primarily on In re Raytheon Sec. Litig., 157 F. Supp. 2d 131 (D. Mass. 2001), and In re Winn-Dixie Stores, 531 F. Supp. 2d 1334 (M.D. Fla. 2007), and they characterize Raytheon as directly on point.

In Raytheon, the corporate defendant had undertaken "a massive consolidation and cost reduction program" in one of its segments, Raytheon Systems Company ("RSC").  157 F. Supp. 2d at 141.  The plaintiff alleged that, the defendants never disclosed that a "dearth of software engineers was directly attributable to the inhospitable employment climate created by RSC's aggressive and far-reaching consolidation program."  Id. at 142.  "At various times, [the defendants] reported publicly on the progress of RSC's consolidation efforts. . . . What the defendants did not disclose was that the ongoing consolidation was impairing

73

Raytheon's ability to attract and retain new engineers for several important projects." Id. at 149. "At the end of the Class Period, Raytheon disclosed that nearly one-third of the company's 1999 revenue shortfall - approximately $170 million - was attributable to the shortage of engineers." Id. at 142. The court held:

> Here, the statements concerning the success of RSC's consolidation efforts did not give rise to a duty to disclose the ongoing shortage of engineers. Although information about the shortage of engineers may have been interesting marketwise, its omission did not alter the meaning of the defendants' consistent statements that RSC was successfully restructuring and scaling down its operations.

Id. at 150. At issue in Raytheon was a plan for reducing costs and the omitted disclosures related to a situation that lead to a shortfall in revenues. However, here what is at issue is a plan to reduce costs and claims of failure to disclose not only conditions which lead to a shortfall in revenue, but also additional costs that offset the savings expected to be realized pursuant to the plan. Thus, the court does not view Raytheon as directly on point.

In re Winn-Dixie Stores involved a chain of grocery stores that had undertaken a centralization and restructuring program. While the court concluded that the "[d]efendants had no duty to discuss the bumps along the road to centralization, or the fact that centralization posed new challenges in Winn-Dixie's

respective divisions," pivotal in the court's analysis was its determination that "the Consolidated Complaint's description of centralization's alleged failure . . . is a description of alleged mismanagement." In re Winn-Dixie Stores, 531 F. Supp. 2d at 1348.  The court held that:

> [e]ach and every statement alleged to be fraudulent by Plaintiff is either (1) a forward looking statement protected by the PSLRA's safe harbor or (2) clearly immaterial corporate puffery.  In addition, the alleged material omission - that Defendants failed to disclose that centralization was a failure - is akin to a failure to disclose mismanagement, which is not actionable.

Id. at 1347.

In view of the net savings realized by Xerox from the Worldwide Restructuring, the court agrees that there is no genuine issue as to the fact that the defendants' statements about the benefits of the Worldwide Restructuring were not false. However, the court concludes that Raytheon, Winn-Dixie and the other cases cited by the defendants[6] do not establish that as a

---

[6]  Stepak v. Aetna Life and Cas. Co., Civ. No. H:90CV00886(AVC), 1994 WL 858045, at *11 (D. Conn. Aug. 29, 1994) (company's statements regarding the value of its investments did not create a duty to disclose the company's techniques for valuing those investments); Gaines v. Guidant Corp., No. 1:03CV00892-SEB-WTL, 2004 WL 2538374, at *11 (S.D. Ind. Nov. 8, 2004) (statements describing a medical device's test results and its acceptance in the clinical community did not create a duty to disclose FDA compliance problems associated with the device); Debora v. WPP Group PLC, No. 91 Civ. 1775 (KTD), 1994 WL 177291, at *6-7 (S.D.N.Y. May 5, 1994) (no duty to disclose where omitted information was "not within the scope of any prior disclosure"); Bragger v. Trinity Capital Enter. Corp., No. 92 CIV. 2124 (LMM),

matter of law the defendants in this case had no duty to speak about the CBO Reorganization's problems because what must be considered in determining whether there was a duty to disclose is the particular prior statement, the particular undisclosed information and whether disclosure of the omitted fact(s) at issue would be viewed by a reasonable investor as having significantly altered the total mix of the information available.[7]  Thus, the court cannot conclude that, as a matter of law, when a corporation makes statements about a restructuring as a whole, it has no duty to disclose with respect to any of the components of that restructuring so long as the statements about the restructuring as a whole are literally true.  Cf. Basic Inc. v. Levinson, 485 U.S. 223, 236 (1988) ("Any approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive.").  Here, the

---

1994 WL 75239, at *4 (S.D.N.Y. Mar. 7, 1994) (statement announcing terms of a proposed merger and describing the business of each merger participant did not create a duty to disclose that one of the merging companies was exposed to sanctions for violating FDA regulations).

   [7] Notably, in a portion of the Raytheon opinion not discussed above and dealing with the issue of nondisclosure of RSC's defense contract problems, the court concluded that "[h]aving opened the door to discussing the schedule and progress on the contract, Raytheon was obligated to disclose the material information regarding delays and overruns that would affect RSC's ability to complete the contract in a timely fashion."  157 F. Supp. 2d at 151.

defendants' argument that they had no duty to disclose is premised on the court finding that as a matter of law there is no duty to disclose under such circumstances.  There is no analysis of whether disclosure of the allegedly omitted facts would have been viewed by a reasonable investor as having significantly altered the total mix of information available.  Therefore, the court concludes that the defendants have not met their initial burden in moving for summary judgment as to this point.

### B. Full Disclosure

The defendants argue, in the alternative, that if they did have a duty to disclose the impact of the CBO Reorganization they fully met that obligation.  The court agrees with the defendants that they are not limited to a "truth-on-the-market defense." Cf. Ganino v. Citizens Utilities Co., 228 F.3d 154, 167 (2d Cir. 2001) (Under the truth-on-the-market defense "[a] defendant may rebut the presumption that its misrepresentations have affected the market price of its stock by showing that the truth of the matter was already known.").  "[I]t is indisputable that there can be no omission where the allegedly omitted facts are disclosed." In re Progress Energy, Inc., 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005).  Furthermore, the identity of the individual or group disclosing the allegedly omitted information does not affect the disclosure analysis. See Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co., 432 F. Supp. 2d 571, 580

(E.D. Va. 2006) ("Where information about a company was made available in an analyst report, or by newspaper articles, any withholding of information by the company is immaterial and <u>cured any omissions by the company</u>." (emphasis in original)).  "Because an alleged misrepresentation or omission must be examined in light of the information available to the market, no securities law disclosure violation can occur when information allegedly omitted from a corporation's public disclosures is already available to the market."  <u>Stepak v. Aetna Life and Cas. Co.</u>, Civ. No. H:90CV00886(AVC), 1994 WL 858045 at *7 (D. Conn. Aug. 29, 1994).

The plaintiffs contend that the defendants failed to disclose information to the marketplace in three areas: first, the impact of the CBO Reorganization on Xerox's operations in the areas of order processing, billing and collections; second, the impact of the CBO Reorganization on the performance of Xerox's sales force; and third, the ongoing nature of the problems associated with the CBO Reorganization.  The court finds that there is no genuine issue as to the fact that such information was disclosed to the market.  Thus, the defendants are entitled to summary judgment.

## 1.  The Impact on Operations

The plaintiffs contend that the defendants failed to disclose that the CBO Reorganization was interfering with

operations and that this interference was offsetting dramatically
the claimed benefits from the Worldwide Restructuring.  The
record shows, however, that the defendants repeatedly disclosed
metrics, such as the increase in both accounts receivable and
DSO, that were indicative of operational difficulties.[8]  The
plaintiffs argue that the defendants attributed these problems to
the Sales Force Realignment rather than to the CBO Reorganization
in an attempt to mask problems with the CBO Reorganization.
However, the record shows that the defendants attributed
increases in accounts receivable and DSO to both the CBO
Reorganization and the Sales Force Realignment.[9]  Consistent
terminology is not always used in documents created by the
defendants and by market analysts, and where there it is

---

[8] The plaintiffs argue that while the defendants disclosed
that certain billing metrics were declining, they did not
disclose the severity of those problems or how they would
ultimately impact earnings.  However, "'[a] company has no duty
to disparage its own competitive position in the market where it
has provided accurate hard data from which analysts and investors
can draw their own conclusions about the company's condition and
the value of its stock.'" In re New York Community Bacorp, Inc.,
Sec. Litig., 448 F. Supp. 2d 466, 480 (E.D.N.Y. 2006) (quoting In
re Donna Karan Intern. Secs. Litig., No. 97-2011, 1998 WL 637547,
at *13 (E.D.N.Y. Aug. 14, 1998)).

[9] The plaintiffs argue that attributing any part of the
operational difficulties to the Sales Force Realignment is
misleading because the defendants had stated that no significant
changes to sales force territories or compensation would be made
during 1999 in connection with the Sales Force Realignment.
However, the record reflects that initial steps, including
training initiatives, were taken in 1999 to implement the Sales
Force Realignment.                .

ambiguous as to whether a document refers to, e.g. the CBO Reorganization, reasonable inferences are drawn in favor of the plaintiffs.

The internal memorandum from Fishbach to Allaire, Thoman and Romeril stating that the deterioration in DSO at September 30, 1998 was largely driven by the CBO Reorganization is dated November 6, 1998.  On November 10, 1998, Xerox's third quarter 10-Q stated that accounts receivable had increased "due to stronger equipment sales growth and some increase in days sales outstanding due to the temporary effects from the reorganization and consolidation of U.S. customer administrative centers . . ." Xerox Corp. Form 10-Q 22(Nov. 10, 1998) (Goldstein Decl., Ex. 20).

On February 25, 1999, Morgan Stanley disclosed that both the CBO Reorganization and the Sales Force Realignment were negatively affecting accounts receivable, stating that "receivables ballooned as Xerox attempted to restructure several operations in the US.  The reorganization and reorientation of business units (from geographical to customer-focused) led to the disruption in billing cycle productivity."  Rebecca Runkle, Morgan Stanley Dean Witter, Xerox (XRX): Preliminary Update on Year-End Balance Sheet and Cash Flow Items IRX-PROC-0000222, 0000223 (Feb. 25, 1999) (Goldstein Decl. Ex. 36).  Morgan Stanley made the same statement on March 15, 1999.  See Rebecca Runkle,

Morgan Stanley Dean Witter, <u>Xerox (XRX): Preliminary Update on
Year-End Balance Sheet and Cash Flow Items</u> MS00054, MS00055 (Mar.
15, 1999) (Goldstein Decl. Ex. 39).  On March 22, 1999, Xerox
issued its 10-K for 1998, in which it disclosed that "[a]ccounts
receivable growth reflects strong equipment sales in 1998 and
some increase in days sales outstanding due to temporary effects
from the reorganization and consolidation of U.S. customer
administrative centers." Xerox Corp., <u>Annual Report (Form 10-K)</u>
53 (Mar. 22, 1999) (Goldstein Decl. Ex. 40).

In a report issued by CFRA on April 19, 1999, "operational
deterioration" was linked with "the December-to-December DSO
increase due to temporary effects from the reorganization and
consolidation of U.S. customer administrative centers."  Ctr. for
Financial Research & Analysis, Inc., <u>CFRA Company Report: Xerox
Corporation</u> IRX-PROD-0060214 (Apr. 19, 1999) (Goldstein Decl. Ex.
41).  Statements attributed to Thoman in April 1999 link
disappointing sales performance in the first quarter with
"Xerox's ongoing restructuring and the realignment of its sales
force."  Michael Lyster, <u>Digital Copiers:  Xerox Ticket to
Networking Service Plans</u>, <u>Investor's Bus. Daily</u>, Apr. 27, 1999,
at A6, IRX-PROD-0050433 (quoting Rick Thoman) (Goldstein Decl.
Ex. 43); <u>see</u> <u>also</u> Steven Milunovich, Merrill Lynch, <u>Xerox
Corporation: Revenue Challenged</u> 2 (Apr. 23, 1999) (Goldstein
Decl. Ex. 75).

During the May 14, 1999 annual Investor's Conference hosted by Xerox, Romeril tied the deterioration in DSOs and receivables to the CBO Reorganization:

> But 1998 cash generation was clearly unsatisfactory. And it was principally caused by a deterioration in receivables, in days sales outstanding and our inventory performance. The growth in accounts receivable is primarily the result of the reorganization and restructuring of our U.S. administrative support activities. . . .

Barry Romeril, Xerox Corporation Investor Conference 122:23 - 123:5 (May 14, 1999) (Goldstein Decl. Ex. 45). Romeril made a similar link during his comments at the Prudential Imaging Technology Conference on June 3, 1999 where he stated: "The growth in accounts receivable is primarily the result of the reorganization and restructuring of our U.S. administrative support activities . . . ." Barry Romeril, Xerox Vice Chairman & CFO, Remarks at Prudential Imaging Technology Conference IRX-PROD-0027213 (June 3, 1999) (Goldstein Decl. Ex. 49).

Analyst reports disclosing a link between the CBO Reorganization and operational difficulties continued to be issued during the period from May to July of 1999. See Steven Weber, SG Cowen, Xerox Corporation: The Tenets of This Growth Story Very Much Intact IRX-PROD-0012720 (May 6, 1999) (Goldstein Decl. Ex. 44) (referring to "organizational dislocations" in the U.S. and Europe); Rebecca Runkle, Morgan Stanley Dean Witter, Xerox (XRX): Annualy Investor's Meeting Review MS00107 (May 26,

1999) (Goldstein Decl. Ex. 47) ("[T]he US and Europe each fell short by about $75-80 million due to low sales productivity and the consolidation of Xerox's administration efforts."); Benjamin Reitzes, PaineWebber, <u>Xerox Corporation: Meeting with CFO Eases Many of Our Concerns</u> 2 (June 9, 1999) (Goldstein Decl. Ex. 53) ("It appears that Xerox's restructuring program in the U.S. had quite an adverse effect on the company's receivables . . . [t]he company reduced the number of its U.S. administrative centers to three from four. . . ."); B. Alex Henderson, Prudential Securities, <u>Xerox Delivers Upbeat Presentation At Prudential Securities' 2nd Annual Imaging Technology Conference</u> AS- PROD-00309 (June 28, 1999) (Goldstein Decl. Ex. 54) (reporting remarks by Romeril that "on the receivables side, we cut back too fast and too many in the administrative side as we restructured in the United States"); and B. Alex Henderson, Prudential Securities, <u>XRX: We Expect XRX to Report at Least the First Call Consensus and Believe a Strong 2Q Could Lift Shares Higher</u> IRX-PROD-0011190 (July 1, 1999) (Goldstein Decl. Ex. 55) (reporting Xerox's belief that "stabilization of back-office operations" would contribute to "a fairly sharp rebound in the top line").

Then, on July 22, 1999, Romeril stated during an earnings release teleconference that "With receivables, we have had to work through the bow wave of U.S. customer administration dislocation, and we are now looking forward to substantial

improvements in the coming months in the United States."  Barry
Romeril, Xerox Corporation Second Quarter Earnings Release
Teleconference 15:5-11 (July 22, 1999) (Levine Decl. Ex. 72).

   Also, on August 13, 1999, Salomon Smith Barney released an
analyst report that stated that Xerox was "adding over 100 people
back to its customer admin centers, in part to help bolster
collections efforts, which were damaged by headcount reductions
during the restructuring.  This will be an important issue to
monitor for improvement in Q3 and Q4."  Rosenzweig & Kalinowski,
Salomon Smith Barney, XRX: Comments on the 10Q IRX-PROD-0010522
(Aug. 13, 1999) (Goldstein Decl. Ex. 56).  On August 16, 1999
Salomon Smith Barney also reported:

>    Accounts receivable rose dramatically in the second
>    quarter, largely due to the U.S. operations. DSOs, which
>    were up by 20% year-over-year in Q2, should start coming
>    down sequentially in the third quarter, as new hires in
>    collections begin to take hold.  By the end of 1999, DSOs
>    actually could be even or down versus last year, and by
>    2000, the average could approximate 1997 levels.

Rosenzweig & Kalinowski, Salomon Smith Barney, XRX: Upbeat
Conversation with Management IRX-PROD-0000175 (Aug. 16, 1999)
(Goldstein Decl. Ex. 57).

   Thus, the court concludes that information as to the
negative impact of the CBO Reorganization on Xerox's operations
in the areas of order processing, billing and collections was
disclosed to the market both by the defendants and by market
analysts prior to September 16, 1999.

## 2. The Impact on the Sales Force

The plaintiffs contend that the defendants failed to disclose that implementation of the CBO Reorganization had a negative impact on the performance of Xerox's sales force. The record shows, however, that information was disclosed to the market prior to September 16, 1999 about the negative impact that the CBO Reorganization had on the sales force.

The plaintiffs contend that the defendants attributed problems to the Sales Force Realignment rather than to the CBO Reorganization in an attempt to mask problems with the CBO Reorganization.  Then, on or around April 27, 1999, when Thoman was talking to Investor's Business Daily about Xerox's strategy for a focus on industry selling, Thoman attributed Xerox's drop in revenue for the preceding quarter to both "Xerox's ongoing restructuring and the realignment of its sales force."  Michael Lyster, Digital Copiers:  Xerox Ticket to Networking Service Plans, Investor's Bus. Daily, Apr. 27, 1999, at A6, IRX-PROD-0050433 (quoting Rick Thoman) (Goldstein Decl. Ex. 43).

Also, Buehler's May 3, 1999 memorandum sent to Thomas Dolan (with copies to Romeril and Thoman) reviewing issues related to the CBO Reorganization mentioned "Sales Coverage/Productivity," Memorandum from William F. Buehler to T. Dolan on 3+9 Direction IRX-PROD 0252096 (May 3, 1999)(Levine Decl. Ex. 52), and an internal Xerox document prepared in May 1999 made a reference to

the CBRs in Chicago being a problem.  Then, at Xerox's annual
Investor Conference on May 14, 1999, Romeril spoke about problems
with the CBO Reorganization.  Romeril disclosed that Xerox had
reduced the headcount at too fast a rate and that it was "too
much change, too fast."  Barry Romeril, Xerox Corporation
Investor Conference 122:23-123:15 (May 14, 1999) (Goldstein Decl.
Ex. 45). At the same conference he stated: "[T]here was no
question that we had, as we rolled out our G&A program,
individual areas where we caused some lack of focus on our sales
force because of our G&A activities.  For example, we talked
about our Chicago center." Id. at 136:24-137:4.  This is a
concern highlighted by Kenneth Baugher in his September 1999
analysis of the problems that had arisen with the CBO
Reorganization.

Many of the statements about the diversion of the sales
force for training and low sales productivity are or appear to be
linked to the Sales Force Realignment.  But the record shows that
although the Sales Force Realignment announced on January 6, 1999
was described by Thoman at that time as something that would
evolve over the next couple of years, Xerox began the planning
and implementation of some aspects of the Sales Force Realignment
during the first quarter of 1999.  During that quarter, the sales
force spent more time than usual out of the field attending
training sessions associated with the new focus on industry

86

selling.  On April 16, 1999, Thomas Dolan sent an internal memorandum to Romeril concerning Xerox's "poor sale activity level" in the first quarter and observed that:

> In support of our industry focus and solutions delivery, we made significant investment in training key sales force and management early in order to realize a full year return and improve critical skills.  Growth in training year-over-year ranged [from] 40% to 60% resulting in time out of the field.

Memorandum from Thomas J. Dolan to Barry D. Romeril on Second Quarter/Second Half IRX-PROD 0124539 (April 16, 1999)(Goldstein Decl. Ex. 18).

Thus, the court concludes that information as to the negative impact of the CBO Reorganization on the performance of Xerox's sales force was disclosed to the market prior to September 16, 1999.

### 3.  Ongoing Nature of the Problems

The plaintiffs contend that the defendants disguised the ongoing nature of the problems associated with the CBO Reorganization.  The plaintiffs have failed to create a genuine issue of material fact as to this contention.

First, as reflected in the discussion of the two prior contentions, there was a series of disclosures about problems associated with the CBO Reorganization from at the latest November 10, 1998 to at least August 16, 1999.  These continuing disclosures conveyed that the problems were ongoing in nature.

87

Second, while the defendants' initial statements about the problems associated with the CBO Reorganization characterized the problems as temporary, the market was informed well before September 16, 1999 that it would take through the end of 1999 to remedy the problems.  On March 15, 1999, a Morgan Stanley report stated that:

> receivables ballooned as Xerox attempted to restructure several operations in the U.S.  The reorganization and reorientation of business units (from geographical and customer-focused) led to the disruption in billing cycle productivity.  Once again, management remains committed to reducing receivable levels back to those found in 1997 by year-end 1999.

Rebecca Runkle, Morgan Stanley Dean Witter, Xerox (XRX): Preliminary Update on Year-End Balance Sheet and Cash Flow Items MS00054, MS00055 (Mar. 15, 1999) (Goldstein Decl. Ex. 39).  On April 23, 1999, Lehman Brothers reported that "it may be another quarter or two before there is meaningful improvement in DSOs and inventories."  Lehman Bros., Xerox: Renewed Focus on Top Line; We Regard 1Q Slip As Temporary IRX-PROD-0000454 (Apr. 23, 1999) (Goldstein Decl. Ex. 42).  Also, in June 1999, a Prudential Securities Analyst Report was issued based on statements made by Romeril earlier that month.  The report recited that Romeril acknowledged Xerox's disappointing performance with respect to inventory and accounts receivable in 1998, stated that there had been no progress in the first quarter of 1999 and that little if any progress should be expected in the second quarter, and

expressed an expectation that cash flow should improve by the end of the year.  <u>See</u> B. Alex Henderson, Prudential Securities, <u>Xerox Delivers Upbeat Presentation At Prudential Securities' 2nd Annual Imaging Technology Conference</u> AS- PROD-00309 (June 28, 1999) (Goldstein Decl. Ex. 54).  Moreover, as discussed above, the August 13, 1999, Salomon Smith Barney report reflected that by the end of 1999 DSOs could be even with or down versus the prior year.

### C. Loss Causation

Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." <u>Emergent Capital</u>, 343 F.3d at 197.  "The burden of establishing loss causation rests on the plaintiff." <u>In re Omnicom Grp., Inc. Sec. Litig.</u>, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008) (citing 15 U.S.C. § 78u-4(b)(4)).

> [L]oss causation has to do with the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant.  If that relationship is sufficiently direct, loss causation is established . . . ; but if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie.

<u>Lentell v. Merrill Lynch & Co., Inc.</u>, 396 F.3d 161, 174 (2d Cir. 2005) (internal citations omitted) (quoting <u>Emergent Capital</u>, 343 F.3d at 199) (internal quotation marks omitted).  "Loss causation can be established either where (1) the market reacted

negatively to a corrective disclosure or (2) the materialization

of the risks that were concealed by the alleged

misrepresentations or omissions proximately caused plaintiffs'

loss." In re Omnicom Grp., 541 F. Supp. 2d at 551.

> Where the alleged misstatement conceals a condition or
> event which then occurs and causes the plaintiff's loss,
> it is the materialization of the undisclosed condition or
> event that causes the loss.  By contrast, where the
> alleged misstatement is an intentionally false opinion,
> the market will not respond to the truth until the
> falsity is revealed - i.e. a corrective disclosure.

In re Initial Public Offering Sec. Litig., 399 F. Supp. 2d 298,

307 (S.D.N.Y. 2005).  "[T]o establish loss causation, 'a

plaintiff must allege . . . that the subject of the fraudulent

statement or omission was the cause of the actual loss suffered',

i.e., that the misstatement or omission concealed something from

the market that, when disclosed, negatively affected the value of

the security.  Otherwise, the loss in question was not

foreseeable." Lentell, 396 F.3d at 173.

To be "corrective" a disclosure must "reveal the falsity of

the alleged misstatements." In re Omnicom Grp., 541 F. Supp. 2d

at 552.  However, there is no requirement that the corrective

disclosure "'take a particular form or be of a particular quality

. . . . It is the exposure of the falsity of the fraudulent

representation that is the critical component of loss causation."

Id. at 551 (quoting In re Windstar Comm'ns, No. 01 Civ. 3014

(GBD), 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006))

(alteration in original).  "While a disclosure need not reflect
every detail of an alleged fraud, it must reveal some aspect of
it."  Id.  "Moreover, the disclosed fact must be new to the
market," and therefore "[a] recharacterization of previously
disclosed facts cannot qualify as a corrective disclosure."  Id.
at 551-52.

   The plaintiffs contend there are two corrective disclosure
dates, September 16, 1999 and October 8, 1999.  The court
concludes that the plaintiffs have not created a genuine issue of
material fact as to loss causation with respect to either date,
and thus the defendants are entitled to summary judgment.

   **1. September 16, 1999**

   On September 16, 1999, a report by a Prudential Securities
analyst stated that Xerox would be conducting "another round of
salesforce account realignment similar to the program which
disrupted the first half 1999 revenue performance."  A.
Henderson, Prudential Securities, XRX: Another Salesforce
Realignment Slated for 1Q00 At Xerox IRX-PROD-0000292-93 (Sept.
16, 1999) (Goldstein Decl. Ex. 30).  On the same day, Dow Jones
News reported that "the second phase of a sales-force realignment
will pressure earnings in the first half of 2000."  Dow Jones
Business News, Xerox Shares Tumble on Word of Plan to Further
Realign Sales Force 1 (Sept. 16, 1999) (Levine Decl. Ex. 81).

During a teleconference with analysts on September 22, 1999, Romeril explained that Xerox was not planning a second realignment of the sales force:

> Now regarding the direct sales force, there seems to have been some misconception that we announced a new restructuring of the sales organization, last week. . . . In fact, we simply took another step implementing the direction we announced last January.  In January, we said we were migrating our direct sales force to an industry and solutions focus over several years . . . .

Barry Romeril, Xerox Corporation Tektronix Announcement 5:16-6:2 (Sept. 22, 1999) (Goldstein Decl. Ex. 58).  Romeril also explained that the time lost by the sales force in connection with training and communications related to the Sales Force Realignment had been in addition to problems related to the CBO Reorganization:

> It is also very clear that we significantly underestimated the revenue impact in the first quarter of this year of all the customer administration changes we made in the USA last year.  The amount of customer face time our sales representatives had was substantially curtailed as they dealt with administrative rather than sales issues.

(Id. at 7:18-7:25).

Although the reports on September 16, 1999 made no connection between the disruption of sales efforts and the CBO Reorganization, the plaintiffs argue that "[o]n September 16, 1999, the market learned for the first time that sales disruptions were an ongoing issue that would persist into the future, a fact which Xerox knew as early as 1998 and failed to disclose, and which Xerox deliberately concealed from the market

92

in the first quarter of 1999." (Pl's Mem. in Opp. at 25.) The
plaintiffs point out that under their theory it is immaterial
that the market did not learn until September 22, 1999 that the
real reason for the ongoing sales disruptions, which would
persist into the future, was the CBO Reorganization. The
plaintiffs' position is that, while the market did not recognize
the connection to the CBO Reorganization, the market did
recognize the only critical fact, namely that contrary to the
defendants' representations the sales disruptions were ongoing
and would persist into the future. See In re Parmalat Sec.
Litig., 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005) ("That the true
extent of the fraud was not revealed to the public until February
- after Parmalat shares were worthless and after the close of the
Class Period - is immaterial where, as here, the risk allegedly
concealed by defendants materialized during that time and
arguably caused the decline in shareholder and bondholder
value.")

Thus the plaintiffs' ability to prove loss causation with
respect to a September 16, 1999 corrective disclosure date hinges
on their ability to prove that the defendants "led the market to
believe that it was the sales realignment - not the CBO
Reorganization - that had caused Xerox to miss its revenue growth
targets for the first quarter of 1999." (Pl's. Mem. in Opp. at
25.) However, as discussed above, the disclosures by the

defendants and market analysts explicitly attributed Xerox's first quarter 1999 sales disruptions to both the Sales Force Realignment and the CBO Reorganization.  Moreover, there were repeated disclosures throughout 1999 as to the ongoing effects of the CBO Reorganization, which included disclosures with respect to the negative impact of the CBO Reorganization on the performance of Xerox's sales force.

Therefore, the court concludes that the plaintiffs have not created a genuine issue of material fact as to whether September 16, 1999 can be a corrective disclosure date.

### 2. October 8, 1999

On October 8, 1999, Xerox announced that it expected to report "essentially flat revenue for the third quarter and about a 10-12 percent decline in diluted earnings per share from 53 cents in the 1998 third quarter."  Press Release, Xerox Corp., Xerox Announces Preliminary Third Quarter Results, Business Wire IRX-PROD-0095847 (Oct. 8, 1999) (Goldstein Decl. Ex. 31).  Xerox attributed its poor performance to "a combination of weaker revenues together with unfavorable product mix and increased competitive pressures, which significantly impacted operating margins.  Sales productivity was affected by the continued realignment to an industry-oriented approach and in the U.S. by the ongoing impact of the customer administration restructuring. . ." (Id.)

94

The plaintiffs argue that the facts defendants have admitted establish loss causation with respect to the October 8, 1999 press release.  The plaintiffs point to the fact that the defendants "concede that the press release identifies the 'ongoing impact of customer administration [CBO] restructuring' as one of the factors responsible for the disappointing earnings. And they do not dispute that the announcement of this decline in earnings caused the price of Xerox's stock to drop 24.9%, or $10.65 per share, on October 8."  (Pl's. Mem. in Opp. at 37.) This argument is in substance that loss causation is established simply because the announcement of the declining earnings caused the price of Xerox's stock to drop.  It is undisputed that during the September 22, 1999 teleconference Romeril stated that Xerox had significantly underestimated the revenue impact in the first quarter of 1999 of the negative impact of the CBO Reorganization on the sales force.  The plaintiffs fail to identify what new fraud-related information was included in the press release. "While a disclosure need not reflect every detail of an alleged fraud, it must reveal some aspect of it."  In re Omnicom Grp., Inc. Sec. Litig., 541 F. Supp. 2d at 551.  Thus, this argument is unavailing.

The plaintiffs also contend that the October 8 press release was corrective because it revealed the materialization of a risk that was previously undisclosed.  They maintain that the

95

defendants "concealed from investors the magnitude of the problem and its likely ultimate effects," (Pl's. Mem. in Opp. at 39), and "that Xerox's October 8 press release concerning the expected earnings miss reveal[ed] the seriousness and magnitude of the problems caused by the CBO Reorganization, resulting in a 24.9% drop in the price of Xerox's stock." Id.  In addition, the plaintiffs maintain, the defendants "intentionally misled investors by reiterating expectations of mid- to high-teens earnings per share growth, despite internal documents showing this was not possible." Id. at 40.

In support of this argument, the plaintiffs rely on Steiner v. Medquist, Inc., Civil No. 04-5487(JBS), 2006 WL 2827740 (D.N.J. Sept. 29, 2006).  However in Steiner, the relevant disclosure revealed that the defendants' fraud had caused the company to be delisted from NASDAQ.  Here, the plaintiffs have pointed to no new fraud-related information that was in the October 8 press release. "[I]t is not enough to argue that [a statement] concealed the risk that [the defendants] would be unable to meet future revenue projections, because the mere failure to meet earnings forecasts is insufficient to establish loss causation." In re AOL Time Warner, Inc. Sec. Litig., 503 F. Supp. 2d 666, 678-79 (S.D.N.Y. 2007); see also In re IPO Sec. Litig., 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) ("[A] failure to meet earnings forecasts has a negative effect on stock prices,

but not a <u>corrective</u> effect.")   Thus, this argument is also unavailing.

Finally, the plaintiffs assert that the defendants cannot meet their burden at the summary judgment stage of demonstrating there is no genuine issue of material fact as to a truth on the market defense.   However, the plaintiffs rely on <u>Freedland v. Iridium World Commc'ns, Ltd.</u>, 545 F. Supp. 2d 59 (D.D.C. 2008), where the court treated loss causation as an affirmative defense, which it is not.   <u>See In re Omnicom Corp.</u>, 541 F. Supp. 2d at 551 (citing 15 U.S.C. § 78u-4(b)(4)).   Thus, this argument is also unavailing.

Therefore, the court concludes that the plaintiffs have not created a genuine issue of material fact as to whether October 8, 1999 can be a corrective disclosure date.

### D.   **Control Person Liability**

"Section 20(a) of the Exchange Act provides for control person liability 'to the same extent as' the controlled entity that committed the violation."   <u>In re Omnicom Grp., Inc. Sec. Litig.</u>, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008).   Because the plaintiffs have failed to establish an underlying violation of federal securities law by Xerox, the motion for summary judgment is being granted as to the § 20(a) claims.

97

**IV. CONCLUSION**

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Doc. No. 436) is hereby GRANTED.

The Clerk shall enter judgment accordingly and close this case.

It is so ordered.

Dated this 29th day of March, 2012, at Hartford, Connecticut.

/s/AWT
Alvin W. Thompson
United States District Judge
